UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DR. MARKCUS KITCHENS, JR. | ) | |
| PLAINTIFF | ) | |
| | ) | CIVIL ACTION NO.: |
| v. | ) | 2:22-CV-03301-JMY |
| | ) | |
| UNITED STATES MEDICAL LICENSING EXAMINATION, | ) | |
| ET. AL | ) | |
| DEFENDANTS | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff, Dr. Markcus Kitchens, (hereinafter "Dr. Kitchens"), incorporates by reference Plaintiff's Motion for Preliminary Injunction as if set forth fully herein at length. Dr. Kitchens has brought an action against the National Board of Medical Examiners ("NBME") for violation of the Americans with Disabilities Act (ADA), 42 42 U.S.C. §12101, et. seq. Dr. Kitchens, an individual with disabilities, has requested appropriate testing accommodations when taking the United States Medical Licensing Exam ("USMLE") STEP 1 and STEP 2, which is prepared and administered by the NBME.

## INTRODUCTION

Dr. Kitchens is a foreign medical graduate who has successfully completed his medical education, is being deprived by Defendant National Board of Medical Examiners ("NBME") and becoming a physician. Dr. Kitchens needs extended testing time on exams administered by NBME because he has Attention-Deficit Hyperactivity Disorder and severe test anxiety.[1] Dr. Kitchens must pass the first two NBME exams – "Step 1" and "Step 2" – in order to participate in the Match residency programs and become a licensed practicing physician. NBME is required under the Americans with Disabilities Act ("ADA") to provide him with the extended time that he requires, but NBME has repeated refused to do so. Now, facing

---

[1] *See* First Amended Complaint. (Exhibit A).

permanent prohibition from practice and a deadline of May 31, 2023 in order to submit Step 1 *and* Step 2 to the Electronic Residency Application Service ("ERAS") or be disqualified in participating in the National Residency Matching Program ("NRMP") for a second year. An injunction requiring the NBME provide the necessary accommodations to Dr. Kitchens and expunging his examination transcript is the only appropriate and equitable remedy for this injustice.

## BACKGROUND

Dr. Kitchens has dreamed of becoming a physician since he was a child and is more than competent. At the start of Dr. Kitchens' education, receptive-expressive language and attention deficits were evident. At the age of seven, (1999) he was evaluated by his pediatrician and a learning disorder (attention deficit/hyperactivity disorder) were reported.[2] During Dr. Kitchens' second grade school year, attention and processing speed limitations became exacerbated. *Id*. School-based intervention for reading and writing were implemented at school in second grade coupled with additional remedial support in Dr. Kitchens' home.

Beginning in primary school and continuing through middle school, Dr. Kitchens was placed in individualized, after school programs such as Kumon, Hooked on Phonics, and personal tutors. Even with the additional educational support, he continued to experience difficulties with attention, focus, and reading comprehension. As Dr. Kitchens approached his teenage years, he began to implement systems to self-accommodate for his disabilities such as planners, checklists, and becoming more involved in after school activities. By the time Dr. Kitchens entered high school, he had a system implemented for every aspect of his life. He utilized various compensatory strategies in attempt to maximize his time on tests and quizzes, studied extensively, and often was the last person to finish school-based tests within the time limits provided.

In 2010, Dr. Kitchens commenced his undergraduate matriculation at Berea College ("Berea"). While a student at Berea, a professor began noticing Dr. Kitchens' need for accommodations – specifically

---

[2] *See* Declaration of Missie King. (Exhibit B).

additional time and a distraction free environment. After he began receiving these informal accommodations, Dr. Kitchens went to health services for an official evaluation. As a result of that evaluation, Dr. Miriam David provided medication to manage his symptoms instead of accommodations.

As a medical student, Dr. Kitchens was chosen to be Class President by his peers and Vice President of Surgery Club. As all medical graduates in programs both in the United States and abroad, Dr. Kitchens must pass a series of tests administered by the NBME which are collectively known as the "United States Medical Licensing Examination" or "USMLE". ADHD and testing anxiety severely affect his performance on reading-intensive timed examinations like the USMLE examinations.

In order to continue his practical education and training, Dr. Kitchens must take and pass Step 1 and Step 2 of the USMLE. In order to become a licensed practitioner, Dr. Kitchens will need accommodations for all of the USMLE Step examinations, as well as a full expungement of his examination transcript to remove his prior failed attempts.

Despite approximately accommodations from professors providing extended time on examinations administered, a decade of diagnoses by medical professionals across multiple states, and receiving accommodations on the Comprehensive Basic Science Examination ("CBSE")[3], the NBME has repeatedly rejected Dr. Kitchens' request for extended testing time on Step 1.

On October 27, 2020, Dr. Kitchens applied for and was granted extended time for the NBME's CBSE. After taking the CBSE, Dr. Kitchens registered for STEP 1. However, due to the COVID-19 shutdown in early 2021, he could not sit for the STEP 1 within the allowed time frame. It was at this point, Dr. Kitchens applied for official testing accommodations for STEP 1.

After NBME's first refusal, Dr. Kitchens sat for STEP 1 without extended time. However, he was unable to read a detrimental portion (approximately 35-40 percent) of the exam questions within the allotted time and failed Step 1. Due to the glaring disparities between his STEP 1 exam score and his Comprehensive Basic Science Self-Assessment, Dr. Kitchens requested a 'Score-Recheck' through the NBME. Pursuant to

---

[3] *See* Email Confirmation from Prometric Test Center on 10/27/2020. (Exhibit C).

the NBME's investigation, the NBME responded and indicated that the STEP 1 score was accurate. Three months after sitting for STEP 1, Dr. Kitchens again attempted to take STEP 1 without accommodations. He failed again. After taking STEP 1 twice, Dr. Kitchens attempted to take STEP 2 – due to the NBME's refusal of accommodations for STEP 1, he did not apply for accommodations – and failed. Soon thereafter, Dr. Kitchens attempted STEP 2, again without accommodations, and failed once more.

Dr. Kitchens then submitted additional information and requested testing accommodations from NBME a second time. NBME refused again. He then attempted STEP 1 for the third time without accommodations and failed yet again. Even if Dr. Kitchens were to attempt Step 1, without extended time, and were now to pass that exam, he would be faced with the exact same barrier upon taking the subsequent STEP examinations which are more reading-intensive than STEP 1.

Due to the NBME's flagrant abuse of power, Dr. Kitchens' must now attempt to complete his ERAS profile before May 31, 2023, and due to the NBME's fluctuating grading period depending on whether or not an exam was taken during the transitional periods, the NBME must cease withholding of necessary accommodations no later than March 6, 2023 or his medical career is over before it even begins. Dr. Kitchens cannot advance without a passing score on STEP 1 or STEP 2. Even if he passes on this final attempt, his ability to be matched into a residency program, which was nominal at best, is decimated due to his extended time between graduation and application to residence. Furthermore, he cannot adequately participate in the NRMP without scores that adequately reflect his true level of knowledge and comprehension.

Dr. Kitchens faces being permanently prohibited from practicing medicine. An injunction is the only possible remedy. Without an injunction, the damage caused by NBME's refusal – damage that is also against the public interest – will become incalculable, incurable, and inequitable.

## SUMMARY OF FACTS

Dr. Kitchens is a foreign medical graduate of the Medical University of Lublin located in Lublin, Poland ("MUL"). He began the four-year program leading to his medical doctorate degree in 2016, graduated in January, 2021, and would have began the Match program in fall, 2021 alongside his peers,

except for the refusal of NBME to provide him with the necessary testing accommodations for the examinations.

Students at Students at "allopathic" medical schools, *i.e.,* schools that confer the M.D. degree, are required to pass three examinations which are collectively referred to as the United States Medical Licensing Examination or "USMLE." These examinations are referred to as "Steps": Step 1, Step 2 CK (Clinical Knowledge), and Step 3, must be passed after graduation and before licensing. *See generally* "Eligibility for the USMLE Steps." Dr. Kitchens has not yet been able to pass the Step 1 examination, but if he does pass, he will also need accommodations for the subsequent Step examinations. Subsequent Step examinations are more reading-intensive than Step 1.

Dr. Kitchens has Attention-Deficit/Hyperactivity Disorder and test anxiety. Both of these conditions affect his ability to take reading-intensive standardized and time-limited written examinations like those administered by NBME. MUL has recognized Dr. Kitchens' need for testing accommodations, including extended testing time, as demonstrated by his CBSE application, but NBME has refused to provide the necessary accommodations. As a result, Dr. Kitchens has been forced to miss the Match program and delay his ability to get licensed. This delay has continued for two years and has potentially caused the permanent stagnation of his career while he repeatedly sought and was denied necessary accommodations by the NBME. Now, Dr. Kitchens is out of time. Should Dr. Kitchens fail to meet the 2023 ERAS deadlines, his opportunity to become a resident will have significantly diminished, and coupled with his examination transcript, will have decayed to nonexistent. As such, Dr. Kitchens must be permitted to take his exam with accommodations and have his transcript expunged at least six weeks in advance of that date, or March 6, 2023.

Dr. Kitchens has exhausted every possibility for convincing the NBME to grant testing accommodations that he needs and that NBME has provided to other applicants. He first applied for accommodations over a year and a half ago, in October, 2021. NBME refused in February, 2022. Dr. Kitchens attempted to take the first STEP exam without accommodations in February, 2022 and received a failing score. Dr. Kitchens then tried to take STEP 1 a second time without accommodations in May, 2022

and failed again. Aware of the upcoming ERAS deadlines, Dr. Kitchens tried to take Step 2 in May and June, 2022 due to his awareness of the NBME increasing the base score and his decreased likelihood of passing without accommodations. He failed both attempts. He then tried to apply for accommodations a second time in August, 2022; NBME rejected his application in August, 2022. An injunction and transcript expungement is now the only path for Dr. Kitchens to obtain the testing accommodations he needs.

## ARGUMENT

### I.   THE NBME IS SUBJECT TO THE AMERICANS WITH DISABILITIES ACT

Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12181-12189 prohibits discrimination on the basis of disability. *See e.g., Bragdon v. Abbott,* 524 U.S. 624, 631-32 (1998). An individual has a disability if he is substantially limited in a major life activity. 42 U.S.C. §12102. The Department of Justice has explained that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 28 C.F.R. §36.105(a)(2)(i).

Courts regularly construe anxiety and ADHD as disabilities that substantially limit the major life activities of reading, writing, learning, and concentrating. *See, e.g.*, *Berger v. Natl Bd. of Med. Examiners,* 2019 U.S. Dist. LEXIS 145666, (S.D. OH. 2019). Title III of the ADA requires that testing providers, like NBME, "offer such examinations. . . in a place and *manner* accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. §12189 (emphasis added). The U.S. Department of Justice regulations interpret this provision of the ADA to require that:

> The examination is selected and administered so as to *best ensure* that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure). (Emphasis added). 28 C.F.R. §36.309(b)(1)(i).

When considering what accommodations are necessary for the test to "best ensure" that the test measures the applicant's ability rather than his disability, the testing entity must give "considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar

testing situations….” 28 C.F.R. §36.309(b)(1)(v). Here, Dr. Kitchens is asking for the same accommodation – extended testing time – he has received from NBME on the CBSE and that his own medical school has recognized is necessary.

The regulations further state that the testing entity “must assure that * * * * [a]ny request for documentation, if such documentation is required, is reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested.” *Id.* §36.309(b)(1)(iv). Here, Dr. Kitchens has documented the accommodations that he already received from the NBME, and has also provided ample documentation of his test anxiety and ADHD. The regulations state explicitly that “[r]equired modifications to an examination may include changes *in the length of time permitted for completion of the examination* and adaptation of the manner in which the examination is given.” *Id.* §36.309(b)(2) (emphasis added).

Courts analyzing the regulation have made clear that testing entities must provide the testing accommodations “so as to best ensure” that the results reflect whatever skill or aptitude the exam purports to measure. *Enyart v. Nat’l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1162 (9th Cir. 2011) (quoting 28 C.F.R. §36.309). This “best ensures” standard is distinct from the “reasonable accommodation” standard used in the employment discrimination context. *Id.*

Courts give considerable weight to expert evaluations of the person with a disability and his or her prior history of accommodations. For instance, in *D’Amico v. New York State Board of Law Examiners*, 813 F. Supp. 217 (W.D.N.Y. 1993), the Court granted a preliminary injunction, taking the view that the opinion of the plaintiff’s physician must be given great weight and that the absence of a medical expert reviewing on behalf of the testing agency left it in “no position to countermand . . . as to what is the appropriate accommodation.” *Id.* at 222-23. *See also Agranoff v. Law Sch. Admission Council, Inc.*, 97 F. Supp.2d 86, 87 (D. Mass. 1999).

## II.    DR. KITCHENS MEETS THE STANDARDS FOR A PRELIMINARY INJUNCTION

The standards for granting a motion for preliminary judgment have been summarized by this Court in several prior cases including *Hall v. Wetzel*, 2018 U.S. Dist. Lexis 28991 (E.D.Pa. 2018), quoting *ACLU v. Black Horse Pike Regional Board of Education*, 84 F.3d 1471, 1477, n.2 (3d Cir. 1996), *Gerardi v.*

*Pelullo*, 16 F.3d 1363, 1373 (3d Cir. 1994) and *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1254 (3d Cir. 1985):

> Four factors govern a district court's decision whether to issue a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest. *Hall v. Wetzel, id.,* at 14.

In the case at hand,

1) The reasonable probability of success on the merits in this case is amply demonstrated by several factors are contained in the Declaration from Missie King, and extensive medical records from Berea College Disability Services and various providers in 2013, 2017, and 2020. Tina Holbrook, APRN has also submitted a CPT-3 evaluation in support of the Motion for Preliminary Injunction. At the date of this filing, Dr. Kitchens is scheduled to be given a DSM-5 evaluation by Mrs. Christina Bacon, a Licensed Psychological Practitioner (LPP), and will supplement this memorandum upon receipt. The United States Department of Justice has declared that "reports from qualified professionals", like Mrs. Holbrook, "who have evaluated the candidate should take precedence over reports testing entity reviewers who have never conducted the requisite assessment of the candidate".[4] No one from NBME has evaluated Dr. Kitchens face-to-face as Mrs. Holbrook did.

2) The irreparable injury in this case is demonstrated by the fact that Dr. Kitchens has already failed STEP 1 and STEP 2 on multiple attempts due to NBME's refusal. His professional career and licensure has been delayed and now his entire future hangs in the balance of this motion. He cannot move forward without the accommodations that he needs for the USMLE examinations and the expungement of his transcript, and he will miss the opportunity to register for ERAS if he does not take STEP 1 and STEP 2 before March 6, 2023.

3) NBME will not be harmed. Extended testing time is an accommodation that NBME has granted in other cases. It is not logistically difficult to provide generally, and especially in this specific case. Increasing

---

[4] U.S. Dep't of Just., Civ. Rts. Div. Disability Rts. Section, *ADA Requirements: Testing Accommodations.* (*See* Exhibit D, p. 7).

the amount of time allotted for answering questions by one hundred percent (100% i.e. double time) allows for the exam to be taken over two days and does not require additional days of testing. All that is required is for NBME to direct the test center to increase the amount of time allotted for answering questions.

4)   There is a clear public interest both in enforcement of the ADA and in enabling qualified people like Dr. Kitchens to pursue his medical career.

No extended pretrial discovery is necessary in this case. Dr. Kitchens has requested accommodations through NBME's internal processes on multiple occasions. Dr. Kitchens will rely, in this litigation, on the same information submitted to NBME and supporting evidence attached hereto. A prompt hearing is required because Dr. Kitchens is in danger of forfeiting his entire career unless the NBME approves the necessary accommodations with enough time to take STEP 1 and STEP 2 by March 6, 2023 so that he is able to take the STEP examinations with accommodations.

### a. DR. KITCHENS HAS DEMONSTRATED A REASONABLE PROBABILITY OF SUCCESS ON THE MERITS

Based on the totality of evidence provided by Dr. Kitchens' repeated applications demonstrate his reasonable probability of success on the merits, along with Ms. Mrs. Holbrook's report.

Mrs. Holbrook's Conners Continuous Performance Test 3rd Edition (CPT-3) report is eight (8) pages and is summarized in her affidavit attached herein as Exhibit E. Mrs. Holbrook is an experienced and licensed nurse practitioner who specializes in behavioral health. While not included in the CPT-3 report, Mrs. Holbrook has interviewed Dr. Kitchens to obtain information about his life-long struggles with reading and attention. Mrs. Holbrook tested him using accepted standard testing instruments and applied generally accepted diagnostic standards to diagnose Dr. Kitchens' reading and attention disabilities. NBME did none of that, and simply ignored Dr. Kitchens extensive treatment history.

While NBME will often deny test accommodations to students by claiming their scores are "average" and therefore do not satisfy the requirements of the ADA, here the NBME merely states "[Dr. Kitchens] have not shown that your requested accommodations are necessary for you to access the

USMLE."[5] The NBME goes on to state that Dr. Kitchens' "treatment professionals did not provide sufficient information regarding the basis for the diagnosis of attention-deficit/hyperactivity disorder (ADHD)." *Id.*

Simply stated, the licensed physicians who treated, interacted with, and examined Dr. Kitchens did not state in enough detail why he would need accommodations – despite Dr. Kitchens having a shorter attention span than almost everyone else. Mrs. Holbrook administered testing to Dr. Kitchens, and also met with him face-to-face, obtained a history, and applied her experience and training to conclude that Dr. Kitchens' attention deficit disorder is severe.

In *Ramsay v. Nat'l Bd. of Med. Exam'rs*, the Court found that the NBME blatantly violated the ADA by focusing its analysis of her accommodation application on prior academic successes and performances without accommodations and whether the applicant met the definition of disability. *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F. 3d 251, 46 (3rd Cir. 2020).. So too, in Dr. Kitchens' first application for accommodations, the NBME penalized Dr. Kitchens for allegedly not meeting the definition of a disability rather than whether he had met with his obligation(s) under the ADA and his academic successes without prior accommodations. The Court's opinion in *Ramsay* can almost be copied verbatim – changing only the Plaintiff's name – and be applicable to Dr. Kitchens.

> "It further appears that NBME either discounted or disregarded entirely the admonition to focus on "how a major life activity is substantially limited, and not on what outcomes an individual can achieve" and apparently ignored the example that "someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read, write, or learn compared to most people in the general population." 29 C.F.R. §1630.2(j)(4)(iii). NBME's exclusive focus on Plaintiff's prior academic successes and her performance on the ACT and MCAT standardized examinations without accommodations was therefore improper, particularly given that we can discern that no consideration was given to the other evidence produced by Plaintiff." *Id* at 46-47.

The ADA expressly provides that the determination of whether a person has a disability must be made without consideration of such strategies. Dr. Kitchens reported to Mrs. Holbrook that he has an

---

[5] *See* NBME Accommodation Denial Letter dated February 8, 2022. (Exhibit F).

extensive history of studying long hours, repeated special memorization study methods, and self-implemented structures to self accommodate for his disability. Moreover, this is notably also a strategy that may work on the ACT and MCAT but that does not work on the USMLE. The NBME refused accommodations to Dr. Kitchens on the basis that he was able to go through his educational career without formal accommodations therefore he does not need them. However, NBME ignores the fact that Dr. Kitchens academic successes are based of his ability to self-accommodate for his disability.

NBME wrongfully refused accommodations to Dr. Kitchens on the basis of the very self-accommodations NBME is required by the ADA to ignore. Thus, the ADA, as amended by the ADA Amendments Act of 2008,31 states:

> (i)  The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as —
>
>       (IV) learned behavioral or adaptive neurological modifications. 42 U.S.C. §12102(4)(E)(i)(IV).

The only reason NBME can point to for denying Dr. Kitchens' accommodations was his ability to "progress[] throughout [his] education with an academic record and scores on timed standardized tests sufficient to gain admission to and graduate from university and medical school, all without formal accommodations." In other words, Dr. Kitchens was able to use "learned behavioral . . . modifications" on other exams, to "ameliorat[e]" the effects of his disability. These learned behavioral modifications are precisely what the ADA, as amended, says that NBME must **not** consider. *See Girard v. Lincoln College of New England,* 27 F.Supp.3d 289, 295 (D.Conn. 2014) (plaintiff's status as a person with a disability was not refuted by evidence that she used adaptive strategies, or by evidence that she succeeded in some courses without accommodations). *See also Harty v. City of Sanford,* (M.D.Fla. 2012), No. 6:11-cv-1041 ("While he is able to ameliorate the effects of his disability by doing these things 'in a different way,' the [ADA Amendments Act] does not permit such measures to be considered").

As the Court explained in *Girard*, in making the threshold determination of whether a person requesting accommodations is a person with a disability, a provider like NBME cannot consider the effects of learned behavioral modifications:

[Defendant's argument that plaintiff was not disabled] is without merit because under the ADA's new definition of disability, "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . learned behavioral or adaptive neurological modifications." 42 U.S.C. §12102(4)(E)(i). Indeed, one of the stated purposes of the ADAA [the ADA Amendments Act] was "to reject the requirement enunciated by the Supreme Court in [*Sutton v. United Air Lines*, 527 U.S. 471(1999)] . . . that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures." 122 Stat. 3553, Sec. 2(b); see 42 U.S.C. §12102(4)(B) (requiring courts to interpret term "substantially limits" in accordance with findings and purposes of ADAA). Because Plaintiff's study strategies are "learned behavior" modifications, I cannot consider them in determining whether Plaintiff's ADP [auditory processing disorder] substantially limits a major life activity.

. . . . The fact that Plaintiff's impairment prompted a request for accommodation in a minority of classes, and proved to be an insurmountable obstacle in only one class in which an adequate accommodation was not provided does not, as a matter of law, mandate a finding that the impairment did not substantially limit Plaintiff. . . . Most importantly, resolution of this question must be guided by the clear congressional intent expressed in the ADAA. In light of the ADAA's findings and purposes, which are set forth in part above and must be considered in determining whether a person is "substantially limited," I find that the evidence in the record raises a genuine issue of material fact as to whether Plaintiff's ADP substantially limits her in any major life activity, *her partial success in overcoming her disability without accommodation notwithstanding.*

27 F.Supp.3d at 295-96 (emphasis added).

In *Berger v. Nat'l Bd. of Med. Exam'rs*, the Court held that the Plaintiff had demonstrated that he had a disability under Title III of the ADA, that his requests for accommodation were reasonable, and that those requests were denied, to the stringent standard of proof required by a preliminary injunction. The Court opined "the central issue in assessing whether Mr. Berger has a strong likelihood of success on the merits of his ADA claim is whether his impairments satisfy the definition of "disability" under the ADA." *Berger, B. v. Nat'l Bd. of Med. Exam'rs*, 2020 U.S. App LEXIS 36486, 2020 WL 5592696 (6th Cir. App. Sept. 2020). Dr. Kitchens has a decade long diagnosis of ADHD, which, is specifically named as an impairment under the ADA. 28 C.F.R. §36.105(b)1(ii), (2). The Court further considered "the condition and manner under which the individual performs the major life activity, as well as the duration of time it takes to perform such activity." *Id*. Dr. Kitchens' declaration demonstrates that schoolwork required significantly more time devoted to studying and reading in particular has always been grueling, draining, and exhausting.

The Plaintiff in *Berger*, "developed a strategy to work through the [MCAT] examination questions as quickly as possible to optimize his score" Dr. Kitchens has developed strategies to accommodate with his ADHD and testing anxiety. *Id* at 47. As demonstrated by Dr. Kitchens' repeated applications and exhibits attached to his amended complaint, he was evaluated and diagnosed with ADHD in 2013, informal accommodations through college and medical school, and has an active prescription for twenty (20) mg of Adderall, are demonstrative measures of Dr. Kitchens' substantially limited ability to read, think, concentrate, and learn. While the ADA prohibits the NBME from "referenc[ing] to the *ameliorative effects* of mitigating measures" it does not prohibit the NBME from taking the *existence* of those mitigating measures into account in determining whether an individual does indeed have a disability. (Emphasis added). 42 U.S.C. §12102(4)(E)(i). Arguably, the decade long prescription and medical diagnoses are proof positive of Dr. Kitchens having an impairment that meets the standard of a disability under the ADA.

## b.  THE HARM TO DR. KITCHENS IS IRREPARABLE

Courts have presumed irreparable harm when there was a violation of the ADA, since the statute's goals "include assuring that individuals with disabilities enjoy 'equality of opportunity, full participation, independent living, and economic self-sufficiency.'" *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp.2d 1078, 1084 (N.D. Cal. 1997) (quoting 42 U.S.C. §12101). Consequently, "[i]njuries to individual dignity and deprivations of civil rights constitute irreparable injury." Id.; see also, *Burriola v. Greater Toledo YMCA*, 133 F. Supp.2d 1034, 1040 (N.D. Ohio 2001) (holding that there is irreparable harm when a person is discriminated against on the basis of disability).

Courts also view as irreparable injury a person's psychological harm in not being able to pursue his chosen profession. In *Enyart v. Nat'l Conference of Bar Examiners*, *supra,* the Ninth Circuit affirmed the grant of a preliminary injunction requiring bar exam administrators to provide accommodations for a blind test-taker, explaining that she had "demonstrated irreparable harm in the form of the loss of opportunity to pursue her chosen profession." 630 F.3d at 1165. *See also Featherstone v. Pacific Northwest U. of Health Sciences,* 2014 U.S. Dist. Lexis 102713, 2014 WL 3640803 (E.D. Wash. 2014). As the Court

stated in *Featherstone,* delay in following a chosen profession – just delay – is enough to satisfy the requirement for "irreparable harm":

> It is uncontested that Plaintiff has been waiting to pursue his medical career for over a year already, and would continue to be delayed in pursuing his chosen profession if not admitted to [Pacific Northwest University]. The Ninth Circuit has concluded that irreparable harm can be shown "in the form of the loss of opportunity to pursue [one's] chosen profession." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1165 (9th Cir. 2011). 2014 U.S. Dist. Lexis at *17 (footnote omitted).

Like Featherstone (now Dr. Featherstone), Dr. Kitchens wants to become a clinically licensed physician. Each day that he has to defer his dream is a day that he suffers the sort of emotional and dignitary harm that the ADA was enacted to prevent. By the time that he is able to take the STEP 1 examination, he will already have lost two years as a result of NBME's refusal to provide testing accommodations, and with the passing of each year, he becomes exponentially less likely to participate in the NRMP necessary to becoming a clinically licensed physician. Since that is precisely the sort of injury that the courts have held to be irreparable harm, Dr. Kitchens satisfies the requirement for irreparable harm.

### c. NBME WILL NOT BE HARMED BY GRANTING A PRELIMINARY INJUNCTION

NBME grants additional time over two days on examinations. NBME will suffer no harm if it grants Dr. Kitchens double time on this examination. The NBME has a proven track record of denying applicants access to the USMLE STEP examinations and requiring the Court's intervention. Dating as far back as 2011[6] to as recently as December, 2022[7], examinees have been repeatedly denied reasonable accommodations by the NBME.

While NBME will suffer no harm if it grants him double time, Dr. Kitchens has had to put his career on hold, and now is out of time. He is in danger of losing his career entirely. Dr. Kitchens has already missed the NRMP once – causing significant damage to his candidacy, to be prevented from *participating* a second time will all but ensure Dr. Kitchens' career has ended before it has even begun. While there is no assurance that if Dr. Kitchens were to enter the NRMP he would be offered a residency position, should he

---

[6] *See* Settlement Agreement between DOJ and the NBME. (Exhibit G).
[7] *See Sampson v. Nat'l Bd. of Med. Exam'rs*, 2022 U.S. Dist. LEXIS 217633, 2022 WL 17403785 (E.D.N.Y. Dec. 2022). (Exhibit H).

be barred from the opportunity to participate, it can be guaranteed that he will not be able to practice medicine. In order to submit both STEP 1 and STEP 2 exams in the ERAS, Dr. Kitchens must be able to schedule and take the examinations by March 6, 2023.

An M.D. graduate must receive further training in a medical residency program before he can be licensed as a physician. Almost all M.D. graduates are placed in residency programs through the NRMP. Even if Dr. Kitchens is able to take the STEP 1 and STEP 2 examination with accommodations at the organic resolution of the litigation, it will already be too late for Dr. Kitchens to enter the NRMP Match Program for 2023 and therefore, he will suffer another year of delay for this reason as well.

### d.   GRANTING A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST

Obviously the enforcement of the ADA is in the public interest. Many areas of the United States are under-served by physicians, and so increasing the number of physicians is in the public interest. Finally, it is in the interest of people with disabilities – estimated to number almost 13 percent of the total population of the United States – to have the opportunity to be treated by people with life experiences that are more similar to their own experiences, i.e., by people with disabilities. See generally *L. Meeks and N. Jain, Accessibility, Inclusion and Action in Medical Education* (Association of American Medical Colleges 2018) ("Meeks and Jain 2018") at 8.

Moreover, the Courts have repeatedly found in favor of examinees who have asked for injunctive relief against the NBME for reasonable testing accommodations. In *Ramsay*, the Court held "[i]n enacting the ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities." *Ramsay*, 968 F.3d at 263 quoting *Enyart*, 630 F.3d at 1167. In *Berger*, the Court held that "[g]ranting injunctive relief would further the public interest by prohibiting discrimination by testing agencies, such as the NBME, on the basis of disability." *Berger*, 2019 WL 4040576 at 29. In *Sampson*, the Court held that

> "Sampson has demonstrated that his requested accommodations are necessary to ensure that when he takes STEP 1, he will be tested on his aptitude and knowledge of the subject matter – not on whether he can overcome his disability. Without his requested accommodations, Sampson risks failing STEP 1 and losing the opportunity to progress in his medical training. And because Sampson has shown a substantial likelihood that he is

entitled to accommodations, there is no reason that providing him the requested accommodations will "alter[ ] the substance of" Step 1. *Powell*, 364 F.3d at 89. Rather, the resulting scores will simply "reflect each examinee's abilities accurately." Id. Thus, the public interest weighs in favor of granting preliminary injunctive relief." *Sampson*, 2022 WL 17403785 at 39.

Dr. Kitchens' career now hinges on not on the extraordinary hard work and commitment he has demonstrated through the course of medical school, but the outcome of this motion seeking accommodations that the NBME is able to provide and does provide to other students. For this reason, he seeks an order requiring NBME to immediately cease its denial of necessary accommodations to allow him to proceed to demonstrate his knowledge and skill under fair testing conditions.

## III.   EXPUNGEMENT IS AN EQUITABLE REMEDY WITHIN THE ADA

Title III of the ADA only allows for a plaintiff to receive injunctive relief. Due to the repeated denial of Dr. Kitchens' accommodations and attempts to self-accommodate for his disability, Dr. Kitchens now faces his final attempt at STEP 1 and risk permanent exclusion from practicing medicine.

Throughout the accommodation request process, the NBME has repeatedly withheld reasonable testing accommodations to Dr. Kitchens in violating of the ADA. Defendant NBME has attempted to deflect, ignore, and even go as far as to disavow Dr. Kitchens' disability in order to justify withholding testing accommodations, in spite of his repeated attempts to demonstrate a need for accommodations. The NBME would rather ask this Court to ignore binding precedent, the ADA, and a lifetime of diagnoses, accommodations and academic adversity, however testing accommodations will not prevent Dr. Kitchens from further injury alone. Due to the NBME's flagrant violations of Dr. Kitchens' right to testing accommodations and the impulsive nature of ADHD, he also needs an expungement of his testing transcript in order to be "tested on his aptitude and knowledge on the subject matter". *Sampson*, 2022 WL 17403785 at 40.

### a.   EXPUNGEMENT IS APPROPRIATE

An expungement is precisely the type of relief this Court can provide Dr. Kitchens that will make him whole. An expungement of Dr. Kitchens' examination transcript simply restores the status quo ante, placing him at the position he ought to have been when he first applied for accommodations with the

NBME. Rescission is a type of equitable relief, and while typically used as a contract remedy, is not specifically precluded.

> "[A]ny person who is being subjected to discrimination on the basis of disability… may institute a civil action for **preventative relief**, including an application for permanent or temporary injunction, restraining order, or other order." (Emphasis added). 28 CFR §36.501.

In the case at hand, an expungement of his examination transcript would be a necessary preventative relief in that it would prevent the NBME's repeated violations of Dr. Kitchens' right to accommodations from improperly affecting his candidacy profile while applying for residency. As stated in *In Re Talmage* "the appropriate function of injunction is to afford preventative relief and not to correct injuries already committed." *In Re Talmage*, 94 B.R. 451, 10, (N.D. OH, 1988), quoting *Goldblatt Bros. v. 63rd & Halstead Realty Co.,* 88 N.E.2d 100, 104 (1949).

Without an expungement of his transcript, Dr. Kitchens will have not one, not two, but *three* failed attempts at STEP 1 and two failed attempts at STEP 2. In his first application for accommodations, Dr. Kitchens attached a letter from his primary care physician, Dr. Ghori S. Khan, who noted that he suffered from 'significant anxiety'. Without the Court's intervention, Dr. Kitchens will be forced to sit for his <u>final attempt</u> at passing STEP 1 before becoming "ineligible to apply for USMLE STEPS."[8]

It is no secret that there are residency programs in the United States that will not consider an applicant that has failed *any* STEP examination: on the University of Tennessee's Internal Medicine Residency Applicant Criteria page the first requirement is "[w]e do require **passing** the USMLE/COMLEX exams on the **first attempt (both STEP 1 and STEP 2)** ...."[9] (emphasis added); on the University of Kentucky's Internal Residency Applicant page it states "we expect a **first time passing score on Step 1**. We generally prefer a USMLE STEP 2 score around the mean."[10] (emphasis added); on the University of Colorado – Boulder's Requirements, Eligibility, and Selection page it states "we expect that individuals

---

[8] *See* USMLE Attempt Limit Common Questions. (Exhibit I).
[9] *See* University of Tennessee Internal Medicine Residency Applicant webpage. (Exhibit J).
[10] *See* University of Kentucky Internal Residency Applicant webpage. (Exhibit K).

have **passed** the exams in their **first attempt** and performed competitively."[11] (emphasis added). These are merely a handful of examples of programs that, as of today, Dr. Kitchens would not be able to apply to for residency. By expunging his examination transcript, the Court would be providing the only remedy that would prevent further harm by the NBME felt by Dr. Kitchens.

The NBME has already recommended, and will likely argue, that instead of expunging his examination transcript, Dr. Kitchens be sponsored by a State Medical Board in order to sit for STEP 1 a fifth time, should he not pass on the fourth attempt. This recommendation ignores the fact that each State Medical Board has limits that can be more or less stringent than the NBME's four attempt per STEP limit. For example, while Pennsylvania has no limit on the number of USMLE examinations an applicant take, Tennessee only allows three (3) attempts per STEP, and Illinois only allows five (5) *total* attempts to pass.[12] In the state of Kentucky, an applicant is only allowed four (4) attempts per STEP. As he stands currently, Dr. Kitchens would not be able to become licensed in the State of Tennessee nor Illinois *even if* he passes STEP 1 with accommodations. Dr. Kitchens would only be eligible for licensure in thirty-one states out of fifty (31 out of 50), or in other words, he is already ineligible for licensure in nineteen (19) states *and their residency programs*. Rather than grant Dr. Kitchens the accommodations he needs, the NBME would prefer if Dr. Kitchens petition a state medical board – one that is <u>not</u> the board of the state he currently lives in – to sponsor him for a fifth attempt at STEP 1.

Without an expungement of his examination transcript, Dr. Kitchens would be severely impacted by the number of attempts listed, both in residency programs he would be eligible for, but also in the number of states he can gain medical licensure in. The examination transcript will permanently carry the discriminatory actions of the NBME and create lasting scars to be felt by Dr. Kitchens throughout his professional career.

### b.  EXPUNGEMENT IS NECESSARY

---

[11] *See* University of Colorado – Boulder Eligibility webpage. (Exhibit L).
[12] *See* Federation of State Medical Boards, *State Specific Requirements for Initial Medical Licensure*, USMLE Step 3 (Feb. 6, 2023, 10:36 a.m.), https://www.fsmb.org/step-3/state-licensure/. (Exhibit M).

The case at hand is both similar and dissimilar to the *Berger v. NBME* and *Ramsay v. NBME*. It is similar to the extent that in all three cases the NBME has denied the Plaintiffs their right to testing accommodations under the ADA. However, Dr. Kitchens is in a far more precarious position than either Berger or Ramsay were at the time of litigation. As an African American man, Dr. Kitchens is statistically not likely to get psychological treatment nor pursue legal recourse, unlike both Caucasian Plaintiffs, who failed once before filing suit compared to Dr. Kitchens multiple attempts to pass both STEP 1 and STEP 2 before turning to the Court as a remedy of last resort. An expungement of his examination transcript is the *only* way of protecting Dr. Kitchens from continued harm.

In 2009, the Academic Pediatric Association published a study of racial and ethnic disparities in metal health utilization; in that study, "forty-nine (49%) of white children with ADHD symptoms ha[d] ever used mental health care, compared with twenty (20%) of black [children]…" even though "black children were more likely to have ADHD… than white children."[13] The article found "a significant and robust disparity in mental health care utilization for black children" compared to their Hispanic and white counterparts. *Id.* In the African American diaspora "black parent perceived ADHD symptoms as behaviors that are better addressed by parenting and discipline than by medical and mental health professionals." *Id* at 94. Moreover, the African American diaspora is unique from its white counterparts in that there are deep "aspects of shame and stigma that [African Americans] associate with treatment and black cultural mistrust of the mental health system." *Id.* The deepest cultural mistrust being toward the mental health profession. Dr. Kitchens, in true conformity with the empirical data, did not seek mental healthcare, and when he did, was treated with parenting and strict discipline well into his young adult years.

In *Ramsay v. NBME*, the Court found that the NBME blatantly violated the ADA by focusing its analysis of her accommodation application on prior academic successes and performances without accommodations and whether the applicant met the definition of disability. *Ramsay*, 968 F.3d at 46. So too, in Dr. Kitchens' first application for accommodations, the NBME penalized Dr. Kitchens for allegedly not

---

[13] Tumaini R. Coker, et. al. *Racial/Ethnic Disparities in the Mental Health Care Utilization of Fifth Grade Children*, 9, Academic Pediatrics, 89-96 (2009). (Exhibit N).

meeting the definition of a disability rather than whether he had met with his obligation(s) under the ADA and his academic successes without prior accommodations. By focusing on Ramsay's prior academic successes, performance on standardized tests such as the MCAT and ACT without accommodations, and general position as a medical student, the NBME detrimentally ignored the fact that an individual can have a learning disability and still achieve a high level of academic success despite being substantially limited in learning. As grounds for denying his application for accommodations, the NBME states:

> "you progressed throughout your education with an academic record and scores on timed standardized tests sufficient to gain admission to and graduate from university and medical school, all without formal accommodations." *See* Exhibit F.

Dr. Kitchens' ability to achieve a high level of academic success is a reflection of the African American diaspora's "culturally based resilience, rather than reliance on traditional psychiatric systems."[14] *Breland-Noble* at 3. Moreover, African Americans' have a high regard for the significance of education. (social environmental influences) This cultural understanding of education and its relationship to life status is reinforced by denial of accommodations at Berea.[15] As found by (author), the African American students "realized that in order to achieve higher levels of academic performance, thy needed to apply themselves and solicit assistance from extended learning opportunities…." *Id.*

The NBME's rationale for denying accommodations is particularly grievous when by the DOJ's example of the absence of previous formal testing accommodations does not preclude a candidate from receiving accommodations is an exact recitation of Dr. Kitchens' lived experience throughout his academic career.

> "A student with a diagnosis of ADHD and an anxiety disorder received informal, undocumented testing accommodations throughout high school, including time to complete tests after school or at lunchtime. In support of a request for extended time on a standardized exam, the student provides documentation of her diagnoses and their effects on test-taking in the form of a doctor's letter; a statement explaining her history of informal classroom accommodations for the stated disabilities; and certifies that she still needs extended time due to her disabilities. Although the student has never previously received testing accommodations through an IEP, Section 504 Plan, or a formal private school

---

[14] Alfiee M. Breland-Noble, *Mental Healthcare Disparities: Disparities Affect Treatment of Black Adolescents*, 34, Psychiatrist Annotated, 534-538 (2009). (Exhibit O).
[15] *See* Berea College Disability Services Progress Note dated 1/10/2013. (Exhibit P).

policy, she may nevertheless be entitled to extended time for the standardized exam." *Id* at 7.

As discussed in *Girard*, *Ramsay*, and *Berger*, the NBME's improper focus on learned behavioral or adaptive neurological modifications "'would prevent a court from finding a disability in the case of any individual… who is extremely bright and hardworking and who uses alternative routes to achieve academic success,' a result inconsistent with the goals of the ADA." Berger, 2019 WL 4040576 at 45 quoting *Bartlett v. New York State Bd of Law Examiners,* No. 93 CIV, 4986, 2001 WL 930792 at *37 (S.D.N.Y. Aug 15, 2001)(Sotomayor, J.). Dr. Kitchens' ability to self-accommodate for his disability should not be grounds for disqualifying him from the very accommodations he needed in the beginning, nor should it continue to disqualify him from participation in NRMP and/or licensure in other states across the country. Moreover, the expungement of his transcript is further supported when "there is no dollar amount that the court may readily ascribe to either Plaintiff's expenditure of these efforts, or to the loss of their potential fruits in the form of a passing score on the [USMLE STEP examination]." *Id* at 57 quoting *Jones,* 801 F. Supp. 2d at 286.

"[I]n granting preliminary relief, we are granting Plaintiff only the *opportunity* to move forward should she succeed in passing her examinations with appropriate accommodations." *Ramsay*, 968 F.3d at 49. So too, this Court should grant Dr. Kitchens the opportunity to participate in the NRMP as his colleagues have – without his examination transcript discoloring his competency and knowledge.

**CONCLUSION**

Dr. Kitchens requires and is entitled to injunctive relief, and he must have such relief in place prior to March 6, 2023 so that he can take USMLE STEP 1 and STEP 2 with accommodations in time to participate in the 2023 NRMP. Furthermore, due to NBME's repeated rejection of accommodations, Dr. Kitchens is entitled to an expungement of his examination transcript so as to put him in the position he would have been had the NBME properly granted his accommodations when he first applied for them in October, 2021.  For the reasons set forth in Plaintiffs Motion, this Memorandum, and the Declarations of Mrs. Missie King and Dr. Kitchens, Plaintiff respectfully requests that this Honorable Court schedule a

preliminary injunction hearing, and issue a preliminary injunction against NBME to require that it provide

Dr. Kitchens with the testing accommodations and transcript expungement that he needs.

Respectfully submitted,

*/s/ Dr. Markcus Kitchens*
Dr. Markcus Kitchens
625 Hampton Way, #2
Richmond, KY 40475
T: (423) 314-4096
markzwanz@gmail.com
***Pro Se Plaintiff***

## CERTIFICATE OF SERVICE

It is hereby certified that a true and accurate copy of the foregoing was filed electronically via the Pacer system and served to the following on February 7, 2023.

Jared D. Bayer
Cozen O'Connor
One Liberty Place
1650 Market Street, Ste. 2800
Philadelphia, PA 19103
T: (215) 665-4127
***Counsel for Defendant***
***National Board of Medical Examiners***

Caroline M. Mew
Perkins Coie LLP
700 Thirteenth Street, N.W., Ste. 800
Washington, D.C. 20005-3960
T: (202) 654-6200
E: CMew@perkinscoie.com
***Counsel for Defendant***