UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DR. MARKCUS KITCHENS, JR. | ) | |
| PLAINTIFF | ) | |
| | ) | CIVIL ACTION NO.: |
| v. | ) | 2:22-CV-03301-JMY |
| | ) | |
| UNITED STATES MEDICAL LICENSING EXAMINATION, | ) | |
| ET. AL | ) | |
| DEFENDANTS | ) | |
| | ) | |

**NOTICE OF FILING OF EXHIBITS TO MEMORANDUM
OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Comes the Plaintiff, Dr. Markcus Kitchens (hereinafter "Dr. Kitchens"), and hereby provides Notice of Filing of the Exhibits referenced in the Memorandum of Law In Support of Motion for Preliminary Injunction (DI 20) filed on February 7, 2023.

Respectfully submitted,

*/s/ Dr. Markcus Kitchens*
Dr. Markcus Kitchens
625 Hampton Way, #2
Richmond, KY 40475
T: (423) 314-4096
markzwanz@gmail.com
***Pro Se Plaintiff***

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true and accurate copy of the foregoing was filed electronically via the Pacer system and served to the following on February 15, 2023.

Jared D. Bayer
Cozen O'Connor
One Liberty Place
1650 Market Street, Ste. 2800
Philadelphia, PA 19103
T: (215) 665-4127
***Counsel for Defendant***
***National Board of Medical Examiners***

Caroline M. Mew
Perkins Coie LLP
700 Thirteenth Street, N.W., Ste. 800
Washington, D.C. 20005-3960
T: (202) 654-6200
E: CMew@perkinscoie.com
***Counsel for Defendant***

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DR. MARKCUS KITCHENS, JR. | ) | |
| PLAINTIFF | ) | |
| | ) | CIVIL ACTION NO.: |
| v. | ) | 2:22-CV-03301-JMY |
| | ) | |
| NATIONAL BOARD OF MEDICAL EXAMINERS, | ) | |
| DEFENDANT | ) | |
| | ) | |
| **SERVE VIA CLERK OF COURT:** | ) | |
| James A. Byrne | ) | |
| U.S. Courthouse | ) | |
| 601 Market Street, Room 2609 | ) | |
| Philadelphia, PA 19106 | ) | |
| | ) | |

---

### FIRST AMENDED COMPLAINT

---

Comes the Plaintiff, Dr. Markcus Kitchens Jr. pro se, and for his First Amended Complaint against Defendants National Board of Medical Examiners and hereby states as follows:

### INTRODUCTION

1.  This action seeks to recover injunctive relief and damages for injuries suffered by Plaintiff, Dr. Markcus Kitchens, which were the direct and proximate result of repeated discrimination based on the Americans with Disabilities Act violations in connection with Dr. Markcus Kitchens' testing accommodations during STEP 1 and STEP 2 of the USMLE Board Examination process.

### PARTIES

2.  Plaintiff, Dr. Markcus Kitchens Jr. (hereinafter known as "Dr. Kitchens") is a resident of Richmond, Kentucky with a residence at 625 Hampton Way Unit #2, Richmond, Kentucky, 40475.

3.  Defendant, National Board of Medical Examiners (hereinafter known as "Defendant NBME" or "NBME") is headquartered at 3750 Market Street, Philadelphia, Pennsylvania, 19104. The NBME may be served by the Clerk of the Court, James A. Byrne, U.S. Courthouse, 601 Market Street, Room 2609, Philadelphia, Pennsylvania, 19106.

EXHIBIT
A

MK000001

## JURISDICTION, VENUE, AND CHOICE OF LAW

4.   Plaintiff restates, re-alleges, and incorporates herein by reference, the proceeding paragraphs as if fully set forth herein.

5.   The Pennsylvania District Court has subject matter jurisdiction under 28 U.S.C. § 1332. Plaintiff is a citizen of Kentucky and none of the Defendants are citizens of Kentucky for the purposes of jurisdiction, therefore, the parties are completely diverse. Further, the amount in controversy exceeds $75,000.

6.   When a federal court sits in diversity, it may exercise personal jurisdiction over an out-of-state defendant only if a court of the forum state could do so. The Pennsylvania Long-Arm Statute reaches the full extent of due process.

### Due Process

7.   The oft-utilized three-part test for accessing the constitutionality of specific jurisdiction requires:

> First, the Defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

8.   The Defendant purposely availed themselves of the privilege of acting within the State of Pennsylvania as this is where all the event leading to this cause of action occurred.

9.   All the claims arise from the decisions made by the Defendant in the State of Pennsylvania in accommodations, grading, and scoring by Defendant and discrimination against Dr. Kitchens.

10. The acts, omissions, and consequences caused by Defendant has a substantial connection to the forum state since they either arose from the data transmitted from the forum or the torts perpetrated in the forum, or the injuries caused by actions from within the forum state.

11. For these reasons, specific jurisdiction over the Defendant is appropriate.

12. General jurisdiction is appropriate because the Defendant has such continuous and systematic contacts with the forum state by virtue of their significant business connections with the State of Pennsylvania.

### Choice of Law and Venue

Page **2** of **8**

MK000002

13. The standard for applying Pennsylvania law is whether Pennsylvania had enough contacts to justify applying Pennsylvania law. The Defendant has more than ample contacts with the forum state when decisions directly affecting Dr. Kitchens's accommodation status and/or grading his STEP board exams were conducted in Pennsylvania. Therefore, Pennsylvania law should govern.

14. Venue is proper under 28 U.S.C. 1391(b)(2) because a substantial part of the events leading up to these claims took place in the District of Pennsylvania.

## FACTUAL BACKGROUND

15. At all times relevant to this complaint, Defendant NBME is a non-profit, private corporation that offers the United States Medical Licensing Examination to board-certified applicants who wish to become licensed to practice medicine in the United States.

16. At all times relevant to this complaint, Dr. Kitchens was a board-certified applicant who has a medical diagnosis of attention-deficit hyperactive disorder ("ADHD") and test anxiety.

17. From August, 2010 to December, 2014, Dr. Kitchens attended Berea College located at 101 Chestnut St., Berea, Kentucky, and received his Bachelor's of Arts.

18. On or about January, 2013, Dr. Kitchens was medically diagnosed with Attention deficit hyperactivity disorder. (See Exhibit A).

19. While a student at Berea College, Dr. Kitchens received unofficial testing accommodations for examinations administered in college. (See Exhibit B).

20. At Berea College, Dr. Kitchens received extended time as an ADA complaint accommodation for all examinations administered.

21. On or about Spring, 2013, Dr. Kitchens sat for the MCAT without ADA accommodations.

22. On October, 2015, Dr. Kitchens was accepted to the Medical University of Lublin, in Lublin, Poland.

23. From August, 2016 to January, 2021, Dr. Kitchens attended the Medical University of Lublin as an American medical student.

MK000003

24. At all times during classroom teaching, Dr. Kitchens received testing accommodations of time plus one-hundred percent (100%) (double time) during examinations.

25. On or about April 28, 2020, Dr. Kitchens was medically diagnosed with significant anxiety. (See Exhibit C).

26. On January 4, 2021, Dr. Kitchens graduated from the Medical University of Lublin.

27. On or about December 2020, Dr. Kitchens sat for the Comprehensive Basic Science Self-Assessment (hereinafter "CBSCI") with accommodations. (See Exhibit D).

28. On October 13, 2021, Dr. Kitchens applied for accommodations with the USMLE STEP board exams, specifically, additional time, due to disability.

29. In his application for accommodations, Dr. Kitchens included the following:

    a.  A note from his primary care physician, Ghori S. Khan, MD. (See Exhibit E); and

    b.  Treatment notes dating back to October 5, 2020. (See Exhibit F).

30. On February 8, 2022, Dr. Kitchens' accommodation application was denied. As grounds for their denial, Defendant NBME stated that "you have not shown your requested accommodations are necessary for you to access the USMLE." (See Exhibit G).

31. On or about August 30, 2022, Dr. Kitchens applied for testing accommodations a second time.

32. In his application for accommodations, Dr. Kitchens included the following:

    a.  The formal application request form through USMLE. (See Exhibit H);

    b.  Multiple treatment notes dating back to 2017. (See Exhibit J);

    c.  The confirmation page received when he applied for the CBSI. (See Exhibit K); and

    d.  A personal statement detailing his longstanding diagnoses of ADHD and severe test anxiety. (See Exhibit L).

33. On or about August 30, 2022, Dr. Kitchens accommodation application was denied. (See Exhibit M).

34. At all times relevant to this Complaint, Dr. Kitchens was subject to discriminatory actions by denial of his ADA test accommodations.

MK000004

35. Dr. Kitchens hereby incorporates each General Allegation into each Count below.

**CAUSES OF ACTION**

**COUNT I    VIOLATION OF 28 CFR § 36.309 (DEFENDANT NBME)**

36. Dr. Kitchens hereby incorporates the allegations set forth in paragraphs 1-34 as if fully set forth

herein.

37. Title III of the ADA provides

"any private entity that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements."

38. 28 C.F.R. 36.309 defines a 'disability' as

    a.  "A physical or mental impairment that substantially limits one or more of the major life activities of such individual;

    b.  A record of such impairment; or

    c.  Being regarded as having such an impairment."[1]

39. To establish a disability under Title III of the ADA, the plaintiff must show that he meets *any* one

of these three tests. (Emphasis added).

40. The plaintiff must show that he has an impairment, identify the life activity that he claims is limited

by the impairment, or prove that the limitation is substantial.

41. Defendant NBME has a duty to grant accommodations when a disability is demonstrated.

42. Defendant NBME reviewed Dr. Kitchens's application for testing accommodations pursuant to

Title III of the ADA and denied same.

43. 28 CFR 36.309(b)(1)(v) states "when considering requests for modifications [or]

accommodations… the testing entity gives *considerable* weight to documentation of past modifications,

accommodations, or auxiliary aids or services received in similar testing situations…." (Emphasis added).

44. Defendant NBME's denial for accommodations discriminated against Dr. Kitchens's disability by

denying him benefits of services needed to fully participate in the STEP 1 and STEP 2 process.

_____

[1] 42 U.S.C. §12102(2).

MK000005

45. Defendant NBME's denial of Dr. Kitchens's benefits was by reason of his disability.

46. Dr. Kitchens has a longstanding history of mental impairment that substantially limits a major life activity that has been recorded and regarded as having an impairment.

47. Dr. Kitchens's mental impairment substantially limits major life activities including but not limited to learning, reading, concentrating, thinking, communicating and working.

48. Pursuant to 28 CFR 36.105(2)(b)(1)(ii) Dr. Kitchens has demonstrated a mental disorder by providing medical and administrative documentation of ADHD and test anxiety.

49. Pursuant to 28 CFR 36.105(3)(c)(1)(i) major life activities include "... learning, reading, concentrating, thinking, writing, … and working…." Dr. Kitchens has demonstrated a longstanding history of impairment to the major life activities listed above.

50. Lastly, pursuant to 28 CFR 36.105(3)(d)(1)(v), "an impairment is a disability if it substantially limits the ability of an individual to perform a major life activity *as compared to most people* in the general population. An impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity to be considered substantially limiting."

51. Dr. Kitchens's mental impairment has been diagnosed and documented in his medical records before, during, and after his academic career.

52. Dr. Kitchens' diagnoses of ADHD and test anxiety substantially limits his ability to sit for standardized examinations in academic and professional settings as compared to most people in the general population to such a degree it can be considered a disability.

53. As a direct and proximate cause of the discrimination by Defendant NBME, Dr. Kitchens suffered injuries to his professional career and reputation in the medical community.

54. Dr. Kitchens has suffered physical and mental injuries as a result of the injuries to his professional career and reputation.

55. It is reasonably certain that Dr. Kitchens has and will continue to sustain real injuries given the permanent nature of Dr. Kitchens's testing transcript.

MK000006

56.  Therefore, Defendant NBME violated 28 CFR §36.309 and has caused Dr. Kitchens to suffer real and actual damages for an amount to be determined at trial.

**WHEREFORE**, Dr. Kitchens respectfully requests the following:

A.  A bench trial on all matters triable by jury as a matter of right;

B.  Equitable relief as determined at trial;

C.  Injunctive relief according to proof;

D.  Plaintiff's costs herein expended; and

E.  Any and all other relief to which the Plaintiffs may be entitled.

Respectfully Submitted,

*/s/ Dr. Markcus Kitchens*
Dr. Markcus Kitchens
625 Hampton Way, #2
Richmond, KY 40475
T: (423) 314-4096
markzwanz@gmail.com
***Pro Se Plaintiff***

MK000007

## VERIFICATION

I, Dr. Markcus Kitchens, Jr., hereby verifies that the above information contained in the Verified Complaint

above is true and accurate to the best of our knowledge and belief.

Dr. Markcus Kitchens, Jr.

STATE OF KENTUCKY          )
COUNTY OF MADISON          )

      Subscribed and sworn to before me, a Notary Public, in and for said County, by Dr. Kitchens, on

the 15th day of January, 2023.

My Commission Expires:     7|19|26

Notary Public

KYNP55542

AMELIA LOU KITCHENS
Notary Public
Commonwealth of Kentucky
Commission Number KYNP55542
My Commission Expires Jul 19, 2026

Page **8** of **8**

MK000008

**Name:** Markcus Z Kitchens **DOB:** ████████ **Student ID:** B00636106
(M)

**Diagnosis:** Attention deficit
disorder Without
mention of
hyperactivity

## Berea College Health Service
### Berea, KY 404030001
### (859)985-3212

Markcus Z Kitchens (M) [1134]                          Note Date: 01/11/2013 03:19 PM
Pt. Phone: ████████          DOB: ████████ (Age 20)

**Summary of note:** Attention deficit disorder Without mention of hyperactivity
**Allergies:** (None)
**Current Medications:** (None)

**Intake:**

| BP | Height | Weight | Temp | Pulse | Respiratory Rate |
|---|---|---|---|---|---|
| 117/67 | 71.5" | 140 lbs | | 62 | |

19.3

Patient saw Cindy and they discussed patient possibly goin on Adderall.
- Entered by Miriam David, MD on Jan-11-2013 03:49 PM

**Subjective:**
STates he has more problems with studying/homework than with focusing in class.  More problems with tests than with homework.
- Entered by Miriam David, MD on Jan-11-2013 03:49 PM

**Objective:**
No exam.  His BP is fine.  His wt is noted--apparently is a paternal trait to b 'skinny'.
- Entered by Miriam David, MD on Jan-11-2013 03:49 PM

**Assessment:**
1)Attention deficit disorder Without mention of hyperactivity - 314.00

Probable
- Entered by Miriam David, MD on Jan-11-2013 03:49 PM

**Plan:**
Office or other outpatient visit for the evaluation and management of an establi

1. Start Adderall 20mg, Qam #30, nrf.  He may adjust this as needed, ie, 1/2 in am, 1/2 at noon, or maybe even as late as 4pm whichever seems to work better for him.
2. Check back with Cindy also about this issue.
3. RTO to see me in 30 days.
- Entered by Miriam David, MD on Jan-11-2013 03:49 PM

Signed by: Miriam David, MD on Jan-11-2013 03:49 PM
Signed by: Miriam David, MD on Jan-11-2013 03:49 PM

**Locked by: Miriam David, MD on Jan-11-2013 03:49 PM**

1 of 2

This document has been signed electronically.

MK000009

**Name:** Markcus Z Kitchens **DOB:** ▮▮▮▮▮▮   **Student ID:** B00636106
(M)

**Diagnosis:** Attention deficit disorder Without mention of hyperactivity

---

**Berea College Health Service**
**Berea, KY 404030001**
**(859)985-3212**

Markcus Z Kitchens (M) [1134]                     Note Date: 02/07/2013 02:57 PM
Pt. Phone: ▮▮▮▮▮▮        DOB: ▮▮▮▮▮▮ (Age 21)

**Summary of note:** Attention deficit disorder Without mention of hyperactivity
**Allergies:** No known drug allergies –
**Current Medications:** (None)

**Intake:**

| BP | Height | Weight | Temp | Pulse | Respiratory Rate |
|-----|--------|--------|------|-------|------------------|
| 111/75 | 71" | 138 lbs | | 75 | |

19.2

Had problems getting adderall filled at Walmart.  Patient still hasnt taken medication yet.  Wants to discuss this.
 - *Entered by Miriam David, MD on Feb-07-2013 03:20 PM*

**Subjective:**
WM charge for adderall was $189- -couldn't afford.
 - *Entered by Miriam David, MD on Feb-07-2013 03:20 PM*

**Objective:**
BP stable.  Wt low.  Will follow
 - *Entered by Miriam David, MD on Feb-07-2013 03:20 PM*

**Assessment:**
1)Attention deficit disorder Without mention of hyperactivity - 314.00

**Plan:**
Office or other outpatient visit for the evaluation and management of an establi

1. Staart Ritalin 20mg, #30, QAM.
2. RTO in 3-4 wks for reeval.
 - *Entered by Miriam David, MD on Feb-07-2013 03:20 PM*

Signed by: Miriam David, MD on Feb-07-2013 03:20 PM

*Locked by: Miriam David, MD on Feb-07-2013 03:20 PM*

1 of 1

This document has been signed electronically.

**Name:** Markcus Z Kitchens  **DOB:** ▮▮▮▮▮▮  **Student ID:** B00636106
(M)

**Diagnosis:**

---

**Berea College Health Service**
**Berea, KY 404030001**
**(859)985-3212**

Markcus Z Kitchens (M) [1134]                              Note Date: 08/05/2013 01:03 PM
Pt. Phone: ▮▮▮▮▮▮        DOB: ▮▮▮▮▮▮ (Age 21)

**Summary of note:** Attention deficit disorder Without mention of hyperactivity
**Allergies:** No known drug allergies -
**Current Medications:** (None)

**Intake:**

| BP | Height | Weight | Temp | Pulse | Respiratory Rate |
|----|--------|--------|------|-------|------------------|
| 106/64 | 71" | 139 lbs | | 54 | |

19.4

Signed by: Glynda Glontz on Aug-05-2013  at 01:03 PM

Was once prescribed Adderall and wants it back, never went and got the rx so has never taken it..
 - Entered by Miriam David, MD on Aug-05-2013 02:44 PM

**Subjective:**
Is applying to med school, taking MCAT and thinks this will help him focus on his future.  He saw Cindy R. last semester who concurred that he does have ADD.  Has no explantion why he didn't use it in the past. Does not smoke or use illegal drugs.
 - Entered by Miriam David, MD on Aug-05-2013 02:44 PM

**Objective:**
Lungs: clear.  CV--RRR <60BPM.  Abd: NT, no HSM.  Extrem:  no edema.
 - Entered by Miriam David, MD on Aug-05-2013 02:44 PM

**Assessment:**
1)Attention deficit disorder Without mention of hyperactivity - 314.00

**Plan:**
Office or other outpatient visit for the evaluation and management of an establi
*RX:* amphetamine-dextroamphetamine 20 mg tablet [Adderall] Take 1 Tablet every morning Take one tablet in the AM Qty 30. No Refills.

1.  Will start Adderall and see how he does for 1 mon.
2.  RTO 1 mo.
 - Entered by Miriam David, MD on Aug-05-2013 02:44 PM

Signed by: Miriam David, MD on Aug/05/2013 02:44 PM

*Locked by: Miriam David, MD on Aug/05/2013 02:44 PM*

1 of 2

MK000011

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

DR. MARKCUS KITCHENS, JR.                 )
          PLAINTIFF                          )
                                     )        CIVIL ACTION NO.:
    v.                                    )        2:22-CV-03301-JMY
                                     )
NATIONAL BOARD OF MEDICAL EXAMINERS,      )
          DEFENDANT                          )
                                     )

## AFFIDAVIT OF ALYSSA HANNA

Comes the Affiant, Dr. Alyssa Hanna, and after being duly sworn, states as follows:

1.     My name is Dr. Alyssa Hanna. I am over the age of eighteen (18). I have personal knowledge of all facts set forth herein.

2.     I am a former professor of Modern Biology and Botany at Berea College located at 101 Chestnut Street, Berea, Kentucky, 40403.

3.     Dr. Markcus Kitchens was a student of my Modern Biology class during the Fall semester of 2010.

4.     Dr. Markcus Kitchens was a student of my Botany class during the Spring semester of 2011.

5.     Dr. Markcus Kitchens was provided unofficial testing accommodations as a student.

6.     During both classes, Dr. Markcus Kitchens was allowed to take his examination(s) in my office at a separate day and time from his peers.

7.     Dr. Markcus Kitchens was provided time plus one hundred percent (time + 100%).

8.     These unofficial accommodations were provided to Dr. Markcus Kitchens in order to accommodate his severe attention deficit hyperactivity disorder (ADHD).

FURTHER, the Affiant sayeth naught.

Dr. Alyssa Hanna

**COMMONWEALTH OF KENTUCKY** )
**COUNTY OF MADISON** )

Subscribed, sworn to, and acknowledged before me by the Affiant Dr. Alyssa Hanna on this 15th

day of January, 2023.

AMELIA LOU KITCHENS
Notary Public
Commonwealth of Kentucky
Commission Number KYNP55542
My Commission Expires Jul 19, 2026

NOTARY PUBLIC

My commission expires: 7|19|26
KYNP55542

MK000013

From: **donotreply@prometric.com**
Subject: **Appointment Confirmation**
Date: **Oct 27, 2020 at 10:48:28 AM**
To: **markzwanz@gmail.com**

---

To:   Markcus Zwanz KITCHENS
       2
       2 ILLINOIS 11111
       UNITED STATES

Date:  27 Oct 2020

| North America |
| --- |

Subject: Confirmation of computer-based **Comprehensive Basic Science,#0000000094927214**

Your appointment for the computer-based **Comprehensive Basic Science** is confirmed  Please find the confirmation details that follow:

| | |
| --- | --- |
| Confirmation: **0000000094927214** | Prometric Test Center: **# 3201** |
| Program:      **NBME Subject Examination Program** | **De Kalb - Sycamore** |
| Exam Code:    **CBSCI** | **1830 Mediterranean Dr** |
|              | **Suite 201** |
|              **Comprehensive Basic Science** | **Sycamore ILLINOIS 60178** |
| Exam Date:    **10 Dec 2020** | **UNITED STATES** |
| Exam Time:    **08:00** | |

**TEST ACCOMMODATIONS**

Extended Time

**GLOBAL TEST CENTER SECURITY PROCEDURES**

Prometric takes our role of providing a secure test environment seriously  During the check-in process, we inspect any and all eyeglasses, jewelry and other accessories to look for camera devices that could be used to capture exam content

- You will be required to remove your eyeglasses for close visual inspection  These inspections will take a few seconds and will be done at check-in and again upon return from breaks before you enter the testing room to ensure you do not violate any security protocol
- Jewelry outside of wedding and engagement rings is prohibited  Please do not wear other jewelry to the test center  Hair accessories, ties and bowties are subject to inspection  Please refrain from using ornate clips, combs, barrettes, headbands, tie clips, cuff links and other accessories as you may be prohibited from wearing them into the testing room and asked to store them in your locker  Violation of security protocol may result in the confiscation of prohibited devices and termination of your exam

**IDENTIFICATION POLICY**

You must bring your Scheduling Permit, or present it electronically (e g , via Smartphone), to the test center, along with your required identification in order to take your exam  Review your Scheduling Permit for complete details  *This email is NOT your Scheduling Permit
To access your Scheduling Permit, go to http://examinee nbme org/documents/mss  We strongly encourage you to print your Scheduling Permit at least several days in advance of your scheduled appointment to avoid any problems accessing or printing your permit on test day

Important Note: In order to be admitted to the exam on test day, your name as it appears on your Scheduling Permit must EXACTLY MATCH the name on the identification you plan to present at the testing center on test day  If the name listed on your permit is misspelled or differs from your name as it appears on your identification, immediately contact your institution  In order to receive a revised scheduling permit your institution MUST submit your name change or correction more than 7 business days prior to your scheduled test date

**RESCHEDULE / CANCEL POLICY**

If you need to change (e g , reschedule, cancel, change test center location) your appointment, you must go to http://www prometric com/MSS

The date that you change your appointment, using Eastern Standard Time in the United States, will determine whether you pay an appointment change fee and the amount of this fee:

- If you change your appointment 15 or more days before (but not including) the first day of your scheduled test date, there is no fee
- If you change your appointment fewer than 15 days but more than 5 days before (but not including) the first day of your scheduled test date, the fee is $30 US Dollars (USD)
- If you change your appointment 5 or fewer days before (but not including) the first day of your scheduled test date, the fee is $63 00 USD

MK000014

NOTE: If you do not test as scheduled, your eligibility will be terminated and you must submit a new application

**DRIVING DIRECTIONS**

I-88 W (signs for I 88 South Toll way/Aurora/I-294)  Take the Peace Rd  exit toward IL-38  Turn right on to Peace Rd  Turn left at the light on Bethany  Turn right onto Mediterrean Dr  The destination will be on the right, in the same parking lot as Cadence Health, we are in the front of the building

**ADDITIONAL INFORMATION**

- TEST DAY ARRIVAL: Report to the test center 30 minutes before your scheduled appointment for check-in procedures  If you arrive later than your scheduled appointment, you may not be admitted  If you arrive more than 30 minutes after your scheduled appointment, you will not be admitted to the testing center
Though the site provides noise reducing headphones, you are encouraged to bring your own cordless soft-foam earplugs (subject to inspection)
IF CENTER NOT ABLE TO TEST: In the event that the test center becomes unavailable on your scheduled test date, we will attempt to notify you in advance and schedule you for a different time and/or center  However, on occasion, we may need to reschedule your appointment at the last minute  We strongly encourage you to check your voicemail and email prior to leaving for your appointment on test day, particularly during inclement weather  You may also call the test center directly or go to www prometric com to ch eck for weather-related closings

TEST CENTER REGULATIONS: For a full listing of Prometric Testing Center Regulations and other FAQ's please visit the Prometric website at http://www.prometric.com/TestTakers/FAQs /default htm
There is a 15 minute scheduled/authorized break between sections two and three  You are encouraged to take a break at this time  During the authorized break, you are permitted to access your locker

You are advised not to take a personal break at any other time during the examination  If you must use the restroom, you may do so  However, you may not access your locker  Accessing electronic devices, such as cell phones, books, or study materials from your locker is prohibited  If you must obtain medicine or a food/drink item, notify Prometric staff before doing so  If Prometric staff are not notified and observe you accessing personal belongings you may be reported for irregular behavior  You are not permitted to make n otes on your note board prior to starting your test  You are not permitted to leave the test center area at any time that your test is in session unless the test center is evacuated because of an emergency situation  In the event the test center is evacuated, you may not access personal belongings or discuss examination content with other test takers  You are required to review and follow the Prometric test center regulations that are provided to you to read during the check-in process


Important Guidelines for testing During COVID-19

https://prometric-4562417 hs-sites com/?hs_preview=KhVSEZiH-30068366739

**PERSONAL DATA COLLECTION & PROCESSING**

You have consented to the collection and processing of your Personal Data, and biometrics, where required by your Test Sponsor

Sincerely,

**North America**
Prometric
www prometric com

MK000015

**From:** M Z <markzwanz@gmail.com>
**Date:** October 22, 2021 at 1:12:04 PM EDT
**To:** info@ecfmg.org, onlineservices@ecfmg.org
**Subject: Request for Accommodations (USMLE/ECFMG ID**  **)**

To Whom This Concern,

I am writing to you today to request changing my current testing application to one with testing accommodations for my approved USMLE Step 1 application. I have Attention Deficit Hyperactivity Disorder and Testing anxiety that requires me to take more time during testing. I have attached several documents to this supporting diagnosis and reasoning for requesting Testing Accommodations. Thank You in advance.

Regards,

Dr. M. Kitchens Jr.

---

**2 attachments**

 **Exam Accommodations Letter.pdf**
34K

 **ADHD Diagnosis.pdf**
2600K

MK000016


**Northwestern**
Medicine

# Fax

Markius Kitchens
Recipient

Recipient's Company/Department

INTERNAL MEDICINE/ Dr. Khan
Sender

815-758-8671        Fax: 815-756-4890
Sender's Phone/Email

Markius Kitchens ███████
Subject

Recipient's Phone

████████████████████████

4-23-20
Date

2
Number of pages (including cover)

This facsimile transmission is intended for the use of the individual to whom it is addressed and may contain health information that is privileged and confidential. Any unauthorized use, disclosure, distribution, dissemination, copying or retransmission of this communication by anyone other than the intended recipient is strictly prohibited. The authorized recipient of this information is prohibited from disclosing this information to any other party unless required to do so by law or regulation and is required to destroy the information after its stated need has been fulfilled. If you have received this transmission in error, please contact us immediately and we will arrange for its return at our expense. Thank you.

MK000017



April 22, 2020

Markcus Kitchens
806 Fotis Dr.
Apt #1
Dekalb IL 60115

To whom it may concern ;

This is to certify that Marcus kitchens is my patient, he has significant anxiety and is under my treatment.  I will suggest exam coordinators to provide him some relaxation allowed in the rules so that it will be easier on him to undergo the exam.

If you have any questions please do not hesitate to call me

Thank you for including us as members of your health care team.

Sincerely,

Ghori S. Khan, MD

1850 GATEWAY DRIVE
SYCAMORE IL 60178-3192
Phone: 815-758-8671
Fax: 815-756-4892

Page 1 of 1

MK000018

 **Northwestern Medicine**

NM Dermatology
1850 GATEWAY DRIVE
SYCAMORE IL 60178-3192

Kitchens, Markcus
MRN: 111012222959, DOB: ████ Sex: M
Visit date: 10/5/2020

**10/05/2020 - Office Visit in NM Dermatology (continued)**

**Provider Progress Notes (continued)**

| Prompt | Yes/No | Diagnosis | Comments | Date |
|--------|--------|-----------|----------|------|
| No relevant medical history. | | | | |

No Known Allergies

PAST MEDICAL HISTORY:
**Past Medical History:**

| Diagnosis | Date |
|-----------|------|
| • ADHD | 2013 |

**Past Surgical History:**

| Procedure | Laterality | Date |
|-----------|------------|------|
| • WISDOM TOOTH EXTRACTION All 4 | | 2009 |

FAMILY HISTORY:
**Family History**

| Problem | Relation | Age of Onset |
|---------|----------|--------------|
| • No Known Problems | Mother | |
| • No Known Problems | Father | |
| • No Known Problems | Sister | |
| • No Known Problems | Brother | |

SOCIAL HISTORY:
**Social History**

Tobacco Use
• Smoking status:          Never Smoker
• Smokeless tobacco:    Never Used
Substance Use Topics
• Alcohol use:               Never
    Frequency:              Never

Occupation: medial student

**Current Outpatient Medications on File Prior to Visit**

| Medication | Sig | Dispense | Refill |
|------------|-----|----------|--------|
| • busPIRone 5 mg tablet | Take 1 tablet by mouth 2 (two) times daily as needed for other (Anxiety). | 60 tablet | 2 |
| • dextroamphetamine-amphetamine 15 mg tablet | Take 1 tablet by mouth daily. TK 1 T PO BID | 60 tablet | 0 |
| • MEN'S MULTI-VITAMIN ORAL | Take by mouth. | | |

No current facility-administered medications on file prior to visit.

MK000019



**Highly Confidential**

February 8, 2022

Markcus Zwanz Kitchens
625 Hampton Way #2
Richmond, KY 40475

RE: USMLE Step 1                              USMLE ID#: ██████████

Dear Markcus Zwanz Kitchens:

We have thoroughly reviewed the documentation you provided in support of your request for test accommodations on the United States Medical Licensing Examination (USMLE) Step 1.

Accommodations are intended to ensure that individuals with a documented disability as defined by the Americans with Disabilities Act (ADA) can take the USMLE exams in an accessible place and manner. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and circumstances. The ADA defines disability as a physical or mental impairment that substantially limits a person's ability to perform one or more major life activities, as compared to most people in the general population. Therefore, not every impairment will constitute a disability.

**We conducted an individualized review of your request in accordance with the guidelines set forth in the ADA. Specifically, one or more doctoral-level psychological or medical professionals:**

- Carefully considered all of the information you provided, including the recommendations of your treating and/or evaluating professional(s)
- Gave substantial weight to your history of accommodations on standardized examinations
- Considered whether and how your reported impairment(s) affects your ability to access a computer-based examination like the USMLE

**Based upon this review, we have concluded that you have not shown that your requested accommodations are necessary for you to access the USMLE. Accordingly, your request is being denied, for the following primary reasons:**

- Your treatment professionals did not provide sufficient information regarding the basis for the diagnosis of Attention-Deficit/Hyperactivity Disorder (ADHD). Even if not formally diagnosed in childhood, the essential feature of ADHD, a neurodevelopmental disorder, is a persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development. According to the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)*, manifestation of the disorder must be present in more than one setting (e.g., home and school, work). Adult self-report and recall is not sufficient to substantiate a history of substantial symptoms across settings. Your documentation does not objectively demonstrate that you have shown pervasive problems managing daily demands for attention, concentration, or organization in school, work, social, or other domains.

MK000020

- While we noted your 2018 diagnosis of Test Anxiety, experiencing anxiety during high-stakes examinations is not, in and of itself, evidence of a disability or impairment in a major life activity.

- Your documentation reveals a history of not being substantially limited in your ability to perform the functions that are relevant to taking a standardized test like the USMLE. As best one can tell, you progressed throughout your education with an academic record and scores on timed standardized tests sufficient to gain admission to and graduate from university and medical school, all without formal accommodations.

We hope this information assists you in understanding the basis for our decision. We will request processing of your exam application without test accommodations. You may inquire at permits@ecfmg.org or call Applicant Information Services at (215) 386-5900 with any questions about your scheduling permit.

**Please monitor the USMLE announcements page at www.usmle.org and the Prometric website at www.prometric.com/corona-virus-update for up-to-date information regarding the impact of the coronavirus (COVID-19) pandemic on USMLE testing.**

Sincerely,
Disability Services

### United States Medical Licensing Examination® (USMLE®)

### REQUEST FOR TEST ACCOMMODATIONS
*Use this form if you are requesting accommodations on the USMLE for the first time.*

---

**The National Board of Medical Examiners® (NBME®) processes requests for test accommodations on behalf of the USMLE program**

If you have a documented disability covered under the Americans with Disabilities Act (ADA), you must notify the USMLE in writing <u>each time</u> you apply for a Step examination for which you require test accommodations. Submitting this form constitutes your official notification.

• Review the USMLE Guidelines for Test Accommodations at www.usmle.org/test-accommodations/ for a detailed description of how to document a need for accommodations.

• Complete all sections of this request form; submit the form and all required documentation to Disability Services. In order to begin processing your request, you must have a completed registration for the USMLE Step exam for which you are requesting accommodations.

• NBME will acknowledge receipt of your request by e-mail and audit your submission for completeness. If you do not receive an e-mail acknowledgement within two business days of submitting your request, please contact Disability Services at 215-590-9700 or disabilityservices@nbme.org. You may be asked to submit additional documentation to complete your request.

• **Requests are processed in the order in which they are received. Processing cannot begin until sufficient information is received by NBME and your Step exam registration is complete. Allow at least 60 business days for processing of your request**.

• The outcome of our review will not be released via telephone. All official communications regarding your request will be made in writing. If you wish to modify or withdraw a request for test accommodations, contact Disability Services by e-mail at disabilityservices@nbme.org or by telephone at 215-590-9700.

---

As explained in the Guidelines to Request Test Accommodations (www.usmle.org/test-accommodations/), you MUST provide supporting documentation verifying your current functional impairment.

<u>Submit</u> the following with this form:

✓ A **personal statement** describing your disability and its impact on your daily life and educational functioning.
✓ A completed **Certification of Prior Test Accommodations** form if you received test accommodations in medical school/residency.
✓ A **complete and comprehensive evaluation** from a qualified professional documenting your disability.

✓ **Supporting documentation** such as academic records; score transcripts for previous standardized exams; verification of prior academic/test accommodations; relevant medical records; previous psycho-educational evaluations; faculty or supervisor feedback; job performance evaluations; clerkship/clinical course evaluations; etc.

---

MK000022

**USMLE® Request for Test Accommodations**

## Section A: Exam Information

Place a check next to the examination(s) for which you are **currently registered** *and* requesting test accommodations: (Check all that apply)

☒ Step 1

☐ Step 2 CK (Clinical Knowledge)

☐ Step 3*

*Please be aware that additional test time for Step 3 may involve 3 to 5 days of testing, depending on the requested accommodation (See Section C2).

## Section B: Biographical Information
**Please type or print.**

**B1.** Name: _Kitchens_ _____ _Markcus_ _____ _Z_ _____
               Last                          First               Middle Initial

**B2.** Date of Birth: ██ – ██ – ████

**B3.** USMLE # ███████████ (required)

**B4.** Address:
_625 Hampton Way #2_
Street

_Richmond_ _____ _KY_ _____ _40475_
City                        State/Province         Zip/Postal Code

_USA_
Country

████████████████
Preferred Telephone Number

████████████████████
E-mail address

**B5.** Medical School Name: _Medical University of Lublin_

Country of Medical School: _Poland_       Date of Medical School Graduation: _01/21_

MK000023

USMLE® Request for Test Accommodations

## Section C: Accommodations Information

**C1**. Do you require wheelchair access at the examination facility? ☐ Yes ☒ No
If yes, please indicate the number of inches required from the bottom of the table to the floor: _____

**C2.**     <u>Step 1, Step 2 CK, or Step 3</u> (computer-based examinations)

Check the appropriate box to indicate the accommodations you are requesting for the exam(s) for which you are currently registered:

**<u>STEP 1: Check <u>ONLY ONE</u> box</u>**

| **Additional Break Time** | **Additional Testing Time** |
|---|---|
| ☐ Additional break time **over 1 day** | ☐ 25% Additional test time (Time and 1/4) **over 2 days** |
| ☒ Additional break time **over 2 days** | ☒ 50% Additional test time (Time and 1/2) **over 2 days** |
| | ☐ 100% Additional test time (Double time) **over 2 days** |

☐ Additional break time <u>and</u> 50% Additional test time (Time and 1/2) **over 2 days**

**<u>STEP 2 CK: Check <u>ONLY ONE</u> box</u>**

| **Additional Break Time** | **Additional Testing Time** |
|---|---|
| ☐ Additional break time **over 2 days** | ☐ 25% Additional test time (Time and 1/4) **over 2 days** |
| | ☐ 50% Additional test time (Time and 1/2) **over 2 days** |
| | ☐ 100% Additional test time (Double time) **over 2 days** |

☐ Additional break time <u>and</u> 50% Additional test time (Time and 1/2) **over 2 days**

**<u>STEP 3: Check <u>ONLY ONE</u> box</u>**

| **Additional Break Time** | **Additional Testing Time** |
|---|---|
| ☐ Additional break time **over 4 days** | ☐ 25% Additional test time (Time and 1/4) **over 3 days** |
| | ☐ 50% Additional test time (Time and 1/2) **over 4 days** |
| | ☐ 100% Additional test time (Double time) **over 5 days** |

☐ Additional break time <u>and</u> 50% Additional test time (Time and 1/2) **over 4 days**

**Describe** any other accommodation(s) you are requesting for **Step 1**, **Step 2 CK**, or **Step 3**.
_____

_____

_____

_____

MK000024

**USMLE® Request for Test Accommodations**

## Section D: Information About Your Impairment

**D1.** List the **specific DSM/ICD diagnostic code(s) and disability** for which you are requesting accommodations and report the year that it was **first** diagnosed.

| DIAGNOSTIC CODE | DISABILITY | YEAR DIAGNOSED |
|---|---|---|
| F90.9 | ADHD | 2013 |
| F41.9 | Test Anxiety | 2018 |
| | | |
| | | |
| | | |

### D2. Personal Statement

📎 **Attach a signed and dated personal statement describing your impairment(s) and how a major life activity is substantially limited.** The personal statement is your opportunity to tell us how your physical or mental impairment(s) substantially limits your current functioning in a major life activity and how the standard examination conditions are insufficient for your needs. In your own words, describe the impact of your disability on your daily life (do not confine your statement to standardized test performance) and provide a rationale for why the specific accommodation(s) you are requesting are necessary in the context of this examination.

## Section E:  Accommodation History

### E1. Standardized Examinations

📎 **Attach copies of your score report(s) for any previous standardized examination taken.**

📎 **If accommodations were provided, attach official documentation from each testing agency confirming the test accommodations they provided.**

List the accommodations received for previous standardized examinations such as college, graduate, or professional school admissions tests and professional licensure or certification examinations (if no accommodations were provided, write NONE).

| | DATE(S) ADMINISTERED | ACCOMMODATION(S) PROVIDED |
|---|---|---|
| ☐ SAT®, ACT® | | Was not diagnosed yet |
| ☐ MCAT® | | Was not diagnosed yet |
| ☐ GRE® | | |
| ☐ GMAT® | | |
| ☐ LSAT® | | |
| ☐ DAT® | | |
| ☐ COMLEX® | | |
| ☐ Other (specify) | | |

USMLE® Request for Test Accommodations

**E2. Postsecondary Education**

List each school and all formal accommodations you receive/received, and the dates accommodations were provided:

✏ **Attach copies of official records from each school(s) confirming the accommodations they provided.**

✏ **If you receive/received accommodations in <u>medical school and/or residency,</u> have the appropriate official at your medical school/residency complete the <u>USMLE Certification of Prior Test Accommodations</u> form available at www.usmle.org/test-accommodations/forms.html.**

| SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|
| **Medical/Graduate/ Professional School** | | |
| | | |
| | | |
| | | |
| **Undergraduate School** | | |
| | | |
| | | |

**E3. Primary and Secondary School**

List each school and all formal accommodations you received, and the dates accommodations were provided:

✏ **Attach copies of official records from each school listed confirming the accommodations they provided.**

| SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|
| **High School** | Tyner Academy | N/A | Wasn't diagnosed |
| **Middle School** | Tyner Middle Academy | N/A | Wasn't diagnosed |
| **Elementary School** | Best T. Shephard | N/A | Wasn't diagnosed |

MK000026

USMLE® Request for Test Accommodations

## Section F:  Certification and Authorization

To the best of my knowledge and belief, the information recorded on this request form is true and accurate.  I understand that my request for accommodations, including this form and all supporting documentation, must be received by the NBME sufficiently in advance of my anticipated test date in order to provide adequate time to evaluate and process my request.

I acknowledge and agree that any information submitted by me or on my behalf may be used by the USMLE program for the following purposes:
- Evaluating my eligibility for accommodations.  When appropriate, my information may be disclosed to qualified independent reviewers for this purpose.
- Conducting research.  Any disclosure of my information by the USMLE program will not contain information that could be used to identify me individually; information that is presented in research publications will be reported only in the aggregate.

I authorize the National Board of Medical Examiners (NBME) to contact the entities identified in this request form, and the professionals identified in the documentation I am submitting in connection with it, to obtain further information.  I authorize such entities and professionals to provide NBME with all requested further information.

I further understand that the USMLE reserves the right to take action, as described in the Bulletin of Information, if it determines that false information or false statements have been presented on this request form or in connection with my request for test accommodations.

Name (print): _Markcus Kitchens_____

Signature: _M. K_____ Date: _08-30-2022_

## Submitting Your Completed Request Form and Supporting Documentation:
**(Do Not Send duplicate documents and Do Not Send by multiple methods as this will delay processing)**

- **Due to business restrictions in Philadelphia because of COVID-19 please submit your request form and supporting documentation via E-mail or Fax.**
- **Requests sent to us via mail may be delayed.**
- **E-mail: Maximum file size is 15 MB (including text in body of email, headers and all attachments). Files larger than 15 MB may require separate emails. All attachments must be in PDF format. Please scan your documents into as few PDF's as possible. Photographs of Personal Items may be in digital format such as JPEGs/JPGs. We are not able to access embedded links.**
- **Fax or Mail: Submit your completed request form and supporting documents to the address below once you register for your exam.**
- **DO NOT bind, staple, paper clip, or tab documents as this may delay processing.**

Disability Services
NBME
3750 Market Street
Philadelphia, PA 19104-3190
Telephone: (215) 590-9700
Facsimile: (215) 590-9422
E-mail: disabilityservices@nbme.org


**Northwestern**
Medicine

NM Dermatology
1850 GATEWAY DRIVE
SYCAMORE IL 60178-3192

Kitchens, Markcus
MRN: ▮▮▮▮, DOB: ▮▮▮▮, Sex: M
Visit date: 10/5/2020

## 10/05/2020 - Office Visit in NM Dermatology (continued)

### Provider Progress Notes (continued)

| Prompt | Yes/No | Diagnosis | Comments | Date |
|--------|--------|-----------|----------|------|
| No relevant medical history. | | | | |

No Known Allergies

PAST MEDICAL HISTORY:
**Past Medical History:**

| Diagnosis | Date |
|-----------|------|
| • ADHD | 2013 |

**Past Surgical History:**

| Procedure | Laterality | Date |
|-----------|------------|------|
| • WISDOM TOOTH EXTRACTION *All 4* | | 2009 |

FAMILY HISTORY:
**Family History**

| Problem | Relation | Age of Onset |
|---------|----------|--------------|
| • No Known Problems | Mother | |
| • No Known Problems | Father | |
| • No Known Problems | Sister | |
| • No Known Problems | Brother | |

SOCIAL HISTORY:
**Social History**

Tobacco Use
• Smoking status:     Never Smoker
• Smokeless tobacco:  Never Used
Substance Use Topics
• Alcohol use:        Never
  Frequency:         Never

Occupation: medial student

### Current Outpatient Medications on File Prior to Visit

| Medication | Sig | Dispense | Refill |
|------------|-----|----------|--------|
| • busPIRone 5 mg tablet | Take 1 tablet by mouth 2 (two) times daily as needed for other (Anxiety). | 60 tablet | 2 |
| • dextroamphetamine-amphetamine 15 mg tablet | Take 1 tablet by mouth daily. TK 1 T PO BID | 60 tablet | 0 |
| • MEN'S MULTI-VITAMIN ORAL | Take by mouth. | | |

No current facility-administered medications on file prior to visit.

MK000028

PULSE OXIMETRY/FIO2

| Time | Pulse Ox (Rest %) | Pulse Ox (Amb %) | O2 Sat | O2 L/Min | Timing | FiO2 % | L/min | Delivery Method | Finger Probe |
|------|------|------|------|------|------|------|------|------|------|
| 4:38 PM | 99 | | | | | | | | |

MEASURED BY

| Time | Measured by |
|------|------|
| 4:38 PM | Hazel Bray, CMA |

## Physical Exam

| Exam | Findings | Details |
|------|------|------|
| General Exam | Comments | tall thin in NAD |
| Psychiatric | Normal | Orientation - Oriented to time, place, person & situation. Appropriate mood and affect. |

## Completed Orders (this encounter)

| Order | Details | Reason | Side | Interpretation | Result | | Initial Treatment Date | Region |
|------|------|------|------|------|------|------|------|------|
| PHQ-9 completed | | | | Mild depression | 7 | | | |

## Assessment/Plan

| # | Detail Type | Description |
|------|------|------|
| 1. | Assessment | Attention-deficit hyperactivity disorder, unspecified type (F90.9). |
| | Plan Orders | Referrals: Mental Health Counselor. Evaluate and treat. |
| 2. | Assessment | Anxiety (F41.9). |
| 3. | Other Orders | Orders not associated to today's assessments. |
| | Plan Orders | The patient had the following procedure(s) completed today PHQ-9 completed.. |

| Status | Ordered | Order | Timeframe | actComments |
|------|------|------|------|------|
| ordered | 05/25/2018 | Referrals: Mental Health Counselor. Evaluate and treat | | please evualate and give opinon about the need for emotional service dogs; |

## Medications *(Added, Continued or Stopped this visit)*

| Started | Medication | Directions | Instruction | Stopped |
|------|------|------|------|------|
| | loperamide 2 mg capsule | take 2 capsule by oral route after 1st loose stool, followed by 1 capsule after each subsequent loose stool not to exceed 16 mg/day | | |
| | ondansetron 4 mg disintegrating tablet | take 1 tablet by oral route every 6 hours for 2 days and place on top of the tongue where it will dissolve, then | | |

Kitchens, Markcus Z. ███████ ███████ 05/25/2018 04:18 PM 3/4

MK000029

*Provider:  Vicki Hackman MD 05/25/2018 05:05 PM*

Vicki L. Hackman MD.

*Document generated by:*  Vicki Hackman 05/25/2018 05:05 PM

Electronically signed by Vicki Hackman MD on 05/27/2018 12:11 PM

MK000030



# WHITE HOUSE
C L I N I C S

| | |
|---|---|
| PATIENT: | Markcus Kitchens |
| DATE OF BIRTH: | ▇▇▇▇ |
| DATE: | 07/26/2017 09:21 AM |
| HISTORIAN: | self |
| VISIT TYPE: | Office Visit |
| PROVIDER: | Vicki Hackman, MD |

This 25 year old male presents for med refill.

## History of Present Illness:
1. med refill
last seen 2/2016;
finished 1st year of med school; working with daniel lee in richond and leaves in september to go back;  has 1 more year there at basic science and 2 y of clinical ;
on adderal since 2014;
says he was focusing better on adderall;

## Allergies
No known allergies.

| Ingredient | Reaction | Medication Name | Comment |
|---|---|---|---|
| NO KNOWN ALLERGIES | | | |

Reviewed, no changes.

## VITAL SIGNS

| Time | BP mm/Hg | Pulse /min | Resp /min | Temp F | Ht ft | Ht in | Ht cm | Wt lb | Wt oz | Wt kg | Weight % | BMI kg/m2 | BMI % | BSA m2 | O2 Sat% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9:30 AM | 100/62 | 73 | 18 | 97.50 | 5.0 | 11.00 | 180.34 | 140.00 | | 63.503 | | 19.53 | 0 | | 98 |

## MEASURED BY

| Time | Measured by |
|---|---|
| 9:30 AM | Hazel Bray, CMA |

Kitchens, Markcus Z. ▇▇▇▇ ▇▇▇▇   07/26/2017 09:21 AM 1/3

## Physical Exam

| Exam | Findings | Details |
|---|---|---|
| Psychiatric | Normal | Orientation - Oriented to time, place, person & situation. Appropriate mood and affect. |

## Assessment/Plan

| # | Detail Type | Description |
|---|---|---|
| 1. | Assessment | Attention and concentration deficit (R41.840). |
| | Provider Plan | is asking me to write an rx for adderall;  he is leaving for poland in september;  He says poland does not prescribe adderall for ADHD but was told if he had an MD here to write a letter, he could get it there.  I told him I could not do that but I could refer him to a specialist for evaluation and get their opinion about him needing the medication.   He was not happy with this; says he was seeing colleen and then Dr David was writing his rx and he brought in a bottle dated 2016 as last rx. |
| | Plan Orders | Referrals: Psychiatry. Evaluate and treat. |

| Status | Ordered | Order | Timeframe | actComments |
|---|---|---|---|---|
| ordered | 07/26/2017 | Referrals: Psychiatry. Evaluate and treat | | needs evaluated for ADHD;  is going overseas in september and has been on adderall in past;  please evaluate ; needs recommendations and treatment |

Provider:  *Vicki Hackman MD 07/26/2017 10:00 AM*

*Vicki L. Hackman MD.*

*Document generated by:*  Vicki Hackman 07/26/2017 10:00 AM
Kitchens, Markcus Z. ███████████████ █ 07/26/2017 09:21 AM 2/3

MK000032

**From: donotreply@prometric.com**
**Subject: Appointment Confirmation**
**Date: Oct 27, 2020 at 10:48:28 AM**
**To: markzwanz@gmail.com**

---

To:   Markcus Zwanz KITCHENS
      2
      2 ILLINOIS 11111
      UNITED STATES

Date:  27 Oct 2020

| North America |
| --- |

Subject: Confirmation of computer-based **Comprehensive Basic Science,#0000000094927214**

---

Your appointment for the computer-based **Comprehensive Basic Science** is confirmed  Please find the confirmation details that follow:

| | |
| --- | --- |
| Confirmation: **0000000094927214** | **Prometric Test Center: # 3201** |
| Program:      **NBME Subject Examination Program** | **De Kalb - Sycamore** |
| Exam Code:    **CBSCI** | **1830 Mediterranean Dr** |
|               | **Suite 201** |
|               **Comprehensive Basic Science** | **Sycamore ILLINOIS 60178** |
| Exam Date:    **10 Dec 2020** | **UNITED STATES** |
| Exam Time:    **08:00** | |

**TEST ACCOMMODATIONS**

Extended Time

**GLOBAL TEST CENTER SECURITY PROCEDURES**

Prometric takes our role of providing a secure test environment seriously  During the check-in process, we inspect any and all eyeglasses, jewelry and other accessories to look for camera devices that could be used to capture exam content

- You will be required to remove your eyeglasses for close visual inspection  These inspections will take a few seconds and will be done at check-in and again upon return from breaks before you enter the testing room to ensure you do not violate any security protocol
- Jewelry outside of wedding and engagement rings is prohibited  Please do not wear other jewelry to the test center  Hair accessories, ties and bowties are subject to inspection  Please refrain from using ornate clips, combs, barrettes, headbands, tie clips, cuff links and other accessories as you may be prohibited from wearing them into the testing room and asked to store them in your locker  Violation of security protocol may result in the confiscation of prohibited devices and termination of your exam

**IDENTIFICATION POLICY**

You must bring your Scheduling Permit, or present it electronically (e g , via Smartphone), to the test center, along with your required identification in order to take your exam  Review your Scheduling Permit for complete details  *This email is NOT your Scheduling Permit
To access your Scheduling Permit, go to http://examinee nbme org/documents/mss  We strongly encourage you to print your Scheduling Permit at least several days in advance of your scheduled appointment to avoid any problems accessing or printing your permit on test day

Important Note: In order to be admitted to the exam on test day, your name as it appears on your Scheduling Permit must EXACTLY MATCH the name on the identification you plan to present at the testing center on test day  If the name listed on your permit is misspelled or differs from your name as it appears on your identification, immediately contact your institution  In order to receive a revised scheduling permit your institution MUST submit your name change or correction more than 7 business days prior to your scheduled test date

**RESCHEDULE / CANCEL POLICY**

If you need to change (e g , reschedule, cancel, change test center location) your appointment, you must go to http://www prometric com/MSS

The date that you change your appointment, using Eastern Standard Time in the United States, will determine whether you pay an appointment change fee and the amount of this fee:

- If you change your appointment 15 or more days before (but not including) the first day of your scheduled test date, there is no fee
- If you change your appointment fewer than 15 days but more than 5 days before (but not including) the first day of your scheduled test date, the fee is $30 US Dollars (USD)
- If you change your appointment 5 or fewer days before (but not including) the first day of your scheduled test date, the fee is $63 00 USD

MK000033

NOTE: If you do not test as scheduled, your eligibility will be terminated and you must submit a new application

**DRIVING DIRECTIONS**

I-88 W (signs for I 88 South Toll way/Aurora/I-294)  Take the Peace Rd  exit toward IL-38  Turn right on to Peace Rd  Turn left at the light on Bethany  Turn right onto Mediterrean Dr  The destination will be on the right, in the same parking lot as Cadence Health, we are in the front of the building

**ADDITIONAL INFORMATION**

- TEST DAY ARRIVAL: Report to the test center 30 minutes before your scheduled appointment for check-in procedures  If you arrive later than your scheduled appointment, you may not be admitted  If you arrive more than 30 minutes after your scheduled appointment, you will not be admitted to the testing center
Though the site provides noise reducing headphones, you are encouraged to bring your own cordless soft-foam earplugs (subject to inspection)
IF CENTER NOT ABLE TO TEST: In the event that the test center becomes unavailable on your scheduled test date, we will attempt to notify you in advance and schedule you for a different time and/or center  However, on occasion, we may need to reschedule your appointment at the last minute  We strongly encourage you to check your voicemail and email prior to leaving for your appointment on test day, particularly during inclement weather  You may also call the test center directly or go to www.prometric.com to ch eck for weather-related closings

TEST CENTER REGULATIONS: For a full listing of Prometric Testing Center Regulations and other FAQ's please visit the Prometric website at http://www.prometric.com/TestTakers/FAQs/default.htm
There is a 15 minute scheduled/authorized break between sections two and three  You are encouraged to take a break at this time  During the authorized break, you are permitted to access your locker

You are advised not to take a personal break at any other time during the examination  If you must use the restroom, you may do so  However, you may not access your locker  Accessing electronic devices, such as cell phones, books, or study materials from your locker is prohibited  If you must obtain medicine or a food/drink item, notify Prometric staff before doing so  If Prometric staff are not notified and observe you accessing personal belongings you may be reported for irregular behavior  You are not permitted to make n otes on your note board prior to starting your test  You are not permitted to leave the test center area at any time that your test is in session unless the test center is evacuated because of an emergency situation  In the event the test center is evacuated, you may not access personal belongings or discuss examination content with other test takers  You are required to review and follow the Prometric test center regulations that are provided to you to read during the check-in process

Important Guidelines for testing During COVID-19

https://prometric-4562417.hs-sites.com/?hs_preview=KhVSEZiH-30068366739

**PERSONAL DATA COLLECTION & PROCESSING**

You have consented to the collection and processing of your Personal Data, and biometrics, where required by your Test Sponsor

Sincerely,

**North America**
Prometric
www.prometric.com

MK000034

To Whom It May Concern:

My name is Markcus Kitchens, Jr. and I'm in the process of registering for the USMLE Step 1 Examination. I am writing this letter to request accommodations, specifically extended time, due to being diagnosed Attention-Deficit Hyperactivity Disorder and severe test anxiety.

Pursuant to Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act (ADA), a person may be considered disabled if he 1) has a physical or mental condition that substantially limits one or more major life activity(ies); 2) has a record of such physical or mental condition; and/or 3) is regarded as having such an impairment. For students with documented disabilities, reasonable accommodations are adjustments that allows for qualified students to have an equal opportunity to succeed without barrier(s).

As an individual with  ADHD and severe test anxiety, standardized exams have often presented challenges to my capacity as a student as well as a professional. When exam scores are used as a metric for whether a candidate is qualified, for a person like myself, it reflects my ability to take an exam rather than my comprehensive understanding of the material. In order to better reflect my abilities, I am requesting additional time to complete the exam. The additional time will maximize my ability to achieve my highest quality of work by decreasing my anxiety, and increase my focus. While in university, I never had the need to file an official documentation for my situation due to my professors willingness to take my exams one on one with extended time. Included in my application is a letter from my primary care physician outlining the severity of my symptoms and need for extended time an. Also, in the application you will notice my current medication list for my ADHD and Test Anxiety.

Thank you and I look forward to hearing from you soon!


Regards,

Markcus Kitchens

**From:** disabilityservices@nbme.org
**Date:** August 30, 2022 at 4:01:58 PM EDT
**To:** markzwanz@gmail.com
**Subject: RE: USMLE Step 1  - ref:_00D46pfBg._5004w2SJqBU:ref

RE: Step 1          USMLE ID#: ██████████

Dear Markcus Zwanz Kitchens:

The National Board of Medical Examiners (NBME) processes requests for test accommodations on behalf of the United States Medical Licensing Examination (USMLE) program.  We have received your request for test accommodations for the USMLE Step 1.

Before we can begin to process your request, you must do the following:

- Please provide new (documentation that we have not already reviewed), substantive documentation to support your request for additional testing time (1.5x) and additional break time. The documentation that was submitted was documentation we had reviewed previously. Ultimately, it is up to each examinee to determine what documentation they have available and would like to submit for our review. Generally, the more information that we have, the more informed decision we can make. Please feel free to share your previous decision letter with your treatment provider(s) or others if you feel they may be able to assist you in obtaining additional supporting information.

Once we are in receipt of new supporting documentation that we have not already reviewed, we will begin to process your request and submitted documentation. If necessary, we may contact you to request additional information.

All written correspondence regarding your request, including the decision letter, will be sent to you electronically via email. When our review is complete, you will receive an email from us with the decision letter attached as a pdf document.

If you have any questions about the review process, please feel free to contact me at (215) 590-9700 or reply to this e-mail.

Sincerely,

Jennifer

Disability Services Specialist

National Board of Medical Examiners

MK000036

3750 Market Street
Philadelphia, PA 19104-3102
215 590 9700
disabilityservices@nbme.org

This email message and any attachments may contain privileged and/or confidential business information and are for the  ole u e of the intended recipient(  ) Any unauthorized review, u e, di clo ure or di tribution is prohibited. If you are not the intended recipient, please notify the sender immediately by reply email and destroy all copies of the original message and any attachments.

MK000037

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DR. MARKCUS KITCHENS, JR. | ) | |
| PLAINTIFF | ) | |
| | ) | CIVIL ACTION NO.: |
| v. | ) | 2:22-CV-03301-JMY |
| | ) | |
| NATIONAL BOARD OF MEDICAL EXAMINERS, | ) | |
| DEFENDANT | ) | |
| | ) | |

**DECLARATION OF MISSIE KING IN SUPPORT
OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Missie King, submit this declaration based upon my personal knowledge. If called upon to testify, I can and will testify truthfully and accurately to the facts contained herein:

1.      My name is Missie King. I am over the age of eighteen (18). I have personal knowledge of all facts set forth herein.

2.      I am the mother of the Plaintiff, Dr. Markcus Kitchens.

3.      As a small child, Dr. Kitchens was an extremely active individual. He always had to be doing something, he could not sit still, and everything was at a run and/or fast pace.

4.      During Dr. Kitchens' first grade school year, the teacher noticed Dr. Kitchens demonstrated signs of an attentional disorder. These signs included:

   a.   Being unable to sit still;

   b.   A constant need to move and/or fidget;

   c.   An inability to focus while the teacher was talking; and

   d.   Being easily distracted.

5.      Towards the end of Dr. Kitchens' first grade school year, the teacher and school administration recommended holding him back to repeat the first grade.

6.       Due to his high performance in classwork, I refused to hold him back.

**EXHIBIT**

**B**

MK000038

7.     During his second grade school year, the teacher recognized the same attentional disorder symptoms in Dr. Kitchens as the previous year.

8.     The teacher met with me in a parent teacher conference and recommended I have Dr. Kitchens evaluated for attentional and/or learning disorders.

9.     I took Dr. Kitchens to his pediatrician and had him evaluated for learning and attentional disorders.

10.     His pediatrician diagnosed Dr. Kitchens with ADHD and recommended he be put on Ritalin[1]. His pediatrician explained to me that the medicine would keep him focused and calm. I turned down the prescription.

11.     Dr. Kitchens' teacher began working with him one-on-one, in a distraction-free environment, with additional time on assignments and/or tasks.

12.     The teacher also recommended that Dr. Kitchens begin attending after-school learning programs such as:

      a.   Kumon;

      b.   Hooked on Phonics;

      c.   Literacy audio tapes;

      d.   Flashcards; and

      e.   One-on-one tutoring.

13.     The teacher also recommended that he be involved in physical after-school activities.

14.     Based on this advice, I enrolled Dr. Kitchens into after school activities and the above referenced academic programs.

---

[1] Ritalin is a methylphenidate (stimulant) that is used to treat children with attention-deficit hyperactivity disorder. *[cite]*.

15.     Each grade subsequent, I pulled Dr. Kitchens' teachers aside and talked with them about Dr. Kitchens' hyperactivity, short attention span, and difficulties focusing in classes.

16.     With each grade, Dr. Kitchens' teachers noted that he performed well academically but needed improvement in his conduct. His teachers all noted Dr. Kitchens was easily distracted, lacked focus, and talked excessively in class.

17.     As he got older, I kept Dr. Kitchens on a routine with check lists, visual progress markers, and physical after-school activities.

18.     In late middle school and/or early high school, Dr. Kitchens began implementing his own systems to manage his personal life, including but not limited to:

    a.  Maintaining planners;

    b.  Writing everything down;

    c.  Keeping alarms for tasks;

    d.   Self-made itinerary; and

    e.  Having specific location(s) for personal belongings and taking photographs of where those belongings were.

19.     During this same time period, Dr. Kitchens began creating systems to manage his academics, including but not limited to:

    a.      Studying in his room in complete silence;

    b.      Using sticky notes as reminders;

    c.      White erase boards;

    d.      Flashcards;

    e.      Audio tapes of books used in school; and

    f.  Studying weeks and/or months in advance of examination(s) and/or quiz(zes).

  20. As Dr. Kitchens progressed through high school, he began having to study two to three times as long as his peers in order to maintain his grades.

  21. Dr. Kitchens graduated high school in May, 2010 with As, Bs, and Cs.

FURTHER, the Affiant sayeth naught.

> Missie King
> ID RsDRnjrcdEy61KLXYKIgMSua

        Missie King

**COMMONWEALTH OF KENTUCKY** )
**COUNTY OF MADISON**    )

Subscribed, sworn to, and acknowledged before me by the Affiant Missie King on this 6th day of February, 2023.

          _Amelia Lou Kitchens_
          NOTARY PUBLIC

```
AMELIA LOU KITCHENS
Notary Public
Commonwealth of Kentucky
Commission Number KYNP55542
My Commission Expires Jul 19, 2026
```

My commission expires: 7/19/2026
           KYNP55542

# eSignature Details

| | |
|---|---|
| **Signer ID:** | **RsDRnjrcdEy61KLXYKfgMSua** |
| Signed by: | Missie King |
| Sent to email: | jackson_missie@yahoo.com |
| IP Address: | 66.85.230.255 |
| Signed at: | Feb 6 2023, 11:02 pm EST |

MK000042

**From: donotreply@prometric.com**
**Subject: Appointment Confirmation**
**Date: Oct 27, 2020 at 10:48:28 AM**
**To: markzwanz@gmail.com**

---

To:   Markcus Zwanz KITCHENS
      2
      2 ILLINOIS 11111
      UNITED STATES

| North America |
| --- |

Date:   27 Oct 2020

Subject: Confirmation of computer-based **Comprehensive Basic Science,#0000000094927214**

Your appointment for the computer-based **Comprehensive Basic Science** is confirmed  Please find the confirmation details that follow:

| | |
| --- | --- |
| Confirmation: **0000000094927214** | Prometric Test Center: **# 3201** |
| Program: **NBME Subject Examination Program** | **De Kalb - Sycamore** |
| Exam Code: **CBSCI** | **1830 Mediterranean Dr** |
| | **Suite 201** |
| **Comprehensive Basic Science** | **Sycamore ILLINOIS 60178** |
| Exam Date: **10 Dec 2020** | **UNITED STATES** |
| Exam Time: **08:00** | |

<u>**TEST ACCOMMODATIONS**</u>

Extended Time

<u>**GLOBAL TEST CENTER SECURITY PROCEDURES**</u>

Prometric takes our role of providing a secure test environment seriously  During the check-in process, we inspect any and all eyeglasses, jewelry and other accessories to look for camera devices that could be used to capture exam content

- You will be required to remove your eyeglasses for close visual inspection  These inspections will take a few seconds and will be done at check-in and again upon return from breaks before you enter the testing room to ensure you do not violate any security protocol
- Jewelry outside of wedding and engagement rings is prohibited  Please do not wear other jewelry to the test center  Hair accessories, ties and bowties are subject to inspection  Please refrain from using ornate clips, combs, barrettes, headbands, tie clips, cuff links and other accessories as you may be prohibited from wearing them into the testing room and asked to store them in your locker  Violation of security protocol may result in the confiscation of prohibited devices and termination of your exam

<u>**IDENTIFICATION POLICY**</u>

You must bring your Scheduling Permit, or present it electronically (e g , via Smartphone), to the test center, along with your required identification in order to take your exam  Review your Scheduling Permit for complete details  *This email is NOT your Scheduling Permit
To access your Scheduling Permit, go to http://examinee nbme org/documents/mss  We strongly encourage you to print your Scheduling Permit at least several days in advance of your scheduled appointment to avoid any problems accessing or printing your permit on test day

Important Note: In order to be admitted to the exam on test day, your name as it appears on your Scheduling Permit must EXACTLY MATCH the name on the identification you plan to present at the testing center on test day  If the name listed on your permit is misspelled or differs from your name as it appears on your identification, immediately contact your institution  In order to receive a revised scheduling permit your institution MUST submit your name change or correction more than 7 business days prior to your scheduled test date

<u>**RESCHEDULE / CANCEL POLICY**</u>

If you need to change (e g , reschedule, cancel, change test center location) your appointment, you must go to http://www prometric com/MSS

The date that you change your appointment, using Eastern Standard Time in the United States, will determine whether you pay an appointment change fee and the amount of this fee:

- If you change your appointment 15 or more days before (but not including) the first day of your scheduled test date, there is no fee
- If you change your appointment fewer than 15 days but more than 5 days before (but not including) the first day of your scheduled test date, the fee is $30 US Dollars (USD)
- If you change your appointment 5 or fewer days before (but not including) the first day of your scheduled test date, the fee is $63 00 USD



**EXHIBIT**

**C**

MK000043

NOTE: If you do not test as scheduled, your eligibility will be terminated and you must submit a new application

**DRIVING DIRECTIONS**

I-88 W (signs for I 88 South Toll way/Aurora/I-294)  Take the Peace Rd  exit toward IL-38  Turn right on to Peace Rd  Turn left at the light on Bethany  Turn right onto Mediterrean Dr  The destination will be on the right, in the same parking lot as Cadence Health, we are in the front of the building

**ADDITIONAL INFORMATION**

- TEST DAY ARRIVAL: Report to the test center 30 minutes before your scheduled appointment for check-in procedures  If you arrive later than your scheduled appointment, you may not be admitted  If you arrive more than 30 minutes after your scheduled appointment, you will not be admitted to the testing center
Though the site provides noise reducing headphones, you are encouraged to bring your own cordless soft-foam earplugs (subject to inspection)
IF CENTER NOT ABLE TO TEST: In the event that the test center becomes unavailable on your scheduled test date, we will attempt to notify you in advance and schedule you for a different time and/or center  However, on occasion, we may need to reschedule your appointment at the last minute  We strongly encourage you to check your voicemail and email prior to leaving for your appointment on test day, particularly during inclement weather  You may also call the test center directly or go to www prometric com to ch eck for weather-related closings

TEST CENTER REGULATIONS: For a full listing of Prometric Testing Center Regulations and other FAQ's please visit the Prometric website at http://www prometric com/TestTakers/FAQs /default htm
There is a 15 minute scheduled/authorized break between sections two and three  You are encouraged to take a break at this time  During the authorized break, you are permitted to access your locker

You are advised not to take a personal break at any other time during the examination  If you must use the restroom, you may do so  However, you may not access your locker  Accessing electronic devices, such as cell phones, books, or study materials from your locker is prohibited  If you must obtain medicine or a food/drink item, notify Prometric staff before doing so  If Prometric staff are not notified and observe you accessing personal belongings you may be reported for irregular behavior  You are not permitted to make n otes on your note board prior to starting your test  You are not permitted to leave the test center area at any time that your test is in session unless the test center is evacuated because of an emergency situation  In the event the test center is evacuated, you may not access personal belongings or discuss examination content with other test takers  You are required to review and follow the Prometric test center regulations that are provided to you to read during the check-in process

Important Guidelines for testing During COVID-19

https://prometric-4562417 hs-sites com/?hs_preview=KhVSEZiH-30068366739

**PERSONAL DATA COLLECTION & PROCESSING**

You have consented to the collection and processing of your Personal Data, and biometrics, where required by your Test Sponsor

Sincerely,

**North America**
Prometric
www prometric com

**U.S. Department of Justice**
Civil Rights Division
*Disability Rights Section*





# Testing Accommodations

Standardized examinations and other high-stakes tests are gateways to educational and employment opportunities. Whether seeking admission to a high school, college, or graduate program, or attempting to obtain a professional license or certification for a trade, it is difficult to achieve such goals without sitting for some kind of standardized exam or high-stakes test. While many testing entities have made efforts to ensure equal opportunity for individuals with disabilities, the Department continues to receive questions and complaints relating to excessive and burdensome documentation demands, failures to provide needed testing accommodations, and failures to respond to requests for testing accommodations in a timely manner.

The Americans with Disabilities Act (ADA) ensures that individuals with disabilities have the opportunity to fairly compete for and pursue such opportunities by requiring testing entities to offer exams in a manner accessible to persons with disabilities. When needed testing accommodations are provided, test-takers can demonstrate their true aptitude.

The Department of Justice (Department) published revised final regulations implementing the ADA for title II (State and local government services) and title III (public accommodations and commercial facilities) on September 15, 2010. These rules clarify and refine issues that have arisen over the past 20 years and contain new and updated requirements.

## Overview

This publication provides technical assistance on testing accommodations for individuals with disabilities who take standardized exams and other high-stakes tests. It addresses the obligations of testing entities, which include private, state, or local government entities that offer exams related to applications, licensing, certification, or credentialing for secondary (high school), postsecondary (college and graduate school), professional (law, medicine, etc.), or trade (cosmetology, electrician, etc.) purposes. Who is entitled to testing accommodations, what types of testing accommodations must be provided, and what documentation may be required of the person requesting testing accommodations are also discussed.

**EXHIBIT**

**D**

MK000045

## What Kinds Of Tests Are Covered?

**Exams administered by any private, state, or local government entity related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes are covered by the ADA and testing accommodations, pursuant to the ADA, must be provided.**[1]

Examples of covered exams include:

- High school equivalency exams (such as the GED);

- High school entrance exams (such as the SSAT or ISEE);

- College entrance exams (such as the SAT or ACT);

- Exams for admission to professional schools (such as the LSAT or MCAT);

- Admissions exams for graduate schools (such as the GRE or GMAT); and

- Licensing exams for trade purposes (such as cosmetology) or professional purposes (such as bar exams or medical licensing exams, including clinical assessments).

## What Are Testing Accommodations?

**Testing accommodations are changes to the regular testing environment and auxiliary aids and services**[2] **that allow individuals with disabilities to demonstrate their true aptitude or achievement level on standardized exams or other high-stakes tests.**

Examples of the wide range of testing accommodations that may be required include:

- Braille or large-print exam booklets;

- Screen reading technology;

- Scribes to transfer answers to Scantron bubble sheets or record dictated notes and essays;

- Extended time;

MK000046

- Wheelchair-accessible testing stations;

- Distraction-free rooms;

- Physical prompts (such as for individuals with hearing impairments); and

- Permission to bring and take medications during the exam (for example, for individuals with diabetes who must monitor their blood sugar and administer insulin).

## Who Is Eligible To Receive Testing Accommodations?

**Individuals with disabilities are eligible to receive necessary testing accommodations.**  Under the ADA, an individual with a disability is a person who has a physical or mental impairment that substantially limits a major life activity (such as seeing, hearing, learning, reading, concentrating, or thinking) or a major bodily function (such as the neurological, endocrine, or digestive system).  The determination of whether an individual has a disability generally should not demand extensive analysis and must be made without regard to any positive effects of measures such as medication, medical supplies or equipment, low-vision devices (other than ordinary eyeglasses or contact lenses), prosthetics, hearing aids and cochlear implants, or mobility devices.   However, negative effects, such as side effects of medication or burdens associated with following a particular treatment regimen, may be considered when determining whether an individual's impairment substantially limits a major life activity.

**A substantial limitation of a major life activity may be based on the extent to which the impairment affects the condition, manner, or duration in which the individual performs the major life activity.** To be "substantially limited" in a major life activity does not require that the person be unable to perform the activity.  In determining whether an individual is substantially limited in a major life activity, it may be useful to consider, when compared to most people in the general population, the conditions under which the individual performs the activity or the manner in which the activity is performed.  It may also be useful to consider the length of time an individual can perform a major life activity or the length of time it takes an individual to perform a major life activity, as compared to most people in the general population.  For example:

- The condition or manner under which an individual who has had a hand amputated performs manual tasks may be more cumbersome, or require more effort or time, than the way most people in the general population would perform the same tasks.

- The condition or manner under which someone with coronary artery disease performs the major life activity of walking would be substantially limited if the individual experiences shortness of breath and fatigue when walking distances that most people could walk without experiencing such effects.

MK000047

- A person whose back or leg impairment precludes him or her from sitting for more than two hours without significant pain would be substantially limited in sitting, because most people can sit for more than two hours without significant pain.

**A person with a history of academic success may still be a person with a disability who is entitled to testing accommodations under the ADA.**  A history of academic success does not mean that a person does not have a disability that requires testing accommodations.  For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more of the major life activities of reading, writing, speaking, or learning, because of the additional time or effort he or she must spend to read, write, speak, or learn compared to most people in the general population.

## What Testing Accommodations Must Be Provided?

**Testing entities must ensure that the test scores of individuals with disabilities accurately reflect the individual's aptitude or achievement level or whatever skill the exam or test is intended to measure.**  A testing entity must administer its exam so that it accurately reflects an individual's aptitude, achievement level, or the skill that the exam purports to measure, rather than the individual's impairment (except where the impaired skill is one the exam purports to measure).[3]

- **Example:** An individual may be entitled to the use of a basic calculator during exams as a testing accommodation.  If the objective of the test is to measure one's ability to solve algebra equations, for example, and the ability to perform basic math computations (e.g., addition, subtraction, multiplication, and division), is secondary to the objective of the test, then a basic calculator may be an appropriate testing accommodation.  If, however, the objective of the test is to measure the individual's understanding of, and ability to perform, math computations, then it likely would not be appropriate to permit a calculator as a testing accommodation.

## What Kind Of Documentation Is Sufficient To Support A Request For Testing Accommodations?

All testing entities must adhere to the following principles regarding what may and may not be required when a person with a disability requests a testing accommodation.

- **Documentation.  Any documentation if required by a testing entity in support of a request for testing accommodations must be reasonable and limited to the need for the requested testing accommodations.**  Requests for supporting documentation should be narrowly tailored to the information needed to determine the nature of the candidate's disability and his or her need for the requested testing accommodation.  Appropriate documentation will vary depending on the nature of the disability and the specific testing accommodation requested.

MK000048

Examples of types of documentation include:

- Recommendations of qualified professionals;

- Proof of past testing accommodations;

- Observations by educators;

- Results of psycho-educational or other professional evaluations;

- An applicant's history of diagnosis; and

- An applicant's statement of his or her history regarding testing accommodations.

Depending on the particular testing accommodation request and the nature of the disability, however, a testing entity may only need one or two of the above documents to determine the nature of the candidate's disability and his or her need for the requested testing accommodation.  If so, a testing entity should generally limit its request for documentation to those one or two items and should generally evaluate the testing accommodation request based on those limited documents without requiring further documentation.

- **Past Testing Accommodations.  Proof of past testing accommodations in similar test settings is generally sufficient to support a request for the same testing accommodations for a current standardized exam or other high-stakes test**.

    - **Past Testing Accommodations on Similar Standardized Exams or High-Stakes Tests.**  If a candidate requests the same testing accommodations he or she previously received on a similar standardized exam or high-stakes test, provides proof of having received the previous testing accommodations, and certifies his or her current need for the testing accommodations due to disability, then a testing entity should generally grant the same testing accommodations for the current standardized exam or high-stakes test without requesting further documentation from the candidate.  So, for example, a person with a disability who receives a testing accommodation to sit for the SAT should generally get the same testing accommodation to take the GRE, LSAC, or MCAT.

- **Formal Public School Accommodations. If a candidate previously received testing accommodations under an Individualized Education Program (IEP)[3] or a Section 504 Plan,[4] he or**

MK000049

**she should generally receive the same testing accommodations for a current standardized exam or high-stakes test.** If a candidate shows the receipt of testing accommodations in his or her most recent IEP or Section 504 Plan, and certifies his or her current need for the testing accommodations due to disability, then a testing entity should generally grant those same testing accommodations for the current standardized exam or high-stakes test without requesting further documentation from the candidate.  This would include students with disabilities publicly-placed and funded in a private school under the IDEA or Section 504 placement procedures whose IEP or Section 504 Plan addresses needed testing accommodations.

- **Example.**  Where a student with a Section 504 Plan in place since middle school that includes the testing accommodations of extended time and a quiet room is seeking those same testing accommodations for a high-stakes test, and certifies that he or she still needs those testing accommodations, the testing entity receiving such documentation should generally grant the request.

- **Private School Testing Accommodations.  If a candidate received testing accommodations in private school for similar tests under a formal policy, he or she should generally receive the same testing accommodations for a current standardized exam or high-stakes test.** Testing accommodations are generally provided to a parentally-placed private school student with disabilities pursuant to a formal policy and are documented for that particular student.  If a candidate shows a consistent history of having received testing accommodations for similar tests, and certifies his or her current need for the testing accommodations due to disability, then a testing entity should generally grant those same testing accommodations for the current standardized exam or high-stakes test without requesting further documentation from the candidate.

- **Example.**  A private school student received a large-print test and a scribe as testing accommodations on similar tests throughout high school pursuant to a formal, documented accommodation policy and plan.  Where the student provides documentation of receiving these testing accommodations, and certifies that he or she still needs the testing accommodations due to disability, a testing entity should generally grant the candidate's request for the same testing accommodations without requesting further documentation.

- **First Time Requests or Informal Classroom Testing Accommodations.  An absence of previous formal testing accommodations does not preclude a candidate from receiving testing accommodations.** Candidates who are individuals with disabilities and have never previously received testing accommodations may also be entitled to receive them for a current standardized exam or high-stakes test.  In the absence of documentation of prior testing accommodations, testing entities should consider the entirety of a candidate's history, including informal testing accommodations,to determine whether that history indicates a current need for testing accommodations.

MK000050

- **Example.**  A high school senior is in a car accident that results in a severe concussion.  The report from the treating specialist says that the student has post-concussion syndrome that may take up to a year to resolve, and that while his brain is healing he will need extended time and a quiet room when taking exams.  Although the student has never previously received testing accommodations, he may nevertheless be entitled to the requested testing accommodations for standardized exams and high-stakes tests as long as the post-concussion syndrome persists.

- **Example.**  A student with a diagnosis of ADHD and an anxiety disorder received informal, undocumented testing accommodations throughout high school, including time to complete tests after school or at lunchtime.  In support of a request for extended time on a standardized exam, the student provides documentation of her diagnoses and their effects on test-taking in the form of a doctor's letter; a statement explaining her history of informal classroom accommodations for the stated disabilities; and certifies that she still needs extended time due to her disabilities.  Although the student has never previously received testing accommodations through an IEP, Section 504 Plan, or a formal private school policy, she may nevertheless be entitled to extended time for the standardized exam.

- **Qualified Professionals.  Testing entities should defer to documentation from a qualified professional who has made an individualized assessment of the candidate that supports the need for the requested testing accommodations.**  Qualified professionals are licensed or otherwise properly credentialed and possess expertise in the disability for which modifications or accommodations are sought.  Candidates who submit documentation (such as reports, evaluations, or letters) that is based on careful consideration of the candidate by a qualified professional should not be required by testing entities to submit additional documentation.  A testing entity should generally accept such documentation and provide the recommended testing accommodation without further inquiry.

  - Reports from qualified professionals who have evaluated the candidate should take precedence over reports from testing entity reviewers who have never conducted the requisite assessment of the candidate for diagnosis and treatment.   This is especially important for individuals with learning disabilities because face-to-face interaction is a critical component of an accurate evaluation, diagnosis, and determination of appropriate testing accommodations.

  - A qualified professional's decision not to provide results from a specific test or evaluation instrument should not preclude approval of a request for testing accommodations where the documentation provided by the candidate, in its entirety, demonstrates that the candidate has a disability and needs a requested testing accommodation.  For example, if a candidate submits documentation from a qualified professional that demonstrates a consistent history of a reading disorder diagnosis and that recommends the candidate receive double time on standardized exams based on a personal evaluation of the candidate, a testing entity should provide the

MK000051

candidate with double time.  This is true even if the qualified professional does not include every test or subtest score preferred by the testing entity in the psychoeducational or neuropsychological report.

## How Quickly Should A Testing Entity Respond To A Request For Testing Accommodations?

**A testing entity must respond in a timely manner to requests for testing accommodations so as to ensure equal opportunity for individuals with disabilities.**  Testing entities should ensure that their process for reviewing and approving testing accommodations responds in time for applicants to register and prepare for the test.[6]  In addition, the process should provide applicants with a reasonable opportunity to respond to any requests for additional information from the testing entity, and still be able to take the test in the same testing cycle.  Failure by a testing entity to act in a timely manner, coupled with seeking unnecessary documentation, could result in such an extended delay that it constitutes a denial of equal opportunity or equal treatment in an examination setting for persons with disabilities.

## How Should Testing Entities Report Test Scores for Test-Takers Receiving Disability-Related Accommodations?

**Testing entities should report accommodated scores in the same way they report scores generally.**  Testing entities must not decline to report scores for test-takers with disabilities receiving accommodations under the ADA.

**Flagging policies that impede individuals with disabilities from fairly competing for and pursuing educational and employment opportunities are prohibited by the ADA.**  "Flagging" is the policy of annotating test scores or otherwise reporting scores in a manner that indicates the exam was taken with a testing accommodation.  Flagging announces to anyone receiving the exam scores that the test-taker has a disability and suggests that the scores are not valid or deserved.  Flagging also discourages test-takers with disabilities from exercising their right to testing accommodations under the ADA for fear of discrimination.  Flagging must not be used to circumvent the requirement that testing entities provide testing accommodations for persons with disabilities and ensure that the test results for persons with disabilities reflect their abilities, not their disabilities.

**To view model testing accommodation practices and for more information about the ADA, please visit our website or call our toll-free number:**

- **ADA Website**: archive.ada.gov

- **ADA Information Line**: 800-514-0301 (Voice) and 833-610-1264 (TTY); M-W, F 9:30 a.m. – 5:30 p.m., Th 12:30 p.m. – 5:30 p.m. (Eastern Time)

- **Model Testing Accommodation Practices Resulting From Recent Litigation:**
  http://www.ada.gov/lsac_best_practices_report.docx


For persons with disabilities, this publication is available in alternate formats.

Duplication of this document is encouraged.

---

1 This document does not address how the requirements or protections, as applicable, of Title II of the ADA, Section 504 of the Rehabilitation Act, the assessment provisions in the Elementary and Secondary Education Act (ESEA) and the Individuals with Disabilities Education Act (IDEA), and their implementing regulations, apply to, or interact with, the administration of state-wide and district-wide assessments to students with disabilities conducted by public educational entities.

2 *See* 28 C.F.R. §§ 36.303(b), 36.309(b)(3) (providing non-exhaustive lists of auxiliary aids and services).

3 Under Section 309 of the ADA, any person (including both public and private entities) that offers examinations related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes must offer such examinations "in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals."  42 U.S.C. § 12189.  Under regulations implementing this ADA provision, any private entity that offers such examinations must "assure that the examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual´s aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual´s impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure)."  28 C.F.R. § 36.309.  Likewise, under regulations implementing title II of the ADA, public entities offering examinations must ensure that their exams do not provide qualified persons with disabilities with aids, benefits, or services that are not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others, 28 C.F.R. § 35.130(b)(1)(iii), and may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability.  28 C.F.R. § 35.130(b)(6).  Both the title II and title III regulations also require public and private testing entities to provide modifications and auxiliary aids and services for individuals with disabilities unless the entity can demonstrate an applicable defense.  28 C.F.R. §§ 35.130(b)(7), 35.160(b), 35.164; 28 C.F.R. §§ 36.309(b)(1)(iv-vi), (b)(2), 36.309(b)(3).

4 An IEP contains the special education and related services and supplementary aids and services provided to an eligible student with a disability under Part B of the IDEA, 20 U.S.C. §§ 1400 *et seq*. and 34 C.F.R. part 300.

5 A Section 504 Plan could contain the regular or special education and related aids and services provided pursuant to section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and 34 C.F.R. part 104.

6 Testing entities must offer examinations to individuals with disabilities in as timely a manner as offered to others and should not impose earlier registration deadlines on those seeking testing accommodations.

The Americans with Disabilities Act authorizes the Department of Justice (the Department) to provide

MK000053

technical assistance to individuals and entities that have rights or responsibilities under the Act. This document provides informal guidance to assist you in understanding the ADA and the Department's regulations.

This guidance document is not intended to be a final agency action, has no legally binding effect, and may be rescinded or modified in the Department's complete discretion, in accordance with applicable laws. The Department's guidance documents, including this guidance, do not establish legally enforceable responsibilities beyond what is required by the terms of the applicable statutes, regulations, or binding judicial precedent.

**PDF Version**

**archive.ADA.gov Home Page**

MK000054



# CONNERS CPT3

## Continuous Performance Test 3rd Edition™

C. Keith Conners, Ph.D.

# Assessment Report

| | |
|---|---|
| **Name/ID:** | MARKCUS KITCHENS |
| **Age:** | 31 |
| **Gender:** | Male |
| **Birth Date:** | ███████████ |
| **Administration Date:** | February 3, 2023 |
| **Normative Option:** | Gender Specific norms |
| **Input Device:** | Keyboard |
| **Assessor's Name:** | |
| **Medication/Notes:** | |

This Assessment Report is intended for use by qualified assessors only, and is not to be shown or presented to the respondent or any other unqualified individuals or used as the sole basis for clinical diagnosis or intervention. Administrators are cautioned against drawing unsupported interpretations. To obtain a comprehensive view of the individual, information from this report should be combined with information gathered from other psychometric measures, interviews, observations, and available records. This report is based on an algorithm that produces the most common interpretations of the obtained scores. Additional interpretive information is found in the *Conners CPT 3 Manual* (published by MHS).



Copyright © 2014 Multi-Health Systems Inc. All rights reserved.
P.O. Box 950, North Tonawanda, NY 14120-0950
3770 Victoria Park Ave., Toronto, ON M2H 3M6

**EXHIBIT**

**E**

MK000055

## Introduction



The Conners Continuous Performance Test 3rd Edition (Conners CPT 3™) assesses attention-related problems in individuals aged 8 years and older. During the 14-minute, 360-trial administration, respondents are required to respond when any letter appears, except the non-target letter "X." By indexing the respondent's performance in areas of inattentiveness, impulsivity, sustained attention, and vigilance, the Conners CPT 3 can be a useful adjunct to the process of diagnosing Attention-Deficit/Hyperactivity Disorder (ADHD), as well as other psychological and neurological conditions related to attention.

## Validity of Administration

The Conners CPT 3 performs a validity check based on the number of hits and omission errors committed, as well as a self-diagnostic check of the accuracy of the timing of each administration. If there is an insufficient number of hits to compute scores, and/or if the omission error rate exceeds 25%, these issues will be noted. Also, the program will issue a warning message noting that the administration was invalid if a timing issue is detected.

There was no indication of any validity issues; the current administration should be considered valid.

## Response Style Analysis

The variable $C$ represents an individual's natural response style in tasks that involve a speed-accuracy trade-off. Based on his or her score on this variable, a respondent can be classified as having one of the following three response styles: a **conservative** style (T-score ≥ 60) of responding that emphasizes accuracy over speed; a **liberal** style (T-score ≤ 40) of responding that emphasizes speed over accuracy; or a **balanced** style (T-score = 41-59) of responding that is sensitive to both speed and accuracy. Based on MARKCUS's responses, **he has a conservative style of responding that emphasizes accuracy over speed (T-score = 60)**. This response style is often associated with slower reaction times, more omission errors (failure to respond to targets), and fewer commission errors (incorrect responses to non-targets). The influence of MARKCUS's conservative response style on other Conners CPT 3 scores should be taken into consideration throughout the interpretation process.

## T-score Guidelines

The guidelines in the following table apply to all T-scores in this report.

| Guidelines | | | |
|---|---|---|---|
| T-score | For Hit Reaction Time (HRT) | T-score | For all other variables |
| 70+ | Atypically Slow | 70+ | Very Elevated |
| 60-69 | Slow | 60-69 | Elevated |
| 55-59 | A Little Slow | 55-59 | High Average |
| 45-54 | Average | 45-54 | Average |
| 40-44 | A Little Fast | < 45 | Low |
| < 40 | Atypically Fast | | |

Copyright © 2014 Multi-Health Systems Inc. All rights reserved.

MK000056

# Overview of Conners CPT 3 Scores

**MHS**

This section provides an overview of MARKCUS's Conners CPT 3 scores.



| Variable Type | Measure | T-score | Guideline | Interpretation |
|---|---|---|---|---|
| Detectability | d' | 73 | Very Elevated | Pronounced difficulty differentiating targets from non-targets. |
| Error Type | Omissions | 90 | Very Elevated | Very high rate of missed targets. |
| | Commissions | 64 | Elevated | High rate of incorrect responses to non-targets. |
| | Perseverations | 71 | Very Elevated | Very high rate of random, repetitive, or anticipatory responses. |
| Reaction Time Statistics | HRT | 90 | Atypically Slow | Very slow mean response speed. |
| | HRT SD | 90 | Very Elevated | Very high inconsistency in reaction times. |
| | Variability | 78 | Very Elevated | Very high variability in reaction time consistency. |
| | HRT Block Change | 64 | Elevated | Substantial reduction in response speed in later blocks. |
| | HRT ISI Change | 90 | Very Elevated | Very substantial reduction in response speed at longer ISIs. |

**Summary:** Relative to the normative sample, MARKCUS was less able to differentiate targets from non-targets, made more omission errors, made more commission errors, made more perseverative errors, responded more slowly, displayed less consistency in response speed, displayed more variability in response speed, displayed more of a reduction in response speed in later blocks and displayed more of a reduction in response speed at longer ISIs.

Overall, MARKCUS has a total of 9 atypical T-scores, which is associated with a very high likelihood of having a disorder characterized by attention deficits, such as ADHD. Note that other psychological and/or neurological conditions with symptoms of impaired attention can also lead to atypical scores on the Conners CPT 3.

MARKCUS's profile of scores and response pattern indicates that he may have issues related to:
• Inattentiveness (Strong Indication)  • Sustained Attention (Some Indication)  • Vigilance (Some Indication)

Copyright © 2014 Multi-Health Systems Inc. All rights reserved.
3
2/3/2023
Conners CPT 3 Report: MARKCUS KITCHENS

MK000057

# Measures of Inattentiveness



This section summarizes MARKCUS's scores on the inattentiveness measures and provides information about how he compares to the normative group. Indicators of inattentiveness on the Conners CPT 3 are poor Detectability (d'), a high percentage of Omissions and Commissions, a slow Hit Reaction Time (HRT), as well as high levels of inconsistency in response speed (Hit Reaction Time Standard Deviation [HRT SD] and Variability).



| | Detectability (d') | Omissions | Commissions | HRT | HRT SD | Variability |
|---|---|---|---|---|---|---|
| T-score | 73 | 90 | 64 | 90 | 90 | 78 |
| Guideline | Very Elevated | Very Elevated | Elevated | Atypically Slow | Very Elevated | Very Elevated |

**Detectability (d')** measures the respondent's ability to differentiate non-targets (i.e., the letter X) from targets (i.e., all other letters). MARKCUS's T-score is 73 and falls in the **Very Elevated** range. This result means that his ability to discriminate non-targets from targets was very poor when compared to the normative group. Poor ability to differentiate non-targets from targets is an indicator of inattentiveness.

**Omissions** result from a failure to respond to targets. MARKCUS's T-score is 90 and falls in the **Very Elevated** range. This result means that he missed a much higher percentage of targets when compared to the normative group. Failure to respond to targets is an indicator of inattentiveness.

**Commissions** are made when responses are given to non-targets. MARKCUS's T-score is 64 and falls in the **Elevated** range. This result means that he responded to a higher percentage of non-targets when compared to the normative group. A high level of commission errors may be related to inattentiveness and/or impulsivity. The combination of MARKCUS's slow response times (see HRT, below) and high commission errors is an indicator of inattentiveness.

**HRT** is the mean response speed of correct responses for the whole administration. MARKCUS's T-score is 90 and falls in the **Atypically Slow** range. This result means that his response speed was much slower than the normative group's response speed. This may indicate that MARKCUS was not processing targets efficiently. Note that HRT may also be affected by response style; MARKCUS's conservative response style may have contributed to the slower response speed. See the *Response Style Analysis* section of this report for more interpretive information.

**HRT SD** is a measure of response speed consistency during the entire administration. MARKCUS's T-score is 90 and falls in the **Very Elevated** range. This result means that his response speed was much less consistent than the normative group. This suggests that MARKCUS was more inattentive and processed stimuli less efficiently during some portions of the administration.

**Variability**, like HRT SD, is a measure of response speed consistency; however, Variability is a "within respondent" measure; that is, the amount of variability that MARKCUS showed in 18 separate segments of the administration in relation to his own overall HRT SD. MARKCUS's T-score is 78 and falls in the **Very Elevated** range. This result means his response speed variability was much higher when compared to the normative group. High response speed variability indicates that MARKCUS's attention and information processing efficiency varied throughout the administration.

**MARKCUS's scores on these measures strongly suggest that he may have problems with inattentiveness.**

Copyright © 2014 Multi-Health Systems Inc. All rights reserved.

MK000058

## Measures of Impulsivity



This section summarizes MARKCUS's scores on the impulsivity measures and provides information about how he compares to the normative group. Indicators of impulsivity on the Conners CPT 3 include a faster than normal Hit Reaction Time (HRT) in addition to a higher than average rate of Commissions and/or Perseverations.



| | HRT | Commissions | Perseverations |
|---|---|---|---|
| T-score | 90 | 64 | 71 |
| Guideline | Atypically Slow | Elevated | Very Elevated |

**HRT** is the mean response speed of correct responses for the whole administration. MARKCUS's T-score is 90 and falls in the **Atypically Slow** range. This result means that his response speed was much slower than the normative group's response speed. This may indicate that MARKCUS was not processing targets efficiently. A slower than normal HRT is often related to inattentiveness rather than impulsivity. See the *Measures of Inattentiveness* section of this report for more interpretative information.

**Commissions** are made when responses are given to non-targets. MARKCUS's T-score is 64 and falls in the **Elevated** range. This result means that he responded to a higher percentage of non-targets when compared to the normative group. Commission errors may be related to impulsivity and/or inattentiveness. The combination of MARKCUS's slow response times (see HRT, above) and high commission errors is an indicator of inattentiveness rather than impulsivity.

**Perseverations** are random or anticipatory responses. MARKCUS's T-score is 71 and falls in the **Very Elevated** range. This result means that he made many more perseverative errors when compared to the normative group. Because MARKCUS's response speed (see HRT, above) was slow, his perseverations are unlikely to be related to impulsivity.

**MARKCUS's scores on these measures do not indicate a problem with impulsivity.**

## Measures of Sustained Attention



This section summarizes MARKCUS's scores on the sustained attention measures. Sustained attention is defined as the respondent's ability to maintain attention as the administration progresses. A decrease in sustained attention across time is captured by atypical slowing in the respondent's Hit Reaction Times (HRT; as indicated by the variable HRT Block Change), as well as by increases in Omissions and Commissions in later blocks of the administration.

### Hit Reaction Time by Block



|  | Block 1 | Block 2 | Block 3 | Block 4 | Block 5 | Block 6 |
|---|---|---|---|---|---|---|
| ■ HRT (ms) | 770 | 768 | 1163 | 920 | 979 | 994 |
| I HRT SD (ms) | 336 | 418 | 604 | 555 | 525 | 745 |

Note. ms = milliseconds; SD = Standard Deviation.

### HRT Block Change



|  |  |
|---|---|
| T-score | 64 |
| Guideline | Elevated |

### Omissions by Block



|  | Block 1 | Block 2 | Block 3 | Block 4 | Block 5 | Block 6 |
|---|---|---|---|---|---|---|
| O Omissions (%) | 6 | 13 | 21 | 13 | 19 | 10 |

### Commissions by Block



|  | Block 1 | Block 2 | Block 3 | Block 4 | Block 5 | Block 6 |
|---|---|---|---|---|---|---|
| ● Commissions (%) | 67 | 50 | 58 | 50 | 58 | 50 |

Note. No statistically significant differences were found in error rates between blocks.

**HRT Block Change** indicates the change in mean response speed across blocks. MARKCUS's T-score is 64 and falls in the **Elevated** range. This result means that he had a substantial reduction in response speed in later blocks. In terms of error rates, MARKCUS's omission and commission errors did not increase significantly across multiple adjacent blocks. MARKCUS's profile of scores on these measures indicates some support for a problem with sustained attention.

## Measures of Vigilance

 **MHS**

This section summarizes MARKCUS's scores on the vigilance measures. Vigilance relates to the respondent's performance at varying levels of stimulus frequency (inter-stimulus intervals; ISIs), and is defined by the respondent's ability to maintain performance level even when the task rate is slow. This construct is captured by changes in the respondent's Hit Reaction Times (HRT), as indicated by the variable HRT ISI Change, as well as the observed pattern of Omissions and Commissions at various ISIs.

### Hit Reaction Time by ISI



| | 1-second ISI | 2-second ISI | 4-second ISI |
|---|---|---|---|
| ■ HRT (ms) | 569 | 838 | 1274 |
| ⊥ HRT SD (ms) | 179 | 431 | 650 |

**Note.** ms = milliseconds; SD = Standard Deviation.

### HRT ISI Change



| T-score | 90 |
|---|---|
| Guideline | Very Elevated |

### Omissions by ISI



| | 1-second ISI | 2-second ISI | 4-second ISI |
|---|---|---|---|
| O Omissions (%) | 26 | 10 | 4 |

### Commissions by ISI



| | 1-second ISI | 2-second ISI | 4-second ISI |
|---|---|---|---|
| ● Commissions (%) | 63 | 50 | 54 |

**Note.** No statistically significant differences were found in error rates between ISIs.

---

**HRT ISI Change** indicates the change in mean response speed at various ISIs. MARKCUS's T-score is 90 and falls in the **Very Elevated** range. This result means that he had a very substantial reduction in response speeds at longer ISIs. There was no statistically significant increase in error rates across all three ISI levels. MARKCUS's profile of scores on these measures indicates some support for a problem with maintaining vigilance; that is, he had some problems with performance on trials with longer intervals between stimuli.

# Glossary

 **MHS**

## Response Style

*C* is a signal detection statistic that measures an individual's natural response style in tasks involving a speed-versus-accuracy trade-off. Based on his or her score on this variable, a respondent can be classified as having one of the following three response styles: a *conservative* style that emphasizes accuracy over speed; a *liberal* style that emphasizes speed over accuracy; or a *balanced* style that is biased neither to speed nor accuracy. Response style can affect scores such as Commissions and Hit Reaction Time (HRT), and should be taken into consideration during interpretation.

## Detectability (*d'*)

**d-prime (*d'*)** is a measure of how well the respondent discriminates non-targets (i.e., the letter X) from targets (i.e., all other letters). This variable is also a signal detection statistic that measures the difference between the signal (targets) and noise (non-targets) distributions. In general, the greater the difference between the signal and noise distributions, the better the ability to distinguish non-targets and targets. On the Conners CPT 3, *d'* is reverse-scored so that higher raw score and *T*-score values indicate worse performance (i.e., poorer discrimination).

## Omissions (%)

**Omissions** are missed targets. High omission error rates indicate that the respondent was not responding to the target stimuli due to a specific reason (e.g., difficulty focusing). Omission errors are generally an indicator of inattentiveness.

## Commissions (%)

**Commissions** are incorrect responses to non-targets. Depending on the respondent's HRT, high commission error rates may indicate either inattentiveness or impulsivity. If high commission error rates are coupled with slow reaction times, then the respondent was likely inattentive to the stimulus type being presented and thus responded to a high rate of non-targets. If high commission error rates are combined with fast reaction times, the respondent was likely rushing to respond and failed to control his or her impulses when responding to the non-targets. In the latter case, high commission error rates would reflect impulsivity rather than inattentiveness.

## Perseverations (%)

**Perseverations** are responses that are made in less than 100 milliseconds following the presentation of a stimulus. Normal expectations of physiological ability to respond make it virtually impossible for a respondent to perceive and react to a stimulus so quickly. Perseverations are usually either slow responses to a preceding stimulus, a random response, an anticipatory response, or a repeated response without consideration of the task requirements. Perseverations may be related to impulsivity or an extremely liberal response style. Perseverations are, therefore, likely the result of anticipatory, repetitive, or impulsive responding.

## Hit Reaction Time (HRT)

**HRT** is the mean response speed, measured in milliseconds, for all non-perseverative responses made during the entire administration. An atypically slow HRT may indicate inattentiveness (especially when error rates are high), but it may also be the result of a very conservative response style. Alternatively, a very fast HRT, when combined with high commission error rates, may indicate impulsivity.

## Hit Reaction Time Standard Deviation (HRT SD)

**HRT SD** measures the consistency of response speed to targets for the entire administration. A high HRT SD indicates greater inconsistency in

response speed. Response speed inconsistency is sometimes indicative of inattentiveness, suggesting that the respondent was less engaged and processed stimuli less efficiently during some parts of the administration.

## Variability

**Variability**, like HRT SD, is a measure of response speed consistency; however, Variability is a "within respondent" measure (i.e., the amount of variability the respondent showed in 18 separate sub-blocks of the administration in relation to his or her overall HRT SD score). Although Variability is a different measure than HRT SD, the two measures typically produce comparable results and are both related to inattentiveness. High response speed variability indicates that the respondent's attention and processing efficiency varied throughout the administration.

## Hit Reaction Time Block Change (HRT Block Change)

**HRT Block Change** is the slope of change in HRT across the six blocks of the administration. A positive slope indicates decelerating reaction times as the administration progressed, while a negative slope indicates accelerating reaction times. If reaction times slow down, as indicated by a higher HRT Block Change score, the respondent's information processing efficiency declines, and a loss of sustained attention is indicated.

## Omissions by Block

**Omissions by Block (raw score only)** is the rate of the respondent's missed targets in each of the six blocks. An increase in omission error rate in later blocks indicates a loss of sustained attention.

## Commissions by Block

**Commissions by Block (raw score only)** is the rate of the respondent's incorrect responses to non-targets in each of the six blocks. An increase in commission error rate in later blocks indicates a loss of sustained attention.

## Hit Reaction Time Inter-Stimulus Intervals Change (HRT ISI Change)

**HRT ISI Change** is the slope of change in reaction time across the three ISIs (1, 2, and 4 seconds). A positive slope indicates decelerating HRT at longer intervals; whereas, a negative slope indicates accelerating HRT at longer intervals. A higher HRT ISI Change score means that the respondent's information processing efficiency declined with longer pauses between stimuli, and a loss of vigilance is indicated. A significant change in response speed at the different ISIs may indicate that the respondent was having trouble adjusting to changing task demands. Sometimes, this finding relates to activation/arousal needs; some respondents may be more efficient in a busier/more stimulating environment (e.g., during the 1-second ISI) than in a less active environment where the stimuli are presented less frequently (e.g., during the 4-second ISI), or vice-versa.

## Omissions by ISI

**Omissions by ISI (raw score only)** is the rate of missed targets in each of the three ISI trial types. An increase in omission error rate on trials with longer ISIs indicates a loss of vigilance.

## Commissions by ISI

**Commissions by ISI (raw score only)** is the rate of incorrect responses to non-targets in each of the three ISI trial types. An increase in commission error rates on trials with longer ISI indicates a loss of vigilance.

Copyright © 2014 Multi-Health Systems Inc. All rights reserved.



**Highly Confidential**

February 8, 2022

Markcus Zwanz Kitchens
625 Hampton Way #2
Richmond, KY 40475

RE: USMLE Step 1                              USMLE ID#: ███████

Dear Markcus Zwanz Kitchens:

We have thoroughly reviewed the documentation you provided in support of your request for test accommodations on the United States Medical Licensing Examination (USMLE) Step 1.

Accommodations are intended to ensure that individuals with a documented disability as defined by the Americans with Disabilities Act (ADA) can take the USMLE exams in an accessible place and manner. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and circumstances. The ADA defines disability as a physical or mental impairment that substantially limits a person's ability to perform one or more major life activities, as compared to most people in the general population. Therefore, not every impairment will constitute a disability.

**We conducted an individualized review of your request in accordance with the guidelines set forth in the ADA. Specifically, one or more doctoral-level psychological or medical professionals:**

- Carefully considered all of the information you provided, including the recommendations of your treating and/or evaluating professional(s)
- Gave substantial weight to your history of accommodations on standardized examinations
- Considered whether and how your reported impairment(s) affects your ability to access a computer-based examination like the USMLE

**Based upon this review, we have concluded that you have not shown that your requested accommodations are necessary for you to access the USMLE. Accordingly, your request is being denied, for the following primary reasons:**

- Your treatment professionals did not provide sufficient information regarding the basis for the diagnosis of Attention-Deficit/Hyperactivity Disorder (ADHD). Even if not formally diagnosed in childhood, the essential feature of ADHD, a neurodevelopmental disorder, is a persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development. According to the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)*, manifestation of the disorder must be present in more than one setting (e.g., home and school, work). Adult self-report and recall is not sufficient to substantiate a history of substantial symptoms across settings. Your documentation does not objectively demonstrate that you have shown pervasive problems managing daily demands for attention, concentration, or organization in school, work, social, or other domains.

EXHIBIT

F

MK000063

- While we noted your 2018 diagnosis of Test Anxiety, experiencing anxiety during high-stakes examinations is not, in and of itself, evidence of a disability or impairment in a major life activity.

- Your documentation reveals a history of not being substantially limited in your ability to perform the functions that are relevant to taking a standardized test like the USMLE. As best one can tell, you progressed throughout your education with an academic record and scores on timed standardized tests sufficient to gain admission to and graduate from university and medical school, all without formal accommodations.

We hope this information assists you in understanding the basis for our decision. We will request processing of your exam application without test accommodations. You may inquire at permits@ecfmg.org or call Applicant Information Services at (215) 386-5900 with any questions about your scheduling permit.

**Please monitor the USMLE announcements page at www.usmle.org and the Prometric website at www.prometric.com/corona-virus-update for up-to-date information regarding the impact of the coronavirus (COVID-19) pandemic on USMLE testing.**

Sincerely,
Disability Services

# SETTLEMENT AGREEMENT

## BETWEEN

## UNITED STATES OF AMERICA

## AND

## NATIONAL BOARD OF MEDICAL EXAMINERS

### DJ# 202-16-181

Press Release



This Agreement is entered into by and between the United States of America, acting through the United States Department of Justice, Civil Rights Division, Disability Rights Section (the "United States"), and the National Board of Medical Examiners ("NBME").

## BACKGROUND AND APPLICABLE LAW

1. NBME is a private, non-profit organization. Its offices and principal place of business are located in Philadelphia, Pennsylvania.

2. Together with the Federation of State Medical Boards, NBME sponsors the United States Medical Licensing Examination ("USMLE"), an examination related to licensing for professional purposes. NBME administers the USMLE. Thus, NBME is subject to the requirements of Section 309 of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12189, and the implementing regulations, 28 C.F.R. § 36.309.

3. The USMLE is a standardized examination used to evaluate applicants' competence for purposes of medical licensure in the U.S. and its territories. The USMLE is designed to assess a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care. The USMLE is administered at locations around the world to individuals who are attending, or have attended, medical schools in the United States and abroad. State medical boards rely upon successful completion of the three USMLE component exams, or "Steps," as an important element in the process for licensing physicians.

4. The United States Department of Justice (the "Department") is the federal agency responsible for administering and enforcing Title III of the ADA, 42 U.S.C. §§ 12181-12189.

5. Pursuant to Title III of the ADA, private entities that administer examinations related to professional licensing must offer the examinations in a place and manner accessible to persons with disabilities. 42 U.S.C. §12189 and 28 C.F.R. § 36.309.

6. Pursuant to 28 C.F.R. § 36.309, private entities that administer such examinations are required to provide reasonable modifications to the examination and appropriate auxiliary aids and services (i.e., testing accommodations) for persons with disabilities. The purpose of testing accommodations is to ensure, in a reasonable manner, that the "examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual or speaking skills (except where those skills are the factors that the examination purports to measure)." 28 C.F.R. § 36.309(b)(1)(i). "Required modifications to an examination may include changes in the length of time permitted for completion of the examination." 28 C.F.R. § 36.309(b)(2).

7. The auxiliary aid requirement is a flexible one. A testing entity can choose among various alternatives as long as the result is effective communication. Use of the most advanced technology is not required so long as effective communication is ensured. *See* 28 C.F.R. Part 36, App. B, at 727-728 (2010).

8. Pursuant to the Attorney General's authority under 42 U.S.C. § 12188(b)(1)(A)(i) to conduct investigations of alleged violations of Title III of the ADA, the Department investigated a complaint from [redacted], alleging that the NBME had failed to grant him reasonable testing accommodations on the basis of a disability (dyslexia) for administrations of the USMLE Step 1 examination in 2008 and 2010. Among other things, the NBME had found that the supporting documentation submitted to NBME by [redacted] did not demonstrate that he is currently substantially limited in a major life activity as compared to most people , so as to be disabled within the meaning of the ADA, as amended.

9. The Department concluded that [redacted] had submitted sufficient documentation to demonstrate that he is a person with a disability within the meaning of the ADA, and that he was entitled to reasonable testing accommodations to take the USMLE. NBME disputes the Department's conclusions and denies that it has violated the ADA in any way in its handling of Mr. [redacted]'s request for accommodations.

10. [redacted] has recently provided additional documentation to the NBME in support of his request for accommodations on the USMLE Step 1 examination relating to accommodations he received in undergraduate school, graduate school, and medical school.

11. NBME and the Department have reached agreement that it is in the parties' best interests, and the Department believes it is in the public interest, to resolve this matter on mutually agreeable terms and have, therefore, agreed to enter into this Agreement.

## AGREEMENT TERMS

**A.** **General Obligations**

12. NBME shall provide reasonable testing accommodations to persons with disabilities who seek to take the USMLE, in accordance with the requirements of 42 U.S.C. § 12189 and the implementing regulations, 28 C.F.R. § 36.309.

13. NBME's requests for documentation shall be reasonable and limited to documentation that establishes (a) the existence of a physical or mental impairment; (b) whether the applicant's impairment substantially limits one or more major life activities within the meaning of the ADA; and (c) whether and how the impairment limits the applicant's ability to take the USMLE under standard conditions. *See* 28 C.F.R. Part 36, App. B, at 737 (2010).

14. NBME will carefully consider the recommendation of qualified professionals who have personally observed the applicant in a clinical setting and have determined -- in their clinical judgment and in accordance with generally accepted diagnostic criteria, as supported by reasonable documentation -- that the individual is substantially limited in one or more major life activities within the meaning of the ADA and needs the requested test accommodations in order to demonstrate his or her ability and achievement level.

15. NBME will carefully consider all evidence indicating whether an individual's ability to read is substantially limited within the meaning of the ADA, including the extent to which it is restricted as to the conditions, manner, or duration as compared to the reading ability of most people.

16. In determining whether to grant a request for testing modifications or accommodations for an individual who did not receive a diagnosis of a reading disability until later in his or her life, NBME shall consider bona fide, reasonably supported reasons for the late diagnosis as well as academic records and other objective evidence relating to the individual's reading ability.

17. NBME has a right to make a timely request for supplemental information if the information submitted by an applicant does not clearly establish the nature of the disability or the need for reasonable testing accommodations, and the request is consistent with the requirements of Paragraph 13. NBME also has the right to have the information submitted by or on behalf of an applicant reviewed by one or more qualified professionals of NBME's choosing at NBME's request and expense. NBME is not required to defer to the conclusions or recommendations of an applicant's supporting professional but it must provide an explanation for declining to accept those conclusions or recommendations.

18. NBME is not required to provide testing accommodations that would fundamentally alter what the USMLE is intended to test, jeopardize exam security, or in the case of auxiliary aids and services, result in an undue burden.

19. If it is not doing so already, NBME will comply with the following requirements of the implementing regulations set forth at 28 C.F.R. § 36.309(b)(1) once they become effective on March 15, 2011:

    (iv)  Any request for documentation, if such documentation is required, [will be] reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested.

    (v)  When considering requests for modifications, accommodations, or auxiliary aids or services, the entity [will] give[] considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations, as well as such modifications, accommodations, or related aids and services provided in response to an Individualized Education Program (IEP) provided under the Individuals with Disabilities Education Act or a plan describing services provided pursuant to section 504 of the Rehabilitation Act of 1973, as amended (often referred to as a Section 504 Plan).

    (vi)  The entity [will] respond[] in a timely manner to requests for modifications, accommodations, or aids to ensure equal opportunity for individuals with disabilities.

**B.** **Testing Accommodations for [redacted]**

20. NBME will grant [redacted] the accommodation of double the standard testing time and a separate testing area when he takes the Step 1 and Step 2 CK examinations. The testing for Step 1 and Step 2 CK shall be accomplished in accordance with a reasonable schedule. Actual testing time shall not exceed eight (8) hours per day.

21. [redacted] will be subject to all standard requirements for registering to take the Step 1 and Step 2 CK examinations and scheduling his examinations.

22. Except for the accommodations provided herein, the USMLE Step 1 and Step 2 CK examinations will be administered to [redacted] under the same conditions as those afforded examinees who do not receive accommodations. [redacted]'s scores on the Step 1 and Step 2 CK examinations will be reported in the same manner as are scores of other examinees who receive accommodations on the USMLE.

**C.** **Miscellaneous**

23. Compliance Review. The Department may, throughout the term of this Agreement, review compliance with Paragraphs 20-22 of this Agreement by, among other things, arranging for meetings and discussions with NBME personnel, requesting copies of any documents related to compliance with this Agreement, or both. The United States may enforce this Agreement. If the Department believes that this Agreement or any portion of it has been violated, it will raise its concern(s) with the NBME and will attempt to resolve the concerns(s) in good faith. The Department will give the NBME thirty calendar days from the date it notifies the NBME of any breach of this Agreement to cure that breach, prior to instituting any court action.

24. Disputes. If the Department and NBME are unable to reach a resolution of any issues covered by this Agreement, the Department may seek appropriate relief. Failure by the Department to enforce any provision or deadline of this Agreement shall not be construed as a waiver of its right to enforce other provisions or deadlines of this Agreement.

25. Entire Agreement. This Agreement constitutes the entire Agreement between the Department and NBME on the matters raised herein, and no other statement, promise, or agreement, either written or oral, made by the Department or NBME or their agents, that is not contained in this written Agreement shall be enforceable regarding the matters raised herein.

26. Agreement Binding on NBME. This Agreement shall be binding on the NBME, as well as the NBME's officers, agents, and employees, and their successors in interest. The NBME shall have a duty to so notify all such successors in interest of the existence and terms of this Agreement.

27. No Admission. This Agreement is not an admission by NBME of any violation of the ADA or its implementing regulations.

28. Term of the Agreement. This Agreement shall remain in effect for three years from the effective date.

29. Severability. If any term of this Agreement is determined by any court to be unenforceable, the other terms of this Agreement shall nonetheless remain in full force and effect.

30. Public Document. This Agreement is a public document. A copy of this document, or any information contained herein, may be made available to any person. The Department and NBME shall provide a copy of this Agreement to any person or entity upon request.

31. Release. The Department will obtain a Release from [redacted] in the form attached as Exhibit A to this Agreement.

32. No Retaliation. The NBME agrees that it will not discriminate or retaliate against any person within the meaning of the requirements of 28 C.F.R. § 36.206.

33. Authorization of Signatories. The individuals signing this Agreement represent that they are authorized to bind the Department and NBME to this Agreement.

34. Effective Date. This Agreement shall be effective on the date it is signed by the last signatory.

FOR NBME:                                              FOR THE UNITED STATES OF AMERICA:


By:                                                    By:

_____                       _____

Dated: _____                           THOMAS E. PEREZ
                                                       Assistant Attorney General
                                                       SAMUEL R. BAGENSTOS
                                                       Principal Deputy Assistant Attorney General
                                                       JOHN L. WODATCH
                                                       Deputy Assistant Attorney General


                                                       _____

                                                       RENEE M. WOHLENHAUS, Acting Chief
                                                       KATHLEEN P. WOLFE, Acting Special Legal Counsel
                                                       SHEILA K. DELANEY, Trial Attorney
                                                       Disability Rights Section – NYAV
                                                       Civil Rights Division
                                                       U.S. Department of Justice
                                                       950 Pennsylvania Avenue, NW
                                                       Washington, D.C. 20530
                                                       Telephone:  (202) 307-6309
                                                       Facsimile:  (202) 305-9775

                                                       Dated: _____ 02/23/2011 _____

MK000067

February 23, 2011

MK000068

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
ROBERT SAMPSON,

**MEMORANDUM &**
**ORDER**

                                    Plaintiff,                    22-CV-05120 (JMA) (AYS)


                    -against-


NATIONAL BOARD OF MEDICAL EXAMINERS,

                                    Defendant.
-----------------------------------------------------------------------X

**AZRACK, United States District Judge:**

      Plaintiff Robert Sampson ("Sampson") claims that Defendant National Board of Medical

Examiners ("NBME") has denied him testing accommodations on Step 1 of the United States

Medical Licensing Examination ("USMLE") in violation of the Americans with Disabilities Act

("ADA"), 42 U.S.C. §§ 12101 et seq.[1]  Now before the Court, following a three-day evidentiary

hearing, is Sampson's motion for a preliminary injunction (ECF No. 16).  Based on the following

findings of fact and conclusions of law, the motion is GRANTED.

## I.   FINDINGS OF FACT

### A.   **The Parties**

      Sampson is a medical student at Stony Brook University's Renaissance School of Medicine

("Stony Brook").  He has wanted to become a doctor for his entire life.  (Tr.[2] 36:24–37:9.)

---

[1]     Sampson also brings a claim under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.  (See Compl. ¶¶ 115–22, ECF No. 1.)  However, neither party addresses the Rehabilitation Act claim here, and therefore the Court will address Sampson's ADA claim only.

[2]     Citations to "Tr." refer to the corresponding pages and lines of the transcript of the preliminary injunction hearing held from October 11 to October 13, 2022.  Citations to "PX" refer to exhibits offered by Sampson and admitted into evidence during the hearing.

**EXHIBIT**

**H**

MK000069

Sampson is also enrolled in a Master of Business Administration ("MBA") program at the Stony Brook College of Business.  (Tr. 36:20–22, 37:22–24, 38:6–7; Decl. of Robert Sampson ("R. Sampson Decl.") ¶ 3 and Ex. 6, ECF No. 16-3.)

NBME is a non-profit organization that develops and administers examinations, including the USMLE.  (Decl. of Lucia McGeehan ("McGeehan Decl.") ¶¶ 3–4, ECF No. 21.)  The USMLE is used by medical licensing authorities to evaluate the qualifications of individuals seeking their initial medical license.  (Id. ¶ 5.)  The USMLE is comprised of three "Step" exams:  Step 1, Step 2 Clinical Knowledge ("CK"), and Step 3.  (Id. ¶ 6.)

Sampson is approximately 40 weeks away from completing his medical degree.  (Tr. 36:20–22, 37:22–24, 38:6–7.)  However, before he can begin his final 40 weeks of medical school, Stony Brook requires that he take and pass Step 1.  (Tr. 38:16–17.)

## B.  Sampson's Educational History

Despite his evident aptitude, Sampson has struggled with learning since his early childhood.  By the time he was four years old, he had been diagnosed with severe stuttering that required intervention therapy.  As part of this intervention therapy, Sampson's speech pathologist instructed his family to slow their speech to afford him more processing time. (Tr. 156:3–156:25, Tr. 158:14-159:5, 196:4–12.)

Sampson's early academic records from elementary school reflect difficulties with attention, focus, organization, and timely completion of assignments.  (Tr. 91:22–93:6; Decl. of Dr. Shelley Sampson ("S. Sampson Decl.") ¶ 14, ECF No. 32-1; PX 20; PX 21.)  For example, Sampson's first grade teacher noted his early struggles with focus and organization, stating, "[w]e will also be working on having Robert stay more focused on a task, so he may complete the task faster and stay more organized."  (PX 20 at 1.)  In fifth grade, Sampson's teacher highlighted that

2

he "appear[ed] at times to be confused with directions or questions that are presented during class." (Id. at 2.)  And in sixth grade, Sampson's teachers commented that he was "easily distracted" and that "distractions during work time . . . have interfered with his performance and completion of his work."  (Id.)

Additionally, although Sampson's early academic records describe him as, among other things, "a good independent reader," (PX 21), Sampson read slowly and had difficulty focusing while reading.  (Tr. 159:6–18.)  Indeed, reading was "painful" for him, and while attempting to read, he "felt like [he] was being lobotomized."  (Tr. 43:12–22.)  Sampson disliked reading aloud in school because the material would "go[ ] in one ear and out the other," (Tr. 45:18–24), and he could not answer his teachers' questions about the material because he "would have no idea what [he] just read."  (Tr. 46:2–3.)  Similarly, when a "teacher would speak and she would write on the blackboard or white board," for Sampson "there was no learning method taking place during those lectures or classrooms."  (Tr. 39:18–24.)  As a result, he was forced to repeat entire lessons at home with parents as tutors.  (Tr. 39:18–40:2.)  Sampson also had trouble reading outside of school.  For example, when he struggled to read music, his cello teacher "asked [him] if [he] was stupid on multiple occasions," and "asked [him] if [he] had dyslexia . . . [and] a learning disability." (Tr. 50:20–51:1.)

Sampson also struggled to complete timed exams within the time allotted.  He was almost always the last student to complete an exam, regardless of subject area.  (Tr. 41:11–17.)  He sometimes was allowed extra time to finish timed exams during lunch or after school, while other students finished the same exam within the allotted time in class.  (Tr. 41:18–42:2.)  Even with additional time, however, he still was unable to finish the exams.  (Id.)

To compensate for his difficulties with speech, attention, and reading, Sampson relied on

MK000071

mitigating measures and informal accommodations throughout his childhood. In addition to working with a speech pathologist, at the urging of one of his teachers, Sampson began seeing a reading specialist in fourth or fifth grade, and he again saw a reading specialist while in high school. (Tr. 162:7–21; S. Sampson Decl. ¶ 4.) Because Sampson did not read material assigned in class, he instead relied on audiobooks and recordings of classroom material. (Tr. Tr. 43:12–44:6; R. Sampson Decl. ¶ 8.) He also made use of "an army of tutors" outside of school. (Tr. 39:16–17; PX 19.) In addition, his mother and other tutors read written material aloud to him and devised games designed to help him learn through repetition. (R. Sampson Decl. ¶ 8.) In high school, Sampson required as much as 15 hours of tutoring per week for a single class. (Tr. 44:20–45:8.) All told, he worked with more than twenty tutors throughout elementary school, junior high, high school, and college. (PX 19.)

After graduating from high school, Sampson went on to attend the University of Virginia ("UVA"), where "he flourished socially and intellectually," and maintained a 3.43 GPA. (PX 3 at 2.) At UVA, Sampson employed strategies to mitigate his continued struggles with attention and reading. Because he "simply did not read text books or other books," he would avoid classes with substantial reading and writing requirements. (R. Sampson Decl. ¶ 9.) He would also record lectures using a Livescribe pen, which synced lecture audio with his own notes, allowing him to later "refer back to what was said at that moment and repeat it many times." (Tr. 52:3–22.) He still was almost always the last student to complete exams and frequently failed to finish exams within the allotted time. (Tr. 53:16–18.) However, at least one professor granted him an informal accommodation by allowing him to take an exam in a separate area. (Tr. 53:23–54:11.)

As a result of his hard work and use of mitigating measures, Sampson progressed through elementary school, junior high, high school, and college without being diagnosed with any learning

MK000072

disorder, Attention Deficit-Hyperactivity Disorder ("ADHD"), or other mental impairment. He had no IEP or Section 504 plan while in school. (Tr. 126:8–10.) He did not receive formal accommodations in elementary school, junior high school, or high school. (McGeehan Decl. Ex. 16 at 5; PX 2.)

## C.  Sampson's Performance on Standardized Tests

Sampson worked with multiple SAT and ACT tutors over the course of years. (Tr. 128:18–24; PX 19 at 2.) He also developed test-taking strategies to mitigate his difficulty with reading. For example, on the SAT and ACT sections that required answering questions about passages, Sampson would "read the question prompt and then the answer choices and attempted to answer questions without reading the material preceding the question prompt if at all possible." (R. Sampson Decl. ¶ 11.) Sometimes, he would read only the topic sentences of a passage. (Tr. 130:5–1317, 133:10–15.) As a result of those efforts, he performed well on the SAT and ACT exams taken without accommodations under standard test conditions, including standard time. On the ACT exam, he scored in the 89th percentile overall compared to other recent high school graduates, including in the 90th percentile on English and the 74th percentile on Reading. (PX 12.) Sampson took the SAT three times in high school, and he received scores on the Critical Reading section in the 74th, 84th, and 93rd percentiles. (PX 14.)

After graduating from UVA, Sampson began preparing to apply to medical school. As part of this process, he was required to take the Medical College Admission Test ("MCAT"), a standardized entrance exam. (Tr. 54:13–21.) Although Sampson sought accommodations on the MCAT, his request was denied. (Tr. 62:20–23.) Instead, he relied on extensive tutoring by his father, a surgeon, and a classmate, Dr. Andrew Lam, among others. (Tr. 15:23–16:2, 63:1–10; PX 19.) Dr. Lam alone tutored Sampson for approximately 200 hours. (Tr. 16:3–4.) Working with

5

Dr. Lam, Sampson was again able to develop and implement test-taking strategies to mitigate his difficulties with attention and reading.  These strategies included writing brief notes summarizing sentences in exam questions, reading only topic sentences and specific portions of the text relevant to a particular question, and double-checking copied sentences and calculations.  (Tr. 21:15–22:16, 57:25–59:1.)  Armed with these mitigating strategies, Sampson's first MCAT score—which placed him in the 67th percentile overall—still was not high enough to earn admission to any medical school.  (Tr. 59:4–8; PX 11.)  After a second year of preparation, his score improved by only one point, placing him in the 73rd percentile overall.  (Tr. 59:9–17; PX 11.)  He subsequently applied to more than sixty medical schools, but he was admitted only to Stony Brook.  (Tr. 59:10–11, 63:25–64:1.)

After observing Sampson struggle—more than any other student he had tutored—with slow reading, writing, comprehension, and recall, Dr. Lam encouraged Sampson to undergo comprehensive educational testing to evaluate whether Sampson had learning disabilities.  (Tr. 20:11–21:14, 60:19–61:14.)

**D.  <u>2013 Evaluations for Learning Disabilities</u>**

In August 2013, Suzanne Michels, Ph.D. performed a psychological evaluation of Sampson.  (PX 3.)  Dr. Michels personally interviewed Sampson, obtained and reviewed his relevant medical and academic history, and administered a battery of assessments.  (<u>Id.</u>)

In her evaluation, Dr. Michels noted that Sampson's "[r]eading and writing skills appear to be somewhat variable, and testing scores were an unusual mix." (PX 3 at 9.)  Although Sampson exhibited "very strong" verbal reasoning abilities, his visual/spatial problem solving was "significantly weaker," a difference that occurs in less than one percent of the population.  (<u>Id.</u>)  Based on her interview of Sampson, his medical and academic history, and the assessment results,

6

Dr. Michels diagnosed Sampson with a Learning Disorder, Not Otherwise Specified.  (Id.)  The diagnosis was based at least in part on the "disparity" between Sampson's verbal and visual/spatial reasoning abilities, which was "likely to underlie the unevenness evident in his academic profile, both in current achievement testing and his school record."  (Id.)  Dr. Michels found it "likely that [Sampson's] strong drive and very conscientious approach to his studies has allowed him to do well in school and perhaps hidden the magnitude of the relative weaknesses uncovered in this testing."  (Id.)  She did not evaluate him for ADHD.  (Id.)  Dr. Michels recommended that Sampson receive accommodations in the form of time-and-a-half on "reading comprehension tasks . . . as well as those involving significant visual/spatial components."  (Id.)  She also noted that he would "benefit from extended time on [applied] math tasks, as well."  (Id.)

In December 2013, Allison Anderson, Ph.D. conducted a supplemental evaluation of Sampson, in part for ADHD.  (PX 2.)  Based on her personal observations of Sampson, her review of Dr. Michels' report, and evaluation of the results of a battery of assessments, Dr. Anderson diagnosed Sampson with Unspecified Neurodevelopmental Disorder, visuospatial processing, and Specific Learning Disorder, with impairment in reading (dyslexia).  (Id.)  Notably, Dr. Anderson did not diagnose Sampson with ADHD.  She acknowledged that he "appear[ed] to be experiencing attention problems," but nonetheless determined that "his testing results and history supply little evidence that [his attention] problems are the result of ADHD," and that while he may be "slightly 'out on the continuum' in terms of distractibility, . . . [he] does not appear to have the consistent and severe pattern of impulsivity, social problems, marked inattentiveness, or physical restlessness that support an ADHD diagnosis."  (Id. at 7.)  However, like Dr. Michels, Dr. Anderson concluded that Sampson required accommodations on exams, including 50% additional time on the MCAT and any medical school exams.  (Id. at 8.)

7

MK000075

### E.  **Sampson's Medical School History**

Sampson began his studies at Stony Brook in August 2015.  (R. Sampson Decl. ¶ 16.) Although Dr. Michels and Dr. Anderson had recommended that he receive accommodations due to his diagnosed learning disabilities, he did not initially request accommodations from Stony Brook.  Instead, he again turned to the stable of mitigating strategies that he had already deployed in other academic settings, such as the Livescribe pen, lecture playbacks, tutoring sessions, and supplemental supportive programs.  (Tr. 65:2–67:9; R. Sampson Decl. ¶¶ 16–19.)  Several of his professors informally permitted him extra time on some exams.  (Tr. 67:10–16.)

Although Sampson passed all his first-year classes, his grades were negatively impacted because he failed some of his end-of-course "shelf" exams.  (R. Sampson Decl. ¶ 16; PX 6, 10A; Tr. 67:17–68:14.)  Shelf exams are subject-specific exams comprised of retired USMLE questions. (Tr. 72:7–73:2.)  Under standard conditions—without extended time or other accommodations— Sampson could not complete the shelf exams within the allotted time.  (Tr. 67:10–16, 68:7–8, 73:24–74:10.)  His struggles on the shelf exams culminated in a warning of marginal performance in November 2016, during his second year of medical school.  (PX 37 at 7.)

Sampson then submitted a request for formal accommodations to Stony Brook's Disability Support Services ("DSS").  (Tr. 69:3–20; R. Sampson Decl. ¶ 22.)  DSS reviewed the results of the evaluations conducted by Dr. Michels and Dr. Anderson and personally interviewed Sampson. (Tr. 69:18–70:3; PX 6.)  Based on its review of the evaluations and its interview of Sampson, DSS granted his request for accommodations.  (PX 6.)  Specifically, DSS determined that

> [Sampson]'s Dyslexia learning disability is a mental impairment that substantially limits his reading ability and reading speed on a daily basis when he is compared to an average individual in the general population.  His learning disability is the reason he routinely runs out of time on exams and generally takes longer to think through ideas presented to him both on exams and outside the classroom.

(PX 6.)  Accordingly, DSS found that it was appropriate to permit Sampson 50% additional time

MK000076

on all time-based exams—including shelf exams—as well as provide note-taking services and a separate testing area.  (Tr. 70:4–25.)  Once he was afforded 50% additional time on shelf exams, he was able to read the questions and complete the exams, with scores ranging from the 74th to 95th percentiles.  (Tr. 198:23–200:10; PX 37 at 7.)

Ultimately, Stony Brook informed Sampson that due to his purportedly marginal performance during his first year, he would have to either repeat the first three semesters of his studies or take and pass Step 1—far earlier than his peers, who did not have to take Step 1 until after their third year of medical school.  (Tr. 71:21–72:6, 145:1–5.)

**F.**   **Sampson's Requests for Accommodations on Step 1**

In response to Stony Brook's directive, Sampson decided to take Step 1 early.  (Tr. 74:16–23.)  Examinees take the USMLE under uniform conditions, including standard testing time. (McGeehan Decl. ¶ 7.)  However, NBME provides accommodations to examinees who have a disability within the meaning of the ADA and need accommodations.  (Id. ¶¶ 7–8.)  So, in April 2017, Sampson sought accommodations from NBME for Step 1.  He requested 50% additional time (time and a half) on the exam—the same accommodation that he recently received from Stony Brook for shelf exams.  (Tr. 74:24–75:6; PX 1.)  In support of his application, Sampson submitted the supporting documents required by NBME.  (Tr. 75:14–86:12; PX 1–15.)  These included, among other materials:  a personal statement describing the impact of his learning disabilities on his life; a letter from DSS attesting to Sampson's need for accommodations due to his learning disabilities; a letter from Linda DeMotta, a learning specialist at Stony Brook, who had personally observed Sampson's struggles with reading; and the evaluations conducted by Dr. Michels and Dr. Anderson.  (PX 2–4, 6–7.)  Sampson also submitted a letter from his treating psychiatrist, Dr. Thomas Aronson.  (PX 5.)  In his letter, Dr. Aronson noted that he had been treating Sampson

9

MK000077

since November 2015 for "Learning Disabilities and mild ADD," and had prescribed him Dexedrine to treat his symptoms. (Id.) Dr. Aronson further explained that Sampson's diagnosed learning disorders "substantially limit major life activities in and out of the classroom," and make it "painful and agonizingly slow to read." (Id.)

NBME sought a recommendation from an outside expert, Benjamin Lovett, Ph.D. (McGeehan Decl. ¶ 13.) Dr. Lovett is a licensed psychologist and the director of the Ph.D. program in school psychology at Teachers College, Columbia University, where he serves as an Associate Professor of Psychology and Education. (Decl. of Benjamin Lovett, Ph.D. ("Lovett Decl.") ¶ 2, ECF No. 22.) After reviewing Sampson's request and supporting documentation, Dr. Lovett concluded that Sampson had not demonstrated that he has a mental impairment that substantially limits his ability to perform any major life activities that are relevant to taking the Step 1. (Lovett Decl. Ex. 2.) Upon considering Sampson's application and Dr. Lovett's recommendation, NBME determined that Sampson's "documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations are an appropriate modification of [the] USMLE Step 1 test administration." (McGeehan Decl. Ex. 3 at 2.) Accordingly, NBME denied Sampson's request by letter dated June 13, 2017. (Id. ¶¶ 13–14, Exs. 2–3.)

Undeterred, Sampson appealed NBME's decision. On June 22, 2017, he submitted a letter from Jan Serrantino, a disability expert at the University of California-Irvine, supporting his request for accommodations; a letter from his parents describing their observations of his learning disabilities throughout his life, and providing a list of his tutors and reading specialists; and early academic records. (Tr. 89:1–93:8; PX 17–21.) NBME provided Sampson's appeal to Dr. Lovett, who recommended that NBME reject the appeal. (McGeehan Decl. Ex. 4.) Based on Dr. Lovett's

MK000078

recommendation and its review of Sampson's documentation, NBME denied his appeal by letter dated August 1, 2017.  (Id. ¶ 18, Ex. 5.)

Sampson appealed again in November 2017.  He submitted new letters from Dr. Aronson, Serrantino, and Dr. Anderson.  (Tr. 93:25–96:11; PX 23–26.)  Dr. Aronson explained that Sampson met the DSM-IV criteria[3] for ADHD, based on his personal observations of Sampson over nearly two years.  (PX 25 at 1–2.)  NBME again provided Sampson's appeal file to Dr. Lovett, who again recommended that NBME reject the appeal.  (McGeehan Decl. Ex. 6.)  Based on Dr. Lovett's recommendation and its review of Sampson's documentation, NBME denied his appeal by letter dated January 12, 2018.  (Id. ¶ 21, Ex. 7.)

Sampson again appealed NBME's denial on February 22, 2018.  (PX 28.)  In support of his request for accommodations, he submitted a second letter from DeMotta, the Stony Brook learning specialist.  (Tr. 97:11–98:12; PX 29.)  In her letter, DeMotta stated that Sampson "meets the criteria, through our disabilities services office and according [to] the guidelines of the ADA, for appropriate testing accommodations."  (PX 29.)  DeMotta objected to NBME's characterization of Sampson's standardized test results as reflecting "unimpaired performances," when in fact, "[t]he records show that sometime prior to medical school, Robert, after studying and practicing well beyond the average time for most students, figured out a way to perform adequately enough under standard testing conditions on two entrance exams that test broad knowledge and aptitude."  (Id.)  DeMotta further explained that NBME had erred in relying heavily on Sampson's SAT and ACT results because "[n]ot all standardized exams are equal and the USMLE Step exams in particular require reading skills, interpretation, synthesis, integration and pattern recognition well beyond any skills required on the college entrance exams."  (Id.)

---

[3]     The "DSM" is the Diagnostic and Statistical Manual of Mental Disorders.  "DSM-IV" refers to the Fourth Edition; "DSM-V" refers to the Fifth Edition.

MK000079

Nevertheless, NBME denied Sampson's appeal by letter dated March 6, 2018.  (Tr. 98:17–23; PX 30.)

Sampson then retained an attorney, Jo Anne Simon, to appeal NBME's latest denial of his request for accommodations.  (Tr. 98:24–99:3.)  Simon submitted an appeal on June 29, 2018, which included a new letter from Dr. Aronson in further support of his application.  (Tr. 99:4–25; PX 31–31-A.)  Dr. Aronson's letter explained that Sampson's dyslexia and ADHD "do in fact limit him (for example, reading, concentrating, writing, test taking)" when compared to "most people in the general population."  (PX 31-A at 1–2.)  NBME provided Sampson's latest appeal to Dr. Lovett for review, and Dr. Lovett again recommended that NBME reject Sampson's appeal.  (McGeehan Decl. ¶ 25, Ex. 9.)  Based on Dr. Lovett's recommendation and its review of Sampson's file, NBME denied his appeal by letter dated September 7, 2018.  (Id. Ex. 11.)

Simon submitted another appeal on Sampson's behalf in November 2018.  (Tr. 100:11–22; PX 33.)  NBME provided Sampson's latest appeal, as well as all the materials that he had previously submitted to NBME to date, to two new external, independent consultants, Samuel Ortiz, Ph.D. and Kevin Murphy, Ph.D.  (McGeehan Decl. ¶ 28, Exs. 12 and 13.)  Dr. Ortiz is a Professor of Psychology and Director of the Graduate Programs in School Psychology at St. John's University.  (Decl. of Samuel O. Ortiz, Ph.D. ("Ortiz Decl.") ¶ 2, ECF No. 24.)  Dr. Murphy has over thirty-five years of professional experience in the field of psychology and has conducted approximately 4,000 ADHD evaluations over the course of his career.  (Decl. of Kevin Murphy, Ph.D. ("Murphy Decl.") ¶¶ 4–5, ECF No. 23.)  Based on the recommendations of Dr. Ortiz and Dr. Murphy and its review of Sampson's appeal, NBME denied his appeal by letter dated January 4, 2019.  (McGeehan Decl. Ex. 14; Tr. 100:23–101:7.)

By this time, NBME had rejected six requests by Sampson for 50% extra time on Step 1.

12

Because Sampson could not proceed in his medical studies without taking Step 1, he was left with little choice but to take Step 1 without accommodations.  (Tr. 101:14–23; R. Sampson Decl. ¶ 33.) He sat for the exam in January 2020.  (R. Sampson Decl. ¶ 33.)  Despite years of preparation for Step 1, Sampson found that the test-taking strategies he previously employed on the MCAT, among other standardized tests, were ineffective on Step 1.  (Tr. 102:8–106:25.)  He was unable to read all the questions on the exam and, as a result, he failed Step 1.  (Tr. 101:22–23, 103:8–10.)

Stony Brook subsequently advised Sampson it was expelling him because he had not passed Step 1.  (Tr. 107:4–20.)  Sampson then retained new counsel and submitted an appeal to the Dean of Stony Brook, arguing that his expulsion on this basis would be discriminatory.  (Tr. 109:3–110:1.)  Stony Brook ultimately permitted Sampson to proceed to his third year of medical school.  (Tr. 110:8–15, 112:11–13.)  However, Stony Brook allowed him to continue on the condition that he re-take and pass Step 1 at the end of his third year—now at the same time as his classmates.  (Tr. 109:6–9, 110:8–14, 112:17–113:3.)

## G.  Evaluation by Drs. Wasserstein and Miller

In August 2020, Sampson obtained additional comprehensive testing from Jeanette Wasserstein, Ph.D., with the assistance of Kim Miller, Ph.D.[4]  (Tr. 113:22–114:2, 184:14–16; R. Sampson Decl. ¶ 20; Decl. of Jeanette Wasserstein ("Wasserstein Decl."), ECF No. 17; PX 37.) Sampson sought this evaluation in order to continue pursuing accommodations from NBME.  (PX 37 at 1.)  Dr. Wasserstein is a licensed psychologist and a board-certified neuropsychologist.  She has been in private practice since 1981, and she has held a faculty position at The Mount Sinai

---

[4]      Dr. Wasserstein personally interviewed Sampson to obtain a comprehensive history.  Based on this interview, she identified issues for evaluation and designed a battery of tests, which she and Dr. Miller administered to Sampson (with Dr. Miller performing "most" of the testing).  Based on her and Dr. Miller's observations of Sampson, the test scores, and relevant materials provided by Sampson, Dr. Wasserstein then prepared the evaluation report.  (Tr. 184:14–186:22; Wasserstein Decl. ¶¶ 8–13; PX 37.)

MK000081

School of Medicine since 1996.  (Tr. 172:2–173:2, 177:2–8; Wasserstein Decl. ¶¶ 1–2 and Ex. 2-A.)  Dr. Wasserstein specializes in the diagnosis and treatment of learning disabilities in adults, including ADHD.  She has evaluated thousands of individuals for learning disabilities in educational settings, including for the USMLE and other standardized exams.  (Tr. 175:2–177:25.)

As part of the evaluation, Dr. Wasserstein interviewed Sampson in person and obtained a developmental, medical, and educational history.  Dr. Wasserstein also reviewed the prior evaluation reports from Dr. Michels and Dr. Anderson, Sampson's educational records as far back as first grade, and other materials that Sampson had submitted to NBME in connection with his requests for accommodations.  (Tr. 189:4–10, 192:9–194:1; PX 37 at 2–7.)  Dr. Wasserstein noted that Sampson's difficulty discerning diction, which he experienced in high school when attempting to learn a foreign language, is common among individuals with dyslexia.  (Tr. 194:2–21; PX 37 at 2.)  She also highlighted that Sampson began years of speech therapy at a young age to ameliorate his severe stutter.  She explained that there is a strong association between stuttering and dyslexia.  (Tr. 194:22–195:8.)

Dr. Wasserstein found that Sampson had experienced difficulty with reading throughout his life.  She noted that he considered reading to be a "very draining and exhausting experience" and frequently had to read the same material multiple times.  (Tr. 195:4–25; PX 37 at 5.)  In reviewing his early academic records, she also found it significant that his teachers reported problems with maintaining focus and organization, symptoms associated with ADHD.  (Tr. 195:22–25; PX 37 p. 5.)  Although Sampson earned "normal range scores" on the PSAT, SAT, and ACT, his scores reflected "relative weaknesses in his reading compared to other academic areas."  (PX 37 at 6.)  Because of his reading difficulties and issues with maintaining attention, Sampson had a "long history of extensive tutoring."  (PX 37 at 6.)  Indeed, Dr. Wasserstein could

14

not recall evaluating or treating any other individual who had received the same amount of tutoring as Sampson, which indicated that he "needed a lot of help in order to perform and function as well as he did." (Tr. 197:22–198:22; PX 37 at 6.)

Dr. Wasserstein also reviewed the evaluation reports prepared by Dr. Michels and Dr. Anderson in 2013. (Tr. 200:11–16, 208:9–17; PX 37 at 7–9.) With respect to Dr. Michels' report, Dr. Wasserstein considered it notable that on the Wechsler Adult Intelligence Scale-4th ed. ("WAIS-IV"), an IQ test, Sampson received a score in the 99.7th percentile on the Verbal Comprehension Index ("VCI"), but on the Perceptual Reasoning Index ("PRI"), he scored only in the 55th percentile. (Tr. 200:17–202:3; PX 37 at 7–8.) Although Dr. Wasserstein acknowledged that some discrepancy between these scores is normal, the degree of discrepancy that Sampson exhibited is "extraordinarily rare" and occurs in less than one percent of the general population. (Tr. 202:8–18.) Furthermore, while Sampson's scores on the WAIS-IV were considered "Average" to "Very Superior," the degree of discrepancy between his VCI and PRI scores represents "an intellectual limp which disrupts unified functioning significantly." (Tr. 202:19–203:4; PX 37 at 8.) As a result of this "limp," Sampson must "use a lot of detours" to obtain an average score. (Tr. 203:8–13.) Dr. Wasserstein also focused on Sampson's results on the Nelson-Denny Reading Test ("NDRT"), which requires reading passages of several paragraphs and answering multiple-choice questions. Under the standard 20-minute administration, Sampson scored in the bottom 16th percentile compared to college seniors. (Tr. 204:8–206:16; PX 37 at 8; Lovett Decl. ¶ 18.) With 50% additional time, he scored in the 64th percentile. (Tr. 206:9–12.) Dr. Wasserstein again noted that the wide disparity in Sampson's scores—even though most fell within normal ranges—implies a learning disability related to reading. (Tr. 206:13–21; PX 37 at 8.)

15

With respect to Dr. Anderson's report, Dr. Wasserstein found significant Sampson's scores on the Scholastic Abilities Test for Adults ("SATA"), which is a timed reading exam based on age norms.  (Tr. 208:18–210:3.)  Under standard time conditions, Sampson only completed half of the questions—not uncommon for persons with dyslexia—scoring in the 25th percentile.  (Tr. 210:9–25; PX 37 at 9.)  Dr. Wasserstein also noted that other assessments administered by Dr. Anderson reflected "underlying neurocognitive deficits" that cause Sampson to, among other things, read "very, very slow[ly]."  (Tr. 211:22–214:9; PX 37 at 9–10.)

Dr. Wasserstein also reviewed letters submitted in support of Sampson's requests for accommodations, as well as NBME's letters denying his requests.  (PX 37 at 10–15.)

In addition to interviewing Sampson and reviewing relevant materials, Dr. Wasserstein and Dr. Miller administered a battery of assessments.[5]  (Tr. 184:14–186:22, 189:4–190:17; PX 37 at 13.)  Dr. Wasserstein administered the WAIS-IV and obtained a near-identical result to Dr. Michels' 2013 WAIS-IV administration.  (Tr. 219:20–221:10; PX 37 at 14–15.)  Dr. Wasserstein also administered the NDRT.  Under standard time, Sampson was only able to attempt 12 of 38 questions.  Although he answered those 12 questions correctly, he scored in the 1st percentile compared to college seniors.[6]  (Tr. 225:8–24.)  Dr. Wasserstein testified that this result "scream[s] dyslexia" and reflects an impairment of Sampson's reading ability.  (Tr. 225:11–19.)  Sampson performed remarkably better when allowed as much time as he needed, answering 37 of 38

---

[5]      As part of Sampson's evaluation, Dr. Wasserstein administered symptom validity tests to ensure data reliability.  (Tr. 218:2–219:6; PX 37 at 13.)  Sampson's results on these tests were valid on all measures, which confirmed that he was "trying hard" and exercising his "best efforts" during the evaluation.  (Tr. 219:7–19; PX 37 at 13–14.)

[6]      This represented a significant decrease from Sampson's 2013 NDRT score, which placed him in the 16th percentile.  (PX 37 at 8.)  Dr. Wasserstein did not address this disparity in her evaluation report.  (PX 37; Lovett Decl. ¶ 20.)  However, in light of the results of Sampson's symptom validity testing, (Tr. 225:14–19), the Court has credited his 2020 NDRT score.  In any event, the 2013 score alone suggests a substantial impairment of Sampson's reading ability.

16

questions correctly and scoring in the 99th percentile.  (Tr. 226:12–227:2; PX 37 at 16.)

Dr. Wasserstein also administered a series of neuropsychological assessments.  (Tr. 227:11–18.)  On the Wisconsin Card Sort Test ("WCST"), a neuropsychological exam measuring visual processing and executive functioning, Sampson's scores varied on different portions of the test, ranging from average to as low as the 21st percentile.  (Tr. 228:10–21; PX 37 at 19.)  Dr. Wasserstein testified this score reflects an impairment in his ability to use visual information rapidly and correctly.  (Tr. 228:22–229:7.)  Dr. Wasserstein also noted that the WCST is "considered a good, performance-based measure of ADD."  (Tr. 229:2–3.)  Dr. Wasserstein administered the California Verbal Learning Test ("CVLT").  (Tr. 229:8–24.)  Again, his scores varied on different components of the test, with some as low as the 7th percentile.  (PX 37 at 20.)  Dr. Wasserstein stated that the CVLT results indicate that Sampson "has both visual memory and learning problems."  (Tr. 229:20–21.)  These problems act as a "roadblock in his ability to retrieve information," which in turn causes him "to do things more slowly," which would impact his performance on the USMLE.  (Tr. 230:8–17.)  Dr. Wasserstein also administered the Rey-Osterreith Complex Figure Test ("RCFT").  (Tr. 230:18–22; PX 37 at 20–21.)  Sampson's scores were below average on each component of the RCFT, reflecting consistent impairment of skills required to retrieve complex information.  (Tr. 230:23–24; PX 37 at 20.)

Dr. Wasserstein also evaluated Sampson for ADHD.  She administered the Conners Adult ADHD Rating Scale ("CAARS"), which indicated clinically significant problems with inattention, memory, and hyperactivity.  (Tr. 232:8–233:15; PX 37 at 22.)  She also considered the prior evaluation reports prepared by Dr. Michels and Dr. Anderson, neither of whom diagnosed Sampson with ADHD; Dr. Aronson's diagnosis of ADHD; Sampson's academic records, including comments from his teachers; Sampson's academic performance; and her own and Dr.

17

Miller's observations of Sampson.  (Tr. 234:4–235:5; PX 37 at 22–25.)

Based on the totality of this data, Dr. Wasserstein found that there was "more than sufficient evidence" that Sampson met the criteria for a DSM-V diagnosis of Specific Learning Disorder with impairment in reading (reading fluency and reading comprehension) and written expression (spelling and handwriting).  (Tr. 187:1–25, 236:6–10; PX 37 at 24.)  Dr. Wasserstein also diagnosed Sampson with ADHD in accordance with the DSM-V criteria.  (Tr. 233:16–234:3.)  She testified that Sampson has substantial impairments in reading, reflected in the "absurdly" slow rate at which he reads compared to most people.  And because of his ADHD, he does not function efficiently compared to others.  These impairments operate in concert with one another.  (Tr. 236:22–237:25.)

Dr. Wasserstein recommended the following accommodations:  double time on in-class and standardized exams, including Step 1; a separate testing room; and longer breaks.[7]  (Tr. 238:1–16; PX 37 at 25.)  After Stony Brook reviewed Dr. Wasserstein's report, it granted Sampson double time on examinations, a separate testing area, and extra breaks.  It also provided note-taking services.  (Tr. 114:24-115:20.)

With Dr. Wasserstein's evaluation in hand, Sampson submitted a seventh request for accommodations to NBME on April 13, 2022, seeking 100% additional time (double time) and additional breaks.  (Tr. 117:3–5; PX 35–37; McGeehan Decl. ¶ 32 and Ex. 16.)  NBME provided Sampson's appeal to Dr. Murphy for review.  Based on Dr. Murphy's recommendation and its review of the file, NBME denied Sampson's request by letter dated June 1, 2022.  (Tr. 119:14–15; McGeehan Decl. ¶ 33 and Ex. 18; Murphy Decl. ¶ 25 and Ex. 2.)

---

[7]     Shortly after evaluating Sampson, Dr. Wasserstein became seriously ill with COVID-19.  (Tr. 118:7–18; 241:12–25.)  Dr. Wasserstein's report was written in December 2020, but Sampson did not receive the final report until January 2022.  (Tr. 116:17–18, 118:8–119:13, PX 37.)  Some of this delay may have been attributable to Sampson, but his and Dr. Wasserstein's testimony on this point was inconclusive.  (Tr. 118:13–119:4, 241:19–243:14.)

MK000086

During Sampson's attempts to obtain accommodations for Step 1, NBME's consultants never met, interviewed, or evaluated him in person.  (Tr. 356:2–357:5, 423:21–424:13.)

## H.  Sampson's Current Academic Status at Stony Brook

Sampson began his third year of medical school in August 2020, ending a three-and-a-half year leave of absence.  (Tr. 112:11–16.)  He received strong performance reviews during his third-year clinical rotations, which he completed in July 2021.  (R. Sampson Decl. ¶ 2 and Ex. 1-A at 12–14.)  Sampson also began taking business school classes at the same time he was completing his third year of medical school, in or around June or July of 2021.  (Tr. 139:3–6, 140:18–141:5.)  Since he finished his third-year clinical rotations, he has taken only business school classes.  (Tr. 141:6–9.)  He has maintained a 4.0 GPA in business school.  (R. Sampson Decl. ¶ 3.)

On July 29, 2022, Sampson filed a complaint and motion for preliminary injunction against Stony Brook.  See Sampson v. Stony Brook Univ., et al., No. 22-CV-4490 (E.D.N.Y.).  He alleged that Stony Brook planned to dismiss him from medical school by August 12, 2022, because he did not complete his degree within seven years as required by school policy.  (See Compl. ¶¶ 95–97, ECF No 1.)  He sought injunctive relief prohibiting Stony Brook from dismissing him from medical school and requiring Stony Brook to allow him more than seven years to complete his degree. (ECF No. 2.)  Action on Sampson's status is currently stayed.  (ECF Nos. 7, 17–18.)

## I.  The Preliminary Injunction Hearing

Sampson commenced this action on August 29, 2022.  The Court held a three-day evidentiary hearing on Sampson's motion for a preliminary injunction from October 11 to October 13, 2022.  Testifying as part of Sampson's case were Dr. Lam; Dr. Shelley Sampson, his mother; Dr. Wasserstein; and Sampson himself.  Testifying on behalf of NBME were Marc Kroopnick, Ph.D., Director of MCAT Development and Psychometrics with the Association of American

MK000087

Medical Colleges (Tr. 249:20–22); Dr. Lovett; and Dr. Murphy.

## II.   CONCLUSIONS OF LAW

### A.  <u>Preliminary Injunction Standard</u>

A party seeking a preliminary injunction must show "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." <u>Raia v. Pompeo</u>, 455 F. Supp. 3d 7, 11–12 (E.D.N.Y. 2020) (quoting <u>N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.</u>, 883 F.3d 32, 37 (2d Cir. 2018) (internal citation omitted)).  However, a more exacting standard applies to a party seeking mandatory relief:

> where the movant is seeking to modify the status quo by virtue of a <u>mandatory</u> preliminary injunction (as opposed to seeking a <u>prohibitory</u> preliminary injunction to maintain the status quo), or where the injunction being sought will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits, the movant must also: (1) make a strong showing of irreparable harm, and (2) demonstrate a clear or substantial likelihood of success on the merits.

<u>Yang v. Kosinski</u>, 960 F.3d 119, 127–28 (2d Cir. 2020) (internal quotation marks and citations omitted); <u>Raia</u>, 455 F. Supp. 3d at 12 (citing <u>N. Am. Soccer League</u>, 883 F.3d at 37).

Here, Sampson must meet this heightened standard.  He seeks an injunction that would require NBME to reverse its current position and provide him accommodations on Step 1.  This would constitute mandatory relief because, if granted, the injunction would alter "the parties' pre-controversy position vis-à-vis the other." <u>N. Am. Soccer League</u>, 883 F.3d at 38.  Sampson also must meet this heightened standard because the injunction he seeks would "provide the [him] with substantially all the relief sought" prior to a trial on the merits. <u>Yang</u>, 960 F.3d at 128.

### B.  <u>Irreparable Harm</u>

First, Sampson must establish "[t]he single most important prerequisite for the issuance of a preliminary injunction," that he would suffer irreparable harm in the absence of preliminary

20

injunctive relief.  Yang, 960 F.3d at 128 (quoting Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009)).  "To satisfy the irreparable harm requirement, [Sampson] must demonstrate that absent a preliminary injunction [he] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (quoting Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005)).  Because he seeks mandatory relief, Sampson must "make a strong showing of irreparable harm." Yang, 960 F.3d at 128.  The Court finds that he has made this showing.

In Ramsay v. National Board of Medical Examiners, the Third Circuit concluded that the plaintiff had demonstrated that she faced irreparable harm where evidence of her disability, together with her previous failures to pass Step 1 without accommodations, indicated that "she likely would fail again and be forced to leave medical school" which "could not later be redressed by a legal or an equitable remedy."  968 F.3d 251, 262 (3d Cir. 2020).  Like the plaintiff in Ramsay, Sampson cannot continue his medical training until he passes Step 1.  He faces injury that is neither remote nor speculative.  Although he has not yet registered to take Step 1 following NBME's latest denial of his request for accommodations, (Tr. 435:22–436:14), he has already taken Step 1 without accommodations.  He failed despite extensive preparation and use of the test-taking strategies that he had employed successfully on the MCAT, as he was unable to read all the questions on the exam.  In light of his substantial impairments, it is likely that he will again fail Step 1 if he takes the exam without accommodations.  Accordingly, he will not be able to progress to his final year of medical school unless he receives accommodations on Step 1.

Moreover, Stony Brook has informed Sampson that he faces termination because he has

21

not completed his studies within seven years.[8]  If Sampson is dismissed from medical school, he will be ineligible to take Step 1, as NBME requires examinees to be currently enrolled as medical students.  (McGeehan Decl. ¶ 34.)  Based on Sampson's MCAT scores and previous attempts to gain admission to medical school—which resulted in only one offer of admission—it is unlikely that he would win admission to other medical schools that, for example, do not condition graduation on passing Step 1.  Cf. Baer v. Nat'l Bd. of Med. Exam'rs, 392 F. Supp. 2d 42, 49 (D. Mass. 2005) (plaintiff failed to establish irreparable harm because "[t]he record indicates that she may plausibly seek admission to other medical schools that, unlike [her current medical school], do not condition matriculation on passing the Step 1 exam").  Thus, it is clear that unless Sampson is able to take Step 1 with accommodations, his "medical career will effectively end." Ramsay v. Nat'l Bd. of Med. Exam'rs, No. 19-CV-2002, 2019 WL 7372508, at *18 (E.D. Pa. Dec. 31, 2019), aff'd, 968 F.3d 251 (3d Cir. 2020).[9]

In addition, courts have repeatedly determined that "an examiner's refusal to provide accommodations can cause the exam-taker irreparable harm because doing so jeopardizes her 'opportunity to pursue her chosen profession.'"  Ramsay, 968 F.3d at 262–63 (quoting Enyart v. Nat'l Conf. of Bar Exam'rs, 630 F.3d 1153, 1166 (9th Cir. 2011)).  Because Sampson cannot proceed to his final year of medical school until he passes Step 1, any further delay pending a trial on the merits would continue to deprive Sampson of his opportunity to pursue his medical training.

---

[8]     NBME argues that Sampson has not shown irreparable harm because "taking the Step 1 exam will not alter the fact that he is subject to dismissal by Stony Brook because he failed to complete his medical degree within seven years."  (NBME Opp'n at 7.)  However, even if Sampson were to prevail in his lawsuit against Stony Brook, he still could not proceed with his medical studies without taking and passing Step 1.

[9]     Moreover, Title III of the ADA does not provide for damages, so absent injunctive relief Sampson will be left without any remedy.  See 42 U.S.C. § 12188(a).  Even if damages were available, however, "[t]he lost opportunity to engage in one's preferred occupation goes beyond monetary deprivation."  Berger v. Nat'l Bd. of Med. Exam'rs, No. 19-CV-99, 2019 WL 4040576, at *28 (S.D. Ohio Aug. 27, 2019) (quoting Bonnette v. District of Columbia Court of Appeals, 796 F. Supp. 2d 164, 186 (D.D.C. 2011)).

MK000090

See Berger v. Nat'l Bd. of Med. Exam'rs, No. 19-CV-99, 2019 WL 4040576, at *28 (S.D. Ohio Aug. 27, 2019) (finding that "a delay in taking the Step 2 CK exam pending the resolution of this lawsuit would deprive [plaintiff] of the opportunity to practice his chosen profession of medicine"); Doe v. Samuel Merritt Univ., 921 F. Supp. 2d 958, 964 (N.D. Cal. 2013) (medical student was likely to suffer irreparable harm by inability to participate in clinical rotations and earn medical degree while lawsuit was pending, delaying her professional career); Bonnette v. D.C. Ct. of Appeals, 796 F. Supp. 2d 164, 186–87 (D.D.C. 2011) ("Because [plaintiff] cannot practice law until she successfully passes the D.C. Bar Examination, any delay in taking the MBE deprives her of time to practice her chosen profession."); Jones v. Nat'l Conf. of Bar Exam'rs, 801 F. Supp. 2d 270, 286–87 (D. Vt. 2011) ("[W]hile Plaintiff is losing opportunities to take the MPRE, there is no countervailing benefit she obtains through the passage of time.  Indeed, the passage of time is likely to exacerbate her harm as it may delay completion of her law school education and may delay her entry into her chosen professional field.").

It is true, as NBME argues, (NBME Opp'n at 8–9, ECF No. 20), that Sampson's delay in seeking preliminary injunctive relief through this lawsuit weighs against finding irreparable harm. In particular, NBME points to the fact that it first denied Sampson's request for accommodations in 2017.  (McGeehan Decl. ¶ 14.)  However, NBME ignores that in 2020, Stony Brook allowed Sampson to proceed to his third year of medical school without first passing Step 1.  (Tr. 109:3–110:14.)  This obviated Sampson's immediate need to obtain accommodations from NBME.  (Tr. 112:19–113:21.)  As a result, the correct point of reference is not NBME's first denial in 2017, but rather NBME's denial of Sampson's most recent request for accommodations, which occurred only in June 2022.  This slight delay does not defeat Sampson's showing of irreparable harm.

Accordingly, the Court concludes that Sampson has made a "strong showing," Yang, 960

MK000091

F.3d at 128, that he will suffer irreparable harm absent preliminary injunctive relief.

## C. Clear or Substantial Likelihood of Success on the Merits

### 1. ADA Framework

Title III of the ADA prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation[.]" 42 U.S.C. § 12182(a). NBME does not dispute that it is subject to the ADA's antidiscrimination provisions. Indeed, the ADA specifically requires that testing entities like NBME "that offer[] examinations . . . related to applications, licensing, certification, or credentialing for . . . professional . . . purposes shall offer such . . . in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." Id. § 12189. United States Department of Justice ("DOJ") regulations implementing this provision of the ADA require that

> [t]he examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure).

28 C.F.R. § 36.309(b)(1)(i).[10] Accordingly, an entity offering such an examination, like NBME, must provide "appropriate auxiliary aids" for those with disabilities, such as additional time or an

---

[10]     The ADA authorizes DOJ to promulgate regulations implementing the ADA's public accommodation provisions. See 42 U.S.C. §§ 12186(b), 12205a; see also Reed v. 1-800-Flowers.com, Inc., 327 F. Supp. 3d 539, 544 (E.D.N.Y. 2018) ("When enacting the ADA, Congress charged [DOJ] with issuing regulations under Title III, 42 U.S.C. § 12186(b), rendering technical assistance, id. § 12206(c), and enforcing Title III in court, id. § 12188(b)."). Such regulations, issued following notice-and-comment rulemaking, have "the force and effect of law." Ramsay, 968 F.3d at 257 (quoting PDR Network, LLC v. Carlton & Harris Chiropractic, Inc., 139 S. Ct. 2051, 2055 (2019)). See also Hill v. Delaware N. Companies Sportservice, Inc., 838 F.3d 281, 290 (2d Cir. 2016) ("In general, there are two types of rules: legislative rules, which have the force of law, and interpretive rules, which inform the public of the agency's construction of the statutes it administers. . . . Interpretive rules lack the force of law because they need not undergo notice-and-comment rulemaking as legislative rules do. . . . For this reason, we defer to interpretive rules only to the extent that we find them persuasive.") (internal quotation marks and citations omitted).

24

alteration in "the manner in which the examination is given," unless the modification would "fundamentally alter the measurement of the skills or knowledge the examination is intended to test or would result in an undue burden." 28 C.F.R. §§ 36.309(b)(2), (3).

A person has a "disability" under the ADA if they have "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). DOJ regulations provide that a "physical or mental impairment" includes ADHD and "dyslexia and other specific learning disabilities." 28 C.F.R. § 36.105(b)(2). "Major life activities" include, as relevant to Sampson's claim, reading and concentrating.[11] 42 U.S.C. § 12102(2)(A); 28 C.F.R. § 36.105(c)(1). Whether an impairment "substantially limits" a major life activity should be measured "as compared to most people in the general population." 28 C.F.R. § 36.105(d)(1)(v). As a result, "not every impairment will constitute a disability." Ramsay, 968 F.3d 251, 257 (quoting J.D. by Doherty v. Colonial Williamsburg Found., 925 F.3d 663, 670 (4th Cir. 2019)). See also B.C. v. Mount Vernon Sch. Dist., 837 F.3d 152, 160 (2d Cir. 2016) (explaining that "[n]ot every impairment that affects an individual's major life activities is a substantially limiting impairment") (citation omitted).

In determining whether Sampson has a disability, the Court must consider the ADA's legislative history. "The definition of 'disability' under the ADA was previously interpreted narrowly." Hamilton v. Westchester Cty., 3 F.4th 86, 92 (2d Cir. 2021) (citing Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197–98 (2002)). However, in 2008, Congress enacted the ADA Amendments Act ("ADAAA"), Pub. L. No. 110-325, with the "principal purpose" of "overrul[ing] the Supreme Court's arguably narrow interpretation of what constitutes an ADA-

---

[11]    Sampson claims to be "substantially impair[ed]" in "the major life activities of reading, spelling, cognitive processing speed, attention [sic] concentration and taking standardized exams." (Sampson Mem. at 3, ECF No. 16-1.) However, for the purposes of this motion, the Court has considered only reading and concentration, which the Court finds are the only "major life activities" relevant to taking the USMLE Step 1.

MK000093

qualifying disability . . . and to make clear that the substantial-limitation requirement in the definition of 'disability' is not an exacting one." Hamilton, 3 F.4th at 92 (citation omitted). Accordingly, the ADAAA commands that "disability" should be "construed in favor of broad coverage[.]" 42 U.S.C. § 12102(4)(A). See also Hamilton, 3 F.4th at 92 (explaining that the ADAAA "broadened the definition of 'disability' under the ADA"); Ramsay, 968 F.3d at 257 ("We construe the term 'disability' broadly.") (citation omitted).

Likewise, DOJ regulations interpreting the ADAAA explain that

> [t]he primary object of attention in cases brought under title III of the ADA should be whether public accommodations have complied with their obligations and whether discrimination has occurred, not the extent to which an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis.

28 C.F.R. § 36.105(d)(1)(ii). The regulations also state that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA," and "is not meant to be a demanding standard." 28 C.F.R. § 36.105(d)(1)(i). Therefore, "the 'substantially limits' inquiry 'should not demand extensive analysis,'" and "'[t]he comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence.'" Ramsay, 968 F.3d at 258–59 (quoting 28 C.F.R. §§ 36.105(d)(1)(ii), (vii)). Additionally, in determining whether an individual has a disability, "the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve." 28 C.F.R. § 36.105(d)(3)(iii). As a result, DOJ's regulations caution against placing undue emphasis on scholastic achievement, as "someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities . . . because of the additional time or effort he or she must spend to

MK000094

read, write, speak, or learn compared to most people in the general population." Id.  Nevertheless, the Court notes that DOJ regulations and guidance "do[ ] not preclude the consideration of grades and outcomes; rather, they simply cannot be the only determining factor."  Wright v. Nat'l Bd. of Med. Examiners, No. 21-CV-02319, 2021 WL 5028463, at *4 (D. Colo. Oct. 15, 2021).

Finally, DOJ regulations require that "[w]hen considering requests for modifications, accommodations, or auxiliary aids or services, the [testing] entity gives considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations . . ." 28 C.F.R. § 36.309(b)(1)(v).  This is because "a recent history of past accommodations is critical to an understanding of the applicant's disability and the appropriateness of testing accommodations."  Ramsay, 968 F.3d at 259 (quoting Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 75 Fed. Reg. 56,236, 56,298 (Sept. 15, 2010)).

### 2.  Sampson's Entitlement to Accommodations Under the ADA

Sampson has provided ample evidence that his learning disabilities and ADHD substantially limit his reading and concentration compared to most people in the general population.

As set forth in the Court's findings of fact, Sampson's parents, teachers, tutors, and psychological evaluators have all noted that, as a result of his impairments, he experiences more difficulty with reading and concentration as compared to most people in the general population.

In elementary school, Sampson's teacher recognized that he needed to work with a reading specialist.  (S. Sampson Decl. ¶ 4; PX 19 at 2; Tr. 162:7–21.)  Dr. Lam, Sampson's MCAT tutor, also recognized Sampson's substantial limitations in reading.  For example, he observed Sampson "reverse letters and numbers, and otherwise miswrite numbers," and struggle with sentences with

MK000095

multiple clauses, only to forget the previous sentence as soon as he moved onto the next sentence. (Decl. of Dr. Andrew Lam ¶ 6, ECF No. 32-2.)  Dr. Lam tutored hundreds of students in elementary school, middle school, high school, college, and medical school.  (Tr. 16:3–4, 16:10–14.)  Out of all the students with whom he worked, Dr. Lam stated that Sampson "by far . . . had the most difficulty . . . when it came to processing written text and reading."  (Tr. 20:11–20.)  Linda DeMotta, who also observed Sampson's struggles with reading firsthand, noted that Sampson "has a slow reading rate and poor visuospatial processing such that he will avoid reading because the reading process is both exhausting and painful."  (PX 7 at 1.)  Based on her observations of Sampson, DeMotta concluded that Sampson's "dyslexia substantially impairs his reading skills, test taking skills, time management skills, and memory."  (Id. at 2.)

Sampson's use of strategies designed to mitigate the effects of his impairments is also well documented.  He has relied on more than 20 tutors from elementary school through college, who have helped him learn material that he could not learn through reading.  He has used a Livescribe pen to record lectures and sync the audio with his notes and has steered clear of classes with substantial reading components or timed exams.  (Tr. 51:14–53:12.)  On the SAT and ACT, he employed measures that allowed him to minimize the amount of reading required to answer questions.  (R. Sampson Decl. ¶ 11; Tr. 130:5–1317, 133:10–15.)  Similarly, in preparing for the MCAT, Dr. Lam helped him develop test-taking strategies that included writing brief notes summarizing sentences in exam questions, reading only topic sentences and specific portions of the text relevant to a particular question, and double-checking copied sentences and calculations.  (Tr. 19:6–11, 21:15–22:16, 58:3–59:1.)  Despite his impairments, by using these mitigating measures, Sampson generally has performed well in school and on standardized exams.

Sampson also has received formal and informal accommodations throughout his life.  He

28

testified that when taking tests in school, he "was pretty much basically the very last person taking the test every single time . . . [a]nd this was in pretty much every subject area, whether it was Social Studies or Math or English, I would always need the most amount of time to finish answering the questions or writing an essay." (Tr. 41:11–17.)  As a result, some of his teachers granted him extra time to complete exams during lunch or after school—though even with extra time, Sampson was sometimes still unable to complete the exams.  (Tr. 41:23–42:2.)  Even before he sought formal accommodations as a medical student, several of Sampson's professors allowed him extra time for exams, though not for shelf exams.  (Tr. 66:4–67:16.)  In his second year of medical school, Stony Brook granted him formal accommodations, including 50% additional time on exams.  (PX 6.)  Once he received these accommodations, his shelf exam scores improved dramatically, climbing from a failing average of 66% on unaccommodated exams to a passing average of 83% on accommodated exams.  (PX 7.)  He later applied for additional accommodations after receiving ADHD diagnoses from Dr. Aronson and Dr. Wasserstein.  (PX 5, 37; Tr. 114:24–115:20.)  Stony Brook approved his request and allowed him 100% additional time on exams—including shelf exams comprised of retired USMLE questions.  (Tr. 115:11–15.)

Finally, Sampson's evaluation conducted by Dr. Wasserstein demonstrates that his reading abilities are substantially impaired compared to most individuals in the general population.  Dr. Wasserstein, with the assistance of Dr. Miller, spent 15 hours evaluating Sampson in person and prepared an exhaustive evaluation analyzing his psychometric scores, accounting for her and Dr. Miller's personal observations of Sampson, and reviewing his academic and medical records describing his substantial impairments.  (PX 37.)  Based on this entire body of evidence, Dr. Wasserstein found that Sampson met the criteria for a DSM-V diagnosis of Specific Learning Disorder with impairment in reading (reading fluency and reading comprehension) and written

MK000097

expression (spelling and handwriting). (Tr. 187:1–25, 236:6–10; PX 37 at 24.) Dr. Wasserstein concluded that, when compared to the general population, Sampson has a substantial impairment in reading in that he reads at a slow rate. (Tr. 236:22–237:10.) Likewise, his treating psychiatrist, Dr. Aronson, as well as Dr. Wasserstein, concluded based on clinical evaluations that his ADHD substantially impairs his concentration ability. (PX 5, 25, 31-A, 37.) These evaluators based their conclusions on "exactly the type of data DOJ contemplates as showing a learning disability that substantially limits an individual as compared to others in the general population." Ramsay, 968 F.3d at 258 (affirming district court's finding that plaintiff was disabled based on diagnostic assessments showing substantial limitation).

Nevertheless, NBME and its consultants argue that Sampson has failed to demonstrate that he is disabled. (See NBME Opp'n at 14–23; Lovett Decl. ¶¶ 3, 45–49; Murphy Decl. ¶ 43; Ortiz Decl.; Decl. of Joseph E. Bernier, Ph.D. ("Bernier Decl.") ¶¶ 8–34, 37, ECF No. 25; Declaration of Dawn P. Flanagan, Ph.D. ("Flanagan Decl.") ¶ 5, ECF No. 26.)[12]

NBME and its consultants attack Dr. Wasserstein's analysis of the psychometric testing that she conducted with Dr. Miller, as well as her interpretation of the evaluations prepared by Dr. Michels and Dr. Anderson.[13] For example, in reviewing Sampson's evaluations, Dr. Lovett found that "[e]very time that Mr. Sampson's academic skills have been measured against age peers on diagnostic tests, his skills have been in the average range or above, including on measures that were timed." (Lovett Decl. ¶ 17.) Dr. Lovett pointed to Sampson's scores on the Wechsler Individual Achievement Test and the Woodcock-Johnson Tests of Achievement, which were in

---

[12]      Dr. Bernier is a licensed psychologist in New York State. (Bernier Decl. ¶ 2.) Dr. Flanagan is a Professor of Psychology at St. John's University. (Flanagan Decl. ¶ 2.) Dr. Bernier and Dr. Flanagan did not serve as external reviewers for NBME at the time Sampson submitted his accommodation requests. (McGeehan Decl. ¶¶ 11–33.) They have provided expert opinions solely in connection with the preliminary injunction proceedings, although neither testified at the hearing.

[13]      They do not, however, challenge the evaluators' administration or scoring of the evaluations.

MK000098

the average range or above. (Id. ¶ 17(c); PX 37 at 15–16.) Similarly, Dr. Bernier reviewed Sampson's three evaluation reports for NBME and concluded that "[c]linical evaluation of Mr. Sampson's intellectual functioning did not indicate substantially limited cognition when compared to the general population." (Bernier Decl. ¶ 19.)

NBME and its consultants highlight specific diagnostic tests that purportedly undermine— or at least do not support—Sampson's claim. (NBME Opp'n at 14–16.) For example, Dr. Bernier asserts that Sampson's evaluators "overemphasize the NDRT findings and feature the results as a cornerstone of their conclusions that Mr. Sampson is an impaired reader who is consequently unable to access standardized examinations under normal time conditions," when in fact the NDRT "is not an appropriate measure of reading impairment because the test scores were compared to an inappropriate reference group, specifically to college graduates, not the general population using age norms." (Bernier Decl. ¶¶ 26–28.) Dr. Lovett similarly discounted Sampson's reliance on the NDRT. (Lovett Decl. ¶¶ 18–22.) NBME and its experts also argue that Sampson's scores on neuropsychological assessments are not probative of his reading or concentration skills. For example, Dr. Lovett critiqued Dr. Wasserstein's conclusion that Sampson's variable performance on measures of visual memory "likely contribute to his reading comprehension difficulties." (PX 37 at 20.) Specifically, Dr. Lovett testified that he does not "necessarily see a relationship between those visual memory scores" from tests involving drawing complex figures and reading comprehension. (Tr. 324:7–17; see also Lovett Decl. ¶ 30; Bernier Decl. ¶ 31; Murphy Decl. ¶ 29.)

NBME and its consultants also take issue with Dr. Wasserstein's conclusion, (Tr. 202:19–203:4, 206:13–21; PX 37 at 8), that extreme variability across some of Sampson's diagnostic test scores is evidence of a substantial impairment. Dr. Lovett testified that variability across test

MK000099

scores is not indicative of an impairment or a disability, as it is "the type of profile of performance that virtually everyone has (at least in some domains)." (Lovett Decl. ¶ 47; Tr. 328:4–23; <u>see also</u> Flanagan Decl. ¶ 6; Bernier Decl. ¶ 20.)

Ultimately, however, the Court finds Dr. Wasserstein's conclusions—as supported by the factual record—more persuasive and finds NBME's experts less persuasive.

First, NBME and its experts apply too exacting a standard in concluding that Sampson is not disabled.  DOJ regulations implementing the ADAAA caution that "the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis," and "is not meant to be a demanding standard."  28 C.F.R. § 36.105(d)(1)(i), (ii).  As set forth above and in the Court's findings of fact, Sampson has provided extensive evidence that his learning disabilities and ADHD substantially limit his reading and concentration abilities compared to most people in the general population.

NBME and its experts single out the results of specific psychometric tests for criticism, but Dr. Wasserstein relied on multiple measures in concluding that Sampson's reading and concentration abilities are substantially limited compared to most people in the general population. Aside from Sampson's NDRT scores, on the SATA he scored in only the 25th percentile, falling "in the <u>below average range</u> compared to same age peers."  (PX 37 at 8–9, 12; Tr. 208:18–210:3, 210:9–25, 211:22–214:9.)   Sampson also scored poorly on several neuropsychological assessments, including the WCST—a "good, performance-based measure of ADD" (Tr. 229:2–3)—the CVLT, and the RCFT.  (PX 37 at 17–20.)  Dr. Wasserstein noted that his low scores on these assessments reflect "impaired neuropsychological functions [that] greatly impact his ability to perform under rapid processing demands, especially where there is reading[.]"  (PX 37 at 24.) She further testified that this would affect his performance on written examinations like Step 1.

MK000100

(Tr. 227:11–229:7, 229:8–231–7.)  Additionally, Dr. Wasserstein explained that the discrepancy between his VCI and PRI scores represents "an intellectual limp which disrupts unified functioning significantly," implying a learning disability relating to reading.[14]  (Tr. 202:19–203:4, 206:13–21; PX 37 at 8.)

Moreover, Sampson's evaluators—most notably, Dr. Wasserstein, but also Dr. Michels, Dr. Anderson, and his treating psychiatrist, Dr. Aronson—made their findings following hours of in-person observation of Sampson's behavior and symptoms.  On the other hand, NBME's experts have never met, interviewed, or evaluated Sampson in person.  DOJ's regulations "mandate that the determination of whether an impairment substantially limits a major life activity requires an individualized assessment.  Such assessments benefit from the reports of professionals who know or have personally examined the individual."  Ramsay, 968 F.3d at 260 (citing 28 C.F.R. § 36.105(d)(1)(vi)).  In-person assessments allow evaluating professionals to closely observe an individual's behavior and effort.  The preamble to DOJ's updated rule implementing the ADA explains that "[r]eports from experts who have personal familiarity with the candidate should take precedence over those from, for example, reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment."  Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 75 Fed. Reg. 56,236, 56,297 (Sept. 15, 2010).[15]  Accordingly, "when testing entities receive documentation provided by a qualified professional who has made an individualized

---

[14]     NBME and its experts contend that "variability across test scores is not indicative of an impairment or a disability."  (NBME Opp'n at 16; see also Lovett Decl. ¶ 47; Murphy Decl. ¶ 30; Bernier Decl. ¶ 20.)  However, the Court finds persuasive DOJ regulatory guidance, cited in Ramsay, explaining that disparities between an individual's aptitude and actual achievement can be used—in part—to diagnose disability.  968 F.3d at 257–58.

[15]     In interpreting and applying an agency's regulation, courts may properly consider "the regulation's preamble . . . as well as the purpose of the regulation's authorizing statute."  Fernandez v. Zoni Language Centers, Inc., 858 F.3d 45, 50 (2d Cir. 2017) (quoting Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ., 819 F.3d 42, 52 (2d Cir. 2016)).  See also Ramsay, 968 F.3d at 258 n.8.

MK000101

assessment of an applicant that supports the need for the modification, accommodation, or aid requested, they shall generally accept such documentation and provide the accommodation." Id.

It is certainly true, as NBME argues (NBME Opp'n at 22–23), that NBME was not required to conduct an in-person interview or evaluation of Sampson. Notably, however, other courts—having considered DOJ regulations and guidance—have decided to credit the testimony and findings of experts who have personally observed a plaintiff over the testimony and findings of experts who have not. See Ramsay, 968 F.3d at 260 (holding that district court's decision to weigh the plaintiff's experts more favorably than the NBME's experts, who had not personally observed the plaintiff, "was consistent with DOJ regulations"); Berger, 2019 WL 4040576, at *25–26 ("[T]he Court finds the strong weight of the evidence supports the findings and conclusions of [the plaintiff's expert], who personally administered multiple assessments to [the plaintiff] and clinically observed his performance and efforts on those assessments"). Here, after considering the DOJ regulations and guidance and all the evidence in the record, the Court finds that the weight of the evidence supports the conclusions of Dr. Wasserstein. Accordingly, the Court credits Dr. Wasserstein—whose evaluation and diagnoses of Sampson also benefited from in-person observation of his behavior and symptoms—over NBME's experts.

Second, NBME's arguments and its experts' opinions fail to adequately account for the evidence of accommodations—both formal and informal—that Sampson has received throughout his life. DOJ regulations require that "[w]hen considering requests for modifications, accommodations, or auxiliary aids or services" testing entities must "give[ ] considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations . . ." 28 C.F.R. § 36.309(b)(1)(v).

Sampson has provided ample evidence of accommodations from childhood through the

MK000102

present day, including his extensive use of tutors and learning specialists, as well as teachers who informally allowed him extra time to finish exams.  Most importantly, however, Stony Brook has determined that as a result of his impairments, he should receive double time on shelf exams.  NBME cannot seriously dispute that these exams—comprised of retired USMLE questions—represent a "similar testing situation," 28 C.F.R. § 36.309(b)(1)(v), as compared to Step 1.  NBME offers no testimony or other evidence demonstrating that it gave "considerable weight" to this evidence in rejecting Sampson's requests for accommodations.  In fact, NBME contends that it need not give any weight to Stony Brook's determination that Sampson is entitled to accommodations.[16]  (NBME Opp'n at 23.)  The Court disagrees and assigns "considerable weight" to Sampson's history of accommodations, especially Stony Brook's determination that he should receive double time on shelf exams.  See Ramsay, 968 F.3d at 259 (holding that district court did not err in giving "considerable weight" to plaintiff's past accommodations in determining that plaintiff was disabled).

Third, NBME and its experts place too much emphasis on Sampson's academic and test-taking outcomes, without accounting for the mitigating measures he employed to achieve those outcomes.  The ADA requires that the determination of whether a person has a disability should be made "without regard to the ameliorative effects of mitigating measures" such as "learned behavioral or adaptive neurological modifications."  42 U.S.C. § 12102(4)(E)(i)(IV).  See also 28

---

[16]   For this proposition, NBME cites Doherty v. National Board of Medical Examiners, in which the Fifth Circuit held that testing entities like NBME need only consider past accommodations "after a person establishes that they are disabled under the ADA."  791 F. App'x 462, 466 (5th Cir. 2019).  The Third Circuit rejected this approach in Ramsay, 968 F.3d at 259 (citing 28 C.F.R. § 36.309(b)(1)(v)), consistent with other courts that have considered an applicant's history of accommodations in determining whether they are disabled.  See, e.g., Bibber v. Nat'l Bd. of Osteopathic Med. Exam'r, Inc., No. 15-CV-4987, 2016 WL 1404157, at *7 (E.D. Pa. Apr. 11, 2016) (explaining that "[c]ourts across the country have considered," among other factors, "whether the individual has been afforded testing accommodations in the past").  Doherty is also factually distinguishable.  There, the Fifth Circuit explained that "the record does not provide evidence of whether [plaintiff's medical school] gave [her] accommodations because it found that she met the definition of disability under the ADA[.]"  791 F. App'x at 466.  Here, by contrast, Stony Brook explicitly told NBME that it had granted Sampson accommodations because it had determined that he met the definition of disability under the ADA and explained the bases for its decision.  (See, e.g., PX 6–7, 29.)

MK000103

C.F.R. § 36.105(d)(3)(iii) ("[T]he focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve.").

NBME argues that Sampson's success on standardized tests, set forth in the Court's findings of fact, "undermines any argument that he is substantially limited compared to most people in any major life activity relevant to taking the Step 1 exam." (NBME Opp'n at 17.) To be sure, the ADA nor DOJ regulations "preclude the consideration of grades and outcomes," Wright, 2021 WL 5028463, at *4, and the Court has considered them here. Likewise, it is true that some courts—including those cited in NBME's brief, (NBME Opp'n at 17–19)—have concluded that prior success in the classroom or on standardized exams does not support a finding of disability. However, those courts also relied on other factors beyond high test scores—factors that are absent here—in concluding that the plaintiffs were not disabled. See, e.g., Wright, 2021 WL 5028463, at *5–6 (plaintiff seeking accommodations on USMLE Step 3 had never received test-taking accommodations and had already taken and passed Step 1 and Step 2 CK without accommodations); Black v. Nat'l Bd. of Med. Exam'rs, 281 F. Supp. 3d 1247, 1249–52 (M.D. Fla. 2017) (plaintiff submitted "diagnoses" obtained from professionals who either did not opine on whether she was "substantially limited," or concluded that she was not "substantially limited"); Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs, 870 F. Supp. 2d 607, 620–22 (S.D. Ind. 2012) (plaintiff's evaluating psychologist testified that his reading skills were average, and plaintiff provided "no evidence of coping mechanisms undertaken to account for a substantially-limiting disorder").

As other courts have recognized, a "'definition of disability based on outcomes alone, particularly in the context of learning disabilities, would prevent a court from finding a disability in the case of any individual . . . who is extremely bright and hardworking, and who uses alternative

36

routes to achieve academic success,' a result that would be inconsistent with the goals of the ADA." Berger, 2019 WL 4040576, at *23 (quoting Bartlett v. New York State Bd. of Law Exam'rs, No. 93-CV-4986, 2001 WL 930792, at *37 (S.D.N.Y. Aug. 15, 2001) (Sotomayor, J.)). See also Peters v. Univ. of Cincinnati Coll. of Med., No. 10-CV-906, 2012 WL 3878601, at *6 (S.D. Ohio Sept. 6, 2012) ("Defendant's rationale—that anyone who has had some modicum of academic success cannot be found to have a disability that affects learning—flies in the face of Congress' directives and the relevant implementing regulations.").

Indeed, this view is consistent with DOJ regulations, which explain that "someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities . . . because of the additional time or effort he or she must spend to read, write, speak, or learn compared to most people in the general population."  28 C.F.R. § 36.105(d)(3)(iii).  See also Amendment of Americans With Disabilities Act Title II and Title III Regulations To Implement ADA Amendments Act of 2008, 81 Fed. Reg. 53,204, 53,230 (Aug. 11, 2016) ("concur[ring]" with Equal Employment Opportunity Commission's "view" that "[i]ndividuals diagnosed with dyslexia or other learning disabilities will typically be substantially limited in performing activities such as learning, reading, and thinking when compared to most people in the general population, particularly when the ameliorative effects of mitigating measures, including therapies, learned behavioral or adaptive neurological modifications, . . . studying longer, or receiving more time to take a test, are disregarded as required under the ADA Amendments Act.") (citing Regulations To Implement the Equal Employment Provisions of the Americans With Disabilities Act, as Amended, 76 Fed. Reg. 16978, 17,009 (Mar. 25, 2011)); Ramsay, 968 F.3d at 257–58.

Here, Sampson provided extensive evidence documenting the mitigating measures that he

37

developed and applied in taking standardized tests such as the SAT, ACT, and MCAT, as well as in other academic settings throughout his life.  Nevertheless, NBME contends that it is doubtful that, given the format of these exams, Sampson could have actually utilized these test-taking strategies to perform as well as he did.  (NBME Opp'n 17–19.)  At the hearing, Dr. Kroopnick testified that a successful MCAT examinee could not answer MCAT Verbal Reasoning questions without fully reading and understanding the passage to which the questions relate.  (Tr. 258:20– 260:7, 262:23–263:20.)  Ultimately, however, the Court credits Sampson's testimony, which was corroborated by Dr. Lam's description of the test-taking strategies that he helped Sampson develop and deploy.  (Tr. 21:15–22:16, 57:25–59:1.)

That Sampson was able to use these mitigating measures with some success does not, as NBME argues, undermine his claim that he is substantially limited in his ability to read and concentrate.  Rather, his past success on standardized tests and in the classroom reflects that he compensated for his impaired reading and concentration abilities through learned behavioral modifications, such as test-taking strategies, and by studying longer than his peers.  See Ramsay, 968 F.3d at 258 n.7 ("[I]n deciding whether [the plaintiff] was disabled, the Court could appropriately consider and discount that she compensated for her very weak reading and writing abilities by devoting more effort to her assignments than most students.") (citing 28 C.F.R. § 36.105(d)(3)(iii)); Berger, 2019 WL 4040576, at *23 (discussing the plaintiff's "compensatory strategies to speed up his reading for standardized examinations like the MCAT").

In sum, considering the entire factual record in this case, the Court concludes that Sampson has established that he is disabled within the meaning of the ADA, by virtue of his diagnosed Specific Learning Disorder with impairments in reading (reading fluency and reading comprehension) and written expression (spelling and handwriting), and ADHD.    These

MK000106

impairments substantially limit his ability to read and concentrate as compared to most people in the general population.  Accordingly, he has demonstrated a substantial likelihood of success on the merits of his ADA claim.

## D.  **Balance of Harms and Public Interest**

Under the final injunction factor, the Court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction."  <u>Yang</u>, 960 F.3d at 135–36 (internal quotations marks and citations omitted).

Sampson argues that the balance of harms weighs in his favor, as "NBME's denials of Sampson's accommodation request denies him the opportunity to take the USMLE Step 1 in a non-discriminatory manner and on equal footing with nondisabled test-takers," while "[e]xtended testing time is not logistically difficult to provide," and "it will cost NBME nothing to grant [his requested] accommodation[s]."  (Sampson Mem. at 22.)  NBME contends that Sampson's reasoning "misses the mark," as "[t]he harm here has nothing to do with logistics or cost, and everything to do with ensuring fairness to other examinees, preserving the integrity of the USMLE, and protecting the public welfare."  (NBME Opp'n at 24.)

This factor favors Sampson.  The Court recognizes that NBME's "procedures are designed to ensure that individuals with bona fide disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the medical licensing examination."  <u>Powell v. Nat'l Bd. of Med. Examiners</u>, 364 F.3d 79, 88 (2d Cir. 2004).  Nevertheless, it is equally true that, "[a]s administrator of the national exam used by a number of states for licensing medical doctors, [NBME] has a duty to ensure that its examination is <u>fairly</u> administered to all those taking

39

it." Id. at 88–89 (emphasis added).  See also 28 C.F.R. § 36.309(b)(1)(i) (requiring testing entities to select and administer exams "so as to best ensure that, when the examination is administered to an individual with a disability . . . the examination results accurately reflect the individual's aptitude or achievement level . . . rather than reflecting the individual's impaired sensory, manual, or speaking skills").   As discussed above, Sampson has demonstrated that his requested accommodations are necessary to ensure that when he takes Step 1, he will be tested on his aptitude and knowledge of the subject matter—not on whether he can overcome his disability.  Without his requested accommodations, Sampson risks failing Step 1 and losing the opportunity to progress in his medical training.  Accordingly, the balance of harms weighs in favor of granting an injunction.

Next, Sampson argues that the public interest favors enforcing the ADA, increasing the number of physicians in the United States, and allowing qualified candidates with disabilities to pursue medical careers.  (Sampson Mem. at 23.)   NBME, on the other hand, contends that Sampson's position "is based on the mistaken premise that [he] has shown he is disabled under the ADA and has a clear likelihood of succeeding on the merits of his claim."  (NBME Opp'n at 24–25.)  Moreover, according to NBME, the public interest weighs against granting a preliminary injunction where accommodations may be unwarranted because "medical licensing authorities rely on the [USMLE] to assess the competency of potential doctors." [17]  (Id. at 25.)

This factor also favors Sampson.  It is NBME's position—not Sampson's—that is based on a mistaken premise.  "In enacting the ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities."  Ramsay, 968

---

[17]     NBME also notes that even if, as Sampson says, "[m]any areas of the United States are under-served by physicians," (Sampson Mem. at 23), Sampson has not provided any evidence that he intends to practice medicine in an underserved area, and there is a "significant question whether he will ever be licensed to practice medicine anywhere . . . given his status in medical school and the fact that he is also pursuing a business degree."  (NBME Opp'n at 25.)  Although it is correct that Sampson has offered scant support for this line of argument, the Court finds—on other grounds—that this factor weighs in his favor.

40

F.3d at 263 (quoting <u>Enyart</u>, 630 F.3d at 1167).  Sampson has shown a substantial likelihood that he is entitled to accommodations under the ADA.  Accordingly, "[g]ranting injunctive relief would further the public interest by prohibiting discrimination by testing agencies, such as the NBME, on the basis of disability."  <u>Berger</u>, 2019 WL 4040576, at *29 (collecting cases).  And because Sampson has shown a substantial likelihood that he is entitled to accommodations, there is no reason that providing him the requested accommodations will "alter[ ] the substance of" Step 1. <u>Powell</u>, 364 F.3d at 89.  Rather, the resulting scores will simply "reflect each examinee's abilities accurately."  <u>Id.</u>  Thus, the public interest weighs in favor of granting preliminary injunctive relief.

### III.    CONCLUSION

For the reasons stated above, Sampson's motion for a preliminary injunction is GRANTED.  NBME is ORDERED to provide the following accommodations to Sampson on the USMLE Step 1 exam:  100% additional testing time (double time), a separate testing room, and extended breaks.

**SO ORDERED.**

Dated:  December 2, 2022
Central Islip, New York

_____/s/_____(JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE

MK000109

Home   -   **Common Questions** ⌐

# Attempt Limit Common Questions

| ⌃ | **1. What is the USMLE policy on attempt limits?** |

The total number of attempts allowed per Step is four (4). Examinees who have attempted any USMLE Step (including Step 2 CS) four or more times and have not passed are ineligible to apply for USMLE Steps.

| ⌄ | **2. Before July 2021, USMLE allowed six attempts per Step examination. Why did this change?** |

| ⌄ | **3. When did the change to the attempt limit policy take effect?** |



**Our Sponsors**

NBME.org

FSMB.org

**EXHIBIT**

I

exhibitsticker.com

In This Section

MK000110   +

Announcements

Common Questions

## Step Exams

Step 1

Step 2 CK

Step 3

Test Accommodations

Reschedule an Exam

## USMLE Updates & Research

Performance Data

Podcasts



Privacy

Copyright © 1996-2022 Federation of State Medical Boards (FSMB) and National Board of Medical Examiners (NBME). All rights reserved. The United States Medical Licensing Examination® (USMLE®) is a joint program of the FSMB and NBME.

MK000111



# The Department of Medicine

## Internal Medicine Applicant Criteria

Dear Doctor,

**Thank you** for your interest in the Internal Medicine Residency Program at The University Graduate School of Medicine.

For the 2022-2023 interviewing season, we will be participating in the Electronic Residency Application Service (ERAs). We have formally agreed to not accept applications outside the ERAs system. Please do not mail applications to us through the postal system - we will **not** be able to process them. To apply to our program, simply go to the ERAs web site and follow the directions. The Educational Commission for Foreign Medical Graduates (ECFMG) has agreed to be the contact agency for all international medical graduates. They will assist you with any questions you may have regarding ERAs. If you are a foreign medical graduate, you will be required to go through this program.

We also participate in the National Resident Matching Program (NRMP) so we have agreed to **only** accept applicants who are participating in the NRMP. **We do not offer positions outside the NRMP.** We have 13 positions available for PGY-1 residents. **At this time our program does not have any vacancies for 2nd & 3rd year residents.**

We review all applications sent to us through ERAs. In the 2021-2022 application season, we received almost 2,000 applications for our 13 positions & filled through ERAS. Our requirements are:

1. We do require **passing** the USMLE/COMLEX exams on the **first attempt** (both Step 1 and Step 2) and **one year** of prior U.S. training, which can include any research work.

2. We require applicants **be within 5 years following graduation from medical school.**

3. **All scores and testing must be completed before an applicant will be considered for interview (we understand that graduation from medical school must take place before you can receive your ECFMG certificate).**

4. Please keep in mind that The University of Tennessee Medical Center/Knoxville does **not** sponsor the H-1 VISA. We do currently have International Medical Graduates in our program (14) - all are either citizens of the U.S. or on a J-1 Visa.

**EXHIBIT**

**J**

exhibitsticker.com

MK000112

5. **Sorry, but due to legal matters (patient confidentiality, malpractice, etc), The University of Tennessee Medical Center or UT Graduate School of Medicine does not allow observerships or externships.**

**Please note that we do not deviate from these rules - we really do mean no more than 5 years following graduation from medical school, one full year of prior U.S. training and all tests must be passed on the first attempt.**

To find out more, please visit UT Graduate School of Medicine, Department of Medicine.

**Again, thank you for your inquiry.** We feel we have an excellent program to offer you. Deadline for receipt of applications will be December 1, 2022.

Daphne Norwood, MD
Interim Program Director, Internal Medicine Residency
University of Tennessee Graduate School of Medicine
The University of Tennessee Medical Center at Knoxville

*Description of the Program* (.pdf)

## The Department of Medicine

| Faculty |
| Faculty by Divisions |
| Residency Program |
| Cardiovascular Disease Fellowship |
| Interventional Cardiology Fellowship |
| Hematology/Oncology Fellowship |
| Pulmonary Disease/Critical Care Medicine Fellowship |
| Transitional Year Program |
| Medical Student Education |
| Research |
| Clinical Trials |
| Scholarly Activity |

MK000113

Alumni

Internal Medicine Patient Portal

Contact Us

# Internal Medicine Residency Program

Resident Agreement (Contract)

Residency Applicant Criteria

Curriculum

Salary and Benefits

Current Residents

Scholarly Activity

Graduate Medical and Dental Education

Contact Us

SHARE

MK000114





MK000115



Tweets by @UTGSM

MK000116

**UTGSM Knoxville** @utgsm · Feb 3

Today is #NationalWearRedDay and we at UTGSM are proud to show our support for raising awareness about heart disease! #WearRedDay #HeartDiseaseAwareness ❤️💕💕❤️💕❤️

💬 1   ♡ 9   ⓘ

**UTGSM Knoxville** @utgsm · Feb 1

Exciting news! @SVanterpoolMD will be speaking at the 5th Annual Targeted Pain Treatment™ #CME Conference on Pain Treatment Advocacy and Access. Sign up today! conta.cc/3WzjXyj #targetedpaintreatment #opioidcrisis @utmedicalcenter @ASRA_Society

💬   ♡ 2   ⓘ

**UTGSM Knoxville** @utgsm · Jan 24

Attend the 5th Annual Targeted Pain Treatment™ #CME Conference with Matthew Vance, MD. He will talk about the opioid crisis epidemiology and "Where We Are Now?" Sign up now! conta.cc/3WzjXyj #painmanagement @SVanterpoolMD

MK000117

## Cancer Education and Patient Care

"Cancer care is an important part of Internal Medicine residency training. The oncology rotation teaches not only the signs, symptoms, biomarkers, diagnostic tests, and treatment options, but also residents learn how to help patients through such a trying process. Sharing these experiences allow us to connect with patients on a far greater level than just the scientific aspect of medicine."

Mark Rasnake, MD, Residency Program Director 

## Headlines

K. Paige Johnson, MD Named Interim Assistant Dean for Undergraduate Medical Education at UTGSM

Tina M. Dudney, MD Named Interim Assistant Dean for Graduate Medical and Dental Education and Designated Institutional Official at UTGSM

Stuart E. Van Meter, MD Named Interim Chair of Pathology

UTGSM Completes Second 'Advancing Access to Careers in Medicine Scholars Program'

Through Dr. I. Reid Collmann's Legacy Scholarship, Medical Studies Participate in GSM Research Projects

# *Support The University of Tennessee Graduate School of Medicine*



Medical Center Map & Parking

ABOUT GSM

Administration        UT Medical Center        Faculty & Staff Affairs

UT Health Science Center

MK000118

Knoxville        Chattanooga        Memphis

CONTACT US

General Information        Graduate Medical Education        Map and Directions

Connect with us: 

The University of Tennessee Graduate School of Medicine

1924 Alcoa Highway

Knoxville, Tennessee 37920 | 865-305-9290

Copyright © 2022

MK000119

Apply   For Patients   Giving   myUK

## Internal Medicine

About Us   Divisions   Fellowships   Residency Programs   Clinical Services   More



# Applicants

Internal Medicine  /  Residency Programs  /  Categorical  /  Applicants

## Two Tracks, 27 Total Positions

Our program has two tracks to which you can apply and match. All 27 positions are filled through the National Resident Matching Program (NRMP). All applications are through the Electronic Residency Application Service (ERAS).

**Categorical**
21 positions per year



EXHIBIT

K

MK000120

Program ID: 1848140C0

**Primary Care**
Six positions per year
Program ID: 1848140M0

## In This Section

> Applicants

Interview

Why UK Internal Medicine?

Explore UK HealthCare

Explore Lexington, KY

# Welcome from the Department Chair - Darwin Conwell, MD

 UK_Chair Welcome_Final_070822

ProsperMG

02:18

# Current Residents:  Why UK?

MK000121



*Madison Tackett, MD: [I]t felt like home to me!...UK is such an important medical hub for the region. I truly feel like I am making a difference for rural people while also learning in a rich academic setting.*

## Selection

We select candidates to interview based on their complete application and seek a class that lives the values of this program.

- Collegiality and teamwork—we care for one another
- The richness of human differences—we all have unique paths
- Connection to our complex patients—including the underserved and rural Kentucky

## Additional Program Requirements

Our application review relies on the Medical School Performance Evaluation, Internal Medicine Standard Evaluation Letter from your clerkships, personal statement, and three letters of recommendation. We expect a first-time passing score on Step 1. We generally prefer a United States Medical Licensing Exam (USMLE) Step 2 score around the mean.

USMLE is preferred to the Comprehensive Osteopathic Medical Licensing Examination (COMLEX), although we do consider both.

## International Students

For international medical graduates, you must be Educational Commission for Foreign Medical Graduates (ECFMG)-certified by June 30 of the year you plan to start residency. We consider applicants who are

MK000122

less than three years out from medical school graduation or those who have been actively practicing clinical medicine.

UK only sponsors J-1 Visas, and the <u>Office of Graduate Medical Education</u> (not the department of medicine) makes all resident-related visa decisions.

## Graduate Profiles



*Meredith McAdams, MD: UK provided me with many great mentors in both the clinical and research realms...I do not believe I would have been as successful in my fellowship as I was if not for my residency training experience at UK.*

---

### Benefits

For information about stipends, vacation, health insurance, and more, please visit the Graduate Medical Education page **here**.

---

## Internal Medicine

800 Rose Street
Lexington, KY 40536-0298

Chairman's Office: (859) 257-5116
Clinical Questions: (859) 257-1000

MK000123

# College of Medicine

College of Medicine
William R. Willard Medical Education Building, MN 150
Lexington KY, USA 40536-0298

   

## Contact Us

Faculty/Staff Directory

Department Directory

Questions, Comments, or Concerns

Login

## Resources

Education

Research

Diversity, Equity, and Inclusion

Wellness

Alumni

Clinical Partners

© 2023 University of Kentucky College of Medicine

An Equal Opportunity University

Accreditation

Privacy Policy

Accessibility

MK000125

## Department of Medicine — Internal Medicine Residency Program

School of Medicine

## Information for Applicants

Thank you for your interest in the University of Colorado School of Medicine Internal Medicine Residency Training Program! Browse the tabs below for information on how to apply, requirements, eligibility and selection, interview dates, and international medical graduates.

### Electronic Residency Application Service ⤴

How to Apply    Requirements, Eligibility    Interview Dates    International Medical
                and Selection                                   Graduates

## Requirements, Eligibility, and Selection

### Our approach to selecting applicants:

- We take a holistic approach to review applications. We take into account the following characteristics: diverse life experiences, medical school performance (with a focus on clerkships and in particular the medicine clerkship and medicine sub-internship), community involvement and engagement, scholarly work, and demonstration of leadership qualities.

- We will not accept any applications sent to us in ERAS after 4pm on Thursday, October 6th, 2022.

- We do not have a set USMLE or COMLEX cut-off score; however, most of our applicants score above 225 on USMLE Step 1. We expect that individuals have passed the exams in their first attempt and performed competitively. We do accept COMLEX scores in lieu of USMLE. The minimum required COMLEX score is 600.
  - USMLE Step 2 scores are not required at the time of application but must be completed before starting residency.

- We strongly recommend having one month of clinical experience in a U.S. healthcare system. Tele-rotations do count as clinical experience; however, we do not count observerships or research as clinical experience.

### Requirements:

- We will accept only applications submitted to us electronically through ERAS. If you are an international medical graduate, you must apply to our program through an ECFMG office.
  - We **are** utilizing the supplemental application for the AY22-23 application cycle
- We require a chairman's letter and three letters of recommendation, which is a total of 4 letters.
  - Chairman's letter is optional for preliminary applicants.
  - For those applying after serving in the armed forces after medical school graduation, we require a chairman's letter from your time at medical school and strongly suggest one of your letters of recommendation be from your current commanding officer.

- Residents in our program must be a U.S. citizen, lawful permanent resident, refugee, asylee, or possess the appropriate documentation to allow a resident to legally train at the University of Colorado School of Medicine.

- Residents in our program must be vaccinated against COVID19 in addition to all standard vaccine series required to work in a medical environment.

- International Medical Graduates must be ECFMG (Educational Commission for Foreign Medical Graduates) certified at the time of your application or far enough along in the application process that you will receive certification no later than February 1 of the year in which you plan to match.

EXHIBIT

L

MK000126

## Entry Requirements:

*The Department of Medicine at the University of Colorado does not discriminate with regard to age, sex, race, religion, national origin, disability, or Veteran status.*

- Certification by the National Board of Medical Examiners (NBME), the National Board of Osteopathic Medicine (NBOME), or the Educational Commission for Foreign Medical Graduates (ECFMG) is required.

- International medical graduates must hold a valid ECFMG (Educational Commission for Foreign Medical Graduates) certificate, or have a full, unrestricted license to practice medicine in a U.S. licensing jurisdiction, or have completed a Fifth Pathway program provided by an LCME-accredited medical school.

The University of Colorado School of Medicine recognizes that housestaff enrolled in its program are trainees, not employees. As such, applicants also must be able to meet the conditions of the school's Houseofficer Training Agreement. Specifically, they must:

- Be a U.S. citizen or hold a valid U.S. resident alien card

- Possess (or be eligible to obtain) all three of the following:
  - Valid passport
  - Valid 1-94 card (obtained upon entry to the U.S.) that indicates D/S J-1 (Duration of Status for J-1 visa);
  - J-1 visa or H1B visa sponsorship from the ECFMG to train at the University of Colorado School of Medicine in the Department of Medicine.

- Eligible for a physician training license as granted by the Colorado Medical Board.

- In accordance with the CU GME USMLE, COMLEX, and LMCC Examination Policy, applicants must have successfully completed the USMLE Step 1 and USMLE Step 2 (CK and CS) examinations, or the COMLEX Level 1 and COMLEX Level 2 examinations, as evidenced by obtaining a passing grade for the examinations prior to starting a residency.

## Selection Criteria:

- We look for ability, aptitude, academic credentials, communication skills, and personal qualities such as motivation and integrity, and the ability to function within parameters expected of a practitioner in the specialty.

- To determine the appropriate level of education for individuals wishing to transfer from another training program, the program director must receive written verification of previous educational experiences and a statement regarding the performance evaluation of the transferring resident prior to acceptance into the program.

- We will review and select applicants in a manner consistent with provisions of equal opportunity employment and will not discriminate with regard to sex, race, age, religion, color, national origin, disability, or any other applicable legally protected status.

- We participate in the National Resident Matching Program (NRMP).

MK000127



### USMLE STEP 3

Overview

Step 3 Application

Critical Announcements

Step 3 FAQ

Home / USMLE Step 3 / State Specific Requirements for Initial Medical Licensure

# STATE SPECIFIC REQUIREMENTS FOR INITIAL MEDICAL LICENSURE

*FSMB reviews and updates this information annually and/or at the request of a board. We strongly encourage you to use this as a guide and to contact the board for the most recent information. Contact information for all boards is available at: **https://www.fsmb.org/contact-a-state-medical-board/***

AL  AK  AZ  AR  CA  CO  CT  DE  DC  FL  GA  GU  HI  ID  IL  IN  IA  KS  KY  LA  ME  MD  MA  MI
MN  MS  MO  MT  NE  NV  NH  NJ  NM  NY  NC  ND  MP  OH  OK  OR  PA  PR  RI  AS  SC  SD  TN
TX  UT  VT  VI  VA  WA  WV  WI  WY

## Alabama

✓ Accepts FCVS



MK000128



- No limit on COMLEX

**Minimum Postgraduate Training Required**
- 1 year ACGME training for US grads
- 3 years ACGME training for IMG's

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to successfully complete all USMLE Steps
- No limit on COMLEX (if board certified by one of the ABMS approved boards can complete all parts in 10 years)

# Alaska

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 2 attempts per USMLE Step
- 2 attempts per COMLEX Level

**Minimum Postgraduate Training Required**
- 2 years
- 3 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE
- 10 years for MD/PhD candidates
- 7 years to complete COMLEX

# Arizona Medical



MK000129



**Number of attempts at Licensing Exam**
- No limit on USMLE

**Minimum Postgraduate Training Required**
- 1 year
- 3 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE if initial licensure
- No limit if already licensed

---

# Arizona Osteopathic

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- Contact the board for information

**Minimum Postgraduate Training Required**
- 1 year

**Time Limit for Completing Licensing Examination Sequence**
- Contact the board for information

---

# Arkansas

✓ Accepts FCVS



**Number of attempts at Licensing Exam**



**Minimum Postgraduate Training Required**
- 1 year
- 3 years IMG unless currently enrolled in training program through University of Arkansas for Medical Sciences.

**Time Limit for Completing Licensing Examination Sequence**
- No limit on USMLE or COMLEX

# California Medical

✓ Limited acceptance of FCVS

**Number of attempts at Licensing Exam**
- 4 attempts at USMLE Step 3

**Minimum Postgraduate Training Required**
- 1 year
- 2 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- Passing scores on a written/computerized exam shall be valid for a period of 10 years from the month of the examination

# California Osteopathic

✓ Limited Acceptance of FCVS

**Number of attempts at Licensing Exam**



**Minimum Postgraduate Training Required**
- 1 year

**Time Limit for Completing Licensing Examination Sequence**
- No limit on COMLEX

# Colorado

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- No limit on USMLE
- No information available on COMLEX

**Minimum Postgraduate Training Required**
- 1 year
- 3 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- 7 years from first sitting to complete USMLE or COMLEX
- 10 years for MD/PhD or DO/PhD candidates

# Connecticut

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- No limit on USMLE



MK000132



**Minimum Postgraduate Training Required**
- 2 years

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE
- No limit on COMLEX

---

# Delaware

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- No more than 6 attempts to pass each step

**Minimum Postgraduate Training Required**
- 1 year
- 3 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE

---

# Washington, DC

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 3 attempts at USMLE Step 3; After which one additional year of postgraduate training is required.
- No limit on COMLEX





**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE; No limit on COMLEX

---

# Florida Medical

✓ Highly recommends FCVS

**Number of attempts at Licensing Exam**
- No limit on USMLE

**Minimum Postgraduate Training Required**
- 1 year
- 2 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- No limit on USMLE

---

# Florida Osteopathic

✓ Highly recommends FCVS

**Number of attempts at Licensing Exam**
- Contact the board for information

**Minimum Postgraduate Training Required**
- 1 year in an AOA-approved program

MK000134



# Georgia

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 3 attempts per USMLE Step
- No limit on COMLEX

**Minimum Postgraduate Training Required**
- 1 year
- 1 year if IMG is on list
- 3 years IMG if not on list

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE
- 9 years to complete USMLE if in MD/PhD program
- No limit on COMLEX

# Guam

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- No information at this time

**Minimum Postgraduate Training Required**
- No information at this time



**Time Limit for Completing Licensing Examination Sequence**



---

# Hawaii

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- No limit on USMLE or COMLEX

**Minimum Postgraduate Training Required**
- 1 year
- 2 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- No limit on USMLE or COMLEX

---

# Idaho

✓ Accepts FCVS
✓ Requires Uniform Application

**Number of attempts at Licensing Exam**
- Failure to pass USMLE after 2 attempts may lead to Board interview or evaluation
- No limit on COMLEX

**Minimum Postgraduate Training Required**
- 1 year
- 3 years IMG (can be licensed after 2 years if in good standing with Idaho residency training program, and has signed an agreement to complete residency in Idaho)

**Time Limit for Completing Licensing Examination Sequence**
- No limit on USMLE or COMLEX





# Illinois

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 5 attempts at all USMLE Steps combined
- 5 attempts at COMLEX Levels combined

**Minimum Postgraduate Training Required**
- 24 months of training

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE
- No limit on COMLEX

# Indiana

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 3 attempts per USMLE Step
- 5 attempts per COMLEX Level

**Minimum Postgraduate Training Required**
- 1 year
- 2 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- 10 years to complete USMLE





# Iowa

✓ Accepts FCVS
✓ Utilizes Uniform Application

**Number of attempts at Licensing Exam**
- 6 attempts at both USMLE Step 1 and 2
- 3 attempts at USMLE Step 3
- 6 attempts at both COMLEX Levels 1 and 2
- 3 attempts at COMLEX Level 3
- 3 years of approved postgraduate training required if outside the attempt limit.

**Minimum Postgraduate Training Required**
- 1 year
- 2 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- 10 years to complete USMLE or COMLEX
- 10 years for MD/PhD or DO/PhD candidates. Note: Board certification by ABMS or AOA is required if the applicant has not met the specified time period.

# Kansas

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 3+ attempts at USMLE Step 3 or COMLEX Level 3

**Minimum Postgraduate Training Required**
- 1 year
- 3 years IMG (minimum 2 years in an ACGME approved program)



MK000138



- 10 years to complete USMLE or COMLEX

# Kentucky

✓ Requires FCVS

**Number of attempts at Licensing Exam**
- Step or Level 1-4 attempts
- Step or Level 2 CK-4 attempts
- Step or Level 2 CS-4 attempts
- Step or Level 3-4 attempts

**Minimum Postgraduate Training Required**
- 2 years

**Time Limit for Completing Licensing Examination Sequence**
- No limit on USMLE or COMLEX

# Louisiana

✓ Requires FCVS

**Number of attempts at Licensing Exam**
- No limit at USMLE Step 1 or COMLEX Level 1
- 4 attempts each at USMLE Steps 2 and 3 or COMLEX Levels 2 and 3

**Minimum Postgraduate Training Required**
- 2 years





# Maine Medical

✓ Requires FCVS

**Number of attempts at Licensing Exam**
- 3 attempts at USMLE Step 3. More than 3 attempts requires a request for a waiver.

**Minimum Postgraduate Training Required**
- US/Canadian medical school graduates who graduated after July 1, 2004 must complete 3 years of ACGME accredited postgraduate training. (Those who graduated before July 1, 2004 are only required to complete 2 years of ACGME accredited PGT.) IMGs 3 years of ACGME accredited.

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete exam sequence (NBME, USMLE, and FLEX) More than 7 years requires a waiver.

# Maine Osteopathic

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 3 attempts at each Step/Level

**Minimum Postgraduate Training Required**
- 1 year in AOA approved program

**Time Limit for Completing Licensing Examination Sequence**
- No limit on COMLEX



MK000140



# Maryland

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- Unlimited attempts at each USMLE Step or COMLEX Level

**Minimum Postgraduate Training Required**
- 1 year
- 2 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- No time limit. There are additional requirements if an applicant fails an exam 3 or more times (See Health Occupations Article, Section 14-307(g))

# Massachusetts

✓ Requires FCVS

**Number of attempts at Licensing Exam**
- 3 attempts at USMLE Step 3 or COMLEX (See Board Regulations 243 CMR 2.02 (3)(b).)

**Minimum Postgraduate Training Required**
- Prior to January 2014, 2 years for domestic graduates and 2 years for IMGs.
- After January 2014, 2 years for domestic graduates and 3 years for IMGs.

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE or COMLEX. May request a waiver under specific conditions. (See Board Regulations 243 CMR 2.02 (3)(c)(2).)





# Michigan Medical

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 3 attempts at each USMLE Step

**Minimum Postgraduate Training Required**
- 2 years

**Time Limit for Completing Licensing Examination Sequence**
- Must pass all Steps of the USMLE within 7 years from the date of first passing any Step of the exam.  Must pass Step 3 within 4 years of the first attempt at Step 3 or must complete 1 year of post-graduate training before making additional attempts at Step 3.

---

# Michigan Osteopathic

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 6 attempts total for each examination

**Minimum Postgraduate Training Required**
- 1 year in AOA approved program

**Time Limit for Completing Licensing Examination Sequence**
- Pass all components of the COMLEX-USA within 7 years from the date you first passed any component of the COMLEX-USA





# Minnesota

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 3 attempts at each USMLE Step, 4 attempts allowed if current license in another State and current certification by specialty board of ABMS, AOABPE, RCPSC, CFPC.
- 3 attempts at each COMLEX Level.

**Minimum Postgraduate Training Required**
- 1 year

**Time Limit for Completing Licensing Examination Sequence**
- USMLE or COMLEX Step or Level 3 must be passed within 5 years of Step or Level 2 or before the end of residency training.

---

# Mississippi

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 3 attempts at each Step
- No limit on COMLEX

**Minimum Postgraduate Training Required**
- 1 year
- 1-3 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE
- No limit on COMLEX





# Missouri

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 3 attempts at USMLE Step 3
- 3 attempts on COMLEX

**Minimum Postgraduate Training Required**
- 1 year
- 3 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE (waived for MD/PhD candidates)
- No limit on COMLEX

---

# Montana

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- If an applicant fails to pass the first attempt at USMLE Step III, the applicant may be reexamined no more than five additional times.
- No limit on COMLEX

**Minimum Postgraduate Training Required**
- Completion of an approved residency program
- 3 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE (exceptions possible for MD/PhD candidates)





# Nebraska

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 4 attempts+ at each USMLE Step
- 4 attempts+ at each COMLEX Level

**Minimum Postgraduate Training Required**
- 1 year
- 3 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- 10 years to complete USMLE or COMLEX beginning with date first Step/Level is passed.

# Nevada Medical

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- Must pass all 3 Steps of USMLE in not more than a total of 9 attempts and must pass Step 3 in not more than a total of 3 attempts

**Minimum Postgraduate Training Required**
- 3 years. An unlimited license may be granted to currently enrolled residents in a post graduate training program in the U.S. or Canada, that have completed at least 24 months of progressive post graduate training and meet all requirements for an unlimited license in the state of Nevada, including having passed all 3 steps of USMLE within the time period allowed by NAC 630.080 and commit in writing to the Nevada State Board of Medical





**Time Limit for Completing Licensing Examination Sequence**
- MD must pass all Steps of the exam within 7 years after the date on which the applicant first passes any Step of the exam; PhD must pass all Steps of the exam within 10 years after the date on which the applicant first passes any Step of the exam.

# Nevada Osteopathic

✔ Accepts FCVS

**Number of attempts at Licensing Exam**
- No limit on COMLEX

**Minimum Postgraduate Training Required**
- 3 years for full license OR 2 years if resident signs commitment to practice in NV

**Time Limit for Completing Licensing Examination Sequence**
- No limit on COMLEX

# New Hampshire

✔ Requires FCVS

**Number of attempts at Licensing Exam**
- 3 attempts at each USMLE Step or COMLEX Level

**Minimum Postgraduate Training Required**
- 2 years



MK000146



# New Jersey

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 5 attempts at USMLE Step 3
- No information available on COMLEX

**Minimum Postgraduate Training Required**
- US and IMG graduates who graduated after July 1, 2003 must complete 2 years of postgraduate training and have signed a contract for a 3rd year in an accredited program. At least 2 of the years must be in the same field. Graduates prior to July 1, 2003: 1 year; 3 years IMG.

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE
- No information available on COMLEX

# New Mexico Medical

✓ Highly recommends FCVS

**Number of attempts at Licensing Exam**
- 6 attempts per USMLE Step

**Minimum Postgraduate Training Required**
- 2 years

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE



# New Mexico Osteopathic

✓ Highly recommends FCVS

**Number of attempts at Licensing Exam**
- No limit on COMLEX

**Minimum Postgraduate Training Required**
- 1 year

**Time Limit for Completing Licensing Examination Sequence**
- Within 7 years of having passed the first level

# New York

✓ Accepts FCVS for domestic graduates
✓ IMGs-FCVS required

**Number of attempts at Licensing Exam**
- No limit on USMLE or COMLEX

**Minimum Postgraduate Training Required**
- Domestic 1 year
- IMG 3 years

**Time Limit for Completing Licensing Examination Sequence**
- No limit on USMLE or COMLEX



MK000148



# North Carolina

✓ Accepts FCVS
✓ Requires FCVS for Physicians with an established FCVS Profile and for IMG's (unless eligible for an Expedited License)

**Number of attempts at Licensing Exam**
- 3 attempts per USMLE Step
- 3 attempts per COMLEX Level

**Minimum Postgraduate Training Required**
- 1 year
- 2 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- No time limit for passing all 3 steps

---

# North Dakota

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 3 attempts at each USMLE Step or COMLEX Level

**Minimum Postgraduate Training Required**
- 1 year
- 30 months IMG of ACGME accredited training

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE or COMLEX



# Northern Mariana Islands

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- No information available at this time

**Minimum Postgraduate Training Required**
- No information available at this time

**Time Limit for Completing Licensing Examination Sequence**
- No information available at this time

---

# Ohio

✓ Requires FCVS

**Number of attempts at Licensing Exam**
- An applicant for licensure has a total of 5 attempts (or 5 times to fail) a USMLE Step or COMLEX Level. The applicant must have passed on the 6th attempt.

**Minimum Postgraduate Training Required**
- 1 year
- 2 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- 10 years to complete USMLE or COMLEX (possible waiver good cause if over 10 years)





# Oklahoma Medical

✓ Accept FCVS

**Number of attempts at Licensing Exam**
- 3 attempts at each USMLE Step (Step 2 = CK & CS)

**Minimum Postgraduate Training Required**
- 1 year
- 2 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- 10 years to complete USMLE

# Oklahoma Osteopathic

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- Contact the board for information

**Minimum Postgraduate Training Required**
- 1 year

**Time Limit for Completing Licensing Examination Sequence**
- No limit on COMLEX



# Oregon

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 3 attempts at USMLE step 3/COMLEX level 3. 4th attempt after additional 1 year postgraduate training. Waiver of attempt requirement may be available if ABMS/AOA certified.

**Minimum Postgraduate Training Required**
- 1 year
- 3 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE or COMLEX

# Pennsylvania Medical

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- No more than 4 attempts at each Step or Step Component

**Minimum Postgraduate Training Required**
- 2 years

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE



MK000152



# Pennsylvania Osteopathic

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- No limit on COMLEX

**Minimum Postgraduate Training Required**
- 1 year

**Time Limit for Completing Licensing Examination Sequence**
- No limit on COMLEX

# Puerto Rico

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- No limit on USMLE

**Minimum Postgraduate Training Required**
- 1 year

**Time Limit for Completing Licensing Examination Sequence**
- USMLE Step 3 shall be passed within 7 years of the date of passing Step 1.



# Rhode Island

✓ Requires FCVS

**Number of attempts at Licensing Exam**
- 3 attempts at each USMLE Step
- 3 attempts at each COMLEX Level

**Minimum Postgraduate Training Required**
- 2 years
- 2 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE
- No information available on COMLEX

# American Samoa

**Number of attempts at Licensing Exam**
- No information available at this time

**Minimum Postgraduate Training Required**
- No information available at this time

**Time Limit for Completing Licensing Examination Sequence**
- No information available at this time



MK000154



# South Carolina

✓ Requires FCVS

**Number of attempts at Licensing Exam**
- 4 attempts per USMLE Step and COMLEX Level

**Minimum Postgraduate Training Required**
- 1 year
- 3 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- 10 years to complete USMLE or COMLEX

---

# South Dakota

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- Allowed 3 attempts, must pass on third, for the USMLE or COMLEX examination

**Minimum Postgraduate Training Required**
- Successful completion of residency program

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE or COMLEX
- 10 years for Dual Program Degree MD-PhD Applicant



MK000155

 FEDERATION OF STATE MEDICAL BOARDS

# Tennessee Medical

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- Applicants who fails any step of the USMLE or FLEX more than (3) times must show ABMS board certification & proof of meeting requirements for Maintenance of Certification to be considered for licensure.

**Minimum Postgraduate Training Required**
- 1 year
- 3 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- All three steps must be taken and passed within ten (10) years of the first successful step, unless you qualify under an exception.

# Tennessee Osteopathic

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 3 attempts

**Minimum Postgraduate Training Required**
- 1 year

**Time Limit for Completing Licensing Examination Sequence**
- No limit on COMLEX





# Texas

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 3 attempts at each USMLE Step or COMLEX Level. (Exceptions may apply for applicants who held a Texas Physician in Training permit on or before September 1, 2005 or who have been licensed in good standing in another state for 5 years. See **TMB website** for more information.)

**Minimum Postgraduate Training Required**
- 1 year
- 2 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- 7 years+ to complete the USMLE or COMLEX. (Exceptions may apply for applicants who are especially board certified or who completed combined MD/PhD programs, or who exceed the time limit but are willing to accept a limited license to practice exclusively in an MUA or HPSA. See **TMB website** for more information.)

---

# Utah Medical

✓ Requires FCVS

**Number of attempts at Licensing Exam**
- 3 attempts at USMLE Step 3

**Minimum Postgraduate Training Required**
- 2 years completed - OR - 1 year of training complete, with a second year in the state of Utah in progress

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE
- 10 years for MD/PhD candidates



MK000157



# Utah Osteopathic

✓ Requires FCVS

**Number of attempts at Licensing Exam**
- 3 attempts at each COMLEX Level

**Minimum Postgraduate Training Required**
- 2 years completed OR 1 year of training complete, with a second year in the state of Utah in progress

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete COMLEX
- 10 years for DO/PhD candidates

# Vermont Medical

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 3 attempts at USMLE Step 3

**Minimum Postgraduate Training Required**
- 2 years
- 3 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- 7 years to complete USMLE



# Vermont Osteopathic

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- No information available at this time

**Minimum Postgraduate Training Required**
- 1 year rotating internship or 3 year residency program

**Time Limit for Completing Licensing Examination Sequence**
- No information available at this time

# Virgin Islands

✓ Requires FCVS

**Number of attempts at Licensing Exam**
- Must take SPEX (only given in May and November) and an oral exam. 2 attempts

**Minimum Postgraduate Training Required**
- 6 months required after 2 attempts for SPEX exam

**Time Limit for Completing Licensing Examination Sequence**
- 3 years to pass the 2 attempts allowed for re-examination. 1 year limitation to take the oral exam after passing written.



MK000159



# Virginia

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- No limit on USMLE

**Minimum Postgraduate Training Required**
- 1 year

**Time Limit for Completing Licensing Examination Sequence**
- 10 years to complete USMLE; Greater than 10 years if candidate is ABMS certified.

# Washington Medical

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 3 attempts at USMLE Step 3

**Minimum Postgraduate Training Required**
- 2 years

**Time Limit for Completing Licensing Examination Sequence**
- 7 years+ to complete USMLE



# Washington Osteopathic

✔ Accepts FCVS

**Number of attempts at Licensing Exam**
- 3 attempts on COMLEX

**Minimum Postgraduate Training Required**
- 1 year

**Time Limit for Completing Licensing Examination Sequence**
- No limit on COMLEX

# West Virginia Medical

✔ Accepts FCVS

**Number of attempts at Licensing Exam**
- 6 attempts per USMLE Step or Step component

**Minimum Postgraduate Training Required**
- 1 year
- 3 years IMG

**Time Limit for Completing Licensing Examination Sequence**
- 10 years to complete USMLE

MK000161



# West Virginia Osteopathic

**Number of attempts at Licensing Exam**
- No limit on COMLEX

**Minimum Postgraduate Training Required**
- 1 year

**Time Limit for Completing Licensing Examination Sequence**
- No limit on COMLEX

# Wisconsin

✓ Accepts FCVS

**Number of attempts at Licensing Exam**
- 3 attempts at each USMLE step/COMLEX level

**Minimum Postgraduate Training Required**
- 2 years

**Time Limit for Completing Licensing Examination Sequence**
- USMLE Step 3 shall be passed within 10 years of the date of passing Step 1
- N/A on COMLEX

MK000162



# Wyoming

✓  Requires FCVS

**Number of attempts at Licensing Exam**
- 7 total attempts on USMLE or COMLEX in 7 years

**Minimum Postgraduate Training Required**
- 2 years (1 year if applicant has current certification by an ABMS or AOABOS/BOC specialty board, or continuous licensure in good standing in 1 or more states and/or D.C. for the preceding 5 years.)

**Time Limit for Completing Licensing Examination Sequence**
- 7 years (8 years if in combined DO or MD/PhD program)

MK000163

# Racial/Ethnic Disparities in the Mental Health Care Utilization of Fifth Grade Children

*Tumaini R. Coker, MD, MBA; Marc N. Elliott, PhD; Sheryl Kataoka, MD, MSHS; David C. Schwebel, PhD; Sylvie Mrug, PhD; Jo Anne Grunbaum, EdD; Paula Cuccaro, PhD; Melissa F. Peskin, PhD; Mark A. Schuster, MD, PhD*

**Objective.**   The aim of this study was to examine racial/ethnic differences in fifth grade children's mental health care utilization.
**Methods.**   We analyzed cross sectional data from a study of 5147 fifth graders and their parents in 3 US metropolitan areas from 2004  06. Multivariate logistic regression was used to exam ine racial/ethnic differences in mental health care utilization.
**Results.**   Nine percent of parents reported that their child had ever used mental health care services; fewer black (6%) and His panic (8%) children had used services than white children (14%). Fewer black and Hispanic children with recent symptoms of attention deficit/hyperactivity disorder, oppositional defiant dis order, and conduct disorder, and fewer black children with symp toms of  depression had ever utilized services compared with white children. In multivariate analyses controlling for demo graphic factors, parental mental health, social support, and symp toms of the 4 mental health conditions, we found that black children were less likely than white children to have ever used ser vices (Odds ratio [OR] 0.3, 95% confidence interval [95% CI], 0.2  0.4, *P* <.001). The odds ratio for black children remained vir tually unchanged when the analysis was restricted to children with symptoms of ≥1 mental health condition, and when the anal ysis was stratified by mental health condition. The difference in utilization for Hispanic compared with white children was fully explained by sociodemographics in all multivariate models.

**Conclusions.**   Disparities exist in mental health care utilization for black and Hispanic children; the disparity for black children is independent of sociodemographics and child mental health need. Efforts to reduce this disparity may benefit from addressing not only access and diagnosis issues, but also parents' help seeking preferences for mental health care for their children.

**KEY WORDS:** mental health; racial/ethnic disparities; utilization

*Academic Pediatrics* 2009;9:89  96

Nantional and community studies have found racial/ ethnic differences in mental health care utilization for children and adolescents;[1–6] these studies sug gest that black and/or Hispanic children are less likely than white children to receive mental health care services. Other studies document significant variation in parental help seeking behaviors for different child mental health condi tions.[2,7,8] Most data on racial/ethnic disparities in mental health care utilization, however, only account for general child mental health need.[2,3,5,6] Few studies provide a comparative examination of racial/ethnic disparities in utilization for specific mental health conditions. One study of specialty mental care use found that black children were less likely than white children to receive specialty care for depression but were just as likely to receive specialty care for behavioral problems.[1] Data on condition- or symp tom-specific racial/ethnic disparities in utilization could help researchers and clinicians focus their efforts in reduc ing these disparities in mental health care use.We know of no published population-based studies that examine how primary and specialty mental health care utilization differs by child race/ethnicity among children with symptoms of each of the most common childhood mental health condi tions. Therefore, our study aims to examine racial/ethnic differences in 1) the utilization of mental health care in chil dren, and 2) the utilization of mental health care among children with symptoms of 4 of the most common psychiat ric diagnoses in children   attention-deficit/hyperactivity disorder (ADHD), oppositional defiant disorder (ODD), conduct disorder (CD), and depression. We hypothesize that 1) significant racial/ethnic disparities exist in mental health care utilization that are more pronounced among children with ADHD and less apparent among children with depression and that 2) socioeconomic factors will ex plain the observed racial/ethnic differences in utilization. These racial/ethnic differences will be examined using the Andersen model of health care utilization as

From the Department of Pediatrics, Mattel Children's Hospital, David Geffen School of Medicine at UCLA, Los Angeles, Calif (Dr Coker); RAND Corporation, Santa Monica, Calif (Drs Coker, Elliott, and Schuster); Psychiatry and Biobehavioral Sciences, David Geffen School of Medicine at UCLA, Los Angeles, Calif (Dr Kataoka); Department of Psychology, University of Alabama at Birmingham, Birmingham, Ala (Dr Schwebel and Dr Mrug); Prevention Research Center Program, Centers for Disease Control and Prevention Research, Atlanta, Ga (Dr Grunbaum); Center for Health Promotion and Prevention Research, University of Texas Health Science Center at Houston, Houston, Tex (Dr Cuccaro and Dr Peskin); and Department of Medicine, Children's Hospital Boston, Harvard Medical School, Boston, Mass (Dr Schuster).

The findings and conclusions in this report are those of the authors and do not represent the official position of the Centers for Disease Control and Prevention.

Address correspondence to Tumaini R. Coker, MD, MBA, Mattel Chil dren's Hospital UCLA, David Geffen School of Medicine at UCLA, UCLA/RAND Center for Adolescent Health Promotion, 1072 Gayley Av enue, Los Angeles, California 90024 (e mail: tcoker@mednet.ucla.edu).

**EXHIBIT**

**N**

MK0001-16

a conceptual framework;[9] thus, predisposing factors (ie, age, race/ethnicity), enabling factors (ie, income, insurance) and need factors (ie, mental health symptoms) may influence and contribute to child mental health care utilization.

## METHODS

Healthy Passages, funded by the Centers for Disease Control and Prevention, is a longitudinal study of a cohort of 5147 fifth graders and their parents that explores health behaviors, outcomes, and related risk and protective factors by using a multilevel approach. Baseline data collected from 2004 to 2006 were used for this analysis. Institutional review boards at each study site and the Centers for Disease Control and Prevention approved this study. "Healthy Passages" provides a comprehensive assessment of preadolescent health and behavior by using baseline data from multiple sources (child, parent, and school). Psychometrically sound standardized measures were used when feasible. Qualitative (ie, focus groups, cognitive interviews) and quantitative studies were conducted during study development, pretesting, and pilot testing to evaluate the appropriateness of survey language, translation, field procedures, and language-specific study materials; these are detailed elsewhere.[10]

### Study Population and Sampling Procedure

Participants were recruited from public schools located in 3 areas: 1) 10 contiguous public school districts in and around Birmingham, Alabama, 2) 25 contiguous public school districts in Los Angeles County, California, and 3) the largest public school district in Houston, Texas. Eligible schools had an enrollment of at least 25 fifth graders, representing over 99% of students enrolled in regular classrooms in the 3 areas. To ensure adequate sample sizes of black, Hispanic, and white students, we used a 2-stage probability sampling procedure. In the first stage, we randomly sampled schools by using probabilities that were a function of how closely a school's racial/ethnic mix corresponded to the site's racial/ethnic target. In the second stage, all fifth grade students in regular classrooms of sampled schools were invited to participate. The small number of students who were not identified as black, Hispanic, or white were categorized as "other" for sampling purposes only. The sampling procedure is detailed elsewhere.[10]

The 118 sampled schools had 11 532 enrolled fifth graders. Almost all students in regular classrooms were eligible to participate; the only exclusion criterion was if the child or primary caregiver was unable to complete the study interview in English or Spanish. A primary caregiver (henceforth referred to as "parent") for each student received a letter requesting permission for contact by study personnel. Of the 11 532 parents   6663 who either agreed to be contacted or who were unsure but were invited to participate   77% (5147) completed an interview. This sample size reached the predetermined sample size targets, which were designed to allow detection of small effects within racial/ethnic subgroups. Details of statistical power are described elsewhere.[10] Interviews were conducted at the parent's home,

study center, or another preferred location. Prior to interviews, parents gave informed consent for their participation and their child's participation; children gave assent.

### Measures

#### Mental Health Care Utilization

To measure mental health care utilization, we adapted one set of questions from the Services Assessment for Children and Adolescents, a self- and parent-report instrument designed to assess the use of outpatient and inpatient mental health services by children aged 8 to 18 years.[11] The Services Assessment for Children and Adolescents shows good concordance ($\kappa = 0.76$) between parent reports and documentation for services.[12]

Parents were asked, "Has your child ever received care for emotional, behavioral, drug, or alcohol problems?" Parents were also asked where their child received that care and could answer with one or more of the following: a) pediatrician, family doctor, medical clinic, general hospital, or other medical provider; b) psychiatrist, psychologist, psychiatric nurse, clinical social worker, other mental health professional in a mental health clinic or office; or c) school counselor, school psychologist, or other school mental health worker.

Although our utilization measure is lifetime service use for emotional, behavioral, drug, or alcohol problems, it likely provides information on more recent utilization (previous 3 years) since the age of the children is 10 to 11 years. National studies demonstrate that ≤3% of children <8 years old have ever used mental health care services or have a significant mental health condition.[5,13] Further, since the prevalence of drug and alcohol use was extremely low among the "Healthy Passages" fifth grade participants (eg, 2% reported ever using marijuana; <1% reported ever using other drugs), most reported utilization was likely for emotional and behavioral problems.

#### Child Mental Health Symptoms

We adapted 32 questions from the Diagnostic Interview Schedule for Children (DISC) Predictive Scales (DPS) to assess the presence of parent-reported symptoms of ADHD (8 yes/no items), ODD (12 yes/no items), CD (8 yes/no items), and child-reported symptoms of depression (6 yes/no items) during the previous 12 months. The DPS is a screening tool based on the DISC; it identifies children with symptoms of 11 *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* diagnoses (sensitivities and specificities for ADHD, ODD, CD, and depression ≥ 0.89).[14] We created dichotomous variables for each disorder, defined by a score (sum of symptoms) above the sample 90th percentile. We used this cutoff value, which was more stringent than cutoff values used in a previously studied community sample,[14] since we did not include impairment or severity measures for symptoms.

#### Covariates

We collected data on several child and parent characteristics previously hypothesized to influence child and adult

MK000165

mental health care use.[1,5,6,15–18] Child sociodemographic covariates included child race/ethnicity (non-Hispanic black, Hispanic, non-Hispanic white, other race/ethnicity), age (≤10 years, ≥11 years [93% were 10 or 11]), gender, insurance status (uninsured, insured), annual household income (<$20 000, $20 000 $69 999, ≥$70 000), and household composition (2-parent, 1-parent, other). Parent sociodemographic covariates included parent age (18 34 years, 35 44 years, ≥45 years), education level (no high school degree, high school degree/some college, college degree or greater), and English language proficiency (speaks English very well vs less than very well;[19] monolingual English speakers were categorized as English proficient). Insurance categories (private insurance, Medicaid, State Children's Health Insurance Program) were dichotomized into insured and uninsured, because bivariate analyses showed no significant differences by insurance type. Parent age and income were categorized based on differences observed in mental health care utilization in bivariate analyses. Lastly, we also included covariates for parental psychological distress, parental social support, and child symptoms of ADHD, ODD, CD, and depression. We omitted parent gender because 93% were female.

Parents completed the Brief Symptom Inventory (BSI 18), a validated tool to identify adult psychological distress.[20] Global distress scores were dichotomized using published cutoff values validated in community samples.[21]

Two subscales from the 10-item Social Well-Being Scale determined the number of social contacts (3 items) and social resources (1 item) available to parents.[22] These questions asked about the frequency of visits with friends and the number of close friends/relatives with whom the parent feels at ease.[22,23] Total scores were calculated for each subscale and used as continuous variables.

### Statistical Analysis

All analyses employed design and nonresponse weights and accounted for both the effects of weights and of the clustering of children within sites by using Stata SE 10 (StataCorp LP, College Station, Tex).[24–26] First, we used chi-square tests of homogeneity, t tests, and logistic regression to describe the characteristics of children using mental health care. We also used bivariate analyses to describe the proportion of children with mental health symptoms by child race/ethnicity and mental health care utilization among them. Next, we used multiple logistic regression to examine the adjusted odds ratios of mental health care utilization in 4 separate models for children with symptoms of 1) ADHD, 2) ODD, 3) CD, and 4) depression. Finally, we examined these odds ratios in multiple regression models that 1) included all children, regardless of symptoms, and 2) were restricted to children with a mental health care need as determined by having symptoms of ADHD, ODD, CD, or depression.

All multiple regression models included the following covariates: child age, gender, and health insurance; parent age, educational attainment, English proficiency, social contacts/resources, and psychological distress; household

composition and income; and study site. The model that examined utilization for all children also included child mental health need (symptoms of ADHD, ODD, CD, or depression). Due to low missing-item rates among the covariates used (mean 1.3%), we used subgroup (school) mean imputation for covariates to avoid the bias that arises with list-wise deletion of complete cases in multivariate models.[27] We did not perform imputation for our main dependent or independent variables (ie, mental health care utilization, mental health symptoms).

## RESULTS

### Characteristics of All Children Using Mental Health Care

Nine percent of fifth graders had received care at some time in their lives for emotional, behavioral, or drug/alcohol problems (Table 1). Of these, 71% received care from mental health specialists (psychiatrist, psychologist, psychiatric nurse, clinical social worker, other mental health professional/specialist), 20% used school services only (school counselor, school psychologist, or other school mental health worker), and 9% received care from a primary care provider only (pediatrician, family doctor, medical provider). Data are not shown. A larger percentage of white (14%) than black (6%) or Hispanic (8%) children had ever used mental health care. There were no significant differences in utilization by parental psychological distress or social contacts/resources. In contrast to children with recent symptoms (during the past 12 months) of depression (16%), more children with recent symptoms of ADHD (30%), ODD (28%), and CD (27%) were reported by their parents to have used mental health services at some time. Of those with a mental health need as determined by symptoms of ≥1 of the 4 mental health conditions, 68% had symptoms of 1 disorder, 20% had 2, 11% had 3, and 1% had all 4 (data not shown).

### Racial/Ethnic Differences in the Prevalence of Mental Health Symptoms

Bivariate analyses showed significant differences in parent-reported symptoms of ADHD, ODD, and CD across race/ethnicity. Hispanic children were less likely to have symptoms of ADHD (7%), ODD (5%), and CD (5%), compared with white children (10% ADHD, 10% ODD, 9% CD), whereas black children were more likely to have ADHD (14%) and CD symptoms (13%) than white children. There were no significant differences in the report of depressive symptoms by race/ethnicity (Table 2).

### Mental Health Care Utilization by Race/Ethnicity and Mental Health Condition

We found significant differences in utilization among children with symptoms of ADHD, ODD, and CD. Forty-nine percent of white children with ADHD symptoms had ever used mental health care, compared with 20% of black, 26% of Hispanic, and 45% of other children. Results were similar for ODD and CD. Black (9%) children with depressive symptoms had much lower utilization than

MK000168

**Table 1.** Characteristics of Children Using Mental Health Care Services†

|  | No. | Yes, % | Unadjusted OR‡ (95% CI§) |
|---|---|---|---|
| Total | 5112 | 9 | … |
| Sociodemographic Characteristics |  |  |  |
| Child race/ethnicity |  |  |  |
| Black | 1738 | 6 | 0.4 (0.3  0.5)*** |
| Hispanic | 1792 | 8 | 0.5 (0.4  0.7)*** |
| White | 1224 | 14 | Referent |
| Other | 358 | 14 | 1.0 (0.6  1.5) |
| Study site |  |  |  |
| Birmingham, Alabama | 1578 | 10 | Referent |
| Houston, Texas | 1781 | 6 | 0.6 (0.4  0.8)** |
| Los Angeles, California | 1735 | 11 | 1.2 (0.9  1.6) |
| Parent age, y |  |  |  |
| 18  34 | 1635 | 8 | Referent |
| 35  44 | 2409 | 9 | 1.1 (0.9  1.5) |
| ≥45 | 1048 | 12 | 1.7 (1.3  2.2)*** |
| Child age, y |  |  |  |
| ≤10 | 2305 | 9 | Referent |
| ≥11 | 2807 | 9 | 1.1 (0.8  1.4) |
| Child gender |  |  |  |
| Female | 2591 | 7 | Referent |
| Male | 2521 | 11 | 1.5 (1.2  1.9)*** |
| Annual household income, $ |  |  |  |
| <20 000 | 1690 | 8 | Referent |
| 20 000  69 999 | 1758 | 8 | 1.0 (0.7  1.3) |
| ≥70 000 | 1531 | 12 | 1.6 (1.1  2.2)* |
| Parent educational attainment |  |  |  |
| No high school degree | 1224 | 5 | Referent |
| High school degree /GED/some college | 2352 | 10 | 2.1 (1.4  3.1)*** |
| ≥4 year college degree | 1449 | 11 | 2.4 (1.7  3.5)*** |
| Household composition |  |  |  |
| 2 parent household | 2850 | 7 | Referent |
| Single parent household | 2017 | 10 | 1.5 (1.1  2.1)* |
| Other composition (foster, adoptive) | 241 | 22 | 3.8 (2.6  5.6)*** |
| Child health insurance status |  |  |  |
| Insured | 4520 | 10 | Referent |
| Uninsured | 592 | 4 | 0.4 (0.2  0.7)** |
| Other Parent Characteristics |  |  |  |
| Parent English proficiency |  |  |  |
| English proficiency | 3693 | 11 | Referent |
| Limited English proficiency | 1423 | 5 | 0.5 (0.3  0.6)*** |
| Parent psychological distress |  |  |  |
| Negative screen | 4248 | 9 | Referent |
| Positive screen | 764 | 10 | 1.2 (0.9  1.6) |
| Social contacts and resources |  |  |  |
| Social contacts scale (mean, CI) | 5112 | 7.1 (6.9  7.3) | 1.1 (1.0  1.1) |
| Social resources scale (mean, CI) | 5112 | 4.0 (3.8  4.3) | 1.1 (1.0  1.1) |
| Child mental health |  |  |  |
| ADHD‖ symptoms¶ | 515 | 30 | 5.9 (4.6  7.5) *** |
| ODD†† symptoms¶ | 407 | 28 | 4.9 (3.9  6.3) *** |
| CD‡‡ symptoms¶ | 431 | 27 | 4.6 (3.5  5.9) *** |
| Depressive symptoms¶ | 366 | 16 | 2.0 (1.4  2.9)*** |

†Results are based on responses to the question "Has your child ever received care for emotional, behavioral, or drug/alcohol problems?" N   5112 because 35 participants did not answer the utilization question.

‡OR indicates odds ratio. Unadjusted model does not control for other covariates.

§CI indicates confidence interval.

‖ADHD indicates attention deficit/hyperactivity disorder.

¶Referent variable is children with a symptom score less than or equal to the sample's 90th percentile.

††ODD indicates oppositional defiant disorder.

‡‡CD indicates conduct disorder.

*$P < .05$.

**$P < .01$.

***$P < .001$.

**Table 2.** Unadjusted Odds of Having Symptoms of a Mental Health Condition

| | ADHD† (n 515) | | ODD‡ (n 407) | | CD§ (n 431) | | Depression (n 369) | |
|---|---|---|---|---|---|---|---|---|
| | No. (%)\|\| | OR¶ | No. (%) | OR (95% CI)‡‡ | No. (%) | OR (95% CI) | No. (%) | OR (95% CI) |
| Black | 244 (14) | 1.4 (1.1 1.9)** | 165 (10) | 1.0 (0.8 1.3) | 215 (13) | 1.5 (1.0 2.3)* | 136 (9) | 1.4 (1.0 2.0) |
| Hispanic | 120 (7) | 0.6 (0.5 0.8)** | 100 (5) | 0.5 (0.4 0.7)*** | 83 (5) | 0.5 (0.3 0.8)** | 124 (7) | 1.1 (0.8 1.6) |
| White | 121 (10) | Referent | 113 (10) | Referent | 100 (9) | Referent | 79 (6) | Referent |
| Other | 30 (8) | 0.8 (0.5 1.2) | 29 (9) | 0.9 (0.5 1.4) | 33 (10) | 1.2 (0.8 1.9) | 30 (10) | 1.6 (1.0 2.7) |

†ADHD indicates attention deficit/hyperactivity disorder.
‡ODD indicates oppositional defiant disorder.
§CD indicates conduct disorder.
\|\|Children with symptoms; unweighted No., weighted percentage.
¶OR indicates odds ratio.
‡‡CI indicates confidence interval.
*$P < .05$.
**$P < .01$.
***$P < .001$.

white (28%) children (Table 3). In each of 4 condition-specific multivariate models, black children with symptoms of ADHD, ODD, CD, and depression were less likely than white children to have ever used mental health services. There were no significant differences for Hispanic or other children compared with white children (Table 4).

## Multivariate Analysis of Mental Health Care Utilization Among All Children

In a multivariate model of all children, black children (OR 0.3, 95% CI 0.2 0.4, $P < .001$) were less likely to have ever used services compared with white children, but the odds ratio for Hispanic children compared with white children was not significant (Table 5).

Study site, parental education, household composition, and parental English language proficiency were associated with mental health care utilization in the multivariate model (Table 5). Children with symptoms of each of the mental health conditions were more likely to have ever used services compared with those without. The odds ratio was greatest for children with ADHD symptoms (OR 3.8, 95% CI 2.8 5.1, $P < .001$) when compared with children who did not have ADHD symptoms. Odds ratios for children with symptoms of ODD (OR 2.0, 95% CI 1.5 2.9, $P < .001$), CD (OR 2.0, 95% CI 1.4 2.8, $P < .001$), and depression (OR 1.8, 95% CI 1.2 2.6, $P = .004$) were also significant but lower in magnitude.

## Multivariate Analysis of Mental Health Care Utilization Among Children with Symptoms

In a multivariate logistic model that only considered children with symptoms of ≥1 mental health condition, black children (OR 0.3, 95% CI 0.2 0.4, $P < .001$) with symptoms were less likely to have ever used care than white children with symptoms (Table 5). The odds ratio for Hispanic compared with white children was not significant.

## DISCUSSION

Our findings suggest that there is a significant and robust disparity in mental health care utilization for black children, which cannot be fully explained by racial/ethnic differences in child mental health, family sociodemographics, or parental social factors. This disparity persists even when just considering those children with symptoms of a mental health condition. It also exists in similar magnitude across all 4 examined mental health conditions. We did not find a disparity in utilization between Hispanic and white children in multivariate analyses.

**Table 3.** Unadjusted Odds Ratio of Mental Health Care Utilization Among Children With Symptoms of a Mental Health Condition

| | ADHD† (n 513) | | ODD‡ (n 407) | | CD§ (n 431) | | Depression (n 366)\|\| | |
|---|---|---|---|---|---|---|---|---|
| | No. (%)¶ | OR†† | No. (%) | OR (95% CI)‡‡ | No. (%) | OR (95% CI) | No. (%) | OR (95% CI) |
| Black | 49 (20) | 0.3 (0.2 0.4)*** | 40 (22) | 0.5 (0.3 0.8)** | 43 (19) | 0.3 (0.2 0.6)*** | 13 (9) | 0.3 (0.1 0.7)* |
| Hispanic | 32 (26) | 0.4 (0.2 0.6)** | 22 (22) | 0.5 (0.2 0.9)* | 20 (24) | 0.5 (0.2 0.9)* | 17 (13) | 0.4 (0.2 1.0)* |
| White | 56 (49) | Referent | 42 (38) | Referent | 42 (41) | Referent | 21 (28) | Referent |
| Other | 12 (45) | 0.9 (0.4 2.0) | 12 (50) | 1.7 (0.6 4.8) | 10 (36) | 0.8 (0.4 1.8) | 7 (30) | 1.1 (0.3 4.2) |

†ADHD indicates attention deficit/hyperactivity disorder.
‡ODD indicates oppositional defiant disorder.
§CD indicates conduct disorder.
\|\|369 students reported depressive symptoms, but 3 had missing data for mental health care utilization.
¶Children using care (children with symptoms); unweighted No., weighted percentage.
††OR indicates odds ratio.
‡‡CI indicates confidence interval.
*$P < .05$.
**$P < .01$.
***$P < .001$.

**Table 4.** Adjusted Odds Ratio of Mental Health Care Utilization Among Children With Symptoms of a Mental Health Condition†

| | ADHD‡ (n   515) | ODD§ (n   407) | CD‖ (n   431) | Depression (n   366) |
|---|---|---|---|---|
| Black | 0.3 (0.2  0.5)*** | 0.4 (0.2  0.7)** | 0.4 (0.2  0.8)** | 0.2 (0.1  0.6)* |
| Hispanic | 0.7 (0.3  1.5) | 0.5 (0.2  1.2) | 0.8 (0.3  2.1) | 1.4 (0.5  4.7) |
| White | Referent | Referent | Referent | Referent |
| Other | 0.5 (0.2  1.3)* | 1.2 (0.4  4.0) | 0.7 (0.2  1.9) | 1.8 (0.5  7.1) |

†Adjusted for child age, gender, and health insurance; parent age, educational attainment, English proficiency, social contacts/resources, and psycho logical distress; household composition and income; and study site. Values are adjusted odds ratios (95% confidence interval).
‡ADHD indicates attention deficit/hyperactivity disorder.
§ODD indicates oppositional defiant disorder.
‖CD indicates conduct disorder.
*P < .05.
**P < .01.
***P < .001.

Our findings are consistent with other studies of racial/ethnic disparities in utilization, although unlike our study, some studies have also reported disparities for Hispanic children. Researchers analyzing 1987 data found that black and other nonwhite children were less likely to receive ambulatory mental health care compared with white children.[6] In another study using 1996 to 1998 data, researchers found that black and Hispanic children were less likely to use specialty mental health care.[5] After controlling for sociodemographics, unmet need for primary or specialty care was significantly lower for Hispanic children, but not black children, compared with white children. A study using a more recent national dataset (2000) found that black and Hispanic children were less likely than white children to have a mental health care specialty visit, after controlling for a number of covariates, including need.[1] In contrast, the "Great Smoky Mountains Study" of youth (1992 1993), a longitudinal, community-based study in western North Carolina, did not find any significant differences in utilization among black and white youth.[28] One reason that we did not find a disparity for Hispanic children may be that we included a number of covariates that seemed to explain the unadjusted difference in utilization between Hispanic and white children. For example, none of these studies included a variable to account for English language proficiency in multivariate analyses.

In unadjusted analyses, fewer black and Hispanic children with symptoms of ADHD, ODD, and CD, and fewer black children with symptoms of depression had ever utilized services compared with white children. A previous study found that black and Hispanic children were less likely to have a specialty visit for depression when compared with white children.[1] More broadly, our findings suggest that many children (of all racial/ethnic categories) who experience depressive symptoms do not receive primary and specialty mental health care services.

In a multivariate model, we found that site, parent education, parent English proficiency, and household composition were positively associated with mental health care utilization. Children in households other than a 2-parent household were more likely to have used services. In a previous study, presence of a father in a household decreased the likelihood of child mental health care utilization.[1] The authors hypothesized that fathers may be less amenable to utilizing mental health care for mental health problems in their children, although other factors may have influenced utilization. Our finding that children in households without 2 parents were more likely to have ever used mental health care than those in 2-parent households may suggest that help seeking for mental health problems differs by household composition, or that children in these "other composition" households have additional mental health care needs that we did not measure (eg, adjustment problems).

The differences in utilization between black and white children were not explained by sociodemographics, parental support, parental mental health, or child mental health symptoms. It is possible that the disparity is a result of cultural differences in mental health care utilization that we were unable to account for in this analysis. Researchers have hypothesized that cultural differences in parental help-seeking preferences may be responsible, in part, for racial/ethnic disparities in mental health care utilization.[2,7] Although our findings do not suggest a differential response to mental health symptoms by parent race/ethnicity, other studies have found racial/ethnic differences in parents' threshold for seeking care based on child symptoms.[2,8,29] In one study, black parents were less likely than white parents to contact mental health care professionals as their first step in help seeking for their child's problem behaviors. The correlation between professional help seeking and perceived severity of the child's behavior was greater for blacks than for Hispanics and whites, suggesting that black parents may have a higher threshold for child symptoms before they seek professional help.[2,7] This higher threshold could be a result of cultural differences or differences in access to care.

Although we accounted for mental health need by assessing recent symptoms of 4 mental health conditions, we were unable to account for parental perceived need. Cultural differences in parents' perceived need for mental health care, and preferred help-seeking behavior when a mental health need is perceived, may partially explain the black-white disparity in utilization. These cultural differences have been explored for ADHD. For example, dosReis and colleagues[30] and Olaniyan and colleagues[31] found that some black parents perceived ADHD symptoms as behaviors that are better addressed by parenting and discipline than by medical and mental health professionals. Bussing and colleagues[32,33] found that black parents

MK000169

**Table 5.** Adjusted odds ratios for mental health care utilization by all children and by children with mental health symptoms†

| | Adjusted odds ratio of mental health care utilization among all children (n  5,002) | Adjusted odds ratio of utilization among children with ADHD,‡ ODD,§ CD,\|\| or MDD symptoms (n  1,187) |
|---|---|---|
| | OR (95% CI) | |
| Child race/ethnicity | | |
| Black | 0.3 (0.2  0.4)*** | 0.3 (0.2  0.4)*** |
| Hispanic | 0.8 (0.6  1.2) | 0.7 (0.3  1.2) |
| White | Referent | Referent |
| Other | 0.8 (0.5  1.3) | 0.7 (0.3  1.5) |
| Symptoms of: | | |
| ADHD | 3.8 (2.8  5.1)*** | |
| ODD | 2.0 (1.5  2.9)*** | |
| CD | 2.0 (1.4  2.8)*** | |
| Depression | 1.8 (1.2  2.6)** | |
| Child age | | |
| 10 and under | Referent | Referent |
| 11 and over | 1.0 (0.8  1.4) | 1.2 (0.9  1.7) |
| Child gender | | |
| Female | Referent | Referent |
| Male | 1.3 (1.0  1.7) | 1.7 (1.2  2.4)** |
| Parent psychological distress | 1.3 (0.9  1.7) | 1.3 (0.8  2.0) |
| Study site | | |
| Birmingham, Alabama | Referent | Referent |
| Houston, Texas | 1.0 (0.7  1.4) | 1.0 (0.6  1.5) |
| Los Angeles, California | 1.9 (1.4  2.6)*** | 2.0 (1.4  3.0)*** |
| Parent age | | |
| 18  34 years | Referent | Referent |
| 35  44 | 1.0 (0.7  1.4) | 0.9 (0.5  1.3) |
| over 45 years | 1.1 (0.8  1.6) | 0.9 (0.5  1.6) |
| Annual household income | | |
| <$20,000 | Referent | Referent |
| $20,000 to $69,999 | 1.0 (0.8  1.4) | 0.8 (0.5  1.3) |
| ≥$70,000 | 1.3 (0.9  2.0) | 0.9 (0.5  1.7) |
| Parent educational attainment | | |
| No high school degree | Referent | Referent |
| High school/some college | 1.9 (1.2  3.0)** | 2.2 (1.2  4.0)* |
| ≥4 year college degree | 1.8 (1.0  3.0)* | 3.0 (1.5  6.2)** |
| Household composition | | |
| 2  parent household | Referent | Referent |
| 1  parent household | 1.8 (1.3  2.6)** | 1.6 (1.1  2.5)* |
| Other composition | 3.6 (2.2  6.0)*** | 4.9 (2.9  8.6)*** |
| Child health insurance status | | |
| Insured | Referent | Referent |
| Uninsured | 0.5 (0.3  1.0) | 0.6 (0.3  1.3) |
| Parent English proficiency | | |
| English proficiency | Referent | Referent |
| Limited English proficiency | 0.6 (0.4  0.9)** | 0.5 (0.2  0.9)* |
| Social contacts and resources | | |
| Social contacts scale | 1.0 (0.9  1.1) | 1.0 (0.9  1.1) |
| Social resources scale | 1.0 (0.9  1.0) | 1.0 (0.9  1.1) |

†Values are adjusted (multivariate) odds ratios (95% confidence interval).
‡ADHD indicates attention deficit/hyperactivity disorder.
§ODD indicates oppositional defiant disorder.
\|\|CD indicates conduct disorder.
*P ≤ .05.
**P ≤ .01.
***P ≤ .001.

were less likely than white parents to prefer medication treatment for ADHD. There are still other factors that we did not measure that could account for the black-white disparity, including difficulty accessing mental health care services despite insurance, parental perceived discrimination by the health care system, or parental distrust of mental health professionals.

There are limitations to this study. First, our results are based on data collected from 3 major metropolitan areas in 3 different states and may not generalize to other areas or the US population as a whole. Second, in our multivariate model for utilization, we only account for recent (last 12 months) mental health symptoms, but our main outcome measure of utilization is lifetime mental health care use for any mental health problems. Because of this discrepancy, our estimates of utilization accounting for mental health needs could be overestimated. Further, for children who did use care, we do not have information on the type, duration, or adequacy of treatment received. Next, although we can account for recent symptoms of mental health disorders, we did not assess parents' perceptions of mental health care needs for their children. Further, we only collected data (including parent-reported child symptoms) from 1 parent for each child and do not have similar data from the other parent in 2-parent households. Lastly, our measures of mental health symptoms do not include functional impairment, which is necessary for diagnosis.[34]

Despite these limitations, our findings have implications for child mental health policy and practice. There is a significant and robust disparity in utilization for black children compared with white children that was not explained by the need, predisposing, or enabling factors that we explored. This disparity existed for all examined mental health conditions in similar magnitude and may be a result of cultural differences in the recognition or perception of mental health problems or in parents' help-seeking preferences. Efforts to reduce these disparities for black children should focus on educating parents about common child mental health conditions and their treatment options and investigating cultural factors that may shape parents' help-seeking preferences for mental health symptoms in their children.

## ACKNOWLEDGMENTS

The "Healthy Passages" study was funded by the Centers for Disease Control and Prevention, Prevention Research Centers (Cooperative Agreements U48DP000046, U48DP000057, and U48DP000056; Dr Mark A. Schuster). The authors thank Dr Greta Massetti for her review of this manuscript.

## REFERENCES

1. Zimmerman FJ. Social and economic determinants of disparities in professional help seeking for child mental health problems: evidence from a national sample. *Health Serv Res.* 2005;40:1514  1533.
2. McMiller WP, Weisz JR. Help seeking preceding mental health clinic intake among African American, Latino, and Caucasian youths. *J Am Acad Child Adolesc Psychiatry.* 1996;35:1086  1093.
3. Sturm R, Ringel JS, Andreyeva T. Geographic disparities in children's mental health care. *Pediatrics.* 2003;112:e308

MK000170

4. Hough RL, Hazen AL, Soriano FI, et al. Mental health care for Latinos: mental health services for Latino adolescents with psychiatric disorders. *Psychiatr Serv.* 2002;53:1556 1562.

5. Kataoka SH, Zhang L, Wells KB. Unmet need for mental health care among U.S. children: variation by ethnicity and insurance status. *Am J Psychiatry.* 2002;159:1548 1555.

6. Cunningham PJ, Freiman MP. Determinants of ambulatory mental health services use for school age children and adolescents. *Health Serv Res.* 1996;31:409 427.

7. Cuffe SP, Waller JL, Cuccaro ML, et al. Race and gender differences in the treatment of psychiatric disorders in young adolescents. *J Am Acad Child Adolesc Psychiatry.* 1995;34:1536 1543.

8. Lambert MC, Knight F, Weisz JR. Over and under controlled clinic referral problems of Jamaican and American children and adolescents: the culture general and the culture specific. *J Consult Clin Psychol.* 1989;1989:467 472.

9. Andersen RM. Revisiting the behavioral model and access to medical care: does it matter? *J Health Soc Behav.* 1995;36:1 10.

10. Windle M, Grunbaum JA, Elliott M, et al. Healthy passages. A multilevel, multimethod longitudinal study of adolescent health. *Am J Prev Med.* 2004;27:164 172.

11. Horwitz SM, Hoagwood K, Stiffman AR, et al. Reliability of the services assessment for children and adolescents. *Psychiatr Serv.* 2001; 52:1088 1094.

12. Hoagwood K, Horwitz S, Stiffman A, et al. Concordance between parent reports of children's mental health services and service records: the Services Assessment for Children and Adolescents (SACA). *J Child Fam Stud.* 2000;9:315.

13. Simpson GA, Bloom B, Cohen RA, et al. U.S. children with emotional and behavioral difficulties: data from the 2001, 2002, and 2003 National Health Interview Surveys. Adv Data. June 2005:1 13.

14. Lucas CP, Zhang H, Fisher PW, et al. The DISC Predictive Scales (DPS): efficiently screening for diagnoses. *J Am Acad Child Adolesc Psychiatry..* 2001;40:443 449.

15. Bovier PA, Chamot E, Eytan A, Perneger TV. Patterns of use of ambulatory mental health services in a universal care setting. *Psychiatr Serv.* 2001;52:1515 1520.

16. Lam JA, Rosenheck R. Social support and service use among homeless persons with serious mental Illness. *Int J Soc Psychiatry.* 1999; 45:13 28.

17. Albert M, Becker T, Mccrone P, Thornicroft G. Social networks and mental health servcie utilisation a literature reveiw. *Int J Soc Psychiatry.* 1998;44:248 266.

18. Golding JM. Social support and use of mental health services by Mexican Americans and non Hispanic whites. *Basic Appl Soc Psych.* 1990;11:443 458.

19. US Census Bureau. Selected social characteristics in the United States: 2006. Available at: http://factfinder.census.gov/servlet/ADPTable? bm y&; qr name ACS 2006 EST G00 DP2& geo id 01000US& ds name ACS 2006 EST G00 & lang en & redoLog false Accessed June 1, 2008.

20. Derogatis L. BSI 18 Brief Symptom Inventory 18. Available at: www.pearsonassessments.com/tests/bsi18.htm. Accessed November 12, 2007.

21. Derogatis L. *BSI 18: Administration, Scoring, and Procedures Manual.* Minnneapolis, Minn: National Computer Systems; 2000.

22. Donald CA, Ware JE. The Quantification of Social Contacts and Resources. *Santa Monica, Calif: RAND Corporation.* 1982.

23. Sherbourne CD. The role of social support and life stress events in use of mental health services. *Soc Sci Med.* 1988;27:1393 1400.

24. Williams R. A note on robust variance estimation for cluster correlated data. *Biometrics.* 2000;56:645 646.

25. Skinner CJ. Domain means, regression and multivariate analyses. In: Skinner CJ, Holt D, Smith TMF, eds. *Analysis of Complex Surveys.* Chichester, England: John Wiley & Sons Inc; 1989:59 88.

26. Wooldridge J. *Econometric Analysis of Cross Section and Panel Data.* Cambridge, Mass: MIT Press; 2002.

27. Little RJA, Rubin DB. *Statistical Analysis with Missing Data.* New York, NY: John Wiley & Sons; 2002.

28. Burns BJ, Costello EJ, Angold A, et al. Children's mental health service use across service sectors. *Health Aff (Millwood).* 1995;14:147 159.

29. Weisz JR, Suwanlert S, Chaiyasit W, Walter BR. Over and undercontrolled clinic referrral problems among Thai and American children and adolescents: the wat and wai of cultural differences. *J Consult Clin Psychol.* 1987;55:719 726.

30. dosReis S, Mychailyszyn MP, Myers M, Riley AW. Coming to terms with ADHD: how urban African American families come to seek care for their children. *Psychiatr Serv.* 2007;58:636 641.

31. Olaniyan O, dosReis S, Garriett V, et al. Community perspectives of childhood behavioral problems and ADHD among African American parents. *Ambul Pediatr.* 2007;7:226.

32. Bussing R, Gary F, Mills T, Wilson Garvan C. Parental explanatory models of ADHD. *Soc Psychiatry Psychiatr Epidemiol.* 2003;38:563.

33. Bussing R, Schoenberg NE, Perwien AR. Knowledge and information about ADHD: evidence of cultural differences among African American and white parents. *Soc Sci Med.* 1998;46:919 928.

34. American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition.* Washington, DC: American Psychiatric Association; 2000.

MK000171

# NIH Public Access
**Author Manuscript**

*Psychiatr Ann.* Author manuscript; available in PMC 2011 November 14.

Published in final edited form as:
*Psychiatr Ann.* 2004 July ; 34(7): 534–538.

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

# Mental Healthcare Disparities Disparities Affect Treatment of Black Adolescents

**Dr. Alfiee M Breland-Noble, PhD**
PREMIER and Duke Clinical Research Institute Fellow in the Department of Psychiatry and Behavioral Sciences, Duke University Medical Center, Durham, NC

Research in the area of health disparities has increased in recent years. Various sources cite widespread differences between whites and people of color in a variety of healthcare treatment areas including cardiovascular disease, cancer, maternal and child health and mental health.[1] In 2001, US Surgeon General David Satcher commissioned a report supplement to illuminate racial mental health disparities, provide empirical support to document the differences, and offer strategies for use in reducing the disparities.[2] In accordance with a number of the suggestions from the Surgeon General's report, the purpose of this article is to present a paradigm that may assist in addressing health disparities in child and adolescent psychiatric research and clinical care.

Regarding blacks and psychiatric clinical care in particular, the following discussion is presented to elucidate sociocultural (ie, nonfinancial) barriers to treatment, the unique aspects of shame and stigma that blacks associate with treatment, and black cultural mistrust of the mental health system. The focus of clinical care in this article is adolescent depression, and the Breland-Noble Model of Pathways to Psychiatric Clinical Care[3] serves as the backdrop for this discussion.

Please note that in this article, the term "blacks" is being used to refer to people of various ethnic groups within the category of black (non-Hispanic), including African Americans, emigrant Caribbean Blacks, and emigrant Continental Africans in the United States.

## DOCUMENTING DISPARITIES

The Unequal Treatment report released in 2002[1] provides empirical evidence of the widespread disparities faced by people of color in interactions with the health service system in general and mental health system in particular. As an example, the report provides evidence describing the infrequency with which blacks are treated with beneficial psychotropic medications and the frequency with which they are involuntarily hospitalized compared with white counterparts.[1] The evidence also suggests that, even when controlling for socioeconomic status, severity of illness, and insurance status, the differences persist.[4,5]

Although most of the research in mental health disparities focuses on adults, children and adolescents face similar obstacles to receiving high-quality psychiatric clinical care. For example, various reports document the higher likelihood of black youth with psychiatric disorders being referred to the juvenile justice system for castigatory services, while white youth are referred for treatment-oriented, ameliorative types of services.[6–8] Replications of such diagnosis and treatment bias are also available in the literature and suggest that, given the same symptoms, mental health professionals will diagnosis black and white patients differently.[9,10]

Address reprint requests to Alfiee M. Breland-Noble, PhD, Duke University Medical Center, Box 3527, Durham, NC 27710.

EXHIBIT

O

MK000172

## Historical Barriers

Years of oppression have influenced the degree to which blacks place trust in the health system. This has been perpetuated in large part by the most widely recognized and infamous example of moral and ethical misconduct committed against blacks — the Tuskegee Experiment. The negative effects of this experiment still resonate widely with many blacks, while relatively few whites are aware of its existence.[11–12]

It appears these types of discriminatory practices against blacks contribute greatly to the cultural mistrust exhibited toward the mental health profession. Cultural mistrust is a phenomenon that has been documented by a number of black scholars. It is defined as a healthy paranoia exhibited by people of African descent toward institutions, systems, and individuals that have exhibited harm in the past and the potential for future harm.

Cultural mistrust manifests itself in a number of ways, including blacks' beliefs that healthcare professionals cannot and will not accurately diagnose their health problems, which necessitates vigilance toward more proactive and aggressive interactions with health professionals to secure adequate care.[11,13] Further, such beliefs contribute to the documented patterns of lower clinical care use by blacks, including children and adolescents.[14–17]

## Perceptual Barriers

Blacks exhibit differences from whites regarding perceptions of mental health concerns in a number of areas. Foremost among these are stigmatization and illness thresholds. In particular, black and white Americans hold very different views regarding perceptions of the degree of stigma associated with psychiatric illnesses. They also hold different views regarding perceptions of type, severity, and prognosis of the same presenting problems.

Mental illness stigma is associated with all racial and ethnic groups in the United States[18,19] and, therefore, is not unique to blacks. The differences lie in the degree of stigma that people of different races associate with psychiatric illness. For example, black parents report that a primary reason for their lack of willingness to subject a child to psychological assessment through the child's school is associated with the great potential for punitive intervention in the family by social service agencies.[20,21]

As it relates to self-perception and identification of psychiatric problems, black parents report less alarm for children with internalizing problems (of which depression is a type) than do clinicians.[22] Conversely, black parents appear to exhibit more alarm for those types of behaviors most likely to generate external problems for the adolescent and family (ie, educational and financial) than for those problems internal to the child. This type of differentiation is well documented by scholars and is well described by the term "John Henryism," or the strategy of employing active coping to overcome adversity and problems. [23–25] In other words, unless the psychiatric problem causes visible and identifiable harm or stress to the adolescent and family, the problem is handled by diverting attention to more visible and manageable problems.

The information included to this point provides an adequate backdrop for a presentation of the Breland-Noble Model[3] and a discussion of its utility in addressing health disparities in the area of adolescent depression.

# DEPRESSION, BLACK ADOLESCENTS, AND CLINICAL CARE

Depression in the adolescent population is an important mental health issue. The Surgeon General's Report[2] identified a limited research-base for children of color and detailed the

MK000173

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

great risks associated with depressive disorders for black youth. Other research supports these findings and suggests that depression in youth is associated with increased risk of suicidal behaviors.[26] The suicide rate for blacks between ages 10 and 19 increased from 2.1 to 4.5 per 100,000 (114%) between 1980 and 1995.[27] This adds validity to the importance of prevention and intervention.

The Surgeon General's report is echoed by recent epidemiological studies that provide varied prevalence estimates of depressive disorders for black versus white adolescents and support the need for more focused attention on depressive disorders among black youth.[17,28] It is possible that black adolescents' disproportionate exposure to distressful life events including racism, stereotyping, living in poverty, violence, and involvement in social service programs such as foster care exacerbate reported mental health trends.[29]

In general, the body of research devoted to psychiatric clinical care of US children and adolescents is growing and suggests that blacks are much less likely to enter traditional forms of mental health treatment than their white counterparts, even when presenting problems are similar.[15] Such rates may reflect the use of nonmedical therapists (eg, religious leaders, native healers), as well as culturally based resilience, rather than reliance on traditional psychiatric systems.[30]

## BRELAND-NOBLE MODEL

The Breland-Noble Model of Pathways to Psychiatric Clinical Care (Figure, see page 537) is a conceptual model of mental health behaviors for depressed black adolescents that reflects the varied relationships that contribute to the identification of and help-seeking behaviors for depressed black adolescents. It is based on Andersen's[31] Health Service Use Model and includes three domains. The model posits that certain characteristics of the youth and their families (ie, primary determinants of mental health behavior) interact in leading to the recognition of psychiatric problems (ie, environmental factors) and determining next steps in addressing those problems (ie, mental health behavior). Specifically, parental and adolescent individual characteristics, such as socioeconomic status, and their mental health knowledge, including the understanding and perceptions of mental health problems, are affected by environmental factors including cultural mistrust, social stigma, community resources for use in managing psychiatric illness, and qualitative aspects of the familial relationship, all of which work together to influence clinical care use.

It is hypothesized that black adolescents and their families do not use a systematic method for identifying the disorder; that black adolescents and their parents consult different entities for help, and that blacks perceive mental health clinical care as a majority culture phenomenon for people with severe psychopathology, thereby making these services irrelevant for them. The model is one that might be used by "brokers" of clinical care for adolescents and families. For example, psychiatrists, psychologists and other mental health service providers might be encouraged to educate referred youth and families about the benefits of those treatments empirically validated for black adolescents.

## CLINICAL DIRECTIONS

To address the problems posited in the model, I have designed a culturally responsive intervention. The components of this intervention include: culturally relevant psychoeducational training to increase depressive disorder recognition; understand the role of indigenous treatment methods currently employed by families; increase willingness to seek appropriate clinical care; and increase efforts in self-advocacy for culturally relevant, empirically supported treatments.

*Psychiatr Ann*. Author manuscript; available in PMC 2011 November 14.

The intervention is designed within a familial context as a culturally relevant means of addressing black culture and is designed for use with a representative sample of black adolescents and families to address unmet need.

Using the techniques of motivational interviewing,[32] the intervention includes a four-session module as the primary means of increasing the participation of black adolescents and their families in psychiatric clinical care for depressed adolescents ages 11 to 17. Motivational interviewing was selected because, for patients traditionally reluctant to seek psychiatric care, clinician advice-giving is not always welcome and can be detrimental to the clinician–patient relationship. However, by accounting for the reluctance and ambivalence, a brief motivational interviewing approach might be an ideal framework in which to engage patients in considering health-promoting behaviors (including using clinical care) that they may not have considered previously.

The sessions include an initial, semiscripted telephone or in-person screening procedure used to determine inclusion orexclusion information and provide any requested information to the interested party. This is followed by a telephone intervention that includes a review of a brief assessment of a motivational interviewing measure, reflective listening, and eliciting self-motivational statements. Two treatment sessions follow, including an individual adolescent portion, a parent portion, and a joint parent–child portion.

The foci of the sessions are to elicit any feelings of ambivalence and concern regarding psychiatric clinical care from both parents and adolescents, discuss the cultural factors associated with clinical care for the families, and identify techniques for use in addressing ambivalence or concerns about clinical care for the adolescent. It is believed that by directly discussing parent and adolescent feelings and concerns before the initiation of treatment, the families and therapist or investigator can share ownership of the process of engagement and allay familial concerns that might hinder clinical care participation.

## CLINICAL IMPLICATIONS

The findings on adolescent depression and perceptions of clinical care and research among blacks raise a number of concerns, including the effects of a limited evidence base for treating depression in these youth and perceptions of clinical research and care by blacks for youth with psychiatric illness. Therefore, it seems important for investigators to gain a general understanding of blacks' perceptions of clinical research and care for youth and then begin to address these factors in the context of an important mental health issue — namely, adolescent depression.

The model and an as-yet untested intervention are presented here to provide clinicians with alternatives to traditional methods of providing care for depressed black adolescents in the context of the family. It is hoped that, by reading about specific techniques, clinicians will gain some practical knowledge of how to encourage and support black participation in evidence-based, culturally relevant clinical care.

### EDUCATIONAL OBJECTIVES

1. Discuss contemporary and historical factors affecting racial, health disparities in psychiatric clinical care.

2. Evaluate black cultural mistrust of the mental healthcare system.

3. Identify institutional and clinician-level approaches for increasing clinical care use by blacks for adolescent depression.

*Psychiatr Ann*. Author manuscript; available in PMC 2011 November 14.

MK000175

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

## Acknowledgments

This research was supported by National Institute of Mental Health grant T32 65742. Dr. Breland-Noble has no industry relationships to disclose.

## References

1. Smedley, BD.; Stith, AY.; Nelson, AR. Unequal Treatment: Confronting Racial and Ethnic Disparities in Health Care. Washington, DC: National Academies Press; 2003. Committee on Understanding and Eliminating Racial and Ethnic Disparities in Health Care.

2. US Department of Health and Human Services. Mental Health: Culture, Race, and Ethnicity — A Supplement to Mental Health: Report of the Surgeon General. Rockville, MD: US Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Mental Health Services; 2001.

3. Breland-Noble, AM. African American Adolescents and Depressive Disorders: Addressing Health Disparities. Seminar presented at: Morehouse School of Medicine, Department of Psychiatry; July 30, 2003; Atlanta, GA.

4. Lindsey KP, Paul GL. Involuntary commitments to public mental institutions: issues involving the overrepresentation of blacks and assessment of relevant functioning. Psychol Bull. 1989; 106(2): 171–183. [PubMed: 2678200]

5. Rosenfield S. Race differences in involuntary hospitalization: psychiatric vs. labeling perspectives. J Health Soc Behav. 1984; 25(1):14–23. [PubMed: 6725921]

6. Teplin LA, Abram KM, McClelland GM, Dulcan MK, Mericle AA. Psychiatric disorders in youth in juvenile detention. Arch Gen Psychiatry. 2002; 59(12):1133–1143. [PubMed: 12470130]

7. Westendorp F, Brink KL, Roberson MK, Ortiz IE. Variables which differentiate placement of adolescents into juvenile justice or mental health systems. Adolescence. 1986; 21(81):23–37. [PubMed: 3728138]

8. Sheppard VB, Benjamin-Coleman R. Determinants of service placement for youth with serious emotional and behavioral disturbances. Community Ment Health J. 2001; 37(1):53–65. [PubMed: 11300667]

9. DelBello MP, Lopez-Larson MP, Soutullo CA, Strakowski SM. Effects of race on psychiatric diagnosis of hospitalized adolescents: a retrospective chart review. J Child Adolesc Psychopharmacol. 2001; 11(1):95–103. [PubMed: 11322750]

10. Garb HN. Race bias, social class bias, and gender bias in clinical judgment. Clinical Psychology Science & Practice. 1997; 4(2):99–120.

11. Frederick Schneiders Research . Perceptions of How Race & Ethnic Background Affect Medical Care: Highlights from Focus Groups. Menlo Park, CA: Henry J. Kaiser Family Foundation; 1999. p. 5

12. Shavers VL, Lynch CF, Burmeister LF. Knowledge of the Tuskegee study and its impact on the willingness to participate in medical research studies. J Natl Med Assoc. 2000; 92(12):563–572. [PubMed: 11202759]

13. Whaley AL. Cultural mistrust: an important psychological construct for diagnosis and treatment of African Americans. Professional Psychology Research & Practice. 2001; 32(6):555–562.

14. Snowden LR. African American service use for mental health problems. J Community Psychol. 1999; 27(3):303–313.

15. Wu P, Hoven CW, Cohen P, et al. Factors associated with use of mental health services for depression by children and adolescents. Psychiatr Serv. 2001; 52(2):189–195. [PubMed: 11157117]

16. Cuffe SP, Waller JL, Addy CL, et al. A longitudinal study of adolescent mental health service use. J Behav Health Serv Res. 2001; 28(1):1–11. [PubMed: 11329994]

17. Angold A, Erkanli A, Farmer EM, et al. Psychiatric disorder, impairment, and service use in rural African American and white youth. Arch Gen Psychiatry. 2002; 59(10):893–901. [PubMed: 12365876]

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

Breland-Noble

18. US Department of Health and Human Services. Mental Health: A Report of the Surgeon General. Rockville, MD: US Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Mental Health Services; 1999. p. 487

19. Alvidrez J. Ethnic variations in mental health attitudes and service use among low-income African American, Latina, and European American young women. Community Ment Health J. 1999; 35(6):515–530. [PubMed: 10863988]

20. McMiller WP, Weisz JR. Help-seeking preceding mental health clinic intake among African-American, Latino, and Caucasian Youths. J Am Acad Child Adolesc Psychiatry. 1996; 35(8): 1086–1094. [PubMed: 8755806]

21. Cuffe SP, Waller JL, Cuccaro ML, Pumariega AJ, Garrison CZ. Race and gender differences in the treatment of psychiatric disorders in young adolescents. J Am Acad Child Adolesc Psychiatry. 1995; 34(11):1536–1543. [PubMed: 8543522]

22. Lambert MC, Puig M, Lyubansky M, Rowan GT, Winfrey T. Adult perspectives on behavior and emotional problems in African American children. J Black Psychol. 2001; 27(1):64–85.

23. Adams JH, Aubert RE, Clark VR. The relationship among John Henryism, hostility, perceived stress, social support, and blood pressure in African-American college students. Ethn Dis. 1999; 9(3):359–368. [PubMed: 10600058]

24. Cooper-Patrick L, Powe NR, Jenckes MW, et al. Identification of patient attitudes and preferences regarding treatment of depression. J Gen Intern Med. 1997; 12(7):431–438. [PubMed: 9229282]

25. James SA. John Henryism and the health of African-Americans. Cult Med Psychiatry. 1994; 18(2): 163–182. [PubMed: 7924399]

26. National Institute of Mental Health. Depression in children and adolescents: a fact sheet for physicians. [Accessed May 17, 2004]. Available at: http://www nimh nih.gov/publicat/depchildresfact.cfm

27. Division of Violence Prevention, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention. Suicide among black youths — United States, 1980–1995; MMWR Morb Mortal Wkly Rep. 1998 [Accessed May 17, 2004.]. p. 193-196.Available at: http://www.cdc.gov/mmwr/preview/mwrhtml/00051591 htm

28. Roberts RE, Roberts CR, Chen YR. Ethno-cultural differences in prevalence of adolescent depression. Am J Community Psychol. 1997; 25(1):95–110. [PubMed: 9231998]

29. Hammack PL. Toward a unified theory of depression among urban African American youth. J Black Psychol. 2003; 29(2):187–209.

30. Adebimpe VR. Constraints on the validity of black/white differences in epidemiologic measurements. J Natl Med Assoc. 2003; 95(8):743–745. [PubMed: 12934874]

31. Andersen RM. Revisiting the behavioral model and access to medical care: does it matter? J Health Soc Behav. 1995; 36(1):1–10. [PubMed: 7738325]

32. Martino, S.; Hopfer, C. An introduction to motivational interviewing. Presented at: Blending Clinical Practice and Research: Forging Partnerships in the Rocky Mountain States to Enhance Drug Addiction Treatment; September 8–9, 2003; Westminster, CO.

MK000177

**Figure 1.**

MK000178

## BEREA COLLEGE DISABILITY SERVICES PROGRESS NOTE

Name: Markus Kitchens                    Date: 1/10/13

Markus referred to me by Sue Reimondo PhD after reporting to her that he feels he has symptoms of ADD/ADHD.  Spent some time in diagnostic interview and learned that he reports had symptoms dating back to 1st grade, at which time it was suggested he be retained.  He reports his mom refused this, became hypervigilant and by his description micro managed him in a positive way with structure, predictability and high involvement with her and with extra curricular activities.

He reports this went well and he had no problems with functioning up until recently.  He reports he is not on academic probation—but over the past few semesters has gotten one F, one D "and B's and C's are now the rule not A's and B's"

At this point in the discussion, he revealed that his wish is not for accommodations—but for medication.  I referred him to staff MD at this point—explained to him my role, and asked him to return if his request for medication from staff MD did not successfully resolve his concerns—so that I could do further assessment at that time.

_____                    _____1/10/13_____
Cynthia Reed, MSW, LCSW                    Date
Disability Services Coordinator

**EXHIBIT**

P