**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DR. MARKCUS KITCHENS, JR.,

     Plaintiff,

  v.

NATIONAL BOARD OF MEDICAL
EXAMINERS,

     Defendants.

Civil Action No. 2:22-CV-03301-JMY

## DECLARATION OF MICHAEL GORDON, PH.D.

I, Michael Gordon, Ph.D., declare as follows:

1.     I have been retained as an expert on behalf of Defendant National Board of Medical Examiners ("NBME") in the above-captioned matter.

2.     I am a clinical psychologist and Professor Emeritus of Psychiatry on the faculty of SUNY Upstate Medical University. I specialize in the evaluation and treatment of children and adults with Attention-Deficit/Hyperactivity Disorder ("ADHD"), having worked in this area since the 1970's. I have published numerous articles, books, and book chapters and delivered many presentations on this topic. I have also developed a system used for assessment of ADHD that is relied upon by clinical practitioners internationally. My qualifications are further addressed at the end of this document.

3.     I have personally evaluated hundreds of individuals with ADHD-type symptoms. Since 1995, I have also conducted hundreds of documentation reviews for schools and testing entities.

4.     NBME asked me to review documentation submitted by Markcus Kitchens, Jr. in connection with a request he made for accommodations on the United States Medical Licensing

Examination ("USMLE") as well as additional documentation that I understand he provided in the course of this litigation and to provide my opinions regarding whether Dr. Kitchens has a disability that warrants his requested accommodations.

5.      In summary, and as explained below, my opinions are as follow: (a) the documentation submitted by Dr. Kitchens to NBME in support of his two requests for accommodations on Step 1 of the USMLE fell well short of the documentation that one would reasonably expect and need in order to make an informed decision regarding extra testing time on a high-stakes standardized medical licensing exam based upon a non-visible mental impairment, such as the two impairments that Dr. Kitchens claims to suffer from; (b) the minimal supporting documentation that Dr. Kitchens submitted to NBME in support of his two requests for accommodations is insufficient to conclude that he suffers from a mental impairment that substantially limits his ability to perform any major life activity that is relevant to taking the USMLE compared to most people; (c) based upon my consideration of the documentation that Dr. Kitchens submitted to NBME and the additional information that he has filed with the court, Dr. Kitchens does not meet professional criteria for a diagnosis of Attention-Deficit/Hyperactivity Disorder ("ADHD"); (d) "test anxiety" is not recognized as a mental impairment in the Diagnostic and Statistical Manual of Mental Disorders ("DSM") (discussed below), and there is insufficient documentation to confirm, support or explain Dr. Kitchens' claimed anxiety diagnosis; and (e) even if one accepts the diagnoses identified by Dr. Kitchens, there is no evidence that any limitations he experiences as a result of his alleged impairments rise to the level of substantial limitations when compared to most people in the general population.

## I.     REVIEW OF DR. KITCHENS' REQUEST FOR ACCOMMODATIONS

### A.     Professional Criteria for ADHD

6.     To evaluate a patient for ADHD, clinicians must follow generally-accepted diagnostic criteria. These diagnostic criteria are set forth in the Diagnostic and Statistical Manual of Mental Disorders (DSM). These guidelines are discussed below.

7.     The diagnosis of ADHD depends on evidence of a significant impairment that has a childhood onset. It must be documented *beyond self-report* that symptoms of ADHD have consistently and pervasively disrupted the individual's functioning. Without compelling evidence of early-appearing and chronic impairment across multiple settings (*e.g.*, home, school, work), the diagnosis is inappropriate. It must also be demonstrated that the symptoms cannot be better explained by other factors (*e.g.*, depression, anxiety, or cognitive levels).

8.     Below are listed those diagnostic criteria most relevant to evaluating the information Dr. Kitchens has submitted.

#### 1.     Age of Onset

9.     First, and most importantly, evidence must exist that the individual experienced meaningful impairment since early in life. The requirement for a childhood onset flows from the fact that ADHD is a neurodevelopmental disorder and thus, by definition, must appear during development. An individual does not "come down" with ADHD later in life. The symptoms must be evident and problematic from early on.

10.     The early onset of symptoms must be documented through tangible evidence of impairment during childhood. Hard evidence is required because many non-ADHD adults self-report that they experienced the ADHD symptoms of inattentiveness and disorganization as children. For example, in a published study reporting on the standardization of an ADHD rating scale, 719 normal individuals were asked if they experienced ADHD symptoms during childhood.

On average, 80% of these normal adults reported having experienced at least 6 of the 18 symptoms listed in the DSM-5 criteria at least "sometimes" during childhood. Twenty-five percent endorsed at least 6 items as having occurred "often." It is therefore quite normal for people (and their parents) to look back on their childhood and identify ADHD-like symptoms. Because of this tendency to over-report such childhood *symptoms*, professional guidelines require evidence of *impairment*.

11.     For individuals who meet the criteria for the diagnosis, providing such evidence is almost always a straightforward task. They can provide clinicians with numerous documented accounts of poor academic or work performance, impaired social adjustment, and, in many cases, highly impulsive and unruly behavior throughout their lives. It has also been well established empirically that many individuals who were diagnosed during childhood as having ADHD often suffer from a range of impairments as adults. These limitations might include academic under-attainment and diminished job success, as well as higher rates of substance use, divorce, out-of-wedlock pregnancies, sexually transmitted diseases, legal problems, and motor vehicle accidents. It should also be noted that these ADHD symptoms emerge despite reasonable efforts at compensation on the part of the individual, parents, and teachers.

### 2.     Consistency and Pervasiveness of Symptoms Across Multiple Settings

12.     The next two elements of the ADHD diagnosis focus on the pervasiveness and consistency of the impairment. ADHD symptoms not only appear early in life, but they disrupt someone's adjustment with relative consistency from year to year and from setting to setting (namely, home, school, work, and the community). Therefore, ADHD affects more than just discrete slices of academic functioning, social interaction, or job performance. The concept here is that this disorder represents a "hard-wired," enduring set of characteristics that have a broad impact on a person's functioning. For that reason, it would be inappropriate to diagnose an

individual with ADHD if the only purported impact of the disorder was test-taking. Except in unusual circumstances, an individual with ADHD will show those characteristics most of the time and in most situations that require attention and self-control.

13.     Studies that have followed ADHD children through their lives have amply documented the impact of the disorder on adjustment. In almost all areas of functioning, from academics to occupational performance to marital adjustment to vulnerability towards substance abuse, ADHD individuals demonstrate widespread maladjustment.

### 3.     Evidence of Impairment During the Lifespan

14.     Because many psychiatric symptoms tend to represent extremes of universal human traits, it becomes even more important for clinicians to ensure that they identify a disorder only when it causes significant functional impairment. If not, definitions of mental disorders can be stretched so thin that they encompass either normal expressions of personality style or expectable reactions to common life events (like failing a class exam or being fired from a job). The sine qua non of a disorder is clear evidence of functional impairment or what has been termed "harmful dysfunction." Such impairment emerges as a significantly diminished capacity to meet age-appropriate expectations in major life activities, such as work, school, social relations, and self-care.  In clinical parlance, the individual shows significant deficits in adaptive functioning.

15.     The DSM requires evidence of impairment for a diagnosis of ADHD, described as "clear evidence that the symptoms interfere with, or reduce the quality of, social, academic, or occupational functioning." Regardless of the specific wording of impairment criteria, psychiatric diagnoses should only be assigned to individuals who function abnormally relative to most other people of the same age.

16.     Conversely, it is considered inappropriate for clinicians to assign a psychiatric diagnosis to someone who functions well, but perhaps not as well as he or she might prefer. To do

so would be like considering an individual to be physically disabled because, although he could run, he could not run as fast as he would prefer or would predict based on his overall athletic ability. For ADHD, impairment is determined by the extent to which the symptoms preclude an individual from managing, as well as most others, routine life tasks across multiple settings (home, school, work, and the social environment).

**B.**    **Dr. Kitchens' Accommodation Requests to NBME Did Not Contain a Formal ADHD Diagnosis or Demonstrate Impairment/Disability or the Need for Accommodations**

17.    The information that I understand Dr. Kitchens submitted originally to NBME in support of each of his two requests for accommodations was so scant as to preclude an assessment of his clinical status.

   a. The one-page dermatology progress note from Northwestern Medicine from October 2020 lists a past diagnosis of ADHD that appears to be based on the self-report of Dr. Kitchens and in any event does not explain how he met the diagnostic criteria.

   b. The two pages of notes from Dr. Kitchens' May 25, 2018 visit to a Dr. Vicki Hackman list "Attention-deficit hyperactivity disorder, unspecified type" and "Anxiety" as areas for assessment, not as a diagnosis of either impairment. In other words, Dr. Hackman identified ADHD as something that should be evaluated and treated if present, as shown by her referral to a "Mental Health Counselor." Furthermore, "unspecified type" is only assigned to a potential ADHD diagnosis when the client does *not* meet full criteria for the disorder.

   c. The two pages of notes from Dr. Kitchens' July 26, 2017 visit to Dr. Hackman state that Dr. Kitchens was asking Dr. Hackman to "write an rx for adderall," but she refused to do so and instead told him that she "could refer to a specialist for evaluation and get their opinion about him needing the medication," which he was apparently "not happy"

about.  She did not diagnose Dr. Kitchens as having ADHD or suggest that Dr. Kitchens

met the diagnostic criteria for ADHD. To the contrary, her comments indicate that Dr.

Kitchens "needs [to be] evaluated for ADHD."

18.     The medical records summarized above constitute the sum total of medical records

relative to ADHD that Dr. Kitchens submitted to NBME in support of both his initial request for

accommodations and his second request for accommodations.

19.     Dr. Kitchens provided no evidence of any kind to NBME to support the notion that

he ever functioned abnormally because of pathological inattention or hyperactivity. Missing was

any information via report cards, teacher comments, special education reports, prior psychological

reports, work evaluations, or other sources that might verify impairment due to ADHD-type

symptoms. Dr. Kitchens did not even meaningfully explain any functional limitations in his

personal statement. Like many others, he conflates what it means to have symptoms of a disorder

with what it means to be impaired by those symptoms sufficient to consider the impact disabling.

20.     While the documentation Dr. Kitchens submitted to NBME in support of his

requests did not provide any verification of an ADHD diagnostic assignment, the information Dr.

Kitchens put on the NBME accommodation request forms indicated that his progress through the

educational system was unhindered in any demonstrable way by ADHD-type symptoms.

According to those forms, he made it through medical school and college without receiving any

accommodations (none were listed in response to the question that asked him to list all such

accommodations); he made it through elementary school, middle school, and high school without

ever receiving formal accommodations (none were listed on his forms); and he did not receive any

accommodations on his college and medical school admission exams. While his personal statement

references his "professors [*sic*] willingness" (it is not clear whether he is referring to one professor

or more than one) to allow him to take his exams one on one with extended time, the fact is that many students avail themselves of such common classroom strategies at one time or another if permitted by a professor. The only difference in Dr. Kitchens' case is that he has progressed much further in his education than most people, with or without those routine accommodations.

### C.   Dr. Kitchens Does Not Meet ADHD Criteria Based on Current Documentation

21.     As indicated above, the diagnosis of ADHD hinges on evidence of clinically significant impairment that has a childhood onset, and it must be documented that such symptoms have consistently and pervasively disrupted the individual's functioning across a range of settings. Without compelling evidence of early-appearing and chronic impairment across settings, the diagnosis is regarded as inappropriate. Overall, the documentation that I have reviewed—including Dr. Kitchens' original submissions to NBME and additional documentation and information that I understand were filed in this action—do not show that these clinical criteria are met.

### 1.   No Evidence of Impairment During Childhood

22.     While Dr. Kitchens and his mother both assert that he could be inattentive and overactive in elementary school, they provided nothing to document that those symptoms caused him to function abnormally. According to the information contained in the Supplemental Filing and the mother's declaration, teachers were able to handle his behavior using standard classroom management strategies. Even his mother felt that his behavior was not so problematic that he required grade retention or medication to keep him in a regular education classroom. Her judgment was good in that he indeed progressed normally, although perhaps not always perfectly. He was simply one of many students in a regular classroom who required teachers to manage occasional bouts of inattention, misbehavior, or low motivation.

**2.      No Evidence of Impairment During Adolescence or Young Adulthood**

23.      According to the records, Dr. Kitchens progressed through high school normally, graduating on time and without the benefit of any formal accommodations. According to his mother's declaration, he was able to earn A's, B's, and C's. Like many students, he apparently benefited from some tutoring and from developing organizational strategies. That he was able to succeed with only commonly utilized supports is proof that any problems he had were modest and manageable. For students who are truly disabled by ADHD, only formal (i.e., school-based) and comprehensive accommodations allow for a chance of meaningful academic progress. And even with such accommodations, most children properly diagnosed and treated for ADHD struggle, far more than others, to even graduate from high school.

24.      I reviewed a Berea College Disability Services Progress Note dated January 10, 2013 that was prepared by Cynthia Reed, a licensed social worker.  One thing that struck me about this note was Dr. Kitchens' report that "he had no problems with functioning until recently" and his expressed dissatisfaction with his more recent grades. In other words, Dr. Kitchens acknowledged that he did not experience the type of functional limitations early in life and through the beginning of college that would be characteristic of an individual with ADHD. Struggling with grades in college—where classes are more challenging and the course load is typically larger—is not indicative of ADHD.

25.      During this meeting with the Berea College Disability Services office, Dr. Kitchens indicated "that his wish is not for accommodations—but for medication." Dr. Kitchens was then referred to a medical doctor.

26.      I also reviewed the documentation from Berea College Health Service attached to Dr. Kitchens' First Amended Complaint, consisting of notes from visits on January 11, February

7, and August 5, 2013. The January 11, 2013 note states that "Attention deficit disorder without mention of hyperactivity" is "probable" and includes a plan for an office or outpatient evaluation. Although this note does not reflect anything remotely resembling a clinical assessment for ADHD, the doctor apparently prescribed Adderall to Dr. Kitchens. This was changed to Ritalin in the February 7, 2013 note, again with no clinical assessment for ADHD. Finally, according to the August 5, 2013 note, Dr. Kitchens was shifted back to an Adderall prescription, again with no ADHD assessment. At this point, Dr. Kitchens reported that he wanted an Adderall prescription because he was "applying to med school, taking MCAT and thinks this will help him focus on his future."

27.     Some have argued that the mere fact that an individual was prescribed medication verifies the ADHD diagnosis. That myth was debunked long ago, because stimulant medication can improve focus in almost all people, whether they have ADHD, most other psychiatric conditions, or are diagnosis-free. The prescription of a stimulant medication is not a diagnostic marker, nor is a favorable response to pharmacotherapy. Moreover, research has shown that, unfortunately, it is very easy to obtain an ADHD diagnosis and then, on the basis of that diagnosis, to obtain Adderall or other ADHD medication. Many of these medication-based ADHD diagnoses are unwarranted and do not reflect the comprehensive evaluation that is called for in light of the DSM criteria.

28.     Dr. Kitchens may feel like he has had to work harder than his peers to succeed, but research indicates that most students feel they work harder than their classmates. It is also the case that people with a bona fide disability function abnormally no matter how hard they try to compensate for their deficits.

### 3.    No Evidence of Current Impairment

29.    I reviewed the February 2023 report of Christina Bacon, LPP ("Peace of Mind Counseling"), that I understand was filed in this action. Ms. Bacon reports assessing Dr. Kitchens over two one-hour sessions, both of which were conducted remotely. Not one sentence in the report pointed to a circumstance that could reasonably be interpreted as reflecting abnormal functioning. It was almost entirely a recapitulation of Dr. Kitchen's presenting complaints.

30.    The one section of Ms. Bacon's report that does not rely on anecdote and Dr. Kitchens' personal recollection is the computerized measure of attention, MOXO - Distracted Continuous Performance Test. This test is by no means a litmus test for ADHD. The promotional material rightly describes it as a "decision support tool" which might substantiate the presence of symptoms, but not the impact of those symptoms in real life.

31.    The same characterization applies to the "Conner's CPT 3" testing results that I understand were filed with this action. This assessment, which I understand was administered to Dr. Kitchens on February 3, 2023 by a nurse practitioner over a period of roughly fourteen minutes, is another computerized measure that is designed to be used as part of a comprehensive assessment for ADHD. It states on the assessment report that the atypical scores Dr. Kitchens produced are "associated with a very high likelihood of having a disorder characterized by attention deficits, such as ADHD. Note that other psychological and/or neurological conditions with symptoms of impaired attention can also lead to atypical scores on the Conners CPT3." In other words, this measure is not diagnostic of ADHD or sufficient evidence of impairment.

32.    As the person who introduced one of the first computerized performance tests used in ADHD assessments almost forty years ago, I have a fine sense of the role they can play in a complete diagnostic assessment. They can certainly be worthwhile tools within a comprehensive

assessment. They are not, however, a divining rod for the disorder and tell you very little independent of other relevant information.

33.     To justify a diagnosis of ADHD, Ms. Bacon's report relies heavily on asking Dr. Kitchens and his wife whether he has symptoms of the disorder. The clinician gathered their opinions via rating scales and diagnostic interviews, all of which simply format and scale the extent to which someone sees themselves (and, in this case, their spouse) as showing symptoms (Ms. Bacon also lists a "mother's report" under her assessment procedures but there is no discussion of any report from Dr. Kitchens' mother in Ms. Bacon's evaluation). Those rating scales are also not designed to provide objective evidence of impairment. Assigning a diagnosis based almost entirely on information generated by the person who stands to gain from assignment of that diagnosis is deeply problematic. It would be like keeping score by asking basketball players whether they made their baskets or asking baseball players whether a ball was hit fair or foul.

34.     In her report, Ms. Bacon concludes—based entirely on Dr. Kitchens' self-report of symptoms, that "[h]is difficulty completing the board exams seems directly linked to his symptoms of ADHD." I do not know of any support for this assertion. In all events, if Dr. Kitchens is having problems managing unusually demanding postgraduate exams, it may be that the material is too difficult for him or he is not adequately prepared rather than that he is unable to gain access to the exam because he is inattentive.

35.     In his declaration, Dr. Kitchens states: "I have been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD). The notable manifestations of this disorder include, but is not limited, to poor reading fluency (i.e., slow reading) and delayed processing of written information." This statement is simply wrong. By definition, ADHD is not a learning disability; it is a neurodevelopmental disorder that is listed as such in the DSM-5. There is no scientific

evidence that confirms a link between attention deficits and reading fluency. Research shows that, generally speaking, individuals who have ADHD have the same levels of reading fluency as those without ADHD.

36. Reading fluency also is not a factor someone can self-diagnose. It is established by administering reliable and valid psychological tests, such as the Word Reading Fluency Test of the Woodcock-Johnson IV Tests of Achievement. If Dr. Kitchens were an abnormally slow and inefficient reader, his scores on such tests would confirm it. Nothing in his documentation—either what he submitted to NBME when he requested accommodations or the supplemental material that he submitted to the court—includes such assessments.

37. Finally, it is not clear why Ms. Bacon is recommending extra time as an accommodation for Dr. Kitchens. Even if she concluded that Dr. Kitchens has ADHD, research shows that extra time does not help individuals with ADHD (any more than it helps individuals without ADHD) and may, in fact, hinder their performance in some cases.

**4.    No Evidence of ADHD-Type Problems in Multiple Settings**

38. Dr. Kitchens is only seeking formal accommodations now because of his problems with the Step Exams.  He points to his problems passing these particular tests, based upon what he believes his underlying knowledge to be, as proof that he must be disabled. He is essentially making the argument that problems passing a highly competitive, postgraduate set of exams is somehow a surefire sign of ADHD. That assertion flies in the face of everything we know about ADHD. By definition, it is not a disorder that only impacts performance in one narrow setting. If an individual's brain is geared toward profound inattention, the consequences will surface in any setting requiring attention. Dr. Kitchens provides no evidence of such wide-ranging impairment. To the contrary, he makes it clear that he performs well in other settings that require a high degree

of attention and organizational ability, stating that "he was successful in rounds, interacting with the patients, and managing hands-on work." Ironically, those settings, given that they are relatively unstructured, would require far more attentiveness and discipline than what would be required in a quiet testing environment. Dr. Kitchens also confirmed in his deposition that he had received positive feedback from his patients and from his rotations and clerkships; has a good relationship with his wife of 5 years; is heavily involved with his church, where he plays the piano; has received positive feedback from employers; was never terminated or disciplined by any employer; and likes working with people and is outgoing. To say the least, this is not the life experience of someone who has widespread adjustment problems because he cannot focus or control his impulses normally.

**D.**     **Regardless of Whether Dr. Kitchens Has Been Properly Diagnosed, There is No Evidence that He is Substantially Limited in His Ability to Perform Any Major Life Activities Compared to Most People**

39.     The DSM expressly notes that clinical criteria may not be directly relevant in making decisions as to whether someone is disabled in a nonclinical context. According to DSM-5, in "most situations, the clinical diagnosis of a DSM-5 mental disorder ... does not imply that an individual with such a condition meets legal criteria for the presence of a mental disorder or a specified legal standard (e.g., for competence, criminal responsibility, or disability).  For the latter, additional information is usually required beyond that contained in the DSM-5 diagnosis, which might include information about the individual's functional impairments and how these impairments affect the particular abilities in question. It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability." (DSM-5, American Psychiatric Association, at p. 25).

40.     In the context of reviewing requests for accommodations on standardized tests, the legal criteria are supplied by the Americans with Disabilities Act ("ADA"). It is my understanding that an impairment does not rise to the level of a "disability" for purposes of ADA coverage unless it results in a substantial limitation on an individual's ability to perform one or more major life activities, as compared to most people. Accommodations would not be warranted simply because an individual might underperform in certain areas relative to others in a particular educational cohort (such as individuals who take the USMLE), or as compared to their aspirations or measured abilities. The extent of functional limitation resulting from the impairment must also be considered, relative to the average person.

41.     Implicit in the discussion above regarding the absence of any evidence of Dr. Kitchens experiencing impairment based on ADHD-type symptoms across settings is a related conclusion: Even if one were to accept as proper the ADHD diagnoses that he received, there is no evidence that his alleged impairment substantially limits his ability to perform any major life activity that is relevant to taking the USMLE as compared to most people in the general population.

42.     Finally, I note that, on his NBME accommodation request forms, Dr. Kitchens reports a diagnosis of "Test Anxiety" in 2018. Although my primary area of clinical expertise is ADHD, I am knowledgeable of other mental disorders, particularly ones that may be co-morbid with (or mistaken for) ADHD. "Test anxiety" is not an impairment recognized in the DSM. It is also something that is typical across non-impaired students. Dr. Kitchens did not submit any documentation that included a formal diagnosis of anxiety or explained how the diagnosis was arrived at. He submitted to NBME a short letter from a Dr. Ghori Khan, who I understand is an internal medicine physician, saying that he was treating Dr. Kitchens for "significant anxiety. There was no discussion in that letter of who provided the diagnosis (if anyone), or on what basis.

Dr. Kitchens also submitted to NBME a page of notes from a visit to Northwestern Medicine's Dermatology group in October 2020 which made reference to him having previously been given a medication that treats anxiety, and two pages of notes from a visit to Dr. Hackman in May 2018 which included as an assessment plan that he be evaluated for ADHD and anxiety, apparently in connection with possibly getting an emotional service dog. The fact that Dr. Kitchens may have been prescribed medication for anxiety in 2020 or was noted for an anxiety "assessment" in 2018 does not establish a diagnosis. I also note that Ms. Bacon did not assess Dr. Kitchens for anxiety or diagnose him with any anxiety disorder when she recently evaluated him. And regardless of that alleged diagnosis, again, there is no evidence in any of Dr. Kitchens' documentation that his alleged anxiety substantially limits his ability to perform any major life activity that is relevant to taking the USMLE as compared to most people.

### E.   <u>Conclusion</u>

43.     I am a clinician with a long history of advocating for my patients and, more generally, people with disabilities. If I had any sense that Dr. Kitchens might qualify for accommodations, I would give him the benefit of the doubt and recommend that accommodations be granted. The last thing I want is to deny someone a benefit that they deserve and need. Unfortunately, Dr. Kitchens did not provide any documentation to NBME in support of his actual requests, and he has not provided any documentation to the court in support of his legal claim, that a clinician or other qualified professional could rely upon to justify accommodations. The data to support a recommendation for extended time are absent.

44.     To a clinician and an advocate for people with disabilities, upholding reasonable standards for assigning a diagnosis and granting accommodations is very important. If anyone who wants a diagnosis gets a diagnosis no matter how thin the justification, then the diagnosis becomes trivial, and resources needed to help those who are truly impaired become strained. Assigning

diagnoses based on perceived need rather than actual impairment and providing accommodations on that basis also impacts the fairness of testing across all test-takers.

45.     Based on my review of all of Dr. Kitchens' relevant documentation (as provided to NBME but also including what he provided to the court), it is my opinion that Dr. Kitchens cannot appropriately be considered as having ADHD under any reasonable construction of professional guidelines for diagnosing ADHD. It is my further opinion that, even if one were to accept this diagnosis or his claimed anxiety diagnosis, the documentation does not show that he is substantially limited in his ability to perform any major life activities relevant to taking the USMLE, as compared to most people in the general population. While it is certainly unfortunate that he has encountered problems passing the USMLE exams, it is impossible to fairly ascribe those test-taking problems to a psychiatric disorder such as ADHD or anxiety based on the current record.

## II.     FACTS AND DATA CONSIDERED

46.     I reviewed the following documents in forming my opinions:

a.      Dr. Kitchens' Accommodation Request Form dated October 13, 2021 and accompanying documentation

b.      January 6, 2022 email from NBME to Dr. Kitchens requesting additional documentation and Dr. Kitchens' January 8, 2022 email response

c.      NBME's February 8, 2022 decision letter to Dr. Kitchens

d.      Dr. Kitchens' Accommodation Request Form dated August 30, 2022 and accompanying documentation

e.      Dr. Kitchens' First Amended Complaint and Exhibits (ECF No. 15 pages 1-37)

f.      Declaration of Dr. Markcus Kitchens in Support of Plaintiff's Motion for Preliminary Injunction (ECF No. 20-1 pages 1-12)

g.      Declaration of Missie King in Support of Plaintiff's Motion for Preliminary
Injunction (MK000038-42)

h.      Conners CPT3 Assessment Report (MK000055-62)

i.      Berea College Disability Services Progress Note (MK000179)

j.      Notice of Supplemental Filing and accompanying documents (ECF No. 22 pages
1-28)

k.      Excerpts from the Transcript of Markcus Kitchens, Jr., M.D. (February 17, 2023)

## III.    QUALIFICATIONS

47.     As stated above, I am a clinical psychologist and Professor Emeritus of Psychiatry
on the faculty of SUNY Upstate Medical University.  Among other duties within the Department
of Psychiatry, I have been director of the Department's ADHD Program.  I have also served as an
Adjunct Professor of Psychology at Syracuse University.

48.     In addition to my faculty and patient responsibilities, I have served as an
independent reviewer for numerous organizations that administer or rely upon standardized tests.
For each of these organizations, I have reviewed documentation submitted by examinees seeking
test accommodations based, at least in part, on an ADHD diagnosis. In the course of this work, I
routinely apply, and have become very familiar with, the standards of the Americans with
Disabilities Act ("ADA"). I have also consulted to the *Consortium on ADHD Documentation* about
appropriate documentation review guidelines. More recently, I was the lead author of a chapter
about ADA accommodations relative to ADHD in the standard textbook for the management of
the disorder.

49.     For more than 40 years I have taught college students, trained graduate students in
psychological assessment and diagnostic practices, and supervised psychology interns, medical

students, social works, and psychiatry and family practice residents in schools, clinics, hospitals, and other agencies. I have published over one hundred professional articles, chapters and books in the areas of ADHD, learning disorders, psychological testing, and disability assessment. Much of my research over the past 20 years has focused on test accommodations for individuals with disabilities.

50.     Additional qualifications may be found on my CV, a copy of which is attached at Exhibit A.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on February 21, 2023

DocuSigned by:

*Michael Gordon*

FEB9D5B0742D483

Michael Gordon, Ph.D.

# EXHIBIT A

# *VITA*
### Michael Gordon, Ph.D.

**Education**

| | |
|---|---|
| Amherst College | 1970-74 B.A. magna cum laude |
| Amherst, Massachusetts | Major: Psychology |
| | Minor: Spanish Literature |

| | |
|---|---|
| The Ohio State University | 1974-77 Ph.D. |
| Major: Clinical Child Psychology | Minor: Developmental Psychology |

(Doctoral Dissertation:  The Assessment of Impulsivity and Mediating Behaviors in Hyperactive and Nonhyperactive Boys Performing on DRL.)

**Present Positions**

Professor Emeritus, Department of Psychiatry, SUNY Upstate Medical University at Syracuse, New York.

ADA consultant to multiple testing organizations (including the NBME, NY State Board of Law Examiners, CFA Institute, Florida Board of Law Examiners, and others)

Faculty to Project Advance for Syracuse University

**Past Editorial Positions and Professional Awards**

Associate Editor, The ADHD Report
Reviewer, Journal of Learning Disabilities
Reviewer, Archives of Clinical Neuropsychology
Reviewer, Journal of Attention Disorders
Reviewer, Perceptual and Motor Skill

Inductee, CHADD Hall of Fame
Winner, Keith Conners' Award for Scientific Contribution to the Field of ADHD

**Professional Affiliations**

Member, American Psychological Association
Member, Central New York Psychological Association
Member, Society for Behavioral Pediatrics
Member, Sigma XI Research Society
Member, Central New York Association for Learning Disabilities
Member, Council for Exceptional Children
Member, International Neuropsychological Society
Member, Society for Research in Child and Adolescent Psychopathology

**Certification**

State of New York, Certification Number 5965
Member, National Register of Health Care Providers in Psychology

**Internship**

Department of Psychiatry, Division of Clinical Psychology
        (Clinical Child specialization), SUNY Upstate Medical Center, Syracuse, New
        York.

**Past Employment**

Staff Psychologist, Psychiatric Services, St. Joseph's Hospital Health Center,
        Syracuse, New York.

**Research Grants**

"The Testing of the Gordon Diagnostic System" funded by Clinical Diagnostics, Inc.,
1983 - 1986.

"The Development of Gordon's Measure of Impulsivity for Clinical, Educational and
Research Applications" funded by the New York State Division of Research Resources,
1980 - 1987.

"The Psychosocial Effects of Short Stature" funded by the New York State Health
Research Council (co-investigator with Robert A. Richman, M.D.),
1978 - 1980.

"Study on the long term outcomes of very low birth weight infants at school age" funded

3

by the Robert Wood Johnson Foundation (co-investigator with Steven Gross, M.D.), 1987 - 1988.

"Pediatric survey of relationship disturbance in low birth weight infants" funded by the March of Dimes (co-investigator with Barbara Fiese, Ph.D. and Martin Irwin, M.D.), 1991-1992.

"Advancing ADHD Diagnosis via Standardized Observations" funded by the National Institute of Child Development (co-investigator with Stephanie McConaughy, Ph.D.), 2003-2007.

## Publications

Sorenson, C.A. & Gordon, M. (1975). Effects of 6-hydroxydopamine on shock-elicited aggression, emotionality and maternal behavior in female rats. *Pharmacology, Biochemistry and Behavior*, *3*, 331-335.

Gittis, A.G. & Gordon, M. (1979). Developmental analysis of behavioral dysfunction in rats with septal lesions. *Journal of Comparative and Physiological Psychology*, 94-106.

Gordon, M. (1981). The assessment of impulsivity and mediating behaviors in hyperactive and nonhyperactive boys. *Journal of Abnormal Child Psychology*, *7*, 317-326.

Gordon, M. & Oshman, H. (1981). Rorschach indices of children classified as hyperactive. *Perceptual and Motor Skills*, *52*, 703-707.

Gordon, M., Crouthamel, C., Post, E.M., & Richman, R.A. (1981). Identifying the academic and emotional difficulties associated with short stature. *Pediatric Research*, *15*, 411.

Gordon, M. (1982). The egocentric placement of Bender Figure A. *Perceptual and Motor Skills*, *54*, 1241-1242.

Gordon, M. & Tegtmeyer, P.F. (1982). The Egocentricity Index and self-esteem in children. *Perceptual and Motor Skills*, *55*, 225-227.

Gordon, M. (1983). Responses of internalizing and externalizing children to clinical interview questions. *American Journal of Child Psychiatry*, *22,* 444-446.

Gordon, M., Crouthamel, C., Post, E.M., & Richman, R.A. (1982). Psychological aspects of constitutional short stature: Social competence, behavior problems, self-esteem and family functioning. *Journal of Pediatrics*, *101*, 477-480.

4

Gordon, M., Post, E.M., Crouthamel, C., & Richman, R.A. (1984).  Do children with constitutional growth delay really have more learning problems? *Journal of Learning Disabilities*, *17,* 291- 293.

Gordon, M.  (1982).  Rorschach Scoring Program *(RSCORE)*. Tampa:  Psychological Assessment Resources.

Gordon, M., Greenberg, R.P., & Gerton, M.  (1983).  Wechsler discrepancies and the Rorschach Experience Balance. *Journal of Clinical Psychology*, *39*, 775-779.

Tegtmeyer, P.F. & Gordon, M.  (1983).  The interpretation of white-space responses in children's Rorschach protocols.  *Perceptual and Motor Skills, 57*, 611-616.

Gordon, M. & Tegtmeyer, P.F.  (1983).  Oral-dependent content in children's Rorschach protocols.  *Perceptual and Motor Skills*, *57*, 1163-1168.

Greenberg, R.P. & Gordon, M.  (1983). Examiner sex and children's Rorschach productivity.  *Psychological Reports*, *53*, 355-357.

Gordon, M. (1983).  *The Gordon Diagnostic System*.  DeWitt, NY:  Gordon Systems.

Gordon, M., McClure, F.D., & Post, E.M.  (1983).  *Interpretive guide to the Gordon Diagnostic System*.  DeWitt, NY:  Gordon Systems, Inc.

Gordon, M., McClure, F.D., & Post, E.M.  (1983).  *Instruction Manual for the Gordon Diagnostic System*.  Denver: Clinical Diagnostics, Inc.

McClure, F.D. & Gordon, M.  (1985).  Performance of disturbed hyperactive and nonhyperactive children on an objective measure of hyperactivity.  *Journal of Abnormal Child Psychology*, *12*, 561-572.

Gordon, M. (1986).  Microprocessor-based assessment of Attention Deficit Disorders.  *Pharmacology Bulletin*, *22*, 288-290.

Richman, R.A., Gordon, M., Tegtmeyer, P., Crouthamel, C., &  Post, E.M. (1986).  Academic and emotional difficulties associated with constitutional short stature. In B. Stabler & L. Underwood  (Eds.), *Growing Up Short: Psychosocial Aspects of Growth Delay.*  New York: Lawrence Erlbaum Associates, Inc.

Gordon, M. (1987).  How is a computerized attention test used in the diagnosis of Attention Deficit Disorder?  In J. Loney (Ed.), *The Young Hyperactive Child: Answers to Questions about Diagnosis, Prognosis, and Treatment* (pp.53-64) New York:  Haworth Press.

Gordon, M. (1987).  Errors of omission and commission: A response to Milich and colleagues regarding the Gordon Diagnostic System.  *Psychopharmacology Bulletin*, *23(2),* 325-328.

Gordon, M.  & Mettelman, B.B. (1988).  The assessment of attention: I. Standardization and reliability of a behavior-based measure.  *Journal of Clinical Psychology*, *44,* 682-690.

Gordon, M., DiNiro, D., & Mettelman, B.B.  (1988).  The effect upon outcome of nuances in selection criteria for ADHD/Hyperactivity.  *Psychological Reports*, *62*, 539-544.

Gordon, M. (1989).  Classroom management techniques for ADHD children.  *Chadder, 3(1)*, 3-4.

Gordon, M., DiNiro, D., Mettelman, B.B., Tallmadge, J. (1989).  Observations of test behavior, quantitative scores, and teacher ratings. *Journal of Psychoeducational Assessment, 7,* 141-147.

Gordon, M., Thomason, D. & Cooper, S. (1990).  To what extent does attention affect K-ABC scores? *Psychology in the Schools*, *27*, 144-147.

Bauermeister, J.J., Berrios, V, Jimenez, AI.I., Acevedo, L. &  Gordon, M. (1990).  Some issues and instruments for the assessment of Attention Deficit Hyperactivity Disorder in Puerto Rican children.  *Journal of Clinical Child Psychology*, *19*, 9-16.

Post, E.M., Burko, M.S., & Gordon, M.  (1990).  Single-component  microcomputer driven-assessment of attention.  *Behavior Research Methods, Instruments, & Computers, 22,* 297-301.

Gordon, M., Thomason, D., Cooper, S., & Ivers, C. (1991).  Non-medical treatment of ADHD/Hyperactivity: The attention training system.  *Journal of School Psychology*, *29*, 151-159.

Gordon, M. (1991).  *ADHD/Hyperactivity: A consumer's guide for parents and teachers*.  Syracuse: GSI Publications.

Gordon, M. (1991).  *Jumpin' Johnny get back to work!: A child's guide to ADHD/Hyperactivity*.  Syracuse: GSI Publications.

Gordon, M. (1992).  *My brother's a world-class pain: A sibling's guide to ADHD/Hyperactivity*. Syracuse: GSI Publications.

Gordon, M. (1992).  *I would if I could: A teenager's guide to ADHD/Hyperactivity*.
    Syracuse: GSI Publications.

Gordon, M. (1991).  *Jumpin' Johnny get back to work!: A child's guide to
    ADHD/Hyperactivity* [video].  Syracuse: GSI Publications.

Gordon, M. (1995).  *I'd rather be with a real mom who loves me: A story for foster
    children.* Syracuse: GSI Publications.

Gordon, M. (1995). *How to operate an ADHD clinic or subspecialty practice.* Syracuse:
    GSI Publications.

Gordon, M. & McClure, F. (1995). *The down and dirty guide to adult ADD.* Syracuse:
    GSI Publications.

Irwin, M., Kline, P. & Gordon, M.  (1991).  Adapting milieu therapy to short-term
    psychiatric hospitalization of children.  *Child Psychiatry and Human Development*,
    *21*, 103-201.

Gordon, M. (1993).  ADHD: Assessment techniques and differential diagnosis. In:
    *Pathways to Progress: Proceedings of the CH.A.D.D. Fourth Annual Conference*.
    Fairfax, VA: Caset Associates.

Gordon, M. (1993). Do computerized measures of attention have a legitimate role in
    ADHD evaluations? *The ADHD Report, 1(6),* 5-6.

Gordon, M., Mettelman, B.B., & Martin, I.  (1994).  Sustained attention and grade
    retention.  *Perceptual and Motor Skills*, *78*, 555-560.

Jerome, L.J., Gordon, M., & Hustler, P. (1994). A comparison of American and Canadian
    teachers' knowledge and attitudes towards Attention Deficit Hyperactivity Disorder
    (ADHD). *Canadian Journal of Psychiatry*, *39*, 563-567.

Gordon, M. (1995). *How to operate an ADHD clinic or subspecialty practice*. Syracuse,
    NY: GSI Publications.

Fischer, M., Newby, R.F., & Gordon. M. (1995). Who are the false negatives on
    continuous performance tests? *Journal of Clinical Child Psychology*, *24(4),* 427-433.

Gordon, M. (1995). ADD: Certainly not a fad, but it can be overdiagnosed. *Attention,
    2(2)*, 20-22.

Gordon, M. (1996). Must ADHD be an equal opportunity disorder? *The ADHD Report*,
    *4(2),* 1-3.

Gordon, M. (1996). Running an ADHD clinic or subspecialty practice. *The Independent Practitioner, 16(2)*, 80-83.

Gordon, M. & Irwin, M. (1997). *ADD/ADHD: A no-nonsense guide for the primary care physician*. Syracuse: GSI Publications.

Murphy, K. & Gordon, M. (1997). ADHD as a basis for test accommodations: A primer for clinicians. *The ADHD Report*, *5(1),* 10-11.

Aylward, G.P. & Gordon, M. (1997). Relationships between continuous performance task scores and other cognitive measures: Causality or commonality? *Assessment*, *4(4),* 325-336.

Gordon, M., Barkley, R.A., & Murphy, K. R. (1997). ADHD on trial. *The ADHD Report*, *5(4),* 1-4.

Gordon, M. (1997). ADHD in cyberspace. *The ADHD Report*, *5(4),* 4-6.

Gordon, M. & Keiser, S., Editors. (1998). *Accommodations in higher education under the Americans with Disabilities Act (ADA): A No-nonsense guide for clinicians, educators, administrators, and lawyers.* NY: Guilford Publications and GSI Publications.

Gordon, M. & Barkley, R.A. (1998). Psychological testing and observational measures. Chapter in: R.A. Barkley (Ed.), *Attention Deficit Hyperactivity Disorders: A Handbook for Clinicians -- Second Edition*. Guilford Publications.

Murphy, K. R. and Gordon, M. (1998). The assessment of ADHD in adults. A chapter in: R.A. Barkley (Ed), *Attention Deficit Hyperactivity Disorders: A Handbook for Clinicians -- Second Edition*. Guilford Publications.

Goldstein, S., Barkley, R. A., & Gordon, M. (1998). Clarification on ADHD (Letter to the editor). *The APA Monitor*, *29(10),* 5.

Gordon, M., Murphy, K., & Keiser, S. (1998). Attention Deficit Hyperactivity Disorder (ADHD) and test accommodations. *The Bar Examiner*, *67(4),* 26-36.

Gordon, M. (1999). Clinical grand rounds: "So you're telling me . . . ." *ADHD Report*, *7(3),* 11-13.

Gordon, M., Lewandowski, L., and Keiser, S. (1999). The LD label for relatively well-functioning students: A critical analysis. *Journal of Learning Disabilities, 32(6),* 485-490.

Gordon, M. (1999). Attention deficit hyperactivity disorder: Diagnosis and management in the USA. *Journal of the Royal Society of Medicine*, *92(22),* 1-3.

Gordon, M. and Barkley, R.A. (1999). Is all inattention ADD/ADHD? *The ADHD Report*, *7(5),* 1-8.

Gordon, M. and Barkley, R.A. (1999). A reply to Brown. *The ADHD Report, 7(6),* 7-8.

Murphy, K., Gordon, M., and Barkley, R. (2000). To what extent are ADHD symptoms common? A re-analysis of standardization data from a DSM-IV checklist. *The ADHD Report*, *8(3),* 1-4.

Gordon, M. (2000). College students and the diagnosis of Attention Deficit Hyperactivity Disorder (Letter to the editor). *Journal of American College Health*, *49*, 46-47.

Gordon, M. and Murphy, K. (2001). Judging the impact of time limits and distractions on past test performance: A survey of ADHD, clinic-referred, and normal adults. *The ADHD Report, 9(3),* 1-5.

Lawrence L., Codding, R., Gordon, M., Marcoe, M., Needham, L., and Rentas, J. (2000). Self-Reported LD and ADHD Symptoms in College Students. *The ADHD Report*, *8(6),* pp. 1-4.

Fiese, B. H., Poehlmann, J., Irwin, M., Gordon, M., Curry-Bleggi, E. (2001). A pediatric screening instrument to detect problematic infant-parent interactions: Initial reliability and validity in a sample of high- and low-risk infants. *Infant Mental Health Journal*, *22(4),* 463-478.

Gordon, M., Lewandowksi, L., Murphy, K. & Dempsey, K. (2002). ADA-based accommodations in higher education: A survey of clinicians about documentation requirements and diagnostic standards. *Journal of Learning Disabilities, 35(4),* 357-363.

Barkley, R. & Gordon, M. (2002). Research on comorbidity, adaptive functioning, and cognitive impairments in Adults with ADHD: Implications for clinical practice. A chapter in: S. Goldstein and A.T.Ellison *Clinician's Guide to Adult ADHD: Assessment and Intervention.* London: Academic Press.

Gordon, M., Goldstein, S., Barkley, R., & Murphy, K. (2003). Response to Nadeau on the subject of ADHD in Women [letter to the editor]. *Psychology Monitor, 34(4),* p. 10.

Goldstein, S. & Gordon,M. (2003). Gender Issues and ADHD: Sorting Fact from Fiction. *ADHD Report, 11(4),* 7-16.

Antshel, K. and Gordon, M. (2003). Evaluating and managing ADHD [letter to the editor]. *International Journal of Therapy and Rehabilitation, 10*, 428.

Canu, W. and Gordon, M. (2005). Mother Nature as treatment for ADHD: Overstating the benefits of green. *American Journal of Public Health, 95(3),* 371.

Kleinmann, A., Lewandowski, L., Sheffield, R. & Gordon, M. (2005). Processing speed and ADHD. *ADHD Report*, *13(1),* 6-8.

Lovett, B.J. and Gordon, M. (2005). Discrepancies as a basis for the assessment of learning disabilities and ADHD. *ADHD Report, 13(3),* 1-4.

Gordon, M., Antshel, K, Faraone, S., Barkley, R.A., Lewandowski, L., Hudziak, J., Biederman, J., and Cunningham, C. (2006). Symptoms versus impairment: The case for respecting DSM-IV's criterion D. *Journal of Attention Disorders*, *11(3),* 465-475.

Gordon, M. & Barkley, R.A. (2006). Psychological Testing and Observational Measures. Chapter in: R.A. Barkley (Ed.). *Attention Deficit Hyperactivity Disorders: A Handbook for Clinicians -- Third Edition*. New York: Guilford Publications.

Murphy, K. R. and Gordon, M. (2006). The assessment of ADHD in adults.  A chapter in: R.A. Barkley (Ed). *Attention Deficit Hyperactivity Disorders: A Handbook for Clinicians -- Third Edition*. New York: Guilford Publications.

Antshel, K. M., Phillips, M. H., Gordon, M., Barkley, R. A., & Faraone, S. V. (2006). Is ADHD a valid disorder in children with intellectual delays? *Clinical Psychology Review, 26,* 555-572.

Lewandowski, L., Lovett, B., Parolin, R., Gordon, M. & Codding, R. S. (2007). Extended time accommodations and the mathematics performance of students with and without ADHD. *Journal of Psychoeducational Assessment, 25,* 17-28.

Gathje, R., Lewandowski, J., & Gordon, M. (2008). The role of impairment in the diagnosis of ADHD. *Journal of Attention Disorders, 11,* 529-537.

Lewandowski, L., Lovett, B., Codding, R., & Gordon, M. (2008). Symptoms of ADHD and academic concerns in college students with and without ADHD diagnoses. *Journal of Attention Disorders, 12,*156-161.

Gordon, M., Antshel, K.M., Seigers, D., & Lewandowski, L. (2008, March). Missed appointments over the course of child psychiatric treatment. Poster session presented at the 20th Annual Research Conference of the Research and Training Center for Children's Mental Health. Tampa, FL.

Lewandowski, L., Lovett, B., & Gordon, M. (2009).  Measurement of symptom severity and impairment. In S. Goldstein & J. Naglieri (Eds.), *The measurement of clinical impairment in psychiatric diagnosis.*

Lovett, B., Gordon, M. & Lewandowski, L. (2009).   Legal and ethical ramifications of considering impairment in clinical diagnosis. In S. Goldstein & J. Naglieri (Eds.), *The* measurement of clinical impairment in psychiatric diagnosis.

Gordon, M., Antshel, K.M., & Lewandowski, L. (2009, March). The Price of Collaboration: Predictors of Hours Spent in Collateral Contacts. Poster session presented at the 22nd Annual Research Conference of the Research and Training Center for Children's Mental Health. Tampa, FL.

Gordon, M. & McClure, F. (2009). *The down and dirty guide to adult ADHD (second edition).* Syracuse: GSI Publications.

Gordon, M. (2009).  *ADHD on Trial: Courtroom clashes over the meaning of "Disability."* New York: Praeger Publishers.

Gordon, M., Antshel, K., & Lewandowski, L. (2010). The cost of collaboration: Predictors of hours spent in collateral contacts. *Psychiatric Services*, 61 (5), 440-442.

Gordon, M., Antshel, K., Lewandowski, L., & Sieigers, D. (2010). Predictors of missed appointments over the course of child mental health treatment. *Psychiatric Services*, 61 (7), 657-659.

McConaughy, S.H., Volpe, R. J., Antshel, K. M., Gordon, M., & Eiraldi, R.B. (2011). Academic and social impairments of elementary school children with Attention Deficit/Hyperactivity Disorder, *School Psychology Review*, 40 , 200-225.

Gordon, M. (2012). How to Optimize the Use of Outside Consultants for ADA Documentation Reviews. *The Bar Examiner*, 81(3) 17-24.

Lewandowski, L., Hendricks, K. & Gordon, M.  (In press) Test-taking performance of high school students with ADHD. *Journal of Attention Disorders*.

Lewandowski, L., Gathje, R.A., Lovell, B,. and Gordon, M. (2013). Test-taking skills with college studens with and without ADHD. *Journal of Psychoeducational Assessment* 31(1) 41 –52.

Gordon, M., Lewandowski, L., and Lovett, B. (2014). The Assessment of ADHD in the Context of ADA Accommodations. Chapter in: R.A. Barkley (Ed.). *Attention Deficit Hyperactivity Disorders: A Handbook for Clinicians -- Fourth Edition.* New York:

Guilford Publications.

**Paper Presentations (selected)**

Gordon, M., Greenberg, R.P., & Gerton, M.  (1982).  *The Rorschach Experience Balance and WAIS Verbal Performance Discrepancies.*  Presented at the Meeting of the Society for Personality Assessment, Tampa.

Greenberg, R.P. & Gordon, M.  (1982).  *Effects of examiner on children's Rorschach productivity*.  Paper presented at the Multi-Ethnic Conference on Assessment, Tampa.

Gordon, M. & McClure, F.D.  (1983).  *The objective assessment of hyperactivity.*  Paper presented at the Annual Meeting of the American Psychological Association, Anaheim.

Gordon, M.  (1983).  *The evaluation of hyperactivity and attentional problems in school-aged children*.  Workshop presented at the Annual Meeting of the New York State Association of School Psychologists, Syracuse.

Gordon, M.  (1984).  *Evaluating Attention Deficit Disorders in clinical populations*.  Paper presented at the 35th Annual Meeting of the American Association of Psychiatric Services for Children, Washington.

Gordon, M. & McClure, F.D.  (1984).  *The relationship between Rorschach Human Movement and an objective measure of impulsivity.*  Paper presented at the Annual Meeting of the Society for Personality Assessment, Tampa.

Gordon, M. & McClure, F.D.  (1984).  *The evaluation of Attention Deficit Disorders by objective techniques*.  Paper presented at the National Association of School Psychologists 1984 Convention, Philadelphia.

Gordon, M. & McClure, F.D.  (1984).  *Cost-effective assessment of Attention Deficit Disorders*.  Paper presented at the National Association of Elementary School Principals Annual Convention, New Orleans.

Gordon, M. & Abrams, P.  (1984).  *The Rorschach protocols of adolescent firesetters*.  Paper presented at the International Rorschach Congress, Barcelona.

Gordon, M. & McClure, F.D.  (1984).  *Assessment of Attention Deficit Disorders using the Gordon Diagnostic System*.  Paper presented at the American Psychological Association Annual Convention, Toronto.

Gordon, M. (1985). *The objective assessment of ADD/Hyperactivity:  The GDS Pilot Project on Staten Island.*  Paper presented at the Second Annual Special Education Institute sponsored by the New York City Board of Education, New York.

Gordon, M. & Meichenbaum, D. (1985).  *The objective assessment and effective treatment of ADD/Hyperactivity.*  Workshop series presented in Denver, Tampa, Atlanta, and Washington.

Gordon, M.  (1985).  *Review of current research on the Gordon Diagnostic System.*  Paper presented at a symposium on the Gordon Diagnostic System at the American Psychological Association Annual Meeting, Los Angeles.

Gordon, M. (1986).  *The assessment of attention: current research.*  Symposium presented at the American Psychological Association Annual Meeting, Washington, D.C.

Gordon, M. (1987).  *School-based evaluations for attention deficits.*  Cumberland County Schools, Cumberland, MD.

Gordon, M. & Mettelman, B. (1987).  *Behavior-based assessment of ADD/Hyperactivity: Standardization of the Gordon Diagnostic  System.*  Presented at the American Psychological Association Annual Meeting, New York, NY.

Gordon, M., Mammen, O., DiNiro, D., & Mettelman, B. (1988).  *Source-dependent subtypes of ADHD/Hyperactivity.*  Paper presented at the Annual Meeting of the Society for Behav- ioral Pediatrics, Washington, D.C.

Gordon, M., DiNiro, D., Mettelman, B., & Tallmadge, J.  (1988).  *Quantitative Scores, Observations of Test Behavior, and Behavior Problem Checklists.*  Paper presented at the Annual Meeting of the American Psychological Association, Atlanta, GA.

Gordon, M., Mammen, O., DiNiro, D., & Mettelman, B. (1989).  *Source-Dependent Subtypes of ADHD: Implications for research criteria and the diagnostic process.*  Paper presented at the Society for Research in Child and Adolescent Psychiatry, Miami, FL.

Gordon, M. (1989).  *Classroom management of the ADD student.*  Invited keynote address presented at the First Annual Conference on Attention Deficit Disorders, Orlando, FL.

Gordon, M., Thomason, D., & Cooper, S. (1989).  *To what extent do IQ tests measure attentiveness?*  Paper presented at the Annual Meeting of the American Psychological Association, New Orleans, LA.

Gordon, M., Mettelman, B.B., & DiNiro, D.D.  (1989).  *Are continuous performance tests valid in the diagnosis of  ADHD/Hyperactivity?*  Paper presented at the Annual Meeting of the American Psychological Association, New Orleans, LA.

Irwin, M., Gordon, M., & Mettelman, B. (1989).  *Concurrent validity of the DSM-III-R Criteria for ADHD/Hyperactivity.*  Paper presented at the Annual Meeting of the American Psychological Association, New Orleans, LA.

Tallmadge, J.T., Paternite, C.E., & Gordon, M. (1989).  *Hyperactivity and aggression in parent-child interactions: Test of a two-factor theory.*  Paper presented at the Annual Meeting of the Society for Research in Child Development, Kansas City, MO.

Gordon, M., Mettelman, B., & Irwin, M.  (1989).  *Cluster analysis of instruments used in the diagnosis of ADHD.*  Paper presented at the Annual Meeting of the American Academy of Child and Adolescent Psychiatry, New York, NY.

Gordon, M. & Irwin, M. (1989).  *The practicalities of establishing a specialty ADHD clinic.*  Workshop presented at the Annual Meeting of the American Academy of Child and Adolescent Psychiatry, New York, NY.

Gordon, M., Thomason, D., & Cooper, S. (1990).  *Non-medical treatment of ADHD/Hyperactivity: The Attention Training System.*  Paper presented at the Annual Meeting of the American Psychological Association, Boston.

Gordon, M.,  Mettelman, B.B., & Irwin, M. (1990).  *The impact of comorbidity on ADHD laboratory measures.*  Paper presented at the Annual Meeting of the American Psychological Association, Boston.

Gordon, M. & Irwin, M. (1990).  *The practicalities of establishing a specialty ADHD clinic.*  Workshop presented at the Annual Meeting of the American Academy of Child and Adolescent Psychiatry, Chicago, IL.

Gordon, M., Mettelman, B.B., & Irwin, M. (1991).  *The relationship between paternal psychopathology and behavior ratings of children referred for ADHD.*  Paper presented at the Annual Meeting of the Society for Research in Child and Adolescent Psychopathology, Amsterdam.

Irwin, M., Fiese, B.H., Gordon, M., Poehlmann, J., & Levy, S. (1991). *Pediatric Infant Parent Exam: Screening Technique to Detect Relationship Disturbances.*  Paper presented at the annual meeting of the American Academy of Child and Adolescent Psychiatry, San  Francisco.

Gordon, M. & Mettelman, B.B.  (1994, June).  *Gender differences in ADHD referrals: IQ, laboratory measures, and behavior ratings.*  Paper presented at the annual

14

meeting of the Society for Research in Child and Adolescent Psychopathology, London.

Gordon, M. & Mettelman, B.B.  (1994, June).  *The impact of parental psychopathology on parent and teacher ratings of child behavior*.  Paper presented at the annual meeting of the Society for Research in Child and Adolescent Psychopathology, London.

Aylward, G., Verhulst, S., Bell, S. & Gordon, M. (1995). *The relationship between computerized CPT scores and measures of intelligence, achievement, memory, learning, and visual-motor functioning.* Paper presented at the Annual Meeting of the Academy of Child and Adolescent Psychiatry, New Orleans.

Gordon, M. Lewandowski, L., Clonan, S., & Malone, K. (1996*). Standardization of the Auditory Vigilance Task.* Paper presented at the Eighth Annual International Conference of CH.A.D.D., Chicago.

Gordon, M. (1998). *ADHD & LD: What are they and how are they diagnosed?* Workshop presented at the National Conference of Bar Examiners 1998 Seminar on Bar Admissions, Chicago, IL.

Gordon, M. (1998). *Emerging trends in mental disability cases*. Paper presented at the National Employment Law Institute=s Americans with Disabilities Act Briefing, Chicago, IL.

Gordon, M. (1998). *Neuropsychologists and the ADA.* Workshop presented at the National Academy of Neuropsychology. Washington, DC.

Gordon, M. (1998). *Should high functioning individuals with LD/ADHD get accommodations?* Symposium presented at the annual meeting of the American Academy of Child and Adolescent Psychiatry, Anaheim, CA.

Gordon, M (1999). *Diagnosis and management of ADHD in the US.* Paper presented at the Royal Society of Medicine joint meeting of the section of pediatrics and the faculty of child psychiatry of the Royal College of Psychiatrists. London, England.

Gordon, M. (2000). *On the assessment of impairment.* University of Massachusetts Memorial Medical Center Grand Rounds, Worcester, MA.

Gordon, M. (2004). *ADA Documentation and ADHD*. National Conference of Bar Examiners National Meeting, New Orleans, LA.

Gordon, M. (2006).  *The assessment of impairment*.  Paper presented at the Royal Society of Medicine Conference on Child Behaviour Disorders. London, England.