IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DR. MARKCUS KITCHENS, JR., <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL BOARD OF MEDICAL EXAMINERS, <br><br> Defendants. | Civil Action No. 2:22-CV-03301-JFM |

**PROPOSED ORDER DENYING PRELIMINARY INJUNCTION**

This matter is before the Court on the Motion for Preliminary Injunction (Dkt. 20) filed by Plaintiff Dr. Markcus Kitchens, Jr. ("Dr. Kitchens").

Dr. Kitchens asserts that he has been diagnosed with Attention-Deficit/Hyperactivity Disorder (ADHD) and test anxiety; that he is unable to read questions on Step 1 and Step 2 CK of the United States Medical Licensing Examination (USMLE) in the standard time allowed due to these alleged impairments; and that he is legally entitled to double the amount of standard testing time on the USMLE because he is disabled within the meaning of the Americans with Disabilities Act ("ADA"). Mot. for Pre. Inj. (Dkt. 20 ¶ 4). Dr. Kitchens seeks a mandatory preliminary injunction that would require the National Board of Medical Examiners ("NBME") to allow him to take all Step exams with double testing time. He also seeks "expungement" of his prior test results on Step 1 and Step 2 CK of the USMLE from his examination transcript. *Id.* p. 4.

The Court held an evidentiary hearing on February 24, 2023. Based upon the evidence presented in that hearing and the written submissions and oral arguments of the parties, the Court hereby **DENIES** Dr. Kitchens' motion for the reasons that follow.

**FINDINGS OF FACT**

1.      NBME is a non-profit organization whose mission is to help protect the public health through the development and administration of high-quality examinations, including the USMLE. Decl. of Erin Convery ¶¶ 3-4 ("Convery Decl.").

2.      The USMLE assesses an examinee's ability to apply the knowledge and demonstrate the skills that constitute the basis of safe and effective patient care. Three "Step" exams make up the USMLE: Step 1, Step 2 Clinical Knowledge (Step 2 CK), and Step 3. Convery Decl. ¶ 6.

3.      Licensing authorities rely upon the USMLE to help evaluate the qualifications of individuals seeking an initial medical license. Convery Decl. ¶ 5.

4.      Examinees take the USMLE under standard conditions, including standard testing time. NBME provides accommodations, however, to individuals who are disabled within the meaning of the ADA. Convery Decl. ¶¶ 7-8. As another court has noted, NBME's objective is to ensure that "individuals with bona fide disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage…." *Powell v. NBME*, 364 F.3d 79, 88-89 (2d Cir. 2004). NBME's accommodation policies are also intended to protect the integrity of USMLE scores, which jurisdictions across the country rely upon to help determine whether prospective physicians have the knowledge and skills to deliver safe effective healthcare. Convery Decl. ¶¶ 5, 7-10.

5.      Dr. Kitchens attended medical school at the Medical University of Lublin, in Poland. He graduated on time and received his medical degree in January 2021. Decl. of Markcus Kitchens ¶ 1.

6. Unlike most U.S. medical students, Dr. Kitchens did not take the Step 1 or Step 2 CK exams during medical school. Instead, he chose to take both exams after graduating. Kitchens Decl. ¶ 32.

7. On January 5, 2022—one year after he graduated from medical school—Dr. Kitchens submitted a request for accommodations on Step 1 to NBME. Convery Decl. ¶ 16. Dr. Kitchens asserted in his court papers that he submitted a request for accommodations in October 2021 to NBME, Kitchens Decl. ¶ 33, but this was not correct. Convery Decl. ¶¶ 17-18 and Exs. 4-5.

8. On his USMLE accommodation request form, Dr. Kitchens reported that he was diagnosed with ADHD in 2013 and Test Anxiety in 2018. *Id.* Ex. 3. He did not, however, submit documentation to NBME substantiating either of these diagnoses. *See id.* Exs. 6-11, 13; Decl. of Michael Gordon, Ph.D. ("Gordon Decl."), ¶¶ 17-20, 38.

9. Dr. Kitchens' accommodation request form disclosed that he did not receive any type of accommodations on his college admission test, in college, on the Medical College Admission Test (MCAT), or in medical school. Convery Decl. Ex. 3 p.4. It also disclosed that he did not receive accommodations in elementary school, middle school, or high school. *Id.* p.5.

10. Along with his application form, Dr. Kitchens submitted (1) a half-page personal statement; (2) a four-sentence letter from a doctor in Illinois dated April 2020; (3) a one-page excerpt from a 2020 dermatology appointment record; (4) a two-page excerpt from medical records dated May 2018 reflecting a short visit to his healthcare provider; (5) two pages of medical records from a July 2017 visit to his healthcare provider; and (6) a document showing that he was scheduled to take an examination in medical school (the Comprehensive Basic Science Exam, or CBSE) with "extended time." *Id.* Exs. 6-11.

11. At NBME's request, *id.* Ex. 5, Dr. Kitchens later provided NBME with his CBSE score report. *id.* Ex. 12. The report showed that he did very badly on the exam, despite having extended time. *Id.* He chose not to provide additional documentation that NBME had requested.

12. NBME advises candidates that their personal statement should include "specific information about the disability-related symptoms and how they affect your academic, occupational, social and other important areas of functioning;" a description of "the extent to which your daily functioning is impaired and how that impairment interferes with your ability to access the examination under standard conditions;" and "a clear rationale for the requested accommodation(s) and [a description of] how each requested accommodation will alleviate the functional limitations caused by your disability." Convery Decl. Ex. 2. Dr. Kitchens did not follow these instructions when he prepared his personal statement for NBME.

13. NBME's published Guidelines for requesting test accommodations provide a thorough discussion of the types of documentation a candidate should submit, including guidelines relating to specific types of claimed impairments. *See* Convery Decl. Exs. 2, 5. Dr. Kitchens did not comply with the Guidelines in multiple respects. Indeed, when deposed, he said he was not sure whether he had read the documentation Guidelines. Opp. Ex. 9 (Dep. Tr. 100-101).

14. Despite his documentation deficiencies, NBME considered Dr. Kitchens' request on the merits when he declined to provide additional documentation. After a thorough review of his supporting documentation, NBME concluded he had not shown that accommodations were warranted, and it denied his request. NBME explained its decision in a letter dated February 8, 2022. *See* Convery Decl. Ex. 14.

15. Dr. Kitchens took Step 1 on February 22, 2022 under standard conditions and did not pass. Convery Decl. ¶ 23.

16. After receiving his score report from his initial Step 1 exam, Dr. Kitchens called NBME inquiring about a score recheck. In that call, Dr. Kitchens explained: "I didn't think the exam was actually that hard for me and then when I look at the score, it's almost like a zero percent, like in the law 20th percentile, which I mean, I did all of my work at Mayo Clinic …. I am the top of all these things in research, etc. so that's — and even my mentors and directors, even Johns Hopkins is not understanding this as well." Opp. Ex. 8.

17. Dr. Kitchens' statements on this call are drastically at odds with, and therefore undermine, the description he has provided in this lawsuit of his testing experience when he first took Step 1, which includes a suggestion that he was not able to read more than 100 of the exam questions. Kitchens Decl. ¶¶ 35-36.

18. Dr. Kitchens took Step 1 again on May 9, 2022, without requesting accommodations, and again did not pass. Convery Decl. ¶ 23.

19. Dr. Kitchens took Step 2 CK on May 28, 2022, and again on June 29, 2022, without requesting accommodations, and he did not pass either time. *Id.* ¶ 24.

20. On August 30, 2022, Dr. Kitchens submitted another accommodation request to NBME, again limited to Step 1. This time, he sought 50% extra time (rather than 100%) and extra breaks. Convery Decl. Ex. 15. He did not submit any new documentation in support of this request, relying instead on the same limited medical records and abbreviated personal statement he provided in support of his initial request. *Id*. ¶¶ 25-26 and Ex. 15.

21. NBME asked Dr. Kitchens to provide additional documentation. *See id.* ¶ 26 and Ex. 16. This request was reasonable. The impairments that Dr. Kitchens claims to have -- ADHD and anxiety -- are non-visible mental impairments. The documentation that he provided to NBME in support of his requests was insufficient for NBME to confirm the existence of his claimed

impairments or the extent to which the impairments limited Dr. Kitchens' ability to perform any major life activities that are relevant when taking the USMLE exams.

22. Dr. Kitchens chose not to provide any additional documents to NBME. Convery Decl. Ex. 17. He did so even though he has filed medical records in this lawsuit that were prepared prior to the date on which he submitted his accommodation request to NBME, and which thus could have been provided to NBME at that time.

23. At that point, Dr. Kitchens was given two options by NBME: proceed with testing under standard conditions, or submit additional information so that NBME could evaluate his need for accommodations. Convery Decl. Exs. 18. NBME also "strongly encourage[d]" Dr. Kitchens to "review the USMLE Guidelines for Requesting Test Accommodations," including the guidance for requesting accommodations if you say that you have ADHD. *Id*.

24. On September 7, 2022, Dr. Kitchens elected to proceed with testing under standard conditions, rather providing additional documentation. *Id.* Ex. 19. He took Step 1 on September 29, 2022 and did not pass. *Id.* ¶ 29.

25. On January 18, 2023, Dr. Kitchens filed an amended complaint in this action, asserting an ADA claim relating to his Step 1 and Step 2 CK exams (even though he did not request accommodations on Step 2 CK). He attached new medical records as well as an affidavit from a professor that he had not submitted to NBME in support of his accommodation requests. Dkt. 15 Exs. A, B.

26. On February 7, 2023, Dr. Kitchens filed his motion for preliminary injunction, claiming that NBME's actions jeopardize his ability to participate in the 2023 NRMP, Dkt. 20 ¶¶ 2-3, and seeking to enjoin NBME from "refusing to grant" him 100% additional testing time on all three Steps of the USMLE. His motion also seeks to have his "examination transcript"

expunged, to prevent the reporting of his past Step 1 and Step 2 CK attempts to residency programs and medical licensing authorities. Dkt. 20 p.4.

27. Dr. Kitchens' preliminary injunction papers include additional documentation that was not submitted to NBME in support of his Step 1 accommodation requests, consisting of a lengthy personal declaration, a declaration from his mother, and additional medical records. Dkt. 20-1, Dkt. 25 Exs. B, E, P. He also filed additional medical records with the Court on February 12, 2023, which he had not submitted to NBME when he requested accommodations. Dkt. 22.

28. Dr. Kitchens claims that he will suffer irreparable harm if he cannot participate in the 2023 residency match that is operated by the National Residency Matching Program, or NRMP. He has also suggested to the Court that the only thing preventing him participating in the 2023 NRMP Match is not having passing scores on Step 1 and Step 2 CK, and that he will be able to obtain the necessary passing scores if he is authorized to test with his requested accommodations by March 6, 2023. Dkt. 20-2 at 1-2, 9, 15.

29. Applying for residency programs is a lengthy, multi-step process. As explained by the Association of American Medical Colleges (AAMC):

> Applying for residency involves two separate activities: preparing and submitting your application to your chosen programs, and interviewing at the programs that offer you an invitation. This high-stakes process spans many months—beginning as early as the fall of your third year in medical school.

Opp. Ex. 2 at 1.

30. Medical students apply electronically for residency positions through AAMC's Electronic Residency Application Service (ERAS). Opp. Exs. 2, 3. To register for ERAS, International Medical Graduates (IMGs) like Dr. Kitchens must obtain a token through the

Educational Commission for Foreign Medical Graduates (ECFMG). Opp. Exs. 3 at 2, 5. Dr. Kitchens thinks he has obtained such a token but he is not sure. Opp. Ex. 9 (Dep. Trans. 203).

31.     Medical students must separately register for the NRMP Match. *Id*. Ex. 9. Dr. Kitchens correctly notes that most medical students use the Match to obtain residency positions. PI Mot. ¶ 10.

32.     Registration for the 2023 Match opened in September 2022, the standard registration deadline was **January 31, 2023, and the late deadline is March 1, 2023**. Opp. Ex. 7. Applicants interview with programs in the fall and winter, Opp. Ex. 2, and then must submit rank order lists by **March 1, 2023**, Opp. Ex. 7. Applicants will learn if they have matched on **March 13, 2023**. There is a follow-up period for applicants who did not match (but who timely registered for and participated in the regular Match), and on **March 17, 2023**, Match results are announced. *Id.*

33.     IMGs must obtain ECFMG Certification to participate in the NRMP Match. To obtain ECFMG Certification, IMGs must pass Step 1 and Step 2 CK and also satisfy other requirements, including attaining a satisfactory score on the Occupational English Test (OET) for Medicine, which is administered by an entity other than NBME. Opp. Exs. 5, 6.

34.     Dr. Kitchens has not taken the OET yet, and he has missed the January 31, 2023 deadline for registering to do so, meaning he will not be able to participate in the 2023 Match because he will not be able to obtain the requisite ECFMG Certification. Opp. Ex. 6. Indeed, he testified in his deposition that he had not "been on the ECFMG's website" and was not aware of the deadline for registering to take the OET exam. Opp. Ex. 9 (Dep. Tr. 205-210).

**CONCLUSIONS OF LAW**

1.  A preliminary injunction is an "extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689 (2008), to be awarded only "upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). When mandatory relief is requested, as here, the plaintiff's burden is even higher. *Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994). Dr. Kitchens has not met that burden.

2.  To prevail on his motion, Dr. Kitchens must make a "clear showing" that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter,* 555 U.S. at 20, 22.

3.  Dr. Kitchens' motion fails at the outset on the irreparable harm factor. "[T]he moving party must make a 'clear showing of *immediate* irreparable harm,'" *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (original emphasis, citation omitted), and the risk of irreparable harm must be certain, not speculative, *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000). Dr. Kitchens has not made a non-speculative showing that he will suffer immediate irreparable harm in the absence of preliminary injunctive relief.

4.  The basis for Dr. Kitchens' motion is his claimed interest in participating in the 2023 NRMP Match. *See* PI Mot. (Dkt. 20) ¶¶ 2, 3, 10, 15.b. But Dr. Kitchens is already foreclosed from participating in the 2023 NRMP because he has not obtained eligibility certification from the ECFMG and cannot do so now, having missed the registration deadline for taking a third "Pathways" examination that is required for certification. Opp. Exs. 5, 6. Dr. Kitchens will also inevitably miss other deadlines, including the late registration deadline to participate in the 2023

NRMP Match (March 1, 2023), and the deadline for submitting rank order lists (also March 1, 2023). Opp. Ex. 7. Even if tested immediately, he will not have taken Step 1 and Step 2 CK in time to have reportable results prior to March 1st. *See* Convery Decl. ¶ 30 (explaining results are typically available two to four weeks after a test date and may take up to eight weeks). Dr. Kitchens is thus not facing *any* risk of immediate harm relating to the 2023 NRMP that can be attributed to NBME or when he retakes the Step 1 and Step 2 CK exams, because it is impossible for him to participate in the 2023 NRMP for other reasons.

5. Dr. Kitchens' alleged risk of irreparable harm is also speculative. He is asking the Court to assume that he will pass Step 1 and Step 2 CK if given double testing time and, conversely, that he will fail without extra testing time. But both propositions are speculative, making a preliminary injunction unwarranted. *See Baer v. NBME*, 392 F.Supp.2d 42, 49 (D. Mass. 2005) ("[I]t is not certain that [plaintiff] will suffer the predicted harm; she may pass the test.") (denying preliminary injunction). There is no evidence beyond his own assertions that a need for extra testing time explains his past performance on Step 1 and Step 2 CK, as opposed to a deliberate testing style, his knowledge of the subject matter, misguided test-taking strategies, his test preparation, his mood the days he tested (*e.g.*, was he anxious or depressed), or whether he had a good night's sleep the night before.

6. Dr. Kitchens suggests that his chances of obtaining a residency position would be better if he participates in the 2023 NRMP Match than if he waited to participate in the 2024 Match or pursued other avenues for obtaining a residency position. This, too, is speculative. *See Doe v. Ohio State Univ.*, 2016 WL 692547, *10-11 (S.D. Ohio) (denying medical student's motion for a preliminary where student "offered only his own testimony that residencies are more likely to be obtained by someone who is a student in good standing" based upon his understanding of "the

'match' and 'scramble' procedures by which medical students are offered residencies"), *objections overruled, report aff'd*, 2016 WL 1578750 (S.D. Ohio 2016).

7. Dr. Kitchens invites the Court to "presume" irreparable harm in the absence of an injunction "when there is a violation of the ADA," Pl. Br. 13, but his argument improperly assumes there has been such a violation. As discussed below, the Court has concluded that he is not likely to prevail on the merits of his ADA claim. Moreover, his suggestion that irreparable harm can be presumed where a likely ADA violation has been shown is inconsistent with the Supreme Court's directive in *Winter* that a party seeking a preliminary injunction must establish all four factors, including irreparable harm. *Cf. T.D. Bank N.A. v. Hill*, 928 F.3d 259, 279-80 (3d Cir. 2019) (irreparable harm cannot be presumed based upon a finding of a Copyright Act violation, for purposes of applying the four-factor test for permanent injunction relief) (citing, inter alia, *Winter*).

8. The Court further concludes that Dr. Kitchens has not shown a likelihood of success on the merits of his ADA claim. He asserts that NBME discriminated against him in February and August 2022 by not approving his requests for accommodations, but that is clearly not the case given the limited information he provided to NBME to support his request and his decision not to provide the additional documentation that NBME reasonably requested.

9. Testing entities have the right to request documentation from examinees, provided the requested documentation is "reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested." 28 C.F.R. § 36.309(b)(1)(iv). The reasonableness of the requested documentation will of course depend on the nature of the claimed impairment. A physical disability might well require relatively little supporting documentation, whereas mental impairments will often require more extensive documentation because of their non-visible nature. Such documentation may be needed not just to confirm the presence of the

- 11 -

impairment, but also to determine the extent of any resulting functional limitations and the accommodation(s) that might be warranted to address those functional limitations.

10. Here, Dr. Kitchens claims to have two mental impairments, ADHD and anxiety. NBME's accommodation Guidelines inform examinees what type of documentation they should submit if seeking accommodations based upon those impairments, and NBME encouraged Dr. Kitchens to review those Guidelines so that NBME could make an informed decision before his request for accommodations. The Guidelines appear to be reasonable given the nature Dr. Kitchens' claimed impairments.

11. Dr. Kitchens failed to provide sufficient documentation for NBME to determine whether he has a proper diagnosis of ADHD or anxiety and, if so, whether the impairments substantially limit his ability to perform any major life activities, as compared to most people in the general population. Therefore, NBME had no obligation to approve his requested accommodations. *Cf. Wells v. Shalala*, 228 F.3d 1137, 1145-46 (10th Cir. 2000) ("[Where an employee] fails to provide necessary medical documentation, [an] employer is not liable for failing to provide a reasonable accommodation.") (citation omitted).

12. Dr. Kitchens fares no better if the Court also considers the additional documents Dr. Kitchens has provided in this court proceeding (but chose not to provide to NBME when he submitted his accommodation requests last year). The record before the Court still fails to support his reported diagnoses or provide any evidence that he is substantially limited in any major life activity relevant to taking the USMLE as compared to most people, which is the operative standard under the ADA.

13. Under the ADA, a private entity that "offers examinations ... relating to applications, licensing, certifications, or credentialing for ... professional ... purposes shall offer

such examinations ... in a place and manner accessible to persons with disabilities or offer alternative arrangements for such individuals." *See* 42 U.S.C. § 12189. Pursuant to Section 12189, persons who qualify as disabled under the ADA are entitled to reasonable accommodations, if needed, during test-taking.

14. To be disabled under the ADA, a person must have "a physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1), "as compared to most people in the general population," 28 C.F.R. § 36.105(d)(1)(v).

15. Dr. Kitchens argues that "[c]ourts regularly construe anxiety and ADHD as disabilities that substantially limit the major life activities of reading, writing, learning, and concentrating," Pl. Br. 6, but having a diagnosed impairment is not sufficient to establish a disability under the ADA. As set forth in DOJ's implementing regulations, "not every impairment will constitute a disability[.]" 28 C.F.R. § 36.105(d)(1)(v); *see also Love v. Law Sch. Admission Council*, 513 F. Supp. 2d 206, 226 (E.D. Pa. 2007) ("An impairment and a disability are two different things.").

16. While ADHD and anxiety *can* be disabilities under the ADA, each is a disability *only* if it substantially limits a person's ability to perform major life activities as compared to most people. This is reflected in many court decisions finding that individuals who have been diagnosed with anxiety, ADHD, or other mental impairments were *not* disabled within the meaning of the ADA. *See, e.g., Mann v. Louisiana High Sch. Athletic Ass'n.*, 535 Fed. App'x 405, 410 (5th Cir. 2013) ("[A] plaintiff must still show substantial limitation....") (setting aside preliminary injunction in case involving a diagnosed anxiety disorder); *Collins v. Prudential Investment & Retirement Servs.*, 119 F. App'x 371, 378 (3d Cir. 2005) ("[Plaintiff's] testimony about her work, academic [background], and community involvement contradicts her claim that her ADHD/ADD

substantially limits her abilities to think, learn, remember and concentrate"); *Wright v. NBME, supra,* 2021 WL 5028463, at *4 (examinee diagnosed with a learning disorder, ADHD, and depressive disorder not likely to succeed on merits of ADA claim); *Hentze v. CSX Transp., Inc.*, 477 F. Supp. 3d 644, 670-71 (S.D. Ohio 2020) (railroad employee who failed employment test and was diagnosed with anxiety not disabled under the ADA); *Black v. NBME,* 281 F. Supp. 3d 1247, 1249-50 (S.D. Fla. 2017) (medical school student with ADHD diagnosis not disabled under the ADA); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs,* 2016 WL 1404157, at *7 (E.D. Pa. 2016) (examinee with dyslexia not disabled under the ADA); *Steere v. George Washington Univ. School of Medicine.* 439 F.Supp.2d 17, 21-25 (D.D.C. 2006) (medical student diagnosed with ADHD not disabled under the ADA).

      17.    In evaluating whether Dr. Kitchens is substantially limited, his claimed limitations must be measured against the general population, not against other college graduates or medical students. *See, e.g., Singh v. George Wash. Univ.*, 508 F.3d 1097, 1103-04 (D.C. Cir. 2007) ("[A]ny measure of substantial limitation that might change based on a plaintiff's particular educational environment—e.g., a comparison of '[m]edical students … to their fellow students,' …—would make disabled status vary with a plaintiff's current career choices, and would fail to achieve the ADA's additional purpose of providing 'clear, strong, *consistent*, [and] enforceable standards' to address discrimination.") (original emphasis, citations omitted); *Black v. NBME,* 281 F. Supp. 3d at 1249-50 ("Although Black insists that the Board must compare Black's performance to her 'medical-school peers,' under 28 C.F.R. § 36.105(d)(1)(v) the substantial-limitation determination depends on a person's performance in comparison to 'most people in the general population.'"); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 WL 1404157, at *6 ("It is inappropriate

under the ADA to compare an individual to her academic peer group or, in the case of standardized tests, other test-takers who are not representative of the general population").

18. If a diagnosis is unwarranted, or if an impairment does not result in substantial limitations, the individual is not disabled under the ADA and is not entitled to accommodations.

19. Here, Dr. Kitchens has not demonstrated that he meets the diagnostic criteria for ADHD. Gordon Decl. ¶¶ 6-38, 41. His alleged "Test Anxiety" diagnosis is also unsupported. *Id*. ¶ 42.

20. Even if Dr. Kitchens had been properly diagnosed, there is also nothing in the record which demonstrates that he is substantially limited in any major life activity relevant to taking the USMLE compared to most people. Gordon Decl. ¶¶ 36-38, 41.

21. Dr. Kitchens complains of difficulty taking a timed medical licensure test, but this is not enough to show substantial limitation in a major life activity compared to most people. *See Shirley v. Univ. of Idaho*, 2014 WL 12991817, at *2 (D. Idaho 2014) (explaining plaintiff's allegations of disability based on an unspecified cognitive disorder "were insufficient, in large part, because Shirley was limited only in his ability to read some highly abstract and complex materials in a short period of time, namely law school examinations").

22. Assuming for the sake of argument that Dr. Kitchens has been properly diagnosed with ADHD or anxiety, there is no record evidence to support a finding on the ultimate question before the Court—whether Dr. Kitchen is substantially limited in any relevant major life activity compared to most people. This precludes any finding that he is likely to succeed on the merits of his ADA claim. *See Rumbin v. Ass'n of Amer. Med. Colleges*, 803 F. Supp. 2d 83, 94 (D. Conn. 2011) (noting that plaintiff's doctor "never compared [plaintiff's] reading or seeing skills to the 'average person'"); *see also Rhodes v. Langston Univ.*, 462 F. App'x. 773, 778 (10th Cir. 2011)

("Rhodes' neuropsychological evaluation does not answer the question of whether her impairment substantially limits Rhodes' ability to learn as a whole for purposes of daily living, as compared to most people."); *Hentze v. CSX Transp., Inc.*, 477 F. Supp. 3d 644, 669 (S.D. Ohio 2020) ("After all, 'some situational anxiety' on a test that could have severe job consequences would be expected for just about anyone. Yet there is no indication in Dr. Hustak's letter as to whether, or by how much, Hentze's anxiety in that setting is worse than anyone else's.").

23. Dr. Kitchens quotes at length the Third Circuit's decision in *Ramsay v. NBME,* 968 F.3d 251 (3d Cir. 2020), *see* Pl. Br. 10, but this case is nothing like *Ramsay*. The plaintiff in *Ramsay*, unlike Dr. Kitchens, followed the NBME documentation guidelines and submitted significantly more documentation and information in support of her accommodation requests, including diagnostic assessments. She was also diagnosed with dyslexia in addition to ADHD and submitted documentation that addressed her reading abilities. 968 F.3d at 254-55, 258.

24. Dr. Kitchens points to his Adderall prescription as evidence of his disability. However, the fact that Dr. Kitchens has been prescribed medication is not a diagnostic marker of ADHD, *see* Gordon Decl. ¶ 27, and says nothing about whether he actually has ADHD or experiences any substantial limitations as a result.

25. The record before the Court does not establish that Dr. Kitchens has ever received a proper diagnosis of ADHD or anxiety and does not, in all events, show that he has any impairment that substantially limits him in any major life activity relevant to taking the USMLE compared to most people. Therefore, he has not satisfied his burden of showing likelihood of success on the merits.

26. Given the Court's conclusions on the irreparable harm and likelihood of success factors, there is no need for the Court to balance the equities or consider the public interest factor.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017).  Nevertheless, the Court concludes that these factors also weigh against granting a preliminary injunction.

27. NBME has a legitimate interest in ensuring fairness to other examinees, preserving the integrity of the USMLE, and protecting the public welfare by ensuring that accommodations are only provided to those with disabilities under the ADA.  *See Powell*, 364 F.3d at 88-19. If Dr. Kitchens were granted a preliminary injunction and his accommodated test results were provided to medical residency programs or other third parties, it would be difficult if not impossible for NBME to undo the damage caused by such disclosures if it is later determined that the preliminary injunction should not have issued. *See, e.g., Rothberg v. Law Sch. Admission Council*, 102 F. App'x 122, 126-27 (10th Cir. 2004) (vacating preliminary injunction that allowed plaintiff to take the LSAT with extra time and noting LSAC would be irreparably harmed if the accommodated score were released prior to a decision on the merits). Particularly in light of the Court's finding on the lack of irreparable harm and the unlikelihood of Dr. Kitchens succeeding on the merits of his claim, the equities strongly favor NBME.

28. Dr. Kitchens asserts that "enforcement of the ADA is in the public interest," Pl. Br. 15, but this argument is based on the mistaken premise that he has shown he is disabled under the ADA and has a clear likelihood of succeeding on the merits of his claim. *See Valles v. ACT*, 2022 WL 2789900, at *5 (E.D. Tex. 2022) ("The public certainly has an interest in ensuring that those with disabilities are provided adequate accommodations, as required under the law.  However, the public also has an interest in ensuring that the ADA is enforced according to its requirements.") (denying preliminary injunction).  The Court has found otherwise.

29. Contrary to what Dr. Kitchens argues, under the facts of this case, the public interest weighs against awarding his requested mandatory preliminary injunction. Like NBME, "the public

... has an interest in the fair administration of standardized tests." *Bach v. LSAC*, 2014 U.S. Dist. LEXIS 124632, at *8. That interest is particularly strong where, as here, residency programs and medical licensing authorities rely on the test to assess the competency of potential doctors. If medical schools, residency programs or other third parties rely on USMLE scores earned with unwarranted accommodations, it will "alter[] the substance of the [exams] because the resulting scores [will] not be guaranteed to reflect each examinee's abilities accurately." *Powell v. NBME*, 364 F.3d at 89.  That would unfairly advantage Dr. Kitchens to the detriment of such third parties, including examinees who meet the ADA's definition of disability -- the very population the ADA is meant to protect.

30. Finally, given that Dr. Kitchens is not entitled to a preliminary injunction, his argument regarding expungement of his testing record likewise does not need to be considered at the present time.  The Court notes, however, that Title III of the ADA allows only "'preventative relief.'" 42 U.S.C. § 12188(a) (adopting the remedies in 42 U.S.C. § 2000a-3).  Preventive relief, by definition, is forward-looking in nature. As Dr. Kitchens himself acknowledges, "'the appropriate function of injunction is to afford preventative relief and not to correct injuries already committed.'" Pl. Br. 17 (citation omitted); *see also SEC v. Gentile*, 939 F.3d 549, 556 (3d Cir. 2019).  Therefore, there is no legal basis for the Court to expunge the results that Dr. Kitchens achieved on past Step exams.

SO ORDERED, this __ day of _____, 2023.

_____
U.S. District Court Judge