UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DR. MARKCUS KITCHENS, JR. )<br>    PLAINTIFF )<br> )<br>v. )<br> )<br>UNITED STATES MEDICAL LICENSING EXAMINATION, )<br>  ET. AL )<br>    DEFENDANTS )<br> ) | CIVIL ACTION NO.:<br>2:22-CV-03301-JMY |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Comes the Plaintiff, Dr. Markcus Kitchens, Jr. (hereby "Dr. Kitchens"), pro se, and Replies in Support of his Motion for Preliminary Injunction and Memorandum. In support of his Reply, Dr. Kitchens states as follows:

## ARGUMENT

I. **Dr. Kitchens Has Met His Burden Of Proof**

  a. **Dr. Kitchens Has A Disability**

Dr. Kitchens has a disability under the ADA. As established in his medical records, Connors CPT3 evaluation, and his ADHD Evaluation conducted by Ms. Bacon, Dr. Kitchens has longstanding diagnoses of anxiety and ADHD-combined. *See* DE 26: Notice of Filing of Exhibits.

The NBME does not dispute that ADHD is considered an impairment. 28 C.F.R. §36.105(b)(1)(ii),(2). ("As to the term 'impairment,' the applicable Department of Justice regulations provide that the term physical or mental impairment includes ADHD and dyslexia and other specific learning disabilities.") *Ramsay v. Nat'l Bd. Of Med. Examiners*, 968 F.3d 251, 2 (3rd Cir., July, 2020); ("Specific learning disorders, dyslexia, and ADHD are considered impairments under the ADA.") *Berger v. Nat'l Bd. of Med. Examiners*, 2019 U.S. Dist. LEXIS 145666, 57 (S. D. Ohio, August, 2019); ("[a] mental impairment is 'any mental or psychological disorder, such as an intellectual disability…, organic brain

syndrome, emotional or mental illness, and specific learning disabilities.") *Healy v. Nat'l Bd. of Osteopathic Med. Examiners, Inc.*, 870 F. Supp. 2d 607, 616 (S.D. Ind., 2012).

Dr. Kitchens' medical records dating back as far as 2013 demonstrates having an active diagnosis for ADHD. Additionally, in approximately 1998, Dr. Kitchens' was diagnosed by his treating pediatrician with ADHD. *See* DE 26: Declaration of Missie King. As such, the onset of Dr. Kitchens' symptomology was consistent and pervasive, evensofar as childhood.

### i. Dr. Gordon patently ignores the African American Diaspora and its Effect on Underdiagnosis

From Dr. Gordon's declaration, Dr. Kitchens' age at the time of diagnosis is the proverbial 'nail in the coffin' as to why he does not meet the DSM-5 criteria for ADHD. The NBME would rely on Michael Gordon, a professor of psychiatry who has never evaluated nor interviewed Dr. Kitchens, over the clinical decisions of treating physicians throughout the years to determine the legitimacy of Dr. Kitchens' medical history. Specifically, he states:

> "the requirement for a childhood onset flows from the fact that ADHD is a neurodevelopmental disorder, and thus, by definition, must appear during development. An individual does not 'come down' with ADHD later in life." *See* DE 26-21, Declaration of M. Gordon, p. 3, ¶9.

While this is true, Dr. Gordon's opinion demonstrates his prejudices and biases as a clinician and, particularly as a non-Afrocentric psychologist. As discussed by Dr. Evelyn Polk Green, a past president of both Children and Adults with Attention-Deficit/Hyperactivity Disorder (CHADD) and the Attention Deficit Disorder Association (ADDA):

> "[i]t was stigma then. It was understanding, and stigma both within the African-American community and then stereotypes about kids and adults of color from outside the community…. And then the African-American community has the burden of a not-great history with the medical community in America. So, those are the kinds of things in our collective history… that make it difficult to be able to accept mental health issues for a lot of families." Brandi Walker*, Addressing Barriers and Disparities: Black Americans and ADHD,* Children and Adults with Attention-Deficit/Hyperactivity Disorder, February, 2021. (Exhibit 1).

Through the rose-colored lens of Dr. Gordon, Mrs. King would have had the knowledge, understanding, and foresight as a young black mother, to have Dr. Kitchens evaluated for ADHD, receive an Individualized Educational Plan (IEP) for official accommodations, and maintain copies of progress reports, report cards,

and parent-teacher evaluations, for over twenty years. However, according to Dr. Rahn Bailey, "[r]esearch indicates that African-American children are less likely to be diagnosed with *and treated for* ADHD than are white children with similar levels of symptoms." (emphasis added). Rahn Bailey, *Tackling Myths and Misinformation*, Children and Adults with Attention-Deficit/Hyperactivity Disorder, June 2010. Dr. Kitchens provided all of the medical evidence that supported his diagnoses in his possession at the time of applying for accommodations.

The documentation provided in his applications contained: a letter from his treating physician, who, relying on diagnostic information, concluded that Dr. Kitchens' ADHD caused him more difficulty than most people; an official accommodation from the Medical University of Lublin (MUL), an accredited medical university with the Educational Commission for Foreign Medical Graduates (ECFMG), who recognized Dr. Kitchens was eligible for accommodations under the ADA, and a history of diagnoses which indicates Dr. Kitchens was not seeking accommodations on the USMLE solely to receive an advantage.

Similar to *Berger v. NBME*, Dr. Kitchens received intervention in grade school and tutoring at home with family. (DE 26: Declaration of Dr. Kitchens) Dr. Kitchens received interventions at each level of academia and post-graduate. *Id.* This is indicative of the impairment continuing from adolescence up and through young adulthood to the present.

Ultimately, the "opinion of the [plaintiff's] treating physician must be given great weight" because the plaintiff's need for accommodation is 'principally a medical issue'." *Agranoff v. Law School Admission Council*, 97 F.Supp. 2d 86, 87 (D. Mass. 1999) quoting *D'Amico v. New York State Bd. of Law Examiners*, 813 F.Supp. 217, 221 (W.D.N.Y. 1993). Dr. Kitchens has provided the NBME medical evidence that demonstrates multiple licensed medical professionals across multiple states have recognized Dr. Kitchens' need for accommodations and medication to manage his disability.

### ii. Dr. Gordon Improperly Weighed Dr. Kitchens' Academic Success

Therefore, the analysis shifts to whether or not the impairment substantially limits a major life activity. The DOJ regulations interpreting the ADAAA state that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the

ADA," and "is not meant to be a demanding standard." *Id.* quoting 28 C.F.R. § 36.105(d)(1)(i). Additionally, "the 'substantially limits' inquiry 'should not demand extensive analysis,'" and "'[t]he comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence.'" *Id.* quoting *Ramsay v. Nat'l Bd. of Med. Examiners*, 968 F. 3d 251, 258-29, (3rd Cir., July, 2020).

Dr. Kitchens has been substantially limited in major life activities outside of an educational setting. During his deposition, Dr. Kitchens testified that he was a car salesman at CarMax and then a Manager at Kroger. (Trans. 15-16). Neither of these positions rely on reading comprehension skills. Unlike *Bibber v. Nat'l Bd. of Osteopathic Med. Examiners*, wherein the Ms. Bibber testified in her deposition that she "enjoys reading despite it being difficult for her" the Court held that her testimony regarding her ability to complete everyday reading tasks… [and] agree[ing] with opposing counsel's assertion that she is an avid reader…" Dr. Kitchens maneuvers his post-academic life to avoid reading-comprehension tasks and job positions altogether. *Bibber v. Nat'l Bd. of Osteopathic Med. Examiners*, 2016 WL 1404157, 18, 7 (E.D. Pa. 2016).

While test-taking may not be a major life activity considered under the ADA, "reading, thinking, communicating, and working" are. 42 U.S.C.S. §12102(2)(A). From employment to whether subtitles are on the television during a movie, Dr. Kitchens ameliorates the effects of his disability by utilizing mitigating measures such as working in positions that do not require significant reading comprehension and/or focus for a prolonged periods of time or turning the television up to "scream" i.e. the maximum volume; these mitigating measures are not allowed to considered in determining whether his impairment substantially limits major life activities. 29 C.F.R. §1630.2(j)(5).

In Poland, Adderall is considered an illegal narcotic that requires the approval of the Chief Pharmaceutical Inspector. See Exhibit 2. In looking at Dr. Kitchens' transcripts from MUL, at no point did Dr. Kitchens' performance in school drastically change whether he was on medication or not. See Exhibit 3. On the contrary, there was a drastic difference in the scores Dr. Kitchens received on the three CBSSAs

taken in preparation for STEP 1 and the actual exams. See Exhibit 4. When presented side by side, the vignettes for the STEP 1 exam are two-to-three times longer than the vignettes for the CBSSA. Arguably, the CBSSA scores indicate the need for Dr. Kitchens to have additional time; the CBSSA in a timed setting demonstrates how Dr. Kitchens would perform on the STEP *with* additional time accommodations due to the discrepancies in length. See Exhibit 5.

In *Rothberg* the Court held "I will not penalize Plaintiff for her compensation abilities." *Rothberg v. Law School Admission Council*, 300 F. Supp. 2d 1093, 26 (D. Colo. 2004). While the court was referring to the plaintiff's compensatory skills in standardized tests such as the LSAT, GRE, and SAT, the rationale behind the decision is sound.

> "The district court's decision in *Bartlett* is instructive. In that case the defendants contend that the plaintiff could not have a reading deficiency because, among other things, plaintiff scored within average on the LSAT, GRE, and SAT without accommodations. The problem with that analysis according to the court was that it relied 'on quantitative outcomes alone'. *Rothberg* at 24 quoting *Bartlett v. New York State Bd. of Law Examiners,* 226 F.3d 69, 3 (2nd Cir. 1988).

So too, this Court should not penalize Dr. Kitchens for his compensation abilities both in and out of school. However, the *existence of* the mitigating factors can in fact be considered in determining whether an impairment is substantially limiting. In *Harty v. City of Sanford*, the Court opined that it must "hypothesize whether Harty would be 'substantially limited' in the absence of any mitigating factors… There is some evidence to suggest that Harty would be substantially limited without his mitigating behavior." *Harty v. City of Sanford*, 2012 U.S. Dist. LEXIS 111121, 11 (M.D. Fl. Aug. 2012). Similar to Harty, Dr. Kitchens has demonstrated that he is substantially limited without his self-mitigating factors and the accommodations provided to him.

II. **The Irreparable Harm is Immediate, Present, and Actual**

The harm caused by the NBME does not merely end simply because Dr. Kitchens cannot make the 2023 NRMP. While it was a motivating factor for filing the motion for preliminary injunction, Defendant NBME conveniently overlooks the fact that Dr. Kitchens still presently faces irreparable harm but for the injunctive relief requested. Currently, Dr. Kitchens has three failed attempts at STEP 1 on his USMLE

transcript, and two additional failed attempts at STEP 2. Should he pass the STEP 1 exam - he still cannot receive licensure in 19 states, nor can he apply to over two-hundred and twenty residency programs. DE 26: FSMB State Specific Requirements for Medical Licensure. Should he fail the STEP 1 exam - he can never receive licensure. Either way, Dr. Kitchens is permanently harmed by the repeated refusal to provide reasonable testing accommodations.

Furthermore, while Dr. Kitchens may not be able to make the 2023 Match, as the NBME has stated, the Match program is a 'lengthy, multi-step process' that "spans many months-beginning as early as the fall of your third year of medical school." *See* DE 26-23: 'How to Apply for Residency'. Should Dr. Kitchens be denied the injunctive relief and asked to pursue his claim until trial, he will inevitably end up back before this Court asking for injunctive relief a second time. To wit, according to the AAMC 'Token Information' Website, the 2024 ERAS Season begins in June, 2023, which is a mere 3 months away. See Exhibit 6.

As the Court opined in *Rothberg v. Law School Admission Council, Inc.*,

> "even if plaintiff is required to demonstrate a specific injury other than the ADA violation, I find she has done so. If [Plaintiff] is required to wait until a full trial on the merits, any relief granted at that time will likely be moot, as she will… have been deprived of the opportunity to demonstrate her true abilities unimpeded by her disability." *Rothberg v. Law School Admission Council Inc.*, 300 F. Supp. 2d 1093, 25 (D. Colo. 2004).

Dr. Kitchens' already suffered a delay once due to the pandemic. The NBME points to the gap year between Dr. Kitchens' prep course ending in February, 2021 and when he sat for the exam in February, 2022; this conveniently places the blame for the delay on Dr. Kitchens, rather than acknowledging the fact that there was an ongoing epidemic and the prometric centers had closed in response to the COVID-19 pandemic and were not considered 'essential' until approximately June, 2021. See Exhibit 7.

Dr. Kitchens' injuries substantially outweigh the NBME's in both permanency and in severity. The NBME states that its interests are to "ensur[e] fairness to other examinees, preserve the integrity of the USMLE, and protect[] the public welfare by ensuring that accommodations are only provided to those with disabilities under the ADA." DE 26: NBME's Opposition to Motion for Preliminary Injunction, 21 ¶¶ C. However, the methodology with which the NBME determines which disabled applicants receive

accommodations are prejudiced against racial and ethnic individuals – particularly in lower socioeconomic status. "ADHD service discrepancies for racially and ethnically diverse individuals can occur throughout the lifespan, beginning in early childhood and can occur regardless of the severity of symptoms." Gornik, Allison, *Healthcare Disparities and ADHD*, August, 2022 at 1. In refusing Dr. Kitchens' accommodations, the NBME hinders its very mission.

      a.  **Injunctive Relief Includes Expungement**

By requesting ADA accommodations for the STEP examinations, Dr. Kitchens – as would the NBME – recognizes that without said accommodations, his STEP scores will not accurately reflect his competency and knowledge of medicine. The NBME states that an expungement of his transcript would "prevent residency programs and state medical boards responsible for protecting the public from knowing his prior test outcomes", however, should residency programs and state medical boards be permitted to consider his prior failed attempts, they will weigh heavily on the results of Dr. Kitchens' disability. Not his capability.

Or in the alternative, Dr. Kitchens will be left with no other recourse than to disclose his disability and the efforts expended in being provided accommodations to every residency program he applied to. The expungement is preventive in that, but for the NBME's failure to provide accommodations, Dr. Kitchens would have been provided the opportunity to be evaluated on his knowledge and competency rather than his disability.

Moreover, Dr. Kitchens' request for expungement is not a case of first impression. In *Agranoff v. Law School Admission Council*, the Court held that "[s]hould Judge Zobel decide in Defendant's favor on the merits, Plaintiff's exam score from the October 2 examination may be deleted." *Agranoff v. Law Sch. Admission Council, Inc*., 97 F. Supp. 2d 86, 87 (D. Mass. 1999). While the Court was referencing to the Defendant, LSAC, when talking about the score deletion – the fact of the matter remains, Dr. Kitchens' request for an expungement is a remedy that can be provided and is appropriate in the case at hand.

**III.**    **Dr. Kitchens' Fears Has Been Realized and Publicized**

In addition to the harm felt by Dr. Kitchens by the NBME's denial for accommodations, Dr. Kitchens now gets to enjoy the permanent stain on his reputation caused by the NBME. The NBME and their third-

party consulting expert point to Dr. Kitchens' lack of accommodations through his academic career as an indicator that his claim for accommodations is due to his attempt to 'malinger' healthcare professionals and gain an unfair advantage over his neurotypical peers. This is patently false and an outrageous accusation that no prior applicant received. Unlike the plaintiffs in *Ramsey, Sampson,* and *Berger*, Dr. Kitchens did not have the available resources to go get evaluated; in Dr. Kitchens' deposition, he stated:

> "I tried to look for different providers. I have to find providers that is going to be inside of my network for my insurance. And then when I notice that, you know, everyone is turning it down, I have to now figure out how I'm going to pay for an evaluation." (Trans. 98-99).

The NBME's position is appalling but not surprising. "Stigma is a huge problem, and it causes a lot of barriers to treatment and care." Napoleon Higgins, Black Adults Who Live With ADHD, October 2021. Even Dr. Higgins, an African American Psychiatrist, appreciated this fear in stating:

> "[r]ealize that anything you can and say will possibly be used against you, be it mental health or any other thing that is going on with you. So, I would be careful about who I share any mental health or physical health diagnosis with." *Id* at 30.

This was precisely what Dr. Kitchens feared as a newly diagnosed young black man. As he stated in his deposition "it's embarrassing…. [I]f I got this official request and went through the school's registrar, then no matter what when they see that registration they are going to see a flag saying that this particular student needs accommodations." (Trans. 117).

The NBME has transparently demonstrated its opinion towards disabled physicians. Rather than acknowledge the disability that Dr. Kitchens has, the NBME now accuses Dr. Kitchens of malingering and questions his competency to deliver safe and effective care. DE 26: NBME's Opposition to Motion for Preliminary Injunction, 16-17.

## CONCLUSION

The material facts of the case at hand are this: Dr. Kitchens applied for reasonable testing accommodations and the NBME denied them. The Motion brought by Dr. Kitchens is the direct and proximate result of Defendant NBME's discriminatory actions. In his application, Dr. Kitchens provided all of the documentation he had, and throughout the course of his litigation, has been able to provide additional documentation at significant monetary and timely cost. The fact of his mental impairment, as

evidenced by his ADHD and anxiety diagnoses, is well documented and the substantial limitations it inflicts on him has been established. The irreparable harm has already been inflicted as indicated by his inability to practice in nineteen states, as well as further deprivation of the opportunity to demonstrate his true abilities. Therefore, Dr. Kitchens hereby requests that his Motion for Preliminary Injunction be GRANTED.

Respectfully submitted,

*/s/ Dr. Markcus Kitchens*
Dr. Markcus Kitchens
625 Hampton Way, #2
Richmond, KY 40475
T: (423) 314-4096
markzwanz@gmail.com
***Pro Se Plaintiff***

**CERTIFICATE OF SERVICE**

It is hereby certified that a true and accurate copy of the foregoing was filed electronically via the Pacer system and served to the following on February 23, 2023.

Jared D. Bayer
Cozen O'Connor
One Liberty Place
1650 Market Street, Ste. 2800
Philadelphia, PA 19103
T: (215) 665-4127
***Counsel for Defendant***
***National Board of Medical Examiners***

Caroline M. Mew
Perkins Coie LLP
700 Thirteenth Street, N.W., Ste. 800
Washington, D.C. 20005-3960
T: (202) 654-6200
E: CMew@perkinscoie.com
***Counsel for Defendant***