UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DR. MARKCUS KITCHENS, JR. | ) | |
| PLAINTIFF | ) | |
| | ) | CIVIL ACTION NO.: |
| v. | ) | 2:22-CV-03301-JMY |
| | ) | |
| UNITED STATES MEDICAL LICENSING EXAMINATION, | ) | |
| ET. AL | ) | |
| DEFENDANTS | ) | |
| | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Comes the Plaintiff, Dr. Markcus Kitchens, Jr. (hereby "Dr. Kitchens"), pro se, and Replies in Support of his Motion for Preliminary Injunction and Memorandum. In support of his Reply, Dr. Kitchens states as follows:

**ARGUMENT**

I.   **Dr. Kitchens Has Met His Burden Of Proof**

a.   **Dr. Kitchens Has A Disability**

Dr. Kitchens has a disability under the ADA. As established in his medical records, Connors CPT3 evaluation, and his ADHD Evaluation conducted by Ms. Bacon, Dr. Kitchens has longstanding diagnoses of anxiety and ADHD-combined. *See* DE 26: Notice of Filing of Exhibits.

The NBME does not dispute that ADHD is considered an impairment. 28 C.F.R. §36.105(b)(1)(ii),(2). ("As to the term 'impairment,' the applicable Department of Justice regulations provide that the term physical or mental impairment includes ADHD and dyslexia and other specific learning disabilities.") *Ramsay v. Nat'l Bd. Of Med. Examiners*, 968 F.3d 251, 2 (3rd Cir., July, 2020); ("Specific learning disorders, dyslexia, and ADHD are considered impairments under the ADA.") *Berger v. Nat'l Bd. of Med. Examiners*, 2019 U.S. Dist. LEXIS 145666, 57 (S. D. Ohio, August, 2019); ("[a] mental impairment is 'any mental or psychological disorder, such as an intellectual disability…, organic brain

syndrome, emotional or mental illness, and specific learning disabilities.") *Healy v. Nat'l Bd. of Osteopathic Med. Examiners, Inc.*, 870 F. Supp. 2d 607, 616 (S.D. Ind., 2012).

Dr. Kitchens' medical records dating back as far as 2013 demonstrates having an active diagnosis for ADHD. Additionally, in approximately 1998, Dr. Kitchens' was diagnosed by his treating pediatrician with ADHD. *See* DE 26: Declaration of Missie King. As such, the onset of Dr. Kitchens' symptomology was consistent and pervasive, evensofar as childhood.

### i. Dr. Gordon patently ignores the African American Diaspora and its Effect on Underdiagnosis

From Dr. Gordon's declaration, Dr. Kitchens age at the time of diagnosis is the proverbial 'nail in the coffin' as to why he does not meet the DSM-5 criteria for ADHD. The NBME would rely on Michael Gordon, a professor of psychiatry who has never evaluated nor interviewed Dr. Kitchens, over the clinical decisions of treating physicians throughout the years to determine the legitimacy of Dr. Kitchens' medical history. Specifically, he states:

> "the requirement for a childhood onset flows from the fact that ADHD is a neurodevelopmental disorder, and thus, by definition, must appear during development. An individual does not 'come down' with ADHD later in life." *See* DE 26-21, Declaration of M. Gordon, p. 3, ¶9.

While this is true, Dr. Gordon's opinion demonstrates his prejudices and biases as a clinician and, particularly as a non-Afrocentric psychologist. As discussed by Dr. Evelyn Polk Green, a past president of both Children and Adults with Attention-Deficit/Hyperactivity Disorder (CHADD) and the Attention Deficit Disorder Association (ADDA):

> "[i]t was stigma then. It was understanding, and stigma both within the African-American community and then stereotypes about kids and adults of color from outside the community…. And then the African-American community has the burden of a not-great history with the medical community in America. So, those are the kinds of things in our collective history… that make it difficult to be able to accept mental health issues for a lot of families." Brandi Walker, *Addressing Barriers and Disparities: Black Americans and ADHD,* Children and Adults with Attention-Deficit/Hyperactivity Disorder, February, 2021. (Exhibit 1).

Through the rose-colored lens of Dr. Gordon, Mrs. King would have had the knowledge, understanding, and foresight as a young black mother, to have Dr. Kitchens evaluated for ADHD, receive an Individualized Educational Plan (IEP) for official accommodations, and maintain copies of progress reports, report cards,

and parent-teacher evaluations, for over twenty years. However, according to Dr. Rahn Bailey, "[r]esearch indicates that African-American children are less likely to be diagnosed with *and treated for* ADHD than are white children with similar levels of symptoms." (emphasis added). Rahn Bailey, *Tackling Myths and Misinformation*, Children and Adults with Attention-Deficit/Hyperactivity Disorder, June 2010. Dr. Kitchens provided all of the medical evidence that supported his diagnoses in his possession at the time of applying for accommodations.

The documentation provided in his applications contained: a letter from his treating physician, who, relying on diagnostic information, concluded that Dr. Kitchens' ADHD caused him more difficulty than most people; an official accommodation from the Medical University of Lublin (MUL), an accredited medical university with the Educational Commission for Foreign Medical Graduates (ECFMG), who recognized Dr. Kitchens was eligible for accommodations under the ADA, and a history of diagnoses which indicates Dr. Kitchens was not seeking accommodations on the USMLE solely to receive an advantage.

Similar to *Berger v. NBME*, Dr. Kitchens received intervention in grade school and tutoring at home with family. (DE 26: Declaration of Dr. Kitchens) Dr. Kitchens received interventions at each level of academia and post-graduate. *Id.* This is indicative of the impairment continuing from adolescence up and through young adulthood to the present.

Ultimately, the "opinion of the [plaintiff's] treating physician must be given great weight" because the plaintiff's need for accommodation is 'principally a medical issue'." *Agranoff v. Law School Admission Council*, 97 F.Supp. 2d 86, 87 (D. Mass. 1999) quoting *D'Amico v. New York State Bd. of Law Examiners*, 813 F.Supp. 217, 221 (W.D.N.Y. 1993). Dr. Kitchens has provided the NBME medical evidence that demonstrates multiple licensed medical professionals across multiple states have recognized Dr. Kitchens' need for accommodations and medication to manage his disability.

### ii.  Dr. Gordon Improperly Weighed Dr. Kitchens' Academic Success

Therefore, the analysis shifts to whether or not the impairment substantially limits a major life activity. The DOJ regulations interpreting the ADAAA state that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the

ADA," and "is not meant to be a demanding standard." *Id.* quoting 28 C.F.R. § 36.105(d)(1)(i). Additionally, "the 'substantially limits' inquiry 'should not demand extensive analysis,'" and "'[t]he comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence.'" *Id.* quoting *Ramsay v. Nat'l Bd. of Med. Examiners*, 968 F. 3d 251, 258-29, (3rd Cir., July, 2020).

Dr. Kitchens has been substantially limited in major life activities outside of an educational setting. During his deposition, Dr. Kitchens testified that he was a car salesman at CarMax and then a Manager at Kroger. (Trans. 15-16). Neither of these positions rely on reading comprehension skills. Unlike *Bibber v. Nat'l Bd. of Osteopathic Med. Examiners*, wherein the Ms. Bibber testified in her deposition that she "enjoys reading despite it being difficult for her" the Court held that her testimony regarding her ability to complete everyday reading tasks… [and] agree[ing] with opposing counsel's assertion that she is an avid reader…" Dr. Kitchens maneuvers his post-academic life to avoid reading-comprehension tasks and job positions altogether. *Bibber v. Nat'l Bd. of Osteopathic Med. Examiners*, 2016 WL 1404157, 18, 7 (E.D. Pa. 2016).

While test-taking may not be a major life activity considered under the ADA, "reading, thinking, communicating, and working" are. 42 U.S.C.S. §12102(2)(A). From employment to whether subtitles are on the television during a movie, Dr. Kitchens ameliorates the effects of his disability by utilizing mitigating measures such as working in positions that do not require significant reading comprehension and/or focus for a prolonged periods of time or turning the television up to "scream" i.e. the maximum volume; these mitigating measures are not allowed to considered in determining whether his impairment substantially limits major life activities. 29 C.F.R. §1630.2(j)(5).

In Poland, Adderall is considered an illegal narcotic that requires the approval of the Chief Pharmaceutical Inspector. See Exhibit 2. In looking at Dr. Kitchens' transcripts from MUL, at no point did Dr. Kitchens' performance in school drastically change whether he was on medication or not. See Exhibit 3. On the contrary, there was a drastic difference in the scores Dr. Kitchens received on the three CBSSAs

taken in preparation for STEP 1 and the actual exams. See Exhibit 4. When presented side by side, the vignettes for the STEP 1 exam are two-to-three times longer than the vignettes for the CBSSA. Arguably, the CBSSA scores indicate the need for Dr. Kitchens to have additional time; the CBSSA in a timed setting demonstrates how Dr. Kitchens would perform on the STEP *with* additional time accommodations due to the discrepancies in length. See Exhibit 5.

In *Rothberg* the Court held "I will not penalize Plaintiff for her compensation abilities." *Rothberg v. Law School Admission Council*, 300 F. Supp. 2d 1093, 26 (D. Colo. 2004). While the court was referring to the plaintiff's compensatory skills in standardized tests such as the LSAT, GRE, and SAT, the rationale behind the decision is sound.

> "The district court's decision in *Bartlett* is instructive. In that case the defendants contend that the plaintiff could not have a reading deficiency because, among other things, plaintiff scored within average on the LSAT, GRE, and SAT without accommodations. The problem with that analysis according to the court was that it relied 'on quantitative outcomes alone'. *Rothberg* at 24 quoting *Bartlett v. New York State Bd. of Law Examiners,* 226 F.3d 69, 3 (2nd Cir. 1988).

So too, this Court should not penalize Dr. Kitchens for his compensation abilities both in and out of school. However, the *existence of* the mitigating factors can in fact be considered in determining whether an impairment is substantially limiting. In *Harty v. City of Sanford*, the Court opined that it must "hypothesize whether Harty would be 'substantially limited' in the absence of any mitigating factors… There is some evidence to suggest that Harty would be substantially limited without his mitigating behavior." *Harty v. City of Sanford*, 2012 U.S. Dist. LEXIS 111121, 11 (M.D. Fl. Aug. 2012). Similar to Harty, Dr. Kitchens has demonstrated that he is substantially limited without his self-mitigating factors and the accommodations provided to him.

## II.   The Irreparable Harm is Immediate, Present, and Actual

The harm caused by the NBME does not merely end simply because Dr. Kitchens cannot make the 2023 NRMP. While it was a motivating factor for filing the motion for preliminary injunction, Defendant NBME conveniently overlooks the fact that Dr. Kitchens still presently faces irreparable harm but for the injunctive relief requested. Currently, Dr. Kitchens has three failed attempts at STEP 1 on his USMLE

transcript, and two additional failed attempts at STEP 2. Should he pass the STEP 1 exam - he still cannot

receive licensure in 19 states, nor can he apply to over two-hundred and twenty residency programs. DE

26: FSMB State Specific Requirements for Medical Licensure. Should he fail the STEP 1 exam - he can

never receive licensure. Either way, Dr. Kitchens is permanently harmed by the repeated refusal to provide

reasonable testing accommodations.

Furthermore, while Dr. Kitchens may not be able to make the 2023 Match, as the NBME has stated,

the Match program is a 'lengthy, multi-step process' that "spans many months-beginning as early as the

fall of your third year of medical school." *See* DE 26-23: 'How to Apply for Residency'. Should Dr.

Kitchens be denied the injunctive relief and asked to pursue his claim until trial, he will inevitably end up

back before this Court asking for injunctive relief a second time. To wit, according to the AAMC 'Token

Information' Website, the 2024 ERAS Season begins in June, 2023, which is a mere 3 months away. See

Exhibit 6.

As the Court opined in *Rothberg v. Law School Admission Council, Inc.*,

"even if plaintiff is required to demonstrate a specific injury other than the ADA violation,
I find she has done so. If [Plaintiff] is required to wait until a full trial on the merits, any
relief granted at that time will likely be moot, as she will… have been deprived of the
opportunity to demonstrate her true abilities unimpeded by her disability." *Rothberg v. Law
School Admission Council Inc.*, 300 F. Supp. 2d 1093, 25 (D. Colo. 2004).

Dr. Kitchens' already suffered a delay once due to the pandemic. The NBME points to the gap year between

Dr. Kitchens' prep course ending in February, 2021 and when he sat for the exam in February, 2022; this

conveniently places the blame for the delay on Dr. Kitchens, rather than acknowledging the fact that there

was an ongoing epidemic and the prometric centers had closed in response to the COVID-19 pandemic and

were not considered 'essential' until approximately June, 2021. See Exhibit 7.

Dr. Kitchens' injuries substantially outweigh the NBME's in both permanency and in severity. The

NBME states that its interests are to "ensur[e] fairness to other examinees, preserve the integrity of the

USMLE, and protect[] the public welfare by ensuring that accommodations are only provided to those with

disabilities under the ADA." DE 26: NBME's Opposition to Motion for Preliminary Injunction, 21 ¶¶ C.

However, the methodology with which the NBME determines which disabled applicants receive

accommodations are prejudiced against racial and ethnic individuals – particularly in lower socioeconomic status. "ADHD service discrepancies for racially and ethnically diverse individuals can occur throughout the lifespan, beginning in early childhood and can occur regardless of the severity of symptoms." Gornik, Allison, *Healthcare Disparities and ADHD*, August, 2022 at 1. In refusing Dr. Kitchens' accommodations, the NBME hinders its very mission.

### a.   Injunctive Relief Includes Expungement

By requesting ADA accommodations for the STEP examinations, Dr. Kitchens – as would the NBME – recognizes that without said accommodations, his STEP scores will not accurately reflect his competency and knowledge of medicine. The NBME states that an expungement of his transcript would "prevent residency programs and state medical boards responsible for protecting the public from knowing his prior test outcomes", however, should residency programs and state medical boards be permitted to consider his prior failed attempts, they will weigh heavily on the results of Dr. Kitchens' disability. Not his capability.

Or in the alternative, Dr. Kitchens will be left with no other recourse than to disclose his disability and the efforts expended in being provided accommodations to every residency program he applied to. The expungement is preventive in that, but for the NBME's failure to provide accommodations, Dr. Kitchens would have been provided the opportunity to be evaluated on his knowledge and competency rather than his disability.

Moreover, Dr. Kitchens' request for expungement is not a case of first impression. In *Agranoff v. Law School Admission Council*, the Court held that "[s]hould Judge Zobel decide in Defendant's favor on the merits, Plaintiff's exam score from the October 2 examination may be deleted." *Agranoff v. Law Sch. Admission Council, Inc.*, 97 F. Supp. 2d 86, 87 (D. Mass. 1999). While the Court was referencing to the Defendant, LSAC, when talking about the score deletion – the fact of the matter remains, Dr. Kitchens' request for an expungement is a remedy that can be provided and is appropriate in the case at hand.

## III.   Dr. Kitchens' Fears Has Been Realized and Publicized

In addition to the harm felt by Dr. Kitchens by the NBME's denial for accommodations, Dr. Kitchens now gets to enjoy the permanent stain on his reputation caused by the NBME. The NBME and their third-

party consulting expert point to Dr. Kitchens' lack of accommodations through his academic career as an indicator that his claim for accommodations is due to his attempt to 'malinger' healthcare professionals and gain an unfair advantage over his neurotypical peers. This is patently false and an outrageous accusation that no prior applicant received. Unlike the plaintiffs in *Ramsey, Sampson,* and *Berger*, Dr. Kitchens did not have the available resources to go get evaluated; in Dr. Kitchens' deposition, he stated:

> "I tried to look for different providers. I have to find providers that is going to be inside of my network for my insurance. And then when I notice that, you know, everyone is turning it down, I have to now figure out how I'm going to pay for an evaluation." (Trans. 98-99).

The NBME's position is appalling but not surprising. "Stigma is a huge problem, and it causes a lot of barriers to treatment and care." Napoleon Higgins, Black Adults Who Live With ADHD, October 2021. Even Dr. Higgins, an African American Psychiatrist, appreciated this fear in stating:

> "[r]ealize that anything you can and say will possibly be used against you, be it mental health or any other thing that is going on with you. So, I would be careful about who I share any mental health or physical health diagnosis with." *Id* at 30.

This was precisely what Dr. Kitchens feared as a newly diagnosed young black man. As he stated in his deposition "it's embarrassing…. [I]f I got this official request and went through the school's registrar, then no matter what when they see that registration they are going to see a flag saying that this particular student needs accommodations." (Trans. 117).

The NBME has transparently demonstrated its opinion towards disabled physicians. Rather than acknowledge the disability that Dr. Kitchens has, the NBME now accuses Dr. Kitchens of malingering and questions his competency to deliver safe and effective care. DE 26: NBME's Opposition to Motion for Preliminary Injunction, 16-17.

## CONCLUSION

The material facts of the case at hand are this: Dr. Kitchens applied for reasonable testing accommodations and the NBME denied them. The Motion brought by Dr. Kitchens is the direct and proximate result of Defendant NBME's discriminatory actions. In his application, Dr. Kitchens provided all of the documentation he had, and throughout the course of his litigation, has been able to provide additional documentation at significant monetary and timely cost. The fact of his mental impairment, as

evidenced by his ADHD and anxiety diagnoses, is well documented and the substantial limitations it inflicts on him has been established. The irreparable harm has already been inflicted as indicated by his inability to practice in nineteen states, as well as further deprivation of the opportunity to demonstrate his true abilities. Therefore, Dr. Kitchens hereby requests that his Motion for Preliminary Injunction be GRANTED.

Respectfully submitted,

*/s/ Dr. Markcus Kitchens*
Dr. Markcus Kitchens
625 Hampton Way, #2
Richmond, KY 40475
T: (423) 314-4096
markzwanz@gmail.com
***Pro Se Plaintiff***

## CERTIFICATE OF SERVICE

It is hereby certified that a true and accurate copy of the foregoing was filed electronically via the Pacer system and served to the following on February 23, 2023.

Jared D. Bayer
Cozen O'Connor
One Liberty Place
1650 Market Street, Ste. 2800
Philadelphia, PA 19103
T: (215) 665-4127
***Counsel for Defendant***
***National Board of Medical Examiners***

Caroline M. Mew
Perkins Coie LLP
700 Thirteenth Street, N.W., Ste. 800
Washington, D.C. 20005-3960
T: (202) 654-6200
E: CMew@perkinscoie.com
***Counsel for Defendant***

# Addressing Barriers and Disparities

## Black Americans and ADHD

**I**N HONOR OF BLACK HISTORY MONTH 2021, CHADD will host a series of important conversations. Our theme for these special activities is *Building a More Culturally Sensitive World: Awareness. Listening. Understanding.* These three words are the foundation of how CHADD will lead the fight. Begin learning about ADHD in the African-American community with these excerpts from recent *All Things ADHD* podcasts, edited for length and clarity, and join us for much more.



### Brandi Walker, PhD

### Health Disparities: Barriers to ADHD Diagnosis and Treatment

Not every community in the United States has the resources available to help individuals and families cope with the challenges that come from ADHD. What are the consequences of late diagnosis and treatment for ADHD in underserved and disenfranchised communities? Brandi Walker, PhD, (MAJ, US Army), shares her insights about what healthcare provides, parents, and educators can do to decrease health disparities. Dr. Walker is a clinical psychologist at Womack Army Medical Center at Fort Bragg, North Carolina, who works directly with service members and their families.

*Key takeaways:*
One of the things that we're focusing on is what we will call health disparities. Those are barriers to diagnosis or barriers with assessment or treatment, and they're based around different factors, such as not being able to have access to care, or access to opportunities for care or access to resources. A lot of those barriers are because of socioeconomic status. They may be because of demographic differences, such as race or ethnicity, maybe age or disability status. So, there are several reasons that kind of contribute to health disparities and why they continue to exist.

Oftentimes we see a lot of disparities for the African-American population and the Latino-American population. It also shows up with different populations, people with various immigrant statuses, so it happens quite frequently.

There are challenges with systems in terms of maybe school systems, maybe programming, maybe communities, access to those resources that would alternatively provide the care—so, not being able to get a diagnosis, for instance, for African Americans. Some African-American kids will get a diagnosis two years later than their counterparts, which means that they're academically behind. They may have a learning disability going on as well. A lot of times with ADHD there's also comorbid anxiety or depression. So, it's having all of those challenges that you typically wouldn't have if you weren't demographically differentiated in terms of resources and support.

And that gap is what we would consider in some cases or a lot of cases when it continuously happens for populations that are underserved or historically underrepresented. Those are the ones where you start seeing a difference in care. And when you see the difference in care, you start seeing a difference in school and academic achievement. You see the difference with adults and their productivity. You see the difference in stability. And the other component of health disparities is the increase for health problems that people would not actually be susceptible to. So, they're preventable medical conditions or medical problems that would otherwise be prevented if the person would have had proper access to care.

For children with ADHD, diagnosed or undiagnosed, the rate of high school dropout is 35%. Most kids get diagnosed at age seven, but an African-American child may not get their diagnosis until nine. So then, it's a two-year loss of academic achievement, or they may be minimally achieving when they could have been achieving well beyond what they actually are getting because of the diagnosis. That same child, as they're moving along to the next grade and next grade, they're just kind of falling behind, falling behind and the ability to get them where they're supposed to be is such a larger challenge than had they been receiving the care all along. And so those are the students who probably are at a greater risk for dropping out of school or disconnecting. Low self-esteem is another impact.

The issue of health disparities is very real. We see it all the time and just understanding, raising awareness that it does happen, and that there is something that every person can do. Practitioners, teachers, everybody can be involved.



### Evelyn Polk Green, MSEd

### Combating ADHD in the African-American Community

Undiagnosed or untreated ADHD in African-American youth creates a higher risk for dropping out of school, abusing substances, and engaging in delinquent activities that may lead to incarceration. ADHD advocate Evelyn Polk Green, MSEd, discusses options and strategies for families. An adult with ADHD who has two adult sons with ADHD, she is a past president of both CHADD and ADDA.

MK000001

**Key takeaways:**
I think one of the biggest barriers that's still around is stigma. I've been doing ADHD advocacy for well over 20 years. It was stigma then. It was understanding, and stigma both within the African-American community and then stereotypes about kids and adults of color from outside of the community. I can recall being told that kids in the city didn't have ADHD, they had behavioral disorders. So, we get those kinds of stereotypes. And then, the African-American community has the burden of a not-great history with the medical community in America. So, those are the kinds of things that are in our collective history, in our collective memory banks, that make it difficult to be able to accept mental health issues for a lot of families.

It's starting to change very slowly. One of the reasons it's changing is that there are more and more people willing to speak up and speak out, like myself and others who are willing to say, "I have ADHD and I'm proud." There's also the fact that we hear more and more about depression and anxiety and other mental health issues, like PTSD, in the media, on television, on the news. So, I think it's getting better, and that's also affecting the African-American community.

I've seen some change, so it's not completely hopeless, but not the kind of change that I would want to see. A big reason that I got into the advocacy and worked with CHADD and with ADDA for so many years is because I wanted to see a difference and to erase some of that stigma, especially in communities of color. That had been my goal. That's why I tell my story, is because I'm hoping that'll help reduce some of the stigma. But it's still not the kind of change that I would like to see.

Parents still struggle with medication issues in the African-American community. I get that, but 20 years ago it was, "I'll never put my child on medication." And now I hear people willing to listen and to think about it and consider it. So, things have improved. They're willing to say, "My child might have ADHD," or "I may have it." So things are improving, it's just that still, we have so much work to do.



### Nekeshia Hammond, PsyD
**Overcoming Myths and Mistrust About ADHD in the Black Community**
African-American parents often question the validity of their child's ADHD diagnosis. Nekeshia Hammond, PsyD, explains what parents need to know about the elements of a comprehensive evaluation for ADHD. She discusses common myths about ADHD in the Black community and explains why healthcare professionals and educators need culturally competent training.

**Key takeaways:**
I really feel that if possible, parents should think about getting a comprehensive psychological evaluation. Some providers are taking five or ten minutes only to hear about symptoms of inattention. The CDC has also said with the majority of kids that have ADHD, there's also something else going on that needs to be addressed as well. So it's really important to have a comprehensive evaluation for ADHD and other things that could be impacting this child.

Ideally, a comprehensive evaluation should take a couple of hours. Sometimes children are gifted and they're so bored in the classroom that they look really inattentive. Or sometimes the opposite end, children's IQs are lower so they may just be struggling with learning. Looking at that, and looking at ADHD measures and depression, anxiety, and trauma measures—all of these things that impact—it takes a couple of hours to do that type of assessment versus a five-minute appointment where a parent says to a physician, "My child's struggling with attention."

There's this unfortunate aspect, particularly with African-American youth, that for some families ADHD may be underdiagnosed because of the stigma of mental health, the worry and concern about the label "ADHD." But then on the other end, sometimes it's too quickly diagnosed. I've had children that have come into my office and literally have said that they are afraid of the racism they're experiencing at school from other students. These are real concerns and affect attention and concentration. But I've seen it go both ways. It's definitely a real concern to properly evaluate for ADHD in Black youth.

I would hope that schools will really start to look at how to have more cultural competence. Every child obviously is just not the same as far as how they learn, as far as their backgrounds, as far as their racial and ethnic identities; there's unique things for different children. This educational system will never, ever work with a cookie-cutter approach.

My hope is that more schools will take the time to recognize how important it is to be culturally competent. To understand trauma-informed education, to understand the unique needs of Black youth, Hispanic youth, and kids from all different backgrounds. And for the educators to learn and be aware of their own stereotypes and biases that they bring into the classroom, because all of this affects youth—especially if a child has ADHD and is in need of special education services.

I found that in some schools that have a greater need of cultural competence, there's a ton of services in the community, but in the school itself, some families have no idea what's available to them. We have to bridge the gap, and that comes with understanding culture, understanding needs, understanding mental health. That's really where the school system needs to start if we're going to make a change and help these youths. **Ⓐ**

CHADD.org

# Know Before You Go: International Travel with ADHD Medications

❮ **ADHD Weekly, January 16, 2020** (https://chadd.org/weekly-editions/adhd-weekly-january-16-2020/)



Do you plan to travel out of the United States, either for business or on vacation? Before you go, you need to reach out to both the US Department of State and the embassy of the country you plan to visit if you intend to take your ADHD medication with you.

"Travelers should not assume that medications approved in the US are approved in another country," the State Department advises (https://www.osac.gov/Content/Report/93c0b3f6-1d6e-4bef-a78d-15f4ad938dd3). "At least two months before departure, the traveler should consult with the treating physician about specific medications and obtain a list of comparable, generic names, including their dosage and composition, in case there is a need for a refill if the medication is licensed."

**What could happen if you don't check**

The State Department describes (https://www.osac.gov/Content/Report/93c0b3f6-1d6e-4bef-a78d-15f4ad938dd3) the situation of a US citizen who was arrested while visiting Japan after her stimulant medication was shipped to her there. She had requested the medication be repackaged in the hope of protecting her privacy. Her prescription Adderall, which is an amphetamine (https://d393uh8gb46l22.cloudfront.net/wp-content/uploads/2021/09/ADHD-MEDICATIONS-APPROVED-BY-THE-US-FDA-2021.pdf), is not legal in Japan.

"She was released after 18 days and heavy US legislative- and diplomatic-level lobbying," the State Department reports. It warns that other countries, including countries in the Middle East, Asia, and Southeast Asia also ban or restrict ADHD medications commonly prescribed in the United States. European countries often have limitations on these medications, making it important for you or your doctor to check on regulations in those countries before you travel overseas with your medications. You should also contact the State Department (http://www.state.gov/) for additional information.

**Not all countries allow stimulant medications**

"It's important to understand that some US prescriptions are actually considered illegal narcotics in Europe, such as Adderall and other stimulant drugs used to treat ADHD," says Micaela Kliegl (https://www.saiprograms.com/transport-medicine-europe), SAI Programs' vice president of

enrollment services. SAI helps to place students in study abroad programs. "Even if your US doctor prescribed these medications legally to you in the US, that won't fly in Europe. You can still bring them legally, but you need to have the right documentation."

In some countries where certain medications are banned, being found with stimulant medications could mean being arrested.

**Preparing for your trip abroad**

In addition to the State Department's recommendation that you contact the embassy of the country you plan to visit and discuss your travel plans with your doctor, consider the following:

- How can you receive official approval to bring your medication if it is limited in your destination country?
- What medications can your doctor prescribe for you that are legal in your destination country?
- Is there a local doctor with whom you can consult in your destination country? Is there a pharmacy nearby that carries your medication and can accept a US prescription?
- Will your insurance cover overseas medical care or do you need to purchase additional insurance?

Getting answers to these questions as early as possible will allow you to make needed changes to your treatment plan before you leave. If you are traveling with an organization, study abroad program, cruise line, or other agency, contact that agency for additional information or recommendations.

**Medication travel tips**

- Make sure the label on the medication bottle identifies the person who has been prescribed the medication.
- Always carry medications in their original containers, listing both brand and generic names.
- Keep medications with you in a carry-on bag or purse. All adults should carry their own medication. An adult caring for a child can carry the child's medication along with the child's travel paperwork.
- Carry a copy of your doctor's prescription and the reason for your medication.
- Keep information about your diagnosis or medications to yourself to reduce the risk of theft while traveling.
- Make sure you have enough medication to cover your entire trip. If you will need your medication refilled, discuss this with your doctor ahead of time. Look for a pharmacy near your hotel, Airbnb, or hostel that can refill your prescription if needed.

**Learn more before you go:**

- Traveling Abroad with Medicine (https://www.cdc.gov/features/travel-medicine/index.html)
- Your Health Abroad (https://travel.state.gov/content/travel/en/international-travel/before-you-go/your-health-abroad.html)
- US State Department: Learn About Your Destination (https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages.html)
- Contact Info for Foreign Embassies & Consulates (https://travel.state.gov/content/travel/en/consularnotification/ConsularNotificationandAccess.html)

*Join the discussion: Have your traveled to another country with your ADHD medication? What was your experience?* (https://healthunlocked.com/adult-adhd/posts/142452805/adhd-weekly-international-travel-with-adhd-medications)

MK000004

## Other Articles in this Edition

Know Before You Go: International Travel with ADHD Medications (https://chadd.org/adhd-weekly/know-before-you-go-international-travel-with-adhd-medications/)

Study Shows Omega-3s Benefit Some Children With ADHD (https://chadd.org/adhd-weekly/study-shows-omega-3s-benefit-some-children-with-adhd/)

Webinar: Taking On Children's Chronis Stress (https://chadd.org/adhd-weekly/webinar-taking-on-childrens-chronis-stress/)

CHADD does not endorse products, services, publications, medications, or treatments, including those advertised in any CHADD publications, webinars or podcasts.

CHADD.org

MK000005

**gov.pl**  



EN ⌄

# Chief Pharmaceutical Inspectorate

**MENU** ⌄

‹ **Back**

# Transport of narcotic and psychotropic substances necessary for medical treatment when crossing the border of the Republic of Poland

Information for travellers relating to the export or import of narcotic and psychotropic substances necessary for medical treatment when crossing the border of the Republic of Poland.

The Pharmaceutical Law Act of 6 September 2001 (Journal of Laws 2016.2142, as amended) and the Regulation of the Minister of Health of 16 March 2017 on Detailed Conditions and Mode of Issuing Approvals and Documents Necessary for Import, Export, Intra-Community Acquisition or Intra-Community Supply of Narcotic Drugs, Psychotropic Substances, or Category 1 Precursors (Journal of Laws 686) specifically regulate the matters related to the import or export of the above medicines for one's own medicinal purposes when crossing the border of the Republic of Poland.

Pursuant to Article 68(5) of the Pharmaceutical Law Act, the import of a medicinal product from abroad for one's own medicinal purposes does not require the consent of the President of the Office if the import concerns no more than five packages of the smallest size.

However, the Article 68(5) does not apply to narcotic drugs and psychotropic substances, the import of which is specified by the Counteracting Addictions Act of 29 July 2005 (Journal of Laws of 2016, items 224, 437, and 1948) and veterinary medicinal products intended for animals used to obtain tissues or products intended for human consumption. (Article 68(6) of the Pharmaceutical Law Act).

**gov.pl**

Pursuant to Article 6 of the above-mentioned regulation, the competent voivodeship pharmaceutical inspector or the competent military pharmaceutical inspector issues documents allowing intra-Community supply or intra-Community acquisition of narcotic drugs or psychotropic substances for one's own medicinal purposes as instructed in the decision of the Executive Committee of 22 December 1944 on the certificate provided for in Article 75 to carry narcotic drugs and psychotropic substances (OJ L 239, 22.09.2000, p. 463, as amended – Official Journal of the European Union, Special Polish Edition, chapter 19, volume 2, page 416).

The Chief Pharmaceutical Inspector issues documents allowing the import or export of narcotic drugs, psychotropic substances, or category 1 precursors for one's own medicinal purposes based on a prescription or medical documentation relating to the recommended use of a particular medicinal product (Article 7 of the above-mentioned regulation)

Based on Article 8 of the above-mentioned regulation, the documents allowing the import, export, intra-Community supply, or intra-Community acquisition of narcotic drugs, psychotropic substances, or category 1 precursors for one's own medicinal purposes are issued within 15 days before crossing the border of the Republic of Poland for a definite period of time no longer than 30 days in two copies, of which:

1. one copy is retained by the issuing authority;
2. one copy is retained by the entity to which the document has been issued in order to submit it to the customs authorities.

The template of the document allowing the intra-Community supply or intra-Community acquisition of narcotic drugs, psychotropic substances for one's own medicinal purposes is provided in Appendix 3 to the Regulation, while the template of the document allowing the import or export of narcotic drugs, psychotropic substances, or category 1 precursors for one's own medicinal purposes is provided in Appendix 4 to the Regulation (Article 9(3 and 4) of the above-mentioned Regulation).

# Materials

### Import or export of psychotropic substances aplication

Dokument_umożliwiający_przywóz_lub_wywóz_środków_odurzających,_substancji_psychotropowych_lub_prekursorów_kategorii_1_na_własne_potrzeby_lecznicze.docx       0.05MB

### Intra-Community import or export of psychotropic substances aplication

Dokument_umożliwiający_wewnątrzwspólnotową_dostawę_lub_wewnątrzwspólnotowe_nabycie_środków

MK000007

_odurzających_lub_substancji_psychotropowych_na_własne_potrzeby_lecznicze.docx        0.05MB

**gov.pl**



 **gov.pl**

Cookie policy

Civil service

Trusted profile

Public Information Bulletin

Copyrights

Gov.pl accessibility declaration

Pages available in the www.gov.pl domain may contain e-mail addresses. By clicking an e-mail address provided as a link, you consent to the processing of your data (e-mail address and other data provided on a voluntary basis in the message) in order for the recipient to send a response to the submitted questions. The details concerning processing of personal data by each unit can be found in their respective policies concerning the processing of personal data.

         All content published on this website is covered by a Creative Commons Attribution 3.0 PL license, unless stated otherwise.







MK000008

# MEDICAL UNIVERSITY OF LUBLIN

### ENGLISH LANGUAGE DIVISION
### OF THE MEDICAL FACULTY

Ul. Chodźki 19

20-093 Lublin

tel.
+ 48 81:
     448 63 10

fax
+ 48 81:
     448 63 11

## OFFICIAL TRANSCRIPT OF GRADES

**Date Issued:** August 4, 2021
**Student Name:** **Markcus Zwanz Kitchens Jr.**
**Address:** Mercellus Dr 238 #2
Berea 40403
KY, USA
**Date of Birth:** 26-01-1992
**Social Security Number:** XXX-XX-4147
**Year of Enrollment:** 2016
**Date of Graduation :** January 8, 2021
**Degree received :** physician/MD

**Grade Point Computation:**

| | | |
|---|---|---|
| A | = | 4.00 |
| A- | = | 3.67 |
| B+ | = | 3.33 |
| B | = | 3.00 |
| C | = | 2.00 |
| F | = | 0.00 |

**Other Marks:**
N = the course continues
P= pass
W = withdrew
X  = course in progress
R   = repeated course
GPS = grade points
GPA  = grade point average
GRD HRS = graded hours
EX = exempted

Grades N, P are not used for computing grade-point average.

**Conversion Scale:**
The grades given have been converted from the Polish numerical grading scale: 5.0=A, 4.5=A-, 4.0=B+, 3.5=B, 3.0=C, 2.0=F.  Generally, an A reflects 90% or above, B reflects 80% or above, C is 70% or above of the possible points.  Below 70% is failing.

**Length of Academic Period:**
A semester is nineteen weeks.  The hours stated next to the course are the hours spent both in lecture and laboratory class.



MK000009

# MEDICAL UNIVERSITY OF LUBLIN

### ENGLISH LANGUAGE DIVISION
### OF THE MEDICAL FACULTY

Ul. Chodźki 19                                              20-093 Lublin

tel.
  + 48 81:
      448 63 10

fax
  + 48 81:
      448 63 11

Student's Name: **Markcus Zwanz Kitchens Jr.**

**YEAR I & II (SEMESTERS I-IV)**
Premed courses accepted on the basis of transcript from Berea College, KY, USA.

**(FALL) 2016/2017:  YEAR III / SEMESTER V**

| COURSE TITLE | HOURS | GRADE |
|---|---|---|
| Human Anatomy I | 100 | C |
| Histology with Embryology I | 100 | C |
| Biochemistry and Molecular Biology I | 75 | C |
| Human Physiology I | 70 | C |
| Biostatistics | 30 | B |
| Genetics | 70 | C |
| Polish | 30 | B+ |
| Ethics | 30 | A |
| Medical Psychology | 30 | B+ |
| Simulation-Based Behavioral Science | 50 | C |
| ALS/BLS | 30 | B |
| Health and Safety | 4 | P |
| Epidemiology | 25 | C |
| Hygiene and Nutrition | 15 | A- |
| Public Health | 30 | A |
| Parasitology | 15 | B |

**TOTAL HRS: 704**
**GRADED HRS: 700**
**GPS: 1,699.85**
**GPA: 2.43**

**(SPRING) 2016/2017:  YEAR III / SEMESTER VI**

| COURSE TITLES | HOURS | GRADE |
|---|---|---|
| Human Anatomy II | 95 | C |
| Histology with Embryology  II | 50 | B |
| Biochemistry and Molecular Biology II | 75 | F |
| Human Physiology II | 65 | C |
| History of Medicine | 10 | C |
| Medical Sociology | 20 | A |
| Polish | 30 | B+ |
| Immunology | 35 | A |
| Cell and Neoplasm Biology | 30 | B+ |
| Physical Basis of Medicine | 60 | B |
| Integrated Basic Science | 31 | B |

**TOTAL HRS: 501**
**GRADED HRS: 501**
**GPS: 1,182.8**
**GPA: 2.36**

MK000010

# MEDICAL UNIVERSITY OF LUBLIN

## ENGLISH LANGUAGE DIVISION
### OF THE MEDICAL FACULTY

Ul. Chodźki 19        20-093 Lublin

tel.
  + 48 81:
     448 63 10

fax
  + 48 81:
     448 63 11

Student's Name: **Markcus Zwanz Kitchens Jr.**

### (FALL) 2017/2018: YEAR IV / SEMESTER VII

| COURSE TITLE | HOURS | GRADE |
|---|---|---|
| Clinical Anatomy with Surgery and Radiology | 20 | B+ |
| Basic Clinical Skills | 15 | A |
| Laboratory Diagnostics | 70 | C |
| Clinical Immunology | 55 | A |
| Pharmacology with Toxicology I | 60 | C |
| Medical Microbiology I | 35 | B |
| Pathophysiology | 90 | A- |
| Pathomorphology I | 70 | C |
| Polish | 30 | A- |
| Biochemistry and Molecular Biology II [R] | 75 | C |

> **TOTAL HRS: 520**
> **GRADED HRS: 520**
> **GPS: 1,442**
> **GPA: 2.78**

### (SPRING) 2017/2018: YEAR IV / SEMESTER VIII

| COURSE TITLE | HOURS | GRADE |
|---|---|---|
| Introduction to Clinical Medicine | 30 | B+ |
| Neuropharmacology | 40 | C |
| Physical Diagnosis | 90 | A |
| Pharmacology with Toxicology II | 60 | C |
| Medical Microbiology II | 35 | C |
| Pathomorphology II | 100 | C |

> **TOTAL HRS: 355**
> **GRADED HRS: 355**
> **GPS: 929.9**
> **GPA: 2.62**

Total for 4 semesters:

> **TOTAL HRS: 2,080**
> **GRADED HRS: 2,076**
> **GPS: 5,254.55**
> **GPA: 2.54**



Page 3 of 4    MK000011

# MEDICAL UNIVERSITY OF LUBLIN

## ENGLISH LANGUAGE DIVISION
### OF THE MEDICAL FACULTY

Ul. Chodźki 19

20-093 Lublin

tel.
+ 48 81:
448 63 10

fax
+ 48 81:
448 63 11

Student's Name: **Markcus Zwanz Kitchens Jr.**

### 2018/2019: YEAR V / SEMESTER IX

| COURSE TITLE | WEEKS | GRADE |
|---|---|---|
| Neurology | 3 weeks | B+ |
| Forensic Medicine | 1 week | A- |
| Ophthalmology | 2 weeks | B |
| Anesthesiology | 2 weeks | B |
| Infectious Diseases | 2 weeks | C |
| Oncology | 2 weeks | A |
| Dermatology | 2 weeks | B+ |
| Orthopedics/Rehabilitation | 2 weeks | A |
| ENT | 2 weeks | B+ |
| ER | 2 weeks | A |
| Anesthesiology – choice elective | 2 weeks | A |
| Neurology – choice elective | 5 weeks | A |

### 2019/2020: YEAR V / SEMESTER X

| COURSE TITLE | WEEKS | GRADE |
|---|---|---|
| *Jackson Park Hospital, IL, USA* | | |
| Family Medicine | 6 weeks | A |
| *LSU Brentwood Hospital, LA, USA* | | |
| Psychiatry | 6 weeks | A |
| *Jackson Park Hospital, IL, USA* | | |
| Internal Medicine | 12 weeks | A |

### 2019/2020: YEAR VI / SEMESTER XI

| COURSE TITLE | WEEKS | GRADE |
|---|---|---|
| *Jackson Park Hospital, IL, USA* | | |
| Internal Medicine – choice elective | 12 weeks | A |
| Radiology/Nuclear medicine | 3 weeks | A |
| Neurosurgery – choice elective | 12 weeks | A |
| OB./GYN. | 6 weeks | A |

### 2020/2021: YEAR VI / SEMESTER XI/XII

| COURSE TITLE | WEEKS | GRADE |
|---|---|---|
| *Jackson Park Hospital, IL, USA* | | |
| Pediatrics | 6 weeks | A |
| Surgery | 12 weeks | A |
| Pediatrics Family Medicine | 3 weeks | A |

**All clinical semesters:**
**TOTAL HRS: 3,875**
**GRADED HRS: 3,875**
**GPS: 14,942.7**
**GPA: 3.86**

Medical University of Lublin
VICE-DEAN of Faculty of Medicine

dr hab. Tomasz Blicharski, MD, Ph.D.

National Board of Medical Examiners®
**Performance Profile**

# NBME® SELF-ASSESSMENTS

## COMPREHENSIVE BASIC SCIENCE SELF-ASSESSMENT

### EXAMINEE PERFORMANCE REPORT



Name:  Kitchens,  Markcus Zwanz                                   Test Date:  3/21/2022

## Total Equated Percent Correct Score: 77%

The chart below represents the performance of a 2020 national cohort of students from LCME-accredited medical schools. Your total equated percent correct (EPC) score on this CBSSA exam is shown along with a range that corresponds to low passing performance (above but near the minimum passing score) on the United States Medical Licensing Examination® (USMLE®) Step 1.

**Based on your performance on this CBSSA, your estimated probability of passing Step 1 if you test within a week is 99%.**



Your Total Equated Percent Correct Score

Your CBSSA likely score range (73 - 81)

LP: Step 1 Low-Pass Range

## Interpreting Your Overall Results:
• **Readiness for Step 1:** Since CBSSA and Step 1 cover very similar content, CBSSA performance can be used in conjunction

Next                                                                          Help

MK000013



mynbme.org

NBME

MARKCUS ...

HOME   PURCHASE   MY EXAMS   PURCHASE HISTORY   SUPPORT

Registration

| Product | Form Name | Pacing | Order Payment Date | Order |
|---|---|---|---|---|
| Comprehensive Basic Science Self-Assessment (CBSSA) | Form 27 | Pacing: Standard | 3/20/2022, 7:24 PM | O-0001884783 |

✓ ✓ Assessment Complete

You completed your assessment on March 21, 2022.
Please note that feedback may be displayed over several pages.
**When viewing results interactively, you may need to maximize the browser window in order to view all navigation buttons.**
Please download a copy of your score report. Your score report will be available online until March 20, 2024.

View Your Results Interactively

Download Your Score Report

### Exam Information

Form
Form 27

Score Report Date
3/21/2022, 7:06 AM

Pacing
Pacing: Standard

Exam Start Date
3/20/2022, 11:54 PM

Exam Completion Date
3/21/2022, 5:17 PM

Exam Expiration Date
6/18/2022, 7:24 PM

### Registration Information

First Name
Markcus

Middle Name

Birthdate

Candidate ID

Get Help Now

**Access our support archive**

or

Create a Case

MK000014



# NBME® SELF-ASSESSMENTS

## COMPREHENSIVE BASIC SCIENCE SELF-ASSESSMENT (CBSSA)

### EXAMINEE PERFORMANCE REPORT



Name:  Kitchens, Markcus Zwanz

Test Date:  4/1/2022

## Total Equated Percent Correct Score: 69%

The chart below represents the performance of a 2020 national cohort of students from LCME-accredited medical schools. Your total equated percent correct (EPC) score on this CBSSA exam is shown along with a range that corresponds to low passing performance (above but near the minimum passing score) on the United States Medical Licensing Examination® (USMLE®) Step 1.

**Based on your performance on this CBSSA, your estimated probability of passing Step 1 if you test within a week is 97%.**



Your Total Equated Percent Correct Score

Your CBSSA likely score range (65 - 73)

LP: Step 1 Low-Pass Range

## Interpreting Your Overall Results:

- **Readiness for Step 1:** Since CBSSA and Step 1 cover very similar content, CBSSA performance can be used in conjunction with other information to assess readiness for Step 1.
- **Your CBSSA equated percent correct score** represents the percentage of the content that you have mastered. It has been statistically adjusted to account for slight variations in exam form difficulty and may be slightly lower or higher than the actual percentage of questions you answered correctly on this specific form.
- **Your estimated probability of passing Step 1** can range from 1 to 99% and is calculated using a statistical model based on examinees who tested within one week of taking Step 1 for the first time. If you tested more than a week before you are scheduled to take it, your estimated probability may be different.
- **Many factors (e.g., changing levels of knowledge) may impact your performance on Step 1,** so your estimated probability is not a guarantee of your future Step 1 performance.
- **Your likely score range** indicates how much your score could change if you tested again without learning or forgetting. Under those conditions, your CBSSA score would fall within 4 points of your current score two-thirds of the time.
- **A PDF version of your report** is typically available within 4 hours. To review your score before then, log in to MyNBME, click on the registration ID associated with this assessment, then click Review Your Results Interactively.

# NBME® SELF-ASSESSMENTS

## COMPREHENSIVE BASIC SCIENCE SELF-ASSESSMENT (CBSSA)



MK000016

## EXAMINEE PERFORMANCE REPORT

Name:  Kitchens,  Markcus Zwanz

Test Date:  4/1/2022

## Interpreting Your Content Area Results:

- **Your equated percent correct (EPC) scores** indicate the percentage of the content that you have mastered. EPC scores may be slighty lower or higher than the actual percentage of questions you answered correctly on this specific exam form because they are statistically adjusted to account for slight variations in exam form difficulty.

- **The comparison group average EPC score** represents the estimated performance of the 2020 cohort of Step 1 first-takers from LCME-accredited medical schools on CBSSA.

- **The green boxes** indicate whether your performance was statistically lower, about the same, or statistically higher than the performance of the comparison group after taking into account the precision of each content area score. Content area EPC scores are less precise than total test EPC scores, so small differences in content area scores should not be overinterpreted.

- **You may use this report to identify areas of strength and weakness**. Keep in mind that some content areas are more difficult than others, and some comprise larger portions of the exam.

- **The percentage of questions contributing to each content area** stays in the same range as shown in the column labeled % of Items across CBSSA, CBSE (Comprehensive Basic Science Examination), and Step 1 exam forms. The percentages may not add up to 100%.

| | **Your EPC Score** | Comparison Group Average EPC Score | Score Comparison: Lower Same Higher | % of Items |
|---|---|---|---|---|
| **Performance by Physician Task** | | | | |
| MK: Applying Foundational Science Concepts | **64** | 79 | Lower | 60-70% |
| PC: Diagnosis | **82** | 83 | Same | 20-25% |
| PBLI: Evidence-Based Medicine | **67** | 80 | Lower | 4-6% |

## NBME® SELF-ASSESSMENTS

### COMPREHENSIVE BASIC SCIENCE SELF-ASSESSMENT (CBSSA)

### EXAMINEE PERFORMANCE REPORT



MK000017

Name:  Kitchens,  Markcus Zwanz                                    Test Date:  4/1/2022

| Performance by System | Your EPC Score | Comparison Group Average EPC Score | Score Comparison: Lower Same Higher | % of Items |
|---|---|---|---|---|
| General Principles | 54 | 78 | | 12-16% |
| Behavioral Health & Nervous Systems/Special Senses | 78 | 80 | | 9-13% |
| Reproductive & Endocrine Systems | 62 | 81 | | 9-13% |
| Respiratory and Renal/Urinary Systems | 69 | 79 | | 9-13% |
| Blood & Lymphoreticular and Immune Systems | 77 | 81 | | 7-11% |
| Multisystem Processes & Disorders | 74 | 82 | | 6-10% |
| Musculoskeletal, Skin, & Subcutaneous Tissue | 85 | 82 | | 6-10% |
| Cardiovascular System | 54 | 79 | | 5-9% |
| Gastrointestinal System | 67 | 80 | | 5-9% |
| Biostatistics & Epidemiology/Population Health | 67 | 80 | | 4-6% |

# NBME® SELF-ASSESSMENTS

## COMPREHENSIVE BASIC SCIENCE SELF-ASSESSMENT (CBSSA)

## EXAMINEE PERFORMANCE REPORT



Name:  Kitchens,  Markcus Zwanz                                    Test Date:  4/1/2022



MK000018

2/23/23, 8:58 AM

| | **Your EPC Score** | Comparison Group Average EPC Score | Score Comparison: Lower  Same  Higher | % of Items |
|---|---|---|---|---|
| **Performance by Discipline** | | | | |
| Pathology | **70** | 81 | | 44-52% |
| Physiology | **67** | 80 | | 25-35% |
| Microbiology & Immunology | **59** | 81 | | 16-26% |
| Biochemistry & Nutrition | **58** | 81 | | 14-24% |
| Pharmacology | **79** | 83 | | 15-22% |
| Gross Anatomy & Embryology | **76** | 76 | | 11-15% |
| Behavioral Sciences | **94** | 87 | | 8-13% |
| Histology & Cell Biology | **58** | 78 | | 8-13% |
| Genetics | **64** | 80 | | 5-9% |

MK000019



NBME

HOME    PURCHASE    MY EXAMS    PURCHASE HISTORY    SUPPORT

MARKCUS ...

Registration

| Product | Form Name | Pacing | Order Payment Date | Order |
|---|---|---|---|---|
| Comprehensive Basic Science Self-Assessment (CBSSA) | Form 30 | Pacing: Standard | 4/1/2022, 9:05 AM | O-0001902294 |

Assessment Complete

You completed your assessment on April 1, 2022.
Please note that feedback may be displayed over several pages.
**When viewing results interactively, you may need to maximize the browser window in order to view all navigation buttons.**
Please download a copy of your score report. Your score report will be available online until March 31, 2024.

View Your Results Interactively

Download Your Score Report

### Exam Information

Form
Form 30

Pacing
Pacing: Standard

Exam Start Date
4/1/2022, 9:08 AM

Exam Completion Date
4/1/2022, 2:05 PM

Exam Expiration Date
6/30/2022, 9:05 AM

Score Report Date
4/1/2022, 3:37 PM

Get Help Now

**Access our support archive**

or

Create a Case

### Registration Information

First Name
Markcus

Middle Name

Last Name

Birthdate

Candidate ID

Street Address

MK000020

# National Board of Medical Examiners®

## NBME®
## Comprehensive Basic Science Self-Assessment (CBSSA) Score Report

**NAME:** Kitchens, Markcus Zwanz

**TEST DATE:** 2/14/2022

### Your Performance

# Assessment Score:  212

### Your Performance Compared to Step 1 Examinees

The chart below represents the distribution of scores for recent examinees from US and Canadian medical schools taking Step 1 for the first time. Reported Step 1 scores range from 1-300 with a mean of 232 and a standard deviation of 19.



- Your Score
- Minimum Passing Score
- Mean Step 1 Score
- Expected Step 1 score range

**Your previous scores:**
02/14/2022 - 212
09/13/2021 - 143
07/12/2021 - 151

Because the Comprehensive Basic Science Self-Assessment (CBSSA) and United States Medical Licensing Examination® (USMLE®) Step 1 cover very similar content, CBSSA performance can be used in conjunction with other information to assess readiness for Step 1. Your CBSSA score represents an estimate of your performance on the USMLE Step 1 if you had taken both exams under the same conditions and with the same level of knowledge. Estimated performance based on taking CBSSA is not a guarantee of your future performance on Step 1. Many factors, including changing levels of knowledge and testing

MK000021

2/23/23, 9:48 AM

conditions, may result in a Step 1 score that is higher or lower than your estimated score.

We anticipate that your actual performance on Step 1 will fall in the range from **202-228** about two-thirds of the time. This range is based on students who took CBSSA within one week before taking Step 1.

Longitudinal performance is provided for exams purchased on or after March 24, 2021. The test dates listed within this score report reflect the exam's completion date.

A PDF version of your score report will be available within 4 hours of completing your exam. There may be longer delays during maintenance periods. To review your score before then, log in to MyNBME, click on the registration ID associated with this assessment, then click Review Your Results Interactively.

MK000022

# National Board of Medical Examiners®

### NBME® Comprehensive Basic Science Self-Assessment (CBSSA) Score Report

**NAME:**  Kitchens,  Markcus Zwanz                    **TEST DATE:**  2/14/2022

### Your Strengths and Weaknesses

The boxes below indicate areas of relatively lower or higher performance in each content area within this examination. The percentage range of items in each content area on CBSSA is indicated below. This information can be used to identify areas of strength and weakness to guide future study. Because the exam is highly integrative, NBME recommends reviewing all content areas if retaking the test.

**Strengths and Weaknesses Relative to Your Overall Performance on this exam:** An orange box in the "Higher" column indicates that your performance in that area was higher than your overall examination performance shown on page 1. An orange box in the "Same" column indicates that your performance in that area was similar to or the same as your overall examination performance. An orange box in the "Lower" column indicates that your performance in that area was lower than your overall examination performance.

**Strengths and Weaknesses Relative to a Step 1 Comparison Group:** A blue box in the "Higher" column indicates that your performance in that area was higher than the average performance of recent examinees from US and Canadian medical schools taking Step 1 for the first time (comparison group). A blue box in the "Average" column indicates that your performance in that area was average relative to the performance of the comparison group. A blue box in the "Lower" column indicates that your performance in that area was lower than the average performance of the comparison group.

## Performance by Physician Task

| | | Lower, Same, Higher than Your Overall Performance | | | Lower, Average, Higher than Comparison Group | | |
|---|---|---|---|---|---|---|---|
| **(% Items Per Test)** | | Lo | S | Hi | Lo | Av | Hi |
| **MK: Applying Foundational Science Concepts** | **(68-75%)** | | ▨ | | ▨ | | |
| **PC: Diagnosis** | **(18-25%)** | | ▨ | | | ▨ | |
| **PBLI: Evidence-Based Medicine** | **(6-6%)** | | ▨ | | ▨ | | |

MK000023

# National Board of Medical Examiners®

### NBME® Comprehensive Basic Science Self-Assessment (CBSSA) Score Report

**NAME:**  Kitchens,  Markcus Zwanz                    **TEST DATE:**  2/14/2022

## Performance by System

| System | (% Items Per Test) | Lower, Same, Higher than Your Overall Performance | | | Lower, Average, Higher than Comparison Group | | |
|---|---|---|---|---|---|---|---|
| | | Lo | S | Hi | Lo | Av | Hi |
| General Principles | (14-14%) | | S | | Lo | | |
| Reproductive & Endocrine Systems | (13-13%) | | S | | | Av | |
| Behavioral Health & Nervous Systems/Special Senses | (11-12%) | | | Hi | | Av | |
| Respiratory and Renal/Urinary Systems | (12-12%) | | S | | Lo | | |
| Blood & Lymphoreticular and Immune Systems | (10-10%) | | S | | | Av | |
| Multisystem Processes & Disorders | (9-9%) | | S | | | Av | |
| Musculoskeletal, Skin, & Subcutaneous Tissue | (9-9%) | Lo | | | Lo | | |
| Cardiovascular System | (8-8%) | | S | | Lo | | |
| Gastrointestinal System | (7-7%) | | S | | | Av | |
| Biostatistics & Epidemiology/Population Health | (6-6%) | | S | | Lo | | |

MK000024

# National Board of Medical Examiners®

## NBME® Comprehensive Basic Science Self-Assessment (CBSSA) Score Report

**NAME:**  Kitchens,  Markcus Zwanz                    **TEST DATE:**  2/14/2022

## Performance by Discipline

| | (% Items Per Test) | Lower, Same, Higher than Your Overall Performance | | | Lower, Average, Higher than Comparison Group | | |
|---|---|---|---|---|---|---|---|
| | | Lo | S | Hi | Lo | Av | Hi |
| **Pathology** | (46-49%) | �in Lo | | | ▧ Lo | | |
| **Physiology** | (27-31%) | | S | | ▧ Lo | | |
| **Pharmacology** | (17-18%) | | S | | ▧ Lo | | |
| **Biochemistry & Nutrition** | (14-18%) | | S | | ▧ Lo | | |
| **Microbiology** | (13-14%) | | S | | ▧ Lo | | |
| **Gross Anatomy & Embryology** | (12-14%) | | | Hi | | Av | |
| **Histology & Cell Biology** | (9-12%) | | S | | ▧ Lo | | |
| **Behavioral Sciences** | (8-9%) | | S | | | Av | |
| **Genetics** | (6-6%) | | | Hi | | Av | |

**To review the answer key, log in to MyNBME, click on the registration ID associated with this assessment, then click Review Your Results Interactively.**

MK000025

MK000026



mynbme.org

NBME

MARKCUS ...

HOME PURCHASE MY EXAMS PURCHASE HISTORY SUPPORT

Registration
[redacted]

| Product | Form Name | Pacing | Order Payment Date | Order |
|---|---|---|---|---|
| Comprehensive Basic Science Self-Assessment (CBSSA) | Form 25 | Pacing: Standard | 2/14/2022, 3:06 AM | O-0001840299 |

Assessment Complete

You completed your assessment on February 14, 2022.
Please note that feedback may be displayed over several pages.
**When viewing results interactively, you may need to maximize the browser window in order to view all navigation buttons.**
Please download a copy of your score report. Your score report will be available online until February 14, 2024.

View Your Results Interactively

Download Your Score Report

## Exam Information

Form
Form 25

Score Report Date
2/14/2022, 11:08 AM

Pacing
Pacing: Standard

Exam Start Date
2/14/2022, 3:59 AM

Exam Completion Date
2/14/2022, 9:13 AM

Exam Expiration Date
5/15/2022, 4:06 AM

Get Help Now

Access our support archive
or
Create a Case

## Registration Information

First Name
Markcus [redacted]

Birthdate
[redacted]

Middle Name

Candidate ID
[redacted]

Last Name

Street [redacted]

A 28-year-old man who has urinary frequency with dysuria that has increased in severity during the past month. He also has had episodes of blood in his urine during the past 5 years. He lived in sub-Saharan Africa until he came to the USA 6 months ago for graduate school. Temperature is 38.0°C (100.4°F), pulse is 80/min, respirations are 16/min, and blood pressure is 110/84 mm Hg. Physical examination shows suprapubic tenderness. Laboratory studies show:

| | |
|---|---|
| Hemoglobin | 12.3 g/dL |
| Hematocrit | 37% |
| Leukocyte count | 13,400/mm$^3$ |
| Segmented neutrophils | 65% |
| Bands | 5% |
| Eosinophils | 5% |
| Lymphocytes | 22% |
| Monocytes | 3% |
| Serum | |
| Urea nitrogen | 75 mg/dL |
| Creatinine | 3.8 mg/dL |
| Urine | |
| Blood | 3+ |
| RBC | 200/hpf |
| WBC | 100/hpf |
| RBC casts | absent |
| WBC casts | absent |

Imaging studies show bilateral hydroureter and hydronephrosis and foci of calcification in the region of the bladder. A biopsy specimen of the bladder shows marked chronic inflammation with fibrosis and scattered granulomas. Which of the following best explains the biopsy findings?

(A) Exposure to a chemical toxin

(B) Interstitial cystitis

(C) Malacoplakia

(D) Schistosomiasis

(E) Vesicoureteral reflux

(Answer: **D**)

MK000028

In This Section

**Example Question: Applying Foundational Science Concepts (Female Reproductive System)**

**Example Question: History and Physical Examination (Multisystem)**

A 6-year-old boy is brought to the office by his mother because of a 1-month history of bleeding gums after brushing his teeth, increasingly severe muscle and joint pain, fatigue, and easy bruising. His mother says he has lost six baby teeth and has been irritable during this time. Use of acetaminophen has provided minimal relief of his pain. He has autism spectrum disorder. He is not toilet-trained. He has a 10-word vocabulary. Vital signs are within normal limits. On examination, he appears alert but does not speak or make eye contact. Skin is pale and coarse. Examination of the scalp shows erythematous hair follicles. Dentition is poor, and gingivae bleed easily to touch. Multiple ecchymoses and petechiae are noted over the trunk and all extremities. There is marked swelling and tenderness to palpation of the elbow, wrist, knee, and ankle joints. He moves all extremities in a limited, guarded manner. Deep tendon reflexes are absent throughout. It is most appropriate to obtain specific additional history regarding which of the following in this patient?

(A) Diet

(B) Evidence of pica

(C) Herbal supplementations

(D) Lead exposure

(E) Self-injurious behaviors

(Answer:  **A**)

**Example Question: Diagnosis (Renal/Urinary System)**

MK000029

# Quick Links

# 2023-2024 ERAS Residency Application Dates and Deadlines

**\*Specific dates for 2023-2024 have not yet been released by AAMC.**

The following ERAS dates and deadlines for 2023-2024 come directly from the AAMC website. Check this resource for the most up-to-date information regarding deadlines.

| | |
|---|---|
| End of May 2023 | ERAS 2023 season ends at 5 p.m. ET. |
| Beginning of June 2023 | ERAS 2024 season begins at 9 a.m. ET. |
| Beginning of August 2023 | Supplemental ERAS application opens for applicants. |
| Beginning of September 2023 | Residency applicants may begin submitting MyERAS applications to programs at 9 a.m. ET. |
| Mid-September 2023 | Supplemental ERAS application closes for applicants at 5 p.m. ET. |
| End of September 2023 | Residency programs may begin reviewing MyERAS applications, MSPEs, and supplemental ERAS application data (if applicable) in the PDWS at 9 a.m. ET. |
| End of May 2024 | ERAS 2024 season ends at 5 p.m. ET. |

MK000030

**AAMC**

Home    Application Process ▾    Document Submission ▾    Timeline    Extra Links ▾

# Token Information

The token is a fourteen-digit alpha-numeric code that is sent to you via email. You need this token to register at MyERAS to begin the fellowship application process. Detailed login instructions will be included in your token email.

You may request an ERAS token for the ERAS 2023 season starting June 09. The token request process will capture your identification information and email address. Simply follow the prompts to complete the token request process. A **non-refundable** $165.00 fee is required for token issuance payable by credit card.

You will receive a token via email once the token request has been processed and the transaction has been approved. To ensure that your token gets to your inbox, please add support@erasfellowshipdocuments.org to your email Address Book or Safe List. If you do not receive your electronic token, check your Junk mail; otherwise, send an email to support@erasfellowshipdocuments.org.

Once you have received your token, copy the token code and use it to register at MyERAS. You only need one (1) electronic token per season. You can use your token to apply to as many specialties as you want. **Be sure to print out the confirmation page for your records; this is your receipt.**

The ERAS 2023 token expires on May 31, 2023.

Request a Token »

© 2003-2023 Association of American Medical Colleges. All rights reserved. The Electronic Residency Application Service, ERAS®, is a program of the Association of American Medical Colleges. Website operated by: ECFMG. Terms & Conditions . Privacy Statement

MK000031



# Notice Regarding COVID-19 and Prometric Test Center Closures

## Notice Regarding COVID-19 and Prometric Test Center Closures
### Updated 4/2/2020

**Summary**
In response to COVID-19 (Coronavirus) pandemic and the need to limit social interaction, all Prometric Test Centers in the U.S. and Canada will be closed for 30 days.  This step is being taken to further protect the health and well-being of the individual test takers and staff.  Prometric anticipates re-opening all test centers effective April 16, unless circumstances require a prolonged closure.

**Next Steps:**

**Candidate with Existing Appointments**
Prometric has been working to cancel existing appointments impacted by the test center closures and hopes to do that on or before April 6th, 2020.  Once their appointment is cancelled, candidates will be able to schedule appointments ONLY on www.prometric.com.  Note that appointments in the US and Canada will not be available until April 16 at the earliest.

**Test Enrollment Window Extensions**
Any test candidate with a test enrollment window end-date in the months of March, April or May will receive a 180-day extension. Should the Prometric test center closure continue beyond 30 days, SRR will consider extending the enrollment windows for those that end beyond May.


Please contact the NMLS Call Center at 1-855-665-7123 for questions about this notice.

Copyright © State Regulatory Registry LLC

MK000032

**accounting**TODAY

-10%     -10%     $18.19 冬季棉靴

Temu

**CPA EXAM**

# Prometric extends testing site closures due to coronavirus

By **Sean McCabe**     April 14, 2020, 1:13 p.m. EDT     2 Min Read

✉     ⋮

CPA Exam testing administrator Prometric has announced an extension of the closure of its testing sites, due to the ongoing coronavirus pandemic, until April 30, 2020, after previously announcing a tentative April 16 return date.

"After closely monitoring the ever-changing events associated with the spread of the COVID-19 virus, including ordinances from state and local governments plus recommendations from the CDC (Centers for Disease Control) and WHO (World Health Organization), Prometric has concluded that test centers in the United States and Canada will remain closed through April 30," Prometric said in a statement. "Prometric will automatically cancel scheduled appointments from April 16 to April 30 and clear Notices to Schedule (NTS). Candidates may then reschedule at their convenience. Please watch for an email from Prometric prior to your testing date confirming cancellation and providing instructions for next steps."

## CORONAVIRUS IMPACT: ADDITIONAL COVERAGE

1  **Deloitte taps former Pfizer finance chief as CFO-in-residence**

2  **Five IRS employees charged with defrauding COVID programs**

3  **IRS updates guidance on taxability of payments to homeowners from state and local COVID funds**

Prometric anticipates opening its test centers on May 1 in "select areas of the United States and Canada minimally impacted by the virus," with these decisions being made at the "test center level, not at the state level." Prometric urges test-takers to check their site for test center statuses in both the United States and abroad.

< News

# Coronavirus (COVID-19): Assessment Information and Updates

**Posted July 15, 2021**



**For the latest information on remote proctoring, please click here.**

Across the globe, schools and workplaces have adopted social distancing policies and remote work and learning where necessary to mitigate the spread of COVID-19. NBME continues to prioritize investigations into alternative assessment delivery methods for physicians, medical school faculty and students.

We are actively working with the medical education and regulation community to also help expand testing opportunities for examinees.

Below, learn about available options for continuing testing:

- **Web-Conferencing with Remote Proctoring for Test Administrations during the 2020-2021 Academic Year**
- **NBME® Subject Examinations, Customized Assessment Services (CAS), and International Foundations of Medicine® (IFOM)®**
- **NBME Assessment Updates for Testing at Prometric Centers**
- **New and expanded learning resources available, including a new educational web series.**
- **USMLE Program updates and resources available in response to the changing environment**
- **Additional Resources**

In addition to remaining committed to supporting the continuity of the medical education system for the duration of the COVID-19 pandemic, we also support the various efforts of public health officials in response to the pandemic. You can read about the actions that underscore this support in a December 2020 **Statement on Public Health by the Coalition for Physician Accountability**, of which NBME is a proud member.

We will continue to share new information as it becomes available.

MK000034

**Remote Proctoring for Test Administrations available throughout the 2021-2022 Academic Year**

Web-Conferencing with Remote Proctoring of Subject Examinations, Customized Assessment Services (CAS) and IFOM's web-based Basic Science Examinations (in English only) and Clinical Science Examinations (in English and Spanish) has been available since April 2020. All exams are also available for web-based administration with **in-person proctoring**. The medical school ordering system has been updated to enable schools to indicate whether their exams will be administered in person or remotely with web conferencing. In Spring 2021, NBME invited schools to participate in a pilot that offers an enhanced remote proctoring solution. As the organization evaluates the response to the pilot option and determines a longer-term strategy for offering remote test administration options, NBME commits to keeping the current Web-based Conferencing with Remote Proctoring solution available through at least June 2022. **Learn more here**.

The implementation associated with remote administration continues to evolve in different ways. For more information about the upcoming Pilot offering, please email **NBMEWebtest@nbme.org.** We will continue to connect with educators, administrators and clinicians to gather feedback and recommendations, share our findings and discuss potential enhancements to this option.

▸ *Executive chief proctors can access information about security and approved web-conferencing tools and obtain Web-Conferencing with Remote Proctoring instructions on the* *MyNBME Services Portal* .

▸ *Read a story* *about how NBME psychometricians continue to research examinee performance during the COVID-19 pandemic.*

## NBME Subject Examinations, Customized Assessment Services and IFOM

### Subject Examinations

NBME® Subject Examinations are available for ordering and administration through the Web-Conferencing with Remote Proctoring option. Ambulatory Care, Histology and Introduction to Clinical Diagnosis will be made available through this option beginning Oct. 29, 2020.

All Subject Examinations are also available for web-based administration with **in-person proctoring**. The medical school ordering system has been updated to enable schools to indicate whether their exams will be administered in person or remotely with web conferencing.

Prometric test centers: Please check the Prometric website ongoing for updates .

### Customized Assessments

Customized Assessment Services (CAS) is available for ordering and administration for Web-Conferencing with Remote Administration as well as in-person administration with physical proctors. Learn more here.

### IFOM

▸ **Web-based Examinations:** Web-Conferencing with Remote Proctoring of IFOM's web-based Basic Science Examinations (in English only) and Clinical Science Examinations (in English and Spanish) has been available since April 2020.

▸ All of the IFOM exams (including the Basic Science Exam in Spanish) are also available for web-based administration with **in-person proctoring**. The medical school ordering system has been updated to enable schools to indicate whether their exams will be administered in person or remotely with web conferencing.

▸ **Paper Examinations:** Institutions considering IFOM exam administrations by paper must contact ifom@nbme.org to discuss their interest before placing orders.

▸ **IFOM Individual Testing at Prometric:** Please check the Prometric website for updates regarding test center closures and re-openings.

*For questions about Subject Examinations or Customized Assessments, please feel free to contact us at assessmentservices@nbme.org. To learn more about IFOM, contact us at ifom@nbme.org.*

MK000035

**NBME Assessment Updates for Testing at Prometric Centers**

NBME® exam programs are considered essential services programs (listed below) for testing at Prometric centers. For updates on site openings, please visit Prometric's announcement page    .

**Essential Services Programs include (in no particular order):**

- USMLE (Step 1, Step 2 Clinical Knowledge, and Step 3)
- North American Veterinary Licensing Examination® (NAVLE®)
- Certification examinations
- IFOM*
- NBME Subject Examinations*

* NBME Subject Examinations and IFOM are considered essential. However, to ensure that examinees for licensure and certification have a better chance of scheduling, NBME requests that medical schools use Web-Conferencing with Remote Proctoring for NBME Subject Examinations and school-based administrations of IFOM. More information is available above and in the MyNBME Services Portal    .

**Additional Resources**

For information about USMLE, please visit the announcement site here    .

- NBME Twitter (@NBMEnow) and our website
- USMLE information: website
- Statement on Public Health by the Coalition for Physician Accountability
- World Health Organization information
- Center for Disease Control news

Questions? Contact NBME Customer Support at https://www.nbme.org/contact or 215-590-9700

Topics:  Examination Updates, USMLE

**< Back to News Archive**

**MORE RECENT ARTICLES:**

| USMLE Program Discusses ChatGPT<br>Posted: February 13, 2023 |
| --- |
| New Philanthropic Initiative Promotes Diversity in Measurement<br>Posted: January 24, 2023 |



Have any Questions?

CONTACT US

MK000036



# Black Adults Who Live with ADHD

Melvin Bogard, MA, interviews
Napoleon B. Higgins, Jr., MD

MK000037



It's always important to make sure you pay attention to race, because there are disparities and they are based upon race. Too often, Black young men, they're more likely to be diagnosed with conduct disorder or oppositional defiant disorder.

SHUTTERSTOCK/ PROSTOCK STUDIO

**B**LACK ADULTS WITH ADHD face barriers when seeking diagnosis and treatment for ADHD. There are cultural concerns that need to be addressed for them to receive proper evaluation and effective treatment.

Earlier this year, CHADD's *All Things ADHD* podcast featured an important conversation between Dr. Napoleon Higgins, a psychiatrist from Houston, Texas, and Melvin Bogard, CHADD's director of multimedia content. They talked about mental health stigma within the Black community, the cultural values that may impact treatment, and ways to address these issues. Dr. Higgins offered resources to help Black adults find culturally competent providers, and strategies they can use to help providers better understand their challenges. We're honored to bring you selections from the podcast, edited for length and clarity.

**MELVIN BOGARD: Many Black people struggle to talk about mental health issues with their families out of fear of being shamed or not taken seriously. My questions are, how do we talk about ADHD to family members, and how do we address the stigma and mental health issues in the Black community?**

**NAPOLEON B. HIGGINS:** One, it's important to be able to receive support and care from your family members and people who love you. If you already know that they're not going to be supportive, there's not always a need to even let them know, especially if it's going to be painful and detrimental to yourself to do that. Now, if you're very ill or very sick and you've got to say something to somebody, definitely do so. The experience of ADHD and treatment really does impact the entire family, so I would prefer an individual to be able to share that, but if you're in a situation where you can't, you may not want to.

The other thing to consider, though, is that because ADHD runs in families, if you're dealing with it, chances are that somebody else in your family also has ADHD, and by not letting them know and not discussing it, it can cause another individual to be suffering needlessly, or at least to have a lack of understanding of what's going on.

Stigma is a huge problem, and it causes a lot of barriers to treatment and care. Stigma typically comes out of ignorance, just a lack of knowledge and information, and then you hear bad knowledge and bad information. That drives further the stigma and the fear of mental health. Too often, we look at mental health as as something to ridicule and do not understand that mental health is a physical health problem. It is the issues that affect the mind and the brain. Just like you have other organs in your body, like your liver and your heart and your lungs and your skin, you also have a brain, and a brain has illnesses that change how people behave, because your brain actually drives behavior.

So, the point in receiving mental health care is that my brain is having an issue with how it's seeing things, how it's perceiving things, or even how I'm acting, my actions, or even what I'm saying. You go and see a doctor that helps you. Sometimes it requires medications, sometimes it doesn't.

This podcast is supported by Cooperative Agreement Number NU38DD000002-01-00 from the Centers for Disease Control and Prevention (CDC). The contents are solely the responsibility of the authors and do not necessarily represent the official views of the CDC.

Listen to the full interview at https://chadd.org/podcasts/black-adults-who-live-with-adhd/.

MK000038

Too often, I find in communities—all communities, but specifically the Black community—so often people believe they have some sort of character flaw. When it's more of a neurobiological issue that is causing them not to be able to focus, not to be able to pay attention, possibly be hyperactive, be impulsive in their decision-making—those are things that are treatable. Sometimes behavioral management, sometimes medication, but we've got to get past the stigma and get more towards the knowledge, because too often people suffer because of the lack of knowledge.

**Let's talk about masking and code-switching. What's the difference between the two, and do you feel that Black people with ADHD have an additional layer of masking or code-switch because of their ADHD?**

Well, it's hard to say. When you look at masking, like masking yourself and how you behave around the dominant culture, and then code-switching so far as being able to go between your culture and the dominant culture, we all do it. We all do it to an extent, and it's not even always according to race. There's a different way that I'm going to act around my homeboy versus act around my mom. There's a different way that I would even act around my homegirl back in the day versus the way that I would probably act with her in front of my wife. It has nothing to do with intimate relationships at all, it's just the flow of your relationship with a particular person.

It can change from room to room, and immediately if needed, but when it comes to race, we have to switch up according to the dominant culture. I saw this recently in an interview where I didn't realize a friend had started filming when I got on the interview. When we were talking, we were talking as colleagues, as friends for well over twenty years, and so my vernacular and even my movements were very different. Once I figured out the camera was on, everything switched and changed. Even though I'm talking to the same person because the camera is on and now, we've gone from a friendly, casual, to a professional conversation, the code switched. It's not even mentally thought of, it just does.

We tend to have to do that. ADHD tends to be neurobiologically a little bit different. I would say it could be an advantage or a disadvantage. Oddly enough, they tend to have the gift of gab because they can switch and change on a dime with whatever's going on at the time. Now, the other problem with that is that sometimes they will forget where they were and switch back out and not realize it, and then go into, for lack of a better term, Ebonics nature, or whatever may have happened because you just switched right out. It could be an advantage, but it could be a disadvantage as well.

**Should individuals disclose their ADHD diagnosis to their employer? And considering the fear of implicit bias and stereotypes, should Black people with ADHD disclose their diagnosis in any way?**

Generally, I probably would not, not unless it is needed. Obviously if I'm filling out a form or something or getting a license and I need to disclose, I would recommend that you disclose at that time. In general conversation, no, because people can start to believe things like, "Well, he did that because he's ADHD," or "She did that because of this particular diagnosis" and start to make excuses for you, which is not always good, but also they say, "Well, we don't want to put them on this important project because they can't focus or pay attention." I would normally leave that out. Maybe the company dropped our insurance, I can't take my medication, and now it's directly affecting performance of my work, and now I need to make an excuse for what's going on, but generally I would leave it out unless it was necessary.

Realize that anything you say can and possibly will be used against you, be it mental health or any other thing that is going on with you. So, I would be careful about who I share any mental health or physical health diagnosis with. Now, of course, if this is your close friend and you want to share, that's up to you, but you have to

> **Realize that anything you say can and possibly will be used against you, be it mental health or any other thing that is going on with you. So, I would be careful about who I share any mental health or physical health diagnosis with.**



MK000039
SHUTTERSTOCK/ PRESSMASTER



**"Race doesn't matter to you or me or your diagnosis of this situation." If you have a doctor that said that you definitely need to keep it moving.**

likely to be diagnosed with conduct disorder or oppositional defiant disorder. A young Black woman who is inattentive who's struggling in school may be perceived as being slow. Well, this person could have a very high IQ, but cannot pay attention to what's going on in front of them, and so therefore we ought to think, "Well, maybe her parents are not people who are professionals," when making this judgment.

The point is you want to make sure that you're culturally competent in everything that you do in order to ensure that you have good outcomes, but you always want to address your own biases. I can't change that I'm a Black man in America, and so I would not want a doctor who walks in the room to see me to say, "Well, I'm going to change that. He's not going to be a Black man in America when he's in my office." No, no, no. That's not smart. What I need the doc to do is, do your own work, that this is a Black man in America. He's coming to see me at the age of mid-to-late forties. Therefore, there are health disparities, and he's more likely to be dead in the next twenty years than a white patient coming in with the same age and the same level of income and the same insurance. That needs to be taken into account when I walk in the room.

The same thing with ADHD. The impact of ADHD on a Black individual from childhood, who's now an adult: missed opportunities. If he did not finish high school and he is twenty years old and he has not been incarcerated, chances are he's going to be incarcerated in the next three years, alright? I need you to take those things into account in your decision-making and understand the acuity of the situation that, "I have a twenty-year-old Black male who's dropped out of high school who's in front of me with his mom trying to get help for ADHD." That is a very powerful thing that's very different, can be very different than somebody of another nationality or of another race.

Their race, the income, the resources, or their mom's education, if she has a master's, then her knowledge level maybe or probably is a lot different than the understanding of ADHD of a mother who dropped out of school herself who's on financial assistance from the government. We've got to take all of that in, because it's not just the diagnosis of ADHD, it is all of those things coming together, which helps to formulate what the story

judge it on an individual case-by-case basis. Or maybe if you want to put on a T-shirt that says, "I have ADHD," in order to promote the information and let people know so it could help somebody, I would do that on your own time, but not necessarily in a work situation. It depends on the individual and the circumstances with the individuals they're working with.

**What if I needed accommodations in the workplace?**
Typically, I would run that through HR. With the work done by CHADD and many others, the attitudes about ADHD seem to have gotten better, and people are more understanding and more willing to accommodate.

**Let's talk about cultural competency. There's an article titled, "Culturally Competent Strategies for Assessing and Treating ADHD in African American Adults." It states that providers must explore patients' and families' historical concepts as being history-sensitive in a fundamental way to reduce African Americans' cultural mistrust of the mental healthcare system. Do you agree that this is a helpful course of action for providers?**
Well, I would say definitely any time you consider culture, it's a good idea. It's not anything to run from, it's something to run into. Fact is that people say, "Well, I don't see race." Well, realize there are disparities in how individuals think about other individuals that we have been taught. We're living in a racial construct. So, "I don't see color." Well, I know I'm not clear. If you see a patient with pelvic pain, you need to take into account whether or not this is a man or a woman. It tells a different story. Your treatment and your outcomes are going to be different based upon what you see in front of you.

It's always important to make sure you pay attention to race, because there are disparities and they are based upon race. Too often, Black young men, they're more

is, and formulate a treatment plan. We've got to be careful, though, we don't want to make assumptions about the individual. That's why you want to dig deeper and ask questions so that you could have a better understanding and a better outcome.

### How do you locate culturally sensitive doctors that diagnose and treat ADHD?

Well, the biggest thing that you could do is make sure that you research the information yourself. Most doctors do not have a problem with an individual doing research. Now, every once in a while, people will be stuck just knowing that Google is a better doctor than the person. "The last twenty minutes I spent on Google is worth the last twenty years that he spent in school," but we've got to make sure we have the right perspective. An educated individual honestly tells me that they're interested in their care, all right? So, the better you are informed, the more in-depth conversation that we can have. We need to be informed as much as we can.

If you feel like the doctor is not getting it, and not getting you and not understanding you, let the doctor know. That's not a tragedy that I missed something that I should have known. Let the doctor know, "As a woman, I feel like you're not getting what I'm saying when I talk about my trauma and dealing with my husband." And for me, if you tell me that, I'm not mad about it; I'm like, "Please let me know, because this may be the breakthrough we need to do in order for you to get better." Most doctors are going to be okay with you sharing information or letting them know, and if you let me know if I have a blind spot, I want to plug the blind spot. There's no such celebration of staying blind.

Very few doctors would, I would say, even argue with you that, "I don't think you're seeing my issue with race and how it's impacted me." I don't think any are going to say that... No, there will be somebody. But the greater majority are not going to say, "No, we're going to disqualify race today. Race doesn't matter to you or me or your diagnosis of this situation." If you have a doctor that said that you definitely need to keep it moving. But most are going to be very interested.

### According to research, minority patients benefit from having minority doctors, but there is also a shortage of Black doctors in America. Realistically, what are the chances of being cared for by a Black physician, and should it really matter if the provider is of another race or ethnicity?

Anywhere from 2% to 4%, sometimes around 5% of psychiatrists are Black, realizing that the American population is about 13% Black. Every Black person will not be able to get in to see a Black psychiatrist. Like they have food deserts, you've got Black psychiatry deserts where there is just no one there, or at least no one knows how to find them there. If you know a Black doctor, ask another Black doctor, even if they're of another specialty, there

are medical societies. Normally it's more or less word of mouth. Google "Black psychiatrist" in a particular area. CHADD has a website. Psychology Today is a very good website that allows you to pick race, area, city, zip code, and things of that sort. Now, at the same time, that does not mean that your doctor in front of you is not doing an excellent job. You may need to do work with the person that you're with, and most people are professionals who are going to try to do their best. If there's something that they're missing, they want to know. If you're getting excellent care, I would not recommend switching your doc if you're getting excellent care. If you've got questions about it, then research, read, and you may even want to get a second opinion, but make sure that you reach out and find someone, even if you can't find someone Black.

### What advice do you have for Black adults who are newly diagnosed?

For those who are newly diagnosed: education, education, education. The more you know about your diagnosis, the more you do more introspection and understanding of yourself, the better for everybody. That's better for you, and so you know what's going on, but it also helps you to be able to communicate with your doctor better. If you know more about your diagnosis, more about the symptoms, as much as you know about the medications, that's better for the doctor because we have a higher level of dialogue, and you can get to optimal functioning.

### Is there anything else you would like to say before we end?

So far as the African-American community, I would say the biggest issue that we tend to have is a lack of knowledge, and the importance of treatment, how it affects you through childhood all the way through adulthood, and how we all can get better. Knowledge is key. I appreciate you today for bringing that knowledge to the front. Ⓐ



**Napoleon B. Higgins, Jr., MD**, *is a child, adolescent and adult psychiatrist in Houston, Texas, and owner of Bay Pointe Behavioral Health Services and South East Houston Research Group. He is the president of the Black Psychiatrists of Greater Houston, past president of the Caucus of Black Psychiatrists of the American Psychiatric Association, and past president of Black Psychiatrists of America. The coauthor of a number of books, including* How Amari Learned to Love School Again: A Story about ADHD, *Dr. Higgins also specializes in nutrition and health to improve his patients' mental and physical lives. He has worked with countless community mentoring programs and has special interest in trauma, racism, and inner-city issues and how they affect minority and disadvantaged children and communities.*



**Melvin Bogard, MA**, *is CHADD's director of multimedia content development. He is passionate about supporting and empowering marginalized communities, fighting for social justice, and reducing ADHD stigma by leveraging social media platforms as a conduit to learn and meet these communities' needs and distribute resources.*

MK000041

# HEALTHCARE
# **DISPARITIES**
# & ADHD

### Allison Gornik, PhD, and Rod Salgado, PhD

**W**HILE ADHD is one of the most prevalent neurodevelopmental disabilities, many individuals are faced with difficulties in accessing appropriate diagnostic and treatment services. Accurate diagnosis and treatment of ADHD can be challenging due to co-occurring conditions or behavioral problems, as well as inconsistencies in reported ADHD symptoms across different settings.

Disparities in ADHD diagnosis and treatment have long been documented, and trends in research suggest links to many factors, including geographic, economic, and demographic. Complicating matters further, these variables rarely exist in isolation, and, together, these barriers may make accessing appropriate ADHD services even more difficult.

While not exhaustive, this article will review common challenges to ADHD services in the hopes that, by coming to a shared understanding, providers, caregivers, and advocates can continue working collectively to reduce barriers and disparities.

## Race and ethnicity

Racially and ethnically diverse children are often less likely to receive an ADHD diagnosis and related treatment, compared to their White counterparts. Notably, ADHD service discrepancies for racially and ethnically diverse individuals can occur throughout the lifespan, beginning in early childhood, and can occur regardless of the severity of symptoms. Moreover, research has highlighted disparities across multiple racial and ethnic minority groups (Latinx, Black, Asian, and Native American), and even when accounting for other characteristics (such as socioeconomic status). While some studies suggest the racial disparity gap may be closing in ADHD diagnosis, ADHD treatment disparities remain largely unchanged.

Several explanations have been offered to explain these differences in service delivery, including inconsistencies in behavioral ratings and historical racism in healthcare.

What many of these explanations share, however, is the idea that adults working with racially and ethnically diverse children are susceptible to implicit biases and may therefore misinterpret ADHD symptoms. In other words, since ADHD diagnostic services and treatment are behaviorally determined, it stands to reason that they are influenced by our own cultural expectations for behavior (such as what is labeled as a "problem" in a household or classroom), assumptions, and personal worldviews.

## Socioeconomic status

Socioeconomic status (SES) is oftentimes used as an umbrella term to refer to several factors (income, education, insurance, financial burden) that can impact ADHD service access in several unique ways. First, as one may expect, lower SES may result in lower rates of ADHD diagnosis and related services. Specifically, insurance (type and adequacy of coverage), as well as limited access to quality providers, often dictate who can be seen and why, before individuals and families even have the chance to voice their concerns.

Interestingly, SES has also been linked to overdiagnosis and overtreatment of ADHD for children from both higher and lower SES backgrounds. Notably, however, the mechanisms driving these disparities are likely distinct. For example, in high SES populations, overdiagnosis and treatment may be the result of increased resource access, as well as ease in navigating medical systems (being able to seek second opinions, having prior knowledge and familiarity with ADHD). In contrast, the overdiagnosis and treatment of ADHD in lower SES populations may be explained by a lack of quality care. Specifically, the increased risks of behavioral problems and co-occurring conditions linked with lower levels of SES (socioemotional or behavioral challenges due to food deserts, insecure housing, exposure to trauma, etc.) may require careful differentiation between ADHD and other concerns that, due to barriers to quality care, may not be available and lead to false-positives.

MK000042

SHUTTERSTOCK/ ARTEMIS DIANA



## Gender and sex

The longstanding gender-based stereotype of the "high energy and disruptive boy" with ADHD continues to influence which children get referred by parents and teachers for further evaluation. While girls can certainly have both inattentive and hyperactive/impulsive symptoms, they tend to present with more inattentive symptoms compared to boys. Also, their hyperactive and impulsive symptoms tend to be less disruptive than boys; for example, girls may be overly talkative and interrupt others as opposed to having difficulties keeping their hands to themselves or trouble staying seated. As a result, girls may fly under the radar as their struggles with distractibility, disorganization, daydreaming, and lack of motivation/effort are not thought of as symptoms of ADHD.

Girls with ADHD also tend to have co-occurring internalizing problems like anxiety or depression, which can be less obvious to others, and they often try to compensate for or hide their struggles from others. When they do get evaluated, those internalizing symptoms can get misinterpreted as the primary problem, and the underlying ADHD can get overlooked. This is true for both girls and women.

In adulthood, women often face significant societal pressure and gender role expectations to be the CEOs of their households, family, and children's lives. Women with undiagnosed ADHD may be more likely to attribute challenges they face in juggling all of their responsibilities as a moral failing instead of a neurodevelopmental difference, which can profoundly impact their sense of self and self-worth. Furthermore, during the transition to menopause, symptoms of ADHD that may have previously been less noticeable or impairing can increase as hormones fluctuate.

## Age

Roughly two-thirds of youth diagnosed with ADHD go on to continue having ADHD symptoms that are impairing in adulthood, with the National Institute of Mental Health (NIMH) finding the lifetime prevalence of ADHD in US adults (age 18-44) to be 8.1%. Unfortunately, there is far less attention given to identifying and providing services for adults with ADHD compared to children.

As discussed in CHADD's ADHD Public Health Summit 2019 white paper, several factors contribute to age-based disparities for adults with ADHD:

● First, because ADHD was perceived for a long time to be a disorder that is outgrown, most professional organizations that produce national diagnostic and treatment



guidelines are child-focused (for example, the American Academy of Pediatrics and the American Academy of Child & Adolescent Psychiatry).

● Second, many healthcare providers receive limited training about what ADHD may look like over the life course (see sidebar), and may not assess for symptoms of ADHD unless it is brought up.

● Third, many adults with ADHD also experience mental health concerns, sometimes as a consequence of their ADHD symptoms, like depression, anxiety, and substance use. Too often, those other concerns might be seen as the primary problem (instead of their ADHD).

People diagnosed with ADHD in adulthood may regret not being diagnosed in childhood, and some adults wonder if appropriate treatment earlier on could have prevented problems in their education, work, and relationships with others. Some undiagnosed adults first consider they may have ADHD, too, only after their child has been diagnosed.

Just like kids with ADHD, adults with ADHD are more likely than adults without ADHD to experience difficulties in executive functioning (planning, organizing, getting started, keeping track of details), work settings, and in relationships with peers and families. A diagnosis can offer an explanation for these difficulties, and just like for children, stimulant medication is the first choice medication treatment for adult ADHD.

## Urban versus rural access to care

Despite the need for all youth with ADHD to have support from the medical system and in school, there are significant disparities in access to services between rural and urban children. In rural settings, parents of kids with ADHD may face barriers due to lack of access or availability of services within their community, long distances required to travel to receive services, and challenges in affording services that are not readily available.

Based on the most recent National Health Interview Survey by the US Centers for Disease Control and Prevention, children who live in rural areas—compared to urban areas—are more likely to receive have received a diagnosis of ADHD (11.4% of children in rural areas, compared to 9.2% of children in urban areas). The same survey also suggests kids who live in rural areas are significantly less likely to have seen a mental health professional, therapists (speech, physical, occupational, respiratory), or to have had a well-child check-up visit in the past year. School is also impacted, with children living in

STOCK.ADOBE.COM/ SULIT PHOTOS

MK000044

# Adult ADHD Symptoms

**S**YMPTOMS OF ADHD in adults can look different than in kids and adolescents. The Adult ADHD Self-Report Scale (ASRS-v1.1) Symptom Checklist is freely available online. Check out the first six of the eighteen-question checklist, where answering four or more of these questions as "often" or "very often" is highly consistent with a diagnosis of ADHD:

1. How often do you have trouble wrapping up the final details of a project, once the challenging parts have been done?

2. How often do you have difficulty getting things in order when you have to do a task that requires organization?

3. How often do you have problems remembering appointments or obligations?

4. When you have a task that requires a lot of thought, how often do you avoid or delay getting started?

5. How often do you fidget or squirm with your hands or feet when you have to sit down for a long time?

6. How often do you feel overly active and compelled to do things, like you were driven by a motor?

● *External*, such as working for positive change outwardly, through advocacy in local government, school boards, or the state legislature. While this can sound intimidating, CHADD has an excellent advocacy manual to help get you started; find it at https://chadd.org/policy-positions/. Speaking up, sharing accurate information, and engaging in conversations with those around you helps to raise awareness. Ⓐ



**Allison Gornik, PhD**, *received her bachelor's degree from New College of Florida and her master's and doctoral degrees in clinical psychology from Michigan State University. She completed an APA-accredited internship in child clinical and pediatric psychology at Children's National Hospital in Washington, DC, prior to fellowship. Dr. Gornik is currently a postdoctoral fellow in child clinical psychology at the Kennedy Krieger Institute. In a research context, Dr. Gornik is interested in multi-method, multi-informant assessment in identifying predictors and distal outcomes of children's change over time, particularly concerning change in internalizing and externalizing problem behaviors. In addition, she is interested in informant discrepancies between children's, parents', and teachers' perceptions of children's experiences and internal states.*



**Rod Salgado, PhD**, *received undergraduate degrees in psychology and Spanish as well as a master's degree in special education from the University of Wisconsin, Madison. He then went on to receive a PhD in school psychology from the University of Oregon. Dr. Salgado completed an APA-accredited predoctoral internship in behavioral health psychology with the Hawaii Psychology Internship Consortium. He is currently a postdoctoral fellow in child clinical psychology at the Kennedy Krieger Institute. His research interests include health and diagnostic disparities for children with disabilities and their families as well as access to culturally appropriate treatment and services.*

rural areas and with a developmental disability (such as ADHD) being less likely to receive early intervention services or special education services than children with a developmental disability in urban areas.

## What to do?

Unfortunately, these disparities are longstanding and many reflect the history of how our society has developed over time, which makes them hard to change quickly. But there can be movement. Working for change can (and, ideally, is) both an "internal" and "external" process:

● *Internal*, such as through gentle, non-defensive acknowledgement and processing of your own experience—what aspects of ADHD diagnosis, intervention, management, and/or support have been especially hard or difficult? What has been easier? Are there system- or policy-level disparities, some of which (but certainly not all) are highlighted above, to consider? Are there disparities you want to learn more about? Two good starting points can be found on the CHADD website: The section on diverse populations (https://chadd.org/diversity/), which provides information about ADHD specific to Black, Hispanic, and military communities, as well as the section on women and girls (https://chadd.org/for-adults/women-and-girls/), which provides information about ADHD specific to girls and women.

### SOURCES

CHADD. (2019, October 7). The adverse health outcomes, economic burden, and public health implications of unmanaged attention deficit hyperactivity disorder (ADHD): A call to action to improve the quality of life and life expectancy of people with ADHD. *Proceedings of the ADHD Public Health Summit*, Washington, DC. Unpublished paper, accessible at https://chadd.org/policy-positions/.

Kessler, R. C., Adler, L., Ames, M., Demler, O., Faraone, S., Hiripi, E. V. A., ... & Walters, E. E. (2005). The World Health Organization Adult ADHD Self-Report Scale (ASRS): A short screening scale for use in the general population. *Psychological Medicine*, 35(2), 245-256.

Morley, C. P. (2010). Disparities in ADHD Assessment, Diagnosis, and Treatment. *The International Journal of Psychiatry in Medicine*, 40(4), 383–389. https://doi.org/10.2190/PM.40.4.b

Morley, C. P. (2010). Disparities in ADHD Assessment, Diagnosis, and Treatment. *The International Journal of Psychiatry in Medicine*, 40(4), 383–389. https://doi.org/10.2190/PM.40.4.b

National Institute of Mental Health. (n.d.). *Attention-Deficit/Hyperactivity Disorder (ADHD)*. https://www.nimh.nih.gov/health/statistics/attention-deficit-hyperactivity-disorder-adhd

Shi, Y., Hunter Guevara, L. R., Dykhoff, H. J., Sangaralingham, L. R., Phelan, S., Zaccariello, M. J., & Warner, D. O. (2021). Racial Disparities in Diagnosis of Attention-Deficit/Hyperactivity Disorder in a US National Birth Cohort. *JAMA Network Open*, 4(3), e210321. https://doi.org/10.1001/jamanetworkopen.2021.0321

Tumaini R. Coker, Marc N. Elliott, Sara L. Toomey, David C. Schwebel, Paula Cuccaro, Susan Tortolero Emery, Susan L. Davies, Susanna N. Visser, Mark A. Schuster; Racial and Ethnic Disparities in ADHD Diagnosis and Treatment. *Pediatrics*, September 2016; 138 (3): e20160407. 10.1542/peds.2016-0407

Young, S., Adamo, N., Ásgeirsdóttir, B. B., Branney, P., Beckett, M., Colley, W., ... & Woodhouse, E. (2020). Females with ADHD: An expert consensus statement taking a lifespan approach providing guidance for the identification and treatment of attention-deficit/hyperactivity disorder in girls and women. *BMC Psychiatry*, 20(1), 1-27.

Zablotsky, B., & Black, L. I. (2020). Prevalence of Children Aged 3-17 Years with Developmental Disabilities, by Urbanicity: United States, 2015-2018. *National Health Statistics Reports*. Number 139. National Center for Health Statistics.

# Tackling Myths and Misinformation

## Gina Pera interviews Rahn Bailey, MD, FAPA

**RAHN KENNEDY BAILEY'S TRAINING AND PRACTICE** as a forensic psychiatrist introduced him to the real-world costs of undiagnosed ADHD.

Forensic psychiatry refers to using one's medical training or knowledge in psychiatry to solve a legal question. Such specialists might write a report about an employee who is disabled, deal with a family that is challenging a loved one's mental competency, or testify in court as to someone's mental condition. Bailey, however, also worked and served in settings where children were in trouble, such as juvenile detention centers and school systems. As he grasped the extent of the problem with underdiagnosed ADHD not only with children but also adults, he devoted his energies to advocacy.

The forty-five-year-old physician currently serves as chair and executive director of the department of psychiatry and behavioral sciences at the School of Medicine of Meharry Medical College in Nashville, Tennessee. A member of the administrative council of the American Academy of Psychiatry and Law and of the professional advisory board of CHADD, Bailey is also a recognized leader in the National Medical Association. The NMA's mission is to "advance the art and science of medicine for people of African descent through education, advocacy, and health policy to promote health and wellness, eliminate health disparities, and sustain physician viability."

Between sessions at a conference, Bailey found time to talk with us about his work and, in particular, his interest in ADHD.

### When you were a child, did you ever imagine growing up to be a psychiatrist?

I always wanted to be a doctor. But I was a little afraid to say it [while I was] growing up. There was always a risk of being teased, and it's such a long-term project. But I'm happy I stayed with it because I definitely enjoy my job.

### What do you find is the most rewarding aspect of your work?

No doubt about it: Treating ADHD is one of the better things we do in psychiatry, because you can see results fast. With children who have been sanctioned at school and are skating on thin ice, you can definitely help them turn their lives around.

Sometimes it does require the skills of a good courtroom attorney, though—it's as though you're arguing your case to some parents. They might be skeptical and unsure, but if you can make a solid case about therapy and medication management and the child does better, then you win friends for life. It's extremely rewarding.

### Both your parents were teachers. Can you describe their influence on you?

Being a teacher is one thing. Being an *elementary* school teacher, you really have your job cut out for you in helping to mold a child's future. Moreover, when your schoolteacher parents are regularly seeing children who are doing the right thing or the wrong thing, they are geared towards reminding you of the right path on a regular basis.

### When did you first learn about ADHD—during your training as a psychiatrist?

Actually, I didn't learn about ADHD until December 2004, years after my medical residency.

I was involved in the National Medical Association as chairman of psychiatry, and I frequently spoke on psychiatric issues that deal with the African-American community. In 2004, I was asked to speak on what the research told us about African Americans and ADHD. When I reviewed the literature, I was surprised to see how little data existed. That ignited my intense interest, and I started speaking on this topic to national organizations such as the Urban League and various psychiatric organizations nationwide.

### Through your forensic work, you saw the connection between untreated ADHD and children who found themselves in juvenile detention centers and later even in prisons or jails. From there, you saw the larger issue with psychiatric illnesses among the incarcerated in this country?

Exactly. Most of us are aware that a record number of Americans are incarcerated today. It's a nightmare from a public-policy perspective. Clinicians don't see it moving in the right direction, either, because many of these people continue to suffer from untreated psychiatric conditions.

It often happens in this country that we try to handle clinical issues with non-clinical solutions. We are increasingly incarcerating persons with mental illness; often these are people who just don't have a good ability to handle themselves. That's a prime reason why our criminal-justice system is not working.

When it comes to ADHD in particular, one of the chief diagnostic criteria is impulsivity, and impulsivity can manifest

*San Francisco-based journalist* **Gina Pera** *is the author of* Is It You, Me, or Adult ADD? Stopping the Roller Coaster When Someone You Love Has Attention Deficit Disorder *(1201 Alarm Press, 2008). For the past decade, she has written about adult ADHD while also advocating for better awareness and treatment standards. Pera is a member of the editorial advisory board of* Attention *magazine.*



**Rahn Kennedy Bailey, MD, FAPA, is chairman of the department of psychiatry and behavioral sciences at Meharry Medical College.**

PHOTO COURTESY DR. BAILEY

in many ways that will land a person in trouble. For example, there is the urge to shoplift or break into a store but little or no tendency to think of consequences.

**Despite the well-documented risks of undiagnosed ADHD, misinformation persists. Have you encountered this in your practice and your advocacy work?**
Yes, there's quite a bit of propaganda around ADHD, particularly the myth that ADHD is overdiagnosed and many children are placed on medication unnecessarily.

If I had a nickel for every parent who comes to my office and says, "The school won't let my child come back without a diagnosis, but there's nothing wrong with my child. This ADHD is overdiagnosed! I had the same problems at that age." Then I ask a few questions and I learn that there were lapses in some of these parents' own academic progression, attributable at least in part to their own ADHD.

It's hard, though, to tell someone who is forty or fifty years old that "maybe you

> **"Stigma and propaganda hit some communities harder than others."**

had some form of cognitive disorder when you were in school and it *did* have some impact on you, but you never knew it because it was *under*diagnosed." It's difficult to say this to someone who's had some setbacks in life—perhaps dropping out of school or doing time in jail.

**Research indicates that African-American children are less likely to be diagnosed with and treated for ADHD than are white children with similar levels of symptoms. Yet, some believe the exact opposite: that African-American children are disproportionately diagnosed with ADHD. How do you explain this misperception?**
Stigma and propaganda hit some communities harder

than others. One reason I spend a good deal of time educating in the African-American community about ADHD is that I was surprised to see the sheer number of people affected by it as well as the variety of settings where this is evident.

For example, African-American children are over-represented in remedial education as well as in jails and prisons. Clearly, unless you want to accept that African-American children in general simply don't do as well in school, it's important to consider untreated cognitive disorders.

Of course some simply don't want to hear about ADHD or any other diagnosis. They might say, "I'd rather be bad than mad." That is, some people see less stigma in the legal option than in the psychiatric one. Of course, this is true not only in the African-American community.

Another factor is that [anti-psychiatry groups] have been geared to destroy psychiatry, and the groups have set a stronghold in the African-American community. [They] find one person who dramatically tells about his or her one bad experience with psychiatry, whereas clinicians and scientists refer to peer-review studies, based on dozens and hundreds of patients and the structure of the data set.

Think about it: If someone stands before a group of people and rants about cancer being a hoax to people who've lost a loved one to cancer, that speaker will not be given the time of day. But when it's ADHD, many people don't *think* they know anyone who has it. And certainly they don't associate anyone's death to it, even though ADHD is associated with higher risk of injury from car accidents and so on. ●

MK000047

3. The patient whose cardiac function is illustrated most likely has which of the following?

A) Arteriovenous malformation

B) Cardiac tamponade

C) Congestive heart failure

D) Cor pulmonale

E) Restrictive cardiomyopathy



Left ventricular end-diastolic volume

Correct Answer: C.

The Frank-Starling mechanism describes the phenomena by which cardiac output is dependent on the amount of cardiomyocyte fiber stretch prior to contraction, as represented by the left ventricular end-diastolic volume. A greater pre-contraction stretch results in a greater force of contraction (to a point), and the relationship is demonstrated by Frank-Starling curves. A given Frank-Starling curve applies for constant afterload and inotropy. Changes in afterload and/or inotropy shift the curve up or down. This patient has a Frank-Starling curve that is shifted down, indicating that for a given preload, there is reduced cardiac output relative to normal. This may occur in decreased inotropic states such as congestive heart failure, with the administration of negative inotropes, or in the setting of increased afterload. The curve shifts up in positive inotropic states and/or with decreased afterload.

Incorrect Answers: A, B, D, and E.

Arteriovenous malformation (Choice A) results in low-resistance, high-volume flow of blood from the arterial to the venous system with greatly increased venous return. The increase in preload causes a greater distension in the cardiomyocyte fibers at the end of diastole, which results in increased cardiac output per the Frank-Starling relationship.

Cardiac tamponade (Choice B) result in decreased ventricular filling because of compression of the heart by fluid in the pericardium. In the absence of other factors affecting afterload or cardiac contractility, the Frank-Starling curve would not be depressed.

Cor pulmonale (Choice D) describes right ventricular failure resulting from chronic pulmonary hypertension. Left ventricular contractility and afterload are not affected, and the Frank-Starling curve for the left ventricle would not shift.

Case 2:22-cv-... Document 28... Page 58 of 59

4. A 27-year-old woman delivers monozygotic twins at 34 weeks' gestation. The larger twin has a hematocrit of 68%; the smaller twin is pale and has a hematocrit of 25%. Which of the following is the most likely explanation for these findings?

A) Amniotic fluid leak across intervening membranes

B) Artery-to-artery chorionic surface anastomoses

C) Chronic abruptio placentae

D) Funisitis

E) Knotting of the umbilical cord

F) Oligohydramnios

Correct Answer: B.

Twin-twin transfusion syndrome (TTTS) and twin anemia polycythemia sequence (TAPS) are complications of monochorionic twin gestation. TTTS occurs because of the formation of arteriovenous anastomoses in the chorion of the placenta that allow blood to pass from one fetus to the other. Less commonly, it can also involve the formation of artery-to-artery chorionic surface anastomoses. It typically presents on prenatal ultrasound with unequal amniotic fluid indices between the two amniotic sacs. It can also present with anemia of one fetus and polycythemia of the other fetus when chronic, which is referred to as TAPS. Monochorionic twin gestations are typically monitored with serial ultrasounds to watch for the development of these conditions, as they have a high morbidity and mortality. Ultrasound findings also include discrepancies in nuchal translucency and crown-rump length, and abnormal ductus venosus flow. Inequalities in amniotic fluid distribution are caused by relative hypovolemia of one fetus, with resultant activation of the renin-angiotensin-aldosterone system and consequent oliguria. In contrast, the hypervolemia of the other twin causes release of atrial natriuretic peptide, which results in diuresis and relative increases in the amniotic fluid index. Complications of this syndrome also include congenital anatomic abnormalities, hydrops fetalis, heart failure, and growth restriction. Options for management include laser ablation of the anastomotic vessels, amnioreduction, and/or selective fetal reduction.

Incorrect Answers: A, C, D, E, and F.

Amniotic fluid leak across intervening membranes (Choice A) could lead to oligohydramnios in one fetus and polyhydramnios in the other fetus if the movement of fluid was unidirectional. However, movement of amniotic fluid from one fetus to another would not cause discordant hematocrit values in the newborns.

Chronic abruptio placentae (Choice C) presents with intermittent vaginal bleeding, oligohydramnios caused by placental insufficiency, and fetal growth restriction. As monozygotic twins share a placenta, chronic abruptio placentae would be expected to affect both fetuses similarly.

Funisitis (Choice D) is an infection of the umbilical cord that occurs in the setting of chorioamnionitis. Chorioamnionitis is a bacterial infection of the fetal membranes that most commonly occurs with premature or prolonged rupture of membranes. Funisitis would not cause an alteration in hematocrit concentrations in the newborns.

# Internal Medicine

## Residency Programs: 618

## Prohibited Programs: 221



MK000050