## IN THE UNITED STATES DISTRICT COURT
## FOR THE Eastern DISTRICT OF PENNSYLVANIA

DR. MARKCUS KITCHENS, JR.,

       Plaintiff,

   v.

NATIONAL   BOARD   OF   MEDICAL
EXAMINERS,

       Defendants.

Civil Action No. 2:22-CV-03301-JFM

### JOINT RULE 26(f) REPORT

Pursuant to Rule 26(f) and Judge Murphy's policies and procedures, the parties have

discussed and communicated about a discovery plan and provide the following report:

**I.      Counsel**

    A.      Lead counsel for plaintiff(s):          Pro se

    B.      Lead counsel for defendant(s):          Caroline Mew

    C.      All counsel who participated in Rule 26(f) conference on behalf of Plaintiff(s):

       None

    D.      All counsel who participated in Rule 26(f) conference on behalf of Defendant(s):

       Caroline Mew
       Bob Burgoyne

**II.     Description of claims and defenses**

**The parties may assume that Judge Murphy has read the complaint and other**

**pleadings and is familiar with the claims and defenses.  With that in mind, counsel**

**should go a layer deeper and summarize the key facts and threshold legal issues that**

**underlie the claims and defenses.  In addition, the parties should attach critical**

**documents to this report, if not attached to the pleadings already (e.g., in a contract case, the document(s) comprising the contract; in a personal injury case, photographs of the scene, etc.).**

Plaintiff's Statement:

The NBME violated Title III of the Americans with Disabilities Act (ADA) when they denied providing reasonable testing accommodations to Dr. Kitchens, who is a qualified individual with a disability. The NBME claims that the documentation provided by Dr. Kitchens was 'sparse', 'unsupported', and provided no basis for approving accommodations, however, his documentation provides over ten years of medical evidence demonstrating a long history of ADHD and anxiety and the severity of it as demonstrated by his prescription dosage.

Title III of the ADA (42 U.S.C. 12181-12189) prohibits discrimination on the basis of disability. *Bragdon v. Abbott*, 524 U.S. 624, 631-632 (1998). To prevail on an ADA violation claim, Dr. Kitchens must prove by a preponderance of the evidence that he 1) has a disability, 2) requested reasonable accommodations and 3) those accommodations were denied. The NBME does not deny that extended testing time is a reasonable accommodation and that the accommodations were denied. Therefore, the focus of this case is whether or not Dr. Kitchens has a disability.

An individual has a disability if he has a physical or mental impairment that substantially limits a major life activity. 42 U.S.C. 12102. Breaking down a disability to its elements, if Dr. Kitchens: 1) has a mental or physical impairment, 2) that substantially limits, and 3) a major life activity, then he is considered an individual with a disability. ADHD and anxiety are explicitly recognized by the ADA as mental impairments. Major life activities include reading, thinking, concentrating, and learning; the relevant life activities in this case are concentrating and thinking.

-2-

Dr. Kitchens was diagnosed with ADHD in 2013 and test anxiety in 2018. Since Dr. Kitchens has been diagnosed with ADHD and anxiety, he has a mental impairment under the ADA. Additionally, the USMLE as a licensing assessment for medical students and/or graduates evaluates how applicants can apply science concepts under timed conditions, which includes major life activities such as thinking and concentration. The NBME does not dispute that ADHD is considered an impairment. 28 C.F.R. §36.105(b)(1)(ii),(2). ("As to the term 'impairment,' the applicable Department of Justice regulations provide that the term physical or mental impairment includes ADHD and dyslexia and other specific learning disabilities.") *Ramsay v. Nat'l Bd. Of Med. Examiners*, 968 F.3d 251, 2 (3rd Cir., July, 2020); ("Specific learning disorders, dyslexia, and ADHD are considered impairments under the ADA.") *Berger v. Nat'l Bd. of Med. Examiners*, 2019 U.S. Dist. LEXIS 145666, 57 (S. D. Ohio, August, 2019); ("[a] mental impairment is 'any mental or psychological disorder, such as an intellectual disability…, organic brain syndrome, emotional or mental illness, and specific learning disabilities.") *Healy v. Nat'l Bd. of Osteopathic Med. Examiners, Inc.*, 870 F. Supp. 2d 607, 616 (S.D. Ind., 2012). Thus, the single fact at issue is whether Dr. Kitchens' ADHD *substantially* limits his ability to think and concentrate.

The Department of Justice ("DOJ") has explained that the "term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 28 C.F.R. 36.105(a)(2)(i). "[T]he 'substantially limits' inquiry 'should not demand extensive analysis,'" and "'[t]he comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence.'"

*Agranoff v. Law School Admission Council*, 97 F.Supp. 2d 86, 87 (D. Mass. 1999) quoting *Ramsay v. Nat'l Bd. of Med. Examiners*, 968 F. 3d 251, 258-29, (3rd Cir., July, 2020).

The USMLE is a high-stakes standardized licensing examination that tests, not only an individual's understanding of important science concepts basic to the practice of medicine, tests an applicant's stamina and ability to maintain a high level of intense focus and concentration for significant periods of time. The NBME does not dispute this. However, unlike any other applicant for accommodations, the NBME does dispute the validity of Dr. Kitchens' diagnoses and the significance with which it impacts his ability to perform major life activities.

Unlike recent applicants who have had to pursue accommodations through litigation, Dr. Kitchens is an African American man who was raised in a single parent household. He was evaluated when he was approximately 6-7 years old by his pediatrician, who diagnosed him with ADHD and prescribed Ritalin. Dr. Kitchens was unaware of this diagnosis and was never put on Ritalin due to his mother's hesitancy and the (mistaken) belief that ADHD could be corrected with behavioral modifications and tight organizational habits. Unbeknownst to Dr. Kitchens, he received unofficial accommodations throughout his educational career up through his freshman year of college. At Berea College, Dr. Kitchens was recommended to disability services for an evaluation; it was at this point he was referred to Lexington, Kentucky for another ADHD evaluation. During this evaluation, Dr. Kitchens was diagnosed with ADHD - for the second time.

The NBME provides no reason for denying Dr. Kitchens' request and relies on the recommendations of two Ph.D. evaluators (one of whom is a consulting witness) to determine whether Dr. Kitchens is 'substantially limited'. As demonstrated briefly in the injunctive hearing, Ph.D. psychologists would have little, if any, knowledge and understanding of how ADHD

161341643.1

impacts the cognitive functions of the brain irrespective of when the diagnosis was made. Psychologists would also undermine the significance of being prescribed Adderall, especially at the dosage levels that Dr. Kitchens is prescribed. At the time of his application, Dr. Kitchens provided medical records demonstrating his ADHD diagnoses and his prescription for Adderall at fifteen (15) mg, twice a day (a total of thirty (30) mg per day), as well as a letter from his treating physician requesting additional time for examinations. These documents alone would demonstrate that Dr. Kitchens is substantially limited compared to the general population and that these accommodations are necessary. As the courts have consistently held, the "opinion of the [plaintiff's] treating physician must be given great weight" because the plaintiff's need for accommodation is 'principally a medical issue'." *Id* quoting *D'Amico v. New York State Bd. of Law Examiners*, 813 F. Supp. 217, 221 (W.D.N.Y. 1993).

The NBME, having barely succeeded against Dr. Kitchens' motion for preliminary injunction, now points to Dr. Kitchens' lack of documentation as an excuse for the failures of its reviewing evaluators. Like most underdog stories, Dr. Kitchens hails from a single-parent household with few resources, this is clear by his admission to Berea College (a liberal arts college whose student body predominantly consists of students under the poverty line), his insurance provider (Medicaid), and his deposition testimony. Where other applicants had the ability to get evaluated by multiple specialty providers, Dr. Kitchens had to pay out of pocket to a provider he could afford. An evaluation which, by both insurance and medical-provider standards, was unnecessary and potentially unethical - not to mention outside of the normal practice for primary care physicians and therapists alike. While Dr. Kitchens will agree with the Defendant in that ADHD is not a reading disorder, the shortcomings of psychologists as evaluators is once again demonstrated, because ADHD is the decrease in norepinephrine and

dopamine (neuroreceptors in the brain). Thus, it affects not just a person's ability to focus, it affects the entire functionality of the brain and how it processes information and impulsivity. Dr. Kitchens' ADHD and anxiety are clearly substantially limiting as indicated by the dosage of a controlled substance and frequency in his prescribed treatment plan.

The NBME would also point to Dr. Kitchens' academic successes by pointing to his ability to progress up to and through medical school without *official* accommodations. However, this is also improper. In *Ramsay v. Nat'l Bd. of Med. Exam'rs*, the Court found that the NBME blatantly violated the ADA by focusing its analysis of her accommodation application on prior academic successes and performances without accommodations and whether the applicant met the definition of disability. *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F. 3d 251, 46 (3rd Cir. 2020). So too, in Dr. Kitchens' first application for accommodations, the NBME penalized Dr. Kitchens for allegedly not meeting the definition of a disability rather than whether he had met with his obligation(s) under the ADA and his academic successes without prior accommodations.

Throughout the entire accommodation process, the NBME has time and time again demonstrated its discriminatory gate-keeping against, not just disabled applicants, but to applicants who are low income persons of color. Instead of using medical or osteopathic doctors to review accommodation applications, it utilizes psychologists who are out of touch with reality or worse, ill-prepared to consider the effects of cultural biases and lack of financial resources to gather *official*, *documented* accommodations. Moreover, the NBME would have Dr. Kitchens be continually punished after this litigation by leaving the prior failed attempts on his examination transcript - permanently barring him from practice in nineteen states. Approximately thirty-eight (38%) percent of the nation, not counting the number of residency programs, hospitals, and/or clinics  that reside in said states.

<u>Defendant's Statement</u>:   Dr. Kitchens claims that NBME violated the Americans with Disabilities Act (ADA) by denying his two requests for extended testing time on Step 1 of the USMLE.  Both of those denials took place in 2022.  Both denials were based upon the identical, sparse documentation that Dr. Kitchens provided at that time in support of his accommodation requests.

NBME's position is that it did not discriminate against Dr. Kitchens by denying his requests for accommodations because his supporting documentation did not substantiate either of his claimed impairments or demonstrate that either alleged impairment substantially limited his ability to perform one or more major life activities, which is the applicable requirement for demonstrating that an impairment constitutes a disability with the meaning of the ADA. The supplemental documentation that Dr. Kitchens submitted to the Court in support of his preliminary injunction motion provides, for the first time, a diagnostic report but still fails to establish that he is disabled within the meaning of the ADA and cannot be relied upon in all events to show that his 2022 requests for accommodations were supported with adequate documentation.

When seeking disability-based testing accommodations under the ADA, a prospective examinee must demonstrate that he has a physical or mental impairment that substantially limits his performance of a major life activity that is relevant to taking the USMLE examination as compared to most people in the general population, *see* 42 U.S.C. § 12102(1); 28 C.F.R. § 36.105(d)(1)(v); and that he needs reasonable accommodations in order to take the USMLE in an accessible manner, *see* 42 U.S.C. § 12189.[1]

---

[1] The parties independently prepared their position statements and NBME is not engaging in a point-by-point refutation of Dr. Kitchens's arguments above. It does want to clarify, however, that the following statement, which Dr. Kitchens says NBME "does not dispute," is not a

NBME reviews each request for accommodations on an individualized basis. Dr. Kitchens's statement that he is the only candidate for whom NBME has questioned the validity of his diagnosis or whether he is substantially limited in any major life activity is not accurate.

Dr. Kitchens sought accommodations from NBME on Step 1 of the USMLE based upon an alleged diagnosis of Attention-Deficit/Hyperactivity Disorder (ADHD) that he claimed to have first received in 2013 and a diagnosis of Test Anxiety that he claimed to have first received in 2018. He did not submit documentation to NBME, however, to substantiate either diagnosis, or to show the functional limitations that he claims to experience as a result of those alleged impairments.

Dr. Kitchens subsequently filed additional documentation with the Court in support of his motion for preliminary injunction, beyond what he had provided to NBME last year when he actually asked NBME for accommodations. Some of the additional documentation related to his claimed ADHD diagnosis in 2013, but these documents still did not show the basis for the diagnosis or identify any functional impairment resulting from his alleged ADHD. Dr. Kitchens was more recently evaluated by Christina Bacon, LPP, in a report that he submitted to the Court in support of his preliminary injunction motion. The report included a diagnosis of ADHD, based largely on information self-reported by Dr. Kitchens, but her evaluation report also failed to address how Dr. Kitchens self-reported symptoms of ADHD actually interfere with, or reduce the quality of, his social, school, or work functioning, or his reading and concentration abilities.

---

statement attributable to NBME: "The USMLE is a high-stakes standardized licensing examination that tests, not only an individual's understanding of important science concepts basic to the practice of medicine, tests an applicant's stamina and ability to maintain a high level of intense focus and concentration for significant periods of time. The NBME does not dispute this."

161341643.1

The American Psychiatric Association's Diagnostic and Statistical Manual sets forth guidelines for the diagnosis of ADHD. *See* Centers for Disease Control and Prevention ("CDC"), Symptoms and Diagnosis of ADHD, *at* https://www.cdc.gov/ncbddd/adhd/diagnosis.html#ref (Ex. A). As recognized by the CDC, following this diagnostic standard "helps ensure that people are appropriately diagnosed and treated for ADHD." *Id.* The diagnostic criteria require a showing of "a *persistent pattern* of inattention and/or hyperactivity-impulsivity *that interferes with functioning or development*[.]" *Id.* (emphases added). For adults diagnosed with ADHD, at least five symptoms must have been present before 12 years of age and the symptoms must be present in two or more settings (home, school, or work; with friends or relatives; in other activities). *Id.* There must also be "*clear evidence* that the symptoms *interfere with*, or *reduce the quality* of, *social, school, or work functioning*." *Id.* (emphases added). In other words, an ADHD diagnosis cannot be based solely on the identification of symptoms of ADHD (whether by self-report, the report of other informants, or through computerized Continuous Performance Tests (CPTs)). There must also be a showing—through "clear evidence"—of a persistent pattern of functional impairment. "Functional impairment is a key construct in the definition of ADHD, since symptoms of inattention and impulsiveness can hardly constitute a disorder in someone who is not impaired by them." B. Lovett and A. Harrison (2021) "Assessing Adult ADHD: New Research and Perspectives," Journal of Clinical and Experimental Neuropsychology, 43:4, 333-339.

Dr. Kitchens's medical records from 2013, 2017, and 2018 do not show how he met the diagnostic criteria for ADHD and do not explain how any ADHD-type symptoms that Dr. Kitchens claimed to be experiencing were present in a *persistent pattern* that *interfered with his*

*functioning or development.* They do not show any evidence—much less *clear evidence*—of how any reported symptoms interfered with Dr. Kitchens's functioning.

The same is true with regard to Ms. Bacon's 2023 evaluation. Her report was based on Dr. Kitchens's self-report. Although Dr. Kitchens "reported that [his] symptoms affect multiple facets of his life," ECF 22 at 3-4, Ms. Bacon did not review any objective information (*e.g.*, school transcripts, report cards, teacher comments, work evaluations) to confirm Dr. Kitchens's self-report. The Achenbach System of Empirically Based Assessment (ASEBA) that she utilized was based on "Self-Report" and gathered Dr. Kitchens's "*perception* of his adaptive functioning and problems." *Id.* at 4 (emphasis added). And Dr. Kitchens's report for purposes of this diagnostic evaluation appears inconsistent with other reports he has made regarding his functioning. For example, in his self-report to Ms. Bacon, "Markcus's score on the Job syndrome was in the clinical range below the 3rd percentile." *Id.* But in his court filings, he reported strong performance in his clinical rotations. *See* ECF 20-1 ¶ 53 ("I received high marks in all of my clinical rotations…."). The MOXO d-Continuous Performance Test (CPT) administered by Ms. Bacon assesses *symptoms* of ADHD, and Dr. Kitchens's performance on this 20-minute measure does not show his real-world functioning. ECF 22 at 6-7.

Even if Dr. Kitchens's ADHD diagnosis were supported by the record (and it is not), the record does not show that Dr. Kitchens is "substantially limited" in any major life activity relevant to taking the USMLE as compared to most people in the general population. Having a diagnosed impairment is not sufficient to establish a disability under the ADA. As set forth in DOJ's implementing regulations, "not every impairment will constitute a disability," 28 C.F.R. § 36.105(d)(1)(v), and numerous courts have found that individuals with diagnosed impairments are not disabled within the meaning of the ADA. *See, e.g., Collins v. Prudential Investment &*

*Retirement Servs.*, 119 F. App'x 371, 378 (3d Cir. 2005) ("[Plaintiff's] testimony about her work, academic [background], and community involvement contradicts her claim that her ADHD/ADD substantially limits her abilities to think, learn, remember and concentrate"); *Hentze v. CSX Transp., Inc.*, 477 F. Supp. 3d 644, 670-71 (S.D. Ohio 2020) (railroad employee who failed employment test and was diagnosed with anxiety not disabled under the ADA); *Black v. NBME,* 281 F. Supp. 3d 1247, 1249-50 (S.D. Fla. 2017) (medical school student with ADHD diagnosis not disabled under the ADA); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs,* 2016 WL 1404157, at *7 (E.D. Pa. 2016) (examinee with dyslexia not disabled under the ADA).

In evaluating whether Dr. Kitchens is substantially limited, his claimed limitations must be measured against the general population, not against other college graduates or medical students. *See, e.g., Singh v. George Wash. Univ.*, 508 F.3d 1097, 1103-04 (D.C. Cir. 2007) ("[A]ny measure of substantial limitation that might change based on a plaintiff's particular educational environment—e.g., a comparison of '[m]edical students … to their fellow students,' …—would make disabled status vary with a plaintiff's current career choices, and would fail to achieve the ADA's additional purpose of providing 'clear, strong, *consistent*, [and] enforceable standards' to address discrimination.") (original emphasis, citations omitted); *Black v. NBME,* 281 F. Supp. 3d at 1249-50 ("Although Black insists that the Board must compare Black's performance to her 'medical-school peers,' under 28 C.F.R. § 36.105(d)(1)(v) the substantial-limitation determination depends on a person's performance in comparison to 'most people in the general population.'"); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 WL 1404157, at *6 ("It is inappropriate under the ADA to compare an individual to her academic peer group or, in the case of standardized tests, other test-takers who are not representative of the general population"). The limited documentation that Dr. Kitchens submitted to NBME and filed in

support of his preliminary injunction motion does not show that Dr. Kitchens is substantially limited in his ability to perform any major life activity relevant to taking the USMLE compared to most people. He was able to proceed through school—at all levels, including medical school—in a timely manner and without school-based supports or accommodations. He did not receive accommodations on the ACT, and reportedly scored in the 50th percentile (decidedly average), and he did not receive accommodations when he took the Medical College Admission Test.

In his court papers, Dr. Kitchens claims that he is "impaired" in the "major life activities of reading, learning, cognitive processing and test taking." ECF 20-1 ¶ 7. Learning is a major life activity under the ADA, 42 U.S.C. § 12101(2)(A), but the USMLE is not a "learning" activity. By "cognitive processing," NBME assumes Dr. Kitchens means thinking, which is a major life activity under the ADA. *Id.* Reading is also a major life activity under the ADA. *Id.* Dr. Kitchens has not been evaluated for or diagnosed with any reading disorder or other learning disorder. He has argued that the "notable manifestations of [his alleged ADHD disorder] include, but is not limited, to poor reading fluency (i.e. slow reading) and delayed processing of written information," ECF 20-1 ¶ 8, but ADHD is not a reading disorder, having ADHD does not itself cause reading fluency impairment, and Dr. Kitchens's processing speed has never been evaluated or measured in any of the documentation he submitted in support of his accommodation requests or in his court filings. There is no evidence that Dr. Kitchens is substantially limited in his ability to read or think compared to most people.

Plaintiff now claims that the relevant major life activities are concentrating and thinking. Again, however, there is no evidence that Dr. Kitchens is substantially limited in these areas compared to most people.

III.    **Stipulated facts and insurance coverage and deductibles**

The parties stipulate to the following facts:

1.  NBME is a non-profit organization based in Philadelphia.

2.  NBME develops and administers (through a third-party vendor) the United States

    Medical Licensing Examination (USMLE).

3.  Licensing authorities across the country rely upon the USMLE to help evaluate the

    qualifications of individuals seeking an initial license to practice medicine.

4.  Three "Step" exams comprise the USMLE:

    Step 1 assesses whether the examinee understands and can apply important

    science concepts basic to the practice of medicine, with special emphasis on

    principles and mechanisms underlying health, disease, and modes of therapy.

    Step 2 Clinical Knowledge (Step 2 CK) assesses whether candidates have the

    patient-centered knowledge, skills and understanding of clinical science that

    provide the foundation for the safe and competent practice of medicine under

    supervision.

    Step 3 assesses whether an examinee understands and can apply medical

    knowledge essential for the unsupervised practice of medicine, with emphasis on

    patient management in ambulatory settings. It is the final examination in the

    USMLE sequence leading to a license to practice medicine without supervision.

5.  The USMLE is a standardized exam, meaning that examinees test under the same

    conditions, including the same time limitations.

6.  Dr. Kitchens is a graduate of the Medical University of Lublin in Poland.

-13-

7.  In January 2022, Dr. Kitchens submitted a request form to NBME seeking testing accommodations on Step 1 of the USMLE.

8.  Dr. Kitchens's request form sought 100% extra time on Step 1.

9.  In his request, Dr. Kitchens reported a 2013 diagnosis of ADHD and a 2018 diagnosis of test anxiety.

10. Dr. Kitchens reported on his request form that he did not receive formal accommodations in elementary school, middle school, high-school, college, or medical school.

11. Dr. Kitchens reported on his request form that he did not receive accommodations on the ACT or Medical College Admission Test (MCAT).

12. NBME denied Dr. Kitchens's request by letter dated February 8, 2023.

13. The Comprehensive Basic Science Self-Assessment (CBSSA) is a practice test designed for students planning to take the USMLE Step 1.

14. Test-takers can choose to take their self-assessment in either a standard-paced or self-paced format and the tests are not proctored.

15. Dr. Kitchens took a CBSSA on July 12, 2021 and received an Assessment Score of 151.

16. Dr. Kitchens took a CBSSA on September 13, 2021 and received an Assessment Score of 143.

17. Dr. Kitchens took a CBSSA on February 14, 2022 and received an assessment score of 212.

18. Dr. Kitchens took Step 1 of the USMLE on February 22, 2022 under standard conditions and did not pass.

19. Dr. Kitchens took a CBSSA on March 21, 2022 and received a Total Equated Percent Correct Score of 77%.

20. Dr. Kitchens took a CBSSA on April 1, 2022 and received a Total Equated Percent Correct Score of 69%.

21. Dr. Kitchens took Step 1 a second time on May 9, 2022 and did not pass.  He did not seek accommodations for this test administration.

22. Dr. Kitchens took Step 2 CK on May 28, 2022 and again June 29, 2022 under standard conditions and did not pass.  He did not request accommodations for either of these test administrations.

23. Dr. Kitchens submitted a second request for accommodations on Step 1 of the USMLE on or about August 30, 2022.  He sought 50% extra time and extra breaks.  He did not submit any new documentation in support of this request.

24. NBME asked Dr. Kitchens to provide new documentation in support of his August 2022 request for accommodations on the Step 1 exam.

25. Dr. Kitchens acknowledged the NBME's request and responded stating that he had no new documents.

26. Dr. Kitchens took Step 1 on September 29, 2022 under standard conditions and did not pass.

27. ADHD is recognized as a mental impairment under regulations implementing the ADA. 28 C.F.R. § 36.105(b)(2).

28. ADA regulations also state that not every impairment will constitute a disability. 28 C.F.R. § 36.105(d)(1)(v).

****

NBME has insurance coverage potentially applicable to this matter, subject to a $250,000 deductible.

161341643.1

**IV.     Anticipated scope of discovery**

  **This information is critical to having a meaningful conference, and Judge Murphy's understanding of the scope and nature of discovery will largely determine the schedule. The parties should consider the discovery that they will need and provide thoughtful answers.   Generic statements like "discovery about all claims and defenses" is unacceptable.   Judge Murphy invites the parties to vary from the default limits in the Federal Rules and provide thoughtful answers based on their actual assessment of the case.**

  A. Summarize with specificity those issues on which the parties will need to conduct discovery.  Identify categories of information each party needs in discovery and why.

Plaintiff's Anticipated Areas of Discovery:

*NBME's policies and procedures* – Dr. Kitchens may seek the policies and procedures provided by the NBME to its Disability Services department and/or application reviewers to determine whether an application should be granted. NBME's expert witness, Erin Convery, claimed that approximately eighty (80%) percent of applicants who apply for accommodations are granted. Dr. Kitchens may seek discovery regarding statistical and/or empirical data regarding the approval rate of applicants. Dr. Kitchens may also seek discovery from NBME regarding how it takes race and/or cultural bias(es) into account when reviewing applications.

*NBME's Scoring Policies and Procedures* - Dr. Kitchens may seek discovery regarding the NBME's grading policies and procedures for the USMLE STEP examinations as well as the policies and procedures of the committee(s) who are responsible for receiving and reviewing score recheck(s). Dr. Kitchens may also seek discovery regarding his prior exams, including but not limited to, reviewing the prior examinations in a secured facility (i.e. Prometric Center).

*NBME's Criterion for Accommodation Applications* – Dr. Kitchens may seek discovery regarding any criteria the NBME sets forth for retaining application reviewers and/or outside consultants; the type and scope of appropriate documentation that may be requested from applicants and the minimum standards for granting testing accommodation requests; and what the NBME requires for documentation to be considered 'complete'. Dr. Kitchens may also seek discovery from the NBME regarding the criteria and guidelines for reviewers and qualified professionals who review or evaluate testing accommodation requests.

*NBME's written recommendations for applicants* – Dr. Kitchens may seek discovery regarding whether there are parameters for written recommendations from any outside consultant(s) who review and/or evaluate requests for testing accommodations and any written explanations for denials of testing accommodation requests.

*NBME's training policies and procedures* – Dr. Kitchens may seek discovery regarding the parameters of training (i.e. content and timing of) to both NBME staff and outside consultants who evaluate or review testing accommodation requests.

*NBME's expungement policy* – Dr. Kitchens may seek discovery regarding expunging prior test scores that were taken under standard conditions.

Defendant's Anticipated Areas of Discovery:

*Dr. Kitchens's history of evaluation/diagnosis* - Dr. Kitchens reports being assessed for ADHD at various times dating back to elementary school and being assessed and treated for anxiety in 2018 and 2020. NBME may seek discovery regarding these and any other prior assessments from Dr. Kitchens and his third-party providers. Dr. Kitchens has also claimed to

have been diagnosed with "test anxiety."  NBME may also seek discovery from Dr. Khan and other third-party healthcare providers regarding his alleged impairment.

*Dr. Kitchens's academic, testing, and work history* - The Diagnostic and Statistical Manual of Mental Disorders (DSM) requires clear evidence that symptoms of ADHD interfere with, or reduce the quality of, social, school, or work functioning. Dr. Kitchens also claims to be substantially limited in areas including thinking and reading. NBME may seek discovery regarding Dr. Kitchens's academic, testing, and work history from Dr. Kitchens, his schools, other testing entities, and his employers. This may include the hospitals where he did his clinical rotations and the institutions where he reports having done internships (e.g., the Mayo Clinic).

*Dr. Kitchens's ADHD symptoms* - According to the DSM, and as touched upon above, symptoms of ADHD must be present in two or more settings and before the age of 12 years. NBME may seek discovery regarding Dr. Kitchens's symptoms of ADHD from his mother and/or wife, both of whom have either testified in this matter or responded to behavior questionnaires from Dr. Kitchens's evaluators. NBME may also seek discovery from others who interact with him on a regular basis.

     B.     Anticipated number of interrogatories per party:

          Plaintiff     25

          Defendant     25

     C.     Anticipated number of depositions per party:

          Plaintiff     10

          Defendant     10

     D.     Do the parties anticipate the need for any agreements on remote deposition protocols?

The parties do not anticipate a need for any protocols.

E.      To the extent either party proposes to exceed the presumptive limits in the Federal Rules for discovery, explain the basis for that proposal.

The parties do not propose to exceed the presumptive limits in the Federal Rules.

F.      Do the parties anticipate the need for a Fed. R. Evid. 502(d) order?

The parties do not anticipate the need for a Fed. R. Evid. 502(d) order.

G.      Do the parties anticipate the need for any third-party discovery?  If so, identify the likely third parties and the discovery to be sought.

Plaintiff: Dr. Kitchens may conduct third-party discovery from some or all of the following third parties:

1)  Erin Convery – records and deposition relating to Disability Services, Dr. Kitchens' accommodation application, and empirical-statistical data regarding approval rates for applicants

2)  Lucia McGeehan – records and deposition relating to her review of Dr. Kitchens' accommodation applications

3)  Michael Gordon, Ph. D. - records and deposition relating to his review of Dr. Kitchens' accommodation applications

4)  Jessica Yarrison - records and deposition relating to her review of Dr. Kitchens' Step 2 CK examination score recheck

Defendant:  NBME may conduct third-party discovery from some or all of the following third parties:

(1)  Schools - records from Dr. Kitchens's time at Rivermont Elementary School, Bess T. Shepard Elementary School, Tyner Middle Academy, and Tyner Academy High School

(2)  Berea College - records from Disability Services, Health Services, and registrar (transcript)

(3)   Northwestern Medicine - records from Ghori S. Khan, MD and the dermatology department

(4)  Alyssa Hanna - records and deposition relating to topics discussed in affidavit submitted in support of motion for preliminary injunction

(5)   Christina Bacon, LPP - records and deposition relating to her ADHD evaluation of Dr. Kitchens

(6)  Tina Holbrook, APRN - records and deposition relating to any ADHD evaluation and treatment of Dr. Kitchens

(7)  Vicki Hackman, MD - deposition relating to medical visits by Dr. Kitchens, including those related to ADHD

(8)  Miriam David, MD - deposition relating to medical visits by Dr. Kitchens, those during which he was seeking ADHD medication

(9)  Cynthia Reed, MSW, LCSW - deposition relating to her interactions with Dr. Kitchens, including any ADHD evaluation

(10)  Jessica Joy - records relating to her interactions with Dr. Kitchens, including any ADHD or anxiety evaluation or treatment

(11)  Andrew Yin/Baptist Health - records relating to his/their interactions with Dr. Kitchens, including any ADHD or anxiety evaluation or treatment

(10)   Association of American Medical Colleges (AAMC) - MCAT score report and any testing accommodation request(s); Dr. Kitchens's medical school applications; Dr. Kitchens's residency program applications

(11)  ACT - ACT score report and any testing accommodation request(s)

(12)  Educational Commission for Foreign Medical Graduates (ECFMG) -- their interactions with Dr. Kitchens's, including on the process for applying to residency programs

(13)   Missie King - records and deposition relating to topics discussed in her affidavit in support of Dr. Kitchens's motion for preliminary injunction and her testimony at the preliminary injunction proceeding

(14)  Amelia Kitchens - deposition relating to any ADHD or anxiety symptoms or impairment and Dr. Kitchens's request for score rechecks on his prior administrations of the Step 1 exam

-20-

H.     **Do the parties anticipate the need for experts?  If so, identify the subjects on which the expert(s) may opine.  Be sure to point out whether defendant(s) will be advancing experts on affirmative issues, or only in response to plaintiff(s) experts.  State whether expert depositions will be taken, and if so, an agreement or positions on how many will be required.**

Plaintiff:

Dr. Kitchens expects to present expert testimony on whether the documentation provided to the NBME in support of the two requests for accommodations on the STEP 1 exam: (1) adequately demonstrated that he was diagnosed with a mental impairment; (2) supported Dr. Kitchens' position that Plaintiff is substantially limited in any major life activity relevant to taking the USMLE compared to most people in the general population; and (3) how cultural biases against the medical community, specifically mental health, may impact the availability of documentation. Dr. Kitchens might also offer expert testimony (perhaps from the same individual(s) who address the subjects noted immediately above) on consideration(s) of the African American diaspora, internal cultural perspectives of its male populace, and the African American interaction(s) with medicine.

Defendant:

NBME expects to present expert testimony on whether the documentation provided by Plaintiff in support of his two requests for accommodations on the Step 1 exam: (1) adequately demonstrated that he has been diagnosed with any mental impairment; and (2) supported a finding by NBME that Plaintiff is substantially limited in any major life activity relevant to taking the USMLE compared to most people in the general population.  This expert testimony will be offered in response to any expert testimony offered by Plaintiff as well as

generally in response to the record in this matter.  NBME might also offer expert testimony (perhaps from the same individuals who address the subjects noted immediately above) on the type and quantity of documentation that is reasonably needed when evaluating whether an individual who has requested extended time on a high-stakes standardized examination has a mental impairment that substantially limits one or more major life activities that are relevant to test taking.

****

The parties have agreed that expert depositions will be taken, with up to three (3) experts and expert depositions per party. This does not include fact witnesses who may also have subject matter expertise (e.g., doctors or other professionals who evaluated Plaintiff or internal NBME reviewers).

I.   Does the plaintiff expect to request attorneys' fees as a prevailing party, either pursuant to a contract or a statute? If so, state the basis for the expected request.

Plaintiff is appearing pro se and therefore does not expect to request attorneys' fees.

J.   Has each party provided written notice to the client of the obligation to preserve all relevant material, including electronic records?

Plaintiff        Yes

Defendant        Yes

161341643.1

## V.       Status of discovery

The parties exchanged initial disclosures on January 17, 2023. The parties participated in a Rule 26(f) conference on February 13, 2023, but did not begin discovery immediately thereafter given the intervening preliminary injunction proceedings.

## VI.      Proposed case management deadlines

A.       Rule 26(a)(1) initial disclosures were exchanged: January 17, 2023

B.       Deadline to amend pleadings to add claims or parties (must be as early as practicable to avoid prejudice or unnecessary delays): March 17, 2023

C.       Deadline for affirmative expert reports (if any) and disclosure of lay witness opinion testimony with related information and documents (if any):

The parties propose forgoing formal expert reports given the expedited proceedings.

The parties will identify the name(s) of any affirmative testifying experts and provide a brief (one paragraph) description of the anticipated subjects of their testimony by or before April 7, 2023.The parties will disclose lay witness opinion testimony by witness and a brief (one paragraph) description of the anticipated subjects of their testimony by or before April 7, 2023.

D.       Deadline for rebuttal expert reports (if any):

The parties will identify the names of any rebuttal testifying experts and provide a brief (one paragraph) description of the anticipated subjects of their testimony by April 21, 2023.

E.       Deadline(s) to complete fact/expert discovery:

Fact discovery: April 21, 2023

Expert discovery: May 5, 2023

F.       Provide an explanation for the position of the parties on whether expert discovery will run concurrently with fact discovery or be sequenced after fact discovery.

The parties propose that expert discovery be conducted after the conclusion of fact discovery so that the expert discovery can take into account all information disclosed during fact discovery.

G. If any party seeks more than 120 days for discovery, explain why.

N/A

H. Deadline to file motion for summary judgment.

April 22, 2023

## VII. Electronic discovery

The parties' Rule 26(f) discussions must include a thorough discussion about electronic discovery, including but not limited to: (1) the need for electronically stored information ("ESI"); (2) sources of ESI; (3) the anticipated scope of electronic discovery; (4) the identity of potential custodians; (5) whether search terms will be necessary and, if so, any limitations thereto; (6) the respective burdens of collecting, reviewing, and producing ESI, including any claims for cost-shifting under the Federal Rules of Civil Procedure; and (7) any anticipated problems with electronic discovery. The parties should summarize their discussion on these issues here. Counsel who attends the Rule 16 conference should be familiar with and able to discuss any ESI-related issues that might arise.

In addition, the Parties should state whether they have agreed to an ESI stipulation. If so, the parties should submit the stipulation to the Court in advance of the Rule 16 conference. If not, the parties should identify what issues need to be resolved to finalize the stipulation.

The parties do not anticipate significant electronic discovery issues given the relatively limited scope of discovery in this case. The parties have agreed that ESI may be produced in .pdf format as email attachments.

## VIII. Protective orders and confidentiality agreements

**The parties should indicate whether they anticipate the need for a protective order in this case.  If so, the parties must explain what type of information needs protection from disclosure and why such protection is warranted under governing standards.  In addition, the parties are directed to Judge Murphy's policies and procedures concerning protective orders and confidentiality agreements.**

The parties do not anticipate the need for a protective order at this time.

IX.     **Alternative dispute resolution**

    A.     **Have the parties engaged in any settlement discussions?  If so, set forth the status of those negotiations.  If not, explain why not.**

    B.     **Have the parties explored or considered other forms of alternative dispute resolution?  If so, summarize those efforts.  If not, state the parties' positions with respect to ADR, as required under Local Rule 53.3.**

    C.     **Identify the individual who will attend the Rule 16 conference who will have authority to discuss settlement.**

The parties have engaged in discussions regarding whether this matter can be resolved amicably but have not reached any agreement as of the time of this filing. The parties understand that the case is being referred to Judge Wells for settlement discussions.

Dr. Kitchens will attend the Rule 16 conference on his own behalf and Caroline Mew will attend the Rule 16 conference on behalf of NBME.

X.     **Consent to send case to a Magistrate Judge**

**If all parties consent to have a United States Magistrate Judge conduct any or all proceedings in this case, pursuant to 28 U.S.C. § 636(c), the parties should indicate as such and complete and return to the Court a Consent and Reference Of A Civil Action To A Magistrate Judge, (available at this link).**

The parties do not consent to send the case to a Magistrate Judge.

-25-

**XI.     Service by electronic means**

**Confirm that the parties consent to service of pleadings and discovery via email pursuant to Fed. R. Civ. P. 5(b)(2)(E).  Any party that does not consent must explain its reasons.**

The parties consent to service of pleadings and discovery by email.

**XII.    Policies and procedures**

**Judge Murphy's policies and procedures are available for the parties to review on the Court's website. By signing below, counsel for each party and/or each *pro se* party represents that he or she has reviewed the Judge's policies and procedures and acknowledges the requirements contained therein.  The parties and their counsel further acknowledge by signing below that Judge Murphy may strike pleadings and other submissions that do not comply with his policies and procedures.**

The parties and their counsel acknowledge these requirements.

**XIII.   Other matters**

**The Parties should identify any other issues that have not been addressed above but may require the Court's attention (*e.g.*, anticipated motions, bifurcation, privilege issues, etc.).**

NBME will request that Dr. Kitchens execute a consent to the release of information to facilitate timely discovery (including medical and educational records) from third parties.

161341643.1

Dated:  March 9, 2023                                      Respectfully submitted,


                                                          /s/ *Dr. Markcus Kitchens (with permission)*
                                                          625 Hampton Way, #2
                                                          Richmond, KY 40475
                                                          (423) 314-4096
                                                          markzwanz@gmail.com

                                                          /s/  *Caroline M. Mew*
                                                          Caroline M. Mew (admitted *pro hac vice*)
                                                          Perkins Coie LLP
                                                          CMew@perkinscoie.com
                                                          700 Thirteenth Street, N.W., Suite 800
                                                          Washington, D.C. 20005-3960
                                                          Telephone: 202-654-6200
                                                          Facsimile:  202-654-6211


                                                          Jared D. Bayer
                                                          Cozen O'Connor
                                                          One Liberty Place
                                                          1650 Market Street, Suite 2800
                                                          Philadelphia, PA 19103
                                                          Telephone: 215-665-4127
                                                          Facsimile: 215-701-2427


                                                          Attorneys for Defendants

161341643.1

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on Plaintiff on March 9, 2023, by email per the agreement of the parties to accept and provide service by email, to:

> Dr. Markcus Kitchens
> 625 Hampton Way, #2
> Richmond, KY 40475
> markwanz@gmail.com
>
> *Pro se plaintiff*

> */s/ Caroline M. Mew*
> Caroline M. Mew

161341643.1