UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


DR. MARKCUS KITCHENS, JR.,    )    22-CV-03301(JFM)
                      )
        Plaintiff,     )
                      )
     vs.            )
                      )
UNITED STATES MEDICAL      )
LICENSING EXAMINATION,     )    Philadelphia, PA
                      )    February 24, 2023
        Defendant.    )    10:00 a.m.


TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE JOHN F. MURPHY
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:          MARKCUS KITCHENS, JR., PRO SE
                       625 Hampton Way, #2
                       Richmond, KY 40475

For the Defendant:          CAROLINE M. MEW, ESQUIRE
                       PERKINS COIE LLP
                       700 13th St. NW, Suite 600
                       Washington, DC 20005

Audio Operator:            INNA GOLDSHTEYN


Transcribed by:            DIANA DOMAN TRANSCRIBING, LLC
                       P.O. Box 129
                       Gibbsboro, NJ 08026
                       Office: (856) 435-7172
                       Fax:    (856) 435-7124
                       Email:  dianadoman@comcast.net



Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1                         I N D E X

2

3    OPENING STATEMENTS:                                PAGE

4    By Dr. Kitchens                                     13

5    By Ms. Mew                                          20

6    WITNESS:           DIRECT    CROSS    REDIRECT   RECROSS

7    FOR THE PLAINTIFF

8    Missie King          24       --        --        --

9    Christina Bacon      51       79        91        --

10   Markcus Kitchens     94      112       131        --

11   FOR THE DEFENDANT

12   Erin Convery        134      148        --        --

13   Dr. Michael Gordon  155      178        --        --

14   CLOSING ARGUMENTS:                                 PAGE

15   Dr. Kitchens                                       184

16   Ms. Mew                                            188

17   THE COURT:                                         PAGE

18   Findings                                           195

19   Decision                                           199

20

21

22

23

24

25

1          (Proceedings commenced at 10:00 a.m.)

2          THE COURT:  All right.  I'm going to call the case.

3    This is a preliminary injunction hearing for the case of Dr.

4    Marcus Kitchens, Jr. vs. United States Medical Licensing

5    Examiners.  It's 22-CV-33-401.

6          Could I please have introductions, and it's -- but

7    not everyone has to speak for themselves, but could we have

8    introductions that account for everyone on the line, please,

9    staring with Dr. Kitchens, starting with you and anyone who

10   you've brought with you?

11         DR. KITCHENS:  Yes, good morning, Judge.  Today, I

12   have two witnesses.  One is Missie King, which is my mother,

13   and also, I have Christina Bacon, who is my expert witness.

14         THE COURT:  All right.  Ms. Mew?

15         MS. MEW:  Good morning, Your Honor.  Caroline Mew

16   for the National Board of Medical Examiners.  With me this

17   morning is Christine Marcil, who is a paralegal in our office

18   and will be assisting me with exhibits, as needed, and

19   Suzanne Williams who is in-house counsel for the National

20   Board of Medical Examiners is also on the call.

21         THE COURT:  And, Ms. Mew, on your side, what

22   witnesses are you expecting?  I saw the email, but could you

23   remind us?

24         MS. MEW:  Yes, Your Honor, Erin Convery and Michael

25   Gordon, and right now, I have them on call to be available

Colloquy                                     4

1    any time after noon, but --

2              THE COURT:  All right.

3              MS. MEW -- or any time.

4              THE COURT:  Okay.  My feeling on the hearing is

5    that there is not a particular need for anyone to be

6    sequestered.  Most people are either lawyers, parties, party

7    representatives or experts anyway.  Is that -- is everyone

8    okay if we -- any witness who wants to watch the proceedings,

9    because it's open court, be allowed to do that.

10             MS. MEW:  Yes, Your Honor, that's fine.

11             DR. KITCHENS:  Yes, that's fine with me.

12             THE COURT:  Okay.  In that case, the way we'll --

13   you know, the way we'll do this is, if there is a particular

14   witness who has something else they're busy with, that's

15   fine.  They don't -- they don't need to be here, but the

16   witnesses are welcome to be here or you can summon them when

17   they're -- when they're needed, all right?

18             MS. MEW:  Yes.

19             DR. KITCHENS:  Yes.

20             THE COURT:  Okay.  So let me -- let's do some

21   preliminaries before we get going.  You guys all saw the

22   email that I sent out last night.  I wanted -- let's -- I'll

23   tell you a little bit about how I think we're going to do

24   this today.  We'll do openings.  We'll try to keep those

25   reasonably brief, 15 minutes per side with plaintiff going

1    first.  Then we'll have witness presentations.  I'll try to

2    keep that into two hours.

3          And what I was trying to communicate about the

4    witnesses, and I hope everyone understood what I was getting

5    at is, you know, in a preliminary injunction motion, you

6    submit things on the papers, and it's typical to get, right,

7    like, what happened here, you get testimony in the form of

8    declaration.  You get exhibits that are -- some foundation

9    has been laid in those declarations.

10          And what I'm trying to say is, that's -- that all

11    counts.  So that's all on the record.  I'm going to take all

12    of that into consideration.  You don't have to do anything

13    special in this hearing in order to make that stuff count.

14    You don't have to put in direct testimony that's duplicative

15    of what's in the declarations, and you don't have to get

16    exhibits admitted that were already brought in through those

17    declarations.

18          That said, you know, I want you to use your time

19    wisely.  If there are some particular points you would like

20    to make, even if they have been made before, that's fine.

21    It's your time.  But, you know, I'll just give you that

22    option.  You don't have to necessarily dot every I and cross

23    every T because we're a little short on time.

24          And I will allow cross-examination, and I realize

25    that if everybody took all the time in the world to do cross-

1    examination, we would not finish today, and we need to finish

2    today because I am out all next week, and we (inaudible) in

3    this matter.  So we're going to get everything done today.

4    I'd ask everyone, on cross-examination, to keep it very short

5    and to the point.  If there is something that needs to be

6    brought out to bring it to my attention, please do so, but I

7    don't require -- I don't require any entertainment or gotchas

8    for cross-examination.  So just keep it to the very -- you

9    know, the very key things that you think I need to know

10   about.

11           I do have another matter that I have to attend to,

12   and so I've scheduled it at lunchtime.  So, basically, at

13   11:55 to 12:45, you guys will have a lunch break or collect

14   yourselves, whatever you want to do.  I'll be taking care of

15   another matter and then be back at 12:45.  I want to wrap up

16   at 5:00, at least for Inna's benefit, if not anybody else,

17   and we'll -- and we'll finish this thing up.

18           At the end, we'll have closings.  You know, my

19   thinking is, just so you know what to expect, for the

20   openings, I'll let you talk.  You know, I won't interrupt.

21   I'll let you say what you'd like to say for those.  During

22   witness presentations, I may have questions, and if I have

23   questions, I'll pipe up.

24           And then, during closings, if I have -- if there is

25   something that's important on my mind that I feel I need to

1    hear from you specifically about, I'll bring that up, and,

2    you know, I may ask questions during closing if it's

3    important.  What else?

4         A couple of other things I want to set the stage

5    on, one is, just a reminder for everyone, you know, this is

6    open court.  It's being recorded.  You guys will have the

7    transcripts generated so we can use those.  And just so

8    everybody knows, that's -- you know, that's -- this is all

9    part of the record of the case.  If the case were to go on

10   after this, you know, this stuff isn't going anywhere. It's

11   going to be lingering in the case, and this is essentially

12   open court in that regard, as well, with respect to what the

13   -- you know, what the public has access to.

14        Let me talk a little bit about -- well, actually,

15   I'm going to -- I want to talk a little about what I'm hoping

16   to learn about in this hearing, but before I do that, does

17   anyone have any preliminary issues about what we're doing

18   today that they'd like to raise?

19        MS. MEW:  Your Honor, I just wanted to confirm one

20   thing on the schedule, because you mentioned two hours for

21   witnesses, and I think -- my understanding from yesterday's

22   email is, it's approximately two hours per side.  Is that

23   what we're expecting?

24        THE COURT:  Right.  Correct.

25        MS. MEW:  And then, also, just a housekeeping issue

1    -- well, two, really.  So we were scrambling a little bit

2    this morning.  It was around 11:30 last night when Dr.

3    Kitchens informed us of his two other witnesses for today,

4    but that's fine.  But we also received, at about 4:00 a.m.,

5    emails with additional material that he said he filed

6    yesterday, but I don't think is on ECF yet.

7              DR. KITCHENS:  Yes, Your Honor -- oh, sorry, go

8    ahead.

9              THE COURT:  You go ahead.

10             DR. KITCHENS:  Yes, I did.  I filed all of my

11   information by the skin of my hair.  I did, at the time, try

12   to send -- well, I sent an email to Attorney Mew, as well.

13   I'm not sure why that didn't come through.  I've actually

14   sent her confirmation screen shots where it did.  And then at

15   4:00 this morning, I tried to redo that, as well, to send her

16   those documents.

17             Attorney Mew, did you receive those?

18             MS. MEW:  Yes, I got the -- the 4:00 a.m. email

19   came.

20             DR. KITCHENS:  Okay.  But those were -- I did try

21   to send that to you last -- yesterday.  I'm not sure what

22   happened.

23             THE COURT:  Okay.  Well, Dr. Kitchens, from my

24   point of view, in looking at the docket, I'm not seeing

25   anything that's been filed after the filing on February 21st

1    from defendant.  So what kind of stuff did you submit?  Is

2    there new -- are there new documents that aren't already in

3    the record?

4             DR. KITCHENS:  Yes, sir, I did submit those.  Yes,

5    there are new documents that I put in there and, also, my

6    reply to their response.

7             THE COURT:  Okay.  Well, probably, what I'm going

8    to let you do -- what I'm going to do is, this, then, and,

9    Ms. Mew, you -- those documents, I mean, you have them right

10   now.  You haven't had a lot of time with them, but you do

11   have those documents?

12            MS. MEW:  Correct, Your Honor.

13            THE COURT:  All right.  So what I'm going to let

14   you do, Dr. Kitchens, is if you want to refer to one of those

15   documents during this hearing, you can -- bear in mind, I

16   don't have it, right, but you can bring it up on the screen,

17   and that's fine because Ms. Mew has seen it.  But what I am

18   going to have you do is, over the weekend, figure out what

19   went wrong with the filing, because whatever happened, I

20   don't have it.

21            So figure out what went wrong with the filing or,

22   you know, call our clerk's office and make sure you get that

23   stuff filed.  And I'll come back to this at the hearing, but

24   what I will -- I would make sure that I would do it because

25   there is no documents that have been filed, and I'm going to

1    give Ms. Mew a chance to file one more paper in response to

2    that, since, you know, this is stuff she hasn't seen before

3    and hasn't had a chance to comment upon.  All right?

4              DR. KITCHENS:  Yes, sir.  Again, and I got the

5    confirmation when everything was uploaded.  Again, I'm not

6    sure what happened there.  But I definitely -- I am prepared

7    to have my screen shared and those documents up.

8              THE COURT:  All right.  That's fine.  Any other

9    preliminary matters?

10             MS. MEW:  Not from defendant, Your Honor.

11             DR. KITCHENS:  Not from --

12             THE COURT:  And Dr. Kitchens?  Okay.  Well, so

13   then, what I want to do here, and this is just to make sure

14   we're all on the same page, and also, to share with you my

15   thinking about, kind of, where I am and what I need to hear

16   about, so that you have the opportunity to use your time as

17   wisely as possible.

18             First thing is, just so everyone knows what my task

19   is here, in deciding whether to enter a preliminary

20   injunction, I have to bear in mind the law that a preliminary

21   injunction is an extraordinary and drastic remedy and one

22   that should not be granted unless the Movant, meaning Dr.

23   Kitchens, here, by a clear showing, carries the burden of

24   persuasion.  So that means it's Dr. Kitchens' burden to make

25   the showing necessary to get the preliminary inunction.  He

1    carries that burden of making the showing.

2             Second is, what is that standard for a preliminary

3    injunction.  So, a plaintiff seeking a preliminary injunction

4    must establish that he is likely to succeed on the merits.

5    These are four factors.  And that was the first one, likely

6    to succeed on the merits.  Two, that he is likely to suffer

7    irreparable harm in the absence of this preliminary relief.

8    Three, that the balance of the equities tips in his favor.

9    And four, that an injunction is in the public interest.

10            So it's those four checkboxes are what I need to be

11   thinking about in order to make this decision.  So, everyone

12   should be focused on addressing those things.  And to drill

13   down a little bit, I think the two factors that we need to be

14   talking about the most today are going to be irreparable

15   harm, and the likelihood of success on the merits.

16            On the irreparable harm side, I was persuaded by

17   our initial discussion that there was enough chance of

18   irreparable harm that we should hurry up and have this

19   hearing.  That's why we're here.  However, you know, in the

20   end, in order to make the decision, I need to consider all of

21   the evidence that's been submitted and make that

22   determination about the level of potential irreparable harm.

23   I do want to have that conversation.

24            I want to hear evidence, Dr. Kitchens, from you,

25   responsive to the things that the defendant said in their

1    brief on irreparable harm, about what it is -- you know,

2    boiling it down, about why it is that this needs to be

3    decided right now, and why this relief needs to be entered

4    right now, and that if it were done, say, six months from now

5    or a year from now, that would be too late, and there would

6    be harm that would be done to you that can't be undone.

7    That's what I -- I need to hear about that on the irreparable

8    harm prong.

9           Okay.  Number two is, the other prong, on

10   likelihood of success on the merits, there's a number of

11   things that you need to prove, under the ADA, most of which

12   aren't critically at issue here.  One that is critically at

13   issue here is the question of whether you have the -- Dr.

14   Kitchens, is whether you have a disability that qualifies

15   under the Act that would entitle you to the relief you are

16   seeking.  And it seems to me that most of what's been

17   submitted is focused on that, so I certainly hope to learn

18   about -- you know, I hope to learn from both of you about the

19   likelihood of success on the merits, and specifically, below,

20   under that, the question of whether there is the disability

21   here.

22          All right.  I just wanted to put that out there so

23   everyone knew, kind of where my head was at, where to direct

24   your -- where to direct everything.  Any questions about

25   that?

1              MS. MEW:  No, Your Honor.

2              DR. KITCHENS:  No, Your Honor.

3              THE COURT:  All right.  So, well, with that, we'll

4     get going.  And we'll have, Dr. Kitchens, we'll give you your

5     time for an opening statement.

6              DR. KITCHENS:  All right.  Thank you, Your Honor,

7     and good morning.

8              If it may please the Court, this case is about the

9     MBME's discrimination against my disability under Title 3 of

10    the ADA.  While the case has only been filed for just a

11    couple of months, there has been a lot of exhibits, several

12    experts and testimonies that would ultimately demonstrate

13    that a lifetime of studying, self-accommodating and adapting

14    to my ability, the MBME would prevent me from prolonging my

15    dream of becoming a doctor, all because the MBME doesn't

16    think that I am "enable" or "disabled" -- excuse me --

17    enough.

18             Thankfully, the decision of whether I am disabled

19    enough, along with being disabled at all is not up to the

20    MBME.  The MBME enacted, in 2008, that the Department of

21    Justice -- sorry, the ADA, that, in 2008, the Department of

22    Justice made it clear that the demonstration of whether an

23    individual is disabled is to be construed broadly.  And at

24    the end of today, you will conclude that my application

25    satisfies the ADA's analysis for disability, and that I will,

Dr. Kitchens - Opening Statement                    14

1    if eligible -- that I am eligible for accommodations.

2            I have only one claim against the MBME.  The MBME

3    violated the ADA based on their failure to accommodate my

4    disability after I submitted documentation that I am

5    disabled, that my request for additional time on the exam was

6    reasonable and that those requests were denied.

7            Your Honor, I can see, and that we will see, that I

8    am a black man.  I grew up in a single-parent household to a

9    teenage mother while my father was in prison for most of my

10   childhood.  My family was the statistic for a very long time.

11   But while my mother did have me evaluated, she declined to

12   give me medication due to the side effects of what the

13   pediatricians -- due to -- sorry -- the side effects that the

14   pediatrician's medication would give to me.

15           Instead, my mother, along with my family members

16   and teachers, provided routine structured assistance at home

17   and tutoring, individualized help and study habits that

18   allowed me to use alternative routes to achieve academic

19   success.

20           At each stage of my education, I received

21   unofficial accommodations, whether it was in elementary

22   school, the teachers would sit with me separately -- sit me

23   separately from my peers and provide individualized

24   instructions.  In middle school, I began hyper-organizing

25   myself and began studying in advance.  In high school, I

1    began removing myself from distractional environments,

2    implementing alarms and daily tasks, even going as far as to

3    photograph where I would put belongings, so if I forgot where

4    I had put them, I could go back and see where they was.

5         In college, different professors allowed me to take

6    their exams in their office without any time restraints and

7    allowed me to take ear plugs while testing with my peers.  It

8    wasn't until college that I was re-evaluated and rediagnosed

9    with ADHD.  As a black man being diagnosed with ADHD felt as

10   though I was flashing this sign above my head, telling the

11   world that something was wrong with me, as though being

12   disabled meant that I am not smart enough or as smart as

13   everyone else, and that, unless I had help, I would not have

14   gotten this far in life.

15        So, I took the medication, but I turned down -- I

16   turned down the official accommodations with the college.

17   Why?  Because of embarrassment.  In medical school, I

18   struggled.  I failed a lot of my first exams because we had

19   different retakes that was given on the first time.  But that

20   was not because I did not know the material, but because I

21   could not overcome my disability.

22        However, with each retake that I took, I was given

23   more time to sit for the test and, essentially, a more

24   distraction-free room, due to the less population inside of

25   the testing area.  As I testified in my deposition, by the

1    time I registered for the CBSE, my school recognized that I

2    would need official accommodations and provided them to me.

3           Although the MBME will claim that I did not prove

4    my ADHD was substantially limiting, my claims are supported

5    by medical documentation provided in my applications, as well

6    as before this Court.

7           In 2021, the defendant, MBME, administered 42 --

8    approximately 42,288 Step 1 Exams.  The recurrent pattern of

9    conduct in this case that resulted in breach of their

10   obligations to accommodate my disability is quite clear.  The

11   MBME repeatedly denied my applications for accommodations by

12   improperly weighing my high level of academic success and

13   seeming lack of accommodations against documentation

14   indicating that I had been evaluated almost ten years prior

15   and had a long history of diagnoses -- or diagnosis and

16   medication.  Not only that, I had received official

17   accommodations just a year before.

18          I have ADHD, Attention Deficit Hyperactive Disorder

19   with Anxiety, both of which are mental impairments under the

20   ADA.  I was diagnosed with ADHD in the second grade, and in

21   my early adult years, diagnosed with anxiety.  the evidence

22   will show that all throughout my educational career, I was

23   provided unofficial accommodations by sympathetic teachers.

24   I had structure, routine home life activities, and that, by

25   implementing time management tools, such as study tricks and

1   good organizational habits, I was able to self-accommodate my

2   disability.

3           The evidence is going to show this Court that, at

4   each level of higher education, my self-accommodating tactics

5   lost their efficacy, and when it did, I was provided the time

6   and area necessary to demonstrate my knowledge and my

7   competence.  The evidence will also show that I applied for

8   testing accommodations twice within a calendar year, and that

9   the defendant, MBME denied my accommodations both times,

10  stating that because I managed to make it thus far

11  professionally and in my education, that I don't need

12  accommodations.

13          In addition to -- in addition to the evidentiary

14  support of my claims, you will hear, Your Honor, today, my

15  testimony and testimonies from my mother, who would testify

16  to the amount of time that I spent studying all throughout my

17  academic career, how I managed to self-accommodate and the

18  drastic difference that I experienced once I received

19  accommodations and the needed medication, and the harms that

20  I have already -- already suffered and will permanently

21  suffer without the accommodations and the expungement of my

22  exam transcript.

23          You will also hear the testimony from my evaluating

24  psychologist, who will testify to my performance on a series

25  of assessments designed to determine whether an individual

1    has ADHD and the diagnosis rendered as a result of those

2    assessments, her professional opinion, based on interacting

3    with my personally and the harms I will suffer without the

4    testing accommodations and expungement of my exam transcript.

5            The evidence will demonstrate that the MBME failed

6    to uphold their obligations to me as a disabled individual

7    and provide the accommodations that will best insure that my

8    Step scores reflected my knowledge and my competency.

9            The defendant has a reputation for denying

10   accommodations for disabled graduates based off of the

11   recommendations of a third-party consultant or consultants.

12   The evidence will show that the MBME is discriminatory

13   towards disabled medical graduates, and whether I had

14   submitted a lifetime's worth of accommodations needed, the

15   evaluations or whether I submitted medical records, a letter

16   from my physician and documentation of having received

17   accommodations in prior exams, I was going to be denied the

18   accommodations that I needed.

19           In sum, the evidence today will show the pattern of

20   the defendant's conduct and actions to avoid obligations to

21   disabled Board-eligible applicants.  This will further be

22   supported by presenting evidence supporting my lifelong

23   history of ADHD diagnosis.

24           The purpose of the ADA is to insure the eradication

25   of discrimination on the basis of disabilities.  Under the

1    ADA, an individual is considered disabled if that person has

2    a mental impairment that substantially limits a major life

3    activity, and that individual must provide -- that that

4    individual must be provided the opportunity to participate

5    equally to their neurotypical peers.

6            The irreparable harm caused by the MBME's decision

7    is not imminent.  It is present, and it is permanent.  And

8    the evidence today will demonstrate just that.  As the

9    evidence will show, a medical diagnosis of ADHD and Anxiety

10   are impairments recognized under the ADHD -- under the ADA,

11   and those impairments work in concert to substantially limit

12   my ability to perform major life activities.

13           Lastly, the evidence will show that there is

14   substantial proof that granting this injunction serves the

15   public's best interest as well as the minimum harm that the

16   MBME will harm if I am granted the accommodations -- if I am

17   granted my accommodations and expungement.

18           At the end of today, you will conclude, Your Honor,

19   as this Court has done, just in the past December, that to

20   allow the MBME to discriminate against my disability would be

21   to allow devastating and irreparable harm against my status

22   as a disabled medical graduate, who, without this injunction,

23   will be permanently banned from practicing medicine.

24           Thank you, Your Honor.

25           THE COURT:  Thank you, Dr. Kitchens.

1          Ms. Mew?

2          MS. MEW:  Thank you, Your Honor, and good morning,

3    Dr. Kitchens.

4          DR. KITCHENS:  Good morning.

5          MS. MEW:  One might ask why MBME is going to the

6    effort of mounting a vigorous defense to Dr. Kitchens' pro se

7    lawsuit and preliminary injunction motion.  It would

8    certainly be far easier and less expensive for MBME to simply

9    agree to provide Dr. Kitchens with the extra time he seeks on

10   the United States Medical Licensing Examination.  It is

11   recognized by the Second Circuit in the <u>Powell</u> decision cited

12   in our papers.  Part of MBME's duties is to insure that the

13   USMLE examinations are fairly administered to all examinees.

14         MBME does grant extra time and other testing

15   accommodations to examinees who demonstrate that they have a

16   disability within the meaning of the ADA.  Hundreds,

17   thousands or hundreds of examinees receive accommodations

18   every year.  However, given the important decisions that are

19   affected by USMLE results, MBME gives due care to each

20   accommodation request.  It does that to protect the integrity

21   of test results and the fairness of the process for all

22   examinees.

23         Simply put, Dr. Kitchens submitted no documentation

24   to MBME and has submitted no documentation to the Court that

25   substantiated either of his claimed impairments or

1    demonstrated that he is substantially limited in any major

2    life activity, which is the relevant standard under the ADA.

3    He provided no basis for MBME to grant his request for

4    testing accommodations, even though he was repeatedly urged

5    to review MBME's guidelines for requesting accommodations and

6    provide more documentation.

7           The handful of documents that he submitted in

8    support of his request were insufficient to confirm the

9    existence of his claimed impairments and did not address at

10   all the extent of his alleged functional limitations.  He has

11   now provided the Court with additional documents and

12   information, but even those documents did not show a

13   disability within the meaning of the ADA, and he has not

14   demonstrated a likelihood of success on the merits.

15          As for irreparable harm, Dr. Kitchens has not shown

16   any risk of non-speculative imminent harm that could be

17   addressed by his requested mandatory preliminary injunction.

18   His preliminary injunction motion is based on a professed

19   need to participate in the 2023 National Resident Matching

20   Program, commonly referred to as the NRMP or the Match, but

21   he has already missed critical deadlines and would not be

22   able to participate in the 2023 match, even if the Court

23   granted him all of the relief he seeks.

24          Indeed, when he was deposed just last Friday, he

25   said that he had not yet reviewed the website of the

1    organization that must certify the eligibility of

2    international medical graduates to participate in the Match.

3    This is the ECFMG, and he was unaware he had missed the

4    required deadline for obtaining such certification.  He will

5    also miss deadlines imposed by the NRMP program for

6    participating in the NRMP Match.  This claimed urgency was,

7    thus, entirely unfounded.

8          Because Dr. Kitchens has not met his heavy burden

9    on either the likelihood of success or irreparable harm, the

10   Court does not need to reach the other preliminary injunction

11   factors, but as we've discussed in our papers, they both

12   support denying his motion.

13         The balance of harm to MBME and to the public

14   interest if an injunction is provided that's not warranted in

15   this situation, particularly in the situation of expedited

16   relief on a mandatory injunction with the Medical Licensing

17   Exam, is significant.  And for all of these reasons, we look

18   forward to participating in the hearing today, but Dr.

19   Kitchens' motion for a preliminary injunction should be

20   denied.

21         THE COURT:  All right.  Thank you, Ms. Mew.  Okay.

22   Well, now, we're going to go to witness presentations.  And

23   one thing I forgot to mention, at the outset, that affects

24   Dr. Kitchens uniquely is, since -- assuming that you intend

25   to testify on your own behalf, I wanted to let you know that,

1    you know, you are free to testify in the form of a narrative.

2    You know, you can just -- you'll be sworn in by Inna, and

3    then you can testify as you wish.  And then, there will be

4    the chance for you to be cross-examined by Ms. Mew.  But you

5    don't have to -- I know that sometimes, when where is a

6    concern about a pro se litigant testifying on their own

7    behalf, about how that's going to be organized.  In my mind,

8    those are mostly jury concerns, that it's perfectly fine for

9    you to testify in a narrative, all right?

10             DR. KITCHENS:  Yes, sir.  Thank you, Your Honor.

11             THE COURT:  Okay.  So, are you planning on being

12   the first witness?

13             DR. KITCHENS:  Yes, I have Missie King that I would

14   like to have be the first witness, Your Honor.

15             THE COURT:  Okay.  In that case, why don't you --

16   why don't you introduce her, and then I will ask Inna to

17   swear her in, okay?

18             DR. KITCHENS:  Yes, sir.  Today, I have my first

19   witness, Missie King.  She is my mother.

20             THE COURT:  All right.  Inna, would you go ahead,

21   please?

22             MISSIE KING, PLAINTIFF'S WITNESS, SWORN

23             COURTROOM DEPUTY:  Please state and spell your full

24   name for the record?

25             THE WITNESS:  Missie King.  Missie, —I-S-S-I-E,

1    King, K-I-N-G.

2              DR. KITCHENS:  Is this where I go, now, Your Honor?

3              THE COURT:  Yes.  Dr. Kitchens, you may proceed.

4              DR. KITCHENS:  Thank you, sir.

5                          DIRECT EXAMINATION

6    BY DR. KITCHENS:

7    Q    Just to get a little bit background information, Ms.

8    King, for the record and for so that the Court can better

9    understand who you are, we just -- I did just introduce you

10   as my mother.  Can you tell us today what state do you reside

11   in?

12   A    Tennessee.

13   Q    And how long have you lived there?

14   A    All my life.

15   Q    Okay.  And how old are you, Ms. King?

16   A    I'll be 50 on Sunday.

17   Q    Congratulations and happy birthday.

18        Are you married?

19   A    Yes.

20   Q    And do you live with your husband?

21   A    Yes.

22   Q    Does there -- is there anyone else that lives with you

23   and your husband?

24   A    No, just us.

25   Q    Okay.  How many children do you have, if any?

1    A    Two.

2    Q    Can you tell the Court today, what is your occupation?

3    A    I'm a barber/stylist.

4    Q    Okay.  And how long have you been doing this particular

5    occupation?

6    A    For almost 27 years no w.

7    Q    Okay.  And do you work for -- are you employed by

8    someone or are you -- are you a business owner?

9    A    I'm a business owner.

10   Q    And what is your highest level of completed education?

11   A    An Associates of Science.

12   Q    Okay.  And what did you study while you were getting

13   your degree?

14   A    Religion Studies.

15   Q    Okay.  During this case, have you talked with anyone

16   outside or talked to anyone about this case?

17   A    Yes.  I've talked with you and your wife about this

18   case.

19   Q    Okay.  And can you please describe, in detail, the type

20   of relationship that you and I have?

21   A    Well, we have a great relationship.  We can talk about

22   anything.  When you come home, we go out to dinner, if I

23   don't cook.  We go around to meet family members.  If we're

24   just at home, we would talk all night long until, like 3:00

25   or 4:00 in the morning.  Even if I have to get up for work

1    the next morning, I would still take advantage of that time

2    with you because we barely get to see each other in person.

3    Q    And, Ms. King, can you -- I'm sorry.

4         DR. KITCHENS:  I'm sorry, Your Honor, it's so weird

5    calling my mom Ms. King.

6    BY DR. KITCHENS:

7    Q    But, Ms. King, can you tell -- can you tell the Court

8    today, are you aware that I, the plaintiff, have spoken with

9    anyone about this case?

10   A    Not that I recall.  I'm not sure.

11   Q    Okay.  Let me ask the question this way, is there,

12   outside of me speaking with my wife and yourself, do you

13   recall me ever speaking with anyone else?

14   A    Well, no, you only entrusted me with the information

15   from this, being the embarrassment of it all.

16   Q    And why would you -- why would you -- well, why would

17   you feel that I would be embarrassed about this?

18   A    Well, because the people in our family and in our

19   community, our neighbors and everyone, they always had high

20   expectations of you, and this is something that you wanted

21   for so long, ever since you were, maybe, like middle school

22   age, it's been something that you always wanted to do.  And

23   then, you have your brother who has always looked up to you

24   and your little cousins who always looked up to you, yeah,

25   and so, the bar is kind of set high for you, so, yeah, it

1    would be embarrassing.

2    Q    And you say my brother.  Can you tell the Court today,

3    how old is my brother?

4    A    He's 29.

5    Q    And how far apart in delivery is my brother and I?

6    A    17 months apart.

7    Q    17 months apart.  Would you -- how would you consider my

8    relationship with my brother?

9    A    You guys have a really great relationship.  You grew up

10   together.  You did everything together, even up to when you

11   went off to college, I made sure that you kept in contact

12   with him.  I told you, always call and check on your little

13   brother and make sure he's good, and so, yeah, he's always

14   looked up to you.

15   Q    Okay.  And so, would you say by having, as you stated

16   earlier, you said that people in the community and family and

17   my -- I have younger siblings that looked up to me and

18   expected me to do such, I guess, great things, would you, in

19   your own words, consider -- or would you, in your own words,

20   have felt that that is pressure that has been put upon

21   myself?

22   A    Yes.

23   Q    Yes.  And why would you say that?

24   A    That holds a great deal of pressure, you know, with

25   everyone looking at you, rooting you on, expecting for you to

1    succeed.  You know, in our community, we always try to

2    support our young people, especially our ambitious young

3    people who has drive and determination, wherever we can step

4    in, you know.  Blood doesn't always make you family, so

5    wherever anybody could step in with support, you know, that's

6    what we would do, even if it was a baseball game.  If you

7    play baseball, we're gonna show up.  We're gonna root you on,

8    you know, because we want you to win.

9    Q    Got you.  So -- so, from what I'm hearing from you that,

10   we had a tight family knit communitywise, is that safe to

11   say?

12   A    Yes.

13   Q    Okay.  I want to transition a little bit from that and

14   talk a little bit about when I was in elementary school.  Can

15   you tell the Court today which elementary school I went to?

16   A    Rivermont Elementary.

17   Q    Is there another elementary school that I went to?

18   A    You went to Bess T. Shepherd Elementary School.

19   Q    Okay.  Thank you.  And in elementary school, when was it

20   -- or what grade was I in when you started being notified by

21   teachers of my behavior and academic disparities?

22   A    First grade.

23   Q    And in your own words, how would you describe, I guess,

24   the relationship -- or, yes, the relationship between my

25   first grade teacher and myself?

1    A    Well, as a child, you were always into things.  You were

2    very hyperactive.  You didn't really -- it was hard for you

3    to focus on different things because you were distracted

4    easily.  You would get bored easily.  So, for your teacher,

5    at times when she would call home, when she would call me,

6    she would seem to be a little frustrated at time with your

7    behavior.  She said you were very talkative.  You would talk

8    while she's talking.  You would get up out of your seat.

9         At times, you would be a distraction for other

10   kids, and you were also a distraction for yourself, because

11   you were failing in your subjects because of the things that

12   you would do because of your behavior.  So, yeah, she seemed,

13   yeah, a little annoyed.

14   Q    Annoyed.  Okay.  So, how often would this teacher call

15   home, concerning the concerns that you just stated?

16   A    She would call, maybe, three to four times a week, yeah.

17   Q    And would you say that in your house, disciplinary was

18   pretty structured?

19   A    Oh, yeah.  Oh, yeah.

20   Q    Okay.

21   A    Yeah.  Raising two sons, you know, being a single

22   parent, I had to put rules in place.  And I expected for you

23   guys to follow those rules, you know, although, you know, at

24   times, rules are broken.  Nobody's perfect, but, yeah, there

25   were still rules in place.

1   Q    Got you.  So, what I'm hearing you said is that, and you

2   can tell me if I'm saying this incorrect or not is that, in

3   the first grade, the teacher would contact you while you were

4   at work or wherever quite often, I think you said three or

5   four times a week, due to my behavior and distractibility and

6   those things, is that correct?

7   A    Yes.

8   Q    Am I saying that correct?

9   A    Yes.

10  Q    Okay.  So --

11  A    Yes.  Sometimes, she could call me at work, if I was

12  there, if she would call me during her -- maybe her downtime,

13  I guess, and she would update me of things that was going on

14  with you in the classroom, and sometimes --

15  Q    And -- uh-huh?

16  A    Sorry.

17  Q    Oh, no, no, you go ahead.  I'm sorry.  You know, I --

18  sorry -- don't do this often.

19          DR. KITCHENS:  I'm sorry, Your Honor.

20  BY DR. KITCHENS:

21  Q    Has there ever been a time that, because of the teacher

22  calling you these times throughout the week, that you had to

23  leave work and to come up to the school because of that?

24  A    Yes.  Yes, though there were times when I had to come up

25  to the school.  There were even times that I would come to

1    the school, and you wouldn't even know that I was coming, and
2    I would just come and just stand in the window, the little,
3    small window that was cut in the door, and I would just stand
4    there and just watch, just so I could observe you without you
5    paying attention.  And --
6    Q    Yeah, and what were those observations, while you were
7    watching me while I did not know that my mother was watching
8    me?
9    A    Yeah.  At times, I would see the teacher, sometimes,
10   like, hovering over you as if to help you with your studies,
11   with your classwork or whatever.  And there was a time, also,
12   that I saw you get up and go to the pencil sharpener, but as
13   you were sharpening your pencil, you were looking wherever at
14   a friend, and you were laughing and going -- and I saw the
15   teacher, you know, getting on to you, like, Marcus, get in
16   your seat, you know, and so forth.  But, yeah, I didn't show
17   up often, but whenever I could, I did that.
18   Q    Okay.  And when -- when was it that I was, first,
19   diagnosed with ADHD?
20   A    In second grade.
21   Q    In second grade.  And did you know anything about ADHD
22   or somebody recommended this to you or -- not recommended to
23   you but for evaluation?  How did you learn about it?
24   A    So, I didn't know anything about ADHD.  I didn't know
25   anything about disorders, actually.  I was a very young

1    parent, so, in second grade, your teacher, she saw the signs

2    and behaviors of what, actually, I kind of warned her of the

3    behaviors beforehand because whenever you went to the next

4    grade, I would have a talk with the teacher, you know, to

5    inform her of your disabilities after second grade.  But I

6    would also inform them of your behavior, and there may be

7    steps that they want to take to help you -- I mean, to help

8    them also discipline you while in the classroom.  So, your

9    second grade teacher, she actually advised me to get you

10   evaluated.

11   Q    And, by her advice, did you get me evaluated?

12   A    Yes, I did.   I took you to your pediatrician, Dr.

13   Jordan.

14   Q    And what was this -- what was -- so you said that my

15   second grade teacher advised you for me to go be evaluated by

16   my pediatrician at that time.  Was that factors that made her

17   kind of see different things that she might have told you

18   about that warranted her making this recommendation to you?

19   A    Yes.  She saw the poor attention span, you know, that

20   you had, that you were easily distracted and that your

21   comprehension wasn't, you know, up to par.  Your reading was

22   poor.  Your math.  And these things came from you not

23   focusing or not being able to focus and to be attentive.  You

24   were very, very -- just very talkative.

25   Q    Okay.  And --

1   A    Also, you -- also, you were easily bored, like, yeah.

2   Q    Okay.  So, tell me -- you said that -- you talked about

3   my reading ability, that I had a decreased reading ability.

4   Talk -- can you -- can you, in your own words, can you give

5   me a little bit more information about the poor reading, and

6   if there was any ways that you might have, even, given to

7   help with that?

8   A    So, as far as your reading, yeah.  Your reading

9   capabilities were poor.  Sometimes, if you're reading

10  something, even if I was helping with homework, even your

11  teacher advised you in the classroom, when you come to a word

12  that you do not know or if you are struggling with it to skip

13  that word and keep going.  But, for some reason, you could

14  not leave that spot.  You would stay there and be stuck, and

15  she would have to tell you, Marcus, keep going.  Keep going.

16  You can't stay there, you know.

17        And even with your comprehension, you would read a

18  sentence or a paragraph or whatever over and over again for

19  the understanding of it.  So, you really didn't catch on as

20  quick or as well as the other kids did.

21  Q    Okay.  And did -- what did you -- you said that you

22  talked with different teachers.  So, what type of things did

23  you talk to them about?  Outside of, you said, the

24  behavioral, was there things put in place for that?

25  A    Well, so, when your first grade teacher and your second

1    grade teacher moved your desk away from the other kids and

2    put your desk right next to theirs, it seemed to help them

3    better to discipline you.  So, whenever I would talk to

4    different teachers or whatever, I would go ahead and let them

5    know, you know, what was going on, and if they could, kind

6    of, isolate you from the other kids, so that you won't be

7    distracted and so that you won't be a distraction for them,

8    and that it would be easier for them if you were, like, right

9    there, you know, in arm's distance.

10   Q   Got you.  So, the isolation, you said that first and

11   second grade.  Was it other grades or was it just those two

12   grades, and --

13   A   No.  No.  Actually, every grade that you went to, I

14   actually gave the teachers a head's up, you know, on the

15   behavior issues and your ADHD and what they could do to

16   minimize distractions.

17   Q   And I want -- I want to -- for clarification, and for

18   the record, you said that every grade, can you be a little

19   bit more specific about every grade.  Was there a time when

20   the grades stopped or was it all the way through, you know,

21   high school, that I had to specifically, you said, about the

22   isolation?

23   A   Yeah.  So, first grade, she came up with that to move

24   your desk.  So, second grade, third grade, fourth grade and

25   fifth grade, also.

1    Q    Got you.  Okay.  Thank you for clarifying that.  So, you

2    spoke -- you said earlier that my second grade teacher that,

3    I remember Ms. Morton, and I remember her because she was,

4    even, my dad's teacher and, even, my aunt's teacher, as well,

5    she recommended you take me to see, I think you stated, a Dr.

6    Jordan, and when I met with Dr. Jordan, what was Dr. Jordan's

7    diagnosis?

8    A    Well, after she evaluated you, her diagnosis was ADHD.

9    Q    Got you.  Now, did she evaluate me just that one day or

10   several days or repeatedly?  How was that -- do you remember

11   that?  I know it was some time ago, but --

12   A    Yeah.  I don't recall exactly what she did, in, you

13   know, as far as the testing goes, but I do remember her

14   asking me questions, and your Aunt Sondra who tutored you,

15   she also asked her questions.  And if I'm not mistaken, I

16   think she also talked to your teacher.

17   Q    Okay.  Thank you.  So what was Dr. Jordan's

18   recommendation to you after she rendered her diagnosis?

19   A    She recommended you to be put on Ritalin.

20   Q    And what was your response to that?

21   A    Well, I declined it because of the side effects.  What

22   really caught my attention was depression, weight loss,

23   suicidal thoughts.  You know, I didn't want that for my small

24   kid.  You know, that would be very hurtful for me to see you

25   in that state, you know, sitting around.  I mean, just in

1    mind, thinking that you're depressed or you're sitting here,

2    like, on Sunday, like you don't have no life in you, and

3    especially, suicidal thoughts.  Yeah, that really triggered

4    me.  There was a young lady, back then, who had a son who was

5    -- he was between the age of eight or nine -- I'm really not

6    sure -- her son was actually suicidal at that age.  I could

7    not believe it.

8            She said that her younger son went into the

9    bedroom, and he had sharpened a pencil, really, really sharp,

10   and he was trying to stick it in his wrist.  And he screamed,

11   and he was, like, what are you doing; what are you doing, and

12   he ran to the next room to get his mother.  She ran in there

13   where he was, and she grabbed him, and she was, you know,

14   trying to take the pencil out of his hand.  And was like,

15   what are you doing, and he actually said that he don't want

16   to live.  He said, I don't want to live; I hate my life; I

17   hate myself, you know, and so forth.

18           And then he proceeded to swing and try to fight his

19   mother, which he had already, pretty much, started to be

20   aggressive towards his little brother, as well, before he did

21   that with the pencil, and his little brother started to be

22   afraid of him.

23   Q    Okay.

24   A    So, just by me knowing this, it scared me, and I did not

25   want that for you, so I didn't want that medicine in your

1   body.  I was afraid.

2   Q    Yes.  And I think that's, you know, valid to say after,

3   because, you know, as a young -- as a young, single parent,

4   then, you did what I guess you felt was best for your child,

5   at that time, and not knowing, as you said earlier today --

6   you didn't know much about ADHD, but you did see, from these

7   examples, from your friend's child, after being on -- you

8   know, having -- and was he on this medication?

9   A    Yes, he was on Ritalin.

10  Q    Okay, so from there -- and that's why it turned you away

11  from there.  So, by -- by hearing that, Ms. King, can you

12  tell me, like, after you decided to decline the physician's

13  recommended treatment plan, what other types of things did

14  you put in place to help me succeed throughout elementary

15  school, other types of tools that you put in place, if any?

16  A    Yeah, so, I knew that you were lacking in reading

17  comprehension and math or whatever, so I figured that if I

18  would get you after school help, fundamental help with your

19  reading and comprehension and math that that would help you.

20  I enrolled you in a center called Kumon -- Kumon Learning

21  Center where they helped you with your reading, and they

22  helped you with comprehension, and they also helped you with

23  your math.  And they also had, like, the work that you would

24  do, they would tear it out.  They would staple it together,

25  and they would send it home with me, so that I can, also, go

1      over these things with you at home.  And they would express,

2      you know, the things that they evaluated you on, like as far

3      as your reading and so forth and so on.  So, and they would

4      also send the blank pages, also, so that we could work on

5      these things together at home.  And I also purchased a kit

6      called "Hooked on Phonics".

7      Q    Yes.

8      A    So that "Hooked on Phonics", it had booklets.  It had

9      cassette tapes for learning and reading and so forth.  The

10     "Hooked on Phonics" didn't really work very well with you,

11     because you were bored of it, like, you really couldn't grasp

12     the concept of it, and plus, maybe because, you know, if you

13     could actually see what was going on instead of just sitting

14     there listening and trying to follow along, that, maybe,

15     could have helped.

16           But just by you sitting there listening to this

17     cassette and trying to follow along in the book, it just

18     wasn't working, so --

19     Q    Okay.  Okay.

20     A    -- I'm sorry.

21     Q    Yeah.  So, you -- I heard you say earlier that my Aunt

22     Sandra -- Sondra, she -- yeah, talk to me about -- what did

23     she do specifically?

24     A    So, Sondra owned a day care center.  She owned it for I

25     don't know how many years, but it was quite some time.  And

1    she would work with kids, you know, every day.  So, she would

2    work with you when she was available on your reading and your

3    comprehension and on your math.  And so, whenever Sondra

4    wasn't available, I knew another young lady who tutored young

5    kids in simple math for a fee.

6            And this young lady, she was a senior in high

7    school.  She was an honor student, and she was -- well,

8    actually, when she graduated, she went to college for

9    English, and from what I hear, she's a school teacher now.

10   So, those things I put in place to try to help you along the

11   way outside of school.  I felt like you needed that extra --

12   that extra push or that extra help.

13   Q   Got you.  So you said -- you said when -- and, also, for

14   the record, Sondra is also known a Lisa.

15   A   Yes.

16   Q   She goes as Lisa.  She's my great-aunt for the record.

17   So when she -- you say, when she was available.  Was it --

18   did she tutor me consistently or was it very sparse that she

19   would tutor me?  How was that, when you talk about when she

20   was available?

21   A   Well, she would tutor you on specific days of the week.

22   Sometimes, she would have late parents who got off, you know,

23   from work at later times or whatever, and so, she would have

24   their kids still there on some days, and so the days that

25   they didn't work as late, those were the days that she had

1    time to tutor you.

2    Q   Got you.  Okay.  Thank you for that, that clarification

3    there.  So -- so, I'm hearing that you, you know, you were

4    invested heavily in my life, especially on these different

5    subjects that you mentioned, as reading and comprehension, as

6    well.

7           Now, I know that these are family members or a

8    person who for a fee, what made these tutors qualified, in

9    your opinion, to be able to coach me and to help?

10   A   Well, I feel like they were qualified because, well, for

11   one, Lisa, your great-aunt, she took, you know, quite a good

12   interest in you already, and plus, you know, she's been to

13   college.  She also owned a day care, where that is what she,

14   you know, did for a living.  Owning the day care is not just

15   about babysitting, you know, babysitting kids.  She had

16   curriculums put in place for the older kids, as well.

17   Q   Okay.  So you mentioned that you are a single parent,

18   and, you know, you're a cosmetologist, as well, so, how is it

19   that -- how do you know, for a fact, whether or not, you

20   know, these people were actually tutoring me, you know, if

21   you wasn't there?

22   A   Well, I could just go by the progression.  I could see,

23   you know, your reading had improved.  You wasn't getting

24   stuck as much as you were at first, and you could sound out

25   letters that you really couldn't, you know, put the letters

1    together at some point.  And, so, yeah, just the progression

2    of it.  I was -- I was amazed.  Even when I tried to help, it

3    was -- you know, it was hard for me to do that.  So, you

4    know, other people were a better fit.

5    Q    Got you.  Okay.  Thank you for that.  Okay.  So, it

6    sounds like you had a community there to be able to help you

7    with, you know, for my -- an investment in my education, huh,

8    is that what I'm hearing there?

9    A    Yes.

10   Q    So, you said -- you said earlier there -- earlier, that

11   in first grade that they wanted to hold me back because of my

12   grades and because of my conduct and a decrease in

13   progression there.  And I also heard you say that you went

14   and spoke with teachers at the beginning of the year to let

15   them know what -- of the diagnosis, right, is that what you

16   said earlier?

17   A    Yes.

18   Q    Okay.  So, you made sure that those teachers there gave

19   special attention to your son?

20   A    Yes.

21   Q    So, in middle school -- in middle school, what type of

22   things did you start to see happen in middle school when it

23   came down to my academic success?

24   A    Well, in middle school, so, I didn't so much go to the

25   middle school to let your teachers know what was going on.

1    You know, you were getting a little older, so they also had

2    these agendas that they would give you at school, give all

3    the students at school.  So, with that agenda, it seems like

4    it kind of turned on, you know, kind of a spark or, you know,

5    it gave you an interest in it, because you could put in this

6    agenda book things that you needed to do.

7            You know, I've got to do my homework at this such a

8    time, and I can do this and this at this such a time.  It

9    kind of gave you some type of structure of things to do and

10   how to put things in place in order not to get off-track.

11   Q   Yes.  Okay.  Was there any other, outside of this agenda

12   book, and I do -- now that you bring -- I definitely do

13   remember those, those agendas, because in the sixth grade is

14   when they started providing us with those, as we got older.

15           Was there other things that you did, outside, when

16   it came to structure?

17   A   Yes.  So, at home, I had a pad that had a magnet on the

18   back of it, and so this magnet stuck to the refrigerator.  So

19   I would write on the notepad what you had to do.  I would

20   write your homework, your chores, you know, different things

21   of that nature, and we would do a check list.

22           And so whenever you completed, you know, your

23   homework or whatever subject you had to do that day for

24   homework, you had to put a checkmark by it, and you had to

25   put the time by it.  So that's what I put in place at home.

King - Direct                                                        43

1    Q    Got you.  Okay.  So, it sounds like you put those
2    structures in place, because you felt that they were
3    warranted, that they were needed, huh?
4    A    Yes.  They were important, because I feel like if that
5    was -- if certain things were not implemented in place, that
6    you would just be all over the place, and nothing would
7    really get done.
8    Q    Okay.  So, let's talk -- talk a little -- can you tell
9    me a little bit about my grades in middle school.  You said
10   earlier that in elementary school, they were -- you know,
11   they were very poor, and you -- you put different things in
12   place, outside tutors, professional tutors that you did, as
13   well.  You also talked about "Hooked on Phonics", those types
14   of things.
15        So, talk to me, now, about, in middle school, about
16   how you felt my grades were and conduct?
17   A    Well, in middle school, your grades were -- they were
18   fair.  They were average.  If you didn't get the grade that
19   you strived for, you would get frustrated because you would
20   work so hard, you know, on your studies and everything to try
21   to, you know, achieve a decent grade.  So, yeah, you would
22   get frustrated when you didn't get -- you know, meet that
23   level that you was trying to get.
24        And so, I would talk to you about, you know, how
25   important it is for you to keep calm and for you to make good

1    grades, because your progress report -- your progress report,

2    to me, was, like, okay, here's a warning -- here's a warning.

3    If you have a D on your progress report, this means that you

4    have a few weeks to bring this grade up, you know, so you're

5    going to have to study a little bit harder.  You're going to

6    have to focus a little bit harder, because the grade that you

7    get on your semester grade is going to go on your transcript.

8    And so, you don't want a D or an F, you know, being on there,

9    so, you know, you have to ask for help.

10   Q    Right.

11   A    And, so I think, you know, back then, you were a little

12   embarrassed -- embarrassed to ask for help because you would

13   always try to figure things out.  Like, you would try this,

14   and you would try that, you know, for your issues, but, at

15   the end of the day, I would tell you, like, stop trying to

16   figure things out on your own and ask for help.  It's okay to

17   ask for help.

18        You can either ask me -- I will help you to the

19   best of my abilities -- or you could ask your teacher.

20   Q    So, what it -- it sounds -- it sounds like, to me, is

21   that, by what you're describing, is that I was a person who

22   wanted to try to figure things out on my own, and with the

23   last resort, I had to ask for help?

24   A    Yes.

25   Q    Okay.  As an adolescent and a preteen, so we're out of

1   sixth grade, seventh grade, and those areas there, do you

2   recall -- I know you said earlier that I always had high

3   expectations -- or high ambitions.  What was the one -- the

4   type of career that I wanted to go in, and when did I first

5   actually -- if you remember, when I started wanting to do

6   that career?

7   A    Yes.  So, you always wanted to be a plastic surgeon.

8   And it was so crazy, because every time you tell someone that

9   you want to be a plastic surgeon, they always think about

10  body augmentations, but you would explain to them that you

11  were really interested in cranial, facial pallets for the

12  kids?

13  Q    Yeah.

14  A    You even did your senior project on cranial, facial

15  pallets, and you did really well, you know, on that because

16  that was a passion for you, and that's what you loved.

17  That's what you wanted to do.  That's what you were striving

18  for.

19  Q    And so, it sounds like things that I am very into or

20  that I'm very passionate about, from your words, is that I

21  will give it 100 percent --

22  A    Yes.

23  Q    -- 110 percent?  You would agree with that?

24  A    Yes.

25  Q    And you said that I wanted to be a plastic surgeon.  Are

1    there other people in the field that has seen this light in

2    me at that time and even whenever?

3    A    Yes.  Even -- I cannot think of his name -- he's a

4    plastic surgeon, also.  I remember we used to meet with him

5    because he did cranial, facial pallets also.

6    Q    It's okay if you don't remember his name.  I remember

7    his name, yes, and would you consider him to be a person that

8    I kind of that was there one minute and then gone or was he

9    the person that could have potentially been there and to

10   still be there?

11   A    Oh, yeah, he's a potential person to still be there.  He

12   took great interest in you.

13   Q    Yes.  And for your recollection, that was Dr. Sargent?

14   A    Yes, Dr. Sargent.

15   Q    Yeah.

16   A    That's his name.

17   Q    I still have a great relationship with him, as well.

18   So, moving on from middle school to high school.  Can you

19   tell me, in your own words, and describe to the Court today,

20   what my high school study habits looked like?

21   A    Well, your study habits were exhausting.  So, when you

22   studied, you had to study long, and you used to have to study

23   hard, especially compared to your brother.  Your brother

24   could do classwork and homework in school, in class.  When he

25   had an exam, he could cram the night before or maybe two

1    nights before, and would go in the next day and ace the test,

2    which you could not do.

3              So, you would have to isolate yourself in your

4    bedroom so that you would be, you know, closed off from

5    distractions or, you know, anything outside of your bedroom.

6    You would study for hours on end.  Whenever you took a break

7    and you came out, you would set your phone for however long

8    you were taking a break, and whenever your alarm goes off,

9    you know it's time to get back to it.  And so, you would go

10   back in your room, and you would lock yourself in again and

11   continue to study.

12   Q    So, Ms. King, you said earlier --

13             THE COURT:  Dr. Kitchens, sorry.

14             DR. KITCHENS:  Yes, sir?

15             THE COURT:  I didn't want to interrupt.  Just in

16   the spirit of timekeeping, I've been -- I've been in your

17   shoes doing what you're doing, and it's very easy to get lost

18   in listening and asking questions.  So, just so you know,

19   you've got -- I think you've used about 48 minutes --

20             DR. KITCHENS:  Okay.

21             THE COURT:  -- you know, of the approximately two

22   hours that we have allotted to you.  And, you know, for that

23   two hours, it's the time that you're doing direct plus, if

24   you want to save time to do cross of the defendant's

25   witnesses, you need to save some time to do that.  Anyway, so

1    I just wanted to let you know that, all right?  Go ahead.

2         DR. KITCHENS:  Thank you so much.  I will -- I will

3    wrap this up.  Thank you.  Sorry about that.

4         Where was I?

5    BY DR. KITCHENS:

6    Q    So, leaving from high school, and I'll ask you this

7    here, in high school, was there other -- were there other

8    things that was put in place or people that invested or would

9    you consider helped?

10   A    Yes, your guidance counselor.

11   Q    And why do you remember her?

12   A    I remember her distinctly because she helped you with

13   social skills and organizational skills.  She would teach you

14   how to use your agenda properly, how to manage your time.

15   Q    Okay.

16   A    It was just different things that she took a great

17   interest in in you.

18   Q    Got you.  Okay.  So, again, there was those things that

19   was put in place and those people who were invested.

20   A    Yes.

21   Q    Is that what you're saying for a clean-up?

22   A    Yes.

23   Q    For the sake of time, I will, instead of going even

24   farther into college.  College and your experience with me

25   during that time in medical school, for time's sake, when I

1    went to -- we'll wrap this up here -- when I went off to
2    college for medical school, can you explain to the Court how
3    you felt when your son went off to medical school?
4    A    I felt really proud when you went off to medical school.
5    I actually couldn't believe that I had a son or a child in
6    medical school.  Like, there was a great appreciation for
7    that.
8    Q    And -- and how would you feel that that -- for yourself,
9    was there other people around you that probably shared these
10   -- your same feelings?
11   A    Yes.  Everybody around me, the family, people that we
12   knew personally, everybody, your brother, your little
13   cousins.  People, you know, those coming up after you, you
14   know, they had something to look forward to, and they had
15   someone to look up to.
16   Q    Got you.  And my last question for you, Ms. King, and I
17   appreciate you on your time today is, can you now express to
18   the Court what you are currently feeling inside, knowing the
19   depth of this court case -- this court hearing?
20   A    Well, just looking back, you know, talking about the
21   things that, you know, you went through, just talking about
22   the struggles and, you know, your focusing, you know, your
23   incapabilities, your reading and all of these things, just
24   looking back, talking about it is much different than living
25   it, you know.  It was very overwhelming, you know, at those

1    times.

2              You know, you didn't ask to have ADHD.  You didn't

3    even ask me not to give you the medicine.  Just thinking

4    about these things and just, you know, this -- this just

5    really saddens me -- saddens me.  It hurts me.  And I feel

6    disappointed.  I even feel disappointed in myself.  You know,

7    being a young parent, there wasn't a book written on how to

8    parent a son or even how to parent someone with a disability

9    or ADHD.  I was afraid.  I did not want to give you the

10   medicine because I was afraid.  I did not want these side

11   effects, these things, for you.  So I made the decision, you

12   know, for you and for me, to not give you this medicine, and

13   now, I mean, to a certain extent, I kind of feel like I

14   failed you, you know.

15   Q   It's okay.  Thank you.

16             DR. KITCHENS:  Your Honor, I think that's all the

17   questions that I have, and I'd like to thank Ms. King for her

18   time.

19             THE COURT:  All right.  I'm going to give Ms. Mew

20   the opportunity to cross-examine, if she would like.

21             MS. MEW:  We don't have any questions.  Thank you.

22             THE WITNESS:  Thank you.

23             THE COURT:  All right.

24             DR. KITCHENS:  Thank you.

25             THE COURT:  In that case, Dr. Kitchens, you may

1    introduce your next witness and remember to introduce the

2    witness, who the witness is, and then we'll have Inna swear

3    the witness in.

4             DR. KITCHENS:  Yes.

5             THE WITNESS:  Excuse me?  Excuse me, Your Honor, am

6    I dismissed?

7             DR. KITCHENS:  Yes.

8             THE WITNESS:  Okay.  Thank you.

9             THE COURT:  Yes.

10            (Witness excused)

11            DR. KITCHENS:  And I'm sorry about that, Your

12   Honor.  She clearly spoke to you.  I'm sorry.

13            For the next -- my next witness that I have here is

14   Ms. Bacon -- Christina Bacon.  She is my expert witness for

15   today.

16            THE COURT:  Okay.  Inna, go ahead.

17            CHRISTINA BACON, PLAINTIFF'S WITNESS, SWORN

18            COURTROOM DEPUTY:  Please state and spell your last

19   name, for the record.

20            THE WITNESS:  Christina Bacon, B-A-C-O-N.

21                       DIRECT EXAMINATION

22   BY DR. KITCHENS:

23   Q    Good morning, Ms. Bacon.  If you would, please, will you

24   talk a little bit about your -- so, we've already stated for

25   -- excuse me -- where do you work at currently, Ms. Bacon?

1    A    I work at Peace of Mind Counseling in Richmond,

2    Kentucky.

3    Q    Okay.  And how long have you worked at Peace of Mind?

4    A    I've worked at Peace of Mind since June of last year.

5    Q    June of last year, okay.  And did I ask you to review

6    any materials related to today's case?

7    A    I have reviewed my report that I -- and the assessment

8    that I made.

9    Q    Okay, wonderful.  And when you reviewed those materials,

10   are you prepared, today, to tell us what you did and how you

11   did it and what conclusions you reached?

12   A    Yes, I am.

13   Q    Wonderful.  Thank you so much for being here, again, Ms.

14   Bacon.

15         Can you tell me, in general, about your educational

16   background?

17   A    Yes.  I have a bachelor's degree in psychology from

18   Eastern Kentucky University that I received in 2001, and I

19   have a master's degree in clinical psychology that I received

20   in 2003.  And I am a licensed psychological practitioner, and

21   that began in 2019.  Until that time, I was an associate

22   level.

23   Q    Okay.  Thank you so much.  And so, throughout your

24   career, have you been a principal or a programmable

25   investigator of a clinical or scientific study?

1    A    No, that has not been part of my career.

2    Q    Thank you.  And have you authorized or co-authorized any

3    peer review articles, as well?

4    A    No, that has not been part of my career.

5    Q    Thank you so much.  And so, here today, we want to talk

6    a little bit about your assessments when you conducted these

7    assessments.

8              So, are you Board certified or eligible to practice

9    in other states outside of Kentucky?

10   A    No, I'm only licensed in Kentucky.

11   Q    Got you.

12             THE COURT:  Dr. Kitchens, I'm sorry to interrupt.

13   I muted you by accident.  That was not intentional.  So you

14   have to unmute yourself.

15             Dr. Kitchens, we can't hear you, and the reason is

16   that I clicked you, and -- there you.  You're back.

17             DR. KITCHENS:  Okay.  Sorry about that, Judge.

18             THE COURT:  No, I -- and the reason -- and, just,

19   sorry to interrupt, is the reason is I'm just getting a

20   little bit of feedback, and I was hunting around for maybe

21   why that is, but no, just go ahead.

22             DR. KITCHENS:  I think it was because I was -- I

23   have my screen shared, because I was going to put an exhibit

24   over there, so you could see it.

25             THE COURT:  Okay.  Well, let's just carry on, and

1    we'll do our best.

2              DR. KITCHENS:  Okay.

3    BY DR. KITCHENS:

4    Q    So, do you provide ADHD evaluations as part of your

5    duties, Ms. Bacon?

6    A    Yes.  As part of my duties at Peace of Mind, I have been

7    performing ADHD evaluations.

8    Q    And how long have you done that?

9    A    I started in September of 2022 at Peace of Mind.

10   Q    Okay.  And any other place before then?

11   A    The other places I've worked did not do evaluations or

12   did not want me to do those, necessarily, because it wasn't

13   part of my career, even though I had the license for to be

14   able to do it.

15   Q    Got you.  Okay.  And since you started doing this, and

16   you're licensed to do these particular evaluations, how many

17   -- or an estimate of how many patients you have probably

18   provided these evaluations to?

19   A    Since September, I've done 16 at this place.

20   Q    Got you.  And could you describe for the Court your

21   personal experience in providing these healthcare services,

22   such as these types of evaluations?

23   A    Sure.  I have worked in the field since 2003, and I

24   worked for 11 years in community mental health, and then I

25   worked in private practices, and as clinical directors and

1    program directors of different clinical therapy types of

2    places.  I am now, as a counselor in a private practice, I

3    have been performed therapy with people.  I generally -- I

4    tend to actually work most with trauma-focused types of

5    therapy, and I do the evaluations as -- as part of my job

6    now.

7    Q    Okay.

8             DR. KITCHENS:  So, after hearing that, Your Honor,

9    at this time, I would like to enter Ms. Bacon as an expert in

10   psychology and cognitive behavioral therapy.

11            THE COURT:  Ms. Mew?

12            MS. MEW:  We won't raise any objections for

13   purposes of this hearing, Your Honor.

14            THE COURT:  I understand.  All right.  Go ahead,

15   Dr. Kitchens.

16            DR. KITCHENS:  Okay.

17   BY DR. KITCHENS:

18   Q    So, Ms. Bacon, can you tell me, how did you -- how did

19   you meet me, Ms. Bacon?

20   A    You called the office asking for an assessment.

21   Q    Yes, ma'am.  And did you conduct this evaluation for me

22   specifically?

23   A    Yes.

24   Q    Well, as a result of your evaluation, did you prepare a

25   report?

1    A    I did.  As part of any evaluation or assessment that I

2    complete, I complete a report to integrate the information

3    that I gained from the assessment so that people can have it

4    or to know where the diagnosis came from.

5    Q    Got you.

6             DR. KITCHENS:  Your Honor, I'd ask the record to

7    reflect that I am going to put in here for docket number 22,

8    Exhibit 1, Bates stamped for MK1 through 8, which would be

9    the evaluation from Ms. Bacon here.

10   BY DR. KITCHENS:

11   Q    Ms. Bacon, can you see that?

12   A    I can.

13   Q    Okay.  And that is your name, there?

14   A    Yes, that is my name.

15   Q    Okay.  So, would you please tell the Court what exams --

16   exam conducts that you have -- that you conducted, and what

17   you have assessed from meeting with me?

18   A    So, when I met with you, I did the general clinical

19   interview, and the DIVA 2 is a semi-structured interview

20   focused on the symptoms of ADHD.  You completed the self

21   report assessment of the Achenbach System of empirically-

22   based assessments that your wife did, as well.  And those

23   were sent to you.  You all completed those, and they were

24   sent back to me.

25             The MAXO Distracted Continuous Performance Test is

1    a test that is used to look at four different aspects of

2    ADHD.  It's normed, and it looks at your Z scores to decide

3    if -- if your performance is outside of the norm for your

4    age.  That is performed online while I am watching the

5    participant.  I've got you on the phone, watching you, as you

6    remember, watching you take the test, while you're on the

7    computer taking it.

8    Q    Yeah.

9    A    They have a liability score to be able to tell whether

10   someone is trying to fake or not, so that's --

11   Q    And can you tell -- tell the Court, today, what you

12   observed while you were watching me take these different

13   assessments and what the kind of looked like?

14   A    Well, it looked really intense.  There was -- it was a

15   20-minute test, and what you -- what the participant is asked

16   to do is to click on the space bar when they see a particular

17   picture, and they are -- there is distractions and noise and

18   visual distractions.  And throughout the assessment, you

19   know, you were wringing your hands and shaking, and I could

20   see your body was visibly shaking, and, you know, lots of

21   deep breaths, and I could tell that you were working really

22   hard to stay on-task.  And you completed the assessment that

23   was -- you know, it was -- really, there was a lot of

24   movement and a lot of deep breaths and what appeared to me as

25   anxiety.

1    Q    Got you.  And, Ms. Bacon, can you -- do you remember if
2    -- you know, so when you're conducting these particular
3    exams, and you're watching them, whether it's in-person or
4    Telehealth, does your patient -- are they aware that they --
5    can they see you or can you -- is it two-way or is it a one-
6    way, where you can only see them or they can see you as well?
7    Can you talk about that?
8    A    Sure.  I actually turn my sound and video off, so they
9    cannot see me, so I am not an added distractor, because the
10   test was validated, and when they did the study, they didn't
11   have the added distractor of a person watching.  So I turn it
12   off, and turn the video off and sound off, but I can hear and
13   see the participant at all times.
14   Q    Got you.  So, for these particular examinations or these
15   evaluations that you are conducting, over how long does these
16   things take to have a full -- a full picture for yourself to
17   make a diagnosis or a medical recommendation?
18   A    You know, it really depends on -- you know, I always
19   take all of the different parts.  You know, we do interviews.
20   We look at history, behavioral observations.  Sometimes we
21   have, you know, clinical information, when we're referred
22   from other counselors.  I look at any information I have, as
23   well as the assessments that we do.
24        When we're looking at ADHD, we know we have to see
25   these symptoms in more than one environment.  It can't only

1    be self-reported.  We need other people to confirm that.  We
2    really look to see if there are several overlaps, and so, as
3    far as the time, it takes me, you know, often six, sometimes
4    more, hours to go through the extensive records and compile
5    it and integrate it into the assessment.
6    Q    Got you.  So, it sounds like, to me, that doing these
7    particular exams, are very time consuming.
8    A    Yes.
9    Q    So, I have here about the behavior observations that you
10   observed.  While conducting your oral interview with myself,
11   can you tell the Court some things that you noticed in my
12   environment, around me, when you were meeting me?
13   A    Yes.  When we were meeting, you were -- because we were
14   meeting in Telehealth, you were showing me around your office
15   because we -- I was asking you, what kinds of things have you
16   done in your life to help yourself and to accommodate.  And
17   you were letting me know the things that you had done.  Some
18   of the things, really, off the top of my head, and I may miss
19   a couple, but I know you have the -- you have the white
20   boards in the back where you were showing me.  You have the
21   list of things to make sure that you do.
22         You had your phone outside of our room, even, when
23   we were meeting so there were no distractions.  You had your
24   -- oh, your window.  You had it with the blacked-out window,
25   so you're not distracted by the outside when you're studying.

1    I noticed the treadmill, which is often helpful for people
2    with ADHD to move while they are taking -- while they are
3    studying or unable to focus.  I know you had mentioned that
4    you had all of those things, but and that you had the
5    schedules and calendars.  There was a lot of -- a lot of
6    structure and scaffolding that you had really put into place.
7    That was my observation.
8    Q    Got you.  And so, from what I'm hearing you say, would
9    than be an easy task for someone to try to put in place to
10   try to put blinders over your eyes?
11   A    It seems to me, in my official opinion, it seems that
12   sometimes we see when people have ADHD and high motivation,
13   the need to do that turns really -- it's rigid because it's
14   so necessary to be able to focus.  You know, and every person
15   would have a different level of difficulty.  But the number
16   of different pieces of ways -- different ways that you were
17   trying to make sure you stayed focused indicated that it
18   would be really hard for you.
19   Q    Now, I wanted to ask -- I want to, kind of, go back a
20   little bit to these different tools that you used to
21   diagnose, and by doing these particular different --
22   different tools, would me being nervous or upset during this
23   period of time, would that have been a big factor in these
24   particular exams that you -- that I was given by you?
25   A    Right.  Well, so, the diagnostic interview for ADHD in

1    adults, the DIVA, that is -- that's more of an interview.
2    So, we're looking at -- and we're looking at specific
3    symptoms, and we're looking at the symptoms in childhood and
4    adulthood and to look at how they overlap.  So, being anxious
5    would not affect that, really, because that doesn't change
6    the symptoms.  I might be able to checkoff one of the
7    symptoms in adulthood, that you are, you know, anxious or
8    fidgety, but that wouldn't negatively or otherwise impact the
9    -- whether you fit the diagnosis based on -- or the
10   characteristics based on that interview.
11   Q    Got you.  Okay.  And I'm going to watch our time here
12   for cross-examining, as well.  Would you say that -- or is --
13   is it a standard testing procedure that other (inaudible)
14   such as yourself would also use these types of tests?
15   A    Yes.  And there are several different options.  You
16   know, different clinicians prefer different techniques or
17   different tests.  As long as they're valid, there are -- you
18   know, there's several different options.  I chose these, but,
19   you know, other people could choose other options they come
20   up with that are also valid.
21   Q    Got you.  And earlier you said, I did a self-exam.  I
22   think that was the -- is that the ASBA, the Achenbach System?
23   A    Yes.  That's the Achenbach System of empirically-based
24   assessments.
25   Q    Yes.  And you talked a little bit about that, as well,

1    and you said that I did it, and you had -- you said, other

2    people conducted it, as well?

3    A    Yes.  Your wife did it, as well.

4    Q    Got you.  And what did those different -- so, when you

5    -- can these things be faked, even for these particular items

6    or these particular valuations?

7    A    Well, in these particular valuations, they do look for

8    inconsistencies and what we -- we know that any self-report

9    is used in comparison to other things.  I do not base any

10   diagnosis only -- this is for ADHD.  If I'm going to do an

11   evaluation, I do not base that only on self-report.

12   Q    Yes.  And then, so, we also -- I wanted to ask you about

13   -- with these types of -- these tools that we put in place,

14   did you employ any evidence-based methods in reviewing the

15   information that they conducted here?

16   A    I reviewed the -- I reviewed the information that was

17   given through the report that -- its computerized -- as

18   testing or computerized scoring.  And I reviewed the

19   information that was on there that was provided to me on

20   that.  I compared all of those different assessments to each

21   other to look for whether it was -- whether they lined up and

22   whether they were the same, presented the same thing.

23   Q    And were you able to form an opinion as to whether or

24   not I had a learning impairment then?

25   A    I'm not able to diagnose a learning impairment or a

1    learning disability through these assessments.  A learning
2    disability is assessed through having the IQ exam compared to
3    an achievement exam.  So, they are comparing to see whether
4    your IQ matches your ability to do a certain, like, a certain
5    subject, reading or any of those.  Those -- that's how those
6    are done.  But that's not what we did here.
7    Q    Got you.  So, and here, it says here that -- are you
8    able to see this over here well?
9    A    I am, yes.
10   Q    Yes.  Can you explain a little bit about what this -- to
11   the Court what this is actually saying here?
12   A    So what this is saying is, compared to other people your
13   age, your -- the symptoms that you have displayed are in the
14   97th percentile.  So, just to clarify, that means that you
15   have the same as or more symptoms than 97 out of 100 people
16   at your same age.
17           Now, the thing about the DIVA or the Achenbach is
18   that it compares the questions that it's looking at there
19   where it has the attention problem subscales, and one of the
20   reasons that we really tend to lean on it whenever we are
21   looking at, well, let's look at symptoms for the DSM, it's
22   been used for many years, and it has -- it's looking
23   specifically at the DSM diagnosis criteria.  So, each of
24   those questions that you see there are based on the DSM
25   diagnosis.

1    Q    Got you.  And when evaluating me, Ms. Bacon, at any

2    point did you ever think that I was giving you falsified

3    information or incorrect information for a certain outcome?

4    A    I didn't get the impression that you needed a certain

5    outcome when we talked.  You told me you needed me just to do

6    the assessment, and we would see what came of it.  And

7    ethically, I am required to put the information that I am

8    given and not sway my results for the person who is having

9    the assessment done.  I would put my license in jeopardy if I

10   did so, and I'm not willing to do that for anybody.

11   Q    And that's -- you know, that's definitely

12   understandable.  You said that, you know, I came to you to do

13   this assessment.  Do you know the reason that I asked you

14   about this assessment?  Do you -- can you tell the Court

15   about that, the reason?

16   A    I knew that you needed to have the assessment done

17   because you needed to see if it was confirmed that you had

18   ADHD in order to seek accommodations to take a test.

19   Q    Yes.  And did you review any other medical documentation

20   about myself, past medical history and things of this matter?

21   A    You shared a -- it was a Conners CPT 3 that was given by

22   another provider.  I did not include that in my assessment,

23   because I did not provide that assessment.  It did correspond

24   with the MOXO which, because those two are the similar tests,

25   and they corresponded, but I did not add that in there

1    because I did not provide the assessment.

2    Q    Got you.  So, you talked about the MOXO.  You talked

3    about the attention, timeliness and compulsiveness.  Can you

4    explain this here, this information?

5    A    Sure.  So, this is that 20-minute test that I observed

6    you taking while -- and it is looking for attention,

7    timeliness, impulsiveness and hyper-reactivity.  What they

8    look at or they look at these scores, and you can see that

9    what they look at is where you fit in comparison to others,

10   that if you are -- if you have a deviation from the standard,

11   which, you know, is what we're looking at, if that happens,

12   they look at how severe is it.

13        You may have a small deviation, and, you know, it's

14   a mild severity.  And that's what we were looking at here,

15   that yours had -- and I can -- if you can either scroll down

16   or if I'm allowed to pull up my own report, I can tell you

17   exactly.  You know, they each had a pretty severe, and I can

18   pull it --

19        DR. KITCHENS:  Is it okay?

20        THE WITNESS:  Your Honor, am I allowed to pull up

21   my report on my own computer?

22        THE COURT:  You know, let's do this.  It is 11:54,

23   and I have to take care of another conference, as I mentioned

24   at the outset.  So, let's take a break from your testimony

25   for now.  I'm going to have to -- I'm going to have to break

 1    off from this thing.  You guys feel free to stay logged-in,

 2    and just, you know, mute your lines or turn off your cameras,

 3    whatever you want to do.  I will be back at 12:45.  And at

 4    12:45, we will resume.

 5              And, Dr. Kitchens, for your reference, when we

 6    resume at 12:45, you'll have about 40 minutes left of your

 7    time budget, all right?

 8              DR. KITCHENS:  Yes, sir.

 9              THE COURT:  So you can think about how you want to

10    best use that.

11              DR. KITCHENS:  Yes, sir.  Thank you.

12              THE COURT:  All right, everyone.

13              THE WITNESS:  Thank you.

14              THE COURT:  I will break off, and we will resume

15    this at 12:45.

16              MS. MEW:  Thank you, Your Honor.

17              DR. KITCHENS:  Thank you, Your Honor.

18              (Recess, 11:55 a.m. to 12:45 p.m.)

19              THE COURT:  All right.  Hello, everyone.  Dr.

20    Kitchens, are you prepared to resume with the witness?

21              DR. KITCHENS:  Yes, sir, I am.

22              THE COURT:  All right.  Do I hear -- is there some

23    kind of -- is everyone else on mute hopefully?  Okay, good.

24    All right.  Dr. Kitchens, go ahead.

25              DR. KITCHENS:  Okay.  Thank you.  Thank you, Judge.

1   Oh, let me share my screen.  Sorry.  Yes.

2   BY DR. KITCHENS:

3   Q    All right.  There we are.  Ms. Bacon, are you ready?

4   A    I am ready.

5   Q    All right.  So, Ms. Bacon, I was going through the file

6   here or your assessment -- I'm sorry -- and what I wanted to

7   really talk about here was -- so, we have already talked

8   about the ADHD, the results that you've seen.  And one thing

9   that you also talked about was the DIVA 2, the evaluation,

10  when you were talking about this area here.  And can you

11  explain a little bit more of what the DIVA 2 looks at in

12  different aspects of life?

13  A    Sure.  The DIVA 2 is really looking at all of the

14  different symptoms.  It goes through the DSM -- excuse me --

15  and it's looking at the symptoms.  And then after we look at

16  the symptoms, there, it looks at childhood and adult

17  symptoms.  We also really look at -- or it looks at in what

18  ways does it affect your life.

19          And after we look at -- you know, because what

20  we're looking at is, you know, sometimes people have

21  symptoms, but they don't affect their lives.  They are able

22  to just go on about their life or it doesn't affect them, and

23  that, you know, is one of those things that we really have to

24  look at with the DSM is, does this impair their ability to

25  perform in their lives.  And that's what it's looking at, as

1    well.  So, it's looking at symptoms, as well as the affect on

2    your life.

3    Q    Got you.  And I'm glad that you brought that up.  So,

4    according to your evaluation, and I guess, the DIVA 2, what

5    was that -- what was your conclusion from your -- from your

6    evaluation on the different affects, having this -- having my

7    disability affect on my life?

8    A    Right.  Well, based on the DIVA 2, what we know is that

9    it affects multiple aspects of your life.  You endorsed that

10   it affects your work, obviously, since we're here, your

11   social -- the social interactions, your self-esteem, ability

12   to really feel confident in your ability to do the things

13   that you are setting out to do and against self image, which

14   is related to self confidence.

15   Q    Got you.  So when you -- when we talk about the self

16   image there, what -- have you noticed when you were

17   evaluating me or when you were doing your evaluation, what

18   was your perception of my character when you -- or, like, my

19   physical being when you assessed me, because if I'm not

20   mistaken, this is part of your assessment when you're doing a

21   new patient?

22   A    Yes.  That is part of the assessment is interacting and

23   looking at behavioral observations as part of the clinical

24   aspect.  And, you know, the thing about your self image being

25   really tied to your career is when you have a struggle to

1    pass a test to prove that you are able to do the job that

2    you're setting out to do, it can really lead to a, you know,

3    negative self image and increased anxiety or just pressure to

4    pass a test, which with ADHD, we also know that the more

5    pressure and negative self image does happen.  And it just

6    kind of compounds.  So, whatever symptoms you would have,

7    sometimes they are more pronounced when we are taking tests.

8    Q    So, am I -- so, are you saying that those tests are

9    triggers?

10   A    It could be said that way.  It depends on the person.

11   But, yes, I mean, if test anxiety is an issue, and there is

12   combined with ADHD symptoms, it could presumably make it

13   worse.

14   Q    Okay.  Thank you.  Ms. Bacon, at any point during your

15   evaluation or your interview with me, did you ever believe I

16   was using my medical education to -- and training to create a

17   false positive result?

18   A    So, one of the things that we do with our -- in

19   practice, we talk to people, and we do attempt to get to know

20   them and really understand what is going on in their lives.

21   And it's really a clinical judgment of how people are

22   presenting.  I would use the information and the presentation

23   and the behavioral observation and our discussions in

24   conjunction with the rest of the report.

25              I did not get that impression from you, but I would

1    also -- if -- I would also look at the different assessments

2    that compare and back up the fact that I did not get that

3    impression that you were using your medical information to

4    get a particular diagnosis.

5    Q    Thank you.  Excuse me.  Thank you for your answer there.

6    So, as you just said there, so in other words, my next

7    question that I would like to move forward to, when you were

8    going through your evaluations and research, did you make any

9    independent investigations into this particular case?

10        Meaning, in other words, did you talk to any of my

11   professors, other doctors or family members, et cetera?

12   A    No, that is not part of my -- not as part of my

13   assessment is not to do that, not necessarily.  And I did not

14   talk to any of your professors or doctors.

15   Q    I saw here that you were -- sorry about that.  So, I

16   want to go back to the tentative scale here --

17        DR. KITCHENS:  -- and for reference, I am at Bates

18   stamp MK06, for the record.

19   BY DR. KITCHENS:

20   Q    And, so, it was talking about the attentiveness and the

21   scale measures.  Can you talk a little bit about that, from

22   your evaluation with me?

23   A    Yes.  The attentiveness scale measures your -- the

24   person's ability to respond correctly, to stay attentive --

25   to stay attending to the task at hand and remain focused.

1   Q    And when you were interviewing me over the phone and

2   also -- well, video chat is what it was, when we talked --

3   how was the interaction when talking with me, when you were

4   speaking; I'm speaking, et cetera?

5   A    Well, you're pleasant while you are speaking.  I know

6   that one of the things that we've talked about that we -- I

7   experienced was, a difficulty staying, necessarily, on topic.

8   We were -- we would be talking about one thing, and I would

9   notice -- you know, there would be associative speech, that

10  would lead to this other thing, which would lead to another

11  thing.

12          And while they are related, it wasn't necessarily

13  the point of what we were talking about.  I know that a

14  struggle was interrupting, and we can see that, sometime,

15  when we're on video chat, but I know that it was a little

16  more than we would regularly see.

17  Q    Is that correlated with different types of disabilities

18  such as ADHD?

19  A    Yes.  One of the things that we see with ADHD is that

20  that kind of goes along with impulsivity of not being able to

21  wait your turn, to having a thought and, you know, that time

22  between having the thought and pausing to wait until the

23  other person is done.  That is, really, where we see it with

24  ADHD.

25  Q    So, one thing that I want to talk about is, in your

1   professional opinion, and your experience with your years of

2   experience and seeing so many different types of patients,

3   what would be your personal opinion on, do African Americans

4   seek medical help -- treatment, especially in mental health?

5   A    Well, I would have to get to look at the research to

6   show the exact numbers.  Over the years, it tends to be quite

7   a bit less than the people who are white, but if you need the

8   exact numbers, I could get those from the National Institute

9   of Mental Health or, maybe, SAMSA, which is the Substance

10  Abuse and Mental Health Organization.

11  Q    Got you.  And a follow-up onto that, as you said, and,

12  you know -- well, I can't really say that -- but, is that --

13  leading off of that, what would be your professional opinion

14  and experience -- so, we talked about seeking help, meaning

15  going to the doctor to look for, you know, something that was

16  happening to them, instead of prolonging it.  But what do you

17  feel that your opinion would be that African Americans over

18  treatment of mental health diagnoses, treatment?

19  A    The research has shown over the years that they seek

20  treatment less than people who are white.  Again, I would

21  need to look at the National Institute of Mental Health to

22  get the exact numbers, but I know that the trends have

23  steadily been that they seek mental health less.

24  Q    Got you.  And so, would it be in your professional

25  opinion that, when it comes down to African Americans, when

1    for the treatment to be lower, would you say that -- what

2    would be your opinion on the refusal of treatment or refusal

3    of medication?  Would it be at an increase or decrease

4    compared to other races?

5    A    I'm sorry, I don't have that information.  I know when

6    dealing where -- I've worked with kids for many years and

7    have been a program director of intensive outpatient programs

8    for children.  And I do know that there is a variety of

9    different responses from parents.  I don't know race versus

10   -- you know, I don't know how that would affect.  I do know

11   that there is a lot of disparity between, you know, some

12   parents are really ready for medication, and some parents

13   will vehemently deny that because of the fear.

14   Q    Got you.  So, and which you lead me to my next question

15   would be so, when you say about the fear, would you, in your

16   professional opinion, render that my mother's rejection of

17   the medication that the healthcare professional recommended

18   would be normal for, in that aspect?

19   A    I don't know that I have the information to be able to

20   compare it to others.  I fear that that is why she did not

21   allow medication, and I have heard that concern before.

22   Q    Yes, no problem.  Thank you for that.

23   A    Okay.

24   Q    I want to go back over to your evaluation.  It says

25   here, in your evaluation, that "His scores represented an

1    extreme level of deficit on all four scales."  Can you talk
2    to us a little bit about that?  What do you mean here?
3    A    So, on the MOXO, whenever you get the raw data, you have
4    -- it rates each level.  If you're beyond, outside of the
5    standard deviation, what they would expect, it rates it based
6    on the number of either low severity, still outside of the
7    standard deviation, low severity, medium severity, high or
8    extreme severity.  And it rates it in -- well, it's a chart.
9    And the charts show that all of your -- all four of your
10   scales were in the extreme severity.  And you can see that
11   each of the numbers are different, but there is a cut-off for
12   each one, that each still fell in the extreme severity.
13   Q    Okay.  And so, with this particular -- it says -- can
14   you read here of your evaluation?
15   A    Yes.  "Dr. Kitchens, based on results, demonstrated a
16   decreased performance in attentiveness and timeliness, where
17   his impulsivity improved as the test progressed."
18   Q    Would it be, in your medical expertise, that this could
19   have aspects of, say, taking extended -- a more extended
20   amount of time when performing a standardized test or a test
21   that has been put before a person?
22   A    Yes.  The timeliness scale is really looking at that,
23   because what it's looking at is, how quickly can you look at
24   the question, decide the answer and just answer it.  And if
25   you are having -- if yours was in the extreme severity, that

1    is going to indicate the need for more time to get the

2    correct answer.

3    Q    Thank you.  So, in summary here, for time's sake, can

4    you -- can you talk a little bit about your summary of when

5    you met with me -- well, excuse me, before you go there, I

6    wanted to say, earlier, you said about the test --

7              DR. KITCHENS:  -- I am going, now, to this is Bates

8    stamp MK01.

9    BY DR. KITCHENS:

10   Q    And you said, here, that -- earlier, you said we did a

11   20-minute examination.  And -- wait, let's see.

12             DR. KITCHENS:  Okay, sorry.  So I'm at Bates stamp

13   number MK03.

14   BY DR. KITCHENS:

15   Q    And at the top, on your behavioral observations, what

16   was that time frame that you have here in the first -- first

17   sentence there, and can you explain a little bit about that

18   and why?

19   A    The first sentence is, "Dr. Kitchens was assessed over

20   two one-hour sessions."

21   Q    So, and why is it -- is that a common time frame or is

22   it shorter?  Is it longer?  And why does it need to have that

23   amount of time?

24   A    So, there are different types of assessments that take

25   different amounts of time.  We spent one of the hours,

1    really, going over history, and you are in the DIVA.  And we
2    -- and from that, I'm doing behavioral observations and
3    making notes about interactions the whole time.  The next --
4    the next hour is spent over doing -- an observation while
5    you're doing the MOXO and more information-gathering and more
6    observing your behavior.
7    Q    So -- all right.  So, is it, in your medical
8    professional opinion, those who have ADHD diagnoses, are
9    these people able to perform well in life without -- in
10   different aspects of life?
11   A    Well, you know, I think there's a lot of different --
12   there's a lot of different levels of ADHD.  There's a lot of
13   different levels of severity, and that's one of the reasons
14   why I really like, with the MOXO, looking at severity,
15   because, you know, there are times that there's just some,
16   you know, really, there's some scaffolding that we can put in
17   place that that's enough.
18         There's some of the, you know, not informal -- the
19   informal types of things that can happen, that that's enough
20   for someone.  And that tends to be when it's more mild.  And
21   what we're seeing, and what we were looking at with the MOXO
22   is, does that necessarily work for everybody?  It does not.
23   Some people need official accommodations, and, you know, we
24   have 504 plans in elementary and middle and high and college.
25         And, you know, we have different aspects and ways

1    that we can support children and adults.  But, you know,

2    everybody needs something different.  We individualize our

3    care.

4    Q    Yes, okay.  So, and I'm going to be closing here.  So,

5    you said that, here, I'm reading, and I am at Bates stamp

6    MK08.  Can you talk to us a little bit about this page here,

7    that you see here, about your diagnostic impressions from

8    your time working with me?

9    A    Yes.  Based on your symptoms, based on the reports, the

10   integrated assessment, it showed that you have Attention

11   Deficit Hyperactivity Combined Presentation.  And we know

12   that the ADHD can have three different types of

13   presentations.  It can be -- one, it can be a, you know,

14   inattentive only.  It can be that we -- you know, we see

15   people who have they're only inattention.

16        We can see that there is the presentation of

17   hyperactive only or there is the combined presentation when

18   we have both inattentive and impulsive hyperactive symptoms.

19   Q    And can you talk a little bit about your recommendation

20   of care for me, specific to what you have here?

21   A    Yes.  So, based on our -- based on what we -- on our

22   assessment, I recommended that you continue to participate in

23   medication management and/or therapy to provide support

24   regarding your current diagnosis and symptoms.  My thought on

25   your testing would be some accommodations that would be based

1    on the extra time needed to -- for the timeliness scale,

2    maybe extra breaks to move -- to be able to move because of

3    the hyperactivity, the fidgeting, which can, you know, cause

4    difficulty to focus.

5          I suggested the ability wear noise-cancelling

6    headphones or earplugs to decrease audio distractions and/or

7    the option to break it down, if you can't -- you know, say,

8    if you can't have extended time, can it be broken up into

9    smaller -- you know, into partial days?  I don't know how all

10   testing works, and I know that -- but it was just an idea

11   that, if it could be taken over less time, based on what --

12   the symptoms that we saw.

13   Q    Got you.  And these particular recommendations or

14   recommendations of care, would you -- would this be something

15   that would be of the norm for other professionals in your --

16   in your field with patients with ADHD or is this just

17   specifically for me?

18   A    So, I always make recommendations for accommodations if

19   there are -- if they are having -- if someone is having

20   problems.  Generally, if they're coming to me for an

21   evaluation, they're having problems.  And if they get

22   diagnosed with ADHD -- not everybody does -- I do make

23   recommendations for accommodations, and I would do it in

24   schools.  We do it at other times.  I don't -- I didn't give

25   you all of the recommendations that I may give somebody else.

1    But I didn't give somebody else the same, you know,

2    recommendations.  It's really, truly based on your symptoms,

3    your behavioral observations, and the things that it would

4    take to make you successful, to be able to use the skills

5    that you have.

6    Q    Got you.  So, I guess what I'm -- and you can tell me if

7    I am hearing this correct, is that you make individualized

8    recommendations of care that you rely on your expertise and,

9    also, other tools in place, such as these particular

10   evaluations?

11   A    Yes.  This is over many years of honing your clinical

12   judgment and, also, looking at the information at hand, I do

13   make those recommendations.

14   Q    Thank you so much.

15            DR. KITCHENS:  Your Honor, I have no further

16   questions for Ms. Bacon.

17            THE COURT:  Okay.  Ms. Mew?

18            MS. MEW:  Thank you, Your Honor.

19                         CROSS-EXAMINATION

20   BY MS. MEW:

21   Q    Good afternoon, Ms. Bacon.

22   A    Hello.

23   Q    Hi.  My name is Caroline Mew.  I'm one of the attorneys

24   for the National Board of Medical Examiners.  I just have a

25   few questions for you.

1    A    Sure.

2    Q    Prior to your first appointment with Dr. Kitchens, had

3    you ever met him before?

4    A    I had not.

5    Q    If we can look at -- pull that document back up ECF-22?

6              DR. KITCHENS:  Yes.

7              MS. MEW:  That's all right, Marcus, we'll handle it

8    on our end, but thank you.  I appreciate it.  You've been

9    doing all the work so far today.

10   BY MS. MEW:

11   Q    I'd like you to look, here, on the first page, Ms.

12   Bacon, under assessment procedures?  And the second item I

13   see listed is record review, do you see where I am?

14   A    Yes, I do.

15   Q    And so I take it, you agree it's important to conduct a

16   record review as part of an ADHD analysis?

17   A    I do.

18   Q    And why do you conduct a record review when you're

19   making an ADHD evaluation?

20   A    Well, we want to make sure, in any assessment, that we

21   are looking at any kind of information that we have.  Here,

22   it was where I was referring to looking at the Conners CPT 3,

23   and I want to make sure that I'm looking at an entire picture

24   as much as possible.

25   Q    And so, you mentioned the Conners CPT 3.  Is there any

1    other record that you looked at as part of your record

2    review?

3    A    No.

4    Q    Did you ask Dr. Kitchens to provide any particular type

5    of records for your review?

6    A    I did not.

7    Q    When you were conducting your evaluation, did Dr.

8    Kitchens tell you that he had been previously diagnosed with

9    ADHD?

10   A    He did.  He let me know that he -- that this had been a

11   previous diagnosis, but he wanted to see if that was still

12   the case.

13   Q    And I believe you mentioned, when you were speaking with

14   Dr. Kitchens, that when you prepare an evaluation, you

15   prepare a report, like the report we're looking at here at

16   ECF-22.  Did you ask Dr. Kitchens if he had any other ADHD

17   evaluation report, similar to what you prepared for him?

18   A    I did ask him, and he explained that he had had one in

19   2012, I believe, but I don't -- I would have to check -- I

20   guess we could ask him -- but that he did not have it

21   available to him.  I apologize if I have the date wrong.

22   Q    That's okay.

23            MS. MEW:  I think, just for the record, we can

24   clarify, I think it was 2013.

25            THE WITNESS:  Oh, okay.  Thank you.

1    BY MS. MEW:

2    Q    And, then, as part of your evaluation, it's my

3    understanding, that Dr. Kitchens reported that he experienced

4    a large number of ADHD symptoms, is that correct?

5    A    He described the symptoms to me, yes, and I listed them

6    there in the report.

7    Q    And would you describe that as a large number of ADHD

8    symptoms?

9    A    He -- in order to be diagnosed with the DSM, you have to

10   have, either, three symptoms in the inattentive category,

11   three symptoms in the hyperactive and impulsive category or

12   in order to have each of the different presentations or if

13   you have the combined, you have to have, at least, six, you

14   know, three in each to combine it, and he did have more than

15   that, so, yes, that is several symptoms.

16   Q    And he endorsed all nine criteria for inattention for

17   example?

18   A    Yes.

19   Q    Are you familiar with symptom validity instruments?

20   A    I am, yes.

21   Q    What are they used for?

22   A    They're used to test to see whether the person is being

23   honest or giving their best effort.

24   Q    Did you administer any symptom validity instruments to

25   determine the validity or reliability of the symptoms that

1    Dr. Kitchens reported?

2    A    The MOXO has a symptom validity aspect to it, and that

3    was one of the aspects that did say it was valid.

4    Q    And that's specific to that test --

5    A    Yes.

6    Q    -- to his performance on that test?

7    A    Yes.

8    Q    And that, again, was the 20-minute continuous

9    performance test?

10   A    Yes, exactly, that was the 20-minute performance test.

11   Q    Did any of Dr. Kitchens' claimed symptoms strike you as

12   inconsistent at all with his educational history?

13   A    No.  I had no reason to believe that that was

14   inconsistent.

15   Q    Or did the number of claimed symptoms strike you as

16   inconsistent when Dr. Kitchens told you about the positive

17   feedback he had received in his clinical rotations?

18   A    No, that was not unusual for someone with ADHD to be

19   able to succeed in some ways.

20   Q    And I think you spoke in your discussion with Dr.

21   Kitchens about the distinction between symptoms and, what

22   I'll call, impairment.  Is that a fair --

23   A    Sure.

24   Q    So, what evidence of impairment did you see with Dr.

25   Kitchens?

1    A    So, the evidence of impairment that I saw with Dr.

2    Kitchens, while we were talking was, it was hard for him to

3    stay on task, and I know that that was a difficulty for him.

4    Evidently, we know that we're here, so it seems his ability

5    to focus and attend and complete the test seems like an

6    indication that that would be an issue.

7            And as far as symptoms with ADHD, you know, a lot

8    of times, we'll see adults who have ADHD and struggle for

9    years, really, it affects their self image and their ability

10   -- their, you know, self confidence, and that, then, affects

11   other parts of their lives.  So it's, really, all of those

12   things are related.

13   Q    And did you see any evidence, other than Dr. Kitchens'

14   self report or what you observed during your assessment that

15   would show these impairments or impacts on his life?

16   A    Everything I saw, I put in the report.

17   Q    Okay.  And so it's limited to what you observed during

18   your sessions with Dr. Kitchens and what he reported to you?

19   A    Could you clarify what you're asking?

20   Q    Sure.  I'm just thinking -- I'm just trying to

21   understand, when you are looking at what I have described as

22   evidence of impairment, but when you're looking beyond just

23   the symptoms, the reported symptoms, but how they are

24   impacting your life, did you see anything outside of these

25   two hours of your assessment and what Dr. Kitchens told you

1    himself?

2    A    Right.  When we are looking at impairment, you know,

3    we're really looking at a lot of different things, and we are

4    looking at his self report.  We -- you know, people don't

5    always come to us if they're not having trouble, and he was

6    reporting that he was having trouble in these areas.  So, you

7    know, I could show you, you know, what I put in the report,

8    and, yes, that is -- I put it in there.

9    Q    Okay, I understand, so it's in your report?

10   A    Hmm-hmm.

11   Q    And I just wanted to also clarify here on this first

12   page, under assessment procedures, the Achenbach System of

13   empirically-based assessment, you list the mother's report,

14   but I don't think I saw that discussed in your evaluation.

15   Did you receive a report from his mother?

16   A    You are right.  I have that listed, and that was a

17   mistake.  As soon as he pulled it up, I saw that, and

18   realized I needed to not have that in there.  I'm sorry.

19   Q    No, that's fine.  I just wanted to make sure.  Thank

20   you.

21   A    I apologize about that.

22   Q    And I think you talked to Dr. Kitchens a little bit

23   about the referral question, which is also shown here on the

24   first page.  Why do you include the referral question in your

25   evaluation?

1    A    Well, usually, I like to include that just to let --

2    really, just to explain why we are here.  You know, it's just

3    a -- it's a little of what brought the person to me, and in

4    his case, he needed to know -- he needed the diagnosis to

5    know if -- another assessment to see if he qualified for the

6    diagnosis.

7    Q    And this was in connection with his interest in

8    receiving extra time accommodations on the USMLE, correct?

9    A    I know he was -- he -- if he had ADHD, he would like to

10   have accommodations.  He did not tell me what accommodations

11   he would like.  I did not discuss any accommodation

12   recommendations with him at all.

13   Q    Oh, I understand.  Let me ask it a different way.  But

14   did you understand, when he first presented to you for an

15   assessment, that he was interested in obtaining

16   accommodations of some sort on the USMLE?

17   A    I understood -- yes, I understood that if he was

18   diagnosed with that, he would like to have accommodations.

19   Q    And then, if we turn to page eight of your report, and

20   we'll turn there.

21   A    Okay, thank you.

22   Q    Okay.  And looking again, at the recommendations --

23   A    Yes.

24   Q    -- how did you decide to recommend double time as the

25   amount of extra time Dr. Kitchens should receive on the

1    USMLE?

2    A    So, I know whenever we are looking at extra time,

3    generally, the options are, you know, time and a half or

4    double time.  And so, what I was just looking at was the

5    severity on his MOXO of the timeliness.  If his timeliness

6    was, you know, on the mild or moderate end of severity, my

7    thought would have been to go to time and a half.  Since it

8    was on the extreme level of severity, I thought that might --

9    that would be a double time situation.

10           I don't know, if your testing, if there is other

11   options.  But based on the information I have, it's generally

12   one and a half or double time.

13   Q    And the MOXO, again, is the continuous performance test?

14   A    Yes.  That's the one that checks the validity of

15   performance, and it's looking at the timeliness and how quick

16   he can get the answer, because a person with ADHD has a

17   slower processing speed.  The working memory and processing

18   speed is really the thing that slows down.  And that's what

19   the timeliness is really looking at.  And so that's why

20   double time can really help a person with ADHD get the same

21   -- get the answers that they have there, but it just takes

22   them longer to process.

23   Q    Is it your testimony that the MOXO CPT is a measurement

24   of processing speed?

25   A    No.

1    Q    And did you do any measurement -- assess Dr. Kitchens'

2    processing speed during any other assessment?

3    A    No, that was part of -- no.  That's done with an IQ

4    test.  I'm giving that as part of an explanation for ADHD if

5    someone did not understand how it works, as clinical

6    information.

7    Q    And there also -- there are psychoeducational

8    assessments that are available to assess an individual's

9    reading speed, correct?

10   A    I suppose there are.  I don't have the list of any in

11   front of me.

12   Q    Are you, generally, aware that there are also

13   psychoeducational assessments available to assess a person's

14   reading fluency?

15   A    If that were what I were testing, then I would look at

16   that, yes.

17   Q    I understand, but you did not test for this?

18   A    I am not looking at that, no.

19   Q    Is it fair to say that almost all of the information or

20   all of the information you have regarding Dr. Kitchens and

21   his educational and medical background, his background was

22   based on his self report that he provided you, since you did

23   not receive any records from him in that regard?

24   A    Can you repeat the question?

25   Q    Absolutely.  Is it fair to say that the information that

1   you received about Dr. Kitchens' educational history, his

2   history, his background, was based on his self report because

3   you didn't receive any records related to that?

4   A    Yes.

5   Q    And if any of the information that he provided to you

6   ended up being not accurate, would that potentially affect

7   the conclusions that you reached in your report?

8   A    The information I gathered was -- you know, I did

9   behavioral observations as well as the MOXO and looking at

10  all of those things, if the information was wrong or

11  different, I could look at that.  I don't know what that

12  would -- I don't know exactly which thing you're asking about

13  to be able to change or not change, so that would be hard to

14  say.

15  Q    Fair enough.  I understand.  Thank you, Ms. Bacon.  I

16  don't have any other questions.

17  A    Thank you.

18            THE COURT:  All right.  Dr. Kitchens, you have

19  about 15 minutes or so.  You know, when I laid out the plan

20  for this hearing, I said, you know, about two hours on each

21  side.  I'm not going to -- you know, it's important that we

22  stick to that for a variety of reasons, but one of the things

23  I also said is, I will provide you with the opportunity to

24  very briefly rebut after the defendant has had a chance to

25  go.  And the scope of what you would be able to do would be

1   only, really, to present -- only to rebut on the key issues
2   and for things that were raised in defendant's case that you
3   didn't have a chance to address already.
4        It would not be an opportunity to just cover
5   additional grounds or repeat things.  So I'm going to save
6   you a little chunk of time that's outside of that 15 minutes
7   or, you know, after defendant goes.  But, for now, you should
8   -- with that 15 minutes, you could continue on, I guess, the
9   remaining witness would be you, if you want to do that.  You
10  also have a declaration in the record, which, of course, we
11  have, and I've read, and that's fine.  And there is -- you
12  were deposed, and the defendant submitted portions of your
13  deposition, which we have those, as well.  So there is
14  already -- you know, there is already some, you know,
15  evidence from you from your testimony or point of view in the
16  record, so bear that in mind when you're thinking about how
17  to use your time.  You also want to save some time to, maybe,
18  do a couple of cross-examination questions when the time
19  comes.
20       The other thing I want to say is, as I've been
21  listening to the hearing, and I've also, you know, I also,
22  during the lunch break, had a chance to review your reply
23  brief, I think it's really important for me to hear more on
24  the irreparable harm point.  And I want -- if you have it, if
25  you would like to do this, if you would like to use your time

1    this way, and I would think it would be useful, it would be

2    good for you to address, in testimony, the irreparable harm

3    or the potential for irreparable harm.  But I'll leave that

4    to you to decide what you want to do.

5              DR. KITCHENS:  Okay.  Thank you.

6              MS. MEW:  Your Honor, if you don't mind, if I

7    interrupt, I think Ms. Bacon might be -- maybe she wants to

8    be excused?

9              THE COURT:  Oh, you know what, I apologize.

10             DR. KITCHENS:  I did have some rebuttal for Ms.

11   Bacon for some of the questions that were asked, but okay, I

12   understand.

13             THE COURT:  You know what?  I'll let you do that,

14   but that's fine if you want to use your time that way, too,

15   but that will have to be very brief.

16             DR. KITCHENS:  Yes, sir, really quick, just to

17   clarify some of the questions that were given.

18             THE COURT:  Okay, go ahead.

19             DR. KITCHENS:  Sorry.

20                      REDIRECT EXAMINATION

21   BY DR. KITCHENS:

22   Q    Ms. Bacon, did you request any information or did you

23   receive any medical records from myself, out of volunteering

24   to you, for you to review?

25   A    You did volunteer the information.

1    Q    And did you receive the medical records from previous

2    physicians from me?

3    A    I am not looking at it directly in front of me, now,

4    but, yes, I know I received some information.  I did not add

5    that into my report.

6    Q    Right.  But you did receive medical records from other

7    physicians?

8    A    Yes.

9    Q    All right.  And, then, also, one thing that I wanted to

10   ask really quicky was that, have I ever expressed to you

11   after -- or continuing treatment plans with you?

12   A    Yes.  You have discussed the possibility of either with

13   me or another therapist to work on continuing to build the

14   skills to manage the symptoms.

15   Q    Right.  So -- okay.  So, is it -- yes.  All right.  So,

16   I did -- so, when we come down to the reason that I asked

17   that question is that it leads on to to ask is that, did I

18   only come to you for a diagnosis for these accommodations or

19   was it for -- more so for a clarification or confirmation, in

20   your own words?

21   A    My understanding was that it was a clarification to

22   reassess and the possibility of treatment in the future.

23   Q    Thank you.

24        DR. KITCHENS:  I have no more questions, Your

25   Honor.

1          THE COURT:  All right.  In that case, Ms. Bacon,

2     thank you for your time.  You can be excused.

3          THE WITNESS:  Thank you.

4          (Witness excused)

5          THE COURT:  All right, Dr. Kitchens, what would you

6     like to do next?

7          DR. KITCHENS:  I guess I would like to give my

8     testimony if that's all right.

9          THE COURT:  That is perfectly fine.  So you go

10    right ahead, and again, if you can work in some discussion of

11    the irreparable harm issue, you know, because I'll just -- to

12    point it out for you, you know, I have some concerns about

13    whether -- and you'll be sworn in.  I have some concerns

14    about, you know, why -- why it is that needs to -- that this

15    decision needs to be made right now, as opposed to, let's

16    say, two months from now, four months from now, six months

17    from now.  The record is a little -- it's got some holes in

18    that regard, so I'd like to hear from you about that.

19          All right.  Well, Inna could you, please, swear in

20    Dr. Kitchens?

21          DR. MARCUS KITCHENS, THE PLAINTIFF, SWORN

22          COURTROOM DEPUTY:  Please state your name for the

23    record.

24          THE WITNESS:  Marcus Kitchens.

25          Thank you, Your Honor, for this time to present to

1    you.  One thing that I want to talk about on the merits of

2    the irreparable harm, the MBME has inflicted these -- these

3    discriminations upon me, and that why this irreparable harm

4    needs to happen now is, because as the MBME has stated even

5    -- has stated is that it takes a lot of time and effort to

6    complete the application, et cetera.

7           One thing I will say is that, on June 9th -- June

8    9th, the ECFMG and also the AAMC opens for to start

9    registering for the 2024 Match.  As of right now, I have

10   already purchased my token there, and if I am not able to

11   have this injunction, now, what it would do is it could

12   potentially make me delayed and even miss the opportunity to

13   have first come advantages over the -- over my other peers.

14          One thing I will say is that I have a long track

15   record, as we have said before -- excuse me -- and what has

16   to happen now is that, without this, there is a likelihood

17   that I may never be able to practice medicine, ever.  And it

18   really does go against everything that the ADA has provided.

19          I submitted a progress, a disability note to the

20   MBME in my application.  But more importantly, I refused

21   those official accommodations as we talked about earlier

22   before, earlier in this statement.  And as a pro se

23   plaintiff, it shows that there is a likelihood that I will

24   succeed on the merits.  And I'd like to pull up a visual aid,

25   if I can, for one second?

1           THE COURT:  Sure.

2           DR. KITCHENS:  Sorry.  Here.  Oh, let me share my

3      screen.  Sorry about that.  Okay.  So, all right, here we

4      are.

5           So, as we can see here, the MBME has asked me

6      whether or not -- in several different ways, whether or not I

7      was here or malandering to try to look just for

8      accommodations for this particular exam.  Your Honor, I must

9      be missing something here.  But for all of the other cases

10     that I have witnessed, here, the defendant could please ask

11     me or explain to me why I was the one that was asked about

12     malandering.

13          And, as I go on to -- let's see, I have here, with

14     docket entry 27.  I have attached to here my official

15     transcript from the Medical University of Lublin.  The MBME's

16     accusations that I am malandering and looking for stimulant

17     medication, and according to other accommodations, directly

18     contradicts my grades that I have shown here.

19          If I were attempting to falsify a disability or

20     particularly for a stimulant such as Adderall, we would see

21     that my grades would be much higher.  That's just not the way

22     it works.  My mother has testified, and other people, as

23     well, have testified that those kinds of accusations made by

24     the MBME, particularly when I have fought so hard to hide the

25     fact that I had a disability, their counsel doesn't know me

1    from Adam, and my understanding is that it is best to know

2    the patient before.

3           I have done so much work and pain to go through

4    when you have such a tight time frame.  I have already missed

5    all types -- I mean, different deadlines.  I've now been out

6    of school for several years and watching my peers go into

7    residency, and here I am three years later, still trying to

8    take it.

9           I have here my -- I'd like to come down.  As you

10   can see --

11          THE COURT:  Doctor, let me ask you a question.

12          THE WITNESS:  Yes, sir.

13          THE COURT:  That transcript you were just showing,

14   is that -- was that attached to your reply brief or where do

15   I find that?

16          THE WITNESS:  Yes, sir, it was.

17          THE COURT:  All right.  Do you know which exhibit?

18          THE WITNESS:  Let me see.  I don't have it on me,

19   because I made this one here.  It's on there.  I don't know

20   which exhibit.  I don't know it right in front of me, Your

21   Honor.  This particular document is documentation that I was

22   -- that I've moved around, I'm sorry.

23          MS. MEW:  Your Honor, if I may, it's ECF-27-2.

24          THE COURT:  All right.  So, my ECF-27-2 is not

25   that.  It's stuff from ECFMG.

1         MS. MEW:  Oh, I apologize.

2         THE COURT:  All right.  Yeah, well, what I'd ask

3    you to do, Dr. Kitchens, is, you know, after the hearing,

4    review -- just review as it appears to the public and me, and

5    if this -- I don't think this is on there.  Maybe you could

6    just upload it again for us?

7         DR. KITCHENS:  Yes, sir, I will do that.

8         THE COURT:  Sorry.  And then -- let me -- can I --

9    while I am asking you questions, there was -- you were

10   showing a page from Docket Number 26, the defendant's brief,

11   and I didn't -- I didn't -- well, I don't know.  You know

12   what?  Never mind.

13        Why don't you just continue with your discussion?

14   Go ahead.

15        THE WITNESS:  Sorry.  I'm a little nervous.  I

16   don't know why.

17        But, I have it here, those particular

18   documentations.

19        THE COURT:  Well, you know what?  Doctor, sorry to

20   interrupt again, I just -- there is -- I just reloaded the

21   docket, and I see, now, it's attached to Docket Number 28.

22   Okay, I got it now.

23        THE WITNESS:  So, everything did come through?

24        THE COURT:  Yes.  I think we're okay in that

25   regard.  I got it.

1        THE WITNESS:  Okay.  Thank you.  Got it.

2        So, one thing that I will say, also, Your Honor, is

3   that I took Step 1 over and over again, and I asked for 100

4   percent of time over two days, plus an additional time break.

5   Over the next page, it is asked on their accommodations here,

6   it is asked about my disability.  And when I did that, I

7   received those accommodations.  Sorry, I am here on -- sorry,

8   yes, and on the next page, you will see where I received

9   those accommodations from my school.

10       I tried being forthcoming with the MBME by putting

11  in the parenthesis that I wasn't diagnosed yet on the -- on

12  my application here, forthcoming in putting those things on a

13  documentation that I didn't know.  And I actually didn't know

14  to explain why, and I was asking why, you know, for these

15  accommodations, now, when I haven't had to do so much in the

16  past when it comes down to the accommodations.

17       All across that application, the USMLE asked for

18  copies of official records, documentation and records from

19  schools, listing the accommodations that were provided, but I

20  never had official accommodations, and I never even had

21  documentation of the unofficial accommodations, except for

22  the particular document I showed earlier from my exam from

23  the CBSE.

24       I, nor my mother, who had did so many things, as we

25  talked about before of looking for ways to prove that I

1      needed this additional time.  I did everything that I
2      possibly could and provide the documentations for something
3      that I was asked for that I did not have to give.  When I sat
4      down to write my personal statement to the MBME, I read and
5      reread the tiny paragraph on the accommodations form about
6      the MBME's need to know in order to give me the extra time
7      that I needed, but I was limited.
8              I couldn't very well bring up accommodations when I
9      didn't have the proof for it.  And what I didn't know, when I
10     first applied for the accommodations was that it doesn't just
11     have to be for the extra time but also for additional breaks
12     or for a private room.  It could include settings of
13     separation from the class, individualized test taking and
14     tutoring and school, when I was in younger -- when I was
15     younger and in high school and also in middle school.
16             So, instead, I tried to look up about the
17     disabilities under the ADA.  Pursuant to the ADA, I needed
18     three things that I had to provide, and I had all three of
19     them, so I listed out each factor to the MBME to be
20     considered under the ADA and talked about how the exams
21     weren't an actual reflection of my knowledge.  Rather, they
22     showed whether or not I struggled to read, without being
23     given the time to comprehend the material.
24             I even explained that I never had official
25     accommodations because I had professors at my medical

1   university that allowed me to take tests with additional

2   time, even though I didn't have formal documentation from the

3   University.  I attached a letter from my physician of this,

4   saying that I had -- who had been treating me -- excuse me --

5   for, maybe, a year and a half at that time and the medical

6   records that also showed that, outside of the extensive track

7   record of my medication use that is more specific for ADHD.

8           I sent in everything that I had in my possession to

9   the MBME, and I gave everything -- and I gave everything to

10  them for the claim, that they were at my whim when it comes

11  down to the information, which I didn't find that to be true.

12  I simply did not and still do not have certain documentation

13  of proof that I received those particular accommodations, but

14  it does not mean that it did not happen.

15          On October 13th, 2021, I had an evaluation when I

16  was in college that Ms. Bacon was just referring to, and on

17  January the 8th, I receive an email from the MBME requesting

18  more and more documentation from me.  So, this was quite --

19  you know, it was really frustrating for me that they were

20  asking for more information.

21          The MBME asked for official certification of prior

22  test accommodations.  I had already graduated by that time,

23  so I couldn't go to the medical school and get an

24  administrator to fill out a form.  They had already saw that

25  I received these accommodations from my medical school for

1    the CBSE.

2            Your Honor, to be honest, the accommodations that I

3    am looking for and that I need to be able to pass the exam is

4    not because I am looking for a leg up.  It's not.  I am

5    looking for accommodations to make it an equal playing field.

6    Did I try to look for evaluations?  I did.  But my insurance

7    wouldn't pay for it, since I had already had a diagnosis on

8    file, so I had no choice but to tell the MBME that I didn't

9    have anymore documentation when they was asking for it.  I

10   didn't hear anything until February the 8th, 2022, and after

11   that, on that particular day, the MBME said that my

12   application was -- that I did not have enough -- enough

13   documentation.

14           And another thing that they said was that I didn't

15   deserve accommodations because my physicians didn't give

16   enough basis for the diagnoses of me having ADHD, and because

17   I "progressed through my education with an additional record

18   -- or academic record, and scores on time standardized tests

19   were sufficient enough to gain access to and graduate from

20   the University and from medical school without these formal

21   accommodations."

22           I lost everything, and I lost too much time waiting

23   for this particular response from them, so I had to take the

24   exam.  And by doing that, I had to take the exam without

25   these particular accommodations.  And so, what I did was, is

1    that, by studying for -- by studying for this exam with such

2    intensity and waiting for the MBME to give me a decision, so

3    when the decision came, I was already preparing to take the

4    test without these accommodations that I needed.  So I knew

5    that to take the CBSSA before taking the actual test to make

6    sure that I would have an idea whether or not I would pass on

7    the real exam.

8           I will show here, and it is here, and that is

9    Docket Number 2622, on February the 14th, as you can see, my

10   score was a 212.  And, Your Honor, as you can also see, at

11   the bottom right-hand corner -- the bottom right-hand corner

12   of the CBSSA, it keeps a track of my past exams and shows

13   that I had a score of a 151 in July, a 221, and let's here,

14   yes, in '21, a 143, and in September, 2021 -- September,

15   2021, yes, it was a 143.

16          So, it isn't that I always scored really well on

17   these particular exams.  And, because of my poor test scores,

18   I didn't register for the test accommodations, because one

19   would ask me, well, why did you wait so long to take an exam?

20   This exam that I was taking in my home, on this particular

21   score, without additional time or -- and in my office, as you

22   see here, with free of distractions, distraction-free with my

23   headphones on, noise cancelling.

24          As the MBME states on its website, and at the

25   bottom of the CBSSA, that my CBSSA score would be a

1    representation of an estimate of your performance on the

2    USMLE Step 1 -- yeah, Step 1 -- estimated performance, if I

3    would take it within a certain time frame.  But, however,

4    only 11 days later, I sat for that same exam, the Step 1

5    exam, and I scored approximately 60 points lower.

6         The MBME would have this Court ignore their own

7    disclaimers as to indicating of my lack of need for

8    accommodations.  And not only that, the MBME would claim that

9    my -- my disparity and difference in performance indicate

10   that my likelihood of passing the Step 1 exams, and without

11   these accommodations, is speculative.  This is also,

12   candidly, false.

13        As we can see here -- as you can see, I took the

14   liberty of a screen shot for the Court's -- for the pleasure

15   of the Court to see, of these questions side by side, of the

16   CBSSA, which is Docket Number 27.  As you can clearly see,

17   the link -- I'm sorry -- here.  Sorry about that.  You can

18   see that the link of the vignettes on this Step 1 is two

19   times, if not three times as long as the CBSSA questions

20   here.  This is the CBSSA, and this is an example question

21   that the -- that is on the MBME's website.

22        So, you can see that it is understood that how an

23   individual can get their score back and think that, you know,

24   something has to be wrong.  Until you look at the link of the

25   questions and the amount of reading, concentration and focus

1    that is required for one, the CBSSA, on its face, is shorter

2    than it would be if I had to spend more time, more questions,

3    on the USMLE Step 1 exam.

4          This further supports how, if provided the proper

5    accommodations, I would be given the opportunity to be

6    evaluated on my knowledge and my competency.  On the actual

7    day of the exam, I felt comfortable about how I would have

8    done, and I also would ask, as well, as to -- excuse me -- to

9    contact the MBME or call with the MBME and explain to them of

10   what happened to my score from just that short amount of

11   time.

12         (Transcriber change)

13         THE COURT:  I appreciate this point you're making.

14   I -- you know, I want to be fair to both sides about how the

15   time is allocated, and you will have the opportunity to give

16   a closing argument.  Let me ask you a couple questions about

17   what you've been saying.

18                        EXAMINATION

19   BY THE COURT:

20   Q    And this is maybe a basic question, but I may have

21   missed it.  The 2013 diagnosis, who -- who made that

22   diagnosis?

23   A    Yes.  In 2013, the diagnosis that I received was -- I

24   think it was Dr. Sue -- it's here.  Let's see.  Yes, 2013

25   here from, yes, Dr. Sue Raimondo (phonetic), and she made

1    that recommendation.  And the reason that she made the

2    recommendation is because my -- my physician at the time,

3    because I hadn't been on that particular medication, she

4    wanted me to get reevaluated before she would feel

5    comfortable prescribing me such medication.

6    Q    Wait, can you -- I'm trying to find that piece of paper.

7    You can show it on the screen, that's fine.

8              Who is -- wait, who is Cynthia Reed?

9    A    Yeah, so Cynthia Reed, she was the -- one of the

10   coordinator of Disability Services at the university.  So she

11   -- she is one -- she's the coordinator for it, but Sue -- Dr.

12   Sue Raimondo was one of the therapists and who conducted the

13   exam for me.

14   Q    So, wait, does this -- does this say that Dr. Raimondo

15   diagnosed you with ADHD?

16   A    So on here, on this it says that she recommends and that

17   she reports or -- yes, this is what she was saying, that she

18   did diagnose me with ADHD.

19             The reason that that's what she's saying, Your

20   Honor, or that her -- that I can say this is because after

21   she provided this report to Disability Services, which housed

22   the -- the physicians there, they then made that -- started

23   prescribing me the medication.  And then we can see here of

24   the assessment that they gave to me for that particular

25   diagnosis, and that's why I was started on the Adderall of 20

1    milligrams after I had the interview and diagnosis from Dr.

2    Sue Raimondo.

3    Q    Well, then but was it -- it looks like this was -- this

4    was Miriam David, M.D.?

5    A    Yes.  Mm-hmm, yes.  And I also had a different -- so in

6    I think it was 2016, Dr. I think Heckburn (phonetic) -- Dr.

7    Heckburn also sent me to -- to a different psychiatrist and

8    to -- because I had a gap in time where I was in medical

9    school.

10            And I went to school in Poland, and Adderall is

11    actually illegal there, so I was not able to have this

12    medication.  So I had to self accommodate, you know, I had to

13    self accommodate myself with over-the-counter medications to

14    help.  So she wanted a second opinion.  So that would be now

15    my third evaluation of ADHD, which then would make Ms. Bacon,

16    who you heard today, my fourth diagnosis by a different

17    clinician.

18    Q    Okay.  Let me come back to the issue of irreparable harm

19    and you addressed it at the beginning, but then I didn't feel

20    like we quite got to the bottom of the question of what is --

21    it seemed to me from reading the briefing, that your -- your

22    focus is next year's Match program or next year's residency

23    application program, not this year's, and I -- I still can't

24    quite get to the bottom of this question.

25    A    Right.  So -- so, Your Honor, I've already -- I've

1    already purchased -- so even though -- I purchased my what

2    they call a token, and you have to get that token through

3    ECFMG.  I have that particular token.

4          I have access, which I -- I uploaded to -- to the -

5    - to the -- sorry, excuse me, that I uploaded to the -- the

6    system yesterday showing that I have that token, also showing

7    that I have access to the residency programs.  But without --

8    without this Court's decision to give me these -- these --

9    this extended time that I need and the expungement of my

10   record, I won't be able to even practice in my own home

11   state, the state that I live in, the state that I'm from.

12         And a lot of the particular -- even the programs

13   that I want to apply to, such as UK, the University of

14   Kentucky, I can't apply to them because even if you failed

15   the exam one time, you can't  -- they say on their website

16   very clearly you can't.

17         I have here, Your Honor, for your viewing to see

18   that if right -- as of right now, the way I stand, I can only

19   apply to 221 programs out of 618 programs because of me

20   trying to take this exam over and over again.  Before I take

21   the Step 1 Exam, I've taken -- and Step 2, I took those CBS -

22   - the CBSSA examinations.  I passed them.  And with a short

23   time frame, when I go take the exam less than 14 days later,

24   I fail miserably as if I couldn't even spell my own name.

25   Not only that --

1    A    Doctor --

2    A    -- Your Honor --

3    Q    Sorry, Doctor.  I just want to -- I want to really --

4    I'm still not understanding one thing which is, when is the

5    deadline to apply for the residency programs?

6    A    So I have -- because I already have my token, I have

7    until May -- I have until May 31st to apply because I have my

8    token.

9         Now, if you don't have the token is what the -- is

10   what I think Ms. -- what the defendant would say is that I --

11   I missed that.  If you already have the token, you have until

12   May 31st when -- when the AAMC closes, which gives you the

13   opportunity to access the residency programs.  So if their

14   program's still there that have seats open, you're able to

15   apply to those.

16   Q    I'm looking at your brief, the reply brief that you

17   filed last night.  And on page 6 of your brief, it says,

18   "Furthermore, while Dr. Kitchens may not be able to make the

19   2023 Match as the NBME has stated, The Match program is a

20   lengthy, multi-step process that spans many months beginning

21   as early as the fall of your third year of medical school."

22   And then it says, "Should Dr. Kitchens be denied the

23   injunctive relief and asked to pursue his claim until trial,

24   he will inevitably end up back before this Court asking for

25   injunctive relief a second time, to wit, according to the

1    AAMC token information website, the 2024 ERA season begins in

2    June 2023, which is a mere three months away."

3            And this is where I'm stuck because when I read

4    that, my interpretation was, you'd like to take the test now

5    so you can get a jump on the 2024 season, which I understand.

6    But when I'm thinking about irreparable harm, to me I

7    thought, well, wait a sec, if -- if the trial -- if we could

8    -- I don't know, if we could have a trial in 60 days on a

9    complete record, I mean why is that not sufficient for what

10   you're trying to do here?

11   A    The reason that is, Your Honor, is because without the -

12   - and outside of the accommodations, when looking at my -- at

13   the transcript, would me being able to even take the exam.

14           I've now been doing this examination for three --

15   studying for this examination going on three years.  Three

16   years I been going on studying for this exam.  And I

17   understand that 60 days sounds like that's not a long way

18   away, but when you've been studying the same exam, and I've

19   taken it so many times, you get burnt.  You are tired.  And

20   without that, it's not fair to force someone that has shown

21   so much, you know, from evaluating physicians, et cetera, to

22   continue to force them to study for an exam that could

23   potentially go south from burnout, when I have been studying

24   for this exam since last -- you know, since -- anticipably

25   (sic), I should say.  And as I expressed to the Court, I'm

1    ready to take the exam yesterday.

2            And the only -- and, you know, the defendant might

3    say to me, well, 60 days don't sound like a lot.  But I've

4    taken this exam now, Your Honor, three times.  That's $1,000

5    each.  I didn't come to the Court, failed one time and I

6    said, nope, I'm gonna search legal.  No.  I kept working

7    hard.

8            My  -- over here it shows on my exams here, that

9    every time I took my exam on the -- the CBSCs, I passed.  You

10   can see this is the Step 1 -- this is the Step 2 score.  Also

11   the first time, Your Honor, that I took it.  So far it's not

12   even on the bracket mark.  The second time that I took it

13   within 30 days, I had almost a 40 point increase.  That's not

14   saying that I'm trying to get a leg up on -- on the rest of

15   the general population.

16           You can see here, Your Honor, that my score, I

17   score in the 70 percentile.  And then here, 69th percentile.

18   I'm passing.  That's three times that I've passed an exam

19   that's supposed to be indicative of my score.  And then for

20   the defendant to continue to ask me to take the same exam and

21   to continue, from the embarrassment that I go through every

22   single day of having to do this and people ask, oh, well,

23   where do you work or where are you -- you know, have you

24   started applying to residency?  Oh, yes, I have, or, where

25   are you staring this year?

1          I have mentors, Your Honor, that has such -- has,

2     you know, has seen me.  And without this, Your Honor, it

3     shows and it proves the fact that if you have a disability,

4     it's okay for you to wait 60 days or 40 days so that you're

5     getting the accommodations or the reasonable accommodations

6     that you deserve right now.

7          THE COURT:  I understand.  All right.  So like I

8     said, Dr. Kitchens, you'll have a chance to -- I'll give you

9     a little bit of time, I know you've gone through most of your

10    time, I'll give you a little bit of time, a few minutes for

11    each witness for cross-examination.  I think we can squeeze

12    that in and still get done by five.  I will give you --

13    because I used some of your time here with this questioning,

14    so I will give you a couple minutes of cross-examination for

15    each witness, and then you'll have a chance to close at the

16    end as well.  But for now I'd like to turn it over to Ms. Mew

17    for cross-examination, and then we'll go from that to her

18    case.  Okay?

19          DR. KITCHENS:  Yes, sir.  Thank you.

20          THE COURT:  Go ahead, Ms. Mew.

21          MS. MEW:  Thank you, Your Honor.

22                      CROSS-EXAMINATION

23    BY MS. MEW:

24    Q    Good afternoon, Dr. Kitchens.

25    A    Oh, sorry, Ms. Mew.  Yes, I'm --

1    Q    That's fine.

2    A    Good afternoon.

3    Q    I want -- I want to pick up here with what you were

4    discussing just now about irreparable harm and the schedule,

5    and just kind of go back here and put this back together a

6    little bit.

7             So in your preliminary injunction papers, it was

8    your argument that you would suffer irreparable harm if you

9    were not able to participate in the 2023 residency matching

10   program operated by the National Residency Matching Program

11   or the NRMP, correct?

12   A    Yes, this is correct.   That was in there.

13   Q    Is it -- is it your -- still your assertion today that

14   if you were to receive passing scores on Step 1 and Step 2 CK

15   in March or April, that you would be able to participate in

16   the 2023 NRMP Match?

17   A    It is to my understanding, Attorney Mew, is that once --

18   if you have the access in order to get to the opportunity to

19   get to the residency matching program, the NRMP, you will be

20   able to apply and participate, if you have the token.   Right

21   now through the ECFMG, you probably won't be able to purchase

22   a token.   But if you had already had the token before that

23   closing date, yes, you can participate.   And -- and I think

24   in the deposition I think I explained that I wasn't sure if I

25   had purchased it before because I was preparing alongside my

1    colleagues for this -- for the residency Match of 2023, yes.

2    Q    Well, so let's just look back here at ECF27, which is

3    the brief you filed yesterday or last night sometime.  Let me

4    go to page 6 -- oh, wait, oh, I think --

5              MS. MEW:  Does he need to take his screen down?

6              THE WITNESS:  Are they -- are they pulling it up

7    or --

8    BY MS. MEW:

9    Q    So let's turn to page 6.  So in this first full

10   paragraph on the page it says, "While Dr. Kitchens may not be

11   able to make the 2023 Match, as the NBME has stated."  So it

12   sounds like you're recognizing here that you can't make the

13   2023 Match.

14   A    No.  It's not that I'm recognizing it, I want to -- I --

15   what I'm saying here is that if I don't match, meaning not --

16   so if you don't particularly match this year, you know, the

17   access to it is there, is the point that I'm getting, the

18   access to be able to do that.

19   Q    Okay.  Well, let's -- let's walk through this then.  So

20   I'm going to pull up the opposition brief, Exhibit 2, which

21   is ECF26-23.

22             THE CLERK:  What was that number again?

23             MS. MEW:  26-23.  Exhibit 2.

24             THE WITNESS:  All right.  I gotta do this here.

25   BY MS. MEW:

1    Q    And we'll pull it up, Dr. Kitchens.

2    A    Oh, okay, wonderful.

3    Q    You don't have to on your side.  So we'll scroll down a

4    page.  Okay.

5              Do you remember looking at this document in your

6    deposition?

7    A    Yes, I do.

8    Q    And are you familiar with the Association of American

9    Medical Colleges or AAMC?

10   A    Yes, I have an account with them.

11   Q    Have you reviewed this information on AAMC's website

12   that explains how to apply for residency programs?

13   A    Yes, I have.

14   Q    And this lists six components that you have to have

15   ready to apply for a residency program.  Do you have these

16   components ready for your residency application?

17   A    Yes, I do.

18   Q    And do you have your -- so you have your medical

19   transcript?

20   A    Not the -- not the licensing exam transcript, no, I do

21   not have that, which is the --

22   Q    Do you have your --

23   A    -- reason we're here.  Yes, ma'am.

24   Q    Do you have your medical school transcripts?

25   A    I do.  You -- I just showed you actually a scanned copy

1   of an official of those medical transcripts.

2   Q    Do you have your Medical Student Performance Evaluation,

3   MSPE?

4   A    Yes.  Now, I don't have the information -- I don't have

5   -- I don't have the Medical School Performance Evaluation on

6   -- uploaded to the -- the AAMC's website.  But when we

7   graduate from -- from medical school, from my particular

8   school, they send us all the different documents from

9   official transcripts, letters of -- of recommendation.  We

10  work on CVs as well.

11  Q    So you have your letters of recommendation --

12  A    Yes, I do.

13  Q    Your letters of recommendation ready to go?

14  A    Yes.

15  Q    And you have your personal statement ready to go?

16  A    I don't have my personal statement ready to go, but that

17  shouldn't -- that shouldn't be hard for me to write a

18  personal statement.

19  Q    Let's turn to the next -- just the next document off

20  Exhibit 3, ECF26-24.

21          Dr. Kitchens, are you familiar with the Educational

22  Commission for Foreign Medical Graduates or ECFMG?

23  A    Yes.  It is considered, and I quote from the definition,

24  the dean's office for IMGs.

25  Q    So just to make sure we're understanding the same thing.

1   So ECFMG serves as your designated dean's office for purposes

2   of assisting you with the Electronic Residency Application

3   Service?

4   A    Yes.

5   Q    Or ERAS?

6   A    Mm-hmm.

7   Q    On the second -- on the second page of this exhibit, if

8   you look at that second bullet point, because I think this is

9   what you were talking about before, that ECFMG issues ERAS

10  tokens to IMGs, is that correct?

11  A    Yes.

12  Q    So what is an ERAS token?

13  A    What is the token?

14  Q    Yes.

15  A    So it's a long identification number that they -- that

16  you have to purchase.  I think it's 160-something-dollars,

17  and once you -- you have to be able to have that token in

18  order to have access to the -- the my -- I think it's the

19  MyERAS, in order to have access to the -- the residency --

20  different residency programs.

21  Q    And when you were deposed last Friday, you weren't sure

22  whether you had the token, correct?

23  A    The reason that I was not sure that I had the token is

24  because again I had already been planning since last -- since

25  last summer to write Step 1, which is why I tried to get Step

```
1    2 in before the increased score from the 209 to the 214, and

2    also to the Step 1 for the second time so that I could have

3    all of those documentations in -- those documents in place so

4    that I could start planning to -- my applications, when it

5    opened up in September.

6    Q    And so when you --

7    A    And I wasn't aware of that.  I'm sorry.

8    Q    Have you received a token from ECFMG?

9    A    Yes, ma'am.

10   Q    And is that for the 2023 ERAS?

11   A    It is for the 2023 season.

12   Q    And when did you obtain this token?

13   A    I -- I got a token last night actually, yes, --

14   Q    Okay.

15   A    -- or was it the day before.

16   Q    So you just obtained your token last night?

17   A    I just obtained the token last night because it was --

18   at first I thought I had already had the token in my

19   possession, but I think I -- the reason that I waited was so

20   that I could work more towards the Step 1 accommodations in

21   the exam.

22   Q    So now let's talk about ECFMG Certification.  What is

23   ECFMG Certification?

24   A    Oh, specific -- oh.  So the certification is that you

25   have to have -- you have to have your different -- you have
```

1   to have your Step 1 and your Step 2 scores already there, and

2   then you have to have the -- the OETs, I think it's called.

3   Q    And what is the OET?

4   A    It's the English test.  And -- and I would like to give

5   clarification that the English is the English test because we

6   had a lot of residents that were coming from a lot of foreign

7   countries that was passing very well on the USMLE, but yet

8   they could not communicate with American patients.  So they

9   put this -- this particular program in place to test them.

10  Q    Let's turn to the same document 26-24, page 4, and

11  scroll down.  So we have the header -- do you see where the

12  header is National Resident Matching Program, NRMP, or The

13  Match?

14  A    Yes.

15  Q    In the third bullet point, do you see where it says that

16  The Match requires that you have met the examination

17  requirements for the ECFMG Certification, and that your

18  passing examination results and satisfactory completion of

19  these requirements are available in time to participate in

20  The Match?

21  A    Yes, I -- I do under -- I do see that available, that

22  they do have that there, and which is why -- yes, sorry, go

23  ahead.

24  Q    So you need to have your ECFMG Certification complete in

25  time to participate in The Match?

1   A    This is correct.  But I will also say and it needs to be

2   understood, though, that if I would have had the

3   accommodations that was -- that I should have had in the

4   first -- from my -- when I started applying for the

5   accommodations, that would not be of even the subject -- of

6   the subject of the matter just because there's been track

7   shown that I have already been passing these other exams.

8   Q    Okay.  But, Dr. Kitchens, I want to just focus on the

9   question I asked you because we don't have much time here.

10  A    I understand.

11  Q    Thank you.  I appreciate it.  So you don't have -- you

12  do not have your ECFMG Certification complete at this point?

13  A    Because of my denial of my accommodations, yes, ma'am.

14  Q    Well, let's -- let's do this.  Let's turn to opposition

15  Exhibit 5, 26-26.  And let's turn to page 3.

16          So looking at this overview section, to be eligible

17  for the ECFMG Certification, international medical graduates

18  must satisfy a number of requirements, including the medical

19  science examination requirement, the clinical skills

20  requirement, and the communication skills requirement.  Do

21  you see that language?

22  A    Yes, I do.

23  Q    And do you agree that these are requirements to be

24  eligible for ECFMG Certification?

25  A    Yes, I do agree to that.

1    Q    And so Step 1 and Step 2 CK Exams that we've been

2    talking about that are part of USMLE, those satisfy the

3    medical science examination requirement, correct?

4    A    This is correct.

5    Q    And then this overview goes on to explain, to meet the

6    clinical and communications skills requirements for ECFMG

7    Certifications, you can use the Pathways.  Is that your

8    understanding, too, of how the process works?

9    A    Yes.  I -- I do understand the Pathway of that.  But we

10   have to -- yes.  I'm sorry.

11   Q    No, I appreciate it.  Thank you, Dr. Kitchens.  And so

12   as part of the Pathways, applicants are required to obtain a

13   satisfactory score on the Occupational English Test of

14   Medicine, is that correct?

15   A    This is correct.

16   Q    And you have not taken that test yet, is that correct?

17   A    This is correct.

18   Q    And you are not currently registered for any Pathways

19   exam?

20   A    I have not -- to my -- no, I have not applied to any of

21   the Pathways yet.

22   Q    Okay.

23   A    Because I can't apply for them if I can't, you know,

24   take the exam.

25   Q    Have you applied for any -- the question, Dr. Kitchens,

1    is have you applied for any of the Pathways?  And this is

2    separate from Step 1 and Step 2 of the USMLE.  This is the

3    Pathways.  Did you apply for that?

4    A    Right, but it --

5    Q    You have not, correct?

6    A    Is it the under -- a clarification.  Okay, no.  I have a

7    question.  Is it -- do you have to have the Step 1 and Step 2

8    completed before you can apply to a Pathway?

9    Q    You're going through the process, Dr. Kitchens, do you

10   know?

11   A    So -- so in order to go through the Pathways, it is my

12   understanding that you have to have both exams completed so

13   that you can have your certif -- so you have the

14   certification.

15   Q    Okay.  But -- but for whatever -- whatever the reason

16   is, you haven't applied for the Pathways yet, correct?

17   A    I have not.

18   Q    And you need the Pathways to get ECFMG Certification?

19   A    This is correct.

20   Q    And you need ECFMG Certification to participate in The

21   Match?

22   A    This is correct.

23   Q    And then if we turn to page 10 of this same document.

24   If you look at the fourth bullet point down, it discusses the

25   communications skills requirement, and I'm just going to read

1    the language in bold.  "He should take LET Medicine on or

2    before the last available test date in December 2022."

3              Do you see that recommendation from ECFMG?

4    A    Yes.  I do note on the recommendation from the ECFMG,

5    yes.

6    Q    And so you -- we're past that December 2022 deadline,

7    correct?

8    A    Yes.  We are past the December '22 deadline, but I would

9    like for it to be noted of the reason why we have had to pass

10   that deadline.

11   Q    Mr. Kitchens, I just -- just that one question.  Are we

12   past the deadline?

13   A    Yes, ma'am.  I understand your question.  I wanted to

14   give you my full answer.

15   Q    Let's turn to opposition Exhibit 6, ECF26-27.  Have you

16   seen this news item from the ECFMG website?

17   A    Yes, I think I saw this in our deposition.

18   Q    And this is reminding that there is an application

19   deadline for the ECFMG Certification for the 2023 Match,

20   correct?

21   A    Yes, this is correct.

22   Q    If you turn -- well, turn to page 2 of the document.

23   And if you see the middle of the page here thereabouts, Dr.

24   Kitchens, it says in bold, "If you are applying to a Pathway,

25   your application must be submitted no later than January 31,

1    2023 to ensure that your application is processed and

2    approved by ECFMG in time for you to participate in the 2023

3    Match."

4              Do you see that language?

5    A    I do see their language.

6    Q    And so have you had your application for a Pathway

7    submitted and processed at this point?

8    A    I have not had my -- my application to be processed

9    because it hasn't been fairly graded.

10   Q    But it's -- it's not processed and complete at this

11   point, correct?

12   A    It has not been fairly graded.

13   Q    So the time for you to apply for an ECFMG Pathway in

14   order to participate in the 2023 Match has now expired,

15   correct?  We're just focusing on 2023.

16   A    Yes.  And I understand, Ms. Mew, that we're focused on

17   2023 because, you know, that has been my focus as well.  It

18   needs to be noted that I have focused on the 2023 process and

19   the Pathway, but I can't ever get there if I'm not fairly

20   treated.

21   Q    Okay.  But for right now we're here on your motion for

22   preliminary injunction and --

23   A    Yes.

24   Q    -- your motion was based on wanting to participate in

25   the 2023 Match, which we already discussed.

1    A    Yes, it is, but there's more aspects to just for the

2    2023 process although, yes, that is for my -- my preliminary

3    injunction there.  But I think it has to be understood,

4    though, that there's other aspects that are in place.

5              THE COURT:  Doctor, just in the interest of being

6    fair to Ms. Mew's allocation of time, it's helpful to try to

7    answer her questions directly, fairly to you, but also

8    directly.  And don't forget, you'll have a chance to do a

9    closing argument later.  Okay?

10             DR. KITCHENS:  Yes, and I apologize to the Court.

11   I'm three years in this.  I'm sorry, and I'm trying.

12             THE COURT:  No apology necessary.  I'm just trying

13   to keep the scales even here.

14             DR. KITCHENS:  Okay.  Yes, sir.

15   BY MS. MEW:

16   Q    And, Dr. Kitchens, let's just -- to wrap this up, I'm

17   going to pull up the opposition Exhibit 7.  This is 26-28.

18   Do you recognize this 2023 Maine Residency Match Applicant's

19   Calendar?

20   A    I have not seen this one and -- well, at least not

21   recently.

22   Q    Okay.  I'll represent to you that I pulled this from the

23   NRMP website.  It's got a -- got a website address there at

24   the bottom of the page.  But this shows that your -- the 2023

25   Residency Match registration opened back in September of

1    2022.  Is that your understanding as well?

2    A    Yes.

3    Q    And then the standard registration deadline was January

4    31st of 2023.  Is that your understanding as well?

5    A    Yes.

6    Q    And then the late registration deadline is March 1st of

7    2023?

8    A    Yes, March 1st.

9    Q    When do residency programs hold interviews with

10   residency candidates, Dr. Kitchens?

11   A    They can start in -- at the end of September, early

12   October.

13   Q    So usually like fall and winter months, is that fair?

14   A    Yes.  That's why we all really push hard to get

15   everything in by then.

16   Q    And so the interview process for the 2023 Match has

17   already come and gone, correct?

18   A    Mm-hmm, yes.

19   Q    And even if you were able to take the Step 1 and Step 2

20   CK Exams, both of them next week and pass, you still would

21   not be able to meet the late registration deadline for The

22   Match, correct?

23   A    This is correct.

24   Q    What are the rank order lists for The Match?

25   A    The rank order list for The Match is where stay if you

1    don't meet your -- if you don't match into your first choice,

2    you have other tiers that might match or that they may choose

3    you as well.

4    Q    And did both medical -- do the medical residency

5    programs and the applicants both submit their -- their rank

6    order lists and that's what's matched up, so to speak?

7    A    I'm not familiar with the whole process with that, so --

8    but, yes, they have to match.

9    Q    Colloquial, speaking colloquial, --

10   A    Yes.

11   Q    -- not specifically.  And so what is the deadline for

12   the rank order list for the 2023 Match?

13   A    Can you say it one more time?

14   Q    Mm-hmm.  I'm just -- so the deadline -- and I'll just --

15   is there a March 1st deadline for the -- putting in your rank

16   order list for the 2023 Match?

17   A    That sounds correct.  I think -- I think you showed me

18   that, correct, right here.

19   Q    It's right here in the middle of the page, that's

20   correct.  And so again, you're not in a position to

21   participate in the -- in the 2023 Match, correct?  Putting

22   aside any reasons why, as a practical matter you will not be

23   able to participate in the 2023 Match?

24   A    That is correct.

25   Q    But you are still in the position to prepare for and

1    participate in the 2024 Match, correct?

2    A    I am not.

3    Q    Oh.  You could still start the process for the 2024

4    Match; you're not -- you haven't missed any deadlines for the

5    2024 Match, correct?

6    A    Not as of yet, no.

7    Q    So, Dr. Kitchens, I'm going to shift topics here a

8    little bit.  You're representing yourself in this case,

9    correct?

10   A    Mm-hmm, yes.

11   Q    And you wrote and typed the complaint, and you prepared

12   the amended complaint, and you prepared the preliminary

13   injunction papers, is that correct?

14   A    Isn't that work product privilege?

15   Q    Oh, I don't think -- and if you don't want to talk about

16   it, that's fine.  I just thought that it was already

17   expressed in your deposition that you were preparing all of

18   the -- all of the materials that you've using in the

19   litigation.

20   A    Yes.

21   Q    And you've done the legal and the factual research

22   relating to your claims?

23   A    This is correct.

24   Q    And that included reading other court decisions and

25   papers from other cases involving NBME?

1    A    Yes.

2    Q    You contacted the White House Clinic in late January of

3    this year and obtained a complete set of your medical records

4    from 2012 through January of 2023, which you submitted to the

5    Court February 12th, correct?

6    A    Yes.

7    Q    And you also recently reached out to your nurse

8    practitioner, Mrs. Holbrook, and she administered a short

9    assessment instrument known as the Conners CPT, which you've

10   also submitted to the Court?

11   A    Yes, this is true.

12   Q    But this is not a document that you submitted to NBME in

13   support of your actual accommodation request, correct?

14   A    I wasn't -- I wasn't able to get the evaluation, as I

15   said earlier, because of my health insurance.  It wouldn't

16   allow me to.  And I only started with Ms. Holbrook at -- for

17   maybe six months or -- no, less than six months, if I'm not

18   mistaken.

19   Q    Regardless of the reason, though, it hasn't gone to NBME

20   in sort of the ordinary course of reviewing an accommodation

21   request?

22   A    No.  No, ma'am.  We were already in litigation.

23   Q    And same with the White House Clinic, the full set that

24   you submitted to the Court, that wasn't something that you

25   submitted to NBME with your accommodation request, correct?

1    A    Those documents that I submitted to the Court and -- are

2    the same as -- within the same packet, if you -- if you look

3    at the application that I submitted to the NBME.  But I guess

4    I must have overlooked some documents when submitting it to

5    the -- for the application.

6    Q    And then we recently met Ms. Bacon today and we received

7    an evaluation report from her from Peace of Mind Counseling,

8    and you submitted that evaluation to the Court, correct?

9    A    Yes.

10   Q    But that report did not go to NBME for review for an

11   accommodation request in the ordinary course, correct?

12   A    Again, I didn't have the opportunity to -- to have it.

13   But, yes.

14   Q    And then at some point after you filed the lawsuit, you

15   -- you found -- you took the time and you located three more

16   pages of medical records from 2013 that you believe support

17   your -- your claim that you were diagnosed with ADHD in 2013,

18   is that correct?

19   A    All documentation that I submitted to the NBME came from

20   that same 2013, but I -- but I accidently must have

21   overlooked and didn't send that in.  Because it wouldn't have

22   helped my case to ignore it and not put it with the

23   application.  So, yes.

24   Q    I understand, right.  But it didn't go to NBME?

25   A    But enough information that showed my diagnoses and

1   track record did go to NBME.

2   Q    Dr. Kitchens, I want to ask you, and this is a separate

3   question, different topic.  You -- you were showing the Court

4   various test examination scores and there was the CBSSA and

5   the CBSE.

6   A    Yes.

7   Q    Do you remember talking about this?

8   A    Yes.

9   Q    And the distinction -- or the difference between the

10  CBSSA or one difference between the CBSSA and the CBSE is

11  that you're taking the CBSSA at home, right, or on your -- on

12  your own terms?

13  A    So both -- they're the same exact exam.  They're the

14  same exam.  The only -- the only difference between the exams

15  is that one -- or actually one of them can be ordered from

16  your  -- I think the university.  So the -- yes, the CBSSA is

17  the one that I took at home, and the -- yes, I took that one

18  at home.  But let me clarify really quickly for the -- the E

19  -- well, all the ones that I did submit should have been for

20  the CBSSA.

21  Q    That's fine.  That's not my question.  This is a -- this

22  is a bigger picture question.

23  A    Oh, okay.

24  Q    Because the SA part of that long acronym, it's a self-

25  assessment, correct?

1    A    This is correct, that the NBME says should be indicative

2    of your score.

3    Q    But you take it at home; it's not proctored.  You can

4    take it on your own terms; no one's looking to see how you're

5    taking it or -- or if you're using materials or things like

6    that.  You can just -- this is for your own personal self-

7    assessment purpose?

8    A    Right.  So in my testimony I was wanting to kind of

9    explain a little bit about that, and the reason of those --

10   those particular scores was because it was essential --

11   essentially like I had the accommodations that I was applying

12   for through the NBME because I was isolated at home and it

13   was a timed exam as well.  Sorry, Judge.

14           MS. MEW:  Your Honor, I think, and Dr. Kitchens, I

15   think in the interest in moving forward in time, we'll stop

16   at that.

17           THE COURT:  All right.  Now, you know, normally,

18   Dr. Kitchens, in this situation, you know, a lawyer would

19   have the chance to do some redirect with you, but I'll give

20   you -- in the interest of fairness, I'll give you two minutes

21   of redirect if -- where you can just -- you can address us,

22   if you'd like.

23           DR. KITCHENS:  Yes, I would.

24                    REDIRECT EXAMINATION

25           DR. KITCHENS:  For the CBSSA that -- that Attorney

1    Mew was just referring to, is the reason that I scored as
2    well as I did is because on the merits it showed my level of
3    competency and not the level of whether or not I can take an
4    exam.  It showed that clearly on several different occasions
5    that I cited here.
6           Even though Ms. Mew would like to -- sorry, not Ms.
7    Mew, but the defendant would focus really hard on the -- the
8    ramifications of me not being able to sit for the -- for The
9    Match for this year, I would ask for the Court to look at the
10   bigger picture and ask, why wasn't the reason that this
11   gentleman, who has studied so hard and passed these different
12   aspects, was not allowed to take or participate in The Match?
13   And to also realize that the harm has already been done.  The
14   harm has been done already.  And I -- yes?  So --
15          THE COURT:  Go ahead.
16          DR. KITCHENS:  For time-wise.  But -- oh, and also
17   lastly for -- really quickly.  The documentation -- the
18   documentation and these different assessments that I got, I
19   didn't get these assessments because -- well, I got them
20   because, yes, I needed to have something to show Your Honor
21   of an assessment, but at the time when I was trying to take
22   these, I was a fresh medical graduate.  My wife was fresh out
23   of law school.  We had no money.  I did extensive research.
24   The average for these exams -- or these evaluations for ADHD,
25   Your Honor, is between $1,000 and $1300 just for an

1    assessment, one assessment.

2            So I couldn't afford those things.  I had to stay

3    within my -- my medical insurance, which is Medicaid.  If

4    anybody doesn't know about Medicaid, you are -- you are HMO.

5    You go where they can get you and that may be six months from

6    now.  So it wasn't for my lack of trying.

7            And for my medical records it was -- since the time

8    frame, Your Honor, was there, I couldn't have gotten new

9    medical records.  I don't even go to that doctor anymore or

10   to White House Clinic at all.  So it wouldn't have been in my

11   best interest to try to leave out documentation from the

12   defendant on my behalf to get them to approve me.  So I think

13   that was kind of moot.

14           THE COURT:  All right.  I understand.  All right.

15   So with that, that will shift the case over to the defendant.

16   Ms. Mew, by my count time-wise, you have until about 4:00 --

17           MS. MEW:  Thank you.

18           THE COURT:  -- for your case.  Okay?

19           MS. MEW:  Thank you, Your Honor.  We, NBME calls

20   Erin Convery.

21           THE COURT:  All right.  Inna, would you please

22   swear in the witness.

23       ERIN CONVERY, DEFENDANT'S WITNESS, SWORN

24           THE CLERK:  (No audio)

25           THE WITNESS:  Erin Convery, C-O-N, as in Nancy, V,

 1    as in Victor, E-R-Y.

 2                THE COURT:  All right.  Go ahead.

 3                      DIRECT EXAMINATION

 4    BY MS. MEW:

 5    Q    Good afternoon, Ms. Convery.

 6    A    Good afternoon.

 7    Q    Do you work at the National Board of Medical Examiners,

 8    or NBME?

 9    A    Yes, I do.

10    Q    And how long have you worked there?

11    A    I've been with NBME for 10 and a half years.

12    Q    And what is your current position?

13    A    I'm the Director of Disability Services.

14    Q    And what are your responsibilities as Director of

15    Disability Services?

16    A    Overall, I manage the day-to-day operations of the unit,

17    including policies and procedures related to the provision of

18    test accommodations for our exams.

19    Q    How many requests for accommodations did NBME receive

20    last year?

21    A    Last year we received over approximately 2500 requests

22    for test accommodations.

23    Q    And do you have any sense of whether most of those

24    requests are granted or denied?

25    A    The majority of requests are granted in full or in part.

1    Q    Does NBME provide information to examinees who are

2    interested in requesting accommodations on the USMLE?

3    A    Yes, we do.

4    Q    And how -- how does it do so?

5    A    Information about test accommodations can be found in

6    the Bulletin of Information which all examinees are required

7    to read and sign prior to applying for the USMLE.  In that

8    Bulletin of Information is a link to the test accommodations

9    information and process.  In addition to that, on the

10   USMLE.org website itself is a test accommodations page with

11   that information as well.

12   Q    And we're going to turn just very quickly to Exhibit 1

13   to your declaration.  This is ECF26-2.  And do you recognize

14   this as the information, sort of the landing page on the NBME

15   website?

16   A    Yes, it is.

17   Q    That's the accommodations?

18   A    Correct.

19   Q    Let's turn to Convery Exhibit 2, 26-3.  What is this

20   document?

21   A    This is a copy of the web page that provides the

22   information about test accommodations.

23   Q    And -- and what is this information called?

24   A    These are the general guidelines to request test

25   accommodations that we recommend everybody follow.

1    Q    And what is the purpose of the guidelines?

2    A    The purpose of the guidelines is just as the name

3    implies, actually.  It provides information for examinees,

4    treatment providers and others to review and determine what

5    information they might want to send, that supports their

6    request for test accommodations that helps us make an

7    informed decision.

8    Q    And how are the guidelines organized?

9    A    So we have the general guidelines here with some various

10   drop-down accordions that everybody should be following to

11   submit those basic requirements.  And then we have more

12   specific guidelines that people can follow based on their

13   reported impairments, that outline more specific criteria

14   that might help them in compiling supporting documentation.

15   Q    Are there specific requirements for requesting

16   accommodations on a USMLE exam?

17   A    The specific requirements are listed here in the general

18   guidelines.  So we do require a completed and signed request

19   or a test accommodations form; some type of personal

20   statement, which is the examinee's opportunity to tell us

21   more about the history, onset, frequency, nature of their

22   impairment and how it's impacting their daily life and

23   functioning; some type of supporting documentation and

24   records of impaired functioning, you know, of some -- of some

25   nature are required.

1    Q    And when you refer to supporting documentation, what

2    could that be?

3    A    Supporting documentation really is up to each

4    individual's discretion to determine what they'd like to

5    supply for our consideration and review, but it varies based

6    on the impairment.  It can be an expanded personal statement,

7    school records, 504 Plans, IEPs, medical records, you know,

8    statements from faculty members, professors, performance --

9    job performance evaluations, things of that nature.

10   Q    Why does NBME have guidelines in place and then review

11   accommodation requests before deciding whether to provide

12   them?

13   A    Well, the USMLE exam is a standardized licensure exam,

14   and while many people I'm sure would like to have extra time

15   or other types of accommodations for their exam, we have

16   guidelines in place and to require documentation to review

17   those requests for test accommodations to make sure that any

18   non-standardized administration of the exam is warranted, is

19   justified in helping somebody who needs test accommodations

20   to access the exam.

21   Q    What do you see as the role of the -- the Disability

22   Services section at NBME?

23   A    The Disability Services Department is here to answer any

24   questions about the test accommodations process itself and

25   communicate about somebody's request for test accommodations.

1    Our analysts review thoroughly and carefully consider all the

2    documentation submitted to make an individualized and

3    thorough decision about each individual request for

4    accommodations.  And then when accommodations may be

5    approved, we are here to make sure that they are implemented

6    for the examinee on their test day.

7    Q    Shifting gears somewhat, did NBME receive the request

8    for testing accommodations from Dr. Kitchens?

9    A    Yes.  Yes, we did.

10   Q    I'm going to turn to Convery Exhibit 3, which is ECF26-

11   4.  And if we just scroll through these pages so you can get

12   a sense of what's here.  Is this the accommodation request

13   form that Dr. Kitchens submitted?

14   A    Yes, it is.

15   Q    If we turn to the last page of this document, it's dated

16   October 13th, 2021, but when did NBME actually receive the

17   request?

18   A    We received this request on January 5th, 2022.

19   Q    And how do you know that?

20   A    All examinees are instructed to email or fax their

21   request to us, and those emails and faxes come in through our

22   customer relation management system.  We particularly use

23   Salesforce.  And all interactions or things that come in via

24   that method are tracked and categorized under everybody's

25   unique identifying information.  So their full name, their

1    unique USMLE ID number, the cases that -- (inaudible 2:51:22)

2    cases.  The emails that come in and activity is tracked that

3    way.

4    Q    If we turn to Convery Exhibit 4, which is ECF26-5, does

5    this show the transmission of the request?

6    A    Yes, it does.

7    Q    And what's the date on this document?

8    A    January 5th, 2022.

9    Q    And can we just -- I'm sorry, if we can look back to

10   Convery Exhibit 3.  And if we turn to page 3 of the form, ECF

11   page 4, which examination did Dr. Kitchens request

12   accommodations on?

13   A    Step 1.

14   Q    If we can turn now to Convery Exhibit 5, ECF26-6.  Can

15   you just quickly explain what this document is?

16   A    This is email correspondence between Disability

17   Services, the specialist that was assigned to Dr. Kitchens'

18   file, and his response back to us.

19   Q    And what is being communicated in this email?

20   A    Disability Services initially asked Dr. Kitchens for --

21   if he had any other additional information to supplement his

22   request, and his reply back to us is that he did not.  I have

23   access to his school to get a CPTA or Certification of Prior

24   Test Accommodations form completed.

25   Q    And let's go ahead just for the -- scroll down, okay, so

1   you can just see -- do you recognize the rest of this?  And

2   this is the remaining part of the USMLE message requesting

3   additional documents, is that right?

4   A    Yes, it is.

5   Q    Did Dr. Kitchens provide any additional documents in

6   response to this request?

7   A    He provided his comprehensive basic science, the CBSE

8   exam score report.

9   Q    And why did NBME ask for the CBSE score report?

10   A    Because as part of this initial application, he

11   submitted to us the scheduling confirmation email that he

12   received from

13   Prometric for the CBSE exam.

14   Q    And let's just turn really quickly to ECF26-13.  This is

15   Convery Exhibit 12.  We'll just scroll through this really

16   quickly.  Is this the CBSE report --

17   A    Yes, it is.

18   Q    -- that you received?

19   A    Yes.

20   Q    Turning to Convery Exhibit 6, ECF26-7.  What is this

21   document?

22   A    This is a letter that we presume to be Dr. Kitchens'

23   personal statement that was received as part of his initial

24   request on January 5th.

25   Q    And let's just turn back for reference to Convery

1    Exhibit 2, which is ECF26-3.  And if we go to ECF page 6.

2    What's the guidelines seek in an examinee's personal

3    statement?

4    A    The guidelines here are referring to the personal

5    statement -- there we go -- and they ask that you provide a

6    personal -- a written statement describing the disability for

7    which you're requesting the accommodations and to include

8    specific information about disability-related symptoms, how

9    they affect your academic, occupational, social, and other

10   important areas of functioning.

11          Describe the extent to which your daily functioning

12   is impaired and how that impairment interferes with your

13   ability to access the examination under standard conditions.

14   And to provide a clear rationale for the requested

15   accommodation and describe how each requested accommodation

16   will alleviate the functional limitations caused by your

17   disability.

18   Q    And this is something that's written by the examinee, is

19   that right?

20   A    That's correct.

21   Q    I'm going to try to move through the next few exhibits

22   quickly.  If we turn to Convery Exhibit 7, ECF26-8.  Was this

23   submitted with Dr. Kitchens' first accommodation request?

24   A    Yes, it was.

25   Q    And is that one page?

1    A    Yes, it is.

2    Q    And then we'll turn to Convery Exhibit 8, ECF26-9.  Was

3    this submitted with Dr. Kitchens' first accommodation

4    request?

5    A    Yes, it was.

6    Q    And we'll just scroll down.  This is just one page?

7    A    Correct.

8    Q    And then we'll turn to Convery Exhibit 9, 26-10.  Is

9    this a document that was submitted with Dr. Kitchens' first

10   accommodation request?

11   A    That is correct.

12   Q    And we'll scroll down in the interest of completeness.

13   And then turn to Convery Exhibit 10, Exhibit 26-11.  Was this

14   submitted with Dr. Kitchens' first request?

15   A    Yes, it was.

16   Q    So what we just looked at, Convery Exhibits 7 through

17   10, are those all the medical records that were submitted

18   with Dr. Kitchens' request?

19   A    Yes, that's correct.

20   Q    And how would you generally describe this documentation

21   in light of the type of information it's looking for, in

22   order to make an informed decision on accommodation requests?

23   A    I would -- I would characterize this as -- as pretty

24   sparse documentation for the type of impairment being

25   reported.

1    Q    Let's turn quickly to Convery Exhibit 11, ECF26-12.

2    What is this document?

3    A    This is the Prometric confirmation -- scheduling

4    confirmation email for the CBSE exam.

5    Q    And what is the CBSE exam?

6    A    That is the Comprehensive Basic Science Exam that is an

7    exam that assesses clinical basic -- or basic science

8    knowledge comparable to what would be assessed on USMLE Step

9    1.

10   Q    It's comparable, but it's not part of the USMLE exam

11   sequence?

12   A    No, it is not.

13   Q    And here in sort of the middle of the page, what does it

14   say under test accommodations?

15   A    It says extended time.

16   Q    Does NBME decide who receives accommodations on the

17   CBSE?

18   A    No, it does not.

19   Q    Who does?

20   A    That would be the medical schools making that decision.

21   Q    And was this document also provided by Dr. Kitchens with

22   his -- his first accommodation request?

23   A    Yes, it was.

24   Q    Do you remember back, maybe we'll save some time by not

25   looking at it, but we looked at the January 6, 2022 email

1   from NBME to Dr. Kitchens and we talked about it as an email

2   request for additional documents?

3   A    Mm-hmm.

4   Q    Okay.  Was one of the additional documents requested a

5   CPTA form?

6   A    Yes, it was.

7   Q    Let's turn to Convery Exhibit 13.  Is this the

8   Certification of Prior Test Accommodations form?

9   A    Yes, it is.

10  Q    What information does this form provide to NBME?

11  A    This provides any accommodations that were provided by

12  the medical school to the student, and their rationale for

13  why they granted accommodations and when accommodations were

14  provided at the medical school.

15  Q    Did Dr. Kitchens provide NBME with the CPTA form as part

16  of his request?

17  A    No.

18  Q    Dr. Kitchens does attend an international medical school

19  or attended and graduated from an international medical

20  school.  Does NBME receive CPTA forms from medical -- from

21  international medical schools?

22  A    Yes, we do.

23  Q    Who reviewed Dr. Kitchens' request for accommodations?

24  A    Dr. Lucia McGeehan.

25  Q    And what are her general qualifications?

1    A    Dr. McGeehan has a doctoral degree in educational

2    psychology with a concentration in school psychology, and she

3    is a certified school psychologist in Pennsylvania.

4    Q    And why isn't Dr. McGeehan with us today?

5    A    Dr. McGeehan is actually out on a family vacation that

6    was pre-planned.

7    Q    And just I think to close this up, let's turn quickly to

8    Convery Exhibit 14, ECF26-15.  What is this document?

9    A    This is NBME's decision letter for Dr. Kitchens' request

10   denying his request for accommodations.

11   Q    Then let's look to Convery Exhibit 15, Exhibit 26-16 --

12   ECF26-16.  And if you can just scroll through it.  Do you

13   recognize this document?

14   A    Yes, I do.

15   Q    And what is this?

16   A    This is the second request for test accommodations that

17   we received from Dr. Kitchens on August 30th, 2022.

18   Q    Okay.  And we'll turn back up to page 3 of the form, ECF

19   page 4 of the document.  What accommodations are -- is Dr.

20   Kitchens requesting here?

21   A    Time and a half and additional break time for Step 1

22   over two days.

23   Q    Did Dr. Kitchens ever request accommodations on Step 2

24   CK?

25   A    No, not that we received.

1   Q    And if we can turn to page -- ECF page 7 of this

2   document.  So this request is dated August 30th, 2022,

3   correct?  Sorry.

4   A    Yes, correct.

5   Q    In this request did he submit any new documentation to

6   NBME?

7   A    No, he did not.  He submitted the previously provided

8   documentation.

9   Q    Let's turn to ECF26-17, Convery Exhibit 16.  What is

10  this document?

11  A    This is an email from NBME Disability Services from the

12  assigned specialist asking for new documentation to support

13  his new request in August of 2022, documentation that we did

14  not previously receive and review.

15  Q    Did Dr. Kitchens provide any additional documents in

16  response to this email?

17  A    No, he did not.

18  Q    If we turn to Convery Exhibit 17, what is this?

19  A    This is the email response from Dr. Kitchens saying that

20  he acknowledges he has no new documents.

21  Q    Now, let's turn to Convery Exhibit 18, which is ECF26-

22  19.  What is this document?

23  A    This is an email letter from Dr. McGeehan to Markcus

24  Kitchens letting him know that we needed new substantive

25  documentation to review his newest request, and it reiterates

1    the accommodations he's asking for and encourages him

2    strongly to review the guidelines for test accommodations.

3    Q    Was Dr. Kitchens given any options in this email?

4    A    Yes.  The -- at the bottom of the email, his options

5    were to either provide new documentation for us to review and

6    wait for a decision based on that review, or to release the

7    hold on his scheduling permit for a standard time exam.

8    Q    And if you turn then to Convery -- we'll turn to Convery

9    Exhibit 19, ECF26-20.  Did Dr. Kitchens provide any

10   additional documentation in support of this email?

11   A    No, he didn't.

12   Q    Did he ask -- what did Dr. Kitchens ask you to do in

13   this email?

14   A    He replied in essence to release the hold.

15   Q    And I just wanted to quickly try to explain because

16   people might not understand this.  How do examinees register

17   for an NBME Step exam?

18   A    When they go to their registration entity, in this case

19   for Dr. Kitchens it would be the ECFMG, they complete their

20   Step Exam application.  They can check the box during that

21   application time saying that they are requesting test

22   accommodations, which places their scheduling permit on hold.

23   And then they select a three-month eligibility window in

24   which they anticipate taking the exam.  And then they from

25   their -- in this case the ECFMG would then complete the

1    application, if he's meeting the requirements for USMLE.

2    Q    And then what happens after their decision on the

3    accommodation request?

4    A    Once a decision has been reached, we send the examinee

5    their decision letter via email, and at that same time we

6    release the hold on their scheduling permit.  Several days

7    later they should receive the permit and they could schedule

8    an exam at their leisure.

9    Q    And then after an examinee tests, how long might it take

10   to have the scores reported?

11   A    It's my understanding that scores generally take two to

12   four weeks to be reported, but examinees are instructed on

13   the website to allow up to eight weeks, should there be any

14   type of scoring delay.

15   Q    Thank you, Ms. Convery.  I don't have any other

16   questions.

17   A    Thank you.

18        THE COURT:  Dr. Kitchens, like I said, I'll give

19   you two minutes, if you have a couple quick cross questions.

20        DR. KITCHENS:  Yes.

21                         CROSS-EXAMINATION

22   BY DR. KITCHENS:

23   Q    Hi there.  How are you doing today?

24   A    I'm good, thank you, Dr. Kitchens.

25   Q    Yes.  Sorry, I'm trying to -- I don't know where you

1    link on there.  There we are.

2            Yeah, so you said that you guys have -- you said

3    about 2500 requests per -- per year that you guys get testing

4    season?

5    A    Last year we received approximately 2500, yes.

6    Q    Gotcha.  And you said that a majority was granted.  As

7    the director, what -- can I have a rough number of applicants

8    that were approved out of that 2500?

9    A    I don't have that data available with me today.  I -- I

10   know generally speaking the majority are approved in part or

11   in whole.

12   Q    Right, and if you can give me a rough number that you

13   estimate, just a rough number, it doesn't have to be exact.

14   A    We have seen, you know, upwards of 80-plus percent of

15   approvals.

16   Q    80-plus percent.  Uh-huh.  So -- okay, thank you.  So

17   isn't it -- could it be also true that even with applicants

18   with extensive documentation has also with -- with many

19   different -- say many different evaluators and documentation,

20   that the NBME has also denied those -- those people their

21   accommodations?

22   A    Your question is, even some files with extensive

23   documentation have been denied?

24   Q    Yes.

25   A    That is -- I'm sure that is true.  I don't have, you

1    know, exact information here, but, yes.  Every -- every

2    request is thoroughly reviewed and all the documentation

3    considered when making that decision.

4    Q    Gotcha.  And so you said they're thoroughly reviewed.

5    What do you mean by thoroughly?  What -- how -- a rough

6    estimate of thoroughly reviewed, because you have third-party

7    entities who review these and then they report back to you,

8    so you're relying on their recommendation, correct?

9    A    No, not -- I mean in some occasions, but not a hundred

10   percent of the time.  We have internal staff who are doctoral

11   level trained staff reviewing documentation.  And when I say

12   thoroughly, every request that is received is reviewed on a

13   thorough and individualized basis, meaning your case, for

14   example, every piece of documentation submitted is looked at,

15   reviewed, and carefully considered when making that decision.

16   Q    Mm-hmm.  Okay.  And when -- so is it for a person to

17   have a disability, are they -- under the ADA Act, do they

18   have to provide extensive documentation in order to be

19   approved for accommodation?

20   A    It is up to each individual to determine what

21   information they'd like to provide and have us consider in

22   our review.

23   Q    Right.  My question is, under the ADA, is it required

24   for an applicant or a person applying for reasonable

25   accommodations to require extensive amount of documentation?

1    A    Well, while I'm not a lawyer, the ADA -- I don't know

2    what the ADA states specifically on what is required or not.

3    Q    Yes, ma'am.  I understand you're not a lawyer, but as

4    the Director of Disabilities, you would probably know that

5    it's probably not required for them to have extensive

6    background -- or extensive documentation, right?

7    A    The information an examinee chooses to submit, whether -

8    - you know, everybody's going to consider something extensive

9    differently.

10   Q    Right.

11   A    Right.

12   Q    I understand.  I guess my question is more of a yes or

13   no, that it would be understood as a director of a particular

14   department that you would know guidelines that is recommended

15   to the entire United States.

16   A    Well, which guidelines are you referring to?

17   Q    The ADA guidelines.

18   A    Okay.  So my general understanding is that the NBME --

19   Q    But for time purposes, it's more of a yes or no.

20   A    I'm not clear on what specifically you're asking about

21   the ADA guidelines.  I mean as I stated, I think every -- we

22   don't require X amount of documentation.  We review whatever

23   an examinee determines to submit to us.

24   Q    I heard you say that, but I really need to key in on the

25   fact that you're saying that it's up to the individual to

1    provide that information.  But if an individual don't have

2    extensive amount of documentation, according to what I'm

3    hearing is that they would most likely be denied?

4    A    That is incorrect.  That's not what we are saying and

5    that's not -- I can't speak to why, you know, certain people

6    would be denied versus approved.  Every -- every individual

7    has a thorough and individual review and those documents,

8    whatever they may be, are thoroughly considered --

9    Q    Right.  So --

10   A    -- in making a decision.

11   Q    Gotcha.  So the answer there is that extensive amount of

12   documentation is not required.

13        DR. KITCHENS:  And I am going somewhere with this,

14   Judge.

15   Q    Reason being is --

16        THE COURT:  Doctor, just a couple more questions.

17   Okay?  I've given you some leeway here.  A couple more.

18        DR. KITCHENS:  Okay.

19   BY DR. KITCHENS:

20   Q    Gosh, I forgot my train of thought there.  For those --

21   for those individuals that cannot produce documentation, say

22   that for whatever other reason that there is -- that there

23   may be, the likelihood of them being granted the

24   accommodations, if they don't have formal evaluations, if

25   they weren't approved on their MCAT, and if they can't not

1    show that they had a -- or they can show unofficial

2    accommodations, it's the likelihood that they would be denied

3    by the NBME the accommodations, true or false?

4    A    I wouldn't -- I'm not sure I fully understand the full

5    question.  I can't say whether some -- you know, the

6    likelihood in a general term that people would be denied or

7    approved as an absolute based on --

8    Q    Right.  So -- so it's safe to say that even as the

9    director of -- of you -- of this department, you're not

10   really sure of what individuals are looking at when they're

11   giving you the paperwork, because these type of things should

12   probably be understood that if, say like an application of

13   the plaintiff, if he doesn't have a lot of -- or a lot of

14   documentation or he has his first personal statement, then

15   their application would be denied because that's what was

16   done?

17   A    Well, I would say -- I would -- I would clarify that the

18   amount of documentation does not determine whether or not

19   somebody is approved or denied.  The documentation -- the

20   documentation itself.  So if the documentation that you have

21   submitted is thoroughly reviewed, it's helping our analyst to

22   make a thorough -- a decision based on the information that's

23   provided, not the amount of information that is provided.

24   Q    Mm-hmm.  So you're saying that they -- the quality of

25   the documentation?

1  A    Every piece of documentation that is submitted, whether

2  it's a lot or -- or a little, and again that's subjective, is

3  thoroughly considered and reviewed for each individual when

4  they make their request, and that is what helps determine the

5  decision.

6  Q    Mm-hmm.  So -- so really what I am hearing is that when

7  for certain ones that you guys are wanting to look at, for

8  certain disabilities, everything is individualized and it all

9  depends upon whoever is reviewing that person's documentation

10 and the way they feel, if it's enough documentation or not.

11 Because they're making recommendations to you.  They review

12 it, they send it to you, then --

13 A    I am not -- Doctor, I just want to clarify, I am not a

14 reviewer and they are not making a recommendation to me as to

15 whether or not somebody is approved or denied accommodations.

16 Q    Okay.

17        DR. KITCHENS:  Judge, the only reason I was going

18 there is -- is because when I was looking at case law in

19 Samson, there was an outside Ph.D. who was reviewing the

20 documentation, and then his recommendation he sent to the

21 director, and then they did the final say on yes or nay.  And

22 they took that based upon what this person, the third party

23 clinician recommendation was.  So I have no more questions.

24        THE COURT:  All right.  Okay.  Thank you.

25        Ms. Mew, are you ready to move on to the next

1    witness?

2              MS. MEW:  Yes, Your Honor.  May Ms. Convery be

3    excused?

4              THE COURT:  Yes, Ms. Convery may be excused.  Let's

5    take a five-minute bio break, and then -- so we'll reconvene

6    at 3:21.  Okay?

7              MS. MEW:  Okay.  Thank you.

8              DR. KITCHENS:  Thank you.

9         (Recess at 3:16 p.m. to 3:26 p.m.)

10             THE COURT:  All right.  I got my key people here.

11   All right.  Ms. Mew, you can resume.

12             MS. MEW:  Thank you, Your Honor.  NBME calls

13   Michael Gordon, Dr. Gordon.

14             THE WITNESS:  Good afternoon.

15             THE COURT:  Inna, would you please swear in the

16   witness.

17        MICHAEL GORDON, DEFENDANT'S WITNESS, SWORN

18             THE CLERK:  (No audio)

19             THE WITNESS:  My name is Michael Gordon.

20                       DIRECT EXAMINATION

21   BY MS. MEW:

22   Q    Good afternoon, Dr. Gordon.

23   A    Good afternoon.

24   Q    What is your professional background?

25   A    I'm a Ph.D. in clinical psychology.

1    Q    Do you have any particular specialty?

2    A    My specialty is clinical child and adult ADHD

3    evaluations and management.

4    Q    And how long have you worked in this area?

5    A    Since 1977.

6    Q    And within ADHD, is there any particular focus to your

7    work and your research over the years?

8    A    I've been involved in the research -- in many areas to

9    the research regarding ADHD.  I think I'm most -- been most

10   involved in diagnostic issues to the extent that I developed

11   one of the very first tests for ADHD to be used within an

12   evaluation.

13            I also was instrumental in focusing on adult ADHD

14   during the course of my career.  And then I have also

15   conducted a good deal of research regarding the impact of

16   extra time and other issues regarding accommodations.

17            MS. MEW:  Dr. Kitchens, you may not be muted and I

18   think -- I'm getting a little bit of feedback and I'm

19   wondering if -- are you muted?

20            DR. KITCHENS:  No, ma'am.  Do I -- you want me to

21   mute?

22            MS. MEW:  I'm just -- I think I'm hearing feedback

23   and I think it might be coming from you.  That might help.

24   Thank you.  I appreciate it.

25   BY MS. MEW:

1    Q    I want to turn very quickly to the Gordon declaration,

2    Exhibit A.  This is ECF26-21.  And in the interest of time,

3    Dr. Gordon, we're not -- we're not going to focus on this;

4    it's in the record.  But I wanted to turn to page 2 of your

5    CV.  And the first line up there, it mentions that you're an

6    inductee in the CHADD Hall of Fame, C-H-A-D-D.  What is

7    CHADD?

8    A    CHADD is the national parent organization advocating for

9    individuals with ADHD.

10   Q    And do you have any idea on why you were inducted into

11   its hall of fame?

12   A    Well, I think it's because I was considered to have

13   contributed sufficiently to warrant it.  I was also the first

14   professional to support CHADD.  I was the first head of the

15   board of advisors to CHADD many, many years ago.

16   Q    Do you have experience evaluating individuals for ADHD?

17   A    I do.

18   Q    How many, rough count, of individuals do you think

19   you've evaluated for ADHD over the course of your career?

20   A    Hundreds.

21   Q    And how long have you been doing this work?

22   A    I have been evaluating individuals for ADHD since about

23   1979.  I also formed and ran one of the very, very first --

24   actually, probably the second subspecialty clinic in the

25   country and did that for many years as well, from about 1984,

1    1985.

2    Q    And do you also in your work review requests from

3    individuals -- from individuals who are seeking

4    accommodations as sort of an outside reviewer to testing

5    entities?

6    A    I have.

7    Q    And how long have you been doing this work?

8    A    Since about 1994.

9    Q    Can you give just a few examples of entities you've done

10   consulting review work for?

11   A    Well, actually the first was NBME, but I have reviewed

12   for a great number of different testing organizations like

13   the ACT and the SAT, the LSAC.  And then I do still do a good

14   deal of reviewing for various bar jurisdictions, including

15   New York, North Carolina, Florida, and others.

16   Q    And, Dr. Gordon, I want to just make sure something is

17   clear for this record.  Did you serve as any kind of an

18   outside reviewer for Dr. Kitchens' request in sort of the

19   ordinary course with NBME?

20   A    No, I only saw this when you sent it to me as part of

21   this action.  I was not a reviewer for this.

22   Q    What questions are you generally asked to answer when

23   you review a request for accommodations on a high-stakes

24   standardized test?

25   A    Well, my specialty, and I limit my reviews largely to

1    ADHD, and in some respects if I could go off on a long

2    lecture about the diagnosis, my job for these is relatively

3    straightforward because for ADHD it rides on somebody's

4    history, clinical history.  And somebody like me in this role

5    is looking for two things:  One, is there impairment.  Our

6    guidelines require clinically significant impairment.  And,

7    number two, can that impairment be reasonably attributed to

8    somebody being pathologically inattentive and impulsive.

9           So when I go through these or my colleagues go

10   through these reviews, we're looking for impairment.  And so

11   our main issue is not whether somebody has just the symptoms

12   of the disorder, because we can all be inattentive, some

13   people more, some people less, we can be (inaudible 3:33:11),

14   disorganized.  It's part of being human.

15          The question is, are those symptoms -- is there

16   evidence that those symptoms cause actual impairment in day-

17   to-day functioning over the course of somebody's life,

18   because it's a neurodevelopmental disorder.  It's a childhood

19   disorder.

20   Q    And I think you test on some of this, so maybe we could

21   go over this relatively quickly but -- and we're kind of

22   short on time, but can you describe generally what the

23   primary diagnostic characteristics of ADHD are?

24   A    Sure.  Number one, the person has to have the symptoms.

25   Those symptoms have to do with inattention and overactivity

1    and impulsiveness.

2              Number two, there needs to be evidence that those

3    problems started relatively early in life, not just

4    appearing, not just that the youngster can be inattentive or

5    impulsive, but it led to some disruption or impairment in

6    their functioning.  So, obviously, if you were to diagnose

7    every, you know, eight-year-old who ran around the room or

8    the classroom as ADHD, you would be pretty much evaluating

9    most children as having ADHD.

10             So we look for evidence of it starting early in

11   life and we look for evidence that it persists over time, at

12   least through childhood, and we're up to the point that the

13   person is asking for accommodations, in this case.  And so

14   what we do is just try to see if there's a personal history

15   of somebody who in situations that require attention and self

16   control relative to other people, are unable to manage those

17   demands.

18             And fortunately for me, it's not so easy for some

19   of the colleagues in other areas, but for me it's pretty

20   straightforward, you know, there should be a paper trail

21   there.  If you have a brain that's ADHD-like, you've had

22   trouble from early on by definition, and you shouldn't find

23   it very, very easy to (inaudible 3:35:18) someone.

24   Q    Okay.  So working from that, this paper trail, what

25   would you expect a paper trail for someone with ADHD to look

1   like?

2   A    First, voluminous.  We used to joke in our clinic that

3   we could probably do the diagnosis by the weight of the paper

4   bag that the parents brought in, with the various report

5   cards and such and -- and detentions that the child had, or

6   the various reports documenting it.

7        So you would see in somebody's documentation

8   evidence from report cards, evidence from IEPs, from

9   educational programs, special ed programs.  You would see

10  evidence perhaps to the grade retention.  You would see

11  evidence of a youngster having substantial social

12  difficulties and just generally behavior problems that

13  precluded them from being able to be managed normally within

14  a classroom.

15  Q    What if someone doesn't have the means to get a

16  psychological assessment for ADHD, they don't have the money

17  or the funds for it?

18  A    Well, you know, again in my circumstance it's easier

19  because, you know, I don't necessarily need to see specific

20  tests.  Like if you were looking at a learning disability,

21  you'd need to have testing for that to document it.  With me

22  I'm perfectly happy to see anything that shows that somebody

23  functions abnormally.  That's it.  And so that doesn't

24  necessarily require a thorough evaluation, although most of

25  these people, most of these children get it through the

1    school.

2    Q    And you mentioned looking for impairment.  What does

3    impairment look like typically with someone -- can you hear

4    me okay?  What does impairment look like for someone

5    typically with ADHD?

6    A    Impairment looks like an inability to function normally

7    in most settings that require you to attend and exert self

8    control.

9    Q    Okay.  So I'm going to shift here again in the interest

10   of time to Dr. Kitchens' request for accommodations.  And you

11   reviewed the documentation that we explained to you that Dr.

12   Kitchens provided to NBME in support of his testing

13   accommodation request, is that correct?

14   A    That's correct.

15   Q    We'll discuss some of the specific documentation in a

16   minute, but first what was your general impression after you

17   first reviewed this file?

18   A    When I first looked at the file, both in terms of what

19   Dr. Kitchens submitted originally and then what came as part

20   of this action, I was impressed by how sparse I think the --

21   how limited the information was that he submitted.  Usually

22   we get an awful lot more than that, and this was about as

23   sparse as I've seen submitted over the years.

24        MS. MEW:  We're going to need to pull up the

25   exhibits to the declaration of Erin Convery.  And turning to

1   Exhibit 3, ECF26.

2   BY MS. MEW:

3   Q    And, Dr. Gordon, I also sent you just a paper binder

4   that's labeled Defendant Exhibits.  If it's easier for you to

5   look at it in paper, you may, but we have it up on the

6   screen.

7   A    I'm fine with this.

8   Q    Okay.  Do you remember reviewing this document?

9   A    I do.

10  Q    And what did this document tell you when you're -- when

11  you're doing the review?

12  A    Could you go back a page or to the first page of this?

13  Right there.  What I would do normally, what I did in this

14  case is to look down and the first thing that would attract

15  my attention is the fact that Dr. Kitchens had already

16  graduated from medical school.  So I see that and I think,

17  okay, well, I guess then I'll be needing to look for what

18  allowed him to make it all the way through medical school,

19  even if he had a psychiatric disorder, had ADHD.

20         And so I would look at that and right away I would

21  think, well, I'd assume I was going to see accommodations

22  that he's received to allow him to do that, because if you

23  look at the research on how people fare who are diagnosed as

24  children, most of those youngsters don't even graduate from

25  high school.  A smaller percent, but not much at all from --

1    from college.  And very, very, very few, if any, have made it

2    through medical school or some other postgraduate program.

3    And so it's so unusual, and of course only maybe five, seven

4    percent of the general population makes it through medical

5    school -- makes it to medical school, I'm sorry.  So that's

6    what I would do.

7          So I would first see that and I would say, okay,

8    I'd go to the next pages and look for the accommodations that

9    I assume he must have had to be able to accomplish --

10   accomplish this.  And then I see that he's never had any

11   formal accommodations on any of the testing he's ever taken,

12   and that surprised me because generally if somebody's made it

13   all the way to medical school, it would be very, very, very

14   unusual not to have some evidence of extended time.

15         And then I see, as you're showing here, that he

16   wasn't diagnosed.  Well, to me reviewing that, you know, I

17   would interpret that as that he wasn't diagnosed because he

18   didn't need to be diagnosed.  He was functioning well.  He

19   was doing fine.

20         And so he apparently made it through all the spots

21   along education that somebody with ADHD would have a terrible

22   time with by definition.  He went through and he didn't

23   require diagnosis, he didn't require extended time, he didn't

24   require anything unusual to be able to make it that far.

25   Q    Okay.  And I think I'm going to try to run through a few

1    documents quickly just for your frame of reference and then

2    we can talk about some.

3               MS. MEW:  If you can pull back Convery Exhibit 6,

4    ECF26-7.

5    BY MS. MEW:

6    Q    Did you -- did you review this document?

7    A    I did.

8    Q    And what did this document tell you?

9    A    Well, this was a bit unusual also because usually the

10   personal statements people submit is explaining why they need

11   the accommodations because of the impact of the -- the impact

12   they see the disability having on their -- on their

13   functioning, on their ability to achieve.  And so usually

14   these personal statements talk about the history of the

15   problems they have had, what they have gotten by way of help,

16   and why they feel that they meet criteria for the diagnosis

17   and qualify for the disability.

18              This was more legal.  It didn't really say much

19   about -- it didn't say anything about any of his history or

20   anything like that, just that he really did need these

21   accommodations.

22   Q    And I'm going to just flip through very quickly, Dr.

23   Gordon, for your frame of reference Convery Exhibit 8, which

24   is ECF26-9; Convery Exhibit 9, which is ECF26-10, and Convery

25   Exhibit 10, which is ECF26-11.  And we can come back to any

1    of these in greater detail, but do you -- do you recall

2    already reviewing these documents?

3    A    I do.

4    Q    And in your review, did anything in these medical

5    records substantiate an ADHD diagnosis?

6    A    No.  As a matter of fact, I was -- I was confused right

7    away because I didn't see a formal diagnosis.  I saw thoughts

8    about getting evaluations and such. but I don't know in these

9    specific three that you showed.  Bbut generally I couldn't

10   find a diagnosis --

11   Q    Let's look back --

12   A    -- that was current.  sorry.

13   Q    No, my apologies.  Let's just turn back to Exhibit 9,

14   ECF26-10.  Was there anything about this particular document

15   that you noted?

16   A    It was very striking to me that under the assessment

17   plan orders, the ADHD, there were two things that were

18   meaningful.  Number one, that's not a diagnosis.  It's

19   essentially identifying what this clinician felt needed to be

20   evaluated and perhaps treated -- and treated if there -- I

21   assume if there was a problem.

22          So, first, I didn't see a diagnosis.  Second, I saw

23   unspecified type for ADHD.  As soon as you see unspecified

24   type, what that tells anybody is that this clinician, even --

25   was only offering the possibility that if there were ADHD

1    once the client was evaluated and treated, it would likely be

2    unspecified type, which means that the person did not meet

3    full criteria for the disorder.

4              That's saying that the person does not show all the

5    things that need to be shown to fit into that diagnosis, and

6    it's sort of there to account for those relatively rare cases

7    where somebody is impaired, but still -- but not by the

8    specific ADHD-type or number of symptoms.

9    Q    And then just very quickly turning to Convery Exhibit 7,

10   ECF26-8, we've been talking about ADHD, but are you also

11   generally familiar with other psychiatric disorders?

12   A    I am.

13   Q    Did you review this document?

14   A    I did.

15   Q    And what does this particular document tell you?

16   A    Nothing about ADHD, number one, and that's what I most

17   paid attention to.  And -- but I looked at that and wondered,

18   really, more than anything, how that diagnosis was arrived

19   at, because whether it's ADHD or anxiety, the point is, is

20   there impairment associated with it.  People can get anxious,

21   people get inattentive, people get impulsive.  Where's the --

22   where's the beef?  Where's the information that would suggest

23   that this actually raises to the threshold of a disorder?

24   Q    Are you aware of research around test anxiety?

25   A    I am.

1    Q    What does that -- what does the research that you're

2    aware of tell us about test anxiety?

3    A    Well, there's two sort of generally accepted points

4    about test anxiety.  One, it is not a psychiatric disorder.

5    There's nowhere in the professional guidelines that have test

6    anxiety alone as a psychiatric disorder.

7         Number two, the research on the impact of test

8    anxiety is kind of interesting because there is no indication

9    that the level of anxiety that somebody expresses during the

10   course of taking a test actually interferes with their

11   ability to do well on that test.  As a matter of fact, for a

12   number of people who report test anxiety, there -- they do

13   better when they are anxious as opposed to when they're not.

14   And that's also the case for people who don't say they have

15   test anxiety.

16        So, in other words, it's very, very unclear

17   generally whether test anxiety really interferes in any

18   substantial way for most people.  And, besides that, it's not

19   a disorder.

20   Q    In the interest of completeness, I just want to turn

21   quickly to Convery Exhibit 11, ECF26-12, just to confirm that

22   you reviewed this as part of looking at the -- Dr. Kitchens'

23   accommodation request to NBME.

24   A    I did see this.

25   Q    And what did this document tell you?

1    A    I wasn't entirely sure, other than the fact that I guess

2    his medical school gave him accommodations on a shelf exam, a

3    subject exam.

4    Q    And then turning to Convery Exhibit 12, ECF26-13, did

5    you review this documentation as well?

6    A    I did.

7    Q    And then what did this tell you?

8    A    It tells me his score.

9    Q    Considered together, did the documents that Dr. Kitchens

10   submitted to NBME in support of his request for testing

11   accommodations demonstrate that he is substantially limited

12   in any major life activity compared to most people?

13   A    It doesn't.

14   Q    And in your opinion was there any basis for NBME to

15   provide Dr. Kitchens with disability-based testing

16   accommodations based on the documentation we just reviewed?

17   A    Based on this documentation, I think the NBME was

18   correct in denying the request.

19   Q    Dr. Gordon, do you remember seeing reference in

20   documentation to Dr. Kitchens being prescribed medication for

21   ADHD?

22   A    I do.

23   Q    Is -- is being prescribed medication alone diagnostic of

24   ADHD?

25   A    No, it's not.  The reason being very simply is that most

1    people, unless somebody's psychotic or has a very severe

2    anxiety disorder, most people do better with stimulant

3    medication when it comes to focusing and paying attention.

4    That's just the way it is.

5            People have been taking it non-clinically, you

6    know, off -- off label, whether it's emergency room

7    physicians or truck drivers or anybody else looking to

8    attend.  And there has been formal research in this regard,

9    and long ago it was put to bed as a diagnostic tool because

10   everybody who takes -- almost everybody who takes a stimulant

11   does better with paying attention.  So it doesn't mean

12   anything.  I just means you're breathing.

13   Q   I want to just focus on a couple of specific points.  We

14   were speaking with Ms. Bacon earlier today and I think --

15   we'll just pull up real quick Plaintiff's supplemental

16   filing, Exhibit 1.  This is ECF22.

17           Did you review this report, Dr. Gordon?

18   A   I did.

19   Q   If you look under the list of assessment procedures here

20   on the first page, one of the procedures that Ms. Bacon used

21   is this MOXO Distracted Continuous Performance Test, CPT.

22   Can you explain what a Continuous Performance Test is?

23   A   The CPT or Continuous Performance Test is a paradigm.

24   It's a method of testing, which there are variants of them,

25   but they all are very similar to the extent that a subject

1    sees usually on a computer screen of some sort numbers or

2    digits, and they have to press the button and respond

3    whenever a certain combination goes by.

4            So I'll speak to the -- I'm not exactly sure what

5    the digits were for this CPT, for mine, for example, you had

6    to press the button whenever a nine came after a one.  So

7    over a nine-minute period, somebody had to press the button,

8    and you could see, get scores on when they hit it

9    appropriately, when the nine came after one, whether they

10   missed it or they hit it at some other time when they

11   shouldn't have, maybe a three after a one.

12           And so that's what these do and it's -- it's a

13   measure that's used within assessments to get a sense of how

14   well somebody can attend in that circumstance.

15   Q    Dr. Gordon, is ADHD any kind of reading disorder?

16   A    No.  ADHD is a neurodevelopment disorder --

17   neurodevelopmental disorder.  It's listed and categorized as

18   such in the professional guidelines, in the DSM.  Learning

19   disorders are learning disorders.  You can be ADHD and have a

20   learning disability.  You can have a learning disability and

21   have ADHD.  You can have either one without the other, but it

22   is not a learning disability.

23   Q    Does ADHD cause problems with reading fluency?

24   A    There's no good research, there's no compelling research

25   that individuals who have ADHD, because of that ADHD have

1    reading problems, reading fluency kinds of difficulties.

2    They can, but that has not been tied by research to their

3    ADHD.  They might just have a separate reading problem.

4    Q    Have you seen any documentation assessing Dr. Kitchens

5    for a reading disorder?

6    A    I did not.

7    Q    And have you seen any documentation diagnosing him with

8    a reading disorder?

9    A    No, I did not.

10   Q    Is -- is difficulty passing the USMLE a sign that

11   someone has an impairment?

12   A    I'm sorry, I couldn't hear you.

13   Q    Is difficulty with passing the USMLE, the United States

14   Medical Licensing Examination, could that be a sign of

15   impairment?

16   A    No, it's a sign of not having passed the exam.  People,

17   I would assume, don't do well on the USMLE for all kinds of

18   reasons.  It might have to do with preparation; it might have

19   to do with any number of factors regarding how they study,

20   how they take exams, et cetera.  But the mere fact that

21   somebody fails a USMLE exam is not a diagnostic tool for

22   impairment or for any disorder.

23   Q    And, Dr. Gordon, we don't have a lot of time to go

24   through -- to go through the rest of the documentation, and

25   we have listed in your declaration the documents that you

1    reviewed.  And on the basis of the documents that you

2    reviewed, has Dr. Kitchens demonstrated that he has a mental

3    impairment of ADHD?

4    A    He hasn't.

5    Q    Or anxiety?

6    A    No.

7    Q    And from the documents and information that you have

8    reviewed, has Dr. Kitchens demonstrated that he's

9    substantially limited in any major life activity relevant to

10   taking the USMLE compared to most people?

11   A    No.

12   Q    From your perspective and in your different professional

13   roles, why does this review process matter?  Why are we

14   looking at the documentation in deciding whether it supports

15   an accommodation request?

16   A    Well, first, we need the documentation because that way

17   we can see whether there's legitimacy to it.  The mere fact

18   that somebody says they have a disorder, especially now in

19   the age of Dr. Google and -- and all the self-diagnosis that

20   goes on, is not alone a way of identifying whether somebody

21   has a problem.  Most of us are not as confident and pleased

22   with how organized we are or how attentive we are.  If we

23   were to diagnose everybody who felt that they were

24   inattentive as ADHD, again we'd be diagnosing a whole lot of

25   the population.

1              When it comes to people who have some possibility

2      of gain by having the diagnosis, or whom the diagnosis

3      becomes a way of getting extra time or some other benefit, it

4      becomes especially important.  One, because their judgments

5      regarding the level of impairment they have may be subtly or

6      otherwise influenced by their desire to get those

7      accommodations.

8              And as far as accommodations go more generally,

9      look, I'm a longtime advocate for ADHD, for individuals with

10     ADHD, and one of the things that is very much a problem in

11     this area and has been for a very long time is, that the

12     diagnosis can get trivialized because everybody is

13     identifying themselves or given medication for ADHD.  That

14     doesn't help my patients.  That doesn't help people with ADHD

15     when the disorder becomes trivialized because it becomes a

16     diagnosis that can be applied to everybody.

17             The other thing is that just has always struck me

18     as just the fairness issue.  You know, I, you know, assume

19     that taking this test there will be people who really have

20     ADHD, who meet the criteria for the disorder, who for

21     whatever reason are not getting accommodations, and they

22     don't get any benefit.  They can go be doing it on their own,

23     and then imagine how fair it is that there are others who

24     don't meet that criteria who do get the extra time, and it

25     just seems unfair.

1          THE COURT:  Dr. Gordon, that answer was not

2     responsive to the question that counsel asked.  I'm going to

3     strike it from the record.

4          THE WITNESS:  I'm sorry, I thought that was.  I

5     apologize.

6     BY MS. MEW:

7     Q    Let me try asking -- asking it again, Dr. Gordon, and

8     just try to focus on the specific question.

9     A    Could you speak up -- speak up?  I'm sorry.

10    Q    I'm sorry.

11    A    I think I'm having trouble hearing you.

12    Q    I'm going to speak more into my microphone.  Why are you

13    looking for documentation in support of an accommodation

14    request?

15    A    To be able to see if there's evidence that the person

16    meets the criteria for the disorder.

17    Q    Thank you, Dr. Gordon.  I don't have any other

18    questions.

19         THE COURT:  I have a couple of questions before --

20    Dr. Kitchens, I'll give you the opportunity to ask a couple

21    minutes' worth of questions, but I have a couple questions.

22                          EXAMINATION

23    BY THE COURT:

24    Q    Dr. Gordon, you said you reviewed the -- the Bacon

25    report?

1    A    I did.

2    Q    Did you disagree with anything in there?

3    A    Yes.

4    Q    And I guess I am fuzzy.  I didn't glean it from -- from

5    the questioning.  Could you tell me which parts you disagreed

6    with?

7    A    Would you mind putting it up so we could go over it?

8    Q    Sure.

9         (Pause)

10   A    Okay.  The first thing that I would have questions about

11   and be uncomfortable with regarding this report is that

12   except for the CPT, it is based entirely on opinion, on the

13   formatted, but nonetheless still sourced opinion from Dr.

14   Kitchens and his wife and -- and perhaps his mother as well,

15   although I didn't see anything regarding the Achenbach for

16   his mother.

17         So, first of all, this doesn't seem to include

18   exactly what we need to hear, which is where is the

19   impairment; where is the evidence that he has a lifelong

20   history of being impaired by ADHD-type symptoms.

21   Q    Dr. Gordon, can I -- two questions now.  First is you

22   said based on opinion.  I mean a diagnosis is an opinion,

23   right?

24   A    A diagnosis is the clinician's opinion of whether

25   somebody meets professional criteria.  It's not -- what I'm

1    talking about is the opinion of Dr. Kitchens by himself on

2    whether he feels he has those symptoms and whether they're

3    impairing him.

4    Q    I see.  And then I understood you to say that you

5    observe about the Bacon report that it doesn't provide -- it

6    doesn't provide an opinion about there being an impairment

7    relative to the general population.  That's what you're

8    saying, right?

9    A    It is.

10   Q    Is it -- I mean have you -- have you reviewed files

11   submitted to the Medical Board in the past or is this the

12   first one you've ever seen?

13   A    No, I've been reviewing them since 1994.

14   Q    Okay.  So is it typical for a clinician to reach the

15   ultimate opinion on the existence of an impairment relative

16   to the general population?

17   A    Yeah, it is typical of reports supporting the diagnosis

18   that -- that would be regarded as appropriately supporting

19   the diagnosis to have an opinion by clear evidence, not just

20   opinion, but records showing impairment.

21   Q    I understand.  But it's -- the Bacon report is offering

22   -- it's reaching a diagnosis of ADHD, right?

23   A    Correct.

24   Q    Okay.  And in your mind there's a difference between a

25   diagnosis of ADHD and then taking the next step and saying,

1    well, there's an opinion that this ADHD causes an impairment

2    relative to the general population.  That's an additional

3    step, right?

4    A    No, that's -- that's not quite right.  The diagnostic

5    criteria themselves require not just the symptoms, but also

6    impairment, clinically significant impairment as a

7    consequence of those symptoms.  So they're not separate,

8    they're -- they're intended to be a package of here are the

9    symptoms and here are the way they impact somebody's

10   function.

11   Q    Are there particular tests that you think are the gold

12   standard for reaching that conclusion?

13   A    There are none.  That's why it's based on somebody --

14   largely based on somebody's clinical history.

15   Q    Okay.  Is there a way -- I mean is there a way -- never

16   mind, I'm going to withdraw that question.

17              THE COURT:  Thanks for your patience.  I'm going to

18   -- I'm going to let Dr. Kitchens ask his questions for a few

19   minutes here.

20              DR. KITCHENS:  Thank you, Your Honor.

21                          CROSS-EXAMINATION

22   BY DR. KITCHENS:

23   Q    Dr. Gordon, have you ever -- do you take into account

24   that some populations do not seek mental health?

25   A    Yes.

1    Q    Mm-hmm.  And so if they don't seek mental health, could

2    it be assumed that they don't have to necessarily be

3    diagnosed as a child to have a diagnosis later on in life?

4    A    No, because if somebody -- whether they sought services

5    or didn't seek services, they would have an academic record,

6    a social record, later on an occupational record that would

7    show that, whether they sought services for it or not.

8         So if somebody -- if a youngster in a classroom is

9    unable to learn because they are so impulsive or inattentive,

10   that is documented.  It's documented in report cards; it's

11   documented in all manner of ways, whether or not that child's

12   family or the school pursued an evaluation.

13   Q    Mm-hmm.  So if a parent or -- or the child didn't go

14   those routes of documentation per se but had other ways of

15   accommodating for the ADHD by say verbal communication with a

16   teacher, would that be considered rendering for a diagnosis?

17   Just because they --

18   A    I'm sorry, I'm not quite sure I got that.

19   Q    Okay.  I'm sorry.  Let me -- let me clarify.  If a

20   person has talked to a teacher, say a parent has talked to a

21   teacher and asked for different accommodations for their

22   child, does that mean that they do not have a diagnosis just

23   because they don't have physical documentation?

24   A    The only thing that I can look at in the course of a

25   review or any of us can look at is whether there is some

1    evidence of any kind, and it doesn't need to be a formal

2    psychological report, it's got to be some evidence of whether

3    the child was retained in a grade, whether they were held

4    back, whether they were referred for special educational

5    services.  There's some actual behavior that reflects that

6    the youngster is not doing well.

7    Q    Right.  So you said -- you spoke a little bit just now

8    on the threat or the child being held back in school as a

9    potential.  Are you saying that that is a potential

10   documentation for the renderance of a diagnosis?

11   A    One of the things that at least give a sense that there

12   were problems would be if a youngster was held back.  Was

13   held back.  A lot of parents during the year wonder whether

14   they should be; the teachers might talk to them about it.

15   It's something to consider, especially in the early ages.

16   But it would be actually being held back that would be useful

17   to know.

18   Q    Okay.  So it doesn't really matter whether or not the

19   teacher recommends the child to be held back and the parent

20   allows them to keep going, it's the matter of whether or not

21   the child actually stays in that course, is that what you're

22   saying?

23   A    Well, if I understand correctly, if -- if the youngster

24   did not get held back and did well, then I would see that as

25   a sign that the youngster wasn't very substantially impaired.

1    Q    Mm-hmm.  So isn't it true that you stated once in the

2    declaration that an individual does not just come down with

3    ADHD later on in life?

4    A    That's correct.

5    Q    Mm-hmm.  So if they don't have the documentation when

6    they're a child or outside of what you consider to be for

7    them to be held back in class or not do well to your

8    standards, that doesn't -- you're saying that that doesn't

9    mean that they have that diagnosis?

10   A    I'm sorry, I'm not sure I understood the question.  But

11   somebody who has ADHD is able to show problems all through

12   the lifespan.  They don't do well and then when they get to a

13   postgraduate program not do well.  It just doesn't work that

14   way.  It's a childhood disorder.  If you have a brain that's

15   ADHD, it's going to show up early and often and not all of a

16   sudden appear when the work gets really hard.

17   Q    Right.  So is it your professional opinion that an

18   individual is not diagnosed with -- with ADHD during

19   childhood, they cannot be diagnosed with ADHD as an adult?

20   A    No.

21   Q    Okay.  You said you've been in -- you've been practicing

22   this particular -- you've been practicing how long now, you

23   say?

24   A    Since 1979.

25   Q    1979.  And how do you describe -- how do you describe in

1    the brain as a person who has your caliber of the

2    neurotypical deficits that causes ADHD from the

3    norepinephrine and the dopamine is where I'm getting at.  How

4    does that work there?

5              THE WITNESS:  And I'm going somewhere with this,

6    Judge.

7    A    Well, actually there are a variety of theories, both

8    neurochemical and -- and structural regarding what can lead

9    to the ADHD-type symptoms.  I think I need some more from you

10   to be able to understand what you're really looking for from

11   me.

12   Q    What I'm -- what I'm looking for here is that a person,

13   in order to have ADHD, they have a decrease and they have a

14   substantial decrease in their brain of norepinephrine and

15   dopatmine, which is the reason why we prescribe Adderall or a

16   stimulant because it works off by blocking the receptor for

17   negative feedback.  So what I'm getting at is, just because a

18   person may not be diagnosed as a child does not mean that

19   they may not have the -- have ADHD.  But I digress.

20             One thing that I would say is, you spoke a little

21   bit about people can get -- anybody can get, you know, this

22   particular diagnosis or medication, the stimulant.  You know,

23   we all want to -- you know, may be a little disorganized, is

24   what you said, and they're looking for the medical to get an

25   advantage over, you know, the other neurotypical peers.  Have

1    you wrote this particular -- have you ever prescribed this

2    medication before?

3    A    I have not.

4    Q    Are you eligible to write this particular type of

5    medication?

6    A    I am not.

7    Q    Do you know the process of writing this particular

8    medication?

9    A    I do.

10   Q    What is that process?

11   A    The process of determining whether somebody requires it?

12   Q    No, sir, of writing the prescription, what is that

13   requirement for a patient to pick the -- for you as the

14   physician to prescribe the medication and for them as the

15   patient to pick the medication up from their pharmacist.

16   A    The clinician -- the physician needs to feel that the

17   person could benefit from it.  And the person who takes it

18   feels that they should take it so that they can do a better

19   job.

20   Q    Right.  So I'll tell you that that's -- that's not true.

21   So -- and I'm sorry if that's improper to say.

22         I guess what I'm getting at is that it's actually

23   pretty hard for physicians to write this medication, reason

24   being with it being a controlled substance, physicians would

25   rather refer a patient out for a -- for a person to render

1    them the diagnosis of ADHD, which was what was happening in

2    my documentation there, before the physician would even

3    prescribe the medication.  Because once they prescribe the

4    medication, a red flag is flagged on that particular

5    physician for writing this medication to a person who's never

6    had the medication before due to a controlled substance.  And

7    then once the patient is going to pick the medication up from

8    their particular pharmacy, they have to put in -- in most

9    states, I should say, in most states they have to even put in

10   their driver's license just because it's such a controlled

11   substance.

12        So I just wanted to make that very clear here and

13   to the Court that physicians are not willing to just go out

14   and write this medication because a person says that they

15   have ADHD.  They're gonna get a secondary opinion from a

16   person who is trained in that particular area of expertise.

17        THE WITNESS:  I have no more questions, Your Honor.

18        THE COURT:  I was just about to -- I was just about

19   to say we'll call it there.

20        Ms. Mew, do you have any redirect?

21        MS. MEW:  No, Your Honor.

22        THE COURT:  All right.  Dr. Gordon, you are -- you

23   may be dismissed.

24        THE WITNESS:  Thank you.

25        THE COURT:  All right.  We're going to wrap this up

1    with some closing statements and, Dr. Kitchens, you can go

2    first.  Let's -- you know, time-wise, we've got time to do 15

3    minutes, maybe it could be a couple minutes over 15, but if

4    we can shoot for 15 or so, that'd be -- that'd be great.  All

5    right?

6              DR. KITCHENS:  Yes, sir.  Thank you, Your Honor.

7              Your Honor, as you have indicated at the beginning

8    of this hearing, we are here on a motion for my preliminary

9    injunction.  I am seeking that you grant me the testing

10   accommodations and the expungement of my examination

11   transcript so that I may participate in the residency

12   process.

13             My burden of proof is to demonstrate a substantial

14   likelihood of success on the merits and the irreparable harm

15   furthermore, and the motion for the public interest and

16   whether or not the defendant and myself is harmed by granting

17   -- I'm sorry, the defendant is harmed by granting this

18   preliminary injunction.

19             The defendant relies on a consultant who has only

20   reviewed my application and made a determination against the

21   fact of my disability, nor the substantial limiting impact

22   that it has on my major life -- major life activities, let

23   alone as we just heard here a person to review my application

24   for the fact of this hearing.

25             However, Ms. Bacon, my evaluating psychologist, has

1    determined that I do meet the criteria for ADHD under the

2    DSM-5.  The NBME's experts rely on documentation as the

3    single- most determination source of a disability, as we just

4    heard.  This ignores the influence of cultural biases amongst

5    African Americans, amongst Latino Americans, and Mexicans and

6    those particular diasporas.

7            The NBME specifically focuses on the fact that the

8    2023 Match deadline has already passed and for that sole

9    reason I should be denied.  And, yes, as stated earlier, in -

10   - the 2023 Match program was the motivational factor for my

11   filing of this motion.  However, the irreparable harm is

12   still met.

13           Without this injunction, I would no -- I would have

14   no other remedy but to wait until trial to determine whether

15   I can even register to sit for the Step Exam, because without

16   the accommodations and the exam expungement, I dare not

17   register for any Step 1 Exams.  I only have one attempt left

18   before permanent disbarment from medicine.

19           The NBME has made their deadlines very clear.  As

20   IMG, I must have an entire application submitted prior to

21   January 31st, including both Step 1 and Step 2 Exam scores

22   submitted into the ECFMG Pathway.  Therefore, waiting an

23   additional four, maybe six months to hold a trial will

24   prohibit me from registering for the Step Exam until roughly

25   September or October.  This leaves me with no other -- no

1    time to receive my score back nor participate in the

2    interview process.

3         In Ramsey the court held that delaying a plaintiff

4    from pursuing their chosen career constitutes irreparable

5    harm, and without the -- without the -- the examination

6    transcript, I still face being prohibited from licensure and

7    clinical practice in 19 states, as you can see, in the red

8    states.

9         Out of 618 residency programs for internal medicine

10   in the United States, I cannot even apply for -- I can only

11   apply for 200 and -- 221 programs as I stand today.

12   Furthermore, without the expungement of my examination

13   transcript or the accommodation, I would not be able to

14   register for either of the Step Exams.

15        To briefly touch on the other factors for the

16   preliminary injunction, Congress made it quite clear that

17   protecting individuals with disabilities from discrimination

18   was in the public interest when it passed the ADA.  Also,

19   with the growing understanding of mental health and -- and

20   disabilities, we see that patients are better served by

21   increasing diversity and representation in the medical

22   profession.

23        Lastly, the NBME would argue that granting testing

24   accommodation and an expungement of my exam transcript would

25   harm the fulfillment of its mission to provide qualified

 1    physicians.  However, their continued denial of my
 2    accommodations directly contradicts their very mission by
 3    denying me accommodations.  As a disabled applicant they are
 4    prohibiting the fairness of -- fairness of the administration
 5    of the exam to myself.
 6              At this point, there's no other remedy for me.
 7    Even with testing accommodations, those failed attempts will
 8    follow me forever.  Without the expungement of my transcript,
 9    I may never be able to fill my lifelong dream of practicing
10    medicine.  My life now depends on the decision that you, Your
11    Honor, render today.
12              I ask that you award me the ability to participate
13    in all of the Step Exams with additional time, specifically
14    time plus 100 percent over the course of two days, and the
15    expungement of my examination transcript, so that I can move
16    forward with the opportunity to determine and to demonstrate
17    my knowledge and my competency, rather than to succumb to my
18    disability and watch the death of my medical career before it
19    ever even started.  Thank you, Your Honor.
20              THE COURT:  All right.  Thank you.  Ms. Mew?
21              MS. MEW:  Thank you, Your Honor.
22              As you set out this morning when we began the
23    hearing, it's Dr. Kitchens' burden to show a clear likelihood
24    of success on the merits, and he has not met this burden.
25              His legal claim is that NBME violated the ADA in

1   2022 by not approving his two requests for accommodations on

2   Step 1.  So to evaluate that claim, you must consider the

3   information that NBME provided -- that Dr. Kitchens provided

4   to NBME in support of that request.

5            As we've heard people describe it today and as we

6   see just by looking at it, that documentation was incredibly

7   sparse.  It's not just about the number of pages, but the

8   quality of the information and the type of information that's

9   provided to it.  This is the opportunity to put information

10  to NBME that can help them make an informed decision on a

11  request.

12           It referenced that the documentation referenced did

13  not substantiate to diagnose impairments, ADHD, and anxiety,

14  and it did not address in any respect whether Dr. Kitchens is

15  substantially limited in his ability to perform major life

16  activities compared to most people.

17           It was a total of 19 pages of documentation in

18  support of two requests.  Six of those were the accommodation

19  reform itself -- the form itself.  Dr. Kitchens reported on

20  that form that he had not received accommodations in primary

21  school, secondary school, college, medical school, on his

22  college admissions test, or on his MCAT Exam.  Nothing in the

23  form shows a need for accommodations.

24           He also submitted a half page personal statement.

25  It contains none of the information that's been coming out in

1    the course of the -- the litigation, none of the information

2    that NBME advises candidates to provide when they're

3    submitting their accommodation request.  It's a total of six

4    pages of medical records, making passing references to ADHD

5    or anxiety diagnoses, maybe based on self report by an

6    unidentified third party, but they didn't substantiate the

7    impairment.  There wasn't anything there.

8         And there's nothing that shows Dr. Kitchens'

9    alleged functional limitations, something that would give

10   NBME a reason to see why he is impaired and limited in his

11   ability to read, to think, to concentrate, or to perform any

12   major life activity that's relevant when taking the test.

13        The records include progress notes from

14   dermatology.  They don't show the name of any physician,

15   nurse, or health care provider.  Progress notes from another

16   physician who refused to provide an Adderall prescription.

17   And they don't show again the reason for the diagnosis or the

18   resulting functional limitations.

19        There is a two-page document on the Clinical Basic

20   Science Exam taken at a Prometric Center.  Again, this wasn't

21   a request that was granted by NBME.

22        NBME asked for a CPTA certification form.  This

23   would give confirmation from the medical school if he had

24   received accommodations there and would also show the reason

25   why the medical school granted the accommodation, but that

1    information wasn't provided to NBME.

2         Dr. Kitchens also provided a four-page score report

3    for the CBSE, an exam that he says he took with double time.

4    But this report showed that he performed very poorly on the

5    test, even with extra time.  This was true even though he had

6    studied extensively for the test, as he had testified in his

7    deposition.

8         This is the sum total of what Dr. Kitchens provided

9    to NBME in support of his two accommodation requests, and the

10   limited documentation either did not provide an adequate

11   basis for NBME to conclude that Dr. Kitchens had either ADHD

12   or anxiety, and no basis to assess his alleged functional

13   limitations.  And the documentation was the same with both

14   accommodation requests.

15        Dr. Kitchens repeatedly chose not to provide

16   additional documentation when requested to do so, when

17   encouraged to do so, when advised to do so, and given

18   multiple opportunities to support his request to NBME, and he

19   didn't do it.

20        Dr. Kitchens has argued that NBME didn't need any

21   additional documentation, but that can't be true because he's

22   put more documentation in the record with the Court.  We're

23   continuing to get new documentation in just last night.

24        These documents, the new documents included college

25   records related to his ADHD diagnosis, records from the White

1   House Clinics, a very lengthy declaration from Dr. Kitchens,

2   a declaration from his mother.  None of this is information

3   that was put before NBME in the first place.  So it's clear

4   that Dr. Kitchens could have provided more information to

5   NBME, but he chose not to do so.

6           Dr. Kitchens has explained that he hasn't -- didn't

7   have the resources to obtain a full ADHD or anxiety

8   assessment.  However, he did get a diagnostic assessment

9   earlier this month for the purposes of this litigation, and

10  there are resources available.  We've heard it from people

11  today, schools and in college for individuals who need

12  diagnostic assessments.

13          The limited documentation that Dr. Kitchens in

14  support of his request fell well short of showing that he had

15  a proper diagnosis or was entitled to an accommodation on the

16  USMLE.

17          And I go back to the question that I posed this

18  morning.  Why -- why does NBME care?  Why are we going to all

19  of this trouble of litigating this case?

20          Again, NBME's only purpose here is to protect the

21  integrity of the test.  It's trying to make its best, most

22  informed decision based on information that candidates

23  provide to it about who is entitled to accommodations on the

24  test and who tests under the standard time conditions.  It

25  has to think about the fairness of the test, the integrity of

1   the process, and the information that it's providing to

2   medical licensing authorities.

3            NBME did not violate the ADA when it denied Dr.

4   Kitchens' two requests in 2022, given the very limited

5   documentation he submitted at that time.  Whether he might be

6   entitled to accommodations on future administrations of the

7   test based on the new documentation that he submitted to the

8   Court, it hasn't yet gone to NBME.  It hasn't gone to their

9   Disability Services office.  It's a separate question for

10  another day.  But for now he has not made a clear showing

11  that he's likely to succeed on his claim that NBME violated

12  the ADA by not approving his two requests in 2022.

13           And irreparable harm, we know now that the basis

14  for the motion to participate in the 2023 Match, as we

15  discussed in our initial call just last week, is not going to

16  happen.  The deadlines have already passed.  And Dr. Kitchens

17  I know is concerned about the deadlines for passing the Step

18  1 and Step 2 CK Exam, but there are other requirements.

19  ECFMG requires international medical graduates to also go

20  down this Pathways path and to get this additional testing

21  done to get an ECFMG Certification.  Dr. Kitchens has not

22  done so.

23           He cannot meet the March 1 Match deadline.  He

24  cannot participate in The Match.  It turns out that there was

25  no risk of irreparable harm after all.

1          Irreparable harm is also speculative.  He

2     speculates that he might have a better chance if he

3     participates in the 2023 Match or if he waits for a year

4     before he takes another one.  There's speculation about what

5     would happen if he takes the test again with double time or

6     extra time.  As he showed you from his CBSSA reports, his

7     scores have been all over the place and he did, as we see,

8     not perform well on the CBSE even when he had extended time.

9          It would certainly be easier and far less expensive

10    for NBME to grant any request that is supported with some

11    documents that makes passing reference to a medical

12    diagnosis, but that would not be responsible or equitable.

13    Unwarranted accommodations are fundamentally unfair and

14    licensing authorities, of course, anticipate that NBME will

15    not inappropriately provide accommodations.

16         Like most other prospective physicians, Dr.

17    Kitchens appears to have worked very hard in pursuing his

18    desire to become a doctor.  None of this is meant to diminish

19    that.  His hard work is commendable.  But for right now,

20    where we are today, he has not met the requirements for a

21    mandatory preliminary injunction providing him all of the

22    relief that he seeks on an expedited basis, without showing

23    that he's got his -- will suffer irreparable harm or is

24    likely to succeed on the merits.  His motion should be

25    denied.  Thank you, Your Honor.

The Court - Findings                                         195

1              THE COURT:  All right.  Thank you both.  So -- all

2    right.  Let me -- let me start by saying that I'm really

3    impressed by how -- how effectively that you both, meaning

4    Dr. Kitchens and Ms. Mew, have been able to provide me with a

5    record, prepare for this hearing, and present witnesses and

6    arguments in a very short amount of time.  And there was a

7    great deal of cooperation and professionalism that I saw

8    leading up to the hearing and at the hearing.

9              Dr. Kitchens, you are obviously passionate about

10   your goals and that's wonderful.  You know, you're the kind

11   of person I can tell just telling me your life story that

12   when you put your mind to something you're not going to give

13   up, and that's great.  And you did a good job with tempering

14   that passion in presenting your case, as you must, in court

15   with facts and arguments in an orderly fashion.  So I thank

16   you for that.

17             And, Ms. Mew, I think you showed a great deal of

18   professionalism as well.  You've kept an eye on what -- on

19   giving me what I need to decide this case, which of course is

20   very critical in a case where there's a pro se litigant, as

21   you must know.  And so frankly let me say that you've also

22   shown friendliness and compassion towards Dr. Kitchens and I

23   thank you for that.

24             I will say, when I look at the likelihood of

25   success on the merits in this case, there is a case here.  I

1   know the parties are quite familiar with Judge Joyner's

2   opinion in the <u>Ramsey</u> case and the Third Circuit's opinion.

3   I've spent some time studying that, as you know, and I think

4   it's well-reasoned.

5          When I consider the record here, I see that Dr.

6   Kitchens has made some significant aspects of that showing

7   that would be necessary, and at the same time, you know, I

8   appreciate that the offer of proof in <u>Ramsey</u> was more

9   thorough than what we have here, at least so far.  I

10  appreciate that.

11  And honestly I'm not sure sitting here how I feel about the

12  merits.  I think this is a close case.

13         But as good a job as I think you've done, you've

14  both done, in assembling the record and putting on this

15  hearing, I just -- it's -- I got a lot of questions, a lot,

16  way more than I can get answered today.  And that's what -- I

17  think that's what takes me to the irreparable harm problem.

18         So the reason that irreparable harm is a vital part

19  of the showing for a preliminary injunction is that the

20  preliminary injunction is asking for a determination based on

21  a limited record, and it's a big remedy, what you're asking

22  for, Dr. Kitchens.  What I have to do is think about whether

23  this must be decided now or if it can wait for the

24  development of a fuller and complete record.

25         That's a particularly big concern for me in this

1    case because if I grant the injunction, the case is over,

2    because -- you know, and sometimes a preliminary injunction

3    exists to maintain the status quo, to keep the parties in a

4    holding pattern, lots of cases where the preliminary

5    injunction just freezes things and let's you get through the

6    case without messing anything up more than it is.

7             That's not how this case is set up.  Here the

8    preliminary injunction would end the case in Dr. Kitchens'

9    favor completely because he would take the exam with the

10   accommodation he seeks and that would be it.

11            So the reason I agreed to this hearing, and I don't

12   regret it, but the reason I agreed to have this hearing is

13   because I had the distinct impression that there was an

14   opportunity for Dr. Kitchens to move forward immediately and

15   apply to residency programs within the next month or two.

16   And the way the preliminary injunction works is, it's a

17   tradeoff.  You trade off some thoroughness in the record for

18   the equitable need to stop immediate harm.

19            But in my view, Dr. Kitchens has not been able to

20   prove that there's a need to take the exam immediately or

21   else there will be some unrecoverable lost opportunity or

22   other harm.  And actually all the evidence that I've got goes

23   the other way on that point.  It seems rather clear to me

24   that it's the 2024 Match that Dr. Kitchens is targeting and

25   he has time to take the test later than right now.

1          Now, I certainly appreciate, Dr. Kitchens, what you

2     said about you've waited long enough to get it.  That's fair

3     to say.  I understand.  And I understand, Dr. Kitchens, your

4     testimony and argument that what has already happened to you

5     is unfair and unreasonable from your point of view.  I

6     understand that.  But the remedy for that is not necessarily

7     a preliminary injunction.  The preliminary injunction is for

8     -- is to freeze that irreparable harm that otherwise would

9     happen as an alternative to waiting until a trial.

10         Okay.  So what I have to think about is that

11     irreparable harm that would arise if we delayed this to an

12     expedited trial.  And I don't see that harm.  And I actually

13     see the opposite for both sides here.

14         You know, Dr. Kitchens would have a chance to

15     thoroughly prepare and marshal the evidence that he believes

16     would justify an accommodation, and the Board would have the

17     chance to fully consider, not just overnight, but to fully

18     consider everything Dr. Kitchens is saying and respond.  And

19     I'll get a decisional record that is significantly more full

20     and clear.

21         And the parties would also have a chance to

22     continue their conversation.  Because the Board, I don't

23     think -- Dr. Kitchens, I don't think the Board is your enemy,

24     and I think all this will greatly increase the chances of a

25     decision in this case being faithful to the balance between

1    on one hand the need for Dr. Kitchens to receive any

2    appropriate accommodation under the ADA, that's essential,

3    and the need for the Board to administer its test fairly and

4    with integrity, which is also essential.

5           Let me make a note about this expungement context -

6    - concept.  It's something for you both to keep in mind.  I

7    have some serious doubts about whether I have the power to

8    expunge under the APA or whether that's an appropriate

9    remedy.  That's something we're going to need to -- I'm going

10   to need more briefing on.  We're going to need to figure that

11   out as the case goes on.

12          But setting that aside, it's clear to me that

13   there's no irreparable harm in holding off on any decision on

14   expungement until the case is decided.  So it kind of falls

15   under the same umbrella of irreparable harm.

16          All right.  So I'm going to deny the motion for

17   preliminary injunction because there's been no showing of

18   irreparable harm, which is a requirement under the applicable

19   Supreme Court and Third Circuit case law.  And then what's

20   going to happen here is, I'm going to be putting in a written

21   order reflecting the denial for the reasons in the record

22   that I've just discussed and will repeat them.  And because

23   I'm ruling from the bench here, you do not need to order the

24   transcript of this hearing on a rush basis.  Actually, you

25   don't need to order the transcript at all.  It's recorded and

 1    you can order it later, if one of you or both decide to do so

 2    for some reason.  So that's up to you, but you don't have to

 3    do it on my account with any immediacy, because I'm ruling.

 4         I will also be asking the parties to submit a

 5    discovery plan that leads up to a quick trial in May.  That's

 6    when we're going to do this.

 7         Does anyone have any blackout dates in May, you

 8    know, prepaid travel or other trials or anything?

 9         DR. KITCHENS:  No, Your Honor.

10         MS. MEW:  Nothing that's coming to mind, Your

11    Honor.  Nothing big.

12         THE COURT:  Okay.  So I'm going to put a trial date

13    on May and you guys will come up with a discovery plan and go

14    ahead with that.  So my order is also going to include a

15    referral to Magistrate Judge Wells, Carol Wells, for

16    settlement discussions.  Judge Wells I believe could be very

17    helpful to you.  She's really good, has a lot of experience.

18         I'm not going to try to engage you personally with

19    settlement discussions because I have -- I'm the one who has

20    to decide the case, so I shouldn't be doing the settlement

21    discussions.  I mean that's okay; like I said, Judge Wells is

22    super experienced, and I think in this particular case could

23    be of help.  So you'll see in the order a referral to -- to

24    Judge Wells for settlement discussions, which I strongly

25    encourage you to -- to engage with.

1           In thinking ahead about the trial, just bear in

2     mind, you know, based on everything I know, this will be a

3     bench trial, right, you know, not a jury trial.  And that

4     bench trial I'm anticipating, based on the location of the

5     witnesses, like what I saw today, I'm sort of thinking that

6     bench trial is going to be on video, too.  If you want to

7     have -- I would love for it to be in person personally, but I

8     am willing to make the accommodation and do it by video

9     because I'm just guessing that that's what everyone's going

10    to want to do.  If you change your mind at some point, let me

11    know.

12          All right.  So that's the end of the session for

13    today.  Again, thank you for all the work you put into this

14    and getting this ready.  I really appreciate it, and I'm

15    looking forward to seeing that discovery plan and hoping you

16    manage this case through to a super quick trial so we can get

17    a final resolution.  Okay?

18          MS. MEW:  Thank you, Your Honor.

19          DR. KITCHENS:  Thank you.

20          MS. MEW:  Thank you, Dr. Kitchens.  We'll be in

21    touch.

22          DR. KITCHENS:  Thank you, Caroline.

23          THE COURT:  All right.  Goodbye, everybody.

24          (Proceedings concluded at 4:40 p.m.)

25                        *  *  *  *  *

1                      C E R T I F I C A T I O N

2              We, the assigned court approved transcribers,

3     certify that the foregoing is a correct transcript from the

4     official electronic sound recording of the proceedings in the

5     above-entitled matter.

6

7      /s/Jacqueline Mullica                 April 5, 2023

8     JACQUELINE MULLICA

9

10     /s/Roxanne Galanti

11    ROXANNE GALANTI

12    DIANA DOMAN TRANSCRIBING, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25