# EXHIBIT B

# Instructions for Qualified Professionals and Applicants
# Regarding Providing Documentation

Below is information to guide professionals and applicants as to the information that should be included in a request for accommodations on the Pennsylvania bar examination. (Professionals: Please pay particular attention to Item 1 (e)). All requests for testing accommodations must be supported by a **comprehensive written evaluation report** from the qualified professional who conducted an individualized assessment of the applicant and is recommending accommodations on the bar examination on the basis of a disability. The burden of proof is on the applicant to establish the existence of a disability as defined by the ADA and to establish the need for testing accommodations.

The Pennsylvania bar examination is a two-day, six-hour-per-day (three-hour A.M. and three-hour P.M.) timed test. The first day consists of two written multistate performance tests (MPT) in the AM session, and six multistate essay examinations (MEE) in the PM session. Applicants have the option to use their personal laptop computers to complete the MPT and MEE portions of the bar examination. The second day consists of 100 multiple choice questions for both the AM and PM sessions. Applicants record their answers by darkening circles on an answer sheet that is scanned by a computer to grade the examination. The Pennsylvania bar examination <u>does not</u> test math skills. Also, factors such as grammar, penmanship, and spelling are not considered in the grading of the MPT and MEE answers. All applicants may take breaks and use the restroom at their convenience and receive an hour for lunch. Applicants may bring a beverage in a clear, resealable container.

## General Guidelines for All Medical Documentation

1. The following information is required for all documentation submitted in support of a request for an accommodation:

   A. **State a specific diagnosis of the disability.** A professionally recognized diagnosis for the particular category of disability is expected, (e.g., the DSM-IV or DSM-V diagnostic categories for learning disabilities).

   B. **Be current.** Because the provision of reasonable accommodations is based on assessment of the current impact of the applicant's disability on the testing activity, it is in the individual's best interest to provide recent documentation. As the manifestations of a disability may vary over time and in different settings, generally in most cases an evaluation should have been conducted within the past three years (e.g., low vision or neuromuscular conditions are often subject to change and should be updated for current functioning). Since applicants must establish "current impairment" in order to be eligible for accommodations, diagnostic evaluations for certain conditions that are more than 3 years old may be denied for that reason alone. However, the required recency of the evaluation will vary depending upon whether the disability or resulting functional limitation is changeable over time. For example, a learning disability may not need to be updated within three years, while certain physical and psychological disabilities may need to be evaluated more recently than three years depending on the specific nature of the disability.

   C. **Describe the specific diagnostic criteria and name the diagnostic tests and other measures used, including date(s) of evaluation, specific test results and a detailed interpretation of the test results.** This description should include the results of diagnostic procedures and tests utilized and should include relevant educational, developmental, and medical history. Specific test results should be reported to support the diagnosis (e.g., documentation for an applicant with multiple sclerosis should include specific findings on the neurological examination, including functional limitations and MRI or other studies, if relevant). Diagnostic methods used should be appropriate to the disability and should be consistent with current established professional practices within the field.

© 2022 Pennsylvania Board of Law Examiners

D. **Describe in detail the individual's limitations due to the diagnosed disability (i.e., a demonstrated impact on functioning related to taking the bar examination) and explain the relationship of the test/evaluation results to the identified limitations resulting from the disability.** The current functional impact on physical, perceptual and cognitive abilities should be fully described (e.g., an applicant with macular degeneration has reduced central vision which limits the ability to read).

E. **Recommend specific accommodations and/or assistive devices.** Include a detailed explanation of why these accommodations or devices are needed and how they will reduce the impact of the identified functional limitations.

If additional time to complete the examination is recommended, you must:

1) explain the rationale for the request;

2) specify the number of additional minutes per session (Essay A.M. and P.M., and MBE A.M. and P.M.) that you are recommending (see Information and Passing Standards);

3) specify if the additional time is for testing or breaks; and

4) submit supporting documentation that the request for additional time ameliorates the impact of the applicant's disability on the examination process without fundamentally altering the nature of the examination.

F. **Establish the professional credentials of the evaluator that qualify them to make the particular diagnosis, including license or certification information and specialization in the area of the diagnosis.** The evaluator should present evidence of comprehensive training and direct experience in the diagnosis and treatment of adults in the specific area of disability.

2. Additionally, if prior accommodations were not requested, required, or provided, the qualified medical/professional authorities must include a detailed explanation as to why accommodations were not sought or required in the past and why accommodations are now necessary.

## Guidelines for Documentation for Learning Disabilities

Documentation for applicants submitting a request for an accommodation based on a learning disability or other cognitive impairment should contain all of the items listed in the "General Guidelines for Medical Documentation" (General Guidelines) section. The following information explains the additional issues and documentation that must be addressed relative to learning disabilities.

Because learning disabilities are commonly manifested during childhood (though not always diagnosed), historical information regarding the individual's academic history and learning problems in elementary, secondary, and post secondary education should be documented and provided. Establishing an early onset of symptoms and impairment during childhood can be accomplished by providing copies of historical documents such as report cards from kindergarten, elementary school, middle school, and high school, prior psycho-educational testing reports, copies of Individualized Education Plans or 504 Plans, achievement test scores, teacher comments, and the like. Self-report alone, without any accompanying historical documents that validate developmentally deviant learning problems, are generally not sufficient to establish a learning disability.

Documentation must be comprehensive. Objective evidence of a substantial limitation in learning or performance must be provided. At a minimum, the current comprehensive evaluation should include the following:

1. **A qualified professional must conduct the evaluation.** The diagnostician must have comprehensive training in the field of learning disabilities and direct experience in working with an adult population.

viii

© 2022 Pennsylvania Board of Law Examiners

2. **Testing/assessment must be current.** The determination of whether an individual is substantially limited in functioning according to ADA criteria is based on assessment of the current impact of the impairment (see General Guidelines). Although a learning disability is normally lifelong, the severity and manifestations can change. The Board generally requires documentation from an evaluation conducted within the last five years to establish the current impact of the disability. A developmental disorder such as learning disability originates in childhood; therefore, information demonstrating a history of impaired functioning beginning in childhood, should also be provided.

3. **A diagnostic interview and history taking.** The assessment report should include a summary of a comprehensive diagnostic interview that includes relevant background information to support the diagnosis. In addition to the applicant's self-report, the report of assessment should include:

    a. A description of the presenting problem(s);
    b. A developmental history that establishes a childhood onset of impairment;
    c. Relevant academic history including results of prior standardized testing, grades, any suspensions or disciplinary actions, teacher comments describing classroom performance and behavior, study habits, and notable trends in academic performance;
    d. Family history, including primary language of the home and current level of fluency in English;
    e. Relevant psychosocial history;
    f. Relevant medical history including ruling out a medical basis for the present symptoms;
    g. Relevant employment history including a description of how their learning problems impacted them on past or current jobs;
    h. A discussion of dual diagnosis, alternative or co-existing mood, behavioral, neurological and/or personality disorders along with any history of relevant medication and current use that may impact the individuals learning; and,
    i. Exploration and ruling out of possible alternative explanations that may better explain their learning/testing difficulties (such as situational stressors, anxiety, depression, divorce, substance abuse, etc.)

4. **A formal psychoeducational or neuropsychological report must be provided.** The psychoeducational or neuropsychological report must be submitted on the letterhead of a qualified medical/professional authority and it must provide clear and specific evidence that a learning or cognitive disability does or does not exist. Diagnosticians need to build a solid case for their diagnostic conclusions incorporating not only testing scores and self-reported history, but including evidence of real world functional impairment relating to the learning problems. For example, in the case of a reading disability, diagnosticians should provide evidence of persistent reading deficiencies in the classroom (low reading groups, history of tutoring/extra help, teacher observations of deficient oral reading or comprehension, resource room assistance etc.) rather than a single test score on a standardized test such as the Nelson Denny Reading Test. The diagnosis must be based on the aggregate of test results, history and level of current functioning. It is not appropriate or acceptable to base any learning disability diagnosis on only one or two subtests. You must also present objective evidence of a substantial limitation to learning or performance that goes beyond mere test scores. Any tests used must be appropriately normed for the age of the patient and must be administered in the designated standardized manner. Minimally, the domains to be addressed should include the following:

    A. **Cognitive Functioning.** A complete cognitive assessment is essential with all subtests and standard scores reported. This is necessary to rule out intellectual limitation as an alternative explanation for academic difficulty and to identify cognitive strengths and weaknesses. Acceptable measures include but are not limited to: Wechsler Adult Intelligence Scale-IV (WAIS-IV); Woodcock Johnson Psychoeducational Battery-III: Tests of Cognitive Ability; and Kaufman Adolescent and Adult Intelligence Test.

    B. **Achievement.** A comprehensive achievement battery with all subtests and standard scores is essential. The battery must include current levels of academic functioning in relevant areas such as reading (decoding and comprehension), spelling, and written expression. Acceptable instruments include, but are not limited to the Woodcock Johnson Psychoeducational Battery-III: Tests of Achievement; and The Scholastic Abilities for Adults (SATA). Other specific achievement tests may be a useful supplement to the achievement battery

ix

© 2022 Pennsylvania Board of Law Examiners

when interpreted within the context of other diagnostic information.  However, please be advised that The Wide Range Achievement Test-3 (WRAT-3), the Peabody Individual Achievement Test (PIAT, PIAT-R), and the Nelson Denny Reading Test are not comprehensive diagnostic measures of achievement.  Therefore, they are not acceptable if used as the sole measure of achievement and are not sufficient to establish a learning disability.

C. **Information Processing.**  Evidence of processing deficiencies might involve short and long-term memory, sequential memory, auditory and visual perception/processing, auditory and phonological awareness, processing speed, executive functioning, and/or motor ability.  It is recommended that these functions be assessed to delineate the learning disability.  Acceptable measures include but are not limited to the Wechsler Memory Scale – IV (WMS-IV), Detroit Tests of Learning Aptitude – Adult (DTLA- A), and the Woodcock Johnson Psychoeducational Battery – III: Tests of Cognitive Ability (visual processing, short term memory, long term memory, processing speed).  It is helpful to show how any testing weaknesses in these areas impact the person's learning and real world functioning in other major life activities.

D. **Effort on Testing.**  The applicant's effort during testing should be monitored to determine the reliability of the diagnostic information and test results.  Information concerning the applicant's behavior and motivational level should be provided along with the results of symptom validity tests.

E. **Other Assessment.**  Procedures (such as inspection of historical medical, psychiatric, academic, or vocational records, use of Rating Scales, input from collateral informants who know the person well such as parents, teachers, tutors, coaches) or clinical observations of behavior and mental status may be integrated with the above instruments to help support a differential diagnosis or to disentangle the learning disability from co-existing neurological and/or psychiatric issues.  In addition to standardized test batteries, nonstandardized measures and informal assessment procedures may be helpful, especially if they serve to illuminate legitimate real world functional impairment in one or more life domains.

F. **Actual test scores must be provided (standard scores where available).**  Evaluators should use the most recent form of tests and should identify the specific test form as well as the norms used to compute the scores.  It is helpful to list all test data in a score summary sheet appended to the evaluation.

G. **Records of academic history must be provided.**  Because learning disabilities most commonly have an onset during childhood, early school records, report cards, or other evidence of developmentally deviant learning problems should be provided whenever possible.  Examples include kindergarten records, elementary, junior high, and high school report cards, written teacher comments, documentation from past tutors or learning specialists, past psychoeducational testing reports, 504 Plans, Individualized Education Plans (IEPs), college and law school transcripts, and the like.  These sorts of records are essential to help validate self-reported impairment and to help determine if the history of functional impairment is of sufficient magnitude to rise to the level of clinical diagnosis and a disability.  It is important to demonstrate the history of functional impairment via objective historical records; not just tell us about it.

H. **Clinicians must build a sufficient case for their diagnostic conclusions and document an attempt to rule out other possible causes for the learning problems.**  The evaluation should provide a sound rationale to support the learning disability diagnosis, show how the deficits currently impair the individual's ability to learn or perform, and show how they impair the person in standardized testing situations.  Again, no single test or subtest is a sufficient basis for a learning disability diagnosis.  The differential diagnosis must demonstrate that:

x

© 2022 Pennsylvania Board of Law Examiners

1) Significant difficulties started early and have persisted in the acquisition and use of listening, speaking, reading, writing or reasoning skills;

2) The problems being experienced are not primarily due to lack of other factors such as insufficient cognitive ability, lack of exposure to the behaviors/skills needed for academic learning or success in law school, or to an inappropriate match between the individual's ability and the instructional demands of the law school environment or the bar exam.

I. **A clinical summary must be provided.** A well-written diagnostic summary based on a comprehensive evaluative process is a necessary component of the clinician's report. Assessment instruments and the data they provide do not diagnose; rather, they provide important data that must be integrated with background information, historical information and current functioning. It is essential then that the evaluator builds a case for the diagnosis by integrating all of the assessment information gathered in a well-developed clinical summary. The following elements should be included in the clinical summary:

1) Demonstration of the evaluators having ruled out alternative explanations for the identified academic problems as a result of poor education, poor motivation and/or study skills, emotional problems, attentional problems, substance abuse, or cultural or language differences;

2) Indication of how patterns in cognitive ability, achievement and information processing (both in test scores and in real world functioning) are used to determine the presence of a learning disability;

3) A description of what historical records were inspected and how they demonstrate a history of impairment that would support a learning disability diagnosis;

4) A specific description of the substantial limitation to learning or performance presented by the learning disability and the degree to which it impacts the individual in the context of taking the Pennsylvania bar examination; and

5) Indication as to why specific accommodations are needed and how the accommodations will ease the impact of the disability in the testing (bar exam) situation.

J. **Each accommodation recommended by the evaluator must include a rationale.** The evaluator must describe the impact the diagnosed learning disability has on a specific major life activity as well as the degree of significance of this impact on the individual. The diagnostic report must include specific recommendations for accommodations and a detailed explanation as to why each accommodation is recommended. Accommodation requests are not granted on the basis of a diagnostic label; they should be tied to the history of functional impairment. The documentation should include any record of prior accommodations or auxiliary aids, including any information about specific conditions under which the accommodations were used and whether or not they were effective. However, a prior history of receiving accommodations in other academic/testing environments is not a guarantee one will receive accommodations on the Pennsylvania bar exam. Applicants must provide sufficient documentation to substantiate they have a current need for accommodations and that they meet the ADA's definition of "disabled". If no prior accommodation(s) has been provided, the qualified medical/professional authority must include a detailed explanation as to why no accommodation(s) was used or necessary in the past and why accommodation(s) is needed at this time.

© 2022 Pennsylvania Board of Law Examiners

**Guidelines for Documentation for AD/HD**

The diagnostic criteria as specified in the Diagnostic and Statistical Manual of Mental Disorders (DSM) are used as the basic guidelines for determination of an Attention Deficit Hyperactivity Disorder diagnosis.  An examiner should use either the DSM-IV or DSM-V.

1. An applicant warranting an AD/HD diagnosis must meet the basic DSM criteria including:

    A. Demonstrating that they exhibit a sufficient number of symptoms of Inattention and/or Hyperactivity/Impulsivity that have been persistent and maladaptive.  The exact symptoms should be specified and described in detail and it should be shown how the patient meets criteria for long-standing history, impairment, and pervasiveness.

    B. Since AD/HD is by definition a developmental disorder, the documentation should provide evidence to support an onset of symptoms and associated impairment by age 12.  Self-report is generally insufficient to substantiate such an onset of symptoms/impairment.  It is always helpful to provide historical records that validate self-reported impairment such as kindergarten, elementary, middle school, and high school report cards, Individualized Education Plans, 504 Plans, early psycho-educational testing reports, teacher comments, documentation from tutors or learning specialists, disciplinary records, and the like.

    C. Providing objective evidence demonstrating that current impairment from the symptoms is present in two or more settings.  Since AD/HD tends to affect people over time and across situations in multiple life domains, it is necessary to show that the impairment is not confined to only the academic setting or to only one circumscribed area of functioning.

    D. A determination that the symptoms of AD/HD are not a function of some other mental disorder (such as mood, anxiety, or personality disorders, substance abuse, low cognitive ability etc.) or situational stressor (such as divorce, grief reaction, family or financial crisis, etc.).

    E. Indicating the specific AD/HD diagnostic subtype; Combined Presentation; Predominantly Inattentive Presentation; or Predominantly Hyperactive/Impulsive Presentation.

2. In the case of AD/HD, applicants must submit

    A. Documentation/records to help establish an onset of symptoms prior to age 12 (report cards, IEPs, teacher comments, etc.)

    B. Documentation of your functional impairment in activities beyond academics and test taking

    C. Documentation of your current and past functional impairment beyond self-report

3. Important considerations regarding AD/HD documentation are:

    A. **Records of academic history must be provided.**  Because developmental disabilities such as AD/HD are usually evident (though not always diagnosed), historical information regarding the individual's academic and behavioral functioning in elementary and secondary education should be provided.  In addition, you must provide transcripts from both undergraduate and law school.  Self-report alone, without any accompanying historical documents that validate developmentally deviant AD/HD symptoms and impairment is not sufficient to substantiate an AD/HD diagnosis.

xii

© 2022 Pennsylvania Board of Law Examiners

B. **A qualified diagnostician must conduct the evaluation.** Professionals conducting assessments and rendering diagnoses of AD/HD must be qualified to do so. The evaluator should be licensed or otherwise properly credentialed and possess experience in the differential diagnosis of AD/HD and other psychiatric disorders. Diagnosticians should include a brief biographical sketch explaining that they possess the necessary training, experience, and credentials for diagnosing AD/HD in adults. The evaluator's name, title and professional credentials should be clearly stated in the documentation.

C. **Testing/assessment must be current.** The determination of whether an individual is "substantially limited" in functioning is based on assessment of the current impact of the impairment on the Pennsylvania bar examination (see General Guidelines). Because the provision of reasonable accommodations is based on assessment of the current impact of the examinee's disability on the testing activity, it is necessary to provide "recent" documentation. Since applicants must establish "current impairment" in order to be eligible for accommodations, diagnostic evaluations that are more than three years old may be denied for that reason alone. Therefore, professional declarations should be generally based on evaluations that are no more than three years old.

D. **The documentation should build a case for and provide sufficient evidence for the AD/HD diagnosis.** An AD/HD evaluation is primarily based on an in-depth history reflecting a chronic and pervasive history of AD/HD symptoms and associated impairment beginning during childhood and persisting to the present day. The evaluation should provide a broad, comprehensive understanding of the applicant's relevant background including family, academic, behavioral, social, vocational, medical, developmental, and psychiatric history. There should be an emphasis on how the AD/HD symptoms have manifested across various settings over time, how the applicant has coped with the problems, and what success the applicant has had in their coping efforts. Any past or current treatments for AD/HD and the impact of those treatments should be discussed (including medications, accommodations, tutoring, classroom modifications, counseling etc. Providing narrative documentation from collateral informants who know the applicant well (such as parents, spouses, siblings, teachers, professors, supervisors, tutors, coaches, etc.) can also help to illuminate and establish a credible history of significant functional impairment relating to AD/HD.

E. **Test scores alone are not sufficient to establish an AD/HD diagnosis.** Test scores or subtest scores alone should not be used as the sole basis for the diagnostic decision. Scores from subtests on the Wechsler Adult Intelligence Scale-III (WAIS-III), memory function tests, attention or mental tracking tests or continuous performance tests do not in and of themselves establish the presence or absence of AD/HD. They may, however, be useful as additional evidence of attentional problems that support the history of the applicant's functional impairment. A neuropsychological or psycho-educational assessment can be helpful in identifying the individual's pattern of strengths and weaknesses and whether there are patterns supportive of attention problems. However, a comprehensive testing battery alone, without illuminating a pattern of real world functional impairment, will not be sufficient to establish an AD/HD diagnosis or a disability. Checklists and/or AD/HD symptom rating scales can be a helpful supplement in the diagnostic process, but by themselves are not adequate to establish a diagnosis of AD/HD. When testing is used, standard scores must be provided for all normed measures.

F. **Effort on Testing.** The applicant's effort during testing should be monitored to determine the reliability of the diagnostic information and test results. Information concerning the applicant's behavior and motivational level should be provided along with the results of symptom validity tests.

G. **Each accommodation recommended by the evaluator must include a rationale.** Thus, in addition to a comprehensive diagnostic evaluation, the report should also address the history of prior accommodations the person has received and the objective of those accommodations. Accommodations are not granted on the basis of a diagnostic label. Instead, accommodation requests need to be tied to a history of functional impairment that supports their use. The evaluator must describe the type and degree of impact the AD/HD has (if one exists) on a specific major life activity and on the individual. The diagnostic report must include specific recommendations for accommodations that flow logically from the history of functional impairment.

© 2022 Pennsylvania Board of Law Examiners

    A detailed explanation must be provided as to why each accommodation is recommended and should be correlated to specific identified functional limitations.

H. **It is important to note that a prior history of receiving accommodations in previous academic/testing environments is not a guarantee one will be granted accommodations on the Pennsylvania bar exam.** Prior documentation may have been adequate in determining appropriate services or accommodations in the past. However, documentation should validate the need for accommodation based on the individual's current level of functioning and needs to show that the person currently meets the ADA's definition of "disabled". The documentation should include any record of prior accommodation or auxiliary aid, including information about specific conditions under which the accommodation was used (e.g., standardized testing, final exams, etc.). However, a prior history of accommodation without demonstration of a current need does not in itself warrant the provision of a similar accommodation. If no prior accommodation has been provided, the qualified medical/professional authority and/or individual being evaluated should include a detailed explanation as to why no accommodation was used in the past and why accommodation is necessary at this time.

I. **Documentation must include a specific diagnosis.** The report must include a specific subtype diagnosis of AD/HD based on the DSM diagnostic criteria. Evaluators should be particularly careful regarding individuals diagnosed with AD/HD with a predominantly inattentive presentation, since this is often confused with symptoms of poor organization, test anxiety, or memory/concentration difficulties that are evident only on a situational basis. Given that many individuals benefit from prescribed medications and therapies, a positive response to medication in and of itself neither supports nor negates the AD/HD diagnosis or the need for accommodation.

**Guidelines for Documentation for Posttraumatic Stress Disorder, Generalized Anxiety Disorder, Obsessive-Compulsive Disorder or other anxiety conditions. [To be collectively referred to as Anxiety Conditions]**

In a request for accommodations for an Anxiety Conditions diagnosis, applicants must submit

1. Documentation/records that explain the age/year of diagnosis, the time course for the development of symptoms, any treatment sought and the response, and the current symptom burden and its impact on cognition or other emotional factors that would directly impact test-taking ability.

2. Documentation of your current functional impairment beyond self-report.

Important considerations regarding Anxiety Conditions diagnosis documentation are:

1. **A qualified diagnostician must conduct the evaluation.** Professionals conducting assessments and rendering diagnoses of Anxiety Conditions diagnosis must be qualified to do so. The evaluator should be licensed or otherwise properly credentialed and possess experience in the differential diagnosis of Anxiety Conditions diagnosis and other psychiatric disorders. Diagnosticians should include a brief biographical sketch explaining that they possess the necessary training, experience, and credentials for diagnosing Anxiety Conditions in adults. The evaluator's name, title and professional credentials should be clearly stated in the documentation.

2. **Testing/assessment must be current.** The determination of whether an individual is "substantially limited" in functioning is based on assessment of the current impact of the impairment on the Pennsylvania bar examination (see General Guidelines). Because the provision of reasonable accommodations is based on assessment of the current impact of the examinee's disability on the testing activity, it is necessary to provide "recent" documentation. Since applicants must establish "current impairment" in order to be eligible for accommodations, diagnostic evaluations that are more than three years old may be denied for that reason alone. Therefore, professional declarations should be generally based on evaluations that are no more than three years old.

3. **The documentation should build a case for and provide sufficient evidence for the Anxiety Conditions diagnosis.** An evaluation for Anxiety Conditions is primarily based on a detailed history reflecting the progress

© 2022 Pennsylvania Board of Law Examiners

of anxiety-like symptoms over time. There should be an emphasis on how the symptoms have manifested across various settings over time, how the applicant has coped with the problems, and what success the applicant has had in their coping efforts. Any past or current treatments for Anxiety Conditions and the impact of those treatments should be discussed (including medications, psychotherapy, accommodations, tutoring, classroom modifications, counseling etc.) Providing narrative documentation from collateral informants who know the applicant well (such as parents, spouses, siblings, teachers, professors, supervisors, tutors, coaches, etc.) can also help to illuminate and establish a credible history of significant functional impairment relating to Anxiety Conditions.

4. **Self-report rating scales alone are not sufficient to establish an Anxiety Condition diagnosis.** Checklists and self-report rating scales for PTSD (PCL-5, DAPS, TSI-2), OCD (Y-BOCS), and Generalized Anxiety Disorder (Beck Anxiety Inventory) can be helpful in narrowing the differential diagnosis and measuring the symptom burden over time but do not replace the need for in-depth history and clinical assessment. Broad measures that assess multiple diagnoses with built in validity scales are preferred (SCL-90, MMPI-2-RF, PAI)

5. **Cognitive test scores alone are not sufficient to establish a cognitive impairment from an Anxiety Condition.** Commonly applicants report cognitive effects of their anxiety condition. Test scores or subtest scores alone should not be used as the sole basis for the diagnostic decision. A neuropsychological or psycho-educational assessment, particularly with measurements of Academic Fluency and Processing Speed, can be helpful in identifying the individual's pattern of strengths and weaknesses and whether there are patterns supportive of acquired cognitive problems. However, a comprehensive testing battery alone, without illuminating a pattern of real world functional impairment, will not be sufficient to establish a disability. Scores from subtests on the Wechsler Adult Intelligence Scale-IV (WAIS-IV), memory function tests, attention, executive function, language fluency, or continuous performance tests do not in and of themselves establish the presence or absence of cognitive impairment. They may, however, be useful as additional evidence of cognitive problems that support the applicant's claim of functional impairment. When testing is used, standard scores must be provided for all normed measures.

6. **Effort on Testing.** The applicant's effort during testing should be monitored to determine the reliability of the diagnostic information and test results. Information concerning the applicant's behavior and motivational level should be provided along with the results of symptom validity tests.

7. **Each accommodation recommended by the evaluator must include a rationale.** Thus, in addition to a comprehensive diagnostic evaluation, the report should also address the history of prior accommodations the person has received and the objective of those accommodations. Accommodations are not granted on the basis of a diagnostic label. Instead, accommodation requests need to be tied to evidence of functional impairment that supports their use. The evaluator must describe the type and degree of impact the Anxiety Condition has (if one exists) on a specific major life activity and on the individual. The diagnostic report must include specific recommendations for accommodations that flow logically from applicant's current reported symptoms. A detailed explanation must be provided as to why each accommodation is recommended and should be correlated to specific identified functional limitations.

8. **It is important to note that a prior history of receiving accommodations in previous academic/testing environments is not a guarantee one will be granted accommodations on the Pennsylvania bar exam.** Prior documentation may have been adequate in determining appropriate services or accommodations in the past. However, documentation should validate the need for accommodation based on the individual's current level of functioning and needs to show that the person currently meets the ADA's definition of "disabled." The documentation should include any record of prior accommodation or auxiliary aid, including information about specific conditions under which the accommodation was used (e.g., standardized testing, final exams, etc.). However, a prior history of accommodation without demonstration of a current need does not in itself warrant the provision of a similar accommodation. If no prior accommodation has been provided, the qualified medical/professional authority and/or individual being evaluated should include a detailed explanation as to why no accommodation was used in the past and why accommodation is necessary at this time.

9. **Documentation must include a specific diagnosis.** The diagnostic criteria as specified in the Diagnostic and

© 2022 Pennsylvania Board of Law Examiners

Statistical Manual of Mental Disorders (DSM) are used as the basic guidelines for determination of an Anxiety Conditions diagnosis. An examiner should use DSM-5. An applicant warranting any Anxiety Conditions diagnosis must meet the basic DSM-5 criteria for that specific diagnosis. Symptoms of poor organization, test anxiety, or memory/concentration difficulties that are evident only on a situational basis are not a direct result of a disabling mental illness. Given that many individuals benefit from prescribed medications and therapies, a positive response to medication and/or psychotherapy in and of itself neither supports nor negates the Anxiety Conditions diagnosis or the need for accommodation.

**Guidelines for Documentation for Neurocognitive Disorder due to Concussion or Traumatic Brain Injury (TBI) [note for the purpose of this documentation concussion and TBI are equivalent]**

In a request for accommodations for a TBI, applicants must submit

1. Documentation/records from the time of the injury (e.g. EMS or emergency room medical records) that indicate injury to the head, altered consciousness at the time, and/or amnesia of a period of time immediately before or subsequent to the injury.

2. Documentation of symptoms consistent with TBI (i.e. post-concussive syndrome) in the days/weeks following the injury.

3. Documentation of your current functional impairment beyond self-report.

Important considerations regarding TBI documentation are:

1. **A qualified diagnostician must conduct the evaluation.** Professionals conducting assessments and rendering diagnoses of Neurocognitive Disorder must be qualified to do so. The evaluator should be licensed or otherwise properly credentialed and possess experience in the differential diagnosis of Neurocognitive Disorder and other psychiatric disorders. Diagnosticians should include a brief biographical sketch explaining that they possess the necessary training, experience, and credentials for diagnosing Neurocognitive Disorder in adults. The evaluator's name, title and professional credentials should be clearly stated in the documentation.

2. **Testing/assessment must be current.** The determination of whether an individual is "substantially limited" in functioning is based on assessment of the current impact of the impairment on the Pennsylvania bar examination (see General Guidelines). Because the provision of reasonable accommodations is based on assessment of the current impact of the examinee's disability on the testing activity, it is necessary to provide "recent" documentation. Since applicants must establish "current impairment" in order to be eligible for accommodations, diagnostic evaluations that are more than three years old may be denied for that reason alone. Therefore, professional declarations should be generally based on evaluations that are no more than three years old. Furthermore, TBI symptoms typically improve over two years after the injury. Evaluations prior to closure of the two year may not be indicative of permanent impairment and may need to be repeated.

3. **The documentation should build a case for and provide sufficient evidence for the Neurocognitive Disorder diagnosis.** A Neurocognitive Disorder evaluation is primarily based on a detailed history reflecting the progress of post-TBI symptoms over time. There should be an emphasis on how the cognitive symptoms have manifested across various settings over time, how the applicant has coped with the problems, and what success the applicant has had in their coping efforts. Any past or current treatments for Neurocognitive Disorder and the impact of those treatments should be discussed (including medications, PT/OT/Speech Therapy/Neurorehabilitation, accommodations, tutoring, classroom modifications, counseling etc.) Providing narrative documentation from collateral informants who know the applicant well (such as parents, spouses, siblings, teachers, professors, supervisors, tutors, coaches, etc.) can also help to illuminate and establish a credible history of significant functional impairment relating to Neurocognitive Disorder. Narrative documentation from collateral informants alone is not sufficient to establish a Neurocognitive Disorder.

© 2022 Pennsylvania Board of Law Examiners

4.  **Test scores alone are not sufficient to establish a Neurocognitive Disorder diagnosis.** Test scores or subtest scores alone should not be used as the sole basis for the diagnostic decision. Scores from subtests on the Wechsler Adult Intelligence Scale-IV (WAIS-IV), memory function tests, attention, executive function, language fluency, or continuous performance tests do not in and of themselves establish the presence or absence of Neurocognitive Disorder. They may, however, be useful as additional evidence of cognitive problems that support the applicant's claim of functional impairment. A neuropsychological or psycho-educational assessment can be helpful in identifying the individual's pattern of strengths and weaknesses and whether there are patterns supportive of acquired cognitive problems. However, a comprehensive testing battery alone, without illuminating a pattern of real world functional impairment, will not be sufficient to establish a Neurocognitive Disorder diagnosis or a disability. Checklists and/or symptom rating scales can be a helpful supplement in the diagnostic process, but by themselves are not adequate to establish a diagnosis of Neurocognitive Disorder. When testing is used, standard scores must be provided for all normed measures.

5.  **Effort on Testing.** The applicant's effort during testing should be monitored to determine the reliability of the diagnostic information and test results. Information concerning the applicant's behavior and motivational level should be provided along with the results of symptom validity tests.

6.  **Each accommodation recommended by the evaluator must include a rationale.** Thus, in addition to a comprehensive diagnostic evaluation, the report should also address the history of prior accommodations the person has received and the objective of those accommodations. Accommodations are not granted on the basis of a diagnostic label. Instead, accommodation requests need to be tied to evidence of functional impairment that supports their use. The evaluator must describe the type and degree of impact the Neurocognitive Disorder has (if one exists) on a specific major life activity and on the individual. The diagnostic report must include specific recommendations for accommodations that flow logically from the development of functional impairment from the identified TBI. A detailed explanation must be provided as to why each accommodation is recommended and should be correlated to specific identified functional limitations.

7.  **It is important to note that a prior history of receiving accommodations in previous academic/testing environments is not a guarantee one will be granted accommodations on the Pennsylvania bar exam.** Prior documentation may have been adequate in determining appropriate services or accommodations in the past. However, documentation should validate the need for accommodation based on the individual's current level of functioning and needs to show that the person currently meets the ADA's definition of "disabled." The documentation should include any record of prior accommodation or auxiliary aid, including information about specific conditions under which the accommodation was used (e.g., standardized testing, final exams, etc.). However, a prior history of accommodation without demonstration of a current need does not in itself warrant the provision of a similar accommodation. If no prior accommodation has been provided, the qualified medical/professional authority and/or individual being evaluated should include a detailed explanation as to why no accommodation was used in the past and why accommodation is necessary at this time.

8.  **Documentation must include a specific diagnosis.** The diagnostic criteria as specified in the Diagnostic and Statistical Manual of Mental Disorders (DSM) are used as the basic guidelines for determination of a Neurocognitive Disorder diagnosis. An examiner should use DSM-5. Given that many individuals benefit from prescribed medications and therapies, a positive response to medication, PT/OT/Speech pathology, and/or neurorehabilitation in and of itself neither supports nor negates the Neurocognitive Disorder diagnosis or the need for accommodation. An applicant warranting a Neurocognitive diagnosis must meet the basic DSM criteria including:

    A.  Evidence of modest cognitive decline from a previous level of performance in one or more cognitive domains (complex attention, executive function, learning and memory, language, perceptual-motor, or social cognition) based on:

        1)  Concern of the individual, a knowledgeable informant, or the clinician that there has been mild decline in cognitive function; and

xvii

    2)     A modest impairment in cognitive performance, preferably documented by standardized neuropsychological testing or, in its absence, another qualified clinical assessment.

  B.   The cognitive deficits are not better explained by another mental disorder (e.g. major depressive disorder, schizophrenia.)

  C.   Rule out other causes of Neurocognitive Disorder including: Alzheimer's Disease, Frontotemporal Lobar Degeneration, Lewy Body Disease, Vascular Disease, Substance/Medication Use, HIV Infection, Prion Disease, Parkinson's Disease, Huntington's Disease, or Another Medical Condition. Evaluators should be particularly careful considering individuals claiming a Neurocognitive Disorder who demonstrate symptoms of poor organization, test anxiety, or memory/concentration difficulties that are evident only a situational basis.

**Guidelines for Documentation for Visual Disabilities**

A qualified evaluator who is familiar with the disability of the individual must submit a vision evaluation report that includes the following information**:**

1. Detailed Visual and Medical History

2. Current Diagnosis

3. Best Corrected Visual Acuities for Distance and Near Vision

4. Eye Health (both external and internal evaluations)

5. Diagnosis-specific Findings (address all relevant areas)

   a. Visual Field: threshold field, not confrontation (provide measurements, and copies of reports).
   b. Binocular Evaluation: eye deviation (provide measurements), diplopia, suppression, depth, perception, convergence, etc. Specify the distance or near point.
   c. Accommodative Skills: at near point, with and without lenses (provide measurements).
   d. Oculomotor Skills: saccades, pursuits, tracking

6. Describe how the individual's diagnosis and symptomology relate to his/her reading ability and why each recommended accommodation is needed. Your recommendation cannot be supported solely by a history or prior accommodation

© 2022 Pennsylvania Board of Law Examiners