April 24, 2023

The Honorable John F. Murphy
U.S. District Court for the Eastern District of Pennsylvania
601 Market Street, Room 3809
Philadelphia, PA 19106

   RE: Kitchens, M v. National Board of Medical Examiners
      2: 22-cv-03301-JMY

Dear Judge Murphy,

   Pursuant to the Court's March 13, 2023 Order (D.E. 34) and in response to the Defendant's letter requesting Leave to file a Motion for Partial Summary Judgment in the above captioned matter, please allow this letter to be my request for leave to file a Motion for Summary Judgment, or in the alternative, a Cross-Motion for Summary Judgment.

   Due to inconsistencies between the parties Amended Joint Report (D.E. 33) and dates set out in the Court's Order, I have attached hereto my Memorandum in Support of My Motion for Summary Judgment to be filed with exhibits to be supplemented, pending the Court's further instructions.

   In short: Defendant's presented issues in the case are an attempt to bifurcate the sole issue before this Court – whether the NBME violated Dr. Kitchens' rights under the ADA.

   I, too, seek leave to move for a motion for summary judgment. If summary judgment were granted in my favor, the issue of expungement as an appropriate remedy may be addressed in a subsequent filing or during oral argument(s), whichever is most convenient for the Court.        Respectfully,

            */s/ Dr. Markcus Kitchens*
            Dr. Markcus Kitchens

Cc: Caroline M. Mew (via ECF)
   Jared Bayer (via ECF)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DR. MARKCUS KITCHENS, JR. | ) | |
| PLAINTIFF | ) | |
| | ) | CIVIL ACTION NO.: |
| v. | ) | 2:22-CV-03301-JMY |
| | ) | |
| UNITED STATES MEDICAL LICENSING EXAMINATION, | ) | |
| ET. AL | ) | |
| DEFENDANTS | ) | |
| | ) | |

---

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

---

## <u>INTRODUCTION</u>

Dr. Kitchens is a disabled individual with Attention Deficit Hyperactivity Disorder ("ADHD") and anxiety and qualifies for reasonable accommodations for the USMLE STEP examinations under the Americans with Disabilities Act. The National Board of Medical Examiners, in its overzealous and discriminatory attempt to gatekeep the USMLE examinations, repeatedly denied Dr. Kitchens' application for testing accommodations. Moreover, the NBME's violation of Dr. Kitchens' rights under the ADA does not end once he receives accommodations; where each state must review and individually approve Dr. Kitchens for licensure to practice medicine in the respective state(s), the effects of the NBME's discriminatory actions will be permanently felt. Summary judgment is appropriate since the NBME's claims of insufficient documentation falls short of the ADA's requirements and there are no genuine issues of material fact.

## <u>FACTUAL BACKGROUND</u>

At all times complained of, Dr. Kitchens is an African American, qualified, board-eligible medical graduate from the Medical University of Lublin. In 1999 or 2000, Dr. Kitchens' mother, under personal observation and recommendation from schoolteachers, had Dr. Kitchens evaluated by his primary care

EXHIBIT

1

pediatrician.[1] His pediatrician, Dr. Jordan, diagnosed Dr. Kitchens with attention deficit-hyperactivity disorder and recommended he be prescribed Ritalin.[2] His mother, incongruity with the African American diaspora's understanding of mental health and the United States medical system, refused the recommended treatment. Rather, his mother began implementing an organized schedule of individualized instruction, after school educational programs, and informally requesting accommodations from Dr. Kitchens' schoolteachers.[3]

During this same time period, Rivermont elementary school – having recognized Dr. Kitchens' need, placed him in the Supportive Alternative Individualized Learning program (hereinafter "SAIL" or "SAIL Program").[4] The SAIL Program is "a specialized program that is student-centered and uses an inquiry-based approach to teaching and learning… [that] follows the… curriculum unless modified…."[5] After participating in SAIL, Dr. Kitchens was separated from his peers and given additional, individualized instruction by way of tutoring programs such as Kumon, Hooked on Phonics, and tutoring with relatives after school.[6] After his diagnosis, Dr. Kitchens' mother spoke with each teacher about his "hyperactivity, short attention span, and difficulties focusing in classes."[7] From third grade to middle school, Dr. Kitchens received informal accommodations such as "a desk to myself… separat[ion] from my classmates… sat near the teacher or to the side away from classmates…."[8]

Dr. Kitchens attended Tyner Middle Academy from 2003-2006. Dr. Kitchens' mother continued to speak with each teacher about his "hyperactivity, short attention span, and difficulties focusing in classes."[9] During this time, Dr. Kitchens developed increasingly stricter, self-implemented accommodation tactics such as planners, multiple alarms, a routine-consistent schedule, and creating a distraction-free environment

---

[1] *See* Declaration of Missie King, ¶8-9.
[2] *Id*.
[3] *Id.*
[4] *See* Exhibit xx.
[5] *See* Exhibit xx.
[6] *See* Exhibit xx.
[7] *Id.*
[8] *Id* at ¶13.
[9] *Id.*

to work on classwork, homework, and study for exams/quizzes.[10] Dr. Kitchens continued to receive individual tutoring with relatives who would "go over homework assignments, teach time management strategies, and would [teach] creative memory tools to help with recall."[11] Despite implementing self-accommodating tactics and utilizing the tools learned through individualized tutoring, Dr. Kitchens still struggled to excel in reading-comprehension heavy subjects like social studies and language arts. While the STEM subjects consistently score in the middle-upper 'B' range, Dr. Kitchens' middle school transcript demonstrates an almost five (5) point difference in language arts and social studies-history.[12]

Dr. Kitchens attended Tyner High Academy from 2006-2010. During this time, Dr. Kitchens created and implemented several series of tools in order to manage his ADHD, including but not limited to "having specific location(s) for personal belongings and taking photographs of where those belongings were… studying in [Dr. Kitchens' bed]room in complete silence, using sticky notes as reminders, and audio tapes of books in school."[13] While in high school, Dr. Kitchens sat for the ACT three different times without accommodations.[14]

From 2010-2014, Dr. Kitchens attended Berea College, located in Berea, Kentucky. While at Berea College, Dr. Alyssa Hanna, one of my professors, noticed that I was struggling in my exam(s) and quizzes while in the classroom.[15] Based on what she observed, Dr. Hanna provided unofficial accommodations - "tak[ing] examination(s) in [Dr. Hanna's] office at a separate day and time from [Dr. Kitchens'] peers."[16] On January 10, 2013, Dr. Kitchens was assessed by disability services coordinator, Cynthia Reed; it was she who recommended official accommodations based on her diagnostic interview and noted that Dr. Kitchens, while not currently on academic probation, was close to.[17] Upon Dr. Kitchens' request, Cynthia Reed referred Dr. Kitchens to Berea College's medical staff for medication.[18] On January 11, 2013, Dr.

---

[10] *Id*.
[11] *Id* at ¶16.
[12] *See* Exhibit xx.
[13] *See* Exhibit xx at ¶18-19.
[14] *See* Exhibit xx.
[15] *See* Exhibit xx at ¶22.
[16] *See* Exhibit xx at ¶6. Hanna affidavit.
[17] *See* Exhibit xx. BC Disability Services Note 1/10/2013.
[18] *Id*.

Kitchens saw Dr. Miriam David for attention deficit disorder; Dr. David referred Dr. Kitchens for a third-party evaluation.[19] From February 7, 2013 to June 19, 2014, Dr. Kitchens returned to Dr. David for ADD and was prescribed Adderall.[20] On April 5, 2014, Dr. Kitchens sat for the MCAT without accommodations; Dr. Kitchens scored a 476, testing within the zero percentile (0%).[21] On July 8, 2014, Dr. Kitchens was seen by Colleen Ambrose at White House Clinic for an unrelated complain; during this appointment, Dr. Kitchens was diagnosed with ADD.[22] Dr. Kitchens matriculated from Berea College in Summer, 2014, with a grade point average of 2.62.[23]

Upon graduating from Berea College with a Bachelor of Arts degree in music, Dr. Kitchens worked as a car salesman – working with customers to sell automobiles, warranties, and trade in their vehicles. Not long after starting as a car salesman, Dr. Kitchens transitioned from a car salesman to manager of a grocery store. Both of these positions were accepted due to their minimal reliance on reading-comprehension or sustained focus for significant periods of time. With both positions, Dr. Kitchens was able to pause tasks and engage in physical activity such as walking around the store, interacting with customers and employees, and sit in on test-drives.

On February 15, 2016, Dr. Kitchens returned to White House Clinic for a medical school physical before attending the Medical University of Lublin ("MUL"). To Dr. Kitchens' knowledge and belief, Adderall is illegal in Poland; during his medical school education, he took an over-the-counter substitute for Adderall.[24] For each exam while at MUL, Dr. Kitchens was allowed three (3) retakes, for each retake, the time limit to complete the exam(s) were relaxed and less students sat for the retake(s). By the third retake, Dr. Kitchens had received relaxed time limits and was essentially in a one-on-one setting to complete

---

[19] *See* Exhibit xx. 1/11/2013 progress note.
[20] *See* Exhibits xx. 2/7/2014-6/9/2014 progress notes.
[21] *See* Exhibit xx. MCAT score.
[22] *See* Exhibit xx. WHC July 8, 2014 progress note.
[23] *See* Exhibit xx. Berea College Transcript.
[24] *See* Exhibit xx. AK Amazon order history

the exam.[25] During the first two years of medical school, Dr. Kitchens received predominantly Cs and Bs with informal accommodations; however, during clinical rotations, Dr. Kitchens received straight A's.[26]

On October 27, 2020, Dr. Kitchens registered for the NBME Comprehensive Basic Science Examination.[27] Dr. Kitchens applied for and was granted additional time by MUL for the CBSE. On or about January, 2021, Dr. Kitchens received his medical doctorate from MUL and began studying for the USMLE Step Exams. Soon thereafter, the COVID-19 pandemic shut down prometric centers around the country. It was not until approximately October, 2021, Dr. Kitchens applied for formal accommodations on the USMLE STEP 1 Examination with the NBME.[28] While awaiting the NBME's decision, Dr. Kitchens continued studying for the USMLE. On February 8, 2022, NBME sent a letter to Dr. Kitchens denying his application request.[29]

On February 14, 2022, six (6) days after the NBME's decision, Dr. Kitchens sat for a Comprehensive Basic Science Self-Assessment ("CBSSA"); Dr. Kitchens received a 212 on the assessment, with a projected 'actual performance range' from "202-228" should the STEP 1 exam be taken within a week.[30] Dr. Kitchens sat for the USMLE on February 25, 2022, and failed in the approximate fortieth percentile (40%).Undeterred, Dr. Kitchens began studying again and took another CBSSA on March 1, 2022, receiving a seventy seven (77%) 'total equated percent correct score'.[31] Dr. Kitchens continued studying and took a third CBSSA on April 1, 2022, receiving a sixty nine (69%) 'total equated percent correct score'.[32] On May 9, 2022, Dr. Kitchens sat for the STEP 1 exam; despite three months of studying and two additional CBSSA's that indicated a passing score, Dr. Kitchens failed in the fortieth percentile again.[33]

---

[25] *See* Exhibit xx. Plaintiff's Declaration.
[26] *See* Exhibit xx. MUL Transcript.
[27] *See* Exhibit xx. CBSSE Exam Confirmation.
[28] *See* Exhibit xx. 10/2021 Accommodation Application.
[29] *See* Exhibit xx. Denial letter.
[30] *See* Exhibit xx. CBSSA 2/14/22.
[31] *See* Exhibit xx. CBSSA
[32] *See* Exhibit xx. CBSSA
[33] *See* Exhibit xx. SCORE REPORT.

Aware of the upcoming deadlines for residency, Dr. Kitchens sat for the USMLE STEP 2 exam on May 28, 2022; Dr. Kitchens failed with a score of one hundred sixty-nine (169).[34] Frustrated, Dr. Kitchens attempted the USMLE STEP 2 again a month later on June 29, 2022. On this attempt, Dr. Kitchens received a score of one hundred ninety-five (195) – an almost thirty-point jump – despite not changing any of his study habits nor tools.[35] Becoming exceedingly frustrated, Dr. Kitchens applied for accommodations with the NBME a second time on August 30, 2022.[36] Defendant NBME contacted Dr. Kitchens and advised that unless Dr. Kitchens had any additional-new documentation to provide, the NBME would not review his application for accommodations. After receiving the second rejection for accommodations, Dr. Kitchens requested a score-recheck for the June Step 2 examination; on September 21, 2022, the NBME responded indicating that his score was accurate.[37] Dr. Kitchens sat for the STEP 1 examination for a third time on September 29, 2022; Dr. Kitchens failed with a score in the approximate fiftieth (50%) percentile.[38]

On February 3, 2023, upon financial ability and availability, Dr. Kitchens underwent the Connors Continuous Performance Test-Third Edition with Tina Holbrook.[39] Days later on February 7-8, 2023, Dr. Kitchens underwent an evaluation for ADHD with Christina Bacon. Both assessments indicated a high likelihood of attention deficit hyperactivity disorder.[40]

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[41] For an issue

---

[34] *See* Exhibit xx. Score report.
[35] *See* Exhibit xx. Score report.
[36] *See* Exhibit xx. 8/30/22 application.
[37] *See* Exhibit xx. Score recheck letter.
[38] *See* Exhibit xx. 9/29/22 score report.
[39] *See* Exhibit xx. Connors cpt
[40] *See* Exhibit xx. Bacon report
[41] *See* Fed-. R. Civ. P. 56(a), (c); *Prudential Ins. Co. of Am. v. Eisen*, No. 11-05872, 2012 U.S. Dist. LEXIS 34982, at *9 (E. D. Pa. Mar. 15, 2012).

to be "genuine" a "reasonable fact-finder must be able to return a verdict in favor of the non-moving party."[42] A factual dispute is "material" if it might affect the outcome of the case under governing law.[43]

While genuine disputes of material fact must be resolved in favor of the party opposing the motion, "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."[44] "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."[45] If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.[46]

In *Thomas v. NBME-National Board of Medical Examiners*, the Court summarized the summary judgment standard in the context of a pro se case as follows:

> In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. Further, a court may not weigh the evidence or make credibility determinations. Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate. Finally, although the Court liberally construes Plaintiff's pro se filings, Plaintiff must set forth facts, supported by affidavits or other evidence of record, sufficient to survive summary judgment.[47]

---

[42] *See Prudential Ins. Co. of Am.*, 2012 U.S. Dist. LEXIS 34982, at *9-10 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[43] *See Demeter v. Buskirk*, No. 03-790, 2003 U.S. Dist. LEXIS 18896, at *5 (E.D. Pa. Oct. 20, 2003) (citing *Anderson*, 477 U.S. at 248).

[44] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[45] *See Berkeley Inv. Group. Ltd. v. Colkitt,* 455 F.3d 195, 201 (3d Cir. 2006).

[46] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[47] *Thomas v. NBME-National Board of Medical Examiners*, 2015 WL 667077, 2 (E.D. Pa. 2015). (Footnotes omitted).

Likewise, "[c]onclusory statements, general denials, and factual allegations not based on personal knowledge would be insufficient to avoid summary judgment."[48] "Plaintiff's subjective beliefs are insufficient to withstand a motion for summary judgment."[49]

## ARGUMENT

Dr. Kitchens is an individual who meets the DSM-5 criteria for Attention Deficit Hyperactivity Disorder (ADHD) and the statutory requirements for a disability under the Americans with Disabilities Act (ADA). The documents provided to the National Board of Medical Examiners (NBME) with his application for accommodations were sufficient to establish that Dr. Kitchens was substantially impaired by his ADHD. The documents included medical records with active diagnoses for ADHD and anxiety dating back to 2013 and 2017, respectively; a letter from Dr. Kitchens' treating physician recommending accommodations; and a personal statement which detailed his symptoms and functional limitations.

Throughout the application process, the NBME improperly denied Dr. Kitchens reasonable accommodations and now attempts to shift the blame onto Dr. Kitchens for Defendant's inadequacies, and even go so far as to denounce all of Dr. Kitchens' treating physicians by claiming Dr. Kitchens is 'drug-seeking' and 'malingering' for an advantage over similarly situated examinees. The NBME would rather ask this Court to ignore the repeated denials of Dr. Kitchens' application for reasonable accommodations in order to penalize a disabled, African-American aspiring physician for documentation that no longer exists. Dr. Kitchens' application was only considered, and rejected by, an evaluator who failed to consider the cultural biases within the African American diaspora. The NBME, improperly relying on the opinion of an internal evaluator, determined that Dr. Kitchens was not disabled enough for accommodations that would allow him to demonstrate his knowledge and competency without being hindered by his disability.

    **I.**    **DEFENDANT NBME VIOLATED DR. KITCHENS' RIGHTS UNDER THE ADA**

---

[48] *See Domenech v. City of Philadelphia*, 2009 U.S. Dist. LEXIS 34902, * 3 (E.D.Pa. April 23, 2009)(citing *Olympic Junior, Inc., v. David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972)(citations omitted)).
[49] *See Sencherey v. Stout Rd. Assocs.*, 2011 U.S. Dist. LEXIS 14179, * 24 (E.D. Pa. Feb 11, 2011).

Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12181-12189 prohibits discrimination on the basis of disability.[50] Case law interpreting the ADA discusses a three part test for whether a violation has taken place. "A plaintiff must show (1) that [he] is disabled, (2) that [his] requests for accommodations are reasonable, and (3) that those requests have been denied."[51] The parties have stipulated to the second and third part of this test, and are not disputed. The sole issue in the case at hand is whether Dr. Kitchens is considered disabled pursuant to the ADA.

### a. Dr. Kitchens is Disabled as Defined by the ADA

An individual has a disability if he is substantially limited in a major life activity.[52] Therefore, to establish a prima facie case of disability, [Dr. Kitchens] must show "that []he has or has a record of (1) a physical or mental impairment (2) that substantially limits (3) one or more of her major life activities."[53] Mental impairment includes intellectual disability, and concentration is a major life activity.[54]

There is no dispute as to the first or third element of the analysis: The parties have stipulated that ADHD is recognized as a mental impairment under regulations implementing the ADA;[55] the USMLE, as a three-part standardized licensing exam, assesses examinee's ability to understand basic and clinical science knowledge and skills necessary to the practice of medicine which involves high levels of "reading, concentration, [and] thinking."[56] Therefore, the sole issue in this case is whether Dr. Kitchens' anxiety and ADHD 'substantially limits him compared to the general population.

### i. Dr. Kitchens' diagnoses conforms with the DSM-5

The Diagnostic and Statistical Manual of Mental Disorders – Fifth Edition (hereinafter "DSM-5") establishes that ADHD is a

---

[50] *See e.g., Bragdon v. Abbott,* 524 U.S. 624, 631-32 (1998).
[51] *Agranoff v. Law Sch. Admission Council, Inc.*, 97 F. Supp. 2d 86, 87 (D. Mass. 1999) *quoting D'Amico v. New York State Bd. of Law Examiners*, 813 F.Supp. 217, 221 (W.D.N.Y.1993). *See also Ware v. Wyoming Bd. of Law Examiners,* 973 F.Supp. 1339, 1356 (D.Wyo.1997) (citing D'Amico).
[52] *42 U.S.C. §12102.*
[53] *Doherty v. Nat'l Bd. of Med. Examiners* (5th Cir. 2019).
[54] *See* 28 C.F.R. § 36.105(b)(1)(ii), (c)(1)(i).
[55] *See* 28 C.F.R. §36.105(B)(2).
[56] *See* 28 C.F.R. §36.105(c).

> "persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development, as characterized by… the following symptoms have persisted for at least six (6) months to a degree that is inconsistent with developmental level and that negatively impacts directly on social and academic/occupational activities."[57]

While children require six (6) or more of these symptoms, older adolescents and adults (age seventeen (17) and older) only require at least five (5) symptoms. *Id*. Missie King, Dr. Kitchens' mother, by sworn declaration and during the preliminary injunction hearing, testified that Dr. Kitchens had more than six symptoms listed in his early adolescence. Specifically, Mrs. King attested to Dr. Kitchens' inability to focus while the teacher was speaking; leaving seated situations at inappropriate times; a 'constant' need to move or fidget; being easily distracted by stimuli; being 'on the go'; and always running about at a fast pace.[58] While the NBME's expert, Michael Gordon, Ph.D., improperly characterized ADHD as *only* being properly diagnosed in early adolescent and that individuals with ADHD being unable to control their behavioral impulses during the preliminary injunction hearing, Dr. Gordon's testimony only supports Dr. Kitchens ADHD diagnosis. As indicated by the 'S', 'N', and 'U's[59] in throughout primary school, Dr. Kitchens' was frequently reprimanded by teachers for poor conduct.[60]

### ii. Dr. Kitchens' ADHD is a qualifying impairment

Federal Courts have consistently recognized that ADHD is an impairment under the ADA.[61] However, "[m]erely having an impairment does not make one disabled for the purposes of the ADA…"[62] In 2013 the American Psychiatric Association published the DSM-5, in order to "take[] a lifespan perspective recognizing the importance of age and development on the onset, manifestation, and treatment

---

[57] *See* Exhibit xx.
[58] See Exhibit xx.
[59] Frank Gogol, "*The U.S. Grading System: A Guide for International Students,*" STILT: Education (Aug. 23, 2022) https://www.stilt.com/blog/2021/09/the-u-s-grading-system-a-guide-for-international-students/
[60] See Exhibit xx.
[61] *Bibber v. Nat'l Bd. Of Osteopathic Med. Exam'r, Inc.*, (E.D. Pa. Apr. 11, 2016) quoting *Love v. Law School Admission Council, Inc.*, 513 F. Supp. 2d 206, 224 (E.D. Pa. 2007). *See, e.g., Rothberg v. LSAC*, 300 F.Supp.2d 1093 (D.Colo. 2004); *Bartlett v. N.Y. State Bd. Of Law Exam'rs*, 2001 WL 9307902 (S.D.N.Y. Aug. 15, 2001); *Price v. Nat'l Bd. Of Med. Exam'rs*, 966 F.Supp. 419 (S.D.W.Va. June 6, 1997).
[62] *Baer v. National Bd. Of Med. Exam'rs*, 392 F. Supp. 2d 42, 46 (D. Mass. 2005) quoting *Toyota Motor Mfg., Inc. v. Williams*, 534 U.S. 184, 195 (2002).

of mental disorders."[63] This recognizes that while neurological developmental disorders such as ADHD are diagnosed in early adolescence, the disorder nor the impact on development and cognitive function does not simply disappear after individuals reach the age of majority. Therefore, an individual with a neurological developmental disorder can still be diagnosed as an adult in conformity with the DSM-5 if the individual expresses five or more of the symptoms listed in a pervasive and consistent manner.

Even if the original assessment by Dr. Jordan is not considered, Dr. Kitchens has undergone multiple assessments (in undergraduate school and as recently as February, 2023) that repeat and reaffirm the ADHD-ADD diagnoses listed in his medical records. As stated in *Agranoff*, the "opinion of the [plaintiff's] treating physician must be given great weight" because the plaintiff's need for accommodation is "principally a medical issue."[64] While Defendant NBME would claim it is "insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment…"[65] Dr. Kitchens' application included medical records that referenced evaluation(s) that diagnosed Dr. Kitchens with ADHD, evidence of treatment plans, and a recommendation from his treating physician for accommodation.

The ADA requires plaintiffs to "offer evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial."[66] As seen by the MOXO d-CPT and the Connors Continuous Performance Test ("Connors CPT"), Dr. Kitchens meets the DSM-5 criteria for ADHD – combined presentation. (*See exhibit xxx*). In *Glueck v. National Conference of Bar Examiners*, the Court held that the Plaintiff was not disabled, due in part, to the Plaintiff's Connors' CPT results indicating only "a fifty (50%) chance that ADHD does exhibit".[67]   The Court also pointed to the Plaintiff's evaluations

[63] Substance Abuse and Mental Health Services Administration. "*DSM-5 Changes: Implications for Child Serious Emotional Disturbance [Internet].*" Rockville (MD): Substance Abuse and Mental Health Services Administration (US); 2016 Jun. 2, DSM-IV to DSM-5 Changes: Overview. Available from: https://www.ncbi.nlm.nih.gov/books/NBK519711/

[64] *Agranoff v. Law Sch. Admission Council, Inc.*, 97 F. Supp. 2d 86, 87 (D. Mass. 1999) *quoting D'Amico v. New York State Bd. of Law Examiners*, 813 F.Supp. 217, 221 (W.D.N.Y.1993).

[65] *Toyota Motor Mfg., Inc. v. Williams*, 534 U.S. 184, 198 (2002).

[66] *Toyota Motor Mfg., Inc. v. Williams*, 534 U.S. 184, 198 (2002) quoting *Albertson's, Inc.* v. *Kirkingburg*, 527 U.S. 555, 567 (1999).

[67] *Glueck v. Nat'l Conference of Bar Exam'rs*, 2018 U.S. Dist. LEXIS 140564, 11-12 (W.D. Tex. Aug. 20, 2018).

wherein he was diagnosed with "ADHD and mild specific learning disorders with impairment in reading and processing speed" but did not fall "below the 'low average' range" compared to other typical respondents.[68] In the case at hand, Dr. Kitchens' results on the Connors' CPT-3 indicated a "**very high likelihood** of having a disorder characterized by attention deficits such as ADHD…" (Emphasis added). *See Exhibit xx.* The Connors CPT score profile also determined issues related to "strong indication [of] inattentiveness, some indication [of] sustained attention, [and] some indication [of] vigilance." *See Exhibit xx.* Unlike the Plaintiff in *Glueck*, Dr. Kitchens' evaluations and medical records – as well as his self-reported symptomology – support his ADHD diagnosis.

In *Baer v. National Board of Medical Examiners*, the Plaintiff was given informal accommodations in grammar school, did not have accommodations on the Scholastic Aptitude Test ("SAT"), and received accommodations on the Medical College Admission Test ("MCAT") after being diagnosed with ADHD as an older teenager-young adult.[69] The Court noted that the

> "[Plaintiff's] ADHD diagnosis is suspect. It has surfaced only very late in the series of evaluations… and it is not made in conformity with the generally accepted standards of the American Psychiatric Association's Diagnostic and Statistical Manual, Fourth Edition ("DSM-IV")."[70]

It is important to note that the Court's decision in *Baer* was issued prior to the American Psychiatric Association's amendments in the DSM-5, which does not account for late-life diagnoses. However, even with this in mind, unlike the Plaintiff in *Baer* Dr. Kitchens received an evaluation in early adolescence, as a young adult, and as an adult in his thirties. Each assessment diagnosed Dr. Kitchens with clinical ADHD in conformity with the DSM-5. The Court's opinion continued to state that

> "…evidence of a disparity between a person's overall intelligence, IQ, or ability and [his] actual performance on exams or in school generally might support a finding of a mental impairment."[71]

---

[68] *Id.*
[69] *Baer v. National Bd. of Med. Exam'rs,* 392 F. Supp. 2d 42, 45 (D. Mass. 2005).
[70] *Id* at 46.
[71] *Id* at 46-47 quoting *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 629 (6th Cir. 2000), cert. denied, 532 U.S. 1038, 121 S. Ct. 1999, 149 L.Ed.2d 1002 (2001).

So too, Dr. Kitchens' overall academic successes or grades in clinical rotations compared to the abysmal ACT, MCAT, and USMLE STEP scores clearly point to a mental impairment.

While ADHD is an impairment under the ADA, the existence of an impairment does not make an individual disabled by default. The DSM-5 acknowledges that ADHD can persist into adulthood and an individual can still be diagnosed in conformity with the DSM-5. In the case of Dr. Kitchens, his medical records and evaluations, including recent assessments, support his ADHD diagnosis. His Connors CPT results indicate a very high likelihood of having a disorder characterized by attention deficits such as ADHD. Unlike the plaintiffs in *Glueck or Baer*, Dr. Kitchens' ADHD diagnosis is consistent with generally accepted standards and is supported by evidence of a disparity between his overall intelligence and academic performance.

### iii.   Dr. Kitchens is substantially limited by his diagnoses

Under the ADA Amendments Act of 2008, an impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity…" to be substantially limiting. The Department of Justice has explained that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA."[72] The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis."[73] Based on Dr. Kitchens' early elementary records, medical records, and below average standardized test scores at multiple levels, Dr. Kitchens has demonstrated that he is substantially limited by his ADHD and anxiety.

In *Glueck*, the Court further opined that Plaintiff's lack of accommodations in primary or secondary school, college, or any standardized test prior to the Bar exam indicated he was not substantially limited to be disabled under the ADA. *Id*. Dr. Kitchens, unbeknownst to him, received formal accommodations in elementary school through Rivermont's SAIL program and informal accommodations by teachers and

---

[72] 28 C.F.R. §36.105(a)(2)(i).
[73] *See Baer*, 392 F. Supp. at 46 quoting *Lessard v. Osram Sylvania, Inc.*, 175 F.3d 193, 197 (1st Cir. 1999).

professors throughout his academic career. *See Exhibits 1-2.* In the case at hand, Dr. Kitchens received individualized instruction at school, home, and through tutoring programs from adolescence up until middle school – and maintaining average grades. The ADAAA also noted that a court may

> "consider the condition, manner, and duration of [an individual's] ability to perform a major life activity, including consideration of difficulty, effort, or time required, pain experienced, the length of time the activity can be performed, and the way the impairment affects the operation of major bodily functions."[74]

Shifting from primary educational years to college and medical school, Dr. Kitchens begins taking Adderall in 2013 and continues to receive informal accommodation by professors. While at Berea College, there is no drastic improvement of GPA, scores, or any other contradiction to medication abuse. *See Exhibit xx.* It is not until Dr. Kitchens begins his upper-level courses within his major do we see an improvement. Even as a music major, which does not rely on reading or reading-comprehension, Dr. Kitchens had to re-take a course over the summer beyond the traditional four-year matriculation. Although Dr. Kitchens received average grades, these grades were the result of hours in-and-out of the classroom receiving accommodation. Additionally, during medical school, Dr. Kitchens received informal accommodations on exams and formal accommodations on the Comprehensive Basic Science Self-Assessment ("CBSSA"). *See Exhibit* xx.

In *Healy v. National Board of Osteopathic Medical Examiners,* the Plaintiff attended elementary and middle school at a Montessori school and tested in the eightieth-ninetieth (80%-90%) percentile ranges, became a member of the U.S. National Figure Skating team at fifteen, and a member of the International U.S. Figure Skating team for three years.[75] While juggling an extremely successful figure skating career, Plaintiff managed to maintain "a strong academic record… earn[ing] mostly As and a few Bs…. At the end of his eleventh (11th) grade year, [Plaintiff] ranked fifth in a class of ninety (90) students."[76] Taking into account the extreme levels of focus and determination to achieve the level of success in his skating career, academic career, and lack of accommodations on standardized tests, the Court held that Plaintiff's ADHD

---

[74] *Healy v. Nat'l Bd. Of Osteopathic Med. Examiners, Inc.,* 870 F. Supp. 2d 607, 617 (S.D. Ind. 2012) (citing 29 C.F.R. § 1630.2(j)(4)(i-iii).
[75] *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs, Inc.,* 870 F. Supp. 2d 607, 610-611 (S.D. Ind. 2012).
[76] *Id.*

constituted a disability under the ADA.[77] Compared to Dr. Kitchens, a regular student who played baseball and earned predominately average grades with informal accommodations from teachers and a series of self-accommodating habits beyond what his neurotypical peers would require. Where the Court in *Healy* found "example after example of Plaintiff's ability to… succeed in high pressure environments…" Dr. Kitchens' record contains the opposite.[78]

Courts across the country have considered, among other factors, whether an applicant had received testing accommodations in the past. In *Glueck*, the Court further opined that Plaintiff's lack of accommodations in on any standardized test prior to the Bar exam indicated he was not substantially limited to be disabled under the ADA.[79] In *Bibber v. National Board of Osteopathic Medical Examiners, Inc.*, the Court heavily weighed the Plaintiff's mixed history of accommodations on standard examinations its findings that the Plaintiff was not substantially limited by her dyslexia.[80] The Plaintiff in *Bibber* received accommodations on the Pre-SAT, the High School Proficiency Assessment ("HSPA"), SAT, and the Advanced Placement ("AP") exams, however, she did not received accommodations on the MCAT or the Graduate Record Examinations ("GRE").[81] With both the MCAT and GRE, Plaintiff received an 'average' score. In *Healy v. National Board of Osteopathic Medical Examiners*, the Court noted in that Plaintiff "performed above average on his SAT scores… and on his college entrance examinations," specifically, Plaintiff tested in the "seventy-first (71%) and seventy-ninth (79%) percentile" on the SAT without accommodations.[82] In *Black v. National Board of Medical Examiners*, the Plaintiff scored uniformly average or above average on standardized examinations in across all levels of education.[83] On the MCAT, specifically, Plaintiff scored "better than seventy-three (73%) of MCAT test-takers despite receiving no

---

[77] *Id.* at 619.
[78] *Id.*
[79] *Glueck v. Nat'l Conference of Bar Exam'rs*, 11-12 (W.D. Tex. Aug. 20, 2018).
[80] *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'r, Inc.*, 2016 U.S. Dist. LEXIS 48181, 15 (E.D. Pa. Apr. 11, 2016).
[81] *Id* at 5-6.
[82] *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs, Inc.,* 870 F. Supp. 2d 607, 611, 615 (S.D. Ind. 2012).
[83] *Black v. Nat'l Bd. of Med. Exam'rs,* 281 F. 3d 1247, 1250-1251 (M.D. Fla. 2017).

additional time."[84] The Court pointedly stated that her success "counsels strongly against the claim that ADHD substantially impairs Black's ability to succeed on a timed and standardized examination."[85]

Albeit Dr. Kitchens' did not receive any accommodations on standardized tests prior to the USMLE exam, his scores are *far* from within the average range. For 2008, 2009, and 2010, the average ACT score globally (including males and females across races) was twenty-one point one (21.1), twenty-one point one (21.1), and twenty-one point zero (21.0) respectively.[86] For African American men, specifically, the average ACT score for each year was sixteen point nine (16.9).[87] Based on the raw scores received per year and the conversion charts for the corresponding year[88], Dr. Kitchens received a thirteen (13.0) in 2008, a fourteen (14) in 2009, and a fourteen (14) in 2010, *two to three points lower than the average for African American men*, and significantly lower than the global average. Compared to *Bibber* and *Black*, who were able to score within an average range – either globally or for their gender-race category – Dr. Kitchens is decidedly <u>below</u> the average range.

Dr. Kitchens' ADHD has not only limited his ability in the classroom. After matriculating from Berea College, Dr. Kitchens found employment as a car salesman and a grocery store manager; both of these are not reading-comprehensive positions nor do they require sustained amounts of high intensity focus.

In conclusion, under the ADA Amendments Act of 2008, an impairment does not need to prevent an individual from performing a major life activity to be considered substantially limiting. The Department of Justice has emphasized that the term "substantially limits" should be construed broadly to provide expansive coverage. Dr. Kitchens has demonstrated that his ADHD and anxiety substantially limit his

---

[84] *Id.*

[85] *Id.*

[86] Digest of Education Statistics, "*ACT Score Averages and Standard Deviations, by Sex and Race/Ethnicity, and Percentage of ACT Test Takers, by Selected Composite Score Ranges and Planned fields of Study: Selected Years, 1995 through 2010.*" National Center for Education Statistics (Apr. 23, 2023). https://nces.ed.gov/programs/digest/d10/tables/dt10_155.asp

[87] *Id.*

[88] Anna Aldric, *ACT Score Chart: Raw Score Conversion to Scaled Score*, PrepScholar: SAT/ACT Prep Online Guides and Tips (Jan. 29, 2020, 2:00 PM), https://blog.prepscholar.com/act-score-chart-raw-score-to-scaled-conversion. Quantum Act Prep: ACT Released Tests. (2022), https://quantumactprep.com/act-official-tests

ability to perform major life activities based on his early elementary records, medical records, and below-average standardized test scores at multiple levels. Furthermore, Dr. Kitchens received individualized instruction and informal accommodations throughout his academic career. While Dr. Kitchens did not receive formal accommodations on standardized tests prior to the USMLE exam, his scores were far from within the average range. Dr. Kitchens' case embodies the spirit and legislative intent Congress had in implementing the ADAA and the importance of considering the individual's condition, manner, and duration of their ability to perform major life activities, including the way the impairment affects the operation of major bodily functions.

## II.   DEFENDANT NBME's ACCOMMODATION EVALUATION POLICIES DISCRIMINATE AGAINST MINORITIES AND PEOPLE OF COLOR

The Department of Justice guidance recommends that "entities must consider the entirety of an applicant's history to determine whether that history, even without the context of an IEP or Section 504 Plan, indicates a need for accommodations. In addition, many students with learning disabilities have made use of informal, but effective accommodations."[89] Currently, Defendant NBME has no policy, procedure, or recommendation to address cultural biases when assessing an applicant's disability. In their policies and procedures, the NBME merely lists what documents are required in order to determine whether a disability exists and if so, whether it is substantially limiting. *See Exhibit xx.*

This deficiency is most clearly demonstrated by the NBME's testifying expert witness, Dr. Michael Gordon. During the preliminary injunction hearing held on February 24, 2023, Dr. Gordon testified that without a formal diagnosis in early adolescence, an individual could not be diagnosed with ADHD under the DSM-5. He also testified that individuals diagnosed with ADHD will present symptoms beyond poor grades; individuals with ADHD will often have conduct and/or behavioral issues that will be evident in adolescence; and that ADHD, or ADHD symptomology, does not continue into adulthood. Setting aside some of the outdated and false claims, Dr. Gordon's analysis fails to evaluate the "condition, manner, or duration" of how an impairment affects an individual in major life activities. The ADAAA, in determining

---

[89] *28 C.F.R.* Part 36, Appendix A.

whether an individual is substantially limited in a major life activity, instruct the NBME to consider the following factors: "[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment."[90]

Case in point, in its Response to Dr. Kitchens' Motion for Preliminary Injunction, the Defendant NBME claimed that Dr. Kitchens was not substantially limited, and if he was, it was his fault the NBME denied his application due to lack of documentation. In support of their argument, NBME cited *Cf. Wells v. Shalala*, where the Plaintiff requested 'relief' from traveling as part of his job requirement(s) for medical reasons until he retired from his employment. The Plaintiff, in support of his request for accommodations, first provided a letter from his chiropractor which made no note of Plaintiff's inability to travel, then provided a second letter indicating he would not be able to travel overnight. After receiving the second letter, the Plaintiff's employer offered to reassign the Plaintiff to a position that did not require overnight travel. The Court held "where [an] employee fails to provide necessary medical documentation, [an] employer is not liable for failing to provide a reasonable accommodation."[91] However, Courts have held that "contemporaneous medical evidence on [a fact issue] is relevant even if not provided to Defendants at the time."[92] *See also Gazvoda* (mentioning contemporaneous medical evidence that was not provided to the defendant as relevant to the question of whether the plaintiff was qualified).[93] In the case at hand, Dr. Kitchens provided the medical records that he had available to him along with a letter recommending accommodations from his treating physician.

It is also important to note that the claims made by the Plaintiff are against its employer, which requires the Plaintiff to demonstrate that the employer "did not make a good faith effort to assist the

---

[90] *See Toyota Motor Mfg., Inc. v. Williams*, 534 U.S. 184, 196 (2002) quoting C.F.R. §§ 1630.2(j)(2)(i)-(iii)(2001).
[91] *Cf Wells v. Shalala,* 228 F.3d 1137, 145-146 (10th Cir. 2000) quoting *Templeton v. Neodata Servs. Inc.*, 162 F.3d 617, 619 (10th Cir. 1998).
[92] *Gazvoda v. Sec'y of Homeland Sec.*, 2017 U.S. Dist. LEXIS 5936, 17 (Mi. E.D. Jan. 17, 2017) quoting *Crocker v. Runyon,* 207 F.3d 314, 319 (6th Cir. 2000).
[93] *Holiday v. City of Chattanooga*, 206 F.3d 637, 644 (6th Cir. 2000).

employee in seeking accommodations."[94] The NBME, as a part of discovery, issued a *Subpoena Duces Tecum* to White House Clinics on March 24, 2023 requesting 'all paper and electronic medical, psychological, or psychiatric records of Dr. Kitchens in your custody or control relating to your evaluation or treatment of Dr. Kitchens....' The only variation in the records produced by Dr. Kitchens and the records produced to the NBME by *subpoena*, were communication notes requested by the NBME, emergency room records (for unrelated health concerns), and progress notes for unrelated health concerns. The NBME now has first-hand confirmation by virtue of the subpoena issued, and the documents produced in compliance, that the evaluation reports are not available to either party for production. Dr. Kitchens' statements throughout the application process – the evaluation reports **cannot be produced**.

The NBME's failure to consider the condition, manner, or duration of an individual's impairment and its effect on major life activities is no accident; the NBME has rejected the ADAA since its inception in 2008. The NBME, in protest to the newly adopted ADAA, claimed that the ADAA would create a "problematic result because… [it created] a significant 'risk of diagnosis'… and the incentives to exaggerate in order to secure preferential treatment."[95] From the outset, the NBME has been cognizant of what the law requires and has detested the expansion of coverage the ADAA provided disabled applicants.

This disdain is demonstrated best in *Berger v. National Board of Medical Examiners, Sampson v. National Board of Medical Examiners,* and *Ramsey v. National Board of Medical Examiners. In Berger v. Nat'l Bd. of Med. Exam'rs*, Berger submitted an extensive history of accommodations, including but not limited to having received individual tutoring in the first grade; being homeschooled in second through fourth grade; assessed and diagnosed with ADHD in the second grade; accommodations in middle and high school (either formal or informal); accommodations on the SAT, PSAT, AP test, and GRE; formal

---

[94] *Cf Wells v. Shalala,* 228 F.3d 1137, 148 (10th Cir. 2000).

[95] Wendy F. Hensel, *Rights Resurgence: The Impact of the ADA Amendments Act on Schools and Universities*, 25 GA. ST. U. L. REV. (2009). Available at: https://readingroom.law.gsu.edu/gsulr/vol25/iss3/7 quoting See, e.g., Feldblum et al., supra note 64, at 234–35. *See also* Letter from ACT et al. to Edward Kennedy, Thomas Harkin, Arlen Specter & Ted Stevens, United States Senate Leaders [hereinafter "Letter from ACT"] (July 14, 2008), available at http://www.aamc.org/advocacy/library/educ/corres/2008/071408s.pdf (noting that "the discussions that have occurred to date" about pending disability legislation "have focused on its likely impact on employers and employees").

accommodations in medical school; and multiple assessments and medical records from early adolescence to young adulthood.[96] Despite being denied accommodations, Berger managed to pass the USMLE Step 1 exam. Berger submitted another application for USMLE Step 2, including all of the above documentation as well as additional evaluations by treating physicians.[97] The NBME denied Berger's application again. Berger applied a third time for accommodations by attaching a new evaluation and an updated personal statement; Defendant NBME denied Plaintiff's application a third time.[98]

The Court held that the Plaintiff had demonstrated that he had a disability under Title III of the ADA, that his requests for accommodation were reasonable, and that those requests were denied, to the stringent standard of proof required by a preliminary injunction. The Court held that the NBME's rationale

> "—that anyone who has had some modicum of academic success cannot be found to have a disability that affects learning — **flies in the face of Congress' directives** and the relevant implementing regulations."[99] (Emphasis added).

Dr. Kitchens has a decade long diagnosis of ADHD, which, is specifically named as an impairment under the ADA. 28 C.F.R. §36.105(b)1(ii), (2). The Court further considered "the condition and manner under which the individual performs the major life activity, as well as the duration of time it takes to perform such activity." *Id*. Dr. Kitchens' declaration demonstrates that schoolwork required significantly more time devoted to studying and reading in particular has always been grueling, draining, and exhausting.

The Plaintiff in *Berger*, "developed a strategy to work through the [MCAT] examination questions as quickly as possible to optimize his score" Dr. Kitchens has developed strategies to accommodate with his ADHD and testing anxiety.[100] As demonstrated by Dr. Kitchens' repeated applications, exhibits attached to the filings in the above captioned case, he was evaluated and diagnosed with ADHD in 2013, informal accommodations through college and medical school, and has an active prescription for forty (40) mg of Adderall, are demonstrative measures of Dr. Kitchens' substantially limited ability to read, think,

---

[96] *Berger, B. v. Nat'l Bd. of Med. Exam'rs*, 2020 U.S. App LEXIS 36486, 2020 WL 5592696 (6th Cir. App. Sept. 2020).
[97] *Id*.
[98] *Id*.
[99] *Id*.
[100] *Id* at 47.

concentrate, and learn. While the ADA prohibits the NBME from "referenc[ing] to the *ameliorative effects* of mitigating measures" it does not prohibit the NBME from taking the *existence* of those mitigating measures into account in determining whether an individual does indeed have a disability.[101] (Emphasis added). Arguably, the decade long prescription and medical diagnoses are proof positive of Dr. Kitchens having an impairment that meets the standard of a disability under the ADA.

In *Ramsay v. Nat'l Bd. of Med. Exam'rs*, the Plaintiff underwent multiple rounds of applications before appearing before the Court. In the first application, she submitted medical records, records of accommodations from her undergraduate school, multiple assessment records, MCAT scores, academic records, and a personal statement.[102] On the second application, she submitted a new neuropsychologist evaluation and letter of recommendation from her treating physician.[103] On the third application, Plaintiff submitted a third evaluation from a psychologist. After three rounds of applying and supplementing her documentation, the NBME provided the application file to an outside expert who again denied Plaintiff's application.[104] The Court held that the data provided by Ramsay was "exactly the type of data DOJ contemplates as showing a learning disability that substantially limits an individual as compared to others in the general population."[105]

Rather, the Court found that the NBME blatantly violated the ADA by focusing its analysis of her accommodation application on prior academic successes and performances without accommodations and whether the applicant met the definition of disability.[106] So too, in Dr. Kitchens' first application for accommodations, the NBME penalized Dr. Kitchens for allegedly not meeting the definition of a disability rather than whether he had met with his obligation(s) under the ADA and his academic successes without prior accommodations. The Court's opinion in *Ramsay* can almost be copied verbatim – changing only the Plaintiff's name – and be applicable to Dr. Kitchens.

---

[101] 42 U.S.C. §12102(4)(E)(i).
[102] *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F. 3d 251, 254 (3rd Cir. 2020).
[103] *Id*. at 255.
[104] *Id.* at 256.
[105] Equal Employment Provisions, 76 Fed. Reg. at 17,009; Title II and Title III Regulations, 81 Fed. Reg. at 53,230.
[106] *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F. 3d 251, 46 (3rd Cir. 2020).

"It further appears that NBME either discounted or disregarded entirely the admonition to focus on "how a major life activity is substantially limited, and not on what outcomes an individual can achieve" and apparently ignored the example that "someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read, write, or learn compared to most people in the general population."[107] NBME's exclusive focus on Plaintiff's prior academic successes and her performance on the ACT and MCAT standardized examinations without accommodations was therefore improper, particularly given that we can discern that no consideration was given to the other evidence produced by Plaintiff."[108]

The ADA expressly provides that the determination of whether a person has a disability must be made without consideration of such strategies. Dr. Kitchens reported to Mrs. Holbrook that he has an extensive history of studying long hours, repeated special memorization study methods, and self-implemented structures to self-accommodate for his disability. Moreover, this is notably also a strategy that may work on the ACT and MCAT but that does not work on the USMLE. The NBME refused accommodations to Dr. Kitchens on the basis that he was able to go through his educational career without formal accommodations therefore he does not need them. However, NBME ignores the fact that Dr. Kitchens academic successes are based of his ability to self-accommodate for his disability.

Lastly, and most egregiously, is *Sampson v. National Board of Medical Examiners.* In applying for accommodations, Sampson applied seven (7) times with six (6) evaluations. In his first application, Sampson included a personal statement, a letter from disability services, a letter from a learning specialist, two evaluations, and a letter from his treating physician.[109] In the second application, Sampson submitted a letter from a disability expert, a letter from his parents, a list of tutors and reading specialists, and early academic records.[110] With the third application, Sampson submitted three new letters from his treating physicians. On his fourth attempt, Sampson submitted a second letter from the learning specialist. On his fifth attempt, with the help of a lawyer, submitted a new letter from an evaluating physician. In his sixth attempt, including all the materials previously submitted, Sampson provided two new independent

---

[107] 29 C.F.R. §1630.2(j)(4)(iii).
[108] *Id* at 46-47.
[109] *Sampson*
[110] *Id.*

consultants.[111] With the *seventh* attempt, Sampson included another evaluation from an expert in learning disabilities in adults. Each time the NBME denied Sampson's applications.

Each of these Plaintiffs, *Berger, Ramsay,* and *Sampson,* each applied and reapplied multiple times, with each attempt providing additional documents, evaluations, and letters from various providers-individuals. Despite the increasing number of documentations, including evaluating reports, the NBME refused to provide accommodations. While these applicants had access to significant resources, Dr. Kitchens and other minority-applicants of color are statistically unlikely to have similar resources. Not only in *obtaining* such documentation and evidence to support their disability, but to *fight* the NBME's inevitable denial(s).

## CONCLUSION

Throughout his entire life, Dr. Kitchens has received accommodation for his ADHD and anxiety. Whether it was unofficial accommodations from sympathetic teachers-professors, black out curtains and noise-proof headphones, or additional time on a standardized examination, Dr. Kitchens has been successful in his efforts to overcome his disability. However, when he needed accommodations the most, the Defendant unilaterally pronounced that Dr. Kitchens was not disabled, or at the very least, did not provide enough documentation to be considered disabled. This is in direct violation of the statutory language and legislative intent of the Americans with Disabilities Act; when faced with the deficiencies of its own accusations, experts, and demonstrated a pattern and propensity for denying claims, the NBME attempts to hide behind the crumbling pretext of protecting the integrity of the USMLE. Therefore, summary judgment is not only appropriate, it is mandatory to properly reverse the discriminatory actions of the NBME and to prevent further damage to Dr. Kitchens'.

Respectfully submitted,

*/s/ Dr. Markcus Kitchens*
Dr. Markcus Kitchens
625 Hampton Way, #2
Richmond, KY 40475

---

[111] *Id.*

T: (423) 314-4096
markzwanz@gmail.com
***Pro Se Plaintiff***

Dated: April 24, 2023

## CERTIFICATE OF SERVICE

It is hereby certified that a true and accurate copy of the foregoing was filed electronically via the Pacer system and served to the following on April 24, 2023.

Jared D. Bayer
Cozen O'Connor
One Liberty Place
1650 Market Street, Ste. 2800
Philadelphia, PA 19103
T: (215) 665-4127
***Counsel for Defendant***
***National Board of Medical Examiners***

Caroline M. Mew
Perkins Coie LLP
700 Thirteenth Street, N.W., Ste. 800
Washington, D.C. 20005-3960
T: (202) 654-6200
E: CMew@perkinscoie.com
***Counsel for Defendant***