## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **DR. MARKCUS KITCHENS, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:22-CV-03301-JFM** |
| | ) | |
| **NATIONAL BOARD OF MEDICAL** | ) | |
| **EXAMINERS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## NBME'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to the Court's May 18, 2023 Order (Dkt. 71), defendant National Board of Medical Examiners ("NBME") respectfully submits the following proposed findings of fact and conclusions of law.

## INTRODUCTION

Plaintiff Markcus Kitchens ("Dr. Kitchens") asserts a single claim under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12189, and seeks double-time testing accommodations on the United States Medical Licensing Examination ("USMLE"). To prevail on that claim, Dr. Kitchens has the burden of proving that he has a disability within the meaning of the ADA and that he needs twice the amount of testing time that other examinees receive in order to take the USMLE in an accessible manner. *See* 42 U.S.C. §§ 12101; 12189.

Dr. Kitchens claims to have been diagnosed with Attention-Deficit/Hyperactivity Disorder (ADHD) and "test anxiety." (Dkt 15 ¶16) But a diagnosis alone does not establish a disability under the ADA. Dr. Kitchens must show that his claimed impairments are actual impairments that were properly diagnosed in accordance with applicable diagnostic criteria and that any cognizable impairments substantially limit his ability to perform one or more major life activities, as compared

to most people in the general population. *See* 42 U.S.C. § 12102(1)(A); 28 C.F.R. § 36.105(d)(1)(v). For the reasons explained below, the Court concludes that, even if the record supports any diagnosis (and the Court does not believe that it does), Dr. Kitchens has failed to show that his alleged mental impairments substantially limit his ability to perform any relevant major life activities as compared to most people. Therefore, he has failed to establish that he has a disability within the meaning of the ADA.

Dr. Kitchens's failure to demonstrate that he is disabled under the ADA on the full trial record is dispositive of any remaining issues in the case, including whether double testing time is a necessary accommodation for Dr. Kitchens on future Step exams and whether "expungement" of his prior test scores is an available remedy under the ADA or appropriate in this case. In the interest of completeness, however, the Court also addresses these issues below. In addition to concluding that score expungement is not an available remedy under Title III, the Court finds that expungement would not be an appropriate remedy here because Dr. Kitchens failed to demonstrate that he was disabled in his 2022 accommodation requests to NBME. Those requests were supported by a mere eight pages of records, none of which described a single symptom of ADHD or anxiety, substantiated a diagnosis of ADHD or anxiety, explained any clinical basis for such a diagnosis, or described any functional limitations that Dr. Kitchens was experiencing. As a matter of law, because Dr. Kitchens failed to show he was disabled or needed accommodations in his 2022 requests to NBME, NBME did not violate the ADA in denying those requests. Thus, even if expungement were an available remedy under Title III—which it is not—Dr. Kitchens is not entitled to any relief relative to his prior accommodation requests.

The Court recognizes the stressful position that Dr. Kitchens is in, having completed medical school (apparently incurring loans to do so) and, to date, not being able to pass Step 1 or

Step 2 CK. He appears to be a hardworking individual who has relentlessly pursued his goals, including litigating this case through trial as a *pro se* plaintiff. But the Court cannot order NBME to provide Dr. Kitchens double testing time simply because Dr. Kitchens thinks it might help him perform better, when he has not shown that he has a disability that warrants such an accommodation.

## PROCEDURAL HISTORY

Dr. Kitchens filed this lawsuit on August 16, 2022, seeking damages based on alleged violations of Title II of the ADA, Section 504 of the Rehabilitation Act, and Title VI of the Civil Rights Act. (Dkt. 1) NBME moved to dismiss. (Dkts. 6, 7, 8) Shortly thereafter, on January 18, 2023, Dr. Kitchens filed an amended complaint, asserting a single ADA Title III claim under 42 U.S.C. § 12189 and its implementing regulation found at 28 C.F.R. § 36.309, and requesting unspecified equitable and injunctive relief. (Dkt. 15)

On February 7, 2023, Dr. Kitchens filed a motion for preliminary injunction, seeking an order "preliminarily enjoining [NBME] from rejecting Dr. Kitchens' request for extended testing time (100% extended time or 'double time') and an expungement of his examination transcript for the [USMLE]." (Dkt. 20 at 1) He claimed that the Electronic Residency Application Services ("ERAS") deadline for the 2023 National Residency Match Program was May 31, 2023, and that he had to complete Step 1 and Step 2 CK of the USMLE (with accommodations) by April 16, 2023 in order to participate. (*Id.* at 2; *see also id.* at 3-4) The Court ordered expedited briefing (Dkt. 24) and held an expedited evidentiary hearing. (Dkt. 27) Following the hearing, the Court denied Dr. Kitchens's motion given, among other things, Dr. Kitchens's concession that he had already missed key deadlines for the 2023 Match. (Dkt. 30 ¶ 5) The Court then ordered expedited discovery ahead of a bench trial on the merits. (Dkts. 31, 34)

On April 24, 2023, NBME sought leave to file a motion for partial summary judgment on the question whether NBME violated the ADA by not granting Dr. Kitchens's January 2022 and August 2022 requests for extra time on Step 1. (Dkt. 41) NBME argued that if summary judgment were granted on this issue, it would also resolve whether expungement of Kitchens's test scores is an available remedy, as there can be no remedy of any kind if there was no ADA violation. (*Id.* at 2). Dr. Kitchens also filed a request to move for summary judgment. (Dkt. 43) The Court denied both requests. (Dkt. 45)

On April 27, 2023, the Court ordered the parties to brief whether score expungement (1) is a remedy that the Court has legal authority to order and, if so, (2) is appropriate in this case. (Dkt. 47) NBME filed its brief by the deadline (Dkt. 55); Kitchens filed nothing. In a May 8, 2023 Order, the Court noted that "NBME has persuasively argued that expungement cannot be 'preventive relief' in this case because it would address past results[,]" while the applicable "statute provides for only 'preventive relief.'" (Dkt. 56 ¶ 4) The Court gave Dr. Kitchens another chance to be heard on the issue, (*id.*), and Dr. Kitchens filed a brief on May 10, 2023. (Dkt. 60)

The Court held a bench trial on May 15-18, 2023. Based on the evidence presented at trial, post-trial deposition designations, and admissible evidence from the preliminary injunction hearing,[1] as well as post-trial submissions from the parties, the Court makes the following Findings of Fact and Conclusions of Law.

---

[1] *See* Fed. R. Civ. P. 65(a)(2). Because all but one of the witnesses who testified at the preliminary injunction hearing also testified at trial, the primary evidence relied upon by the Court from the preliminary injunction hearing is the testimony of the witness who did not testify at trial—Christina Bacon, a Licensed Psychological Practitioner (LPP) in Kentucky who evaluated Dr. Kitchens in February 2023 and diagnosed him as having ADHD. (Dkt. 7-35 PX30)

## FINDINGS OF FACT

### I.   The Parties

1.    Dr. Kitchens is a Kentucky resident and January 2021 graduate of the Medical University of Lublin in Poland. (Dkt. 77-24 PX2 at 2)

2.    NBME is a non-profit organization whose mission includes protecting the health of the public through state-of-the-art medical assessments. (Tr. 51:11-15) NBME develops and offers the USMLE, an examination relied on by medical boards across the country to inform licensure decisions. (Tr. 51:5-21; Dkt. 77-7 JX 8 at 13)

### II.  The USMLE

3.    The USMLE assesses an examinee's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills that constitute the basis of safe and effective patient care. (Dkt. 77-7 JX8 at 13)

4.    There are three "Steps" of the USMLE. Step 1 assesses the examinee's understanding of and ability to apply important concepts of the basic sciences to the practice of medicine, with special emphasis on principles and mechanisms underlying health, disease, and modes of therapy. (Tr. 51:22-52:7; Dkt. 77-7 JX8 at 14) Step 2 CK assesses the examinee's ability to apply medical knowledge, skills, and understanding of clinical science essential for the provision of patient care under supervision, with an emphasis on health promotion and disease prevention. (Dkt. 77-7 JX8 at 15) Step 3 assesses the examinee's ability to apply medical knowledge and understanding of biomedical and clinical science essential for the unsupervised practice of medicine, with emphasis on patient management in ambulatory settings. (*Id.*)

**III. Dr. Kitchens's Claimed Impairments**

5.    Dr. Kitchens requested accommodations on the USMLE based on claimed diagnoses of ADHD and "test anxiety." (Dkt. 15 ¶ 16; Dkt. 77-24 PX2 at 4; Dkt. 77-25 PX3 at 4) He also referenced ADHD and anxiety at trial. (*See, e.g.,* Tr.I 17:25)

6.    According to the Diagnostic and Statistical Manual of Mental Disorders ("DSM"),[2] the "essential feature" of ADHD "is a persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development." (Dkt. 77-38 PX 48 at 3) ADHD is a neurodevelopmental disorder and thus begins in childhood. (*Id.*) Symptoms must be present in more than one setting (example settings are home, school, and work). (*Id.*; *see also* Tr.III 123:10-124:23) ADHD cannot be diagnosed based solely on an individual's self-report. (Tr.III 124:24-125:11) There must be "clear evidence that the symptoms interfere with, or reduce the quality of, social, academic, or occupational functioning." (Dkt. 77-38 PX 48 at 2)

7.    According to the DSM, the "essential feature" of generalized anxiety disorder is "*excessive* anxiety and worry (apprehension expectation) about a number of events or activities." (Dkt. 77-39 PX49 at 1) (emphasis added) Symptoms must cause "clinically significant distress or impairment in social, occupational, or other important areas of functioning." (*Id.*; *see also* Tr.IV 11:8-21 (explaining that generalized anxiety disorder requires a pervasiveness and severity of symptoms that prevent someone from doing things that need to be done on a day-to-day basis)) "Test anxiety" is not recognized in the DSM and, according to expert testimony at trial, there is no sound research to support it as a standalone psychiatric illness. (Tr.IV 15:10-19)

---

[2] The DSM is the listing of criteria for all identified mental disorders. (Tr.III 122:5-9)

A.   **Expert Testimony at Trial**

1.   **Expert Witnesses Offered by Dr. Kitchens**

8.    Dr. Kitchens did not present any of his treating or evaluating professionals as fact or expert witnesses at trial. Instead, he offered three other individuals with whom he has personal connections as proposed expert witnesses: Christopher Pullins, M.D., Jonathan Shepherd, M.D., and Joanne Senoga, Ph.D.

a.   **Dr. Pullins**

9.    Dr. Pullins is one of Dr. Kitchens's mentors. (Tr.II 172:16-21; *see also* Tr.I 38:1-3) Dr. Pullins has not provided medical care to Dr. Kitchens or evaluated him in any way. (Tr.I 90:17-21) Dr. Pullins was offered as an expert in family medicine. (Tr.I 42:7-8)

10.    Dr. Pullins works in family medicine at the Mayo Clinic. (Tr.I 39:25-40:2; 45:21) Within the past year, Dr. Pullins estimates that he has evaluated five individuals for ADHD and more than 30 patients for anxiety. (Tr.I 43:12-14; 43:25-44:2) He has not written any articles on ADHD or anxiety. (Tr.I 42:19-20; 44:3-4)

11.    When a patient presents with concerns about ADHD-type symptoms, Dr. Pullins obtains a detailed history to find out their history of evaluation and how their reported symptoms have affected their quality of life. (Tr.I 40:6-18) Dr. Pullins uses rating scales that the patient and others (such as a teacher or employer who has good knowledge of the individual) can fill out. (Tr.I 60:23-61:6) Dr. Pullins uses the Conners Continuous Performance Test (CPT) to help determine whether a patient is suffering only from inattentiveness or whether he also has hyperactivity. (Tr.I 61:18-22) For a new patient who has not been previously diagnosed with ADHD, Dr. Pullins involves a specialist in the assessment. (Tr.I 42:21-43:2; 63:22-25)

12.     For a patient presenting with a history of being prescribed Adderall, Dr. Pullins would refill the prescription if the patient reports being stable and is seeking the same medication dosage. (Tr.I 64:3-18) He would not refer the patient out for another ADHD evaluation. (Tr. 64:24-65:1)

13.     When Dr. Pullins makes an ADHD-related accommodation recommendation for a college student, he considers the person's academic history and might also interview a parent. (Tr.I 95:9-23) In determining whether someone is succeeding only through compensation for an impairment, Dr. Pullins will also look to I.Q. and other cognitive testing to assist with the diagnosis and understand the source and nature of any difficulties. (Tr.I 96:7-97:9; *see also id.* 97:18-98:6)

### b. Dr. Shepherd

14.     Dr. Shepherd is the chief medical director of Hope Health Systems, where he supervises physicians and nurse practitioners and engages in direct patient care. (Tr.II 8:24-9:2; 12:4-13:1) He estimates conducting "easily 1,000" ADHD evaluations in the past two years. (Tr.II 13:6-10)

15.     Dr. Shepherd is also a mentor to Dr. Kitchens. (Tr.II 71:24-25) He has never evaluated or provided medical care to Dr. Kitchens. (Tr.II 71:16-18) Dr. Shepherd was offered as an expert in clinical psychiatry. (Tr.II 14:9-10)

16.     Dr. Shepherd emphasized that an expert—rather than a primary care physician—is needed to diagnose ADHD because primary care physicians may not be able to tell whether symptoms such as impulsivity, hyperactivity, or inattention are due to ADHD. (Tr.II 16:20-17:4)

17.     When he assesses a child for ADHD, Dr. Shepherd wants to see records and reports from a parent and school, because ADHD must present itself in more than one environment. (Tr.II 17:7-18:3) Dr. Shepherd also testified that the symptoms of ADHD must cause functional impairment. (Tr.II 19:14-19 ("[M]any times people are inattentive, but the disorder means that you are not able to function properly.")) He looks to multiple sources for an evaluation and will also obtain

objective assessments from other therapists. (Tr.II 37:8-38:16) Dr. Shepherd looks to the DSM as providing the "guardrails" for diagnosing ADHD. (Tr.II 23:6-16)

18.   If a patient reports that he is already taking Adderall, Dr. Shepherd will continue the current dose if the patient reports that the medication is working. (Tr.II 38:18-39:8)

### c.   Dr. Senoga

19.   Dr. Senoga is a friend and former colleague of Dr. Kitchens. (Tr.I 102:20-103:3) She testified to her experiences taking the USMLE and participating in the residency match program.

20.   NBME filed a motion in limine challenging Dr. Senoga's proffered testimony. (Dkt. 62) Dr. Kitchens responded in writing to NBME's motion after the trial. (Dkt. 75) The Court took Dr. Senoga's testimony but has concluded that her testimony about her personal experiences is not relevant to the action and that she does not have specialized expertise that would qualify her as an expert on the topics on which she testified. Her testimony therefore is not being considered as part of the Court's findings.

### 2.   NBME's Expert Witnesses

21.   NBME offered expert testimony from Michael Gordon, Ph.D. and Timothy Allen, M.D. Dr. Gordon and Dr. Allen served solely as experts in this lawsuit; they did not review Dr. Kitchens's accommodation requests at the time they were submitted to NBME. Like Dr. Kitchens's experts, Dr. Gordon and Dr. Allen did not attend other parts of the trial.

### a.   Dr. Gordon

22.   Dr. Gordon's background is in clinical psychology, and he specializes in ADHD. (Tr.III 116:7-15) He has been working in the field of ADHD since 1977, has evaluated hundreds of individuals for ADHD, has authored 60-70 peer-reviewed articles on ADHD, has taught classes on how to evaluate for ADHD, and has been involved in establishing diagnostic procedures and

treatment approaches for ADHD. (Tr.III 117:11-119:21) Dr. Gordon also reviews requests for accommodations on standardized tests as an independent consultant to various testing entities. (Tr.III 120:7-121:14) Dr. Gordon is an expert in ADHD and ADHD assessments, anxiety, and documenting and reviewing accommodation requests under the ADA. (Tr.III 121:21-24)

23.   In summarizing the diagnostic criteria for ADHD from the DSM, Dr. Gordon explained there must be an early onset of symptoms, because ADHD is a neurodevelopmental disorder. The disorder must be consistent across settings and relatively consistent across time. The symptoms of ADHD must also cause clinically significant impairment. (Tr.III 123:10-124:23)

24.   Dr. Gordon testified that, based on his experience, someone could receive a diagnosis of ADHD even if he or she does not meet the diagnostic criteria. (Tr.III 125:12-16)

25.   Dr. Gordon explained that psychological testing can be a very important part of an ADHD evaluation. The testing can identify whether there are functional deficits associated with the disorder and the extent of those deficits, rule out other possible reasons for ADHD-like symptoms, and show whether there are other factors affecting someone's functioning, such as their intellectual or academic abilities. (Tr.III 149:7-20)

26.   It is Dr. Gordon's opinion that the medical records and other information from Dr. Kitchens and persons with personal knowledge of Dr. Kitchens do not demonstrate that Dr. Kitchens has a mental impairment of ADHD; do not demonstrate that Dr. Kitchens is substantially limited in his ability to concentrate, think, read, or perform any other major life activity relevant to taking the USMLE; and do not demonstrate that Dr. Kitchens needs accommodations to access the USMLE. (Tr.III 173:16-175:10)

### b.   Dr. Allen

27.   Dr. Allen is a licensed physician and is board certified in both general psychiatry and forensic psychiatry. (Tr.IV 5:7-17) He is a part-time faculty member at the University of Kentucky, works part-time for a Kentucky state agency providing assessments of criminal defendants for competency to stand trial, and also maintains a private practice. (Tr.IV 5:18-6:5) About half of his time is spent treating patients. (Tr.IV 6:25-7:11) Dr. Allen has testified in criminal cases for the State of Kentucky approximately 500 times in the last 15 years and in civil hearings and trials 50 times or more. (Tr.IV 45:20-25)

28.   Dr. Allen evaluates patients for anxiety on an almost a daily basis and regularly evaluates patients for ADHD. (Tr.IV 8:19-24) He conducted approximately 25-30 ADHD evaluations in the past year. (Tr.IV 49:8-14) As a forensic psychiatrist, Dr. Allen routinely reviews records prepared by other healthcare professionals. (Tr.IV 9:5-12) He is familiar with medications that can be prescribed for ADHD and anxiety and is also familiar with physician practices around prescribing medication for anxiety and ADHD. (Tr.IV 9:13-17) Dr. Allen also reviews requests for accommodations as an outside reviewer for standardized testing entities. (Tr.IV 9:18-10:24) Dr. Allen is an expert in anxiety and ADHD, prescription practices around anxiety and ADHD, physician practices in keeping medical records, and the documentation and review of accommodation requests under the ADA. (Tr.IV 10:5-9)

29.   Dr. Allen explained that healthcare professionals will treat patients for anxiety-like conditions, including prescribing anti-anxiety medication, even when the patient does not necessarily meet the requirements for a clinical disorder. (Tr.IV 11:22-13:5) Medical professionals treat symptoms, and when a patient presents with symptoms that are distressing, the professional wants to help alleviate those symptoms. Although therapy can also help, Dr. Allen testified that

we as a society increasingly rely on medication, and it is often easier for both the clinician and the patient to use medications that generally have low side effects and low risk. (*Id.*)

30.   Dr. Allen explained that anxiety is not a static condition. It can change hour to hour and over longer periods of time. (Tr.IV 14:9-20) Current information about a patient's condition is therefore important. (Tr.IV 22:2-10)

31.   When Dr. Allen reviews a request for testing accommodations, he looks for longevity of symptoms, a description of the actual symptom burden, and evidence of how the symptoms directly impact academic functioning and testing ability. If an accommodation request is based on an impairment that typically does not cause significant reading impairment (like ADHD or generalized anxiety disorder), Dr. Allen looks for objective measures of cognitive impairment or difficulties that would indicate whether someone has a substantial limitation in reading compared to the general population. (Tr.IV 15:23-16:15)

32.   Dr. Allen testified that in a clinical setting such as a busy family practice, mental impairments are commonly diagnosed based solely on subjective complaints. (Tr.IV 41:21-27) But when an evaluation is made regarding whether diagnostic criteria are met and whether symptoms cause functional limitations that substantially limit someone compared to the general population, Dr. Allen says it is inappropriate to "just base that on subjective complaints[.]" (Tr.IV 42:8-13) As he explained:

> It's not that we don't necessarily trust the person complaining, but patients don't have perspective on how their symptoms are compared to other people's symptoms with the same diagnosis. They don't know how anyone else experiences these things … or [what is normal] in test taking in high stress situations …, they only know their subjective complaints.

(Tr.IV 42:14-22)

33.   Dr. Allen testified that while you could "potentially" infer the severity of a patient's condition based on the medication they have been prescribed, other factors go into the analysis.

- 12 -

The fact that someone has a history of being prescribed Adderall "shows that one clinician thought that they benefitted from the medication, but it does not specifically [show] they met the criteria [for ADHD] as laid out in the DSM." (Tr.IV 60:12-18) Likewise, the dosage of medication prescribed may "potentially" allow you to infer the severity of a patient's condition, but various factors can impact dosage, since everybody metabolizes drugs differently. (Tr.IV 57:5-13)[3]

34.   It is Dr. Allen's opinion that the medical records and other information from Dr. Kitchens and individuals with personal knowledge of Dr. Kitchens do not demonstrate that Dr. Kitchens is substantially limited in his ability to perform any major life activity relevant to taking the USMLE, and do not demonstrate that Dr. Kitchens needs 100% extra testing time to take the USMLE in an accessible manner. (Tr.IV 43:3-45:2)

### B.   Dr. Kitchens's Background

#### 1.   Primary and Secondary School

35.   Dr. Kitchens's mother, Missie King ("Ms. King"), testified at trial that Dr. Kitchens had problems with paying attention and not being a distraction to himself and others in elementary school. She also testified he had problems with reading and math. (Tr.I 143:21-144:2)

36.   Ms. King testified that around first or second grade, she took Dr. Kitchens to his pediatrician to be evaluated for ADHD at the recommendation of his teacher. (Tr.I 145:14-146:12) She reports that the pediatrician concluded Dr. Kitchens had ADHD and prescribed Ritalin, but she chose not to give the medication because she was concerned about side effects. (Tr.I 146:14-147:17) There are no documents in the record related to this reported evaluation or diagnosis.

---

[3] Dr. Kitchens's experts seemed to offer conflicting testimony on this point. Dr. Pullins opined that an individual prescribed 30 milligrams of Adderall in a 24-hour period would have moderate to severe ADHD. (Tr.I 56:25-57:19) Dr. Shepherd, however, testified that ADHD medications are as potent in the smallest dose as the largest dose. He prescribes larger doses to help the medication stay in someone's system longer. (Tr.II 33:2-10)

37.    At trial, Ms. King testified that Dr. Kitchens's school wanted to retain him after first grade and perhaps after third or fourth grade, but she declined to do so because she believed she could help him "get to the level that [he] needed to be on" and she did not want him to end up in the same grade as his younger brother. (Tr.I 154:18-155:5)

38.    Ms. King offered different testimony in a declaration that was filed in support of Dr. Kitchens's motion for preliminary injunction. There, she testified that she refused to hold Dr. Kitchens back after first grade "[d]ue to his high performance in classwork." (Dkt. 77-49 ¶ 6) She also testified that "[w]ith each grade, Dr. Kitchens' teachers noted that he performed well academically but needed improvement in his conduct." (*Id.* ¶ 16)

39.    In first and second grade, the years that Ms. King testified Dr. Kitchens's behavior caused the school to recommend an ADHD evaluation and possible grade retention, his conduct grades were all "S" for "Satisfactory." (Dkt. 77-1 JX1) In third and fourth grade, Dr. Kitchens's conduct scores varied from Satisfactory to Unsatisfactory or Needs Improvement. (Dkt. 77-1 JX1) By fifth grade, his conduct scores were again all Satisfactory. (Dkt. 77-1 JX1)

40.    Dr. Kitchens's elementary school transcript reflects individual instruction in reading through the "Sail" program in first grade but not in any other grade. (Dkt. 77-1 JX1)

41.    Ms. King testified at trial that, by late middle school and early high school, Dr. Kitchens began using his own systems to manage his personal life and academics. (Dkt. 77-49 ¶¶ 18-19; Tr.I 161:15-162:24; *see also* Tr.II 90:24-91:20)

42.    In middle school, Dr. Kitchens generally obtained Bs and Cs across subjects. (Dkt. 77-2 JX2) He did not receive formal accommodations in middle school. (Dkt. 77-24 PX2 at 5)

43.    Dr. Kitchens was generally a B-C student in high school, where he took a number of honors and AP classes. (Dkt. 77-3 JX3; Tr.II 179:17-180:1) He graduated with a 2.812 GPA and

a class rank of 45 out of 135 students. (*Id.*) He did not receive formal accommodations in high school. (Dkt. 77-24 PX2 at 5)

44.   Dr. Kitchens took the ACT exam three times in high school without accommodations. (Dkt. 77-3 JX3; Tr.II 95:13-14) His score improved on his second attempt to what Dr. Kitchens described as a score in the 50th percentile. (Tr.II 94:4-13)

### 2.   College

45.   Dr. Kitchens attended Berea College, a liberal arts college in Kentucky. (Tr.II 98:18-25)

46.   Dr. Kitchens testified that his biology professor, Dr. Alyssa Hanna, allowed him to finish exams in her office. (Tr.II 101:20-22)[4] He did not receive formal accommodations in college. (Dkt. 77-24 PX2 at 5)

47.   Dr. Kitchens graduated from Berea College in 2014, with a B.A. in Music and a GPA of 2.62. (Dkt. 77-27 JX4)

### 3.   Work After College

48.   After graduating from Berea College, Dr. Kitchens worked as a car salesman, where he regularly interacted with customers. He enjoys working with people, and he was a good car salesman. He did not request any type of accommodations for this job. (Tr.II 174:3-15) Dr. Kitchens later worked in store management at Kroger for approximately two years, and he did not request any accommodations in that job, either. (Tr.II 174:16-175:10)

---

[4] Dr. Kitchens attached an affidavit from Dr. Hanna to his amended complaint. The affidavit stated that Dr. Hanna provided Dr. Kitchens with 100% extra time as an "unofficial accommodation" for his "severe attention deficit hyperactivity disorder." (Dkt. 15 at p. 12) Dr. Kitchens, however, took classes with Dr. Hanna in the fall of 2010 and spring of 2011—years before he visited Berea College Health Services seeking ADHD-related medication. (Dkt. 77-27 PX5) Dr. Kitchens did not present Dr. Hanna as a witness at trial and her affidavit testimony is therefore hearsay and cannot be considered for the truth of what it states.

### 4.   Medical School

49.   Dr. Kitchens attended medical school in Poland at the Medical University of Lublin. (Dkt. 77-5 JX5) He lived in Poland for approximately two years while taking classes. (Tr.II 184:22-185:5) Dr. Kitchens did not take Adderall while attending medical school, nor did he receive any formal accommodations. (Tr.II 145:17-23; Dkt. 77-24 PX2 at 5)

50.   Dr. Kitchens testified that he needed to take his medical school exams three times to pass, and that on the last attempt, he was in a less distracting environment and "had access to the professor who was always standing right there to answer those questions and to be able to help in a more inclusive way than she could if she had everyone in the classroom." (Tr.II 119:15-18) He also testified that his professors wanted to see their students succeed and would allow extra testing time. (Tr.II 119:5-120:1) He offered no supporting documentation from his school for any of this testimony.

51.   Dr. Kitchens participated in clinical rotations during medical school at Jackson Park Hospital in Chicago and at Brentwood Psychiatric Hospital in Louisiana, without the need for accommodations. (Tr.II 175:11-21) He also had summer internships at the Mayo Clinic in Chicago and at Baptist Health in Kentucky during medical school, again without needing accommodations. (Tr.II 175:22-176:16)

### C.   Medical Records

52.   On January 10, 2013, Dr. Kitchens reported to the Berea College Disability Services office that he believed he might have ADHD. (Dkt. 77-27 PX5) He reported symptoms dating back to first grade but told office personnel that through "structure, predictability and high involvement" in extra-curricular activities "he had no problems with functioning up until recently," when he

began receiving lower grades. (*Id.*) He "revealed that his wish is not for accommodations—but for medication," and therefore he was referred to a medical doctor. (*Id.*)

53.    The next day, on January 11, 2013, Dr. Kitchens was seen by Miriam David, MD, at Berea College Health Services. At that time, he explained that "he [had] more problems with studying/homework than with focusing in class" and "[m]ore problems with tests than with homework." (Dkt. 77-28 PX6) Dr. David's "Assessment" states "Attention deficit disorder without mention of hyperactivity - 314.00" followed by "Probable." (*Id.*) Her "Plan" language is incomplete but seems to contemplate a subsequent in-office or outpatient evaluation. (*Id.*) Dr. Kitchens was started on Adderall. (*Id.*)

54.    In August 2013, Dr. Kitchens returned to Berea College Health Services, reporting: "Was prescribed Adderall and wants it back, never went and got the rx so has never taken it." (Dkt. 77-29 PX9) He explained that he was "applying to med school, taking MCAT and thinks this will help him focus on his future." (*Id.*) Dr. David's "Assessment" again lists "Attention deficit disorder without mention of hyperactivity - 314.00" and her written "Plan," while cut off, again appears to reflect the need for further evaluation. (*Id.*) Dr. David's notes state: "Will start Adderall and see how he does for 1 mon." (*Id.*) Dr. Kitchens did not present Dr. David as a witness at trial.

55.    Although the 2013 documents from Berea College Health Services appear to reference an ADHD diagnosis, none of the documents reflect an appropriate evaluation being done for ADHD or any basis for a diagnosis. They also do not address the nature and extent of any functional limitations. (Tr.III 139:22-140:10)

56.    Seven months later, in March 2014, Dr. Kitchens went back to Berea College Health Services, seeking medication refills. (Dkt. 77-30 PX11) Dr. David's "Assessment" repeats "Attention deficit disorder without mention of hyperactivity - 314.00," her "Plan" again references

the need for some sort of additional evaluation, and she notes refilling "his stimulant" while instructing Dr. Kitchens to return to the office in one month. (*Id.*)

57.   In July 2014, Dr. Kitchens went to White House Clinics for a pre-medical school physical with Nurse Practitioner Colleen Ambrose. (Dkt. 77-51 DX 7 at MK23) Nurse Ambrose's report notes a prior medical history of ADD (attention deficit disorder) "treated by meds." (*Id.*) Her report states: "[A]dvised he will have to find a local provider to treat his ADD" in medical school. (*Id.* at MK25) The report reflects a prescription for Adderall "prescribed elsewhere." (*Id.*) Nothing in this report suggests that Nurse Ambrose assessed Dr. Kitchens for ADHD in 2014. (Tr.III 140:11-25)

58.   In February 2016, Dr. Kitchens again reported to White House Clinics for a medical school physical, this time with Dr. Vicki Hackman. (Dkt. 77-51 DX 7 at MK19) This record reflects "ADD" under past medical history. (*Id.*)  It also shows an Adderall prescription that was "stopped" as of the date of the visit. (*Id.* at MK22) Nothing in this record shows any type of ADHD assessment or diagnosis by Dr. Hackman. (*Id.*; *see also* Tr.III 141:1-8)

59.   In July 2017, Dr. Kitchens reported back to Dr. Hackman, seeking a "med refill." (Dkt. 77-51 DX 7 at MK16) He reported being on Adderall since 2014 and that "he was focusing better on [A]dderall." (*Id.*) Dr. Hackman's "Assessment" lists "Attention and concentration deficit (R41.840)." Next to "Provider Plan," she wrote:

> is asking me to write an rx for adderall; he is leaving for poland in september, He says poland does not prescribe adderall for ADHD but was told if he had an MD here to write a letter, he could get it there. I told him I could not do that but I could refer him to a specialist for evaluation and get their opinion about him needing the medication. He was not happy with this; says he was seeing colleen and then Dr David was writing his rx and he brought in a bottle dated 2016 as last rx.

(*Id.* at MK17) Dr. Hackman's "Plan Orders" reflect a referral to psychiatry to evaluate and treat. (*Id.*) Dr. Kitchens provided no evidence of ever having had such an evaluation. Dr. Kitchens did not present Dr. Hackman as a witness at trial.

60.   Dr. Allen explained that the code R41.840 noted in Dr. Hackman's record does not reflect an ADHD diagnosis. (Tr.IV 25:21-26:4 ("She is putting in a kind of a vaguer code, a broader code to say he is complaining of these symptoms…but not making a formal diagnosis of ADHD."); *see also* Tr.III 142:15-143:16)

61.   In May 2018, Dr. Kitchens went back to Dr. Hackman, this time to discuss getting a service dog. (Dkt. 77-51 DX7 at MK12) He reported high stress levels and said that "he should still be on [A]dderall." (*Id.*) Dr. Hackman's report noted that she had referred Dr. Kitchens to Lexington for an evaluation, Dr. Kitchens had not been on Adderall for "a while," and he reported taking over-the-counter medication as needed "to help with concentration." (*Id.*)

62.   Dr. Hackman's "Assessment" for this visit noted "Attention-deficit hyperactivity disorder, unspecified type (F90.9)." (*Id.* at MK14) Dr. Gordon explained that "ADHD unspecified type," signals that "even if she felt this was ADHD, it would be of a type that did not meet full criteria" of the disorder. (Tr. III 131:15-24; *see also* Tr.IV 24:21-25:1) The code F90.9 typically means that a doctor has not performed a full evaluation for ADHD. (Tr.IV 17:16-22; *see also* Dkt. 77-38, PX48 at 8)

63.   Dr. Hackman's "Assessment" also noted "Anxiety (F41.9)." (*Id.*) The code used by Dr. Hackman, F41.9, refers to "unspecified anxiety," which does not reflect a diagnosis under the DSM but is a "catchall" category conveying that "there is some anxiety here, and I don't know what else to call it." (Tr.IV 16:16-17:12, 25:8-10)[5]

---

[5] Dr. Allen explained that diagnostic codes are necessary for billing purposes, so healthcare professionals can show why they are seeing a patient. These codes must be put in every electronic medical record, so Dr. Hackman "had to put in something." (Tr.IV 17:6-9)

64.   Thus, Dr. Hackman did not diagnose Dr. Kitchens with ADHD or anxiety on this visit, and she once again referred Dr. Kitchens out for evaluation and treatment. She also did not prescribe any medication for ADHD or anxiety.

65.   Dr. Kitchens's more recent health records are spotty. At some point, Dr. Kitchens apparently began receiving prescription medication for anxiety and ADHD, as a one-page excerpt from an October 2020 dermatology appointment record from Northwestern Medicine reflects prescriptions for Buspirone and Adderall. (Dkt. 77-24 PX2 at 9) There is also a brief letter from Dr. Ghori Khan at Northwestern Medicine dated April 22, 2020, which indicates that Dr. Kitchens was under Dr. Khan's care at that time and had "significant anxiety." (Dkt. 77-44 PX57) However, Dr. Kitchens did not offer any other medical records from Northwestern Medicine as evidence at trial, and he did not present Dr. Khan as a witness.

66.   As explained by Dr. Allen, the reference to "significant anxiety" in Dr. Khan's letter is unclear, but it does not indicate a diagnosis and does not provide any information about functional limitations or the need for any accommodations. (Tr.IV 20:24-21:23)

67.   Buspirone is an anxiety medication, and Adderall is a medication used to treat ADHD. (Tr.IV 23:3-24:9) A record that these medications have been prescribed does not, in and of itself, provide any information about whether ADHD or anxiety has been properly diagnosed, much less any information about the existence of symptoms or the extent of any resulting functional impairment. (Tr.III 131:1-4; Tr.IV 23:3-24:11)

68.   More recently, Dr. Kitchens has been treated at Baptist Health. A March 23, 2021 after-visit summary with Arthur Yin, M.D., reflects a medication change from Buspirone to Propranolol.

(Dkt. 77-32 PX19)[6] This record does not describe Dr. Yin's clinical thinking, nor does it describe any symptom burdens or functional limitations. (*Id.*; *see also* Tr.IV 32:9-18) Dr. Yin did not testify at trial, nor did Dr. Kitchens offer any written testimony from Dr. Yin.

69.   A Progress Note for a September 22, 2022 visit with Nurse Practitioner Tina Holbrook at Baptist Health shows Dr. Kitchens reporting for a "medication management follow-up," with chief complaints of anxiety and depression.[7] According to this note:

> Markcus Kitchens … [r]eports that he has been doing well overall continues to study for upcoming exam that is required to obtain certification in order to start residency. Feels that he continues to be overwhelmed with the pressure of passing these exams. Has been studying full time since last visit, test is scheduled for next week. Feels that overall anxiety and depression is well controlled with medication. Admits that he has always been driven to complete goals, but feels that medication has allowed him to better verbalize and display emotions. Wife is a huge support for him. Has history of ADHD, he does complain of continued symptoms associated with ADHD. Has been on current dose of Adderall for several years. Verbalizes that he does not take medications on the weekends or when he does not have to complete mentally challenging tasks. Has tried several interventions at home such as using headphones that block out noise, [special] lighting and soothing sound machines. Has also tried OTC Active Mind supplement that he has found can be beneficial….

(Dkt. 77-36 PX37 at 1) At this visit, which occurred after Dr. Kitchens filed this lawsuit and after he had been denied accommodations by NBME, Nurse Holbrook diagnosed Dr. Kitchens with generalized anxiety disorder, attention deficit disorder, unspecified hyperactivity presence, and major depressive disorder, recurrent, in partial remission. (Dkt. 77-36 PX37 at 3) Dr. Kitchens did not present Nurse Holbrook as a witness at trial.

---

[6] Propranolol is a blood pressure medication that "helps break the cycle between [a] subjective perception of being anxious and the physical symptoms of anxiety, like increased heart rate, sweating, shortness of breath, … and it also … has a calming effect overall." (Tr.IV 31:15-32:8)

[7] This medical record is unusual because it was signed by Nurse Holbrook on September 22, 2022, but reflects an addendum on February 5, 2023, without showing what was changed in the report. (Tr.IV 36:25-37:25) February 5, 2023, is the day before Dr. Kitchens visited Nurse Holbrook seeking documentation to support his preliminary injunction motion in this case. *See infra* ¶ 74.

70.    Dr. Kitchens's description in this September 2022 visit of not taking ADHD medication on the weekends or when he is not performing mentally challenging tasks is inconsistent with ADHD, as explained by Dr. Gordon:

> Our patients would find it difficult on weekends too, and take their medication because it's not just about being challenged and having to think through things. It's about being able to plan and strategize and cope for all of the demands that we have in our life, well beyond … those that are mentally challenging. As a matter of fact, it's the [tasks] that are the least mentally challenging that can be most difficult for somebody because they may be less interesting.

(Tr.III 145:12-146:2) Dr. Allen offered similar testimony, explaining that dysfunction from ADHD should be seen in all walks of life, not just in academics, (Tr.IV 33:20-34:3), and that his patients with ADHD "can't keep their home clean, they don't pay their bills on time, the rest of their life is just as chaotic as their work or school life. And so they need the medication to do all of the basic functions in a timely and reasonable manner." (Tr.IV 34:3-8)

71.    With respect to Nurse Holbrook's anxiety diagnosis, Dr. Allen noted that Dr. Kitchens's report shows stress but not symptoms of anxiety, there was not a significant symptom burden described, and his symptoms were described as being under control. (Tr.IV 32:19-33:19)

72.    On January 10, 2023, Dr. Kitchens was again seen by Nurse Holbrook through a video visit for a medication management follow-up, with his chief complaints being anxiety, depression, and ADHD. (Dkt. 77-52 DX28 at 1) At this time, Dr. Kitchens reported:

> [H]e is doing well overall ….. He continues to be in the lawsuit with the medical testing board. Has missed residency deadlines so component has been postponed. … Reports that he stopped taking Prozac about two weeks after last visit (November) and feels that he has been managing overall symptoms of depression and anxiety well on his own. Feels that overall ADHD symptoms are controlled with current regimen. Says that he does not take Adderall every day as he does not feel he needs to take medication when sustained mental effort is not required. ….

(Dkt. 77-52 DX28 at 1) The only diagnosis reported for this visit is ADHD. (*Id.* at 3)

73.   As with the September 22, 2022 report, Dr. Kitchens's statements to Nurse Holbrook in January 2023 reflect that any symptoms he was experiencing were controlled and that his functioning was not impaired. (*See also* Tr.III 146:14-147:1) Dr. Kitchens again reported that he only takes ADHD medication when he is engaged in "sustained mental effort." (Dkt. 77-52 DX 28 at 1) As Dr. Allen opined in response to Dr. Kitchens's similar report in September 2022: "[I]f he only needs [Adderall] when his cognitive demand is the highest, such as on a USMLE licensure exam, then that leads away from the diagnosis of ADHD, and instead, suggests just difficulty with really hard tasks, which, I guess, is true for most people." (Tr.IV 34:9-14)

74.   On February 6, 2023 Dr. Kitchens presented for another office visit with Nurse Holbrook, requesting a letter he could submit in support of his preliminary injunction motion in this case. According to the record from this visit, Dr. Kitchens told Nurse Holbrook:

> [H]e has history of ADHD that was diagnosed in childhood, but was denied ADA accommodations when testing for medical boards.… Denies any past psychological evaluations to determine accommodations needed. He does say that he was evaluated by a psychologist during college, but declined any type of accommodation. Reports added stressor as he needs to have this lawsuit reviewed by judge that will enable him to obtain the accommodations he needs for testing. … Does admit to increased anxiety and depressed mood at times due to current situation, but feels as though he is handling the situation well. Continues to feel that ADHD symptoms are adequately controlled with current medication regimen.

(Dkt. 77-53 DX35 at 23) Nurse Holbrook's sole diagnosis at this time was ADHD. (*Id.* at 26)

75.   It appears that Nurse Holbrook drafted a letter at Dr. Kitchens's request, although Dr. Kitchens did not provide the letter to the Court with his preliminary injunction motion. Her letter indicated that Dr. Kitchens had been a patient of the clinic since August 25, 2022 and had a current diagnosis of ADHD, predominantly inattentive type, and it stated that "[a]ny reasonable accommodations should be implemented." (Dkt. 77-53 at 32) Dr. Kitchens apparently was not satisfied with this letter and called the clinic to inform them that it "needs to include

accommodation[s] 100 percent of time plus 100%." (Dkt. 77-53 at 10) Apparently, the clinic did not agree to make that revision, and no letter from Baptist Health was provided to the Court.

76. Nurse Holbrook's notes from this visit indicate that Dr. Kitchens was administered a Continuous Performance Test (CPT) on February 3, 2023, with results suggesting issues related to sustained attention and vigilance. (Dkt. 77-53 DX35 at 26) Contrary to the instructions on the Conners CPT report,[8] Nurse Holbrook provided Dr. Kitchens a copy of the test results with the instruction that "this is a tool that [you] can present verifying [an] ADHD diagnosis." (Dkt. 77-53 DX35 at 26) She encouraged him, however, to make an appointment for psychological testing "as this evaluation is more detailed and will recommend accommodations that may be needed" and would rule out other conditions that could cause atypical scores on the CPT. (*Id.* at 26-27)

77. On a more recent visit to Baptist Health on March 24, 2023, again for a medication follow-up, Dr. Kitchens saw a different provider, Kristine Baula, MD. (Dkt. 77-37 PX 46) Dr. Kitchens requested an appointment due to increased anxiety as a result of this litigation. As in past visit to healthcare providers, he also reported that "his ADHD symptoms are adequately managed with [his] current dose of Adderall," that "[h]e is able to focus well when taking it twice a day," and that he "does not take it on days where he is not working and is not needing to focus on anything." (Dkt. 77-37 PX46 at 1)

78. Dr. Baula diagnosed Dr. Kitchens with generalized anxiety disorder, moderate episode of recurrent major depressive disorder, and attention deficit disorder, unspecified hyperactivity presence. (Dkt. 77-37 PX46 at 3) Dr. Kitchens did not present Dr. Baula as a witness at trial, and there is no evidence regarding how she arrived at these diagnoses. She noted "[h]e endorses

---

[8] The Conners CPT Report states: "This Assessment report is intended for use by qualified assessors only, and is not to be shown or presented to the respondent or any other unqualified individuals or used as the sole basis for clinical diagnosis or intervention." (Dkt. 77-33 PX26 at 1)

increasing anxiety as well as depressive symptoms …. Main stressor is his ongoing lawsuit, which is approaching its final stages….” (*Id.*)

79.  Dr. Allen describes this record from Dr. Baula as the first report of Dr. Kitchens experiencing real anxiety symptoms. (Tr.IV 40:1-23 (discussing symptoms such as picking at his skin and tearfulness)) Dr. Allen also explained, however, that while these symptoms are relevant to a diagnosis, there is no description of these symptoms impacting Dr. Kitchens's test-taking ability or functional limitations in an academic sense. (Tr. IV 40:24-41:6). To the contrary, the report noted that Dr. Kitchens is still focusing well on his medication. This record shows, in other words, that Dr. Kitchens is "stressed out over a bad situation" and is reporting some subjective symptoms of anxiety, but that the cognitive component is well-controlled. (Tr.IV 41:7-18; *see also* Tr.III 147:25-148:14)

### F.    Christina Bacon Evaluation

80.  During this litigation, Dr. Kitchens obtained a psychological evaluation from Christina Bacon, LPP, to support his motion for preliminary injunction. Dr. Kitchens did not have any treatment relationship with Ms. Bacon before or after the evaluation. (Dep. Tr. 24:13-25:8)[9] Dr. Kitchens offered Ms. Bacon as a witness at the preliminary injunction hearing but not at trial; he offered her as an expert in psychology and cognitive therapy (PI Tr. 55:8-10), not as an expert in ADHD.

81.  Ms. Bacon received training in diagnosing disorders, including ADHD, as part of her master's-level training. (Dep. Tr. 11:25-12:6) She has not taken any specialized classes or received other training in ADHD, and she has not published any articles or books on ADHD. (Dep. Tr.

---

[9] Deposition designations and exhibits (with "CB" references) are found at Dkt. 76. All references to "Dep. Tr." are to the transcript of the deposition of Christina Bacon, LPP.

12:7-11, 12:17-21) She began performing ADHD assessments in September 2022 (Dep. Tr. 13:19-22), and she has conducted 16 ADHD assessments to date. (Dep. Tr. 13:6-9; 13:14-16).

82.   Ms. Bacon's 2023 report is the only diagnostic report in the record. Ms. Bacon spent approximately two hours in her evaluation of Dr. Kitchens. (Dep. Tr. 16:21-17:9)

83.   Ms. Bacon utilized a DIVA-2 questionnaire in her evaluation, which gathers a patient's self-report of his symptoms and impairment. (Dep. Tr. 33:23-34:6) Ms. Bacon also utilized the Achenbach System of Empirically Based Assessment (ASEBA), which again gathers a patient's self-report of symptoms. Dr. Kitchens's wife also filled out an ASEBA questionnaire. (Dep. Tr. 34:7-35:1; 35:7-21)

84.   Ms. Bacon administered a MOXO distracted continuous performance test (d-CPT) to Dr. Kitchens. (Dep. Tr. 40:13-19) In this 20-25 minute test, Dr. Kitchens was instructed to click every time he saw an image of an ace of hearts playing card, as different sounds played and different images appeared on his computer screen. (Dep. Tr. 40:20-41:17) The MOXO is not a reading test or a test of reading fluency. (Dep. Tr. 41:18-22) It also is not diagnostic of ADHD, as the report itself shows. (Dkt. 77-34 PX27 at 1 ("The MOXO test is designed to support clinical assessment. Results of the test should be used only by a qualified professional [as a] decision support tool and should not be the sole basis for diagnosis."))

85.   Ms. Bacon does not know whether Dr. Kitchens took Adderall on the day he took the MOXO test. (Dep. Tr. 43:7-44:10) The MOXO report states "none" following "medication." (Dkt. 76-4 CB-6 at 1)

86.   Ms. Bacon concluded in her evaluation report that Dr. Kitchens "exceeds the number of symptoms for diagnosis of ADHD combined presentation under the DSM." (Dkt. 76-2 CB-1 at 7) This was based solely on Dr. Kitchens's own report of those symptoms. (Dep. Tr. 51:24-52:7)

87.    Ms. Bacon reported that "Markcus's behavior has been seen since childhood, diagnosed by multiple practitioners, and has been provided medication for the disorder since 2013." (Dkt. 76-2 CB-1 at 7) This was also based entirely on Dr. Kitchens's self-report to Ms. Bacon. (Dep. Tr. 37:7-22; 52:8-16)

88.    Ms. Bacon concluded in her report that "[d]espite Dr. Kitchens successfully completing medical school the symptoms [of ADHD] have had a great impact on his work and education." (Dkt. 76-2 CB-1 at 3-4) This opinion is also based entirely on Dr. Kitchens's self-report. (Dep. Tr. 45:17-47:21)

89.    Ms. Bacon opined in her report that Dr. Kitchens's "difficulty completing the board exams seems directly linked to his symptoms of ADHD." (Dkt. 76-2 CB-1 at 4) At her deposition, however, Ms. Bacon had no recollection of Dr. Kitchens informing her that he ran out of time in taking the USMLE (Dep. Tr. 49:2-6), and there is no such report by Dr. Kitchens in Ms. Bacon's written evaluation. Rather, Ms. Bacon's opinion was based on her observation of Dr. Kitchens during the 20-25 minute MOXO, where she observed Dr. Kitchens having difficulty sitting still and staying on task, getting distressed when he made a mistake, wringing his hands, rocking, and showing "physical expression of ADHD symptoms…." (Dep. Tr. 49:16-50:1)[10] Dr. Kitchens knew that Ms. Bacon was observing him while he was taking the MOXO. (Dep. Tr. 61:1-3)

90.    Dr. Kitchens's score of 15.2 on the inattentiveness scale of the MOXO was "remarkably out of the normal range." (Tr.III 156:3-10) According to Dr. Gordon, "somebody would have to be likely substantially brain damaged to have scores that far outside the norm…." (Tr.III 156:11-

---

[10] The Court witnessed Dr. Kitchens over the course of a stressful four-day trial and witnessed none of this type of behavior. To the contrary, while representing himself with respect to all witnesses and otherwise interacting with the Court, he was focused and sustained his attention over multiple hours for multiple days.

5) Dr. Allen testified that Dr. Kitchens's score was closer to someone attempting to "simulate" ADHD than someone who actually has ADHD, and therefore he questioned the validity of the assessment. (Tr.IV 69:9-25)

91.   Ms. Bacon did not conduct any type of functional assessment of Dr. Kitchens. (Dep. Tr. 50:19-21) She did not measure his IQ or measure any of his academic skills, such as his reading speed or fluency. (Dep. Tr. 50:22-51:1) Ms. Bacon did not diagnose Dr. Kitchens with a learning disorder or with anxiety. (Dep. Tr. 52:22-53:5) Indeed, she apparently ruled these issues out in diagnosing Dr. Kitchens with ADHD. (Dep. Tr. 39:11-40:1; 9-10)

92.   Ms. Bacon's recommendations were based on her ADHD diagnosis, not any finding that Dr. Kitchens is disabled within the meaning of the ADA. (Dep. Tr. 59:1-18)

### III. Dr. Kitchens's Requests for Accommodations on Step 1 of the USMLE

93.   Examinees who seek disability-based testing accommodations on any Step exam first register for the exam and state in their registration material that they intend to seek accommodations, then they submit an accommodation request to NBME. (Tr. 52:8-24; Dkt. 77-56 DX60) Each request is made with respect to a specific test administration. (Tr. 53:13-16)

94.   Dr. Kitchens first requested testing accommodations from NBME on January 5, 2022. (Dkt. 77-59 DX69). He requested 100% additional test time (double time) over two days on the Step 1 exam, based on claimed diagnoses of ADHD (reportedly first diagnosed in 2013) and "Test Anxiety" (reportedly first diagnosed in 2018). (Dkt. 77-24 PX2)

95.   Dr. Kitchens was asked on the accommodation request form to list any accommodations he received on prior tests such as the ACT or MCAT (Medical College Admission Test). (Dkt. 77-24 PX2 at 4) He reported that he did not receive accommodations on the SAT/ACT (in high school)

because he had not been diagnosed at that time, and that he did not request accommodations on the MCAT because he did not know he could do so. (*Id.*)

96.   Dr. Kitchens was also asked to list any formal accommodations he had received in school. (Dkt. 77-24 PX2 at 5) For elementary, middle, and high school, Dr. Kitchens reported he did not receive any accommodations because he "wasn't diagnosed yet." (*Id.*) Likewise, he did not report receiving any accommodations in college or medical school. (*Id.*)

97.   NBME's accommodation request form asks applicants to include a personal statement describing their impairments and how they substantially limit a major life activity. (Dkt. 77-24 PX2 at 4) Dr. Kitchens provided a very short personal statement with his January 2022 accommodation request, but he did not describe his current functioning or the impact of his ADHD or "test anxiety" symptoms on his daily life. (Dkt. 77-24 PX2 at 6) His statement consisted primarily of legal argument. (*Id.*)

98.   Kitchens provided a handful of medical records in support of his January 2022 request, which the Court will summarize in chronological order.

99.   <u>First</u>, Dr. Kitchens provided a two-page office visit report from Dr. Hackman dated July 2017, where he presented for a medication refill. (Dkt. 77-24 PX2 at 12-13) This reflects an "Assessment" of "Attention and concentration deficit (R41.840)," indicates that Dr. Hackman declined to write a prescription for Adderall, and shows a referral to a psychiatrist to "evaluate and treat." (*Id.*) This record is discussed *supra* at paragraphs 59-60 and, as noted there, the assigned code does not reflect an ADHD diagnosis.

100. <u>Second</u>, Dr. Kitchens provided pages 3 and 4 of a May 25, 2018 medical report signed by Dr. Hackman showing an "Assessment" of "Attention-deficit hyperactivity disorder, unspecified type (F90.9)" and "Anxiety (F41.9)." (*Id.*) In this record, Dr. Hackman again made a

referral to a mental health counselor for evaluation and treatment and commented "please evaluate and give opinion about the need for emotional service dogs." (*Id.*)  This record, in its complete form, is discussed *supra* at paragraphs 61-64.

101. <u>Third</u>, Dr. Kitchens submitted a letter dated April 22, 2020, from a Dr. Khan. (Dkt. 77-24 PX2 at 7) This record is discussed *supra* at paragraphs 65-66. Dated almost two years prior to Dr. Kitchens's January 2022 accommodation request, this letter did not reflect a diagnosis or discuss Dr. Kitchens's symptoms or functioning, even as of the date it was written. (*Id.*; *see also* Tr.IV 14:9-20; 21:24-22:10) And because it was two years old, it provided no information on Dr. Kitchens's current functioning, which is important with this condition. (Tr.IV 14:9-15; 21:24-22:10)

102. <u>Fourth</u>, Kitchens provided one page of an October 5, 2020 office visit report from Northwestern Medicine Dermatology. Circled on this page were a "Past Medical History" showing a 2013 ADHD diagnosis and a listing of then-current (as of October 2020) prescription medications of buspirone (to be taken as needed for anxiety) and Adderall. This record is discussed *supra* at paragraph 65 and 67.

103. Dr. Kitchens provided one other document with his January 2022 accommodation request, an October 27, 2020 email from Prometric (a company that administers computer-based exams) confirming a testing appointment for the Comprehensive Basic Science Examination that he took while in medical school (CBSE). (Dkt. 77-24 PX2 at 14) This email indicates that Dr. Kitchens received "test accommodations" of "extended time" on the CBSE. (*Id.*)[11]

104. The day after NBME received the January 5, 2022 accommodation request, it wrote to Dr. Kitchens requesting that he "[h]ave the appropriate official at [his] medical school complete a

---

[11] NBME does not decide accommodation requests for the CBSE. (Tr.III 215:19-22)

USMLE Certification of Prior Test Accommodations (CPTA) form," which is available online at the USMLE website. (Dkt. 77-80 DX70) The CPTA form is a one-page form where a medical school official lists any accommodations that were provided to the student and the reason for the accommodations. (Dkt. 77-58 DX 62) NBME also requested a copy of Dr. Kitchens's CBSE score report, a copy of his MCAT score reports, and additional documentation related to his reported ADHD and anxiety diagnoses. (Dkt. 77-60 DX 70)

105. In response, Dr. Kitchens provided only his CBSE score report (Dkt. 77-40 PX52). Dr. Kitchens refused to provide any additional documentation. He stated that he did not have access to his medical school to ask them to complete the CPTA form, (Dkt. 77-61 DX 71), although he acknowledged at trial that he could have communicated with his medical school about the CPTA form by email, and the form could have been submitted by the school to NBME by email or fax, (Tr.II 40:12-41:18; Dkt.77-58 DX62).

106. Dr. Kitchens also represented that "[a]ll medical documentation from [his] physician with his contact information regarding [his] disabilities has been submitted…." (Dkt. 77-61 DX 71)  It was clear from Dr. Kitchens's testimony at trial, however, that he already had and/or could have readily obtained other medical documents and other information to provide to NBME at that time (just as he did in the context of this litigation). (*See, e.g.,* Tr.II at 142:16-19 ("I kept looking through all of my documents at—you know, through my medical records because I am the type of person that I like to print off my medical records if I'm moving just in case I may need them."); *id.* at 237:11-239:22)

107. Although Dr. Kitchens did not provide all the information requested, NBME still reviewed his request on the merits. (Tr.III 246:24-247:12) His request was reviewed by Lucia McGeehan, Ph.D., NBME's Manager of Examinee Accommodations. (Tr.III 198:12-14; 206:23-

207:1) Dr. McGeehan's educational background is in school psychology, and she is a nationally certified school psychologist and licensed psychologist. (Tr.II 198:15-24)

108.  Dr. McGeehan did not find Dr. Kitchens's personal statement very informative, because he simply repeated his reported diagnoses without describing his symptoms or explaining why he needed 100% extra time to take the Step 1 exam in an accessible manner. (Tr.III 209:2-12)

109.  Dr. McGeehan did not find the medical records provided by Dr. Kitchens to be supportive of his request for extra time. (Tr.III 211:5-14) She described the letter from Dr. Khan as "extremely vague," with no discussion of whether Dr. Kitchens met the diagnostic criteria for anxiety and no discussion of any functional limitations. There was also no recommendation for specific accommodations. (Tr.III 211:15-212:11) The letter also was not recent, and symptoms of anxiety and other mood disorders can vary considerably over time and with treatment. (Tr.III 212:13-18) The dermatology record from Northwestern likewise did not provide any relevant clinical information, discussion of functional impairment, or recommendation for accommodations. (Tr.III 212:19-213:9) And the records from Dr. Hackman did not address how any diagnosis was reached or discuss the existence or extent of functional impairment or the need for accommodations. (Tr.III 213:22-215:7)

110. The testing record from Prometric also provided limited information, according to Dr. McGeehan. Although it showed extended time as a test accommodation, it did not indicate why Dr. Kitchens was provided accommodations for this one exam. (Tr.III 215:8-3) (As previously noted, Dr. Kitchens chose not to provide an accommodation verification form from his medical school to clarify the issue, and he reported on his accommodation request form that he was not provided formal accommodations in medical school.)

111. By letter dated February 8, 2022, NBME denied Dr. Kitchens's request for testing accommodations, concluding he had not shown that his requested accommodations were necessary for him to take the USMLE Step 1 exam in an accessible manner. (Dkt. 77-26 PX4)

112. On August 30, 2022, Dr. Kitchens submitted a second request for accommodations. (Dkt. 77-25 PX3). This time, Dr. Kitchens sought 50% extra testing time and additional break time over two days on the Step 1 exam. (*Id.* at 3) He did not submit any new documentation or expanded personal statement in support of this request.

113. NBME emailed Dr. Kitchens that same day, explaining that it had already reviewed his documentation with his prior request. NBME indicated that "it is up to each examinee to determine what documentation" they would like to submit for NBME's review, but that "[g]enerally, the more information [NBME has], the more informed decision [it] can make." (Dkt. 77-62 DX75)

114. Dr. Kitchens acknowledged NBME's email and stated that he had "no new documents." (Dkt. 77-63 DX76)

115. On September 2, 2022, Dr. McGeehan wrote another email to Dr. Kitchens, "strongly encourag[ing]" him to review the USMLE Guidelines for Requesting Test Accommodations to assist in supporting his request. (Dkt. 77-64 DX78) She also noted, however, that Dr. Kitchens could release the hold on his scheduling permit and test without accommodations if he chose not to provide additional documentation in support of his request. (*Id.*)

116. Five days later, Dr. Kitchens responded, "Release hold." (Dkt. 77-65 DX79)

## IV. Dr. Kitchens's USMLE Performance

### A.  Dr. Kitchens's Scores

117. Dr. Kitchens took Step 1 on February 25, 2022 under standard conditions after NBME denied his request for accommodations, and he earned a failing score. (Dkt. 77-8 JX9)

118. He took the Step 1 exam a second time on May 9, 2022. He did not request accommodations for this exam. (Tr.II 209:22-24) He again failed. (Dkt. 77-9 JX10)

119. On May 28, 2022, Dr. Kitchens took the Step 2 CK exam for the first time. He did not request accommodations for this exam. (Tr.II 210:20-23) The minimum passing score was 209, and he achieved a failing score of 169. (Dkt. 77-1 JX12)

120. On June 29, 2022, Dr. Kitchens took the Step 2 CK exam a second time. He did not request accommodations for this exam. (Tr.II 210:24-211:5) He again failed, with a score of 195, where the minimum passing score was 209. (Dkt. 77-12 JX13)

121. On September 29, 2022, Dr. Kitchens took Step 1 a third time under standard conditions, after he chose to do so rather than submit additional documentation in support of his accommodation request, and he again failed. (Dkt. 77-10 JX11)

### B.  Dr. Kitchens's Representations About His USMLE Performance

122. Shortly after Dr. Kitchens took Step 1 for the first time in February 2022, his wife wrote to NBME on her law firm's letterhead, identifying Dr. Kitchens as her client and asserting that "there has been a distinct possibility my client's exam has been incorrectly graded." (Dkt. 77-67 DX84) In this March 11, 2022 letter, Ms. Kitchens suggested that Dr. Kitchens had been given too many exam questions or had been erroneously given another examinee's exam results. She requested that an in-depth investigation be conducted and that Dr. Kitchens's test score be expunged, and she threatened legal action if NBME did not do so. (*Id.*)

123. At no point in this letter did Ms. Kitchens suggest that Dr. Kitchens's performance on Step 1 was adversely affected by a lack of accommodations generally or running out of time specifically. She did not claim he had been distracted by the clock or was anxious while testing.

To the contrary, she insisted on having his score expunged because of a purported administrative or scoring error by NBME.

124. In his declaration in support of his preliminary injunction motion, however, Dr. Kitchens provided a different explanation for his low score on his first Step 1 exam, asserting that his test-taking strategies "did not allow me full comprehension of exam questions, but rather meant that I was making answer choices based on a sentence or two out of a long paragraph of material. Despite this approach, *as I came to the end of the hour for each block, I would then randomly guess at questions until the clock ran out to be sure nothing was left blank*." (Dkt. 20-1 ¶ 36) (emphasis added)

125. Dr. Kitchens's declaration testimony is inconsistent not only with his wife's contemporaneous letter to NBME, but also with his electronic testing data. (Dkt. 77-18 JX19). Dan Jurich, Ph.D., Associate Vice President of the USMLE program,[12] reviewed "outcome data" showing the amount of time Dr. Kitchens spent on each question, his answer choice, and whether his answer was correct. He testified that Dr. Kitchens's score responses showed that he spent a meaningful amount of time on items at the end of each block of the test, that the amount of time spent on items was similar throughout the block, and that Dr. Kitchens's performance (*i.e.,* correct and incorrect responses) was relatively consistent throughout each block. (Tr.IV 97:4-99:11) Timing data showing the amount of available testing time used by Dr. Kitchens also showed that he ended one section of this exam with over four minutes of test time remaining—*i.e.*, he did not run out of time. (Dkt. 77-13 JX14)[13]

---

[12] Dr. Jurich is a psychometrician, which is someone who specializes in the application of statistical techniques and measurement science concepts to the development, administration, and scoring of an examination. (Tr.IV 81:15-18)

[13] Although Dr. Kitchens used all or almost all of his time for other blocks, this is not unusual, as most examinees use all the allotted time for testing. (Tr.IV 102:13-16)

126. Dr. Kitchens testified in his preliminary injunction declaration that he utilized the same strategies the second time he took Step 1 on May 9, 2022, but again "ran out of time and was forced to begin guessing at questions randomly until the clock ran out to be sure nothing was left blank." (Dkt. 20-1 ¶ 41)

127. Once again, this testimony is inconsistent with Dr. Kitchens's testing data from the May 9, 2022 exam. Outcome-file data show fairly consistent time spent on questions throughout the blocks, including questions at the end of blocks where a meaningful amount of time was spent on the items. There was also not a particularly noticeable change in Dr. Kitchens's performance at the end of each block. (Tr.IV  99:14-101:24) ***Timing data also show that Dr. Kitchens ended most sections with significant amounts of testing time remaining***: over two minutes on block four; over four minutes on block five; close to seven minutes on block seven; and close to three minutes on block eight. (Dkt. 77-14 JX15) This data squarely contradicts Dr. Kitchen's description of running out of time and therefore guessing on answers.

128. Dr. Kitchens also testified in his preliminary injunction declaration that the first time he took the Step 2 CK exam on May 28, 2022, he ran out of time and "was not able to read through a sizeable portion of vignettes in each block." (Dkt. 20-1) Although the timing data cannot show what Dr. Kitchens actually read, they do show that he ended each block with significant time remaining, ranging from approximately one minute on block three to over ten minutes on block eight. (Dkt. 77-15 JX 16) He left over four minutes on blocks two, four, six, and seven, and on block nine, he had almost ten minutes of test time remaining. (Dkt. 77-15 JX16)

129. Dr. Kitchens offered similar testimony regarding his test-taking experience the second time he took the Step 2 CK exam, on June 29, 2022. (Dkt. 20-1 ¶ 43) Once again, however, timing

data contradicts his testimony. He ended block three with almost two minutes remaining, block six with four minutes remaining, and block nine with two minutes remaining. (Dkt. 77-16 JX17)

130. The statements in Dr. Kitchens's preliminary injunction declaration regarding his reported difficulties taking Step 1 and Step 2 CK are also inconsistent with his representations on a September 20, 2022 call he made to NBME to inquire about a score recheck. (Dkt. 77-70 DX93) At that time, Dr. Kitchens reported:

> I'm just very taken by, when I did receive those scores back which is, you know, on the exam I was very confident that — I didn't think the exam was actually that hard for me and then when I look at the score it's almost like a zero percent, like in the low 20th percentile, which I mean, I did all my work at Mayo Clinic for god's sake, you know. … I am the top of all these things in research, etc. ….

(*Id.* at 3)

131. Finally, Dr. Kitchens testified in his preliminary injunction declaration that, when he took Step 1 for a third time on September 29, 2022, he:

> [W]ent to the 21st questions preemptively and marked all of the questions from 21 to 40 of each block with the same letter (as noted above, I believe 'C') for each ensuing answer. This ensured that no questions were left blank. (It probably took me 2 or 3 seconds per question to do this.)
>
> I then returned to the first question of the block and proceeded to read and answer as many questions as I could using my best test-taking strategies for the remainder of the time allotted. …
>
> In total, I estimate that I was able to read to some degree approximately 200 of the 320 questions. In sum, the rest of the answers were filled in with the letter 'C' which I hoped would give me a 20% statistical chance of correct answers on those questions I did not have sufficient time to read.

(Dkt. 20-1 ¶¶ 48-51)

132. Yet again, this description is inconsistent with his actual testing data. (Dkt. 77-20 JX21) There was not a preponderance of "C" responses—the responses are more evenly distributed.

(Tr.IV 105:16-24)[14] The time spent on questions is also relatively consistent throughout the exam. (Tr.IV 105:25-106:5) And Dr. Kitchens closed four of the seven blocks early, including leaving almost three minutes on block 3. (Dkt. 77-17 JX18)

133. Finally, the descriptions in Dr. Kitchens's declaration with respect to the September 29, 2022 Step 1 exam are also inconsistent with representations his wife made on his behalf in yet another letter. On October 5, 2022, Dr. Kitchens's wife sent a letter to the ECFMG, stating that she represented Dr. Kitchens and accusing ECFMG of "illegal behavior" with respect to his failing scores on the Step 1 and Step 2 exams. (Dkt. 77-69 DX89) She again complained of improper scoring and stated that Dr. Kitchens believed his third attempt at Step 1 "was a reasonable measure of [his] proficiency and knowledge." (*Id.* at 2)

## CONCLUSIONS OF LAW

### I.   Disability Under the ADA

134. NBME is governed by 42 U.S.C. § 12189, which provides as follows:

> Any person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.

135. To be disabled under the ADA, a person must have "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1). More specifically, a person must have an impairment that substantially limits his or her ability to perform a major life activity "*as compared to most people in the general population*." 29 C.F.R. § 36.105(d)(1)(v) (emphasis added). Thus, it is not appropriate to compare Dr. Kitchens's functioning relative to other medical students or other high-performing groups. *See, e.g., Singh v. George Wash. Univ.*,

---

[14] Dr. Kitchens provided 58 "C" responses on the September 29, 2022 Step 1 exam. (Dkt. 77-20 JX21) By way of comparison, there were 42 "A," 55 "B," and 62 "D" responses. (*Id.*)

508 F.3d 1097, 1103-04 (D.C. Cir. 2007) ("[A]ny measure of substantial limitation that might change based on a plaintiff's particular educational environment—e.g., a comparison of '[m]edical students … to their fellow students,' …—would make disabled status vary with a plaintiff's current career choices, and would fail to achieve the ADA's additional purpose of providing 'clear, strong, consistent, [and] enforceable standards' to address discrimination.") (original emphasis, citations omitted); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, No. 15-4987, 2016 WL 1404157, at *6 (E.D. Pa. 2016) ("It is inappropriate under the ADA to compare an individual to her academic peer group or, in the case of standardized tests, other test-takers who are not representative of the general population").

136.  Having a diagnosed impairment is not the same as being disabled under the ADA. *See* 28 C.F.R. § 36.105(d)(1)(v); *see also Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 257 (3d Cir. 2020) ("'Not ever impairment will constitute a disability …,' but [an impairment] will meet the definition [of disability] if 'it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.'") (citation omitted); *Bibber*, 2016 WL 1404157, at *7 (finding that examinee diagnosed with dyslexia was not disabled under the ADA).

137.  Under the ADA Amendments Act ("ADAAA"), the definition of disability should be construed in favor of broad coverage. This broadened coverage, however, does not extend beyond the terms of the statute. *See* 42 U.S.C. § 12102(4)(A) ("The definition of disability … shall be construed in favor of broad coverage of individuals …, ***to the maximum extent permitted*** by the terms of [the ADA].") (emphasis added). And the terms of the statute require a showing of substantial limitation, even after enactment of the ADAAA:

> By retaining the essential elements of the definition of disability including **the key term 'substantially limits'** we reaffirm that not every individual with a physical

> or mental impairment is covered by the … definition of disability in the ADA.  An
> impairment that does not substantially limit a major life activity is not a disability[.]
> That will not change after enactment of the ADA Amendments Act[.]

Statement of the Managers, 154 Cong. Rec. S8840, S8841-42 (Sept. 16, 2008) (emphasis added);

*see* 42 U.S.C. § 12102(1)(A).

138. At trial, Dr. Kitchens's expert witness, Dr. Shepherd, discussed his experiences in recommending testing accommodations for students in schools under the Individuals with Disabilities in Education Act (IDEA). (Tr. 77:19-78:20) There is a distinction, however—as he acknowledged (Tr.II 78:4-20; see also Tr.II 49:17-20)—between school-based accommodations provided under IDEA standards and accommodations provided under the ADA. As explained by the Second Circuit:

> Disability is defined generically in the ADA, 42 U.S.C. § 12102(1), with the
> substantiality requirement then serving to focus the statute on the class of persons
> Congress aimed to protect—those who, by virtue of their disability, may experience
> discrimination impairing their 'right to fully participate in all aspects of society,'
> *id.* § 12101(a)(1). The IDEA, for its part, focuses on ensuring that special education
> and related services are provided to persons who might benefit by virtue of a mental
> or physical impairment. *See* 20 U.S.C. § 1400.

*B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 161 (2d Cir. 2016).

139. Adherence to the "substantial limitation" standard of the ADA thus ensures that needed testing accommodations are provided to individuals who are entitled to the protections of the statute, while avoiding any undue advantages or unwarranted changes to standardized testing conditions from accommodations that are provided to individuals who do not fall within "the class of persons Congress aimed to protect" in the ADA. *See also Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88 (2d Cir. 2004) ("With respect to the National Board, … [i]ts procedures are designed to ensure that individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the medical licensing examination.").

140. The determination whether an impairment substantially limits a major life activity must be made without regard to the ameliorative effects of mitigating measures, such as medication. *See* 28 C.F.R. § 36.105(d)(1)(viii); 28 C.F.R. § 36.105(d)(4)(1). The positive effects of ameliorative measures can be considered, however, in determining whether any testing accommodations are needed, as the Department of Justice has noted. *See* 81 Fed. Reg. 53,204, 53,232 (Aug. 11, 2016) (explaining the ADAAA's "prohibition on assessing the ameliorative effects of mitigating measures applies only to the determination of whether an individual meets the definition of 'disability'" and does not apply when determining whether testing accommodations must be provided).

## II. Dr. Kitchens Has Not Shown He Is Disabled Within the Meaning of the ADA or Needs Testing Accommodations to Access the USMLE

141. Dr. Kitchens is only entitled to accommodations on the USMLE if he is disabled within the meaning of the ADA and needs accommodations to test in an accessible manner. 42 U.S.C. § 12189. It is Dr. Kitchens's burden to make this showing. *See Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs, Inc.*, 870 F. Supp. 2d 607, 608 (S.D. Ind. 2012) ("In order to avail himself of the protections [of] this provision, [plaintiff] must show that he is a person with a disability, that his requests for accommodation are reasonable, and that those requests were denied.").

142. Based on the full trial record, Dr. Kitchens has not shown that he is disabled—*i.e.*, that he has a mental impairment that substantially limits him in a major life activity compared to most people.[15]

143. First, although the evidence indicates that Dr. Kitchens has been diagnosed with ADHD and anxiety, it does not show that Dr. Kitchens actually meets the diagnostic criteria for either disorder.

---

[15] *See* Dkt. 71 Question 1.

144. Dr. Kitchens appears to have obtained an ADHD diagnosis from Dr. David at Berea College Health Services in 2013, which appears to have been based solely on Dr. Kitchens's self-report of symptoms. (Dkt. 77-28 PX6, 77-29 PX9) When he reported to Dr. Hackman at White House Clinics a few years later, she did not diagnose him with ADHD and refused to provide him with prescription medication for ADHD. (Dkt. 77-51 PX7 MK12-22) A partial record from a Northwestern Dermatology visit and subsequent record from Baptist Health indicate that he was prescribed ADHD medication in 2020 and 2021, but there is no evidence showing he was evaluated for ADHD as part of that process. (Dkt. 77-24 PX2 at 9; Dkt. 77-32 PX19)

145. Dr. Kitchens's more recent records at Baptist Health (primarily from visits that occurred after he requested accommodations from NBME in 2022) show a continuing course of treatment and medication management, not diagnostic evaluations to determine if diagnostic criteria for ADHD are met. (*See, e.g.,* Dkt. 77-26 PX37)

146. As Dr. Kitchens's expert witnesses testified, if a patient presents to them who already has a prescription for ADHD medication, they will not reevaluate whether the patient actually meets the diagnostic criteria and will continue the medication if the patient reports being stable. (Tr.I 64:3-18; 64:24-65:1; Tr.II 38:18-39:8) This practice seems relatively benign for purposes of providing healthcare services to a patient complaining of problems, but it does not satisfy the evidentiary burden of showing a legally-cognizable impairment. (Tr.IV 11:22-13:5; 41:21-27; 42:8-13) *See Black v. Nat'l Bd. of Med. Exam'rs*, 281 F. Supp. 3d 1247, 1251 n.3 (S.D. Fla. 2017) ("The Board correctly questions the validity of the ADHD diagnoses, which suffer from a pronounced lack of methodological rigor.…[T]he diagnoses typically involved only a brief, informal interview with [plaintiff]. The psychologists, at least one of whom admits that the purpose of [plaintiff's] examination for ADHD was to allow [plaintiff] to continue a Vyvanse prescription,

failed to review [plaintiff's] history, failed to confirm with a third party [plaintiff's] self-reported symptoms, and failed to administer clinical tests in accord with the accepted protocol for diagnosing ADHD."); *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d at 619 (declining to credit ADHD diagnosis where there was a "dearth of data" to support it, and noting "[i]t may be that Dr. Brewer's experience and knowledge is sufficient to justify minimal record-keeping in the context of providing treatment to his patients, but there is no dispute that it is insufficient to justify formal recognition of a clinical diagnosis").

147. The only healthcare professional who has testified in this case that Dr. Kitchens has ADHD is Ms. Bacon. Earlier this year, and in connection with this litigation, she conducted a psychological assessment of Dr. Kitchens and diagnosed him with ADHD. However, the Court cannot credit her findings. Ms. Bacon relied almost entirely on Dr. Kitchens's self-report. (Dep. Tr. 37:7-22; 45:17-47:21; 51:24-52:16; *see also* Tr.III 150:25-151) Although she relied on the MOXO CPT to substantiate her diagnosis, the MOXO report itself shows it is not diagnostic. (Dkt. 77-34 PX27 at 1; *see also* Dkt.77-38 PX48 at 3 (tests of attention are not sufficiently sensitive or specific to serve as diagnostic indices). There is also some question whether Dr. Kitchens's performance on this particular test was valid. (Tr.III 156:3-18; Tr.IV 69:9-25) In any event, this snapshot of Dr. Kitchens's performance during a 20-minute test is not a sufficient reflection of whether Dr. Kitchens experiences clinically significant impairment from symptoms of ADHD in multiple settings in the real world.

148. Although Ms. Bacon personally evaluated Dr. Kitchens, the Court concludes that her findings are not entitled to deference. Non-binding DOJ guidance suggests that "'[r]eports from experts who have personal familiarity with the candidate should take precedence over those from … reviewers for testing agencies, who have never personally met the candidate or conducted the

requisite assessments for diagnosis and treatment.'" *Ramsay*, 968 F.3d at 260 (quoting 75 Fed. Reg. at 56,297). Nothing in the ADA or DOJ's implementing regulations requires NBME to defer to an examinee's evaluating professional, but even if this guidance were considered here, it would be a stretch to describe Ms. Bacon as someone who has "personal familiarity" with Dr. Kitchens. Her evaluation consisted of two one-hour, online appointments, and she had no treatment relationship with Dr. Kitchens before or after these appointments. (Dep. Tr. 24:13-25:8) Ms. Bacon did personally observe Dr. Kitchens while he took the MOXO and witnessed behavior that she found to be consistent with ADHD, but the Court is mindful of the fact that Dr. Kitchens obtained this evaluation in the middle of this litigation and for the express purpose of supporting his motion for preliminary injunction, and he was aware he was being "observed" at the time he was taking this very short test, which involved clicking on visual images. By contrast, the Court has observed Dr. Kitchens across a number of Court appearances, including almost four days of trial, and saw nothing of the type of restlessness described by Ms. Bacon during Dr. Kitchens's 20 minutes of MOXO testing.[16]

149. Dr. Kitchens also characterizes himself as having "test anxiety" and testified to experiencing anxiety while taking the USMLE, but test anxiety is not a recognized diagnosis under the DSM. (Tr.IV 15:10-19) And, as one court noted in a case involving employment testing, "'some situational anxiety' on a test that could have severe job consequences would be expected for just about anyone." *Hentze v. CSX Transp., Inc.,* 477 F. Supp. 3d 644, 669 (S.D. Ohio 2020). Dr. Kitchens offered no evidence that anyone had ever diagnosed him with "test anxiety."

150. Dr. Kitchens has been diagnosed more recently (during this litigation) with generalized

---

[16] The Court notes Dr. Shepherd's testimony that he would not support a patient's request for disability-based benefits unless he had been treating that individual for six months, to protect against possible malingering. (Tr.II 26:17-27:19)

anxiety disorder, and within the past few months he has reported to his healthcare provider symptoms that are consistent with that disorder (arising from the stress of this litigation), but the symptoms are not described as consistently and pervasively impacting Dr. Kitchens's functioning in such a way as to rise to the level of a generalized anxiety disorder. (Tr.IV 40:1-41:18)

151. In any event, the fact that Dr. Kitchens has obtained diagnoses for ADHD and generalized anxiety disorder is not enough to show that he is disabled within the meaning of the ADA. The regulations are clear that "not every impairment will constitute a disability." 28 C.F.R. § 36.309(d)(1)(v). Dr. Kitchens must show that he is substantially limited in a major life activity relevant to taking the USMLE when his abilities are compared to those of most people. He has failed to make this showing. Indeed, he offered virtually no evidence that addresses the critical issue of current functional limitation resulting from his claimed impairments.

152. The "substantial limitation" analysis necessarily focuses on functional impairment. It is not enough to show that Dr. Kitchens has some impairment; he must be *substantially limited* in his ability to function, and that determination must be made by examining evidence of his functional abilities as they compare to the abilities of most people.

153. Dr. Kitchens claims that he is substantially limited in learning, reading, concentrating, thinking, communicating, and working. Dkt. 15 ¶ 47. The USMLE is not a learning activity, so that major life activity is not implicated here. The USMLE also does not test communication skills (it is a written test) or involve "working." The Court will therefore consider whether Dr. Kitchens has shown a substantial limitation in reading, concentrating, or thinking.

154. Dr. Kitchens has not presented any evidence showing that he is substantially limited in reading. Indeed, his reading skills have never been measured. The only diagnostic report in the record is the report Ms. Bacon provided in the midst of this litigation, and she did not conduct any

reading assessment. Thus, this is not a case like *Ramsay*, where the court relied upon evidence showing that the plaintiff's "reading, processing, and writing skills were abnormally low by multiple measures" as providing "a sufficient comparison of [plaintiff's] abilities to those of the general population[.]" 968 F.3d at 259; *see also Bibber*, 2016 WL 1404157, at *8 (referencing psychometric testing of plaintiff's reading abilities). Moreover, NBME's expert witnesses testified that ADHD and anxiety are not reading disorders and do not affect reading skills (and there was no contrary testimony from Dr. Kitchen's experts). (Tr.III 125:17-22; Tr.IV 14:21-15:8); *cf. Bibber*, 2016 WL 1404157, at *5 n.7 ("[P]laintiff has presented scant, if any, evidence supporting her contention that her ADHD affects her ability to read and process information."). And while Dr. Kitchens's testimony about his inability to read all the questions on the USMLE in the time allotted would be insufficient to establish a disability in any event (the USMLE is an examination that most people in the general population do not even take), his testimony was contradicted by the outcome and timing data for his exams and the contemporaneous communications that he and his wife had with NBME and the ECFMG. *See supra* ¶¶ 122-133; *cf. Love v. Law Sch. Admission Council*, 513 F. Supp. 2d 206, 221 (E.D. Pa. 2007) ("Plaintiff's psychologists relied on self-reporting as well as clinical observation in reaching their conclusions. In this regard, there is some question as to the reliability of some of the information provided.").

155. The evidence also does not show that Dr. Kitchens is substantially limited in thinking or concentrating. The only arguable evaluation of his concentration ability was the MOXO assessment administered by Ms. Bacon. The validity of his results on that assessment are questionable and, in any event, provide in isolation no reliable information on the extent of any functional limitation. Moreover, the evidence shows that Dr. Kitchens repeatedly reported to his providers at Baptist Health that he only needs Adderall when he is engaged in mentally challenging

tasks, which does not reflect substantial limitation compared to most people. As Dr. Allen testified, "difficulty with really hard tasks … is true for most people" (Tr.IV 34:12-14); *cf. Jayatilaka v. Nat'l Bd. of Med. Exam'rs*, No. 09-2932, 2011 WL 223349, at *14 (C.D. Cal. 2011) (concluding that Plaintiff was not substantially limited and noting that, among other things, "Jayatilaka told his treating psychologists before any neuropsychological testing that he 'does not feel he currently has significant cognitive problems that interfere with his day-to-day functioning'"). The Court was also in a position to witness Dr. Kitchens's functioning first-hand through almost four long days of trial and saw nothing suggesting that Dr. Kitchens was limited in any way in his ability to think or concentrate.

156.  Dr. Kitchens's grades are perhaps not as strong as the records in some cases where courts have concluded that an examinee was not "substantially limited" given a record of stellar academic success. *See, e.g., Black v. Nat'l Bd. of Med. Exam'rs*, 281 F. Supp. 3d 1247 (M.D. Fla. 2017). But Dr. Kitchens did progress, on time, through school and completed not only college but medical school, with no formal, school-based accommodations. Most people in the general population do not graduate from college, much less attend medical school, and medical school is inherently challenging. (*Cf.* Tr.I 77:23-78:6) Dr. Kitchens also attended medical school while living abroad, and he participated in a number of activities and leadership positions while doing so. (Tr.II 173:16-173:2)

157.  Tellingly, and importantly, none of Dr. Kitchens witnesses testified that they believed he was substantially limited compared to most people. *See Black v. Nat'l Bd. of Med. Exam'rs*, 281 F. Supp. 3d at 1252 ("[Plaintiff] submits no evidence or argument that Dr. Sancholtz, who saw [plaintiff] for nine brief 'general counseling sessions,' concluded that ADHD substantially limits [plaintiff] in comparison to the average person."); *Glueck v. Nat'l Conf. of Bar Exam'rs*, No. 17-

451, 2018 WL 3977891, at *6 (W.D. Tex. 2018) ("The evaluators did not indicate beyond their diagnoses and Plaintiff's self-reporting how Plaintiff might be substantially limited in his ability to perform major life activities compared to the general population. Plaintiff provides no further evidence to show how he might be so substantially limited.").

158.  Finally, even if the Court had concluded that Dr. Kitchens is disabled within the meaning of the ADA, there is no record support for his claim that he needs 100% extra testing time to address his alleged impairments. *See* Tr.I 18:13-14.[17] Ms. Bacon is the only professional who recommended extra testing time, and her recommendation was made with no knowledge of the USMLE or Dr. Kitchens's prior testing history, and instead appeared to be based on his performance on the 20-minute MOXO, (Dep. Tr. 54:8-1; 55:10-21; 57:18-24; 57:25-58:1; 58:6-25), an image-based test that is nothing like the USMLE and which Dr. Kitchens took mid-litigation and with questionable results. Dr. Kitchens has also repeatedly informed his healthcare providers that he focuses well when he takes Adderall, (Dkts. 77-52 DX28; 77-53 DX35; 77-37 PX 46), indicating that even if he was impaired and substantially limited from symptoms of ADHD or anxiety, those functional limitations are adequately addressed through his medication—*i.e.*, he needs no accommodations in order to test in an accessible manner. *See supra* ¶¶ 69, 72, 74, 77. The Court also notes that Dr. Kitchens was provided double testing time on the CBSE and still failed badly, (Dkts. 77-24 PX 2 at 14; 77-40 PX52), which suggests that testing time is not the issue. Finally, Dr. Kitchens's testimony that he was rushed on prior testing and therefore was forced to guess at many of the answers is not consistent with objective data for the tests. *See supra* ¶¶ 125-132.[18]

---

[17] *See* Dkt. 71 Question 4.

[18] In response to Question 5 of the Court's Order (Dkt. 71), although NBME does not believe that Dr. Kitchens has come close to establishing that he is disabled and requires double-time testing

159. Dr. Kitchens described expungement as an "accommodation" in his opening statement at trial. (Tr.I 18:14) Score expungement does not fit into any category of test accommodation contemplated under the ADA. *See* 28 C.F.R. § 36.309(b)(2)-(4). Accommodations ensure that a disabled individual can take a test "in an accessible place and manner." *See* 42 U.S.C. § 12189.

## III. Expungement Is Not an Available or Appropriate Remedy in this Case

160. Given that Dr. Kitchens has failed to show he is disabled within the meaning of the ADA, it is not necessary to discuss his request for expungement of his prior test scores as a remedy in this case. In the interest of completeness, however, the Court will briefly address the issue here.[19]

### A.   Expungement of Prior Test Results Is Not an Available Title III Remedy[20]

161. The remedies provision for Title III of the ADA—42 U.S.C. § 12188(a)—adopts by reference the remedies set forth in Title II of the Civil Rights Act of 1964:

> Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by [this Title], a civil action for *preventive relief*, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved....

42 U.S.C. § 2000a-3(a) (emphasis added). Thus, a Title III plaintiff may only seek relief that prevents a current or future violation of the ADA. *See* 42 U.S.C. § 12188(a)(1); *see also* 28 C.F.R. § 36.501(a) ("Any person who is being subjected to discrimination on the basis of disability ... or who has reasonable grounds for believing that such person is about to be subjected to discrimination ... may institute a civil action for *preventive relief*....") (emphasis added).

---

accommodations to take the USMLE in an accessible manner, if the Court concludes otherwise on both points, NBME is not aware of any reasons why the Court could not issue an injunction ordering NBME to accommodate Dr. Kitchens with double time on future tests, provided he is otherwise eligible to test under standard program rules.

[19] Given the Court's instruction not to repeat prior argument on the expungement issue, *see* Dkt. 71 at 3-4, NBME also refers the Court to its prior briefing as to why expungement is (1) not an available remedy under Title III and (2) is not warranted here in any event. *See* Dkt. 55.

[20] *See* Dkt. 71 Question 6.

162. Here, the statutory language is clear and unambiguous. *See Kaufman v. Allstate New Jersey Ins. Co.*, 561 F.3d 144, 155 (3d Cir. 2009) ("'In interpreting a statute, the Court looks first to the statute's plain meaning and, if the statutory language is clear and unambiguous, the inquiry comes to an end.'") (citations omitted). The only relief available under the statute is "preventive" relief. "Preventive" means "devoted to or concerned with prevention: Precautionary." Merriam-Webster Dictionary, *at* https://www.merriam-webster.com/dictionary/preventive. "Prevention" means "the act of preventing or hindering." *Id.* In other words, the Title III remedies provision allows for injunctive relief to prevent "any act or practice prohibited by" Title III. *See generally* https://thelawdictionary.org/?s=preventive+.

163. NBME's obligation under Title III is to offer the USMLE in an "accessible place and manner." 42 U.S.C. § 12189. If a testing entity denies a request for testing accommodations such that an individual with disabilities would not be able to test in an accessible place and manner, that individual can institute a civil action to prevent a violation of the statute, *i.e.*, obtain an injunction that would require the testing entity to offer the test in an accessible place and manner through the provision of accommodations. *See Three Rivers Ctr. for Independent Living v. Housing Auth. of the City of Pittsburgh*, 382 F.3d 412, 420 (3d Cir. 2004) (explaining language in 42 U.S.C. § 2000a-3(a) provides a private right of action to pursue preventive relief when someone "has or is about to contravene" the prohibition against discrimination in Title II of the Civil Rights Act); *Doe v. Nat'l Bd. of Med. Exam'rs*, 199 F.3d 146, 156 (3d Cir. 1999) ("The notion of accessibility [in 42 U.S.C. § 12189] … mandates changes to examinations … so that disabled people who are disadvantaged by certain features of standardized examinations may take the examinations without those features that disadvantage them.").

164.  Although the statute allows an injunction to be issued as a remedy, it does not allow for unbounded injunctive relief. It only allows for an injunction that provides *preventive relief*. *See, e.g., Fiorica v. Univ. of Rochester,* 2008 WL 907371, *3 (W.D.N.Y. 2008) ("[T]he injunctive relief sought by the plaintiff (reinstatement to the nursing program) is not preventative relief, and therefore, is not available under Title III of the ADA.").

165.  A comparison to the remedies provision in Title I of the ADA bolsters this plain language reading of Title III's remedy provision. The remedies provision for Title I not only allows a court to "enjoin the respondent from engaging in [an] unlawful employment practice," but also to order "such affirmative action as may be appropriate," including but not limited to reinstatement of the employee (with or without backpay) or "any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g)(1) (incorporated by reference in 42 U.S.C. § 12117(a)). Title III, in contrast, does not provide for "affirmative action" or broader equitable relief.

## B.    Expungement Would Not Be Warranted in This Case in Any Event

166.  Even if expungement were an available remedy, it would not be appropriate in this case.[21] NBME clearly did not violate the ADA when it denied Dr. Kitchens's requests for accommodations in 2022, given the handful of supporting documents that he chose to provide at that time. Dr. Kitchens is therefore not entitled to any relief relating to the two exams he took after his requests were denied.

167.  Indeed, it can be reasonably argued that Dr. Kitchens does not have standing to pursue any relief at all against NBME, because NBME has never violated the ADA with respect to any

---

[21] *See* Dkt. 71 Questions 2-3. With respect to Question 3, the timeframe for evidence in a typical testing accommodation case, where an examinee seeks accommodations on a future examination, is the present. Here, where Dr. Kitchens purports to seek expungement of past test results as a remedy, the relevant evidence on that issue is the documentation that Dr. Kitchens submitted to NBME in support of his past requests, as discussed below.

request for accommodations submitted by Dr. Kitchens to NBME. *See* 42 U.S.C. § 12188(a); 42 U.S.C. §2000a-3(a); *cf. Cunningham v. Univ. of New Mexico Bd. of Regents*, 531 F. App'x 909, 916-17(10th Cir. 2013) (finding ADA claim against NBME was not ripe where NBME had requested additional documentation before making accommodation decision and plaintiff "deprived the Board of the opportunity to make such a final determination because he failed to submit the additional requested information"); *id*. at 917 n.8.

168. Dr. Kitchens provided very little information to NBME in support of his 2022 accommodation requests. The documents did not even substantiate a diagnosis, but in any event, they did not convey any information whatsoever about the nature of Dr. Kitchens's claimed impairment(s) or any functional limitations. In the absence of this essential information, there was no basis for concluding that Dr. Kitchens is substantially limited in any major life activities relevant to taking Step 1 of the USMLE. The records also did not show what accommodations Dr. Kitchens might have needed, had he shown that he was disabled within the meaning of the ADA. *See supra* ¶¶ 93-116.

169. Testing entities are entitled to request reasonable supporting documentation from individuals who request accommodations. *See* 28 C.F.R. § 36.309(b)(1)(iv). Supporting documentation allows the testing entity to confirm the existence of the impairment, understand the nature of any functional limitations, and approve appropriate accommodations.

170. Because Dr. Kitchens did not provide documentation to show he was entitled to disability-based accommodations in 2022, NBME did not violate the ADA in denying either of those requests. *Cf. Kaltenberger v. Ohio College of Podiatric Med.*, 162 F.3d 432, 437 (6th Cir. 1998) (explaining "the College was not obligated to provide accommodations until plaintiff had provided a proper diagnosis of ADHD and requested specific accommodations"); *Powell v. Nat'l*

*Bd. of Med. Exam'rs*, 364 F.3d at 88-89 ("Nothing in the record suggests that the National Board's review and rejection of plaintiff's application for an accommodation was anything other than standard procedure. Nor is there evidence that the procedure itself was unreasonable or discriminatory in nature.") (affirming summary judgment for NBME). And, because NBME did not violate the ADA with respect to those two requests, there is no basis for awarding Dr. Kitchens *any* relief with respect to those two requests.

171.  Even more obviously, because Dr. Kitchens did not request accommodations on either of his Step 2 CK exams or the third administration of Step 1, and thus NBME did not deny any request for accommodations on those exams, NBME cannot be found to have violated the ADA with respect to the administration of those examinations, and Dr. Kitchens plainly is not entitled to expungement of the scores from those exams. *Cf. Kaltenberger*, 162 F.3d at 437.[22]

172.  It is also NBME's position that expungement also is not appropriate under the traditional four-factor test for injunctive relief, *see eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 386, 391 (2006), but it understands that the Court is not seeking briefing on this issue at this time. *See* Dkt. 71 at 4 n.4; Tr.IV 157:1-158:11.

---

[22] *See* Dkt. 71 Question 7.

## CONCLUSION

For the foregoing reasons, the Court denies Dr. Kitchens's request for injunctive relief, dismisses his claim with prejudice, and enters judgment against Dr. Kitchens and in favor of NBME.

## Word Count Certification

Undersigned counsel certifies that this document contains 17,135 words (not including this word count certification), as determined by the word count feature in Microsoft Word.

Dated: June 16, 2023

Respectfully submitted,

*/s/ Caroline M. Mew*

Jared D. Bayer
Cozen O'Connor
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Phone: 215-255-8590
jbayer@cozen.com

Caroline M. Mew - admitted *pro hac vice*
Perkins Coie LLC
700 13th Street, NW, Suite 800
Washington, DC 20005
Phone: (202) 654-1767
cmew@perkinscoie.com
*Attorneys for NBME*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 16, 2023, a true and correct copy of the foregoing document was served by electronic mail on plaintiff Markcus Kitchens, Jr. at markzwanz@gmail.com

<u>*/s/ Caroline M. Mew*</u>