UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

DR. MARKCUS KITCHENS, JR.　　　　　　　)
　　　　　PLAINTIFF　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)　　CIVIL ACTION NO.:
　　v.　　　　　　　　　　　　　　　　)　　　　2:22-CV-03301-JMY
　　　　　　　　　　　　　　　　　　　)
NATIONAL BOARD OF MEDICAL EXAMINERS　)
　　　　　DEFENDANT　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)

---

### PLAINTIFF'S POST-TRIAL BRIEF

---

Dr. Markcus Kitchens, Jr.
625 Hampton Way, #2
Richmond, KY 40475
***Pro Se Plaintiff***


CERTIFICATE OF SERVICE

It is hereby certified that this Brief was served upon the Court via PACER, and copies were served

via electronic mail upon Jared D. Bayer, Cozen O'Connor, 1650 Market Street, Suite 2800,

Philadelphia, Pennsylvania, 19103 and Caroline M. Mew, Perkins Coie, LLP, 700 Thirteenth

Street, N.W., Suite 800. Washington, D.C., 20005-3960 on this the 6th day of July, 2023.

Dr. Markcus Kitchens, Jr.
625 Hampton Way, #2
Richmond, KY 40475
***Pro Se Plaintiff***

## TABLE OF ARGUMENTS

ARGUMENT ................................................................................................................ 7

1   DR. KITCHENS IS DISABLED UNDER THE ADA ....................................................... 7

   1.1    Based on the Evidentiary Record, Dr. Kitchens Has A Mental Impairment that Substantially Limits His Ability to Perform One or More Major Life Activity Relevant to the USMLE .................................................................................................................... 8

      1.1.1    The Evidentiary Record Clearly Demonstrates A Mental Impairment ........................... 8

      1.1.2    The Evidentiary Record Clearly Demonstrates Substantially Limited ........................... 11

   1.2    Based on the Documentation Provided to the NBME, Dr. Kitchens Has A Mental Impairment That Substantially Limits His Ability to Perform One or More Major Life Activity Relevant to the USMLE ...................................................................................................... 20

      1.2.1    The Documentation Provided In Both Applications Clearly Demonstrate A Mental Impairment ................................................................................................................. 20

      1.2.2    The Documentation Provided In Both Applications Clearly Demonstrate Substantially Limited… ...................................................................................................................... 22

2   DOUBLE ADDITIONAL TESTING TIME IS AN APPROPRIATE AND REASONABLE TESTING ACCOMMODATION .................................................................. 29

3   THE COURT MUST ORDER THE NBME TO ACCOMMODATE DR. KITCHENS FOR ALL FUTURE EXAMS ......................................................................................... 34

4   THE RELEVANT TIMEFRAME FOR EVIDENCE IS THE PRESENT ................... 39

   4.1    The Analysis For Relief is the Present ........................................................................ 39

   4.2    If the Analysis for Relief is the Past – the Court Must Adopt the Employment Discrimination Burden-Shifting Framework .......................................................................... 41

5   EXPUNGEMENT IS PREVENTATIVE RELIEF UNDER 42 U.S.C. §2000a-3(a) ..... 45

   5.1    Expungement Should Be Available for Exams Where an Accommodation Was Sought and Denied ..................................................................................................................... 49

   5.2    Expungement Should Be Available for Exams Where Accommodations Were Not Previously Requested .......................................................................................................... 52

CONCLUSION ........................................................................................................... 57

## TABLE OF AUTHORITIES

**Cases**

*Bartlett v. New York State Bd. of Law Examiners,* 2001 U.S. Dist. LEXIS 11926 (S.D.N.Y. Aug. 15, 2001)...................................................................................................................................14

*Berardelli v. Allied Servs. Inst. Of Rehab. Med.,* 900 F.3d 104 (3rd Cir. 2018) ....................................39

*Berger v. Nat'l Bd. of Med. Exam'rs,* 2019 U.S. Dist. LEXIS 145666 (S.D. Ohio, Aug. 27, 2019). passim

*Cooper v. Harris,* 137 S. Ct. 1455, 1474, 197 L. #d. 2d 837 (2017)........................................................27

*D'Amico v. New York State Bd. Of Law Exam'rs,* 813 F. Supp. 217 (W.D.N.Y. 1993). ........................33

*Doherty v. Nat'l Bd. of Med. Examiners,* 791 Fed. Appx. 462 (5th Cir. 2019). .................................... 7

*Enyart v. Nat'l Conf. of Bar Exam'rs,* 823 F.Supp.2d 995 (N.D. CA, Oct. 24, 2011). .....................31, 32

*Hartman v. Nat'l Bd. of Med. Exam'rs,* 2010 U.S. Dist. Lexis 27691, 5 (E.D. Pa., Mar. 9, 2010).....53, 54

*Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs, Inc.,* 870 F. Supp. 2d 607 (S.D. Ind. 2012). .........13, 15

*Martin v. PGA, Tour, Inc.,* 204 F.3d 994, 1001................................................................................29

*Matheis v. CSL Plasma, Inc.,* 936 F.3d 171 (3rd Cir. 2019).........................................................39, 41

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ..................41

*PGA Tour Inc. v. Casey Martin,* 532 U.S. 661, 24 (2001) ...............................................................29

*Ramsay v. Nat'l Bd. of Med. Exam'rs,* 968 F.3d 251 (3d Cir. July 31, 2020) .............................. passim

*Rush v. Nat'l Bd. of Med. Exam'rs,* 268 F.Supp.2d 673, 675 (N.D. Tex. 2003)....................................53

*Sampson v. Nat'l Bd. of Med. Exam'rs,* 2022 U.S. Dist. LEXIS 217633 (E.D. PA, Dec. 2, 2022) .. passim

*Thomas v. Orangeburg Theaters, Inc.,* 241 F. Supp. 317, 319, 1965 U.S. Dist. LEXIS 6332 (D.S.C. 1965) ...........................................................................................................................................45

**Other Authorities**

ADA Amendments Act 2008 .......................................................................................................39

**Regulations**

28 C.F.R. § 36.105(b)(1)(ii), ...................................................................................................... 7

28 C.F.R. § 36.105(c)(1)(i). ........................................................................................................ 7

28 C.F.R. § 36.105(d)(1)(i) .....................................................................................................19, 22

28 C.F.R. § 36.309(b)(1)(v) ...............................................................................................19, 22, 28

28 C.F.R. § 36.105(b)(2) ........................................................................................................7, 10

28 C.F.R. § 36.105(c)................................................................................................................ 7

28 C.F.R. § 36.105(d)(1)(ii) .......................................................................................................11

28 C.F.R. § 36.105(d)(3)(iii) .......................................................................................................14

28 C.F.R. § 36.309(b)(1)(i) ...............................................................................................29, 40, 49

28 C.F.R. § 36.309(b)(2)(3) .......................................................................................................29

28 C.F.R. Pt. 36, App. A .......................................................................................................11, 26

28 C.F.R. § 36.309(b)(2) ...........................................................................................................29

29 C.F.R. § 1630.2(j)(1)(ii) .......................................................................................................11

29 C.F.R. § 1630.2(j)(1)(v) .......................................................................................................11

**Docket Entries**

57, Joint Pre-Trial Memorandum...........................................................................................7, 10, 30

77-1, Hamilton County Schools Transcript (Grades 1-5) ..........................................................13, 15

77-18, Outcome File, Feb. 25, 2022, STEP 1 ...............................................................................43

77-2, Hamilton County Schools Transcript (Grades 6-8) ...................................................................14

77-23, FSMB, State Specific Requirements for Initial Medical Licensure ............................................48

77-24, Application for Accommodations dated 10/31/2021 .......................................................... passim
77-27, MOXO d-CPT Report ...................................................................................................... 11
77-28, Berea College Health Service Progress Note ................................................................... 8
77-29, Berea College Health Service Progress Note .................................................................. 8, 9
77-30, Berea College Health Service Progress Note ................................................................... 8
77-31, White House Clinics Progress Note .................................................................................. 9
77-33, Connors CPT-3 Assessment Report ............................................................................... 9, 11
77-35, Report of Attention Deficit Hyperactivity Disorder Evaluation ........................ 9, 11, 12
77-36, Baptist Health Medical Service Group Progress Note ..................................................... 9
77-37, Baptist Health Medical Records 3/24/2023 .................................................................... 12
77-38, DSM-5: Attention-Deficit/Hyperactivity Disorder ........................................................ 19
77-4, Berea College Transcript .................................................................................................. 14
77-40, CBSE Score 12/10/2020 .................................................................................................. 32
77-41, CBSSA Report 2/14/2022 ................................................................................................. 33
77-42, CBSSA Report 3/21/2022 ................................................................................................. 33
77-43, CBSSA Report 4/1/2022 .................................................................................................. 33
77-45, Excerpt from General Guidelines for Requesting Test Accommodations ........................ 18, 35
77-47, Example CBSSA Questions .............................................................................................. 32
77-5, Medical University of Lublin Transcript ........................................................................... 14
77-53, Baptist Health Medical Service Group Progress Note ................................................... 9, 27
77-57, USMLE Website, General Guidelines to Request Test Accommodations ....................... 25
77-6, NBME 2023 Training Guide Disability Assessment Analyst .............................................. 18
85, Defendant's Proposed Findings of Fact and Conclusions of Law ................................ 26, 34, 39, 42

**Trial Transcript**
Dr. Allen Testimony  ............................................................................................................... passim
Dr. Gordon Testimony ............................................................................................................... 10
Dr. Jurich Testimony ............................................................................................................... passim
Dr. Kitchens Testimony ...................................................................................................... 9, 16, 32
Dr. McGeehan Testimony ....................................................................................................... passim
Dr. Pullins Testimony .............................................................................................................. passim
Dr. Senoga Testimony ............................................................................................................ 46, 50
Dr. Shepherd Testimony ................................................................................................ 10, 13, 22, 47
Ms. Convery Testimony .................................................................................................. 18, 25, 37, 38
Mrs. King Testimony ...................................................................................................... 13, 15, 16, 17

**United States Code**
42 U.S.C. § 12186(b) ................................................................................................................... 29
42 U.S.C. § 12188(2)(A)(i-iii) ..................................................................................................... 40
42 U.S.C. § 12188(a)(1). ........................................................................................................ 40, 56
42 U.S.C. § 12205a ..................................................................................................................... 29
42 U.S.C. §12102. ......................................................................................................................... 7
42 U.S.C. §12188(2)(A)-(B) ....................................................................................................... 40
42 U.S.C. §12189 ........................................................................................................................ 32
42 U.S.C. §2000a-3(a) ........................................................................................................... 45, 49
42 U.S.C.S. §12182(b)(2)(A)(ii). ................................................................................................. 29

Plaintiff, Dr. Markcus Kitchens, Jr. (hereby "Dr. Kitchens"), pro se, tenders the following Post-Trial Brief pursuant to the briefing schedule entered on May 18, 2023. For the reasons set forth below, this Court should determine that Dr. Kitchens is disabled as defined by the Americans with Disabilities Act ("ADA") and is entitled to injunctive relief under Title III, including the expungement of his examination transcript.

## **INTRODUCTION**

The Court has asked the parties to address seven specific questions:

(1) Whether Dr. Kitchens has a mental impairment that substantially limits his ability to perform one or more major life activities that are relevant to taking the USMLE as compared to the general population based on the evidentiary record.

(2) Whether Dr. Kitchens has a mental impairment that substantially limits his ability to perform one or more major life activities that are relevant to taking the USMLE as compared to the general population based on the evidence submitted to the NBME as part of his application for accommodation.

(3) What the relevant timeframe for evidence is when determining substantial limitation, either the present or the past, or if the question was dependent on whether the remedy is expungement of past results or ordering future accommodation.

(4) If Dr. Kitchens has met his burden of proof for disability under the ADA, whether double testing time is a reasonable accommodation.

(5) If Dr. Kitchens prevailed on the merits, whether there was any reason the Court should not order accommodations on all future USMLE examinations.

(6) Is Expungement of past test results a legally permissible form of relief?

(7) If Expungement is a legally permissible form of relief, whether expungement should be unavailable to Dr. Kitchens for exams where he declined to seek accommodations or exams where he sought accommodation, was denied, but chose to take the exam anyway.

Unlike Defendant NBME, who opted to answer the Court's questions predominately in the footnotes, the undersigned has endeavored to answer each of the Court's questions (albeit out of order) with supporting evidence and case law.

The evidence submitted in Dr. Kitchens' application and during the course of litigation unequivocally demonstrates NBME's consistent denial of reasonable accommodations for individuals with disabilities, thereby violating the rights of qualified individuals as protected under the Americans with Disabilities Act Amendments Act (ADAA). At the heart of this case lies the fundamental principle of equal access to educational and professional opportunities for all, regardless of disability. Dr. Kitchens, along with numerous other individuals, has faced an arduous and disheartening journey as they sought accommodations from NBME for the United States Medical Licensing Examination (USMLE).

The evidence presented reveals a disturbing pattern of NBME's callous disregard for the rights of disabled individuals. Despite providing extensive and compelling documentation to support their accommodation requests, the plaintiffs have consistently been met with unwarranted denials. This brief further underscores that Dr. Kitchens is not alone in his experience, as demonstrated by Defendant NBME's chillingly similar history of denying accommodation applications, regardless of the evidence presented.

Moreover, the explicit language of the ADAA supports, not just Dr. Kitchens' request for accommodations, but also his request for expungement of his USMLE Examination Transcript.

Which not only guarantees the right to reasonable accommodations but also acknowledges that individuals with disabilities should not be subjected to futile gestures when a covered entity demonstrates a clear intent to override the law. By continually denying accommodations, NBME has effectively forced the plaintiffs and other qualified individuals into an unending cycle of fruitless applications, rendering their pursuit of relief in litigation a mere formality. Lastly, Defendant NBME would fault Dr. Kitchens for his treating physicians alleged lack of credentials compared to the guns-for-hire Defendant NBME has on payroll. Unlike Defendant NBME's demonstrated familiarity with the Courts in disability discrimination claims, Dr. Kitchens had neither the resources nor the intention to pursue litigation while navigating the test-taking process.

Through this case, Dr. Kitchens seeks to demonstrate that the denial of accommodations by NBME goes beyond individual harm. It represents a systemic failure to uphold the principles of equal access and fair treatment for disabled individuals. By examining the evidence presented in this document, this court has the opportunity to rectify Defendant NBME's incompetence and set a precedent that will safeguard the rights of disabled individuals and promote inclusivity within the medical licensing examination process.

## ARGUMENT

## 1   DR. KITCHENS IS DISABLED UNDER THE ADA

The sole issue before the Court is whether Dr. Kitchens has a mental impairment that substantially limits his ability to perform one or more major life activity(ies) relevant to the USMLE as compared to most people in the general population. The documents provided by Dr. Kitchens in his application and throughout litigation, when evaluated by a person with the proper medical knowledge and training as intended by Congress under the ADA Amendment Act of 2008 ("ADAA"), demonstrates a lifetime of substantial impairment as a result of debilitating ADHD and anxiety as defined by the DSM-5.

An individual has a disability if he is substantially limited in a major life activity.[1] Therefore, to establish a prima facie case of disability, [Dr. Kitchens] must show "that []he has or has a record of (1) a physical or mental impairment (2) that substantially limits (3) one or more of her major life activities."[2] Mental impairment includes intellectual disability, and concentration is a major life activity.[3] The parties have stipulated that ADHD is recognized as a mental impairment under regulations implementing the ADA;[4] The USMLE, as a three-part standardized licensing exam, assesses an examinee's ability to understand basic and clinical science knowledge and skills necessary to the practice of medicine which involves high levels of "reading, concentration, [and] thinking."[5]

## 1.1 Based on the Evidentiary Record, Dr. Kitchens Has A Mental Impairment that Substantially Limits His Ability to Perform One or More Major Life Activity Relevant to the USMLE

Based on the evidence submitted at trial, there can be no doubt that Dr. Kitchens has been diagnosed with ADHD. An individual with a neurological developmental disorder can be diagnosed as an adult in conformity with the DSM-5 if the individual expresses five or more of the symptoms listed in a pervasive and consistent manner.

### 1.1.1 The Evidentiary Record Clearly Demonstrates A Mental Impairment

Dr. Kitchens' first documented diagnosis of "attention deficit disorder without mention of hyperactivity" was on January 11, 2013.[6] However, this is not the first time Dr. Kitchens has been diagnosed with ADHD. Missie King, Dr. Kitchens' mother, testified that she had brought Dr. Kitchens to be evaluated in approximately the second grade by pediatrician Dr. Jordan (first name

---

[1] 42 U.S.C. §12102.
[2] *Doherty v. Nat'l Bd. of Med. Examiners*, 791 Fed. Appx. 462 (5th Cir. 2019).
[3] *See* 28 C.F.R. § 36.105(b)(1)(ii), (c)(1)(i).
[4] *See* D.E. 57, p.7 ¶ 31 Joint Pre-Trial Memorandum and 28 C.F.R. §36.105(b)(2).
[5] *See* 28 C.F.R. §36.105(c).
[6] *See* D.E. 77-28, p. 1 Berea College Health Service Progress Note.

unknown). Specifically, Mrs. King stated that "after [Dr. Jordan] did different evaluations… She came to the conclusion that [Dr. Kitchens] had ADHD. And she prescribed Ritalin…."[7] Ritalin is a drug commonly prescribed for young children with attention deficit disorder and attention deficit disorder with hyperactivity.[8]

Since 2013, Dr. Kitchens has been diagnosed with ADHD-ADD over ten times across medical providers in Kentucky and Illinois. Dr. Kitchens' decades long diagnoses is repeatedly supported by medical records dated: January 11, 2013; August 5, 2013[9]; March 20, 2014[10]; July 8, 2014[11]; February 15, 2016[12]; July 25, 2017[13]; May 25, 2018[14]; September 22; 2022[15]; February 3, 2023[16]; February 6, 2023[17]; and March 24, 2023[18]. In his testimony, Dr. Kitchens testified that as a child, "Dr. Jordan evaluated me and recommended that I be put on Ritalin."[19] Dr. Kitchens further testifies that in the subjective notes of the August 5, 2013 medical record, Cynthia Reed "concurred that [Dr. Kitchens] does have ADD during that evaluation."[20] Most recently, on February 7, 2023, Dr. Kitchens was formerly evaluated by Ms. Christine Bacon, LPP, who diagnosed Dr. Kitchens with Attention Deficit Hyperactivity Disorder-combined presentation.[21]

---

[7] *See* Mrs. King Testimony, Day 1, 146:16-19.
[8] "Methylphenidate is the most frequently prescribed medication for the treatment of ADHD in children and adolescents in many countries." Ritalin is a brand-name of Methylphenidate. Kenneth KC Man, Ph.D., et al., *Long-Term Safety of Methylphenidate in Children and Adolescents with ADHD: 2-Year Outcomes of the Attention Deficit Hyperactivity Disorder Drugs Use Chronic Effects (ADDUCE) Study*, 10 The Lancet – Psychiatry, March 20, 2023 at 323. https://doi.org/10.1016/S2215-0366(23)00042-1
[9] *See* D.E. 77-29, p. 1-2 Berea College Health Service Progress Note.
[10] *See* D.E. 77-30, p. 1-2 Berea College Health Service Progress Note.
[11] *See* D.E. 77-53, p. 50-52 Baptist Health Medical Service Group Progress Note.
[12] *See* D.E. 77-31, p. 1-4 White House Clinics Progress Note.
[13] *See* D.E. 77-53, p. 43-44 Baptist Health Medical Service Group Progress Note.
[14] *See* D.E. 77-53, p. 39-41 Baptist Health Medical Service Group Progress Note.
[15] *See* D.E. 77-36, p. 1-6, Baptist Health Medical Service Group Progress Note
[16] *See* D.E. 77-33, p. 1-8, Connors CPT-3 Assessment Report.
[17] *See* D.E. 77-53, p. 24, 26 Baptist Health Medical Service Group Progress Note.
[18] *See* D.E. 77-37, p. 1-6 Baptist Health Medical Service Group Progress Note.
[19] *See* Dr. Kitchens Testimony, Day 2, 84: 16-17.
[20] *See* Dr. Kitchens Testimony, Day 2, 110: 14-16; D.E. 77-29, p. 1 Berea College Health Service Note.
[21] *See* D.E. 77-35, Bacon Evaluation Report.

Defendant NBME would rely on Dr. Gordon's testimony that "somebody would have to be likely substantially brain damaged to have [MOXO Report results] that far outside the norm.…"[22] This is the same alleged expert who claimed

Dr. Kitchens: Isn't it true that a grade school teacher would not recommend holding back a student who has high performing grades?

Dr. Gordon: That's not true. That is not true.

---

Dr. Kitchens: So for the record you were saying that – it is true, that a school teacher would not recommend[] holding back a student with high performing grades, correct?

Dr. Gordon: That is not true. You are incorrect in my opinion.

Dr. Kitchens: So… you are saying that a teacher would recommend holding back a student with high performing grades?

Dr. Gordon: A teacher can recommend that in some circumstances.

See Dr. Gordon Testimony, Day 3, 181: 12-15, 182: 6-16.

While it need not be stated, a teacher would most certainly *not* recommend holding back a high performing student – a fact that Dr. Gordon repeatedly rejects. As such, it is evident that Dr. Gordon's assertions are incongruous with established principles and lack reliability in basic common sense.

Defendant NBME also relies on Dr. Allen's testimony in questioning the validity of the overall evaluation.[23] However, when asked what reliable diagnostic tools that Dr. Allen uses when assessing and diagnosing a patient with ADHD, Dr. Allen indicated that he would "refer [the patient] for psychological testing to one of [his] psychologist colleagues."[24] In fact, Dr. Allen refers patients for testing rather than performing the diagnostic exams because "I am not qualified to

---

[22] *See* Dr. Gordon Testimony, Day 3, 156:11-5.
[23] *See* Dr. Allen Testimony, Day 4, 69:9-25.
[24] *See* Dr. Allen Testimony, Day 4, 49:20-21.

administer those test[s]."[25] As Dr. Jonathan Shepherd, the considerably more qualified psychiatrist, testified Ms. Bacon's evaluation "[i]s valid."[26]

Since there can be no dispute as to Dr. Shepherd's credentials or expertise, Ms. Bacon's evaluation and diagnosis of ADHD-Combined Presentation is in conformity with the DSM-5. Moreover, the above referenced medical records and evaluation indicate that Dr. Kitchens has had an active diagnosis ADD-ADHD since 2013. Pursuant to the Joint Pre-Trial Memorandum, the parties have stipulated that ADHD is recognized as a mental impairment under regulations implementing the ADA.[27] Therefore, Dr. Kitchens, having been diagnosed with ADHD, has a mental impairment under the ADA.

1.1.2   The Evidentiary Record Clearly Demonstrates Substantially Limited

While ADHD is recognized as a mental impairment, not every impairment will constitute a disability.[28] The "threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis."[29] Courts have long recognized under the ADAA, the analysis of whether an individual is 'substantially limit' "usually will not require scientific, medical, or statistical analysis."[30] As evidenced in Dr. Kitchens' grades, conduct, and medical records, Dr. Kitchens' ADHD substantially limits the major life activities involved in taking the USMLE STEP Examination.

Pursuant to 28 C.F.R. Pt. 36, App. A – the Department of Justice (DOJ) Guidelines – "individualized assessments or evidence that a qualified professional has individually and personally evaluated the candidate" are heavily favored when considering requests for test-taking

---

[25] *See* Dr. Allen Testimony, Day 4, 50: 7-83
[26] *See* Dr. Shepherd Testimony, Day 2, 48:14-17.
[27] *See* D.E. 57, p. 7 Joint Pre-Trial Memorandum quoting 28 C.F.R. §36.105(b)(2).
[28] 29 C.F.R. §1630.2(j)(1)(ii).
[29] 28 C.F.R. §36.105(d)(1)(ii).
[30] *Berger v. Nat'l Bd. of Med. Exam'rs*, 2019 U.S. Dist. LEXIS 145666, 58 (S.D. Ohio, Aug. 27, 2019) quoting 29 C.F.R. §1630.2(j)(1)(v).

accommodations. Dr. Kitchens' Connors Continuous Performance Test ("Connors CPT-3") make clear the likelihood of having attention deficits as demonstrated by a clinical number of atypical T-scores, specifically related to inattentiveness, sustained attention, and vigilance.[31] On the MOXO d-CPT Report, "a deviation from the norm was detected in [Dr. Kitchens'] tests. This deviation could indicate attention difficulties and along with other findings, the existence of ADHD."[32] Moreover, within Ms. Bacon's evaluation, Dr. Kitchens' wife, Amelia Kitchens, completed the Achenbach System of Empirically Based Assessment (ASEBA) "to obtain [her] perception of [Dr. Kitchens'] adaptive functioning, substance use, and problems".[33] As Defendant NBME is quick to point out, Mrs. Kitchens is a lawyer, *not* a medical professional, and yet her assessment of Dr. Kitchens indicated that "the DSM should be consulted to determine whether [Dr. Kitchens] meets the diagnostic criteria for anxiety problems and AD/H (sic) problems."[34] Based on the results above and her personal evaluation of Dr. Kitchens, Ms. Bacon diagnosed Dr. Kitchens with ADHD-Combined presentation.[35] Each of these assessment tools are commonly used by the medical community in diagnosing patients; as Dr. Pullins explained

> Dr. Pullins:     There are several tools… but these are all validated tools, and that's the key. When you are using a tool to diagnose anything, you want to make sure it's a validated tool. So, for example, the Conners (sic) rating system is one that we use. There is also an adult self-reporting scale that are used. And those can be given, not only to the patient, but you can also give it to someone else who has a good knowledge of an individual. So whether it's a teacher, whether it's an employer, they can use it in different situations… it helps us give a better likelihood what the diagnosis is.

*See* Dr. Pullins Testimony, Day 1, 60: 18-25, 61: 1-6.

---

[31] *See* D.E. 77-33, p. 3 Connors CPT-3 Assessment Report.
[32] *See* D.E. 77-27, p. 4 MOXO d-CPT Report.
[33] *See* D.E. 77-35, p. 5 Report of Attention Deficit Hyperactivity Disorder Evaluation.
[34] *See* D.E. 77-35, p. 6 Report of Attention Deficit Hyperactivity Disorder Evaluation.
[35] *See* D.E. 77-35, p. 8 Report of Attention Deficit Hyperactivity Disorder Evaluation.

Defendant NBME does not contest the validity of the *assessment tools* administered by Ms. Bacon. Assessments like the Connors CPT and the Achenbach System of Empirically Based Assessment Report are used by institutions as infamous and reputable as the Mayo Clinic. Rather, Defendant NBME contests the validity of Dr. Kitchens' *results*. But that is not the question at hand. The question is whether Dr. Kitchens have a mental impairment that substantially limits one or more major life activities. Based on his March 24, 2023 visit at Baptist Health, Dr. Kristina Baula diagnosed Dr. Kitchens with "generalized anxiety disorder, moderate episode of recurrent major depressive disorder, [and] attention deficit disorder, unspecified hyperactivity presence…" and prescribed twenty (20) milligrams of Adderall to be taken two times a day.[36] Since March of 2023, Dr. Kitchens has been prescribed twenty milligrams twice a day for a total of 40 milligrams of Adderall,[37] the <u>*maximum*</u> prescription dosage allowed by the FDA. Based on the results of Dr. Kitchens' Connors CPT-3, MOXO d-CPT, ADHD Evaluation, and Dr. Baula's prescription dosage for Adderall, there can be no dispute that Dr. Kitchens is substantially limited.

In addition to individual assessments, courts have also considered "whether a plaintiff has a pattern of substantial academic difficulties".[38] Throughout Dr. Kitchens' academic career, he has demonstrated a consistent pattern of academic difficulties beyond below-average performance. In elementary school, Dr. Kitchens had low grades, receiving predominately mid-low C's or D's in reading and spelling.[39] In the first grade, the school gave Dr. Kitchens accommodations for reading by placing him in the "Sail (Reading)" program – unbeknownst to either Ms. King or Dr. Kitchens.[40] As indicated by the DSM-5 for ADHD, hyperactive-impulsive symptoms include

---

[36] *See* D.E. 77-37, p. 3 Baptist Health Medical Records 3/24/2023.
[37] *See* Dr. Shepherd Testimony, Day 2, 40: 20-22.
[38] *Berger v. Nat'l Bd. of Med. Exam'rs*, 2019 U.S. Dist. LEXIS 145666, 57 (S.D. Ohio, Aug. 27, 2019) quoting *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs, Inc.*, 870 F. Supp. 2d 607, 620 (S.D. Ind. 2012).
[39] *Berger v. Nat'l Bd. of Med. Exam'rs*, 2019 U.S. Dist. LEXIS 145666, 58 (S.D. Ohio, Aug. 27, 2019).
[40] *See* D.E. 77-1, Hamilton County Schools Transcript (Grades 1-5).

"often talks excessively… [o]ften blurts out an answer before a question has been completed…"'
Ms. King's testimony, coupled with Dr. Kitchens', "Ns" and "Us" ('N' for 'Needs Improvement'
and 'U' for 'Unsatisfactory'), grades in conduct  for conduct are consistent with these symptoms:

> Dr. Kitchens:   So are you implying behavioral issues in the classroom?
>
> Ms. King:       Yes. [Dr. Kitchens] loved to talk, run that mouth all day. [Dr. Kitchens
>                 loved to play. [Dr. Kitchens] loved to, you know, play with [his] little
>                 friends and distract them when [Dr. Kitchens was] supposed to be doing
>                 [his] work or, you know, whatever the teacher is doing, [Dr. Kitchens was]
>                 supposed to be paying attention.

*See* Ms. King Testimony, Day 1, 144:10-15.

In middle school, Dr. Kitchens' grades in reading and social studies – subjects that are
reading intensive – continue to be significantly lower than any other subject, despite having
unofficial accommodations at each grade level.[41] At Berea college, Dr. Kitchens often received
C's, D's, and even an F, in his non-major coursework.[42] Even during the pre-clinical phase at the
Medical University of Lublin ("MUL") Dr. Kitchens' grades largely consist of C's.[43] Defendant
NBME would point to Dr. Kitchens' ability to pass each grade level up until and through medical
school as evidence that he is not substantially limited. However, as Courts have eloquently stated,
"[a] definition of disability based on outcomes alone, particularly in the context of learning
disabilities, would prevent a court from finding a disability in the case of any individual… who is
extremely bright and hardworking, and who uses alternative routes to achieve academic
success…."[44] *See also* "Defendant's rationale – that anyone who has had some modicum of
academic success cannot be found to have a disability that affects learning – flies in the face of

---

[41] *See* D.E. 77-2, Hamilton County Schools Transcript (Grades 6-8).
[42] *See* D.E. 77-4, Berea College Transcript.
[43] *See* D.E. 77-5, Medical University of Lublin Transcript.
[44] *Berger v. Nat'l Bd. of Med. Exam'rs*, 2019 U.S. Dist. LEXIS 145666, 65-66 (S.D. Ohio, Aug. 27, 2019) quoting
*Bartlett v. New York State Bd. of Law Examiners,* 2001 U.S. Dist. LEXIS 11926, 37 (S.D.N.Y. Aug. 15, 2001).

Congress' directives and the relevant implementing regulations."[45] *See also* "the [NBME's] reliance on Ramsay's academic achievement was contrary to the regulations that explain that 'someone with a learning disability may achieve a high level of academic success but nevertheless be substantially limited in one or more major life activities…Ramsay's high academic performance does not foreclose her from having a disability…."[46] As it so often does, Defendant NBME improperly relies on Dr. Kitchens' academic achievements as justification for denying his disability altogether. As Ms. King testified

> Ms. King:      Or if [Dr. Kitchens] needed help, you know, they could help you, because you would – in your reading, you would get stuck on words. And if you get stuck on a word, you won't move on, although your teacher tell you if you don't know the word Markcus, just move onto the next, just keep going. But in your little mind, you could not move on, you just stayed there until you figured it out. And you wasted so much time, you know, on trying to sound the word out. And even with your comprehension, you would read the same sentence or small paragraph over and over again until you really grasped the concept of it.

*See* Ms. King Testimony, Day 1, 155: 18-25, 156: 1-4.

Similar to *Berger* and *Ramsay*, Dr. Kitchens' academic accomplishments does not allow the NBME to disregard evidence of his limitations. Throughout Dr. Kitchens' educational career, he had to spend additional time and effort overcoming his ADHD, time and effort that the Defendant rejects entirely in favor of accusing Dr. Kitchens of being a bad student. This is not only the discriminatory behavior that brought Dr. Kitchens before this Court, but is explicitly what Congress enacted the ADAA to *prevent*.

---

[45] *Berger v. Nat'l Bd. of Med. Exam'rs*, 2019 U.S. Dist. LEXIS 145666, 65-66 (S.D. Ohio, Aug. 27, 2019) quoting *Peters*, 2012 U.S. Dist. LEXIS 12646, 6.
[46] *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 260 (3d Cir. July 31, 2020) quoting 28 C.F.R. §36.105(d)(3)(iii).

Lastly, courts have also considered "whether a plaintiff has been afforded testing accommodations in the past" to determine *substantially* limited.[47] In early adolescence and in medical school, Dr. Kitchens received official accommodation. In the first grade, the school gave Dr. Kitchens accommodations for reading by placing him in the "Sail (Reading)" program – unbeknownst to either Ms. King or Dr. Kitchens.[48] In medical school, Dr. Kitchens received "extended time" on the Comprehensive Basic Science Exam ("CBSE").[49] The same accommodation Dr. Kitchens requested the Defendant NBME provide on the USMLE STEP Exams.

Dr. Kitchens did not magically improve between first grade and medical school. All throughout elementary school through college, Dr. Kitchens was provided *unofficial* accommodations and spent more time-effort in order to sustain academic progress. As Ms. King stated:

> Mrs. King:    I put [Dr. Kitchens] in Kumon Reading and Math Center. And [Dr. Kitchens was] tutored by [his] Aunt Sandra, [he was] tutored by a young lady named Whitney. [Dr. Kitchens] had hooked on phonics cassettes… [and] the hooked on Phonics VHS."

> ---

> Dr. Kitchens:    [Y]ou spoke earlier about these unofficial accommodations that were put in place when you spoke to the teachers to put [Dr. Kitchens] in isolation and things to help [Dr. Kitchens] focus. Did you feel that was beneficial or not?

> Mrs. King:    [A]t the beginning of every school year I would have, you know, talks with [Dr. Kitchens'] teachers or meeting with [Dr. Kitchens'] teachers to let them know that I found this, you know, effective. Because if [Dr. Kitchens was] in close proximity, they can, you know, keep tabs on you, and they can quiet you down or make you be still.

---

[47] *Berger v. Nat'l Bd. of Med. Exam'rs*, 2019 U.S. Dist. LEXIS 145666, 57 (S.D. Ohio, Aug. 27, 2019) quoting *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs, Inc.*, 870 F. Supp. 2d 607, 620 (S.D. Ind. 2012).
[48] *See* D.E. 77-1, Hamilton County Schools Transcript (Grades 1-5).
[49] *See* D.E. 77-24, p. 14 Application for Accommodations dated 10/31/2021.

*See* Ms. King Testimony, Day 1, 153: 20-25, 155: 6-18.

> Dr. Kitchens:   My professor, Dr. Alyssa Hanna, who was one of my biology professors, noticed that – how I was struggling to finish my exams and quizzes… in a traditional class setting. So she allowed me to sit in her office during office hours and take the exam until I was finished…. Dr. Hanna was not concerned on exactly how much time it took for me to finish the exam but for me to actually finish the exam under a less stressful environment.

*See* Dr. Kitchens Testimony, Day 2, 101: 8-10, 23-25, 102: 1.

Accommodations were not simply limited to the classroom. As Dr. Allen indicated

> "as part of the diagnostic criteria for ADHD, you are supposed to see the disfunction in all walks of life, not just academically…. [P]atients I have with ADHD… the rest of their life is just as chaotic as their work or school life."[50]

A fact to which both Ms. King and Dr. Kitchens testified to.

> Dr. Kitchens:   Can you describe [the] tools that we put in place during high school?

> Mrs. King:   [I]n high school you had a more professional type of planner… and [Dr. Kitchens] could write [his] subjects… times and dates and had plenty of space for notes. So we still had the thing on the refrigerator, but [Dr. Kitchens] would have [his] phone set for alarms for [his] homework. …

> ---

> Mrs. King:   I would stay in the living [room] area and [Dr. Kitchens] would go and shut the door in [his] room, isolate [himself] to [his] room, turn [his] phone off, no TV. [He] had to be in complete silence when [he] did his studying and homework.

> ---

> Mrs. King:   [Dr. Kitchens'] teacher can tell you all there's an exam in two weeks. [Dr. Kitchens would] have to start studying tonight in advance leading up to the day of the test. And whenever [Dr. Kitchens] went to school… every day, [he] would leave home like an hour before school started. And school was only like 10 minutes away… [He] just felt like [he] just had [to] go, relax, eat your breakfast, get [his] thoughts together for the day… and [Dr. Kitchens] didn't want to be in a rush….

---

[50] *See* Dr. Allen Testimony, Day 4, 34: 1-6.

*See* Mrs. King Testimony, Day 1, 161: 17-25, 162: 1-24.

Dr. Kitchens would not be the first student to receive unofficial accommodations by sympathetic teachers or involved parents. Similar to the plaintiff in *Berger*, Dr. Kitchens has a history of receiving both informal and formal accommodations throughout grade school, high school, college, and medical school. "Throughout his formal education career, teachers and other professionals have recognized [plaintiff's] need for accommodations to address his… impairments."[51] *See also* "[d]uring ninth, tenth, and part of eleventh grade, [plaintiff] was **<u>informally</u>** accommodated in the classroom by his teachers, [plaintiff] received extra time to complete tests…."[52] (Emphasis added). In the *Berger* case, the Court held that the plaintiff was substantially limited under the ADA and that "evidence of self-mitigating measures, informal accommodations, or recently provided accommodations or modifications" are equally valuable with respect to proving or disproving disability.[53]

Based on the NBME's website, however, it appears as though Defendant NBME disagrees with the DOJ's guidance with respect to unofficial accommodations. Throughout the guidelines posted on their website, Defendant NBME requests "[o]**fficial** academic records and transcripts… [o]**fficial** score reports for nationally normed standardized tests… [o]**fficial** records verifying approved accommodations from schools or other testing agencies… [w]ritten feedback from teachers or supervisors."[54] (Emphasis added). At first the only 'informal' or 'unofficial' method of documentation required is the written feedback from teachers or supervisors, except that at the bottom of that same page the Defendant NBME's website states "[r]eports and correspondence from professionals must be typewritten on **official** letterhead, dated, and signed by the

---

[51] *Berger v. Nat'l Bd. of Med. Exam'rs*, 2019 U.S. Dist. LEXIS 145666, 74 (S.D. Ohio, Aug. 27, 2019).
[52] *Berger v. Nat'l Bd. of Med. Exam'rs*, 2019 U.S. Dist. LEXIS 145666, 74 (S.D. Ohio, Aug. 27, 2019)
[53] *Berger v. Nat'l Bd. of Med. Exam'rs*, 2019 U.S. Dist. LEXIS 145666, 72 (S.D. Ohio, Aug. 27, 2019)
[54] *See* D.E. 77-45, Excerpt from General Guidelines for Requesting Test Accommodations.

professional."[55] (Emphasis added). Even Ms. Erin Convery, Defendant's Disability Services Director, when asked if unofficial accommodations would not be accepted as part of an examinee's application for accommodations stated: "[u]nofficial, that is unsubstantiated by the medical school… yes" would **not** be considered.[56]

Furthermore, when asked where in the 2023 Disability Analyst training manual the word "unofficial" appeared, Ms. Convery could not say. To wit, after conducting a word-search of the entire eighteen (18) - page training guide for the word 'unofficial', "Adobe Acrobat has finished searching the document. __NO MATCHES WERE FOUND__."[57] (Emphasis added). It is clear that Dr. Kitchens' history of receiving both formal and informal accommodation throughout his academic career highlights the recognition by teachers and medical professionals of his need for accommodation to address his impairments. As the Court in *Berger* recognized, evidence of self-mitigating measures, informal accommodations, or recently provided accommodations are equally valuable in proving disability under the ADA despite Defendant's emphasis for official documentation and records. This discrepancy raises concerns about the Defendant NBME's willingness to consider unofficial accommodations despite the clear value it lends to assessing disability.

As 28 C.F.R. § 36.105(d)(1)(i) states, "'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the ADA" and "is not meant to be a demanding standard".[58] As demonstrated by the evidentiary record and testimony presented to the Court at trial, Dr. Kitchens has established that his ADHD diagnosis, from early adolescence

---

[55] *See* D.E. 77-45, p. 2 Excerpt from General Guidelines for Requesting Test Accommodations.
[56] *See* Ms. Convery Testimony, Day 3, 97: 19-25.
[57] *See* D.E. 77-6, NBME 2023 Training Guide Disability Assessment Analyst.
[58] *Sampson v. Nat'l Bd. of Med. Exam'rs*, 2022 U.S. Dist. LEXIS 217633, 27 (E.D. PA, Dec. 2, 2022) quoting 28 C.F.R. § 36.309(b)(1)(v).

and from the present, substantially limits one or more major life activities relevant to taking the USMLE STEP Examination compared to the general population.

1.2  Based on the Documentation Provided to the NBME, Dr. Kitchens Has A Mental Impairment That Substantially Limits His Ability to Perform One or More Major Life Activity Relevant to the USMLE

In order to be clinically diagnosed with ADHD, the DSM-5 requires (in part) "clear evidence that the symptoms interfere with, or reduce the quality of, social, academic, or occupational functioning."[59] An individual with a neurological developmental disorder can be diagnosed as an adult in conformity with the DSM-5 if the individual expresses five or more of the symptoms listed in a pervasive and consistent manner

1.2.1  The Documentation Provided In Both Applications Clearly Demonstrate A Mental Impairment

There is no doubt that Dr. Kitchens was diagnosed with ADHD. Based on the medical evidence attached to Dr. Kitchens' application for accommodations, not only did he have a diagnosis for ADHD, Dr. Kitchens has been officially diagnosed since 2013.

Defendant NBME would ignore the medical documentation submitted by Dr. Kitchens in reliance of Dr. McGeehan's opinion that "the medical records that were submitted by Dr. Kitchens were ambiguous…."[60] The NBME's deliberate ignorance contradicts the preamble to the DOJ's recommending, "[r]eports from experts who have personal familiarity with the candidate should take precedent over those from… reviewers for testing agencies…."[61] To add insult to injury, Dr. McGeehan herself testified that "I am **not** qualified to review these medical records."[62] (Emphasis added). Dr. McGeehan, one of the four Disability Analysts for Defendant NBME whose sole

---

[59] *See* D.E. 77-38, p. 2 DSM-5: Attention-Deficit/Hyperactivity Disorder.
[60] *See* Dr. McGeehan Testimony, Day 3, 211: 11-12.
[61] *Sampson v. Nat'l Bd. of Med. Exam'rs*, quoting Nondiscrimination on the Basis of Disability by Public Accommodations and in Commerical Facilities, 75 Fed. Reg. 56, 236, 56, 597 (Sept. 15, 2010).
[62] *See* Dr. McGeehan Testimony, Day 3, 235: 21-22.

purpose is to determine whether Dr. Kitchens meets the criteria for substantial limitation under the ADA, admits that she is **<u>unqualified</u>** to review medical records, which raises serious doubts about the credibility and weight of her opinion compared to the recommendations of the Dr. Kitchens' treating medical physicians.

On the other hand, when presented with the October 5, 2020 medical record – the same record that Dr. McGeehan reviewed – Dr. Christopher Pullins explained that

> [b]ased on the medication, the Dextroamphetamine-Amphetamine and the Buspirone, those are both used purposely for a certain condition. And so again as I said before, the Dextroamphetamine-Amphetamine on the list would lead me to believe that the patient was being treated for ADD or ADHD. And Buspirone is a medication commonly used for anxiety. So I would come to the conclusion that either a generalized anxiety disorder plus ADHD would be the conclusion I came to in reviewing the documents.

*See* Dr. Pullins Testimony, Day 1, 60: 2-10.

Dr. Timothy Allen, Defendant NBME's forensic psychiatric expert, confirmed Dr. Kitchens' diagnosis.

| | |
|---|---|
| Dr. Kitchens: | If a medical history lists a diagnosis and a date, the date in a case [is] when the diagnosis was made, correct? |
| Dr. Allen: | Yes. |
| Dr. Kitchens: | And what is the date that you see [on the report]? |
| Dr. Allen: | 2013. |
| Dr. Kitchens: | So according to this record, isn't it true that [Dr. Kitchens] have a diagnosis of ADHD? |
| Dr. Allen: | Yes. |
| Dr. Kitchens: | And [does the report show] that [Dr. Kitchens] ha[d] a diagnosis of ADHD since 2013, correct…? |
| Dr. Allen: | That's what that indicates. Yes. |

*See* Dr. Allen Testimony, Day 4, 55:18-23, 56:5-10.

Neither Dr. Allen nor Dr. Pullins seemed to believe that the medical records provided to Defendant NBME were ambiguous. It cannot be understated that Defendant NBME's refusal to acknowledge and consider the medical documentation submitted by Dr. Kitchens, relying instead on the unqualified opinion of Dr. McGeehan raises serious concerns as to the integrity of their evaluation process. The medical records provided demonstrate that Dr. Kitchens had a diagnosis of ADHD since 2013, that Dr. Kitchens had been prescribed "[A]dderall since 2014", and that Dr. Kitchens had consistently been treated for ADHD since his diagnosis.[63]

In light of the testimony by both parties' experts, and the medical evidence submitted to Defendant NBME in Dr. Kitchens' application for accommodations, it is indisputable that Dr. Kitchens has a well-documented diagnosis of ADHD since 2013. This diagnosis, as attested to by Dr. Pullins and Dr. Allen, verifies Dr. Kitchens' mental impairment under the ADA.

1.2.2   The Documentation Provided In Both Applications Clearly Demonstrate Substantially Limited

As 28 C.F.R. § 36.105(d)(1)(i) states, "'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the ADA" and "is not meant to be a demanding standard".[64] The documentation submitted by Dr. Kitchens, when reviewed by *qualified* medical professionals as demonstrated by the expert testimony from both parties, confirms the existence of a substantial limitation as per the criteria outlined by the ADA.

Dr. Pullins was able to draw clear conclusions regarding Dr. Kitchens' condition, pointing out the medication prescribed and its purpose in treating ADHD and anxiety disorders. Notably, Dr. Pullins was not the only expert who affirmed Dr. Kitchens' diagnosis for ADHD and anxiety.

Dr. Kitchens:   After thoroughly reviewing documentation submitted with my request to the NBME, for reasonable accommodations, were there

---

[63] *See* D.E. 77-24, p.8-13 Application for Accommodations dated 10/31/2021.
[64] *Sampson v. Nat'l Bd. of Med. Exam'rs*, 2022 U.S. Dist. LEXIS 217633, 27 (E.D. PA, Dec. 2, 2022) quoting 28 C.F.R. § 36.309(b)(1)(v).

> any specific active diagnoses mentioned in the provided documentation?
>
> Dr. Shepherd: Yes
>
> Dr. Kitchens:  And do you remember what those are?
>
> Dr. Shepherd: Yes. ADHD and anxiety disorder.

*See* Dr. Shepherd Testimony, Day 2, 34: 15-22.

ADHD is a neurological developmental disorder, which affects the development and functioning of the nervous system. As such, ADHD is not curable. "[I]t's manageable. It's treatable."[65] Moreover, Dr. Allen explained that while "severity can wax or wane over the lifetime [of a person]... it is typically permanent and there are some residual symptoms for their whole life." *See* Dr. Allen Testimony, Day 4, 61:14-17.

While the medical records provided do not "clearly delineate[] how the diagnostic criteria were met for the diagnoses… [nor provide] a clear rationale for any accommodations…"[66] the records do indicate how severe Dr. Kitchens' ADHD is. As a prescribing physician, Dr. Allen is cognizant of the relevant federal laws relating to controlled substances like Adderall.

> Dr. Kitchens:  Isn't it true that… the FDA mandates a maximum dosage of Adderall, correct?
>
> Dr. Allen:      Yes.
>
> Dr. Kitchens:  What is that maximum dosage?
>
> Dr. Allen:      The largest pill size of Adderall XR, the extended release is 30 milligrams….the short acting is 20 Milligrams twice a day.  So 40 milligrams a day.

*See* Dr. Allen Testimony, Day 4, 56: 11-17.

---

[65] *See* Dr. Pullins Testimony, Day 1, 63 :12, 14.
[66] *See* Dr. McGeehan Testimony, Day 3, 210: 21-23, 211: 2-3.

Based on the medical evidence submitted, Dr. Kitchens has been prescribed ten (10) mg of Buspirone and thirty (30) mg of Adderall since 2020. Ten milligrams less than the *maximum* dosage permitted by the FDA. Specifically, the October 5, 2020 medical record instructs "TK 1 T PO BID" and dispensed sixty (60) dextroamphetamine-amphetamine fifteen (15) mg tablets.[67] To the untrained eye, it may seem as though Dr. Kitchens' physician prescribed 15 milligrams in one tablet daily; as demonstrated by Defense Counsel's own objection:

> Ms. Mew:    I want to object just because I think it mischaracterizes the evidence. Doesn't this show 15 milligrams in one tablet daily?

*See* Dr. Allen Testimony, Day 4, 58: 3-5.

However, competent medical professionals with expertise in the field are able to recognize the dosage listed. As demonstrated by Dr. Allen and Dr. Pullins:

> Dr. Kitchens:   Would you agree that a patient who is prescribed 30 milligrams of Adderall, given that the maximum amount that can be given is 40 milligrams, would indicate a moderate to severe level of ADHD?

> Dr. Allen:   So yes, so it does say 15 milligrams BID, which is latin for twice a day, so
>
> it is 30 milligrams a day total.

*See* Dr. Allen Testimony, Day 4, 58:17-24.

> Dr. Kitchens:   Do you see this particular drug here, this medication?

> Dr. Pullins:   I do.

> Dr. Kitchens:   … Can you confirm where this medication is located on this particular record?

> Dr. Pullins:   Under current outpatient medications.

> Dr. Kitchens:   What would you say in your experience of the dosage of 15 milligrams  twice a day, would you consider that in the range of small, medium, large amount of a medication for this particular medication?

---

[67] *See* D.E. 77-24, p. 9 Application for Accommodations dated 10/31/2021.

Dr. Pullins:      At a total of 30 milligrams in a 24-hour period, I would rate that on the higher end for the range, the maximum range on that medication.

---

Dr. Kitchens:  How would you rate the severity of the diagnoses of that particular – of ADHD that it is used for?

Dr. Pullins: I would rate it anywhere from moderate and severe.

*See* Dr. Pullins Testimony, Day 1, 56: 21-25, 57: 1-7, 15-19.

When asked to explain what 'PO BID' meant, Dr. McGeehan indicated that she could not because "[she] didn't know what that meant."[68] Yet it is Dr. McGeehan, who lacks prescription-writing abilities, openly acknowledges her limited understanding of the maximum dosage mandated by the FDA and concedes that the mechanism for how Adderall works is "outside [her] scope of practice" holds the responsibility of assessing whether applicants are substantially limited.[69] According to Erin Convery, the Director of Disability Services at the NBME, Dr. McGeehan is the "manager of examinee accommodations in disability services."[70] Ms. Convery also stated that Dr. McGeehan was the only analyst to review Dr. Kitchens' application for accommodations... and that she did not assign or send out Dr. Kitchens' application to a third party expert-consultant.[71] However, based on Dr. McGeehan's testimony, it appears that the Defendant NBME relies on inadequately trained staff to evaluate an applicant's disability. As Dr. Pullins and Dr. Allen attested the medical evidence submitted by Dr. Kitchens clearly demonstrates a moderate to severe diagnosis of ADHD.

Medical evidence is not the only documentation that can demonstrate substantially limited, as recognized by Defendant NBME. On the United States Medical Licensing Examination's website, the Defendant NBME lists, in part, relevant objective records of impaired functioning that

---

[68] *See* Dr. McGeehan Testimony, Day 3, 234: 22-24, 237: 1-2.
[69] *See* Dr. McGeehan Testimony, Day 3, 235: 5.
[70] *See* Ms. Convery Testimony, Day 3, 72: 7-8.
[71] *See* Ms. Convery Testimony, Day 3, 83: 25, 84: 1-5, 88: 11-14.

are considered when applying for accommodations.[72] In both of Dr. Kitchens' applications, he attached a letter from Dr. Ghori Khan, his primary care physician in 2020, medical records from 2020, 2018, and 2017, and the confirmation email from the Prometric Center confirming his scheduled CBSE exam with formal accommodations. As confirmed by Ms. Convery, Dr. Kitchens' application consisted of "acceptable documentation."[73]

As referenced above, the Department of Justice (DOJ) Guidelines heavily favor – "individualized assessments _or_ evidence that a qualified professional has individually and personally evaluated the candidate" when considering requests for test-taking accommodations.[74] (Emphasis added). This includes compelling evidence such as a letter from a treating physician advocating on behalf of their patient. Notably, Dr. Kitchens diligently adhered to, both the DOJ Guidelines and the USMLE's website, by submitting Dr. Khan's letter dated April 22, 2020.

Dr. Khan's letter states

"[t]his [letter] is to certify that Marcus (sic) Kitchens is my patient, he has significant anxiety and is under my treatment. I will suggest exam coordinators to provide him some relaxation allowed in the rules so that it will be easier on him to undergo the exam."[75]

As Dr. Kitchens' primary care physician, Dr. Khan possesses unparalleled insight into the specific needs of Dr. Kitchens and is uniquely equipped to identify the accommodations necessary for him to have equitable and unhindered access to take the examination. Defendant NBME would discount Dr. Khan's letter entirely by highlighting its brevity and that "it does not indicate a diagnosis and does not provide any information about functional limitations or the need for any

---

[72] _See_ D.E. 77-57, p. 14 USMLE Website, General Guidelines to Request Test Accommodations.
[73] _See_ Ms. Convery Testimony, Day 3, 90: 24-25.
[74] 28 C.F.R. Pt. 36, App. A
[75] _See_ D.E. 77-24, p. 8 Application for Accommodations dated 10/31/2021.

accommodations."[76] However, Defendant NBME improperly weighs the length of the letter over

the contents and its existence. As Dr. Pullins explains:

> Dr. Pullins:   [T]his is a standard letter accommodation that is required on almost a weekly basis from patients for various reasons, whether it's to have a service animal... there is multiple reasons why we get these requests.
>
> ---
>
> Dr. Kitchens:   How would you... determine the length of extra time given when writing a document of such?
>
> Dr. Pullins:   So normally when we write a letter of accommodation, unless we have the particulars of like, for example, let's say I know a person works an eight-hour day. Depending on whatever the issue is, I may say they can only work four-hour half a day. So it really depends on the severity of the symptoms. **As far as this exam that you are talking about, sometimes we don't necessarily make the decision on the exact time limits, that's beyond our scope**. But we will request that whoever the organization is that they take into consideration the underlying issue at hand, when it's pain, whether it's ADHD or depression, anxiety, whatever the situation is.

(Emphasis added). *See* Dr. Pullins Testimony, Day 1, 68: 21-25, 70: 1-15.

Both Dr. Khan's letter and Dr. Pullins' testimony is corroborated by a letter from Nurse Tina

Holbrook recommending accommodations on Dr. Kitchens' behalf. In it, Ms. Holbrook states

> "Markcus Kitchens [redacted] has been a patient of this clinic since 8/25/22. He has [a] current diagnosis of ADHD, predominantly inattentive type. Any reasonable accommodations should be implemented."[77]

In each instance, the treating provider does not list exactly what time limit(s) are recommended

nor do the providers specify what accommodation ought to be provided. As the Court in *Ramsay*

held,

> "it is within the trial judge's discretion to credit a physician with firsthand observations of a patient over one who only reviewed the patient's records....[78]

---

[76] *See* D.E. 85, p. 20 ¶ 65-66 Defendant's Proposed Findings of Fact and Conclusions of Law.
[77] *See* D.E. 77-53, p. 32 Baptist Health Medical Record 2/6/23.
[78] *Ramsay v. Nat'l Bd. of Med. Exam'rs,* 968 F.3d 251, 258 (3d Cir. July 31, 2020) quoting *United States v. Olhovsky,* 562 F.3d 530, 548-49 (3d Cir. 2009).

Such a professional has the benefit of seeing how the patient actually acts and speaks and provides a perspective not limited to the cold record."[79]

By submitting Dr. Khan's letter, Dr. Kitchens provided the NBME with the recommendations of his treating physician who would have more personal knowledge and firsthand observation than either Dr. McGeehan or an evaluating provider. Insight that the Courts give deference to over evaluating physicians or reviewing analysts. In light of the aforementioned evidence and the expertise of Dr. Khan, it is clear that Dr. Kitchens' submission of Dr. Khan's letter provides a compelling and credible basis that Dr. Kitchens is substantially limited.

Lastly, the DOJ guidelines *require* prior accommodations be given "considerable weight" because "a recent history of past accommodations is critical to an understanding of the applicant's disability and the appropriateness of testing accommodations."[80] In medical school, Dr. Kitchens received "extended time" on the Comprehensive Basic Science Exam ("CBSE").[81] The same accommodation Dr. Kitchens requested the Defendant NBME provide on the USMLE STEP Exams. Defendant NBME failed to produce any evidence at trial suggesting that Dr. Kitchens did not receive accommodations during his academic career. Rather, the evidence was just the opposite. Dr. Lucia McGeehan, after testifying that "[disability analysts] ask individuals to inform us whether they were previously formally accommodated. Again, in any prior standardized exams or in their educational history..." testified that Defendant NBME does not decide who receives accommodation(s) on the CBSE.[82] Pursuant to C.F.R. §36.309(b)(1)(v), "[w]hen considering requests for accommodations... the [testing] entity gives considerable weight to documentation of

---

[79] *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 258 (3d Cir. July 31, 2020) quoting *Cooper v. Harris*, 137 S. Ct. 1455, 1474, 197 L. #d. 2d 837 (2017).
[80] *Sampson v. Nat'l Bd. of Med. Exam'rs,* 2022 U.S. Dist. LEXIS 217633, 27 (E.D. PA, Dec. 2, 2022) quoting *Ramsay*, 968 F.3d at 259.
[81] *See* D.E. 77-24, p. 14 Application for Accommodations dated 10/31/2021.
[82] *See* Dr. McGeehan Testimony, Day 3, 210: 2-5, 215:19-22.

past accommodations..." It is clear from the evidence that MUL provided Dr. Kitchens formal accommodation on the CBSE, a high-stakes, timed-standardized exam, just a year prior.

## 2   DOUBLE ADDITIONAL TESTING TIME IS AN APPROPRIATE AND REASONABLE TESTING ACCOMMODATION

Additional time is not only a *reasonable* accommodation, it is the <u>only</u> accommodation that is listed on the Defendant's Application Form, provided by Defendant NBME to examinees for the express purpose of applying for testing accommodations. Additional time on the USMLE STEP Examination does not fundamentally alter the nature of, nor the skill(s) and knowledge, the STEP Examination(s) purport to test, therefore, it is a reasonable testing accommodation under Title III of the ADA.

To determine if an accommodation or modification is reasonable, the requested accommodation must <u>not</u> "fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or modifications." 42 U.S.C.S. §12182(b)(2)(A)(ii). The United States Department of Justice regulations require that

> "[t]he examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure). 28 C.F.R. §36.309(b)(1)(i).[83]

In other words, a private entity such as Defendant NBME, who provides licensure examinations must provide "appropriate auxiliary aids" for qualified individuals with disabilities, such as additional time or altering the "manner in which the examination is given" unless the

---

[83] The ADA authorizes DOJ to promulgate regulations implementing the ADA's public accommodation provisions. *See Sampson v. Nat'l Bd. Of Med. Exam'rs*, 2022 U.S. Dist. LEXIS 217633 (E.D.N.Y., Dec. 02, 2022) quoting 42 U.S.C. §§ 12186(b), 12205a.

accommodation or modification would "fundamentally alter the measurement of the skills or knowledge the examination is intended to test or would result in an undue burden." 28 C.F.R. §36.309(b)(2)(3).

Pursuant to 28 CFR §36.309(b)(2) "[r]equired modifications to an examination may include changes in the length of time permitted for completion of the examination…." As stated by the Supreme Court in *PGA Tour Inc. v. Casey Martin*, accommodation(s) are not 'one size fit all' and that determining reasonable accommodation is "'an intensively fact-based inquiry'".[84] Courts have long held that the use of accommodations is merely *an aid* to the examinee, not a tool or device to *replace* the examinee's abilities.

On February 28, 2020, the DOJ posted technical assistance for testing accommodations under Title III for standardized exams and other high-stakes tests which included "braille or large print exam booklets; wheelchair-accessible testing stations; distraction free rooms; [and] extended time…."[85] (Emphasis added.) Across high-stakes standardized exams such as the SAT[86], ACT[87], MCAT[88], GRE[89], MPRE[90], and the USMLE[91], recognize and list extended testing time as an accommodation available for qualified individuals.

As stipulated by both parties, the USMLE STEP Examination is a three-part examination, which consists of STEP 1, STEP 2 Clinical Knowledge (STEP 2 CK), and STEP 3.

---

[84] *PGA Tour Inc. v. Casey Martin*, 532 U.S. 661, 24 (2001), quoting *Martin v. PGA, Tour, Inc.,* 204 F.3d 994, 1001.
[85] U.S. Dep't of Justice, *Civil Rights Division – Disability Rights Section*, "Testing Accommodations", 3-4 (Feb. 28, 2020).
[86] https://accommodations.collegeboard.org/how-accommodations-work/about-accommodations/extended-time
[87] https://www.act.org/content/act/en/products-and-services/the-act/registration/accommodations.html
[88] https://students-residents.aamc.org/mcat-exam-accommodations/mcat-exam-testing-conditions-what-you-need-know
[89] https://www.ets.org/gre/test-takers/general-test/register/disability-accommodations.html#accordion-bb3e70b2ac-item-e5a650ab15
[90] https://www.ncbex.org/exams/mpre/test-accommodations/test-conditions
[91] https://www.usmle.org/step-exams/test-accommodations

"Step 1 assesses whether the examinee understands and can apply important science concepts basic to the practice of medicine, with special emphasis on principles and mechanisms underlying health, disease, and modes of therapy.

Step 2 Clinical Knowledge (Step 2 CK) assesses whether candidates have the patient-centered knowledge, skills and understanding of clinical science that provide the foundation for the safe and competent practice of medicine under supervision.

Step 3 assesses whether an examinee understands and can apply medical knowledge essential for the unsupervised practice of medicine, with emphasis on patient management in ambulatory settings. It is the final examination in the USMLE sequence leading to a license to practice medicine without supervision."[92]

At no point throughout the USMLE Examination program is time, or an examinee's ability to perform under time-constraints a skill tested by the STEP exams. Defendant NBME recognizes this crucial point. To wit, Dan Jurich, the Associate Vice President of the Defendant, NBME, testified that additional time "<u>does not</u> alter the function or the assessment of the exam."[93] (Emphasis added). As Dr. Allen eloquently stated

"[w]hen the appropriate accommodation is given and justified, it allows the performance… [to] become more comparable in terms of adjusting for that accommodation when the accommodation is unrelated to the skills being measured in the assessment. So it essentially allows that individual to test in a more comparable setting as the standard time and the standard conditions."[94]

It is worth noting that the NBME does not contest that additional testing time is offered on the USMLE STEP Examinations as a reasonable testing accommodation. Having answered whether additional testing time is a reasonable accommodation, the analysis shifts from whether additional time generally is reasonable to whether double testing time is reasonable.

In *Enyart v. National Conference of Bar Examiners*, Stephanie Enyart was a legally blind law school graduate who applied to take the Multistate Professional Responsibility Exam

---

[92] *See* D.E. 57, p. 4 ¶4 Joint Pretrial Memorandum.
[93] *See* Dr. Jurich Testimony, Tr. Day 4, at 126:01-04, 127:16-18.
[94] *See* Dr. Allen Testimony, Tr. Day 4, at 127:05-12.

("MPRE") and Multistate Bar Exam ("MBE") with "a computer equipped with assistive technology software known as JAWS and ZoomText."[95] The Court held that Ms. Enyart's requested accommodations were reasonable in fulfilling the purpose of 42 U.S.C. §12189 – "'to assure that persons with disabilities are not foreclosed from educational, professional, or trade opportunities because an examination or course in conducted in an inaccessible site or without accommodation.'"[96] Moreover, the Court expressly deferred to the DOJ's interpretation of 42 U.S.C. §12189, which interprets 'accessible' as "administer[ing] the exam 'so as to best ensure' that the exam results accurately reflect aptitude rather than disabilities."[97] In following a 'best ensures' standard, so too, this Court must consider how much additional time would 'best ensure' Dr. Kitchens be evaluated on his skills and competency, not his disability.

Dr. Kitchens testified that at various stages in his educational career, he was provided unofficial accommodations – namely additional time – to complete his course work.

> [I]n order to get this schoolwork done, I would go into my room and shut myself out with any distractions. I would even study almost every single day, even on the weekends and would… put myself into a situation where I would become frustrated because I would see all of my friends and my brother, all who can procrastinate, go outside and play and half study[], but get better grades… than I would.
>
> ---
>
> The amount of time that I spent studying for an exam or quiz was what I had to do to try to make something of myself.
>
> ---
>
> While in University, I never had… the need to file an[y] official documentation for my situation due to my professors' willingness to take my exams one-on-one with extended time.

*See* Dr. Kitchens' Testimony, Tr. Day 2, 91: 20-25, 94: 20-22, 137: 9-15.

---

[95] *Enyart v. Nat'l Conf. of Bar Exam'rs*, 823 F.Supp.2d 995 (N.D. CA, Oct. 24, 2011).
[96] *Id* at 4 quoting *H.R. Rep. No. 101-485(III) at 68-69.*
[97] *Id* quoting 42 U.S.C. §12189.

The Court saw first hand, when comparing questions on the Comprehensive Basic Science Self-Assessment ("CBSSA") and the USMLE STEP Examination, the questions on the CBSSA are a fraction of the questions on the STEP Examination.[98] Moreover, Dr. Kitchens has already demonstrated his knowledge and competency in the material the STEP Examination purports to evaluate. On December 10, 2020, Dr. Kitchens took the Comprehensive Basic Science Examination ("CBSE") and scored a 156 – twenty-eight (28) points lower than the minimum passing score.[99] After studying for a little over a year, on February 14, 2022, Dr. Kitchens took the CBSSA and scored a 212 – eighteen (18) points *higher* than the minimum passing score.[100] Six weeks later, on March 21, 2022, Dr. Kitchens took another CBSSA and scored a total equated percent correct score of seventy seven percent (77%).[101] Two weeks later, Dr. Kitchens took a third CBSSA and scored a total equated percent score of sixty nine percent (69%).[102] According to the NBME's website, "CBSSA results can be used in conjunction with other information to assess readiness [for] the USMLE Step 1…."[103] Dr. Jurich ratified the website when he stated that Dr. Kitchens' February 14, 2022 CBSSA score would give an examinee an indication of their likelihood to pass the STEP 1 exam.[104] As Dr. Jurich stated and the Court has seen with Dr. Kitchens' CBSSA scores, when provided with the opportunity to read the questions and answers properly, he is able to demonstrate his knowledge of the material.

In *D'Amico v. New York State Board of Law Examiners*, Marie D'Amico was a plaintiff with severe visual disabilities and required additional time to complete the Bar Exam along with

---

[98] *See* D.E. 77-47 Example CBSSA Questions.
[99] *See* D.E. 77-40, p. 1 CBSE Score 12/10/2020.
[100] *See* D.E. 77-41, p. 1 CBSSA Report 2/14/2022.
[101] *See* D.E. 77-42, p. 1 CBSSA Report 3/21/2022.
[102] *See* D.E. 77-43, p. 1 CBSSA Report 4/1/2022.
[103] *See* Dr. Jurich Testimony, Day 4, 113: 24-25, 114: 1.
[104] *See* Dr. Jurich Testimony, Day 4, 116: 10-19.

other accommodations for her visual impairments.[105] In that case, the parties stipulated to additional time being reasonable – however, the New York State Board (hereinafter "the Board") refused to grant leave over four (4) days rather than two (2). While the Court acknowledged the Board's 'obligation to maintain the integrity of the exam', due to D'Amico's 'willingness to comply with any reasonable security requirements required by the Board', the Court held that the additional testing time over four days was a reasonable accommodation under the ADA.[106]

It is evident that additional time on the USMLE STEP Examination is not only a reasonable accommodation, but also the only accommodation specifically listed on the Defendant's Application Form for testing accommodations. This accommodation does not fundamentally alter the nature of the examination or the skills and knowledge it seeks to test, making it a reasonable testing accommodation under Title III of the ADA. Under the ADA and the Department of Justice regulations, private entities, such as the Defendant NBME, are required to provide appropriate auxiliary aids for qualified individuals with disabilities, including additional time or alterations to the examination format, unless it would fundamentally alter the measurement of the skills or knowledge being tested or result in an undue burden. Given these legal obligations, it is clear that the request for additional time is not only reasonable but necessary to ensure a fair and accurate assessment of Dr. Kitchens' aptitude or achievement level, in accordance with the ADA's goal of promoting equal access for individuals with disabilities.

## 3    THE COURT MUST ORDER THE NBME TO ACCOMMODATE DR. KITCHENS FOR ALL FUTURE EXAMS

Through medical evidence, expert testimony, and fact witnesses, Dr. Kitchens has demonstrated that he has a mental impairment that substantially limits one or more major life

---

[105] *D'Amico v. New York State Bd. Of Law Exam'rs*, 813 F. Supp. 217 (W.D.N.Y. 1993).
[106] *Id.*

activities relevant to taking the USMLE STEP Examination. Precedent dictates, reasonableness – particularly as it relates to additional time – is fact specific. Even Defendant NBME acknowledges that, should the Court find in favor of the undersigned, "NBME is not aware of any reasons why the Court could not issue an injunction ordering NBME to accommodate Dr. Kitchens with double time on future tests…."[107]

When asked if an applicant who was requesting one hundred percent (100%) additional time over two days was a reasonable request, Dr. Lucia McGeehan said "yes."[108] In the case at hand, as Dr. McGeehan indicated, Dr. Kitchens' request for 'double time' is squarely in the realm of reasonable. Therefore, having demonstrated that Dr. Kitchens is substantially limited under the ADA and a qualified applicant for accommodations, time plus 100% is a reasonable accommodation.

Moreover, ADHD is a neurological developmental disorder – individuals who suffer the debilitating effects of ADHD will not miraculously recover from one exam to the next. Should the Court order accommodations for Dr. Kitchens on the USMLE STEP 1 exam but not on the remaining exams, Dr. Kitchens will be required to re-apply for accommodations with the same disability services department that improperly denied him the first two times.

As demonstrated by the Defendant NBME's training manual, the NBME provides **no** guidance or instruction on how to assess unofficial or informal accommodations.[109] Dr. McGeehan, who is "responsible for supervising, mentoring, and training the disability assessment analysts", admits that she is "not qualified to review these medical records."[110] Focusing

---

[107] *See* D.E. 85, p. 49-50 n.18 Proposed Findings of Fact and Conclusions of Law by United States Medical Licensing Examination
[108] *See* Dr. McGeehan Testimony, Tr. Day 3, at 244:05.
[109] *See* D.E. 77-45, Excerpt from General Guidelines for Requesting Test Accommodations.
[110] *See* Dr. McGeehan Testimony, Day 3, 235: 21-22.

specifically on Dr. McGeehan, when asked various questions related to documentation provided by Dr. Kitchens in support of his application, often replied that it was outside of her scope, that she did not know, or 'I guess'.

| | |
|---|---|
| Dr. Kitchens: | Would it be unprofessional for [a medical doctor] to give a diagnosis of ADHD without doing the proper evaluations to justify their diagnoses of ADHD? |
| Dr. McGeehan: | I can't speak to how a medical doctor might diagnose ADHD. I am a psychologist, and I can explain typically psychologists… diagnosing ADHD. |

---

| | |
|---|---|
| Dr. Kitchens: | What is that particular medication used for, burspirone? |
| Dr. McGeehan: | Apparently anxiety. |
| Dr. Kitchens: | [Dextroamphetamine-Amphetamine] is written specifically for which diagnoses? |
| Dr. McGeehan: | I'm assuming ADHD. |
| Dr. Kitchens: | Do you see right beside it – and what is the dosage. |
| Dr. McGeehan: | That's outside my scope. |

---

| | |
|---|---|
| Dr. Kitchens: | Can you tell me what P-O-B-I-D stands for and what it means? |
| Dr. McGeehan: | No. I can't. |
| Dr. Kitchens: | Dr. McGeehan, are you able to prescribe medication? |
| Dr. McGeehan: | I am not. |
| Dr. Kitchens: | Do you know how the medication for ADHD works? |
| Dr. McGeehan: | That's outside my scope of practice. |

---

| | |
|---|---|
| Dr. Kitchens: | Isn't it true that [PO BID] would indicate that my medication is 30 milligrams per day…? |

| Dr. McGeehan: | I guess. |
|---|---|
| Dr. Kitchens: | Isn't it true that a person who is taking a medication such as Adderall for ADHD, 30 milligrams a day, is considered to be moderate to severe symptoms… of ADHD? |
| Dr. McGeehan: | I don't know. |
| Dr. Kitchens: | Isn't it true that the maximum dosage that you can give a person with ADHD is 40 milligrams per day? |
| Dr. McGeehan: | I don't know. |

*See* Dr. McGeehan Testimony, Day 3, 232: 24-25, 233: 1, 4-7, 25, 234: 1-9, 22-25, 234: 22-25, 235: 1-5, 19-22, 237: 3-17.

Dr. McGeehan is currently the Manager of Examinee Accommodations in the Disability Services Unit and has reviewed accommodation requests for seven years, yet her testimony is fraught with uncertainty and frightening lack of knowledge and expertise.[111] Repeatedly, Dr. McGeehan's responses indicated a limited understanding of the subject matter and raises serious doubts about her ability to assess and review applications for testing accommodations. Moreover, Dr. McGeehan's inability to provide insight into basic medical terminology, such as the purpose of certain medications or the meaning of abbreviations commonly used in medical documentation, calls into question, not just her competence, but the competence of every analyst trained by her.

The inadequacies do not stop at Dr. McGeehan. Defendant NBME's *Director* of Disability Services, Ms. Convery, does **not** know the standard for disability under the Americans with Disabilities Act.

Dr. Kitchens:  Isn't it true that you don't fully understand the rules of the ADA?

Ms. Convery:  I have a general understanding of the ADA.

*See* Ms. Convery Testimony, Day 3, 81: 4-7.

---

[111] *See* Dr. McGeehan Testimony, Day 3, 198: 12-14, 200: 12-13.

Ms. Convery further illustrated Defendant NBME's shortcomings when she talked about her own background in Disability Services.

| | |
|---|---|
| Dr. Kitchens: | You have been the Director of Disability Services at the NBME since March, 2022, correct? |
| Ms. Convery: | Correct. |

---

| | |
|---|---|
| Dr. Kitchens: | Before that, you were a senior disability specialist at the NBME, correct? |
| Ms. Convery: | Before that I was actually the manager of the [disability services] unit. |
| Dr. Kitchens: | … [A]nd before that, what was your position? |
| Ms. Convery: | Before the manager, I was a senior disability services specialist. |
| Dr. Kitchens: | So the NBME doesn't require senior disability services specialists to have any clinical medical knowledge, correct? |
| Ms. Convery: | That's correct. |

---

| | |
|---|---|
| Dr. Kitchens: | NBME does not require for a person in disability services… who have a Ph.D., so they are a doctor, to have clinical medical experience? |
| Ms. Convery: | [N]o. |

See Ms. Convery Testimony, Day 3, 74: 3-21, 76: 18-21.

As attested to by Defendant NBME's own Director and Manager of Disability Services, the individuals responsible for reviewing and assessing applications for testing accommodations do not possess the necessary expertise and familiarity with the subject matter to make informed and accurate decisions. Both Ms. Convery and Dr. McGeehan demonstrated a lack of knowledge and inability to answer basic questions undermines their credibility and raises concerns about the reliability and fairness of the evaluations performed by the NBME. The Court can clearly see the

testimony provided by Dr. McGeehan and Ms. Convery unequivocally portrays them as unfit for the rigorous task of evaluating applications, casting doubt on the integrity of the NBME's accommodation review process and the reliability of its decisions. Without the Court's Order mandating accommodations on future examinations, Dr. Kitchens will be required to once again go before NBME's Disability Services department, only this time, knowing full-well the incompetency and inexperience of his evaluators.

## 4   THE RELEVANT TIMEFRAME FOR EVIDENCE IS THE PRESENT

As Defendant NBME acknowledges in the footnotes, when determining whether an individual is disabled for the purposes of accommodations, the relevant time frame is the present.[112] The undersigned agrees with Defendant NBME and would argue that the timeframe is the present. In enacting the ADAA, Congress made its intentions clear that "the [ADA] 'provide[s] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities'…."[113] To comply with Congressional intent, relief requested under Title III of the ADA should be applied in a manner that puts the qualified individual in a position that minimizes the discriminatory effect(s). By applying the present time frame for evidence, the Court is able to consider all of the available evidence in determining whether an individual is substantially limited under the ADA.

### 4.1   The Analysis For Relief is the Present

A private company, such as Defendant NBME, regulated under Title III may be held liable for failing to accommodate. The legal standard for private companies is "(1) whether the requested accommodation to the program was 'reasonable'; (2) whether it was necessary to 'assure meaningful access'; and (3) whether it would represent a 'fundamental alteration in the nature of

---

[112] *See* D.E. 85, p. 51 n. 21 Proposed Findings of Fact and Conclusions of Law by the United States Medical Licensing Examination.
[113] ADA Amendments Act 2008, p. 1 ¶(a)(1)

[the] program'."[114] The plaintiff "bears the initial burden of proof of establishing the desired accommodation is reasonable and necessary, while the defendant bears the burden of showing that it would fundamentally alter the nature of the program."[115]

In the case at hand, the NBME does not dispute that they are subject to Title III of the ADA nor the DOJ regulations. Defendant NBME also does not contend that additional time nor expungement fundamentally alters the nature of the USMLE STEP Examination.

The DOJ regulations implementing Title III requires that

> [t]he examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure....[116]

In other words, the qualified individual must be accommodated in a manner that ensures his knowledge and skill is tested, not his ability to overcome his disability. Because no damages remedy is available,[117] qualified individuals such as Dr. Kitchens must rely upon equitable relief the Court considers appropriate.[118] Under 42 U.S.C. §12188(2)(A)-(B), the Court may grant relief including

"(i)      granting temporary, preliminary, or permanent relief;

(ii)     providing an auxiliary aid or service, modification of policy, practice, or procedure, or alternative method; and…

(B)      may award such other relief as the court considers to be appropriate…."

As the Court in *Berger* recognized

---

[114] *Matheis v. CSL Plasma, Inc.*, 936 F.3d 171, 178 (3rd Cir. 2019) quoting *Berardelli v. Allied Servs. Inst. Of Rehab. Med.,* 900 F.3d 104, 155 (3rd Cir. 2018).
[115] *Matheis v. CSL Plasma, Inc.*, 936 F.3d 171, 178 (3rd Cir. 2019) quoting *Berardelli v. Allied Servs. Inst. Of Rehab. Med.,* 900 F.3d 104, 124 (3rd Cir. 2018).
[116] 28 C.F.R. § 36.309(b)(1)(i).
[117] 42 U.S.C. § 12188(a)(1).
[118] 42 U.S.C. § 12188(2)(A)(i-iii).

"[i]f Mr. Berger does not receive accommodations… he will not be tested on his aptitude and knowledge of the subject matter but on how effectively he can overcome his reading disability…. This resolution not only minimizes any harm to Mr. Berger, but it also places him on equal footing by allowing him to fully demonstrate his skill set and knowledge…."[119]

So too, without accommodations on future examinations *and* the expungement of his USMLE Examination transcript, Dr. Kitchens would not be evaluated on his aptitude but rather his ability to overcome his ADHD. Should the Court find that Dr. Kitchens' is substantially limited under the ADA, the USMLE Examination Transcript subjects Dr. Kitchens to repeated assessment and evaluation by residency programs and state licensure boards on the severity of his disability rather than on his competency and skill.

Moreover, Due to the nature of ADHD, the documentation submitted at the time of Dr. Kitchens' application is only bolstered by the documentation produced during the course of litigation. The medical evidence submitted by Dr. Kitchens during litigation contains ongoing documentation of appointments and evaluations that had not yet occurred at the time of his application. By applying the present timeframe for evidence as a matter of law, the Court is able to apply the ADA and congressional intent to all of the relevant evidence in a manner that supports judicial efficiency and recognizes the interests of both the qualified individual and the testing organization.

## 4.2    If the Analysis for Relief is the Past – the Court Must Adopt the Employment Discrimination Burden-Shifting Framework

Alternatively, the undersigned would argue that if the timeframe for evidence is not the present due to the relief requested, that the Court implement the burden-shifting framework utilized in employment discrimination claims for the evidence submitted at the time of the application(s). By imposing the burden-shifting analysis, the applicant's burden of proof remains,

---

[119] *Berger*, 2019 U.S. Dist. LEXIS at 88.

but allows the testing entity, in this case Defendant NBME, to justify their denial for accommodations. Note, the undersigned would recommend the Court look at the documentation submitted at each application, if more than one application and/or appeal was submitted to the testing agency prior to filing suit, to establish a clear difference between analyses.

As explained by *Matheus v. CSL Plasma,*

> That framework involves burden shifting: a plaintiff must establish a prima facie case of discrimination; when he does, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse action against the employee. If the employer does so, the employee may attempt to show the reason is a pretext to hide discrimination.[120]

In applying the burden-shifting framework to the case at hand, Dr. Kitchens would have to meet all of the same requirements under Title III of the ADA in establishing the prima facie case of discrimination as evidenced by the documentation submitted to Defendant NBME on both his January and August, 2022 applications for accommodation. The burden then would shift to Defendant NBME to prove that they rejected the applications for a 'legitimate, nondiscriminatory reason'. For the purposes of this brief, Dr. Kitchens will assume that the Defendant NBME's non-discriminatory reason was what they argued in their post-trial brief: that Dr. Kitchens had not met his burden of proof for a disability based on the evidence produced at the time of the application. The burden would return to the undersigned to prove that the Defendant NBME's alleged claim for nondiscriminatory behavior is a pretext.

The NBME's claim that Dr. Kitchens failed to demonstrate he is disabled under the ADA is a pretext for the foregoing reasons more thoroughly briefed above. Additionally, the NBME's claim that Dr. Kitchens is not disabled due to his performance on the USMLE STEP Examinations

---

[120] Matheis v. CSL Plasma, Inc., 936 F.3d 171 (3rd Cir. 2019) quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

improperly weighs Dr. Kitchens self-implemented mitigating measures over the results produced. As the Court in *Ramsay* noted, "Ramsay's high academic performance does not foreclose her from having a disability…."[121] However, Dr. Kitchens did not demonstrate high academic performance on the USMLE STEP Examinations; Dr. Kitchens scored so poorly, his score(s) registered below the bell curve. As Dr. Kitchens indicated in his declaration and during his testimony at trial, Dr. Kitchens described testing strategies that ensured every question was answered prior to his time expiring. Defendant NBME would rely wholly on timing data entered during trial to indicate that Dr. Kitchens' performance was 'relatively consistent throughout each block.'[122]

During discovery and prior to the start of trial, the undersigned requested a copy of the timing review and the answer choices as created by the Defendant during the course and scope of business. No privilege log was provided due to Defendant NBME's position that no documents were withheld or redacted due to privilege. Part of the documents produced was, what seemed to be, an excel spreadsheet of Dr. Kitchens' answers, the time spent on each question, and whether a point was awarded.[123] Meanwhile, Dr. Jurich conceded:

> Dr. Kitchens:   Isn't it true that the NBME collects changed answer choices selections?
>
> Dr. Jurich:   Yes.
>
> Dr. Kitchens:   Isn't it true that this information is **not** indicated on [any of the Outcome Files] that you testified to today?
>
> Dr. Jurich:   The answer choice changes are **not** indicated.
>
> Dr. Kitchens:   [I]sn't it true that it is common knowledge for each exam or each STEP Exam administered that experimental questions are contained?

---

[121] *Ramsay*, 968 F.3d at 16.
[122] *See* D.E. 85, p. 35 ¶ 125 Proposed Findings of Fact and Conclusions of Law by United States Medical Licensing Examination quoting Dr. Jurich Testimony, Day 4, 97: 4 - 99: 11.
[123] *See* D.E. 77-18, Outcome File, Feb. 25, 2022, STEP 1.

Dr. Jurich:      Yes.

---

Dr. Kitchens:  Isn't it true that this information is not indicated on the document
we see before us?

Dr. Jurich:      Yes. That's not indicated. Yes.

---

Dr. Kitchens:  [T]his is my final selection, correct?

Dr. Jurich:      Yes.

*See* Dr. Jurich Testimony, Day 4, 120: 7-18, 22-25, 121: 20-21, 122: 2, 124: 1-2.

Based on Dr. Jurich's testimony above, Defendant NBME intentionally altered business records created and maintained in the course and scope of its business and produced them to Dr. Kitchens and the Court in violation of Federal Rule of Civil Procedure 26(b)(1). In light of the concerning actions of Defendant NBME, it is evident that the Defendant has no hesitancy in unilaterally deciding which evidence is relevant for the purposes of disclosure during litigation.

Under the proposed burden-shifting framework analysis, Dr. Kitchens has not only demonstrated that he has met his burden of proof for a prima facie claim of discrimination, he has also discredited any alleged non-discriminatory reason for denying accommodations put forward by the Defendant NBME. The alleged 'experts' employed by Defendant NBME in the disability services unit have demonstrated incompetence and a lack of expertise that voids any opinion relating to Dr. Kitchens' disability; the accommodations requested do not alter the form or function of the examination nor the skills purported to assess; and Defendant NBME's alteration of evidence Dr. Kitchens is entitled to as a matter of law only further demonstrates the lack of credibility and integrity that the NBME possesses. Thus, any claim as to the veracity of Dr.

Kitchens' substantially limited under the ADA is a pretext designed to hide the NBME's transparent shortcomings and discriminatory actions.

## 5    EXPUNGEMENT IS PREVENTATIVE RELIEF UNDER 42 U.S.C. §2000a-3(a)

Just before the trial, the Court inquired about, and the parties briefed, the novel statutory interpretation of injunctive relief proposed by Dr. Kitchens. To take the issue one step further – expungement is preventative relief under 42 U.S.C. 2000a-3(a). Case in point, this Honorable Court heard testimony from four different medical doctors: Dr. Christopher Pullins, Dr. Jonathan Shepherd, Dr. Joanne Senoga, and Dr. Timothy Allen, **_all of whom_** testified that the USMLE Examination transcript is used as a permanent measure of aptitude throughout their careers. While the exam itself was taken in the past, the discriminatory effects of the NBME's refusal will follow Dr. Kitchens in perpetuity.

42 U.S.C. §2000a-3(a) states "[w]henever any person _has_ engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by Section 203." (Emphasis added). Defendant NBME has discriminated against Dr. Kitchens' rights under Title III, not once, not twice, but _five times_.

In _Thomas v. Orangeburg Theaters_, the plaintiffs were African Americans who were denied admission to the movie theaters operated by the Defendant on the basis of their race. The case was filed in Summer, 1964; by August 31, 1964 the directors of the Orangeburg Theaters "duly adopted a resolution… that in the future all persons should be admitted to all its theater facilities… and that no restrictions would be enforced thereafter on the purchase of tickets… because of race."[124] The Court held that "inasmuch as it appears there will be no future violations by defendant of the rights of plaintiffs" the Defendant's motion to dismiss was granted. (Emphasis

---

[124] _Thomas v. Orangeburg Theaters, Inc.,_ 241 F. Supp. 317, 319, 1965 U.S. Dist. LEXIS 6332 (D.S.C. 1965).

added).[125] However, in the case at hand, the NBME has made no claim nor prospective changes that will prevent future violations of Dr. Kitchens' rights.

Significantly, the NBME's failure to address the lasting consequences of the USMLE Examination transcript on Dr. Kitchens' rights speaks volumes about their disregard for preventing future violations. Each testifying medical doctor attested to the long-lasting impacts the USMLE Examination transcript maintains.

| | |
|---|---|
| Dr. Kitchens: | Based on your experience and your opinion as a licensed physician, what are the potential long-term consequences of a multiple failed USMLE transcript? |
| Dr. Pullins: | Are you referencing that into seeking board certification or to just get a license in general in a state? |
| Dr. Kitchens: | In general. |
| Dr. Pullins: | Where it is going to be most impactful is going to be during the first initial license application that goes in. Because once you get passed that, the subsequent years is not as important. But if you don't even get a license to begin with, that's obviously going to have long lasting implications, because you may not be able to practice in that state. So you may have to start looking elsewhere. |
| Dr. Kitchens: | You said about different states that the person can apply to, can you elaborate there? |
| Dr. Pullins: | Yes. So each state has their own State Board Medical License Board. And so just because I am licensed in Arizona does not mean I am automatically accepted in Illinois, per se. So I would have to go through the whole process. |

*See* Dr. Pullins Testimony, Day 1, 87: 24-25, 88: 1-25.

| | |
|---|---|
| Dr. Kitchens: | Why have you not matched into a residency program after so long? |
| Dr. Senoga: | [T]he simple fact is that one of them being mainly failed attempts. |
| Dr. Kitchens: | And how do you know that… you didn't get into a residence program because of failed attempts? |

---

[125] *Id.*

Dr. Senoga:    Because I had a program mentor group who kind of highlighted my red flags.

---

Dr. Senoga:    I wanted to stay in the Chicago area because I do have family here. But I cannot practice in Illinois because of my attempted score….

Dr. Kitchens:  [D]id I hear you correct when you said you can't practice in your own home state where you live currently?

Dr. Senoga:    Yes.

*See* Dr. Senoga Testimony, Day 1, 122: 8-19, 124: 16-24, 132: 18-20, 24-25, 133: 1-2.

Dr. Kitchens:  What state or states… have you applied for [medical licensure]?

Dr. Shepherd: Illinois, Maryland, and District of Columbia.

Dr. Kitchens:  Could you please provide a description to the Court regarding the process involved in applying for licensure in the U.S.?

Dr. Shepherd: It's a very involved process. I just went through it for the District of Columbia, where you must submit and request transcripts all the way back from your undergrad and medical school. You have to go through the FCVS… [Federation Credentials Verification Service] that provides this information. That's where… the USMLE scores and those transcripts are stored….

---

Dr. Kitchens:  In [your application to D.C.]… did you include your USMLE transcript as part of your application?

Dr. Shepherd: Yes.

---

Dr. Kitchens:  Does the USMLE Transcript remain with a medical provider throughout their career for the purpose of documentation and continuity?

Dr. Shepherd: Absolutely. Yes.

*See* Dr. Shepherd Testimony, Day 2, 68: 4-17, 69: 3-6, 16-19.

Ms. Mew:       Are you a licensed physician?

| Dr. Allen: | Yes. So I am licensed to practice in Kentucky since 1999. I also have licenses in West Virginia, Tennessee, and Oklahoma. |
|---|---|

---

| Dr. Kitchens: | Are you familiar with the FSMB, the Federation of State Medical Boards? |
|---|---|
| Dr. Allen: | Yes. |
| Dr. Kitchens: | Isn't it true that each state has its own requirement for licensure? |
| Dr. Allen: | Yes. |

(Emphasis added). *See* Dr. Allen Testimony, Day 4, 5: 7-10, 47: 4-6, 48:14-16.

Even Dr. Jurich, a Doctor of Philosophy, acknowledged that the USMLE Examination Transcript is used by state medical licensure boards.

| Dr. Kitchens: | Are state medical [] boards able to review an applicant's USMLE score when applying for licensure? |
|---|---|
| Dr. Jurich: | Yes. They review the transcript which contains the performance on USMLE exams. |

*See* Dr. Jurich Testimony, Day 4, p. 49: 111:8-11.

The most glaring example of the USMLE Examination Transcript's permanency is listed on the Federation of State Medical Board's ("FSMB") website. On the FSMB website, each state is listed with their respective state requirements for licensure for both Doctor of Osteopathic Medicine ("D.O.") and Doctor of Medicine (M.D.) – including the number of attempts at licensing exam; minimum post-graduate training required; time limit for completing licensing examination sequence; and whether the state accepts the FCVS.[126]

Based on Dr. Kitchens' current examination transcript, assuming he passes each STEP exam moving forward, he would have a total of eight (8) attempts: three (3) failed attempts on STEP 1 and two (2) failed attempts on STEP 2. Should Dr. Kitchens apply for licensure, he could

---

[126] *See* D.E. 77-23, p. 2 FSMB, State Specific Requirements for Initial Medical Licensure.

only apply to thirty (30) states and Puerto Rico.[127] The detrimental impacts of being restricted in practice before even starting his medical career are evident in Dr. Kitchens' situation. Such restrictions not only hinder Dr. Kitchens' ability to pursue his chosen profession but also undermine his professional growth and potential.

Expungement serves as an essential form of preventative relief, as demonstrated by the testimonies of four medical professionals and the principles outlined in relevant legal precedents. The USMLE Examination transcript, used as a perpetual measure of aptitude, carries discriminatory effects that will haunt Dr. Kitchens throughout his career. The permanency of the USMLE Examination Transcript is starkly highlighted on the FSMB's website, where each state's requirements for licensure are listed. Under 42 U.S.C. §2000a-3(a), the NBME's repeated discrimination against Dr. Kitchens' rights is clear. In the past, resolutions adopted in cases like *Thomas v. Orangeburg Theaters* successfully prevented future violations. However, in this case, the NBME has failed to make any commitment or propose prospective changes to prevent further infringements on Dr. Kitchens' rights. Expungement is not only an act of justice but also a vital means of preventing continued discriminatory practices and ensuring equal opportunities for Dr. Kitchens in his medical career.

5.1   Expungement Should Be Available for Exams Where an Accommodation Was Sought and Denied

Expungement should be available to Dr. Kitchens where he applied for accommodations, was denied same, and chose to take the exam anyway. Similar to any other plaintiff who files suit to receive accommodation after being previously denied, expungement seeks to rectify the Defendant NBME's discriminatory actions.

---

[127] Based on the FSMB Website, Dr. Kitchens could apply to two additional states (Idaho and Tennessee) however, that is dependent on additional state-specific requirements that the undersigned is unable to determine would be achievable.

28 C.F.R. §36.309(b)(1)(i) requires that private testing organizations administer the examination(s) to best ensure that the results accurately reflect the disabled individual's aptitude and skills. However, without expungement, a permanent 'report card' containing Dr. Kitchens' past attempts without accommodations only further subjects Dr. Kitchens to discrimination by residency programs and state licensing boards who rely on the USMLE Examination transcript. Dr. Senoga embodies this fact with her own USMLE Examination Transcript.

> Dr. Kitchens:   You mentioned earlier that you failed certain exams. Can you reiterate for the record what that – your process?
>
> Dr. Senoga:   Despite having STEP 2 CS removed as a national exam, [my attempts] has been showing in my transcript, which has led to certain programs not being able to use me, to accept me as an applicant because… like where I am located in Chicago, Illinois, you are only allowed five attempts, and five attempts means all STEP 1, 2, 3. You pass it once and I have obviously not passed it once, so I could not be admitted into that Illinois program.
>
> ---
>
> Dr. Kitchens:   [STEP 2 CS] is a retired exam.
>
> Dr. Senoga:   It is a retired exam and yet it is still on my transcript.
>
> Dr. Kitchens:   Can it be removed from your transcript?
>
> Dr. Senoga:   No, we have appealed it and it was [denied].

*See* Dr. Senoga Testimony, Day 1, 122: 8-19, 123: 1-6.

Even though the STEP 2 CS exam is no longer administered and is listed on USMLE Examination Transcripts after its permanent cancellation on January 26, 2021, Dr. Senoga's transcript still reflects the failed score and the number of attempts. Because of this, there are programs and states where she may never practice. Moreover, when asked by the court if there was any mitigating remedies available to examiners in the same or similar position to Dr. Kitchens, Dr. Jurich indicated there were none.

| The Court: | Does the NBME, do they ever expunge test results? |
|---|---|
| Dr. Jurich: | Yes. There is a process to expunge test results. In rare circumstances where [] the computer delivery method has an error that affects the response time allotted to the examinee or the actual outcomes that they have provided. |
| The Court: | Other than a computer glitch, are you aware of anytime NBME has expunged a test result? |
| Dr. Jurich: | No, I am not aware. |
| The Court: | Is there ever an occasion where NBME when it provides a transcript has included any explanatory letter with the transcript specific to that particular test taker? |
| Dr. Jurich: | I am not familiar with additional supplemental letters. |

*See* Dr. Jurich Testimony, Day 4, 130: 19-25, 131: 1-2.

Based on Dr. Jurich' s testimony, Dr. Kitchens' medical career rested in the hands of Ms. Convery and Dr. McGeehan with no remedy available to fix her egregious mistakes. Moreover, the futility of Dr. Kitchens is demonstrated between his January and August applications. After submitting his application in January and being duly denied, Dr. Kitchens made a good-faith effort to take the examinations without accommodations. Having seen the drastic disparity between his CBSSAs and his USMLE scores, Dr Kitchens applied for accommodations again. Instead of having his application processed by a different disability analyst, Dr. Kitchens was subjected to Dr. McGeehan's review for the second time.

Expungement should be granted to Dr. Kitchens in light of the Defendant NBME's discriminatory actions and lack of credibility and fairness. By denying Dr. Kitchens the accommodations he rightfully applied for and then penalizing him for choosing to take the exam without the necessary support, Dr. Kitchens was subjected to further discrimination and disadvantage. The failure to expunge his record perpetuates the unfair treatment he has endured

and already hinders his access to the medical field. The lack of available remedies for examiners in similar situations and the misguided decisions made by individuals such as Ms. Convery and Dr. McGeehan only amplify the necessity of granting expungement. The continued presence of Dr. Kitchens' previous attempts without accommodations on his exam transcript exposes him to potential discrimination by residency programs and state licensing boards, limiting his professional opportunities. Moreover, without expungement being granted, this Honorable Court will further set back individuals like Dr. Kitchens from equal access in both educational and professional systems.

5.2   <u>Expungement Should Be Available for Exams Where Accommodations Were Not Previously Requested</u>

     Expungement should be a remedy available if an examinee has applied for accommodation on any sequential exam, such as the USMLE STEP Exams, was denied those accommodations, and proceeded to take any of the sequential exams without accommodation. The repeated and indiscriminate denial of accommodations by Defendant NBME, regardless of the type or amount of documentation provided, highlights the need for expungement, as applicants should not be subjected to rote futility at the NBME's hand, simply to preserve their right to seek relief.

     In the case at hand, Dr. Kitchens applied for accommodations for STEP 1 twice and was denied twice. Defendant NBME's only argument against expungement is that Dr. Kitchens is not disabled, and even if he were, he is not deserving of expungement, despite their disability services department's gross negligence and clear lack of expertise, due to documentation. Case in point, Defendant NBME references Dr. Kitchens documentation – or lack thereof – a total of twelve (12) times. This ignores the fact that other applicants who have submitted exponentially more detailed applications have been denied *numerous times*. A fact that Dr. McGeehan was either unaware of or attempted to conceal. Plaintiffs such as *Ramsay, Berger, Sampson, Hartman,* and *Rush* each

submitted applications to Defendant NBME for accommodations and were denied despite containing the type of documentation recommended by the NBME. Dr. Kitchens should not – and is not – required to subject himself to repeated rejection for the sole purpose of preserving his right to relief in litigation. In no particular order, the plaintiffs in the above referenced cases each did exactly what the Defendant NBME faults Dr. Kitchens for – when their applications were denied, they appealed the decision; submitted additional documentation; sought additional evaluation(s); and submitted additional records substantiating their disability.

In *Rush v. NBME*, James Avery Rush – now Dr. Rush – applied for accommodations on the STEP 1 Exam due to impairments in reading and learning. Dr. Rush applied for accommodations once before filing suit. At the end of his second year of medical school, Dr. Rush applied for double time on the STEP 1 exam.[128] Defendant NBME rejected his request. After a three (3) day preliminary injunction hearing, the Court awarded Dr. Rush double time to take the STEP 1 exam.[129] With accommodation, Dr. Rush was able to pass the STEP 1 exam and continue in his medical career to a flourishing neurology practice.

In *Hartman v. NBME*, Aaron Hartman – now Dr. Hartman – applied for accommodations on the STEP 2 CS exam due to a profound stutter. Dr. Hartman applied for accommodation twice: October, 2008 and fall, 2009. In October, 2008, Dr. Hartman requested double time and the use of a teletypewriter (TTY) for the telephone encounters.[130] Defendant NBME rejected his request and provided "time and a half for each patient encounter and in-person patient encounters instead of telephone patient encounters".[131] In June, 2009, Dr. Hartman took the STEP 2 CS with the aforementioned accommodations and received an overall failing score. In fall, 2009, Dr. Hartman

---

[128] *Rush v. Nat'l Bd. of Med. Exam'rs*, 268 F.Supp.2d 673, 675 (N.D. Tex. 2003).
[129] *Id.* at 679.
[130] *Hartman v. Nat'l Bd. of Med. Exam'rs*, 2010 U.S. Dist. Lexis 27691, 5 (E.D. Pa., Mar. 9, 2010).
[131] *Id.*

applied for accommodations a second time requesting "double time for each patient encounter; replacement of telephone encounters with in-person encounters; and use of a text to speech device during in patient encounters."[132] Defendant NBME denied Dr. Hartman's request for the text-to-speech device but granted the other requests. On November 2, 2009, Dr. Hartman filed suit. After a five (5) day preliminary injunction hearing, the Court granted Dr. Hartman all of his requested accommodations for the STEP 2 CS exam. Pursuant to the parties Motion to Vacate filed on August 19, 2010, Dr. Hartman took the STEP 2 CS exam with two different sets of accommodations as mandated by the Court and *passed* STEP 2 CS.[133] Each time Dr. Hartman applied for accommodations, Defendant NBME overruled his request and offered him less than what he, and his treating physicians, requested. It was only until *after* litigation did Dr. Hartman finally receive the accommodations necessary for him to pass the STEP 2 CS and eventually continue in his career to practice medicine.

In *Berger v. NBME*, Brendan Berger – now Dr. Berger – applied for accommodations on the STEP 2 CK exam due to impairments in reading, processing, and attention.[134] Dr. Berger applied for accommodation on the STEP 1, STEP 2 CS, and STEP 2 CK Exams. For the STEP 1 Exam, Dr. Berger applied for accommodation once and was denied;[135] for STEP 2 CS and STEP 2 CK, Dr. Berger applied for accommodations three times and was denied each time before filing suit.[136] With each additional application for accommodation, Dr. Berger submitted additional evaluations, medical reports, and letters from physicians and his attorney detailing why Dr. Berger needed accommodation, how the lack of accommodation impacted his ability to move forward in his

---

[132] *Id.*
[133] Joint Motion to Vacate Preliminary Injunction at 3, *Hartman v. Nat'l Bd. of Med. Exam'rs*, 2010 U.S. Dist. Lexis 27691, No. 09-5028, (E.D. Pa., Mar. 9, 2010), ECF No. 53.
[134] *Berger v. Nat'l Bd. of Med. Exam'rs*, 2019 U.S. Dist. LEXIS 145666, 39-41 (W.D. Ohio, Aug. 27, 2019).
[135] *Id.* at 39.
[136] *Id.* at 42-45.

career, and how substantially limited he was due to his impairments. In spite of all the submitted documentation, Defendant NBME repeatedly denied Dr. Berger accommodation. In total, Dr. Berger applied for accommodation four times with Defendant NBME and was unable to receive *any* accommodation until the Court intervened and Ordered the NBME provide "double extended time over two days, extra break time, and distraction limited testing environment."[137]

In *Ramsay v. NBME*, Jessica Ramsay – now Dr. Ramsay – applied for accommodation on the STEP 1 Exam due to ADHD and dyslexia. Dr. Ramsay applied for accommodations on STEP 1 and STEP 2 CK twice before filing suit.[138] Similar to Dr. Berger, Dr. Ramsay supplemented each additional application for accommodation with additional evaluations, medical reports, and letters from treating medical professionals.[139] After a three (3) day preliminary injunction hearing, the Court awarded Dr. Ramsay accommodations on the STEP Exams.[140] Without the Court's intervention, Defendant NBME would steadfastly denied all of Dr. Ramsay's accommodations and she almost assuredly would not be practicing today.

The most recent, and arguably the most egregious, example of this fact is *Sampson v. NBME*. Robert Sampson applied for accommodation on STEP 1 due to impairments in reading, written expression, and ADHD.[141] Mr. Sampson applied for accommodation a total of seven (7) times spanning five (5) years for additional time: three (3) times in 2017,[142] three (3) times in 2018,[143] and again in 2022[144] before filing suit. With each application for accommodation, Mr. Sampson submitted additional supporting documentation from his parents, disability experts, medical

---

[137] *Id.* at 90.
[138] *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 2 (3rd Cir., July 31, 2020).
[139] *Id.* at 5.
[140] *Id.* at 22.
[141] *Sampson v. Nat'l Bd. Of Med. Exam'rs*, 2022 U.S. Dist. LEXIS 217633, (E.D. NY, Dec. 2, 2022).
[142] *Id.* at 10-11.
[143] *Id.* at 11-12.
[144] *Id.* at 18.

doctors, specialists from his medical school, and legal counsel all for additional time to pass STEP 1. Despite a veritable Mount Everest's worth of evidence, Defendant NBME repeatedly denied Mr. Sampson's application for accommodation. After a three (3) day, the Court Ordered Defendant NBME to provide "100% additional testing time (double time), a separate testing room, and extended breaks".[145]

These plaintiffs are certainly not the only individuals who sought accommodations with Defendant NBME. Across the mere five cases the undersigned cites, Defendant NBME has demonstrated a twenty (20) year long history of denying applications irrespective of the amount of documentation provided. Each of the above referenced cases highlights Defendant NBME's consistent disregard for the rights of individuals with disabilities and ominous predictability towards applications for accommodations.

It is the undersigned's opinion that Dr. Kitchens, and qualified individuals in his position should not be required to 'go through the motions' of repeatedly applying for accommodations when the outcome is all but certain for the sole purpose of preserving their right to relief in litigation. Congress agrees. As 42 U.S.C. §12181 states

> Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this title does not intend to comply with its provisions.[146]

Defendant NBME claims that even though Dr. Kitchens is not disabled, he only applied for accommodation on the STEP 1 Exam, therefore, if he was entitled to expungement it should only be for the exam(s) he applied for accommodation for. This argument not only allows Defendant NBME to continue their discriminatory practices, it puts the onus on disabled applicants to

---

[145] *Id*. at 41.
[146] 42 USCS § 12188(a)(1).

navigate unnecessary obstacles and bureaucratic hurdles when seeking accommodations from Defendant NBME. This violates the legal concept of futility and the ADAA's express language for qualified individuals. Combined with Dr. Kitchens' attempts for accommodation, the six individuals applied with Defendant NBME a total of eighteen (18) times and eighteen (18) times, Defendant NBME rejected their application for accommodation.

In light of Defendant NBME's longstanding pattern of denying accommodations regardless of the documentation provided, expungement must be an available remedy for applicants who have requested accommodation and were denied. The cases cited, spanning over two decades, showcase the consistent and predictable nature of Defendant NBME's disregard for the rights of individuals with disabilities. Congress itself supports this perspective, as stated in 42 U.S.C. §12181, which recognizes that individuals with disabilities should not be compelled to engage in futile gestures when the covered entity demonstrates a clear intent to noncompliance. By insisting that Dr. Kitchens, who is not disabled, should only be entitled to expungement for the exams he applied for accommodations for, Defendant NBME not only perpetuates discriminatory practices but demonstrates clear disregard for Congress' intent in enacting the ADAA. Defendant NBME's rejection of accommodation applications have been persistent, prejudicial, and inequitable. Congress laid the burden on Defendant NBME to make the USMLE STEP Examination accessible in a manner that best ensures the examinee is able to demonstrate their skills and competency, *not* disabled applicants. So too, the Court should not put the burden on Dr. Kitchens and similarly situated individuals to apply for accommodations for each STEP in anticipation of litigation.

## CONCLUSION

The evidence presented before the Court overwhelmingly supports Dr. Kitchens claims against the Defendant NBME. The medical evidence submitted during the course of litigation demonstrates a substantial limitation due to Dr. Kitchens ADHD diagnoses, as demonstrated by

years of prescription medication close to or at the federally mandated maximum dosage allowed in a day. Moreover, the medical evidence submitted in Dr. Kitchens application supports his request for accommodation. The repeated denials of accommodation applications and the consistent disregard for the rights of individuals with disabilities demonstrate a clear pattern of discrimination, incompetence, and a flagrant violation of the Americans with Disabilities Act Amendments Act (ADAA). Dr. Kitchens has been subjected to unnecessary obstacles and bureaucratic hurdles when seeking accommodations, impeding their ability to demonstrate their skills and competency on the USMLE STEP Examination.

While the parties agree the present timeframe is the appropriate standard when considering evidence for whether a plaintiff is disabled under the ADA, even under Dr. Kitchens' proposed burden shifting framework – the evidence submitted to Defendant NBME and to the Court demonstrates that Dr. Kitchens is substantially limited, that he requested reasonable accommodations, and that he was denied accommodations. Additionally, if Defendant NBME were to provide a non-discriminatory reason for denying accommodation, Dr. Kitchens' is able to demonstrate by the testimony of their own experts why it is a pretext.

The cases cited throughout this document, spanning over two decades, provide a compelling narrative of NBME's long-standing practice of denying accommodations, irrespective of the amount of documentation provided. Dr. Kitchens, is not alone in his experiences with NBME's discriminatory practices. Defendant NBME maintains an impeccable record of denying accommodations, leaving qualified individuals with disabilities without the support they are entitled to under the law, until subjected to Court order. The sheer number of applications rejected by NBME, as evidenced by the eighteen times the plaintiffs collectively applied for

accommodations, further underscores the persistent, prejudicial, and inequitable nature of the defendant's actions.

Moreover, the defendant's argument that Dr. Kitchens, who is not disabled, should only be entitled to expungement for the exams he applied for accommodation for, is fundamentally flawed. This argument not only perpetuates discriminatory practices but also places an undue burden on disabled applicants to navigate unnecessary obstacles and bureaucratic hurdles. Such an approach contradicts the clear intent of the ADAA, which seeks to ensure equal access and opportunity for qualified individuals with disabilities. Congress, recognizing the futility of engaging in gestures when a covered entity demonstrates clear noncompliance, explicitly stated that persons with disabilities should not be compelled to do so under 42 U.S.C. §12181. Dr. Kitchens, nor individuals in his position, should not be set at a greater disadvantage than the Defendant NBME simply due to the type of treating physicians available to them compared to the resources at Defendant's disposal. The Court must not allow Defendant NBME to take advantage of their familiarity with the legal system in favor over individuals who avail themselves to much-needed accommodation.

Expungement, as a remedy, is not only necessary but also justifiable in this case. By granting expungement, the court will not only address the individual harm suffered by Dr. Kitchens but also send a clear message to NBME and other organizations that discrimination against individuals with disabilities will not be tolerated. Expungement will serve as a tangible measure to rectify the long-standing pattern of denial and ensure that individuals with disabilities are afforded equal opportunities to showcase their skills and competency. Expungement will not only provide redress to the plaintiffs but also serve as a deterrent to NBME, compelling it to change its discriminatory practices and ensure accessibility for all individuals with disabilities. The burden should not be placed on Dr. Kitchens and similarly situated individuals to repeatedly apply for

accommodation, in anticipation of litigation, in order to preserve their right to relief. Instead, the court should recognize the defendant's clear noncompliance and prioritize the protection of the rights and dignity of qualified individuals with disabilities. The ADAA places the responsibility on NBME to make the USMLE STEP Examination accessible in a manner that best ensures the examinee's ability to demonstrate their skills and competency.

Therefore, for the foregoing reasons, the undersigned prays the Court finds in favor of Dr. Kitchens on all claims and grants his request for accommodations and expungement of the USMLE Examination Transcript in its entirety.

## <u>WORD COUNT CERTIFICATION</u>

Dr. Kitchens certifies that this document contains 17,149 words (not including this word count certification, the Table of Authorities, or Table of Arguments) as determined by the word count feature in Microsoft Word.

Dated: July 6, 2023.

Respectfully submitted,

*/s/ Dr. Markcus Kitchens*
Dr. Markcus Kitchens
625 Hampton Way, #2
Richmond, KY 40475
T: (423) 314-4096
markzwanz@gmail.com
***Pro Se Plaintiff***