# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **DR. MARKCUS KITCHENS, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:22-CV-03301-JFM** |
| | ) | |
| **NATIONAL BOARD OF MEDICAL** | ) | |
| **EXAMINERS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## **NBME'S REPLY TO PLAINTIFF'S POST-TRIAL BRIEF**

# TABLE OF CONTENTS

I.      Dr. Kitchens Has Not Demonstrated a Current Disability or Need for
        Accommodations ................................................................................................1

II.     Dr. Kitchens Has Not Demonstrated That He Needs Double Testing Time .......................9

III.    Dr. Kitchens Is Not Entitled to Expungement of His Prior Test Scores...........................10

        A.      Expungement is not an available remedy ..............................................10

        B.      Even if expungement were an available remedy, it would only be
                warranted when a past accommodation request had been wrongfully denied
                based on the documentation submitted at the time of the request .........................12

        C.      There is no basis for applying a burden-shifting analysis ......................................13

        D.      Even if expungement were an available remedy, it would only be available
                with respect to instances in which an examinee had requested
                accommodations ................................................................................14

        E.      Even if expungement were an available remedy, it would not be warranted
                here because NBME did not violate the ADA in 2022 by denying his two
                requests ..........................................................................................16

        CONCLUSION………………………………………………………………………..22

i

# TABLE OF AUTHORITIES

**CASES**

*A.C. v. Owen J. Roberts Sch. Dist.*,
   554 F. Supp. 3d 620 (E.D. Pa. 2021) ...................................................................7

*Berger v. Nat'l Bd. of Med. Exam'rs*,
   No. 19-99, 2019 WL 4040576 (S.D. Ohio 2019) ...........................................8, 11

*Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*,
   No. 15-4987, 2016 WL 1404157 (E.D. Pa. 2016) ...........................................2, 6

*Black v. Nat'l Bd. of Med. Exam'rs*,
   281 F. Supp. 3d 1247 (S.D. Fla. 2017) ..........................................................2, 14

*Doherty v. Nat'l Bd. of Med. Exam'rs*,
   791 F. App'x 462 (5th Cir. 2019) ................................................6, 7, 8, 14, 21

*G. v. Fay Sch.*,
   931 F.3d 1 (1st Cir. 2019)........................................................................11

*Glueck v. Nat'l Conf. of Bar Exam'rs*,
   No. 17-451, 2018 WL 3977891 (W.D. Tex. 2018)............................................2, 6

*Hartman v. Nat'l Bd. of Med. Exam'rs*,
   2010 WL 4461673 (E.D. Pa. 2010) ...............................................................14

*Honig v. Doe*,
   484 U.S. 305 (1988).....................................................................................7

*Jayatilaka v. Nat'l Bd. of Med. Exam'rs*,
   2011 WL 223349 (C.D. Cal. 2011).................................................................15

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019)....................................................................................4

*Matheis v. CSI Plasma, Inc.*,
   936 F.3d 171 (3d Cir. 2019).........................................................................13

*Mielo v. Steak*,
   897 F.3d 467 (3d Cir. 2018)........................................................................15

*Pickern v. Holiday Quality Foods Inc.*,
   293 F.3d 1133 (9th Cir. 2002) ....................................................................15

*Ramsay v. Nat'l Bd. of Med. Exam'rs*,
   968 F.3d 251 (3d Cir. 2020).................................................................4, 5, 8

*Sampson v. Nat'l Bd. of Med. Exam'rs*,
    2023 WL 3162129 (2d Cir. 2023).............................................................................14

*U.S. v. Nasir*,
    17 F.4th 459 (3d Cir. 2021) .......................................................................................4

*Wright v. Nat'l Bd. of Med. Exam'rs*,
    No. 21-2319, 2021 WL 5028463 (D. Colo. 2021)..............................................4, 14

### STATUTES

42 U.S.C. § 12182 ..............................................................................................................13

42 U.S.C. § 12183 .........................................................................................................11, 12

42 U.S.C. § 12188 .........................................................................................................11, 15

42 U.S.C. § 12189 .........................................................................................10, 11, 12, 13

### REGULATIONS

28 C.F.R. § 36.105 ......................................................................................................5, 6, 15

28 C.F.R. § 36.309 ...............................................................................................................7

28 C.F.R. § 36.501 .............................................................................................................11

Pursuant to the Court's May 18, 2023 Order (Dkt. 71), defendant National Board of Medical Examiners ("NBME") respectfully submits the following reply to Plaintiff's Post-Trial Brief (Dkt. 88) ("Pl. Br.").

Sidestepping the fundamental weaknesses in his own case, Dr. Kitchens attempts to make this a dispute about other examinees' accommodation requests and purported problems in NBME's accommodation review process. His characterizations are unfounded, however, and his approach is misguided.

The central issue before the Court is whether Dr. Kitchens has shown that he is disabled within the meaning of the ADA and entitled to his requested accommodation on <u>future</u> administrations of the USMLE. With respect to his novel request for expungement of his <u>prior</u> test scores, the issue before the Court—*if* the Court concludes that expungement is an available remedy under Title III (it is not)—is whether Dr. Kitchens has shown that NBME violated the ADA in denying his prior accommodation requests based on the limited information Dr. Kitchens submitted to NBME in support of that requests. The evidence supports NBME, not Dr. Kitchens, on both issues. Dr. Kitchens's ADA claim should therefore be dismissed and judgment should be entered in favor of NBME.

## I.     Dr. Kitchens Has Not Demonstrated a Current Disability or Need for Accommodations

Dr. Kitchens has not demonstrated that he has a mental impairment that substantially limits him in any major life activity relevant to taking the USMLE, as compared to most people.

With respect to his claimed mental impairment of ADHD, Dr. Kitchens asserts that he has been diagnosed with ADHD over ten times since 2013, Pl. Br. at 9, and that he "has had an active

diagnosis of ADD-ADHD since 2013," *id.* at 11.[1] That is not what the record shows. After cursory evaluations at Berea College Health Services in 2013 and 2014 apparently led to an ADHD diagnosis and Adderall prescription, *see* NBME's Proposed Findings of Fact and Conclusions of Law ("NBME FOF/COL") at 17 ¶¶ 52-56, Dr. Kitchens was not diagnosed with ADHD by any healthcare provider between 2014 and 2018, and his Adderall prescription was stopped in 2016. *See id.* at 18-20 ¶¶ 57-64. Dr. Kitchens's own recitation of his purported past diagnoses reflects a gap from 2018 to 2022. *See* Pl. Br. at 9.

Even if Dr. Kitchens's more recent ADHD diagnoses (at Baptist Health and by Ms. Bacon) are taken at face value, Dr. Kitchens acknowledges that "not every impairment will constitute a disability." Pl. Br. at 11; *see also, e.g., Glueck v. Nat'l Conf. of Bar Exam'rs*, No. 17-451, 2018 WL 3977891, at *4-6 (W.D. Tex. 2018) (finding law school graduate with ADHD and learning disorder diagnoses was not disabled under the ADA); *Black v. Nat'l Bd. of Med. Exam'rs*, 281 F. Supp. 3d 1247, 1249-50 (S.D. Fla. 2017) (finding that medical school student with ADHD diagnosis was not disabled under the ADA); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, No. 15-4987, 2016 WL 1404157, at *7 (E.D. Pa. 2016) (finding medical student with dyslexia diagnosis was not disabled under the ADA). Rather, Dr. Kitchens must demonstrate that he is substantially limited compared to most people in the general population. *See* NBME FOF/COL at 38-39 ¶ 135.

Dr. Kitchens contends his "grades, conduct, and medical records" show he is substantially limited. Pl. Br. at 11. But that is not the case. Dr. Kitchens relies heavily on his performance on the Conners CPT and MOXO d-CPT, *id.* at 12, 13—two short, computerized tests that he took

---

[1] Dr. Kitchens only identifies and discusses ADHD (not anxiety) as the relevant current mental impairment. *See* Pl. Br. at 8-19.

during this litigation to support his motion for a preliminary injunction. *See* NBME FOF/COL at 42 ¶ 76; 26 at ¶ 84. The results of these tests alone, however, are insufficient to even diagnose a disorder, much less to show that he is substantially limited in any relevant major life activities as compared to most people. *See* Dkt. 77-33 PX26 at 1; Dkt. 77-34 PX27; Tr.III 157:1-10. There is also good reason to question Dr. Kitchens's results on these tests. *See* NBME FOF/COL at 27 ¶ 90. Dr. Kitchens argues that the validity of his results is "not the question at hand," Pl. Br. at 13, but that is of course incorrect given that he is relying on his performance on the CPTs as evidence of impairment and substantial limitation. Dr. Kitchens also points to his wife's written report to Ms. Bacon of symptoms consistent with ADHD as part of Ms. Bacon's mid-litigation evaluation of Dr. Kitchens, *id.* at 12, but Mrs. Kitchens is in no position to compare Dr. Kitchens to others in the general population (as Dr. Kitchens aptly notes, "Mrs. Kitchens is a lawyer, *not* a medical professional," *id.*). *See* Tr.III 159:1-18. And Mrs. Kitchens did not testify at trial regarding Dr. Kitchens's current functioning. Indeed, Dr. Kitchens did not present a *single* witness at trial to corroborate any self-reported current functioning—not his wife, not a teacher, not even one of his treating medical professionals.

With respect to medical records, Dr. Kitchens emphasizes his current Adderall dosage, Pl. Br. at 13, but his own witnesses disagreed about the significance of dosage amounts, and prescription information alone does not show functional limitation as compared to most people. *See* NBME FOF/COL at 12-13 ¶ 33; *infra* at 17-19. Dr. Kitchens also overlooks his repeated reports to his healthcare providers that he only takes ADHD medication when he is engaged in mentally challenging activities. *See* NBME FOF/COL at 21-22 ¶¶ 69-70; 22-23 ¶¶ 72-73; 24 ¶ 77; *see also id.* at 15 ¶ 48 and 16 ¶ 51 (showing Dr. Kitchens did not need accommodations in work settings). These reports are inconsistent with an ADHD presentation, much less any conclusion

that Dr. Kitchens experiences significant impairment from ADHD-type symptoms. As Dr. Allen explained: "[I]f he only needs [Adderall] when his cognitive demand is the highest, such as on [a] USMLE licensure exam, then that leads away from the diagnosis of ADHD, and instead, suggests just difficulty with really hard tasks, which, I guess, is true for most people." Tr.IV 34:9-14.

Dr. Kitchens attempts to bolster Ms. Bacon's evaluation report by pointing to DOJ guidance and arguing that "'individualized assessment or evidence that a qualified professional has individually and personally evaluated the candidate' are heavily favored when considering requests for test-taking accommodations." Pl. Br. at 11-12 (citing 28 C.F.R. Part 36 App. A). This is not a precise quote, but in any event, there is no reasonable basis—in law or fact—to give primacy to Ms. Bacon's cursory evaluation of Dr. Kitchens, where her findings relied overwhelmingly on Dr. Kitchens's self-report and where she did not make any determination whether Dr. Kitchens is substantially limited. *See* NBME FOF/COL at 26-27 ¶¶ 86-88; *id.* at 43-44 ¶ 148; *id.* at 25-28 ¶¶ 80-92. Moreover, nothing in the ADA or its implementing regulations requires testing entities (or the Court) to simply accept the recommendations of an evaluating professional without independently determining whether an examinee has an impairment that substantially limits then in a major life activity compared to most people in the general population. *See Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 261 (3d Cir. 2020) ("[N]othing in the District Court's discussion indicates that it held that the statute and regulations 'compel' deference to Ramsay's experts."); *Wright v. Nat'l Bd. of Med. Exam'rs*, No. 21-2319, 2021 WL 5028463, at *7 (D. Colo. 2021) ("[A] professional evaluation is not the only piece of evidence a court should consider under the ADA."); *see generally U.S. v. Nasir*, 17 F.4th 459, 469-71 (3d Cir. 2021) (discussing treatment of agency interpretations of regulations post-*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)). Instead, the operative question after trial is whether the evaluating professional "provided

facts more probative to the relevant inquiries under the ADA….” *Ramsay*, 968 F.3d at 261. Ms. Bacon’s “facts” amount to little more than a parroting of Dr. Kitchens’s self-report, resulting in a diagnosis but no opinion regarding the extent of any resulting functional limitation as compared to most people. There is no basis for giving significant weight to her opinions, or for giving greater weight to her opinions than to the contrary opinions of NBME’s experts.

With respect to grades, Dr. Kitchens first criticizes NBME for addressing his academic performance then contradictorily embraces his academic history as purportedly showing he is substantially limited. *See* Pl. Br. at 13-15. As NBME previously noted, *see* NBME FOF/COL ¶ 156, although Dr. Kitchens does not have the same stellar academic history seen in some other testing accommodation cases, he proceeded successfully through school (including medical school) without any formal accommodations. Dr. Kitchens describes “below-average performance” in school, Pl. Br. at 13, but apart from a somewhat uneven start in elementary school (which says nothing about any current impairment),[2] there is no evidence to support this characterization or to show that Dr. Kitchens performs “below average” in comparison to most people in the general population, the relevant standard under DOJ’s regulations. *See* 28 C.F.R. § 36.105(d)(1)(v). In high school, Dr. Kitchens had a cumulative GPA of 2.812 and graduated in the top third of his class (45 out of 135), while taking classes that included AP English Literature (grade=98), AP English Language and Composition (grade=86), AP Biology (grade=91), Honors US History (grade=88), Honors World History (grade=90), Honors Chemistry (grade=88), and Honors Geometry (grade=95). Dkt. 77-3 JX3.[3] Dr. Kitchens may not have received the grades he

---

[2] For example, with greater maturity, Dr. Kitchens appeared to be generally a B-C student in middle school (with course averages generally improving each year). *See* Dkt. 77-2 JX2.

[3] It appears that Dr. Kitchens’s high school GPA would have been even higher if his high school weighted honors or AP classes more heavily than other classes (as many schools do), but his school

would have liked in college or medical school, *see* Pl. Br. at 14, but he successfully graduated from both—a feat most individuals in the general population do not accomplish. His performance in these advanced educational endeavors is not reflective of any impairment compared to most people in the general population. *See Doherty v. Nat'l Bd. of Med. Exam'rs*, 791 F. App'x 462, 465 (5th Cir. 2019) ("We agree that DOJ regulations require an individual with an impairment to be compared to more than just her college-educated or 'same-aged student' peers to show a substantial limitation."); *cf. Glueck v. Nat'l Conf. of Bar Exam'rs*, 2018 WL 3977891, at *5 and n.4 (holding that the plaintiff was not disabled as a matter of law, despite scoring in the fourth percentile on a reading test, because his performance was measured "'using end of college norms'"); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 WL 1404157, at *8 (finding comparison to other four-year college graduates "assuredly not representative of the general population when over half of the people in the country lack a bachelor's degree").

Dr. Kitchens argues that "[t]hroughout [his] educational career, he had to spend additional time and effort overcoming his ADHD," Pl. Br. at 15, but the only supporting evidence he cites is his mother's description of his reading as a child in elementary school, *id.* Her testimony regarding his educational performance, moreover, was inconsistent, *see* NBME FOF/COL at 14 ¶¶ 37-38; was limited to Dr. Kitchens's performance in early school grades; and was necessarily limited to her own subjective views, with no basis for comparing his abilities to those of most people in the population. This is not enough. Any analysis of the "condition, manner, or duration" of performance of a major life activity must also be made—with supporting evidence—in comparison to most people in the general population. 28 C.F.R. § 36.105(d)(3)(i); *cf. id.* § 36.105(d)(3)(iii)

---

transcript shows a GPA based on an unweighted 4.0 scale. *See* Dkt. 77-3 JX3 ("GPA unweighted on 4.0 scale.").

("[S]omeone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities, including, but not limited to, reading, writing, speaking, or learning *because of the additional time or effort he or she must spend* to read, write, speak, or learn *compared to most people in the general population*.") (emphases added); *Doherty*, 791 F. App'x at 466 ("Doherty's testimony did not show that her reading impairment substantially limited her when compared to most people in the general population because she did not compare her reading ability to that of anyone but herself.").

Importantly, there is also no evidence that any of Dr. Kitchens's grades or reported difficulties in school are due to his claimed impairments of ADHD and anxiety. Dr. Kitchens continues to reference issues with reading, *see* Pl. Br. at 14-15, but neither ADHD nor anxiety is a reading disorder, *see* NBME FOF/COL at 45-46 ¶ 154, and there is no indication that Dr. Kitchens has ever been evaluated for or diagnosed as having a reading disorder, *see* Tr.III 165:21-166:4.

Finally, Dr. Kitchens argues that he has a history of accommodations that supports a finding of substantial limitation. Pl. Br. at 16-19. DOJ regulations require testing entities to give "considerable weight" to "*documentation*" of past accommodations received in similar testing situations or in response to an IEP or Section 504 Plan. 28 C.F.R. § 36.309(b)(1)(v) (emphasis added). There is no such documentation in the record here. Dr. Kitchens points to his elementary school transcript that shows individualized reading instruction in first grade through "Sail," Dkt. 77-1 JX1, but this is not an IEP or Section 504 Plan. *See generally Honig v. Doe*, 484 U.S. 305, 311 (1988) (discussing IEPs); *A.C. v. Owen J. Roberts Sch. Dist.*, 554 F. Supp. 3d 620, 623-25 (E.D. Pa. 2021) (discussing a Section 504 Plan). Whatever this "Sail" program was, it was inconsequential enough that neither Dr. Kitchens nor his mother even realized and/or remembered he had participated in such a program. *See* Pl. Br. at 13; *see also* Tr.III 168:9-12 (Dr. Gordon)

(explaining it is common for children to receive remedial reading help as they are learning to read). As for the Prometric scheduling email for the CBSE exam Dr. Kitchens took in medical school, which shows that he was approved to receive extended time, neither this document nor any other document in the record explains *why* that one instance of extra time was provided (presumably by his medical school). *See Doherty v. Nat'l Bd. of Med. Exam'rs*, 791 F. App'x at 466 ("[T]he record does not provide evidence of whether Tulane gave Doherty accommodations because it found that she met the definition of disability under the ADA; Tulane may grant accommodations to individuals who do not meet the ADA's definition of disability."). Therefore, this email does not assist in "understanding … [Dr. Kitchens's] disability and the appropriateness of testing accommodations." *Ramsay*, 968 F.3d at 259 (citation omitted).

Dr. Kitchens also relies on "unofficial" accommodations that he or his mother testified about at trial. The testimony he highlights discusses tutoring and special seating in elementary school; the use of personal planners, studying alone, preparing in advance for tests, and leaving early for school in high school; and one professor in college who allowed him extra time to complete exams in her office. *Id.* at 16-17.[4] Contrary to Dr. Kitchens's argument, Pl. Br. at 19, however, this evidence is not analogous to the facts in *Berger v. Nat'l Bd. of Med. Exam'rs*, where

---

[4] Dr. Kitchens's criticism of NBME for not considering his "unofficial" accommodations, *see* Pl. Br. at 19, rings hollow given his own failure to present *any* documentation of such alleged accommodations in support of the accommodation requests he submitted to NBME in 2022. He also selectively quotes the record in suggesting that NBME would not consider evidence of "unofficial accommodations" as part of an accommodation review in any event, *see id.*, and he distorts the record in doing so. NBME's witnesses were clear that all documentation submitted is reviewed. *See, e.g.,* Tr.III at 98:9-13 ("Q: Does the NBME's guidelines within disability services allow unofficial accommodations to be accepted as part of an application for accommodations? A: The answer is yes…."); *id.* at 91:18-22 ("Again, all information that you…submitted for our review, if you considered that to be relevant, it's part of your file. … We are not going to not accept something that somebody chooses to submit …."); 103:8-10 ("All documentation that is submitted is reviewed and considered as a point of information.").

the Plaintiff testified to receiving extensive school-based informal accommodations in the early part of high school including extra time on tests, extra sets of textbooks for highlighting, and the use of audio books, and then undergoing a psychological evaluation after which he began receiving formal accommodations in the latter part of high school. *See* No. 19-99, 2019 WL 4040576, at *3 (S.D. Ohio 2019). In Dr. Kitchens's case, the use of personal planners, studying in isolation, preparing in advance for tests, and leaving early for school, Pl. Br. at 17, are ubiquitous actions, and they are not an indication of impairment much less substantial limitation compared to most people. *See* Tr.III 172:9-22.

Dr. Kitchens failed to present evidence at trial sufficient to demonstrate that he has a mental impairment that substantially limits him in a major life activity relevant to taking the USMLE. Therefore, he is not entitled to his requested accommodations when he takes future administrations of the USMLE.

## II.   Dr. Kitchens Has Not Demonstrated That He Needs Double Testing Time

Even if Dr. Kitchens had demonstrated a disability within the meaning of the ADA (and he has not), he has not shown that he needs double the amount of time that other examinees receive in order to take the USMLE in an accessible manner. The issue here is not whether extra testing time *could* be an appropriate accommodation *when warranted*, *see* Pl. Br. at 29-34, and NBME is not arguing that extra time accommodations—*when warranted*—are a fundamental alteration of the USMLE. But extra testing time is not a "reasonable accommodation" for every examinee with an ADA disability,[5] simply because it is an accommodation that is provided by NBME when

---

[5] Contrary to Dr. Kitchens's characterization of her testimony, *see* Pl. Br. at 35, Dr. McGeehan did not testify that 100% additional time over two days was a reasonable accommodation for any applicant. *See* Tr.III 243:5-244:6.

warranted, as Dr. Kitchens seems to argue.[6] The question is whether Dr. Kitchens has demonstrated that *he* needs double the amount of testing time that other examinees receive in order to take the USMLE in an accessible manner. *See* 42 U.S.C. § 12189. He has not.

Dr. Kitchens points to his performance on CBSSA practice tests and argues that "when provided with the opportunity to read the question and answers properly, he is able to demonstrate his knowledge," but he took those practice tests under *standard* time conditions. *See* Dkt. 57 at 6 ¶¶ 20, 21, 23. Conversely, Dr. Kitchens took the CBSE with double time and failed. *See* Dkt. 77-4 PX52. As previously explained, nothing in the record demonstrates that Dr. Kitchens needs extra time—much less 100% extra time—to take the USMLE in an accessible manner. *See* NBME FOF/COL at 48 ¶ 158.

## III.   Dr. Kitchens Is Not Entitled to Expungement of His Prior Test Scores

### A.  Expungement is not an available remedy

As NBME explained in its opening brief (and in the pre-trial briefing requested by the Court, *see* Dkt. 55), the applicable remedies provision in Title III only allows for preventive injunctive relief, and "preventive" relief does not include expungement of prior test scores. *See* NBME FOF/COL at 49-50; Dkt. 55 at 2-4.

Dr. Kitchens admits that he is pursuing a "novel statutory interpretation" in seeking expungement, Pl. Br. at 45, but his "novel" interpretation has no support in the statutory language. Dr. Kitchens relies on the wrong section of the Title III remedies statute in listing relief the Court purportedly may grant on his claim, *see* Pl. Br. at 40, quoting provisions relating to enforcement

---

[6] Dr. Kitchens incorrectly states that extra time is "the only accommodation specifically listed" on the USMLE accommodation request form. Pl. Br. at 34. The form also lists additional break time as an accommodation and invites examinees to describe any other accommodations they may be requesting. *See* JX 77-24 PX2 at 3. And double time is not the only extra-time option. Examinees can request 25% extra time or 50% extra time. *Id.* Indeed, Dr. Kitchens requested 50% extra time and extra breaks in his second accommodation request. JX 77-25 PX3 at 3.

actions by the Attorney General found at 42 U.S.C. § 12188(b)(2)(A) and (B). *Cf. G. v. Fay Sch.*, 931 F.3d 1, 9-11 (1st Cir. 2019) (distinguishing remedies available for different sections of the ADA). Dr. Kitchens also cites to the decision in *Berger v. NBME* to support his request for score expungement, *see* Pl. Br. at 40-41, but no such relief was awarded in that case. Indeed, the *Berger* case aptly illustrates the appropriate relief that is available to examinees who believe their requests for accommodations have been wrongfully denied—preventive injunctive relief awarding their requested accommodations on a future test. *See* 2019 WL 4040576, at *30.

Dr. Kitchens's claim arises under 42 U.S.C. § 12189, which requires that tests be administered to examinees in an accessible place and manner. The statute is violated when necessary and reasonable accommodations are not provided to a disabled examinee when testing. Expungement of *prior* test scores, no matter what the reason, *see* Pl Br. at 45-51, does not *prevent* any alleged violation of the statute by NBME, and thus is not preventive relief under Title III. *See* NBME FOF/COL at 49-51.

Other the language in the remedies provision of Title III also merits attention. Section 12188(a)(1) provides a private right of action when someone "***is being subjected to discrimination*** on the basis of disability in violation of this subchapter…." 42 U.S.C. § 12188(a)(1) (emphasis added); *see also* 28 C.F.R. § 36.501.[7] An examinee who requested accommodations in the past, had that requested denied, and then proceeded to take the test, is no longer being subjected to discrimination in violation of Section 12189 with respect to that past test, because the testing event is concluded, and they cannot seek relief with regard to that past test under the plain language of Section 12188(a)(1).

---

[7] Section 12188(a)(1) also addresses individuals who have "reasonable grounds for believing [they are] about to be subjected to discrimination in violation of Section 12183" of Title III, but Section 12183 is not at issue in this case.

**B. Even if expungement were an available remedy, it would only be warranted when a past accommodation request had been wrongfully denied based on the documentation submitted at the time of the request**

As NBME previously explained, the timeframe for evidence in a typical testing accommodation case (where an examinee seeks accommodations on a future test), is the present. But in the present "novel" situation where Dr. Kitchens seeks to expunge prior test results, the relevant evidence is the documentation that was submitted by the examinee in support of his prior request for accommodations. *See* NBME FOF/COL at 51 n.21. The basis for the requested relief, after all, is an alleged past act of discrimination. If the testing entity did not improperly deny the request based on the documentation submitted, there was no discrimination and thus no basis for a remedy.

Dr. Kitchens, however, seems to contend that the full trial record can and should be considered in determining whether expungement of his prior test scores is warranted, *see* Pl. Br. at 39-41, because "[s]hould the Court find that Dr. Kitchens' is substantially limited under the ADA, the USMLE Examination Transcript subjects Dr. Kitchens to repeated assessment and evaluation by residency programs and state licensure boards on the severity of his disability rather than on his competency and skill," *id.* at 41. But this argument is focused on third parties' use of his test scores, not any action by NBME relative to actual administration of the test, which is the subject of Section 12189 and its implementing regulation. It also makes no sense.  If Dr. Kitchens had submitted no documentation in support of his prior two requests for extra testing time on the USMLE, surely NBME could not be found to have violated the ADA by denying those requests— no matter how much evidence he offered in a later trial in an effort to show that the denials were unlawful. The Court would necessarily and properly ask "did the testing entity act unlawfully, given the information it was provided at that time?" The same is true here, where Dr. Kitchens chose to provide only a limited amount of documentation in support of his requests. It is that

documentation that determines whether NBME acted unlawfully in denying his requests, not some record he develops after the fact to support his claimed disability status and need for accommodations.

### C. There is no basis for applying a burden-shifting analysis

Dr. Kitchens's alternative suggestion that a burden-shifting analysis should be applied in determining whether expungement is an appropriate remedy, *see* Pl. Br. at 40-41, simply underscores how far afield his request for expungement relief lies. Indeed, in the case he cites, *Matheis v. CSI Plasma, Inc.*, 936 F.3d 171, 179 (3d Cir. 2019), the Third Circuit expressly rejected the use of a burden-shifting analysis in a Title III case.[8]

Dr. Kitchens's new complaint that NBME should have presented evidence showing his changed test responses or identifying "experimental" questions on the test and that NBME "intentionally altered business records" is unsupported and wrong. *See* Pl. Br. 42-45. Dr. Kitchens's motion to compel set forth his perceived discovery complaints, was responded to by NBME, and was denied by the Court. *See* Dkts. 52, 58, and 59. Dr. Kitchens's meritless and gratuitous attacks on NBME do not overcome the fact that his testing data refutes his prior statements in this litigation about his test-day experiences—including his testimony under oath. *See* NBME FOF/COL at 34-38 ¶¶ 122-133.

---

[8] Dr. Kitchens cites *Matheis* to show the issues before the Court, *see* Tr. Br. at 39-40, but that case arose under a different provision in Title III, 42 U.S.C. § 12182, which is applicable to public accommodations. *See* 936 F.3d at 176. This case arises under a different provision in Title III applicable with respect to certain examinations and courses, 42 U.S.C. § 12189. *See* NBME FOF/COL at 3.

### D. Even if expungement were an available remedy, it would only be available with respect to instances in which an examinee had requested accommodations

Dr. Kitchens has taken the Step 1 exam three times and the Step 2 CK exam two times, but he only submitted two (largely identical) requests for accommodations, both on the Step 1 exam. He nevertheless seeks to "expunge" all of his test scores, even for the tests on which he did not request accommodations.

Dr. Kitchens argues that he did not have to submit additional requests or supporting documentation after his first request was denied, because this would have been a futile gesture given that other examinees have submitted "more detailed applications" and their requests were denied. Pl. Br. at 52-56. This after-the-fact argument, based on cases involving five examinees other Dr. Kitchens (out of the tens of thousands of examinees who have requested accommodations on the USMLE since the ADA's enactment),[9] ignores the individualized nature of a disability analysis. *See* 28 C.F.R. § 36.105(d)(vi). Contrary to Dr. Kitchens's argument, the issue is not the volume of documents submitted in support of an accommodation request, *see* Pl. Br. at 52-53, but the nature of the information conveyed in those documents. Dr. Kitchens appears to improperly disclaim any obligation to submit sufficient support for an accommodation request or to even

---

[9] The decisions in *Sampson* and *Hartman* relied on by Dr. Kitchens were both vacated. *See Sampson v. Nat'l Bd. of Med. Exam'rs*, 2023 WL 3162129 (2d Cir. 2023) (vacating district court preliminary injunction order given plaintiff's failure to show irreparable harm); *Hartman v. Nat'l Bd. of Med. Exam'rs*, 2010 WL 4461673 (E.D. Pa. 2010) (vacating preliminary injunction ruling after plaintiff tested without his text-to-speech accommodations and passed the test). And to the extent Dr. Kitchens is citing cases involving requests for accommodations on the USMLE by other examinees to suggest that NBME routinely denies accommodation requests even when properly supported, he has omitted numerous cases where NBME prevailed, including cases such as: *Doherty v. Nat'l Bd. of Med. Exam'rs*, 791 F. App'x 462 (5th Cir. 2019) (reversing grant of preliminary injunction to examinee); *Wright v. Nat'l Bd. of Med. Exam'rs*, 2021 WL 5028463 (D. Colo. 2021) (denying examinee's motion for preliminary injunction); *Black v. Nat'l Bd. of Med. Exam'rs*, 281 F. Supp. 3d 1247 (M.D. Fla. 2017) (awarding summary judgment to NBME); and *Jayatilaka v. Nat'l Bd. of Med. Exam'rs*, 2011 WL 223349 (C.D. Cal. 2011) (issuing final judgment in favor of NBME).

inform a testing entity that a disability-based accommodation is desired in the first place. *See* Pl. Br. at 56-57.

Dr. Kitchens relies on the "futile gesture" provision of 42 U.S.C. § 12188(a)(1), *see* Pl. Br. at 56, but his argument turns this provision on its head. This statement in the statute makes clear that an individual does not have to actually experience discriminatory treatment to pursue a claim for preventive relief under the statute if it is otherwise shown that they would be subject to discriminatory treatment. *See Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1136 (9th Cir. 2002); *see also Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 480 n.15 (3d Cir. 2018). Thus, after an examinee submits an accommodation request to a testing entity and that request is denied, the examinee may challenge that denial in court and to seek an injunction requiring the testing entity to provide the requested accommodations on a future test—*i.e.*, to seek preventive relief based on a claim they are being subjected to discrimination. The futile gesture to be avoided is having to take the test without accommodations before filing suit. This process is reflected in the very cases cited by Dr. Kitchens.

Dr. Kitchens argues in this regard that his "medical career rested in the hands of Ms. Convery and Dr. McGeehan with no remedy available to fix her egregious mistakes[,]" Pl. Br. 51,[10] but this statement is doubly-wrong—there were no mistakes, and if Dr. Kitchens believed he

---

[10] In one section of his brief, Dr. Kitchens incorrectly argues that NBME did not have the competence to review his accommodation requests. *See* Pl. Br. 34-39. Dr. McGeehan, a Ph.D. psychologist, is well-qualified, by education and experience. *See* Tr.III 198:15-199:24; 236:3-10; *see also* Dkt. 77-53 DX 35 at 26 (showing Nurse Holbrook recommending that Dr. Kitchens obtain psychological testing to support his accommodation request). Dr. Kitchens's own evaluator who diagnosed him with ADHD, Ms. Bacon, is also a psychologist (although, as a Master's-level psychologist, her education level is not as advanced as Dr. McGeehan's). Dr. Kitchens's criticisms of Ms. Convery are likewise misplaced. Ms. Convery is an operational director in NBME's Disability Services department; she does not review the substantive accommodation decisions by Dr. McGeehan or other licensed professionals at NBME. *See* Tr.III 105:13-106:19.

had improperly been denied testing accommodations, he had a remedy available—he could have filed a lawsuit prior to testing, seeking an injunction that would order NBME to provide him his requested accommodations on a future test. He chose not to do so. Dr. Kitchens also had the option of providing additional information and documentation to NBME in support of his accommodation requests—including the same documentation and information that he obtained and submitted to the Court in this litigation to argue that he is disabled—but he did not do this, either, despite being encouraged to do so by Dr. McGeehan. *See* Dkt. 77-64 DX78.

Dr. Kitchens cannot test five times and then, only after failing to pass, seek to erase his testing history so that it is never known to residency programs or licensing boards—based on documents and information that he never submitted to NBME in the first place on the two occasions that he actually requested accommodations.

### E.  Even if expungement were an available remedy, it would not be warranted here because NBME did not violate the ADA in 2022 by denying his two requests

To show that testing accommodations are warranted under the ADA, an individual must demonstrate (1) the existence of a mental or physical impairment and (2) that the impairment substantially limits the individual's ability to perform one or more major life activities that are relevant when taking a standardized test. The documentation and information submitted by Dr. Kitchens in 2022 in support of his two accommodation requests did not substantiate his claimed impairments and provided virtually no information regarding any functional limitations. The documentation did not show that he was substantially limited compared to most people and needed his requested accommodation to access the USMLE. NBME therefore properly denied his accommodation requests.

In his post-trial brief, Dr. Kitchens focuses on whether the one-page dermatology record excerpt from October 2020 that he submitted to NBME was sufficient to show that he had been

diagnosed with ADHD. *See* Pl. Br. 20-25.[11] This record excerpt reports a 2013 diagnosis of ADHD under "past medical history." Dkt. 77-24 PX2 at 9. It also lists prescriptions for Buspirone and Adderall. *Id.* But this record shows absolutely nothing about who made any ADHD diagnosis in 2013 or the basis for the diagnosis, and it does not address in any way the extent of any functional limitations due to symptoms of ADHD. As Dr. Allen explained, the one-page excerpt:

> [D]oes not provide any symptoms related to this diagnosis, and it lists a past diagnosis of ADHD, so this clinician is not really even addressing it. So this is a dermatology clinic. And so there is no description of not only symptoms related to ADHD, but functional limitation as a result. So this does not support that diagnosis.

Tr.IV 22:17-23.

Dr. Kitchens's heavy reliance on his Adderall prescription is likewise misplaced. *See* Pl. Br. at 23-25. Although it may be assumed that some healthcare provider diagnosed Dr. Kitchens with ADHD if he was prescribed Adderall, no document or information was offered to establish that diagnoses or to show who made it or on what basis, and it cannot be assumed that Dr. Kitchens actually met all the DSM criteria at the time of the diagnosis. *See* Tr. IV 60:12-18 (Dr. Allen) ("Q: [I]sn't it true that a patient's lengthy prescription history would indicate a validation of diagnosis? A: Well, I mean it shows that one clinician thought that they benefitted from the medication, but it does not specifically say that they met the criteria as laid out in the DSM.").[12] Nor can any functional limitations related to ADHD simply be presumed based on a prescription alone. *See*

---

[11] Dr. Kitchens discusses only ADHD as the relevant impairment in discussing his accommodation requests to NBME, *see* Pl. Br. at 20-22, and makes only passing reference to anxiety in discussing substantial limitation, *see id.* at 22-29.

[12] Although Dr. Kitchens focuses his argument on Adderall, Dr. Allen gave similar testimony regarding anxiety-related prescriptions. *See* Tr.IV 11:22-13:5 (discussing the current "medicalized" society and concluding: "So we do see people prescribed things like SSRI's and antidepressants, [and] other anxiety medicine like Buspirone, routinely without meeting all of the criteria for a clinical diagnosis of generalized anxiety disorder or panic disorder, one [of] the other DSM recognized illnesses.").

Tr.III 192:9-19 (Dr. Gordon) ("Providers will write prescriptions for Adderall, or any of the stimulants, because they feel their clients want it and might do better with it …. The mere fact that somebody gets an Adderall prescription does not mean they are functionally limited.").

Dr. Kitchens argues, however, that his reported dosage of Adderall alone shows he experienced moderate to severe ADHD symptoms. Pl. Br. at 22-25. But even his own experts offered different opinions on this point. Dr. Pullins speculated that someone prescribed the maximum dosage of Adderall would have moderate to severe ADHD, Pl. Br. at 24-25, but Dr. Shepherd opined that "ADHD medications are as potent and powerful in the smallest doses as the largest dose," and testified that he prescribes larger doses so they will stay in the system longer, Tr.II 33:2-10. Dr. Allen, for his part, testified that a number of factors can influence Adderall dosage (in testimony that Dr. Kitchens incompletely and thus inaccurately depicts on page 24 of his Trial Brief):

> Q:   So as a clinical psychiatrist, isn't it true that you can infer the severity of a patient's diagnoses based on the prescription of the medication?
>
> A:   Potentially. ***There are other factors that go into that. Everybody metabolizes drugs differently, body size may have something to do with it or the difference between muscle versus fat, because [of] the way drugs are absorbed. But also affect is a component, so all of those things are considered***.
>
> Q:   Right, but for Adderall, is that the same case for Adderall?
>
> A:   Yes. All of those things can be — can be considered. …
>
> Q:   Given here the dosage of medication, would you agree that a patient who is prescribed 30 milligrams of Adderall, given that the maximum amount that can be given is 40 milligrams, would indicate a moderate to severe level of ADHD?
>
> A:   So yes, so it does say 15 milligrams BID, which is Latin for twice a day, so it is 30 milligrams a day total. But that being said, it is an indicator of severity, ***but it is also an indicator of the other factors that I mentioned***. So it is one of the factors that I consider, yes.

Tr.IV 57:5-59:3 (emphases added). In all events, any debate on whether the severity of ADHD symptoms can be surmised from dosage levels of stimulant medication alone is largely academic, because this still does not address whether Dr. Kitchens experienced any functional limitations from ADHD and how those limitations compare to most people in the general population, which is the focus of the substantial limitation analysis.

In his concerted effort to characterize his 2022 accommodation requests as showing an ADHD diagnosis, Dr. Kitchens incorrectly summarizes what the records show. He writes:

> The medical records provided [to NBME in 2022] demonstrate that Dr. Kitchens had a diagnosis of ADHD since 2013, that Dr. Kitchens has been prescribed '[A]dderall since 2014'; and that Dr. Kitchens had consistently been treated for ADHD since his diagnosis.

Pl. Br. at 22. This is not what the records submitted to NBME showed. The 2017 record from Dr. Hackman showed Dr. Kitchens' **self-report** that he had been "on Adderall since 2014," Dkt. 77-24 PX2 at 12, but it also showed that his last prescription bottle was from 2016 **and** that Dr. Hackman had **declined** to prescribe Adderall at that visit, which upset Dr. Kitchens, *id.* at 13.[13] The partial record from May 2018 from Dr. Hackman likewise showed no Adderall prescription and a referral to a mental health counselor to **evaluate for** ADHD. *Id.* at 10-11.[14] Contrary to Dr. Kitchens's current characterizations, the records affirmatively showed that he had **not** been "consistently treated for ADHD since his diagnosis" in 2013 and he had **not** been "prescribed 'Adderall since 2014.'" And importantly, the records did not show the basis for any such diagnosis or reflect any functional limitations. Dr. Kitchens himself concedes that "the medical records

---

[13] The assessment description of "attention and concentration deficit (R41.840)" does not reflect an ADHD diagnosis. *See* NBME FOF/COL at 19 ¶ 60.

[14] The assessment description of "attention-deficit hyperactivity disorder, unspecified type (F90.9)" does not reflect an ADHD diagnosis. *See* NBME FOF/COL ¶ 62.

provided do not 'clearly delineate[ ] how the diagnostic criteria were met for the diagnoses… [nor provide] a clear rationale for any accommodations….'" Pl. Br. 23.

Dr. Kitchens also points to the 2020 letter from Dr. Khan that he submitted in support of his 2022 accommodations requests, but he elevates form (a doctor's letter) over substance (any pertinent information actually provided in that letter). *See* Pl. Br. at 26-28. Even if Dr. Khan was Dr. Kitchens's treating physician in 2020, his letter provided no information about Dr. Kitchens's functional limitations and provided no basis for concluding that Dr. Kitchens was substantially limited compared to most people. Dr. Khan did not even reference an actual anxiety diagnosis in his letter. *See* NBME FOF/COL ¶ 66. Dr. Kitchens now argues, post-trial, that "Dr. Khan possesses unparalleled insight into the specific needs of Dr. Kitchens," Pl. Br. at 26, but there is nothing in the written record to show this and Dr. Khan did not testify at trial. Dr. Kitchens likewise argues that Dr. Khan "is uniquely equipped to identify the accommodations necessary for him to have equitable and unhindered access to take the examination," *id.*, but Dr. Khan made no such recommendations. And Dr. Khan's 2020 letter did not address Dr. Kitchens's functioning as of the time of his requests in 2022 and thus did not provide the current information needed to assess any limitations due to his reported anxiety, because mood disorders such as anxiety can change over time and with treatment. NBME FOF/COL at 12 ¶ 30; 30 ¶ 101.[15]

Dr. Kitchens also argues that the Prometric email showing he received extra time on the CBSE should receive "substantial weight." Pl. Br. at 28. As previously discussed, nothing in this scheduling email showed why Dr. Kitchens was approved for extended time on this one medical school exam, and Dr. Kitchens failed to provide a straightforward form from his medical school,

---

[15] Dr. Kitchens also references a letter written by Nurse Holbrook in 2023, Pl. Br. at 27, but that letter was not part of Dr. Kitchens's 2022 accommodation requests and, in any event, does not provide any information other than a diagnosis.

available on the USMLE website, that would have delineated any disability-based accommodations he says he was provided by his medical school. *See* Dkt. 77-58 DX 62. This email provides no basis to conclude that his medical school in Poland provided extra time based on a determination that Dr. Kitchens was disabled within the meaning of the ADA. *See Doherty v. Nat'l Bd. of Med. Exam'rs*, 791 F. App'x at 466. Dr. Kitchens argues that "NBME failed to produce any evidence at trial suggesting that Dr. Kitchens did not receive accommodations during his academic career," Pl. Br. at 28, but this statement misunderstands that it was ***Dr. Kitchens's*** obligation to submit sufficient documentation to support his accommodation requests at the time he made them in 2022.

There was simply no basis for granting Dr. Kitchens's accommodation requests based on the limited documentation and information Dr. Kitchens chose to submit to NBME in 2022. Therefore, NBME did not violate the ADA by denying those two requests, and there is no basis for expunging his test results on those two exams, even if expungement were a proper remedy under Title III.

## **CONCLUSION**

For the foregoing reasons and those set out in NBME's Proposed Findings of Fact and Conclusions of Law, the Court should deny Dr. Kitchens's request for injunctive relief, dismiss his claim with prejudice, and enter judgment against Dr. Kitchens and in favor of NBME.

Dated: July 20, 2023

Respectfully submitted,

*/s/ Caroline M. Mew*

Jared D. Bayer
Cozen O'Connor
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Phone: 215-255-8590
jbayer@cozen.com

Caroline M. Mew - admitted *pro hac vice*
Perkins Coie LLC
700 13th Street, NW, Suite 800
Washington, DC 20005
Phone: (202) 654-1767
cmew@perkinscoie.com
*Attorneys for NBME*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 20, 2023, a true and correct copy of the foregoing document

was served by electronic mail on plaintiff Markcus Kitchens, Jr. at markzwanz@gmail.com

<u>/s/ Caroline M. Mew</u>