UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DR. MARKCUS KITCHENS, JR. | ) | |
| PLAINTIFF | ) | |
| | ) | CIVIL ACTION NO.: |
| v. | ) | 2:22-CV-03301-JMY |
| | ) | |
| NATIONAL BOARD OF MEDICAL EXAMINERS | ) | |
| DEFENDANT | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S SUR-REPLY POST-TRIAL BRIEF**

Dr. Markcus Kitchens, Jr.
625 Hampton Way, #2
Richmond, KY 40475
*Pro Se Plaintiff*

CERTIFICATE OF SERVICE

It is hereby certified that this Brief was served upon the Court via PACER, and copies were served

via electronic mail upon Jared D. Bayer, Cozen O'Connor, 1650 Market Street, Suite 2800,

Philadelphia, Pennsylvania, 19103 and Caroline M. Mew, Perkins Coie, LLP, 700 Thirteenth

Street, N.W., Suite 800. Washington, D.C., 20005-3960 on this the 3rd day of August, 2023.

Dr. Markcus Kitchens, Jr.
625 Hampton Way, #2
Richmond, KY 40475
*Pro Se Plaintiff*

<u>**TABLE OF ARGUMENTS**</u>

**ARGUMENT** ................................................................................................... **5**

**1   DR. KITCHENS HAS MET HIS BURDEN OF PROOF FOR DISABILITY UNDER THE ADAA** ............................................................................................... **5**

   1.1   Dr. Kitchens is Substantially Limited in Major Life Activities Related to the USMLE . 5

   1.2   Changing the Requested Accommodation Is Not Indicative of Disability ..................... 9

**2   ADA REQUIREMENTS FOR ACCOMMODATION APPLICATIONS** .................... **13**

   2.1   The CBSE Performance is Irrelevant (Accommodation Doesn't Dictate Success) ....... 14

   2.2   Prior Accommodations Were Provided ........................................................... 16

   2.3   NBME Guidelines for Accommodation Applications .................................... 18

**3   NBME DISABILITY SERVICES** .................................................................. **21**

   3.1   The NBME Cannot Account for Systemic Racism and Implicit Biases ........................ 21

**4   THE USMLE-NBME-FSMB RELATIONSHIP** ................................................ **24**

   4.1   The NBME's Discriminatory Decision-Making Goes Beyond the USMLE ................ 24

   4.2   The Employment Discrimination Burden-Shifting Framework is a Proposed Solution 27

**5   FUTILITY AND U.S.C. §12188** .................................................................. **27**

   5.1   Taking the USMLE Unaccommodated Is the Norm ...................................... 27

**CONCLUSION** ......................................................................................... **30**

## TABLE OF AUTHORITIES

**Cases**

*Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 258 (3d Cir. July 31, 2020) ...............................16

*Sampson v. Nat'l Bd. Of Med. Exam'rs*, 2022 U.S. Dist. LEXIS 21763 (E.D. PA, Dec. 2, 2022) ..........29

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 2023 U.S. LEXIS 2791, 311
      (June 29, 2023)(Jackson, K., dissenting). .................................................................................22

**Other Authorities**

*About the USMLE*, USMLE ..............................................................................................24, 25, 26

*Comprehensive Basic Science Subject Exam-Content Outline*, NBME (Aug. 3, 2023),
      https://www.nbme.org/subject-exams/comprehensive/basic-science. ..............................................14

*Notice Concerning the Americans with Disabilities Act (ADA) Amendments Act of 2008*, U.S. Equal
      Employment Opportunity Commission, (Aug. 3, 2023), https://www.eeoc.gov/statutes/notice-
      concerning-americans-disabilities-act-ada-amendments-act-2008...................................................13

*Our Collaborators: About NBME*, NBME ......................................................................................25

U.S. Dep't of Justice, Civil Rights Division Disability Rights Section, *ADA Requirements: Testing
      Accommodations,* (Sept. 15, 2010) https://archive.ada.gov/regs2014/testing_accommodations.html...17

U.S. Department of Education: National Center for Education Statistics, *America's High School
      Graduates*, p. 13, chrome-
      extension://efaidnbmnnnibpcajpcglclefindmkaj/https://nces.ed.gov/nationsreportcard/pdf/studies/20114
      62.pdf. .................................................................................................................................. 7

**Regulations**

28 C.F.R. §36.501(b) .....................................................................................................................26

**Trial Transcript**

77-19, Outcome File, Feb. 25, 2022 Step 1 ......................................................................................11

Dr. Allen Testimony ...........................................................................................................6, 21, 23

Dr. Jurich Testimony ............................................................................................................. passim

Dr. Kitchens Testimony .......................................................................................................... passim

Dr. McGeehan Testimony...............................................................................................................11, 17

Dr. Pullins Testimony ...................................................................................................................21

Dr. Senoga Testimony....................................................................................................................26

Ms. Convery Testimony .................................................................................15, 19, 20, 22

**Docket Entry**

77-13, Timing Review for Feb. 25, 2022 STEP 1 Exam ..................................................................... 8

77-14, Timing Review for May 9, 2022 STEP 1 Exam...................................................................... 8

77-16, Timing Review for June 29, 2022 STEP 2 Exam .................................................................... 8

77-17, Timing Review for September 29, 2022 STEP 1 EXAM ......................................................... 8

77-24, Application for Accommodations dated 10/31/2021.................................................................16

77-25 Application for Accommodations dated 8/30/2022 ..................................................................16

77-26, NBME Letter to M. Kitchens dated 2/8/2022 ........................................................................10

77-28, Berea College Disability Services Progress Note 1/11/2013 .................................................... 6

77-3, Hamilton County Schools Transcript (Grades 8-12)................................................................5, 7

77-30, Berea College Disability Services progress Note 3/20/2014 .................................................... 6

77-38, ADHD DSM-5 ................................................................................................................7, 22

77-4, Berea College Transcript........................................................................................................5, 6

77-41, CBSSA Report 2/14/2022.................................................................................. 9
77-42, CBSSA Report 3/21/2022.................................................................................. 9
77-43, CBSSA Report 4/1/2022 ................................................................................... 9
77-48, "Impact of USMLE STEP 1 Study" ...........................................................28, 29
**Deposition Transcript**
Dr. Kitchens Depo...........................................................................................................10
**United States Code**
42 U.S.C. §12188 ...........................................................................................................27
42 U.S.C.A. § 12101(2)(a)(2)..........................................................................................21

Plaintiff, Dr. Markcus Kitchens, Jr. (hereby "Dr. Kitchens"), pro se, tenders the following Sur-Reply Post-Trial Brief pursuant to the briefing schedule entered on May 18, 2023. For the reasons set forth below, this Court should determine that Dr. Kitchens is disabled as defined by the Americans with Disabilities Act ("ADA") and is entitled to injunctive relief under Title III, including the expungement of his examination transcript.

## INTRODUCTION

The present case centers on the undeniable importance of upholding the principles enshrined in the Americans with Disabilities Act (ADA), a landmark legislation aimed at ensuring equal opportunities and access to individuals with disabilities. Dr. Kitchens encountered a daunting journey plagued by prejudice, unjust denials, and a lack of consideration for his unique challenges. Defendant NBME's disability services department is rife with inadequacies and inherent biases. Moreover, the NBME's website and guidelines, purportedly designed to accommodate individuals with disabilities, fail to align with their stated mission. These outdated and unsatisfactory policies create a vicious cycle that deters applicants from seeking the accommodations they rightfully deserve. While Defendant NBME may feign ignorance, race plays an undeniable role in accessibility within the healthcare system, as acknowledged by numerous studies and expert testimonies. The stark absence of diversity in the disability services department hinders the

NBME's ability to comprehend the unique challenges faced by individuals of African American descent, including Dr. Kitchens.

ARGUMENT

## 1   DR. KITCHENS HAS MET HIS BURDEN OF PROOF FOR DISABILITY UNDER THE ADAA

### 1.1   <u>Dr. Kitchens is Substantially Limited in Major Life Activities Related to the USMLE</u>

The evidence at trial, including medical evidence, transcripts, fact witness testimony, expert witness testimony, and the plaintiff himself, decisively supports Dr. Kitchens substantial limitations with ADHD and anxiety in comparison to the general population. As demonstrated by Dr. Kitchens' academic performance, letters of recommendation by treating physicians, and by the time and energy devoted to progressing through academics, the reason Markcus Kitchens, Jr. has Medical Doctor behind his name is a testament to his perseverance and dedication. Not because he wants special treatment because he has 'difficulty with really hard tasks', as the NBME would characterize him, but rather because he worked to overcome the limitations that ADHD and anxiety presented.

The NBME's position that the severity of ADHD symptoms cannot be determined by the dosage of medication prescribed by treating physicians' flies in the face of what medical physicians do on a daily basis. Specifically, as it relates to Dr. Kitchens' prescription for Adderall, this argument is untenable. In high school, Dr. Kitchens received predominately Bs with grades in writing and reading heavy courses in the low Bs-high Cs range (World History, English WS, ACT Prep).[1] In early college courses, Dr. Kitchens received grades ranging from F, D, C-, C, and C+ in courses ranging from "American History Since 1865", "Understandings of Christianity", "Family Relations (WGS)", and "Experimental Zoology".[2] As the medical evidence demonstrated, Dr.

---

[1] *See* D.E. 77-3, p. 1, Hamilton County Schools Transcript (Grades 8-12).
[2] *See* D.E. 77-4, p. 1, Berea College Transcript.

Kitchens began receiving twenty milligrams (20 mg) of Adderall in 2013 as a second semester sophomore at Berea College.[3] However, his grades did not exponentially improve as one would expect if an individual was abusing the medication or malingering. Case in point, in Spring, 2014, Dr. Kitchens received Cs, C+s, and D+s *while taking Adderall*.[4] (Emphasis added). As Dr. Allen testified,

| | |
|---|---|
| Dr. Kitchens: | [I]sn't it true that ADHD is associated with reduced school performance? |
| Dr. Allen: | Generally, yes. |
| Dr. Kitchens: | Part of your testimony today was based off of records where I was diagnosed with ADHD in 2013 and 2014, correct? |
| Dr. Allen: | [Y]es. |
| Dr. Kitchens: | [E]arlier you testified that a person taking Adderall would be more focused, correct? |
| Dr. Allen: | Yes. |
| Dr. Kitchens: | Isn't it true that there is a stigma that college students abuse Adderall to be more focused and receive better grades? |
| Dr. Allen: | Yes. |

*See* Dr. Allen Testimony, Day 4, 73: 13-25, 74: 1.

If Dr. Kitchens truly was abusing his medication to gain an advantage over his peers, as the NBME claims, his grades after starting Adderall should have demonstrated a meaningful improvement compared to his grades prior to taking the medication. The fact that it does not further demonstrates how substantially limited Dr. Kitchens is as compared to the general population *even with* mitigating factors such as medication. According to the U.S. Department of Education 'Nation's

---

[3] *See* D.E. 77-28, p. 1, Berea College Disability Services Progress Note 1/11/2013. *E.g.* D.E. 77-30, p. 1, Berea College Disability Services progress Note 3/20/2014.
[4] *See* D.E. 77-4, p. 1 Berea College Transcript.

Report Card', in 2009 the overall GPA for high school graduates was 3.00.[5] According to Figure 30, the average GPA trend by race/ethnicity was 2.97. In 2010, Dr. Kitchens graduated from high school with a cumulative GPA of 2.812, the average GPA of high schoolers in 1998.[6]

These limitations, which required informal and formal accommodation, date back as far as elementary school, as indicated by Hamilton County Elementary School's SAIL Reading Program. While ADHD and anxiety are not reading impairments per se, the DSM-5 characterizes ADHD as "a persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development".[7] The DSM-5 outlines symptoms of ADHD including "[o]ften has difficulty sustaining attention in tasks or play activities (e.g. has **difficulty remaining focused** during lectures, conversations, or **lengthy reading**)... often avoids, dislikes, or is reluctant to engage in tasks that require sustained mental effort (e.g. schoolwork or homework; for older adolescents and adults, preparing reports, completing forms, reviewing lengthy papers)...."[8] (Emphasis added). Though the USMLE STEP Examinations are not a reading test, each exam requires an exorbitant amount of concentration. For Dr. Kitchens:

> The [CBSSA and the USMLE STEP Examination] were completely different. Completely different. Whereas on the CBSSA, … [you] see what type of questions those were versus on the USMLE. [Questions on the USMLE] were sometimes paragraphs long plus many la[b]s for one question. So when I was taking the exam – it took so much more concentration for me on this examination….[9]

---

[5] U.S. Department of Education: National Center for Education Statistics, *America's High School Graduates*, p. 13, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://nces.ed.gov/nationsreportcard/pdf/studies/2011462 .pdf.
[6] *See* D.E. 77-3, p. 1, Hamilton County Schools Transcript (Grades 8-12).
[7] *See* D.E. 77-38 p. 1, ADHD DSM-5.
[8] *See* D.E. 77-38 p. 1, ¶¶ b, f, ADHD DSM-5.
[9] *See* Dr. Kitchens Testimony, Day 2, 157: 13-21.

As explained by Dr. Jurich "each block is given an hour, or sixty (60) minutes, and there are forty (40) items within each block."[10] While the NBME focuses primarily on the amount of break time (used or unused by Dr. Kitchens) the significant portion of the Timing Review is the "Unused Block Time". During Dr. Kitchens' February 25, 2022 STEP 1 Exam, the *total* unused block time was five minutes eight seconds (5:08)[11]; on the May 9, 2022 STEP 1 Exam, the total unused block time was sixteen minutes six seconds (16:06)[12]; on the June 29, 2022 STEP 2 Exam, the total unused block time was eight minutes ten seconds (8:10)[13]; and on the September 29, 2022 STEP 1 Exam, the unused block time was three minutes twenty five seconds (3:25)[14]. For almost every exam, Dr. Kitchens used all but ten to fifteen minutes of an eight hour exam; but despite the amount of time spent on the questions, Dr. Kitchens tested beneath the bell curve or at the lowest end of the curve.

The stark contrast between Dr. Kitchens' CBSSA Score – taken just over a week prior – as compared to his USMLE STEP 1 Exams empirically demonstrates his need for double time. The NBME's website explains how the purpose behind the CBSSAs

> CBSSA results can be used in conjunction with other information to assess readiness [f]or the USMLE Step 1, especially when the self-assessment is taken in conditions that mirror a STEP 1 administration.
>
> ---
>
> [The CBSSA likely score range shows how much your score could vary if you tested again without learning or forgetting any information.] Under those conditions, your score would fall within four (4) points of the reported score two-thirds of the time. It could be four points lower or higher.
>
> ---

---

[10] *See* Dr. Jurich Testimony, Day 4, 95: 19-21.
[11] *See* D.E. 77-13, p. 1, Timing Review for Feb. 25, 2022 STEP 1 Exam.
[12] *See* D.E. 77-14, p. 1, Timing Review for May 9, 2022 STEP 1 Exam.
[13] *See* D.E. 77-16, p. 1, Timing Review for June 29, 2022 STEP 2 Exam.
[14] *See* D.E. 77-17, p. 1, Timing Review for September 29, 2022 STEP 1 Exam.

> If [your] CBSSA likely score range is completely above the STEP 1 low-pass range, you are likely ready to take STEP 1.

*See* Dr. Jurich Testimony, Day 4, 113: 24-25, 114: 1-5, 22-24. 115: 2-4.

For each CBSSA taken: February 14, 2022[15], March 21, 2022[16], and April 1, 2022[17] Dr. Kitchens received scores comfortably in the passing range. It is clear that Dr. Kitchens' performance on the USMLE STEP 1 Exams does not accurately reflect his true abilities and readiness on the merits of the USMLE. The consistent and substantial amount of unused block time in each of the exams, coupled with Dr. Kitchens' performance on the CBSSA tests, vividly demonstrates his need for double time during the examination process. The CBSSA, designed to simulate real exam conditions, has reliably shown that Dr. Kitchens possesses the knowledge and aptitude to succeed when granted the appropriate time accommodations.

1.2   Changing the Requested Accommodation Is Not Indicative of Disability

Dr. Kitchens submitted two applications for accommodation: in January, 2022 for time plus one hundred percent ("double-time") and again in August, 2022 for time plus fifty percent ("time and a half"). Defendant NBME would point to Dr. Kitchens' change in requested time as an admission by Dr. Kitchens' that he was not disabled under the ADA. However, this retroactive application of Dr. Kitchens' current knowledge of accommodation application(s) gives a sinister view to innocent intentions. As explained by Dr. Kitchens:

> Accommodations I requested for additional time… as we can see it says, STEP 1 check only one box here, I did additional break time over two days and I also selected 100 percent of time over two days…. [N]ot only that I also know that when

---

[15] According to the CBSSA taken on February 14, 2022, Dr. Kitchens received a 212 under standard testing conditions. *See* D.E. 77-41, p. 1, CBSSA Report 2/14/2022.

[16] According to the CBSSA taken on March 21, 2022, Dr. Kitchens received a total equated percent correct score of 77%. In bold print, the Assessment states that 'based on your performance on this CBSSA, your estimated probability of passing STEP 1… is 99%.' *See* D.E. 77-42, p. 1, CBSSA Report 3/21/2022.

[17] According to the CBSSA taken on April 1, 2022, Dr. Kitchens received a total equated percent correct score of 69%. In bold print, the Assessment states that 'based on your performance on this CBSSA, you estimated probability of passing STEP 1… is 97%.' *See* D.E. 77-43, p. 1, CBSSA Report 4/1/2022.

applying for accommodations to take the NBME by the [medical] University, that we got one hundred percent (100%) of time. So I decided on here that I would do the exact same thing on this documentation.

See Dr. Kitchens Testimony, Day 2, 129: 17-21, 130: 4-7.

| | |
|---|---|
| Mr. Burgoyne: | Ok. Alright. And at this time you are asking for fifty percent extra time, not 100% extra time, and you are asking for additional break time. Is that an accurate summary of the accommodations you were requesting? |
| Dr. Kitchens: | I checked the fifty percent (50%) mark because I was trying to think that, well, if the NBME will not allow me to have the one hundred percent (100%) that I'm wanting and that I have been requesting, just maybe if I apply for the fifty percent (50%) maybe [the NBME] will give that to me. The same reason in, you know, possibly different conversations or negotiations people may go and meet in the middle somewhere. So yes, it is requesting for fifty percent (50%) but the need is one hundred percent (100%). |

See Dr. Kitchens Depo., 109: 12-25, 110: 1.

To the average bystander, this explanation not only makes sense, it is a reasonable response. A month after Dr. Kitchens' application was submitted, the NBME's letter denying his application emphasized the physician's failure to explain why Dr. Kitchens needed *double time*.[18] As the NBME has repeatedly stated, Dr. Kitchens provided little to no evidence indicating his mental impairment(s), let alone his substantial limitation. This approach is particularly understandable when, according to Defendant's supplemented Interrogatory response to the undersigned, Defendant NBME received "two thousand four hundred sixty-seven (2,467) accommodation requests and two thousand eighty five (2,085) of those requests were granted in whole or in part" between December 1, 2021 and November 30, 2022.[19]

---

[18] *See* D.E. 77-26, NBME Letter to M. Kitchens dated 2/8/2022.
[19] *See* 2023-0428 LF Mew.

Defendant NBME claims that Dr. McGeehan's "at least two or so hours, maybe more" review, and eventual denial, of Dr. Kitchens' accommodation request was not a mistake.[20] Notwithstanding NBME's lack of medical training, credential requirements for disability analysts, or Dr. McGeehan's own testimony about her qualifications, Dr. McGeehan testified that last year "the total number we received are two thousand five hundred (2,500), but **not all of those requests are comprehensively and thoroughly reviewed**."[21] (Emphasis added). Dr. McGeehan, as the Manager of Examinee Accommodations in Disability Services with other responsibilities atop of management and reviewing accommodation applications,[22] freely admits that not all accommodation requests are thoroughly reviewed; for an individual who would not know the specific number of accommodation applications submitted in any given year, it would stand to reason that submitting a second request for less than the full time necessary in the hopes of receiving *some form* of accommodation would be more likely to be granted than attempting to apply a second time.

Moreover, double time is the appropriate accommodation based on Dr. Kitchens' performance on each USMLE examination. Dr. Jurich specified that "the average amount of time per [question] is **ninety (90) seconds**".[23] According to the NBME's Outcome File for the February 25, 2022 STEP 1 Exam, Dr. Kitchens spent more than ninety seconds on a number of questions, but not just a little bit more – for a number of questions, Dr. Kitchens spent *significantly* more time on a question (220.30 seconds, 254.60 seconds, 237.2 seconds, and 186.4 seconds).[24] Not only did

---

[20] *See* Dr. McGeehan Testimony, Day 3, 223: 12-13.
[21] *See* Dr. McGeehan Testimony, Day 3, 249: 5-7.
[22] Dr. McGeehan testified during trial that she reviews applications as well doing other activities assumedly related to her job. *See* Dr. McGeehan Testimony, Day 3, 246: 11-20.
[23] *See* Dr. Jurich Testimony, Day 4, 95: 19-21.
[24] *See* D.E. 77-19, p. 1, Outcome File, Feb. 25, 2022 Step 1.

Dr. Kitchens spend more time on questions within the block(s), when asked if Dr. Kitchens used

all of the time allotted for his exam, Dr. Jurich indicated that he had.

Dr. Kitchens:  Do you see used time per block there[?]

Dr. Jurich:     Yes.

Dr. Kitchens:  Do you see that it's for the first block is twenty-four (24) seconds
                left?

Dr. Jurich:     Yes, the first multiple choice question[s], yes.

Dr. Kitchens:  [I]s it safe to say that the majority of the blocks, the time is expired?

Dr. Jurich:     Yes.

*See* Dr. Jurich Testimony, Day 4, 118: 9-23.

Without the additional time to review and comprehend the fact pattern, Dr. Kitchens is not

able to access the exam in the same manner as his neurotypical peers are. Dr. Jurich confirms as

much when asked about the unused block time. Additionally, when asked by the Court why the

USMLE was timed, Dr. Jurich stated

The Court:      Why is the NBME Exam timed? The USMLE, I suppose?

Dr. Jurich:     Several factors, I would say. I think one is practicality and having it
                be within a certain set amount of time for everyone. Because for
                equity purposes, individuals who maybe do not have the resources
                to spend more additional time on the exam might be an advantage
                potentially by that and vise versa. So it adds this level of
                standardization and comparability…

The Court:      Is part of what the USMLE is testing, the speed at which a test taker
                can accomplish answering the questions?

Dr. Jurich:     No. Speed is not a part of the construct.

The Court:      Have you, I suppose, in your duties at NBME, have you ever been
                involved with using the psychometric data that you collect to study
                the effects of accommodations?

Dr. Jurich:     Not me personally, and not that I am aware of.

*See* Dr. Jurich Testimony, Day 4, 131: 5-24.

Defendant NBME argues that a time limit creates 'standardization and comparability' but when accommodations are improperly withheld, examination results – such as Dr. Kitchens' – cannot be compared to other examinees. Especially when taking into account that the USMLE STEP Examinations are closed book, "no materials [are] allowed in the testing center, it is just the examinee and the exam… a student would not be able to [leave the prometric center] to complete the same items they would have seen before."[25] Although Defendant NBME would argue that the exam is comparable because of timing requirements, due to the exam being closed book, it would not matter how long is spent on a particular question and/or block. It is the timing constraint(s) that impedes Dr. Kitchens' performance. As the saying goes, either you know it or you do not. In this case, Dr. Kitchens knows the information, he does not have the time necessary to "focus on the question and have a chance to select the correct answer."[26]

## 2    ADA REQUIREMENTS FOR ACCOMMODATION APPLICATIONS

Congress made their legislative intent clear when enacting the ADA and the ADAA - accommodations were meant to provide equal *access* to standardized licensing examinations - not to improve a disabled examinee's likelihood of passing. As explained by the U.S. Equal Employment Opportunity Commission, "the effect of [the Americans with Disabilities Act Amendments Act of 2008] is to make it *easier* for an individual seeking protection under the ADA to establish that he has a disability within the meaning of the ADA."[27]

---

[25] *See* Dr. Jurich Testimony, Day 4, 134: 14-25.
[26] *See* Dr. Kitchens Testimony, Day 4, 143: 16-18.
[27] *Notice Concerning the Americans with Disabilities Act (ADA) Amendments Act of 2008*, U.S. Equal Employment Opportunity Commission, (Aug. 3, 2023), https://www.eeoc.gov/statutes/notice-concerning-americans-disabilities-act-ada-amendments-act-2008.

2.1   <u>The CBSE Performance is Irrelevant (Accommodation Doesn't Dictate Success)</u>

Defendant NBME attempts to shift their failure to grant accommodations onto Dr. Kitchens by citing, at least in part, that due to his failure on the CBSE *with* accommodations, he is not entitled to additional-double testing time. According to the NBME's website, the Comprehensive Basic Science Subject Exam ("CBSSE") is a "general integrated achievement test covering material typically learned during basic science education… [t]he exam reflects content coverage on USMLE STEP 1 and uses the same item formats."[28] It is not a test intended to determine preparedness for the USMLE as the CBSSA is, and while the exam reflects content coverage, it is not the practice test designed specifically for the USMLE STEP Exam(s). Therefore Dr. Kitchens' score on the CBSSE, whether pass or fail, is negligible when considering accommodation eligibility.  Dr. Jurich acknowledges this point when he indicated how accommodations function:

> [w]hen the appropriate accommodation is given and justified, it allows the performance – or the exam administration becomes more comparable in terms of adjusting for that accommodation when the accommodation is unrelated to the skills being measured in the assessment. So it essentially allows that individual to test in a more comparable setting as the standard time and the standard conditions.

*See* Dr. Jurich Testimony, Day 4, 127: 5-13.

Defendant NBME's argument that a poor score on 'an achievement test' ought to be a determinative factor for accommodation application(s) is improper in that the eligibility of an examinee does not change simply due to their success/failure on a practice examination (accommodated or not). Not only is a prior practice exam score *not* indicative of an individual's disability, in light of Ms. Convery's testimony regarding the hiring and training requirements of Defendant's disability services department, this argument is especially egregious.

---

[28] *Comprehensive Basic Science Subject Exam-Content Outline*, NBME (Aug. 3, 2023), https://www.nbme.org/subject-exams/comprehensive/basic-science.

| Dr. Kitchens: | [T]he NBME does not require disability service specialists to have any medical knowledge, correct? |
|---|---|
| Ms. Convery: | Correct. |
| Dr. Kitchens: | [T]he NBME does not require disability services experts to have medical knowledge, correct? |
| --- | |
| The Court: | I thought I heard that the answer is no, not expressly…. |
| Dr. Kitchens: | NBME does not require for a person in disability services… who have a Ph.D., so they are a doctor, to have clinical medical experience? |
| Ms. Convery: | [N]o. |

*See* Ms. Convery Testimony, Day 3, 74: 22-25; 75: 1; 76: 13-15, 18-21.

Defendant NBME would have applicants not only bear the burden of proving their disability to a department that has **no medical training, expertise, or ability to properly evaluate** lived experiences of disabled persons of color, but also require applicants to repeatedly demonstrate their disability should they fail the examination(s) with accommodations. As Dr. McGeehan demonstrates, Defendant NBME's ability to evaluate documentation submitted by examinees is unreliable at best.

| Dr. Kitchens: | [I]sn't it true that… there ha[ve] been applicants who have submitted all of the things that… [the] NBME requests from their guidelines for accommodations and were denied? |
|---|---|
| Dr. McGeehan: | No, if it didn't support their requests. |

*See* Dr. McGeehan Testimony, Day 3, 230: 8-13.

In their defense to their own expert witness testimony, Defendant NBME would resort to belittling and employing elaborate titles-degrees as a means to assert their authority and undermine the expertise of a treating physician. A tactic that lacks credibility and veers from sound reasoning and established precedent. The DOJ clearly stated "[r]eports from experts who have personal

familiarity with the candidate should take precedence over those from… reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment."[29]  Defendant NBME's repeated claims that there is no requirement for deference to treating physicians in opposition to their own 'educated' disability service staff asks the Court to uphold the opinions of evaluating academics with little to no medical education-experience and training over medical professionals who *actually treat* patients on a day-to-day basis. This directly contradicts Congressional intent and makes accommodation applications for disabled individuals more prohibitive. Defendant NBME, by way of Dr. Jurich's testimony indicates the understanding that accommodations are meant to level the playing field and allow individuals to perform at their best regardless of their disability.

## 2.2   Prior Accommodations Were Provided

In both applications for accommodations, Dr. Kitchens submitted documentation evincing past testing accommodation(s) in a similar test setting. As demonstrated by the confirmation email from the Prometric Center, (Defendant's third party vendor), Dr. Kitchens received additional time on his CBSE.[30] Dr. McGeehan confirmed as much:

| | |
|---|---|
| Dr. Kitchens: | Do you see… where I took this CBSE provided by my university? |
| Dr. McGeehan: | Mm-hmm. |
| Dr. Kitchens: | Do you see where it says "Testing Accommodations"? |
| Dr. McGeehan: | Yes. |
| Dr. Kitchens: | [W]hat [does] that say[] below it? |

---

[29] *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 258 (3d Cir. July 31, 2020) quoting *Cooper v. Harris*, 137 S. Ct. 1455, 1474, 197 L. #d. 2d 837 (2017).
Ct. 1455, 1474, 197 L. #d. 2d 837 (2017).
[30] *See* D.E. 77-24, Application for Accommodations dated 10/31/2021 and D.E. 77-25 Application for Accommodations dated 8/30/2022.

Dr. McGeehan:          It says "extended time."

See Dr. McGeehan Testimony, Day 3, 93: 1-8.

Dr. McGeehan goes on to say that the email should not be considered an official record of testing

accommodation being provided, however, when asked how the accommodation was listed Dr.

McGeehan conceded that the university would have to get permission from the NBME in order to

provide accommodations.

> Dr. Kitchens:          Isn't it true that the university has to first purchase the examination from the NBME?
>
> Dr. McGeehan:          Correct, yes.
>
> Dr. Kitchens:          [I]sn't it true that [the university] then ha[s] to get permission whether or not to provide accommodations on these particular examinations?
>
> Dr. McGeehan:          Yes, they do.

See Dr. McGeehan Testimony, Day 3, 93: 16-23.

Dr. McGeehan made it clear, the CBSE "is a subject exam" provided by the NBME, and therefore

is a standardized exam under the ADA.[31] As the DOJ indicated:

> If a candidate requests the same testing accommodations he or she previously received on a similar standardized exam or high-stakes test, provides proof of having received the previous testing accommodations, and certifies his or her current need for the testing accommodations due to disability, then a testing entity should generally grant the same testing accommodations for the current standardized exam or high-stakes test without requesting further documentation from the candidate."[32]

Defendant NBME cannot have their cake and eat it too. If the CBSE is a standardized exam

provided by the NBME, then Dr. Kitchens provided proof of formal accommodations on a similar

high stakes exam, requested the same testing accommodation on the STEP 1 exam, and should be

---

[31] See Dr. McGeehan Testimony, Day 3, 94: 2.
[32] U.S. Dep't of Justice, Civil Rights Division Disability Rights Section, *ADA Requirements: Testing Accommodations,* (Sept. 15, 2010) https://archive.ada.gov/regs2014/testing_accommodations.html.

granted the accommodation without further documentation required. If the CBSE is a high stakes subject exam used by the school, then Dr. Kitchens provided proof of formal accommodation during medical school and the NBME must value the confirmation email denoting the accommodation as documentation of a past testing accommodation.

2.3   NBME Guidelines for Accommodation Applications

Defendant NBME's guidelines are outdated and fail to account for the intersectionality of race and disability. Guidelines, particularly for medicine, have to be periodically updated to ensure they remain relevant, reflect current knowledge, and adapt to evolving circumstances or needs. Yet, according to the **Director** of Disability Services, guidelines that have not been updated in *at least* five years – guidelines that make no mention of unofficial accommodations or how to account for it – were not outdated.

| | |
|---|---|
| Ms. Convery: | Many of these guidelines have been in place for many years. I am generally aware of them and refer to them but we have not altered these guidelines in many years, and not in my time as director. |
| Dr. Kitchens: | [I]n a rough estimate, … when was the last time that you can recall these guidelines were updated? |
| Ms. Convery: | I cannot recall specifically. |
| Dr. Kitchens: | Five years? |
| Ms. Convery: | At least five years but again, … I don't have a solid recollection of when they were last formally updated. |
| --- | |
| Dr. Kitchens: | [I]sn't it safe to say that… these guidelines are outdated for today's times? |
| Ms. Convery: | No. |
| Dr. Kitchens: | And why is that? |
| Ms. Convery: | Because the[] [NBME] guidelines are still applicable to today's guidelines, otherwise [the NBME guidelines] would |

> have been updated sooner if we had thought they were
> outdated.

*See* Ms. Convery Testimony, Day 3, 84: 19-25, 85: 1-17.

Because Defendant NBME used these guideline(s) as a procedural rubric for their disability

analysts-specialists, and had not updated their guidelines in over 5 years, the NBME failed to offer

adequate and up-to-date requirements for analysts to accurately determine an individual's disability

status. This is further demonstrated when Ms. Convery was asked where in the guidelines

unofficial accommodations were addressed:

| | |
|---|---|
| Dr. Kitchens: | [W]ouldn't it be safe to say that there is no language in this document for unofficial accommodations? |
| Ms. Convery: | Yes. |

*See* Ms. Convery Testimony, Day 3, 103: 1-4.

Defendant's disability services department is *currently* inept at valuing unofficial

accommodations, and *has been for at least five years*. But Defendant NBME would lay blame at

the examinee's feet for failing to provide documentation that meets the standards of obsolete rules.

By the same token, Defendant NBME argues that 'all documents are considered' in an examinee's

application for accommodations, whilst their own website indicates otherwise.

| | |
|---|---|
| Dr. Kitchens: | [D]o you see where it states, "Requests for Accommodations must include the following"? |
| Ms. Convery: | Yes. |
| --- | |
| Dr. Kitchens: | [W]ould you consider a teacher to be a professional? |
| Ms. Convery: | Yes. |
| Dr. Kitchens: | [I]sn't it true that a letter is considered a correspondence? |
| Ms. Convery: | A letter is correspondence, yes. |

| | |
|---|---|
| Dr. Kitchens: | So a letter from a teacher would have to be on the school's official letterhead, correct? |
| Ms. Convery: | No, if the school has letterhead, sure, preferably. |
| Dr. Kitchens: | [D]oes the NBME accept letters from a teacher without a letterhead? |
| Ms. Convery: | Yes, we do. |
| Dr. Kitchens: | [D]o you recognize this document this is one we just went over? PX69? |
| Ms. Convery: | Yes, I do recognize it. |
| Dr. Kitchens: | Can you read [the second bullet point] out loud for the record? |
| Ms. Convery: | "Reports and correspondence from professionals **must be** typewritten on official letterhead, dated and signed by the professional. Handwritten or unsigned letters from physicians or evaluators will not be accepted." |
| Dr. Kitchens: | So isn't it true that a teacher must write a letter of recommendation on an official letterhead? |
| Ms. Convery: | [**Y]es.** |

(Emphasis added). *See* Ms. Convery Testimony, Day 3, 95: 15-25; 96: 1-8, 17-25.

If Defendant NBME's website does not align with the documentation that Defendant NBME espouses as acceptable, how can the 'appropriate' documentation be submitted for evaluation? The answer is it cannot.

This is evident in Defendant NBME's argument that should an examinee alter or amend their application for accommodation it ought to disqualify an examinee from eligibility for accommodations. This too is improper; as Congress made clear in the ADAA, "people with physical or mental disabilities are frequently precluded [from fully participating in all aspects of society] because of prejudice, antiquated attitudes, or the failure to remove societal and

institutional barriers."[33] Due to Defendant's lack of training and experience, an examinee applying for accommodations can hardly be faulted for trying to accommodate the Defendant's own shortcomings. Particularly in the case at hand wherein Defendant NBME claimed that it was Dr. Kitchens' treating physicians' lack of specificity and explanation that caused his application to be rejected. Just as individuals in various real-life situations must make compromises to attain essential benefits, so too, examinees with limited knowledge of the inner workings, guidelines, and requirements would also propose compromises to gain some accommodation(s) rather than nothing at all.

## 3   NBME DISABILITY SERVICES

### 3.1   The NBME Cannot Account for Systemic Racism and Implicit Biases

As of 2023, African American male physicians make up "less than three (3%) percent of all African American physicians, … I think [it is] two-point-seven (2.7%) percent. In 1940, the percentage of African American males was two-point-eight (2.8%) percent."[34] The NBME, as demonstrated throughout litigation, considers race so immaterial they make no mention of it in their argument(s). However, race plays a definitive role in accessibility. As Dr. Allen stated:

> There is no doubt that there is an access problem for mental health services in this country, and that minorities are disproportionately subjected to that lack of access, that is undoubted.[35]

Systemic racism aside, access does not simply mean whether an individual has the ability to go to a physician if they needed one. Cultural biases such as providers' perceptions, communication, and treatment decisions all lead to disparaging access for individuals across cultural backgrounds. In the African American community "as a whole… mental health is still a very taboo topic."[36] For

---

[33] 42 U.S.C.A. § 12101(2)(a)(2) quoting Americans with Disabilities Act Amendments Act of 2008.
[34] *See* Dr. Pullins Testimony, Day 1, 79: 14-19.
[35] *See* Dr. Allen Testimony, Day 4, 64: 9-12.
[36] *See* Dr. Pullins Testimony, Day 1, 76: 3-5.

African American families, let alone African American men, the lack of health literacy around mental health creates a chain reaction in lack of treatment, lack of accommodation, and overall lack of understanding that puts individuals such as Dr. Kitchens at the mercy of the NBME. The cultural biases and systemic racism are so prevalent in healthcare, the DSM-5 includes a sub-section titled 'Culture-Related Diagnostic Issues' wherein "[c]linical identification rates in the United States for <u>African American</u> and Latino populations tend to be **lower** than for Caucasian populations."[37]

Supreme Court Justice Ketanji Brown Jackson aptly stated "[d]eeming race irrelevant in law does not make it so in life."[38] In Defendant NBME's entire Disability Services Department, there is not a single African American person (male or female).

| Dr. Kitchens: | How many of your disability assessment analysts are African American in your department? |
|---|---|
| Ms. Convery: | We do not have anybody that is African American. |
| Dr. Kitchens: | How many disability specialists are African American are in your department? |
| Ms. Convery: | Currently today, none. |
| Dr. Kitchens: | In your direct department, how many African Americans are under your watch? |
| Ms. Convery: | Currently, today, there are none. |
| Dr. Kitchens: | So it's true to say that… there are no African Americans represented in your department as a whole? |
| Ms. Convery: | As of today, that's correct. |

*See* Ms. Convery Testimony, Day 3, 107: 14-25, 108: 1-3.

---

[37] *See* D.E. 77-38, p. 4, ADHD DSM-5.
[38] *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.,* 2023 U.S. LEXIS 2791, 311 (June 29, 2023)(Jackson, K., dissenting).

The absence of black evaluators for disability accommodation requests creates a significant barrier to understanding the unique challenges faced by individuals of African American descent. The lived experiences of racial minorities, including the ways in which race intersects with disability, are often overlooked or misunderstood when there is a lack of diverse perspectives in the evaluation process. Even in Defendant NBME's *third-party evaluators* this lack of diversity resonates. Dr. Allen, one of Defendant NBME's Americans with Disabilities Act consultants, reinforced these shortcomings when he identified the demographic of his patients.

| | |
|---|---|
| Dr. Kitchens: | [W]hat tends to be the demographics of your patients? |
| Dr. Allen: | [W]here I see[] the ADHD patients mostly these days is the clinic I do with UK which it is a [rural] outreach program. So we are seeing patients that live in Appalachia via telemedicine through their primary care doctor. So it's sort of a rural, low socioeconomic group, many of them on Medicaid. |
| --- | |
| Dr. Kitchens: | [O]f those patients that you are diagnosing in these rural areas, how many of them are African American? |
| Dr. Allen: | **Few. Less than ten percent**. |

(Emphasis added.) *See* Dr. Allen Testimony, Day 4, 51: 4-6, 10-16, 23-25, 52: 1.

When guidelines and policies have not been updated in an extended period, the presence of black evaluators brings a much-needed perspective that is often lacking in outdated policies, such as insights into the systemic barriers and biases that may affect access to healthcare, stigma, and accommodations. So too, the incorporation of physicians who treat African American patients or are African American themselves, allows for the perspective and understanding necessary to assessing unique challenges faced by racial minorities.

It is no question that race plays a definitive role in accessibility in healthcare. Cultural biases, such as provider-patient perceptions, treatment decisions, and health literacy contribute to

disparities in healthcare access for individuals across different cultural backgrounds. The lack of diversity in Defendant's Disability Services Department demonstrates, not just the lack of effort to understand challenges faced by disabled African Americans, but the outright *inability* to consider informal accommodations and mitigating techniques outside of a formal Individualized Education Plan ("IEP") or Section 504 plan dismisses the lived experiences of racial minorities such as Dr. Kitchens and continues systemic access deficiencies.

## 4    THE USMLE-NBME-FSMB RELATIONSHIP

### 4.1    The NBME's Discriminatory Decision-Making Goes Beyond the USMLE

Defendant NBME argues that expungement is not an available remedy because the USMLE Examination transcript is merely a recording of an examinee's performance on the USMLE STEP Examinations, and that how third parties ultimately weigh and/or gauge an examinee's performance(s) is not subject to Title III of the ADA because it does not relate to the NBME's issuance for accommodations. This argument minimizes the controlling authority that the USMLE Examination Transcript carries and the role that the NBME plays in determining an applicant's eligibility for accommodation.

The United States Medical Licensing Examination program ("USMLE") is "owned by **two entities:** the Federation of State Medical Boards ("FSMB") **and** the National Board of Medical Examiners ("NBME").[39] (Emphasis added). As the USMLE website states, the purpose of the USMLE is to

> "provide to licensing authorities meaningful information from assessments of physician characteristics – including medical knowledge, skills, values, and attitudes – that are important to the provision of safe and effective patient care… to

---

[39] *About the USMLE*, USMLE (Aug. 3, 2023), https://www.usmle.org/about-usmle.

continue to develop and improve assessment for licensure with the intent of assessing physicians more accurately and comprehensively."[40]

Defendant NBME pointed out, the USMLE is not an entity, it is a series of high stakes exams. The NBME "works with the [FSMB] to co-sponsor the USMLE…."[41] It is not *merely* the NBME's repeated refusal to provide accommodations, it is the outset of a <u>lifetime</u> of attempting to overcome his disability across several organizations used for medical licensure. Dr. Jurich's testimony confirms the intricate relationship between the NBME and other organizations such as the ECFMG with regards to the USMLE STEP Examination.

| | |
|---|---|
| Dr. Kitchens: | [E]arlier you testified that you spoke with different students regarding… [the USMLE] STEP Examinations, correct? |
| Dr. Jurich: | In my role, I sometimes meet with students about USMLE issues, yes. |
| Dr. Kitchens: | And how many of those students are international medical graduates or foreign medical students? |
| --- | |
| Dr. Jurich: | Ten to fifteen percent. |

*See* Dr. Jurich Testimony, Day 4, 110: 19-25, 111: 7.

The NBME's willingness to meet with international medical graduates and engage in discussions about the USMLE demonstrates their comprehensive understanding of the interconnectedness between the NBME and organizations like ECFMG. The effect of the NBME's failure to update their policies and procedures does not stop on examination day. Dr. Senoga attested to this:

So I failed STEP 2 two times. And one of them was STEP 2 CS, which was eliminated in 2020 right after I had failed it.

---

---

[40] *About the USMLE*, USMLE (Aug. 3, 2023), https://www.usmle.org/about-usmle.
[41] *Our Collaborators: About NBME*, NBME (Aug. 3, 2023), https://www.nbme.org/about-nbme.

STEP 2 CS was eliminated in 2020, and therefore that was a result of removing [the exam from the USMLE program] but if you did have a fail, that was never going to be rectified that you pass.[42]

When the USMLE discontinued STEP 2 CS, the NBME failed to update its policies and procedures to allow for prior applicants to have their exam attempt(s) be considered neutral or removed from the USMLE Examination Transcript altogether. In Dr. Senoga's case, this means that while the STEP 2 CS is no longer used for the USMLE, *her* exam results will continue to penalize her career prospects. For each application to residency; for each application for licensure; for each job application going forward; Dr. Kitchens will be discriminated against on the basis of his ability to overcome his disability, not his knowledge and competency. To wit, the USMLE is governed by a comprising of several organizations including "the ECFMG, FSMB, NBME, and the public."[43] While there are multiple entities involved in creating the examination(s), formulating the material tested, and determining the assessment standards, it is **only** the NBME that determines whether an applicant is eligible for accommodations.

Pursuant to 28 C.F.R. §36.501(b), injunctive relief "shall also include requiring… modification of a policy or provision of alternative methods to the extent required by the Act or this part. In the case at hand, Dr. Kitchens has been discriminated against by Defendant NBME's denial of accommodation requests and will perpetually feel the discriminatory effects due to the manner and purpose the USMLE Examination Transcript is used. As Dr. Jurich indicated, the NBME has expunged examination results solely based on technology issues – this is a pre-existing policy that is subject to 28 C.F.R. §36.501(b) and would remedy a discriminatory action that occurred in the past but continues in perpetuity. Therefore, expungement is an available remedy under Title III because the NBME's assessment of an examinee's application for

---

[42] *See* Dr. Senoga Testimony, Day 1, 106: 7-9, 108: 8-11.
[43] *About the USMLE*, USMLE (Aug. 3, 2023), https://www.usmle.org/about-usmle.

accommodation(s) subjects the disabled individual to repeated discrimination well beyond the confines of the USMLE STEP Exams.

## 4.2    The Employment Discrimination Burden-Shifting Framework is a Proposed Solution

The undersigned proposed a burden-shifting framework, similar to the legal analysis under Title I of the ADA, merely as an alternative to a sum-zero analysis for the Court's consideration. The undersigned, in no way, intends to assume it knows better than the Court or that its proposed analysis must be assumed. Arguably, in bringing to light the perpetual discriminatory effects felt by the NBME's refusal to approve Dr. Kitchens' accommodation requests, Dr. Kitchens brings a solution that the courts are familiar with and can readily adopt. Defendant NBME provided no such alternative to the burden-shifting analysis; the NBME goes so far as to delineate how the Third Circuit rejected its use for public accommodation cases. However, as Defendant conceded, this case arises under a different provision in Title III and has no express provision *against* using a burden shifting analysis.

## 5    FUTILITY AND U.S.C. §12188

## 5.1    Taking the USMLE Unaccommodated Is the Norm

Congress has made its intent clear in enacting the Americans with Disabilities Act (ADA) and subsequent laws like 42 U.S.C. §12188. The ADA aims to prevent discrimination against individuals with disabilities and to ensure their full participation and independent living within society. In the case at hand, Defendant NBME claims that Dr. Kitchens forfeited his right to relief because instead of appealing the application decision or pursuing litigation, he opted to take the exam without accommodations. This ignores the prevalence with which similarly situated examinees make the exact same decision Dr. Kitchens made.

According to an Impact Study conducted on USMLE STEP 1 accommodation denials on U.S. Medical Schools, "out of two hundred seventy six (276) students that applied for

accommodation, one hundred forty four (144) students were denied accommodation [52%]. Of the one hundred forty four (144) students that were denied accommodation, one hundred ten (110) students took the STEP 1 Exam **unaccommodated** [72%]."[44] This study was conducted across the nation with no mention of race, class, or gender. Which further suggests that Dr. Kitchens' decision to forgo accommodation is not an unusual or abnormal decision. In other words, Dr. Kitchens' decision to take the USMLE STEP Examination unaccommodated **is in line with the standard**.

Defendant NBME is well-known for consistently rejecting accommodation requests. During Dr. Kitchens testimony, he addressed why he chose to move forward and take the USMLE exam without accommodations and alluded to the Defendant's reputation:

> It made me believe all of the things that… we as students and medical graduates talk about. You know, it's not just one person or two people, you are talking about… hundred[s] of people or more that are talking about [NBME's] representation of injustice when it comes to accommodations and the only thing that this did for me was solidify that.

*See* Dr. Kitchens Testimony, Day 2, 165: 22-25, 166: 1-5.

To the same degree, out of forty-three (43) students,

> "almost twenty percent (20%) of respondents described students ***choosing not to apply*** for accommodations altogether or forgoing appeal processes due to the associated costs and perceived low success rate informed by historical accounts." *See* D.E. 77-48, "Impact of USMLE STEP 1 Study", p. 8, ¶¶ 2-3.

The reputation Defendant NBME has created is felt across students and medical universities nationwide. A reputation for consistently denying accommodation applications can have a detrimental effect on individuals with disabilities, discouraging them from even attempting to apply for accommodations in the first place. This creates a cycle where the reputation of denial becomes a barrier itself, preventing students from accessing the accommodations they require. Furthermore, when examinees are ultimately denied accommodations, it further deters students

---

[44] *See* D.E. 77-48, "Impact of USMLE STEP 1 Study", p. 8, ¶¶ 2-3.

from appealing the decision, as they may perceive the process as futile or biased. Students and examinees are not the only ones who are aware of the NBME's predilection against accommodation. The Impact Study found that

> [b]arriers to appeal included lack of expert disability resource professional staff to help students frame and support requests for appeal, cost to update disability documentation, likelihood of further delays to the clinical portion of the curriculum, and **institutional advice** **to forgo an appeal based on perceived lack of application success**.[45] (Emphasis added).

Medical schools believe that appealing an accommodation decision is so ineffectual that they recommend **against** filing an appeal and *Sampson v. NBME* demonstrates precisely why. In *Sampson v. NBME,* the district court held that Sampson met his burden of proof for injunctive relief, the Court of Appeals had no choice but to vacate the decision due to Sampson's expulsion from medical school for **failure to complete USMLE STEP 1 and STEP 2**.[46] The Court of Appeals held that because the school had already expelled Sampson, he could not show that he would be irreparably harmed without accommodation prior to the outcome of his litigation against the medical school. Cases such as *Ramsay, Sampson,* and *Berger* are precautionary tales of the risks, and severe consequences, examinees take when appealing accommodation decisions.

Students also reported impacted performance on subsequent exam(s). As indicated in the study,

> [R]espondents believed denials led to underperformance on the exam and other coursework due to lack of equal access to Step-1, increased stress, and lost confidence. As one respondent explained: 'They are defeated before they even take the exams, as they know that accommodations lessen the barriers that their disabilities present.'[47]

This statement mirrors verbatim Dr. Kitchens' testimony.

---

[45] *See* D.E. 77-48, "Impact of USMLE STEP 1 Study", p. 8, ¶¶ 2-3.
[46] *Sampson v. Nat'l Bd. Of Med. Exam'rs*, 2022 U.S. Dist. LEXIS 21763 (E.D. PA, Dec. 2, 2022).
[47] *See* D.E. 77-48, "Impact of USMLE STEP 1 Study", p. 9, ¶¶ 3.

> After the fail, I continued to work hard, continued to study for the examination.
> And it ran through my mind that, you know what, I need to apply for these
> accommodations again but I do not have any more documentation and… I cannot
> afford these evaluations.[48]

Dr. Kitchens' decision to forgo accommodations for the USMLE STEP Examination should not be seen as an abnormal or unusual choice, as the Impact Study reveals that a significant percentage of similarly situated examinees faced the same predicament. The reputation of Defendant NBME for consistently rejecting accommodation requests is well-known and has far-reaching consequences. This reputation creates a barrier for individuals with disabilities, discouraging them from even attempting to apply for accommodations in the first place. Medical schools' advice against filing appeals further highlights the ineffectiveness of the appeal process, forcing students to endure the negative impact of denial on their subsequent exams and coursework.

## CONCLUSION

In conclusion, the evidence presented throughout this litigation indisputably demonstrates the Defendant NBME's disregard for the rights and equitable treatment of disabled individuals. Dr. Kitchens was met with a series of insurmountable barriers, discriminatory practices, and an outright refusal to acknowledge his unique challenges. The NBME's outdated guidelines, pitiful hiring and training requirements for disability analysts, and obsolete policies exhibit a shocking derision towards the Congressional intent behind the Americans with Disabilities Act (ADA).

Defendant NBME's disability services department, as exemplified by its website and guidelines, fails to live up to the organization's espoused commitment to equal access and accommodation. This misalignment deprives disabled examinees like Dr. Kitchens of a fair chance to demonstrate their true potential and competency. Instead, these individuals are faced with a

---

[48] *See* Dr. Kitchens Testimony, Day 2, 161: 3-8.

deeply flawed system that deters them from seeking accommodations and perpetuates a cycle of discrimination.

Moreover, the impact of systemic racism and implicit biases in healthcare cannot be ignored. The absence of African American evaluators in the Defendant NBME's disability services department and its third-party evaluators showcases a significant barrier to understanding the challenges faced by individuals of African American descent. Race plays a definitive role in accessibility within healthcare, creating disparities in treatment decisions and access to mental health services. This reality is reflected in the lack of representation and understanding within the NBME's evaluative processes.

The Court must acknowledge the NBME's reputation for consistently denying accommodation requests, a reputation that discourages students from even attempting to apply for accommodations, lest they face the same fate as Dr. Kitchens. The advice given by medical schools to forgo the appeal process due to perceived low success rates further highlights the futility examinees experience when seeking justice and accommodation.

In light of these compelling arguments, we implore this honorable court to grant the Plaintiff's full request for double-time accommodations and full expungement of the USMLE examination transcript. The ADA was enacted to ensure equal opportunities and protection from discrimination for disabled individuals. By awarding the requested accommodations and expungement, the Court would uphold the principles of the ADA and pave the way for a more inclusive and equitable medical licensing process.

Therefore, for the foregoing reasons, the undersigned prays the Court finds in favor of Dr. Kitchens on all claims and grants his request for accommodations and expungement of the USMLE Examination Transcript in its entirety.

## <u>WORD COUNT CERTIFICATION</u>

Dr. Kitchens certifies that this document contains 8,179 words (not including this word count certification, the Table of Authorities, or Table of Arguments) as determined by the word count feature in Microsoft Word.

Dated: August 3, 2023.

Respectfully submitted,

*/s/ Dr. Markcus Kitchens*
Dr. Markcus Kitchens
625 Hampton Way, #2
Richmond, KY 40475
T: (423) 314-4096
markzwanz@gmail.com
***Pro Se Plaintiff***