## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DR. MARKCUS KITCHENS, JR.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  22-3301** |
| | : | |
| **NATIONAL BOARD OF MEDICAL** | : | |
| **EXAMINERS** | : | |

### MEMORANDUM

**MURPHY, J.**                                                                **October 31, 2023**

### I.      Introduction

Federal law requires that anyone who administers credentialing examinations must make

those examinations accessible to test-takers with disabilities.  In this case, a medical school

graduate named Dr. Markus Kitchens, Jr. seeks extra time to take his board examinations as an

accommodation for his ADHD.  He's representing himself.  After denying a preliminary

injunction because there was no urgent prospect of irreparable harm, we held a four-day bench

trial.  We heard from Dr. Kitchens, his mother, and a number of experts on both sides.  As

explained below, after weighing all the evidence, we conclude that Dr. Kitchens is disabled

under the Americans with Disabilities Act ("ADA") and is entitled to take a medial licensure

examination with extra time to accommodate his ADHD.  But we cannot grant Dr. Kitchens's

request that we order the expungement of his past failing examination scores, because the ADA

affords only "preventive" relief.

### II.      Procedural History

Dr. Kitchens, proceeding pro se, filed suit against defendant National Board of Medical

Examiners ("NBME") on January 18, 2023.  DI 15.  He alleges that the NBME violated the

ADA by denying him extra testing time on the United States Medical Licensing Examination

("USMLE").  *Id.*  As a remedy, he seeks two forms of injunctive relief: 100% extended testing

time ("double time") on all future USMLE attempts and expungement of his past USMLE scores.

Shortly after filing the operative complaint, Dr. Kitchens moved for a preliminary injunction.  DI 20.  We held an evidentiary hearing and denied the motion because the risk of irreparable harm to Dr. Kitchens was insufficient to warrant preliminary relief.[1]  So the parties conducted expedited discovery and proceeded to a four-day bench trial, during which they entered seventy-one exhibits and called eleven witnesses.

Post-trial briefing reflecting the parties' proposed findings of fact and conclusions of law closed on August 3, 2023.  DI 92.  Dr. Kitchens's request for injunctive relief is thus ripe for disposition, and for the below stated reasons, is granted in part and denied in part.

## III.   Findings of fact[2]

A.   The parties

1.   Dr. Kitchens resides in Kentucky.  DI 77-24, PX2 at 2.  He graduated from the Medical University of Lublin in Poland in January of 2021.  *Id.*

2.   The NBME is a non-profit organization that develops and administers medical licensure examinations, including the USMLE.  DI 80 at 51.

B.   The USMLE

1.   The USMLE is a standardized examination used by medical boards in the United States to award medical licenses to physicians.  DI 77-7, JX8 at 13.

2.   The USMLE consists of three separate examinations called "Steps."  DI 80 at 51.

3.   Physicians may not practice unsupervised medicine in the United States without first passing all three Steps of the USMLE.  *Id.*  Some states limit an examinee's attempts per Step.  For instance, an examinee who fails any Step of the USMLE

---

[1] "The 2024 [residency application] cycle is too far off to warrant preliminary intervention by the Court now."  DI 24 at 2.

[2] The citations in this section are intended to be exemplary, but not necessarily limiting of everything we considered when rendering each finding of fact.

four times is ineligible for medical licensure in Kentucky — Dr. Kitchens's state of residence.  DI 77-23, JX 25 at 141 (ECF).

4.  Step 1 of the USMLE tests the basic sciences.  DI 77-7, JX8 at 14.  It consists of approximately 280 multiple choice questions taken during 60-minute blocks over the course of one day.  *Id.*

5.  Step 2 tests "medical knowledge" and "clinical science."  *Id* at 15.  It consists of approximately 318 multiple choice questions taken during 60-minute blocks over the course of one day.  *Id.*

6.  Step 3 tests "medical knowledge" and "biomedical and clinical science essential for the unsupervised practice of medicine."  *Id.*  It consists of multiple-choice questions and computerized case simulations taken over the course of two days. *Id.*

7.  Examinees may request disability-based testing accommodations on each Step of the USMLE.  DI 80 at 52-54.  The NBME grants most of these requests.  *Id.* at 53-54.

8.  Examinees can access information about testing accommodations during the USMLE registration process and at the USMLE website.  DI 77-56, DX 60; DI 77-7, JX8 at 20; DI 80 at 54.  The NBME publishes impairment-specific guidance about documentation an examinee should submit with a request for accommodations.  DI 80 at 57-58.

C.  <u>Dr. Kitchens's requests for accommodations and performance on the USMLE</u>

1.  On January 5, 2022, Dr. Kitchens requested testing accommodations on Step 1 of the USMLE for "ADHD" and "test anxiety."  DI 77-59, DX69; DI 77-24, PX2. He requested "100% [a]dditional test time ([d]ouble time) over two days" and "[a]dditional break time over two days."  DI 77-24, PX2 at 3.  He indicated on the request form that he had not received accommodations from any previous academic institution.  *Id.* at 5.

2.  Dr. Kitchens attached several supporting documents to his request for accommodations, including: (i) a personal statement; (ii) a two-page office visit report from Dr. Vicki Hackman dated July 26, 2017 showing an assessment of attention and concentration deficit and a referral to a psychiatrist; (iii) two pages of a May 25, 2018 medical report signed by Dr. Hackman showing an assessment of ADHD and anxiety with a referral to a mental health counselor; (iv) an April 22, 2020 letter from Dr. Ghori S. Khan indicating "treatment" for significant anxiety; (v) an October 5, 2020 dermatology office visit report listing ADHD as a past diagnosis; and (vi) an October 27, 2020 email indicating that Dr. Kitchens received extended time on a different NBME examination — a standardized basic science test taken in medical school.  DI 77-24, PX2 at 7-15.

3. On February 8, 2022, NBME denied Dr. Kitchens's January 5, 2022, request for accommodations, concluding that he had not shown that the "requested accommodations [were] necessary . . . to access the USMLE."  DI 77-26, PX4 at 1.

4. On February 25, 2022, Dr. Kitchens took Step 1 of the USMLE without accommodations and failed.  DI 77-8, JX9.

5. On May 9, 2022, Dr. Kitchens took Step 1 without accommodations and failed a second time.  DI 79 at 209; DI 77-9 JX10.

6. On May 28, 2022, Dr. Kitchens took Step 2 without accommodations and failed. DI 77-11, JX12; DI 79 at 210.

7. On June 29, 2022, Dr. Kitchens took Step 2 without accommodations and failed a second time.  DI 77-12, JX13.

8. On August 30, 2022, Dr. Kitchens submitted a second request for accommodations on Step 1, this time seeking "50% [a]dditional test time (time and 1/2)" and "[a]dditional break time over two days."  DI 77-25, PX3.  The second request was nearly identical to the first request, though the second request sought less time than the first.  *Id.*

9. The NBME twice asked Dr. Kitchens to supplement his second request for accommodations because the information therein had already been considered in the denial of his first request.  DI 77-62, DX75; DI 77-64, DX78.

10. Dr. Kitchens did not submit additional documentation, and instead, took and failed Step 1 of the USMLE without accommodations for the third time on September 29, 2022.  DI 77-65, DX79; DI 77-10, JX11.

D. Dr. Kitchens's claimed disability

   **1. ADHD generally**

   a. Physicians use the DSM-5 ("DSM-5") as a diagnostic manual for mental health disorders.[3]  The DSM-5 includes diagnostic criteria for ADHD.  DI 77-38, PX48.

---

[3] DI 79 at 18.  Witnesses referenced both the "DSM-5-TR" and the "DSM-5" during trial. We understand the DSM-5-TR to be an "update" to the DSM-5 and understand both manuals to be materially similar with respect to ADHD.  *Id.* at 21.  PX 48 is an excerpt from the DSM-5, so we refer to the DSM-5 here.  *Id.* at 22-23; DI 77-38, PX48.

b.  According to the DSM-5, the "essential feature" of ADHD is a "persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development" in more than one environment.  DI 77-38, PX48 at 61.[4]

c.  "Inattention manifests behaviorally . . . as wandering off task, lacking persistence, [and] having difficulty sustaining focus and being organized." DI 77-38, PX48 at 61.  "Hyperactivity refers to excessive motor activity (such as a child running about) when it is not appropriate."  *Id.* "Impulsivity refers to hasty actions . . . without forethought."  *Id.* Impulsivity "may manifest as social intrusiveness" such as "interrupting others" or "talk[ing] excessively."  *Id.* at 60-61.  Children with ADHD typically present with hyperactivity and impulsivity while adults with ADHD typically do not.  DI 79 at 16.

d.  ADHD is usually identified during elementary school years when a child's inattention "becomes more prominent and impairing."  DI 77-38, PX48 at 62.  But ADHD can be diagnosed for the first time in adulthood.  DI 79 at 43.

e.  ADHD is associated with "reduced school performance and academic attainment."  DI 77-38, PX48 at 63.  Individuals with the disorder "exhibit cognitive problems on tests of attention, executive function, or memory." *Id.* at 61, 63.  However, individuals impaired by ADHD may "compensate" for their symptoms and do well in school.[5]

## 2.  Dr. Kitchens's history of ADHD

a.  Dr. Kitchens was born into low-income housing in Chattanooga, Tennessee to a single teenage mother: Ms. Missie King.  DI 78 at 142, 147-48.  He has struggled with symptoms of ADHD, including inattention and disruptive conduct, since early childhood.  DI 78 at 143-44.

b.  Ms. King is familiar with and competent to describe Dr. Kitchens's education and behavior during his childhood, including feedback from his teachers.  During elementary school, Dr. Kitchens talked and played excessively.  *Id.* at 144.  He was unfocused on his schoolwork, behaved poorly, distracted other students, and frustrated his teachers.  *Id.* at 144. He was restless and unable to sit still.  DI 77-49, DX3 ¶ 12.  His teachers

---

[4] *See also* DI 79 at 17 (reflecting expert testimony by Dr. Jonathan Shepherd, whose opinions are discussed more fully below).

[5] *See* DI 78 at 96-97 (reflecting expert testimony by Dr. Christopher Pullins, whose opinions are discussed more fully below).

called Ms. King about this behavior several times a week, and on occasion, invited her to Dr. Kitchens's school to discipline him during the day.  DI 78 at 144-45.

c.  Dr. Kitchens's first-grade teacher recommended that he repeat the grade because he was disruptive in class, over-talkative, and did not read as well as his classmates.  DI 78 at 154; DI 79 at 83-84.  Ms. King declined to hold Dr. Kitchens back to spare him the discomfiture of sharing a grade with his younger brother.  DI 78 at 154-55.

d.  Dr. Kitchens's second-grade teacher recommended that Ms. King consult with a doctor about his inattention and behavior.  DI 78 at 145-46.  While she worked with Dr. Kitchens one-on-one in a distraction free environment, and gave him extra time on assignments, DI 77-50, DX4 ¶ 11, his pediatrician evaluated him, diagnosed him with ADHD, and prescribed a medication to improve his concentration.  DI 78 at 146; DI 79 at 84-85; DI 77-50, DX4 ¶ 10.[6]  Ms. King declined to fill the prescription because she was worried about the side effects it could have on her young son's mood and mental health.  DI 78 at 146-47.

e.  In lieu of medication, Dr. Kitchens used other strategies to mitigate the challenges of ADHD during elementary and middle school.  He frequented math and reading tutors.  *Id.* at 153.  He sat in isolated desks close to his teachers and away from the rest of his class to avoid distractions.  DI 78 at 149, 153, 156; DI 79 at 90.  He participated in an individualized reading class.  DI 78 at 151-52; DI 77-1, JX1.  And Dr. Kitchens prepared far in advance for tests, sometimes staying home to study instead of socializing with his friends.  DI 79, at 91-92.

f.  At home, Ms. King managed Dr. Kitchens closely through structure, predictability, and high involvement.  DI 77-27, PX5.  She ran a strict household, tracking Dr. Kitchens's homework and chores on a notepad on the refrigerator.  DI 78 at 157.  She disciplined him for poor behavior and stressed the importance of education.  *Id.* at 149, 157.

g.  Ms. King spoke to Dr. Kitchens's teachers at the beginning of each year until he was in middle school to ensure that they monitored him closely, kept him on task, and offered him extra help on his work.  DI 78 at 155-56.

h.  Dr. Kitchens used similar mitigation strategies in high school, both at home and at school.  He set alarms and used professional planners to stay

---

[6] DX 4 is a declaration by Ms. King in support of Dr. Kitchens's motion for preliminary injunction.  NBME moved to admit DX 4 to the record and had the opportunity to cross-examine Ms. King at trial.  *See, e.g.*, DI 78 at 173-74; DI 79 at 243-45.

organized. DI 78 at 161-62. He designated specific locations for his belongings and took photographs to keep track of them. DI 77-50, DX4 ¶ 18. He did his schoolwork in complete silence with all distractions removed from the room, DI 78 at 162, and deployed a system of sticky notes, white erase boards, and flashcards to facilitate his studies. DI 77-50, DX4 ¶ 19. He listened to his schoolbooks on audiotape. *Id.* He arrived at school approximately one hour early each day to gather focus before his classes began. DI 78 at 162-63. And he took advantage of special attention and assistance from his high school teachers; they would always allow him extra time on tests and schoolwork. DI 78 at 163.

i. Similarly, Dr. Kitchens attended a very small college where his professors worked with him closely, discussed his academic difficulties with him and Ms. King, and granted him extra time on tests when he asked for it. DI 78 at 166-68; 174. He was permitted to take some tests and quizzes in a particular professor's office without a time limit because he struggled to finish them in the classroom setting. DI 79 at 101.

j. But eventually, these accommodations were not enough. DI 77-27, PX5. On January 1, 2013, Dr. Kitchens sought assistance from the disability services department at his college for suspected symptoms of ADHD. *Id.* He declined formal accommodations from the college because he was "embarrassed to even . . . have a disability" and feared that the other members of his tight-knit academic community would think that he was "not . . . that smart" or "undeserving." DI 79 at 103-04. He thought that resorting to medication would be a "less public" way to manage his symptoms. *Id.* at 104.

k. So disability services instead referred him to a staff medical doctor who diagnosed him with ADHD without mention of hyperactivity and prescribed Adderall: a stimulant medication used to treat symptoms of ADHD.[7] On the date of this visit, Dr. Kitchens was not aware that he had already been diagnosed with ADHD as a child. DI 79 at 133-34.

l. Dr. Kitchens filled and continues to take an Adderall prescription, though stopped taking it while in Poland for medical school due to the medication's illegal status there.[8]

---

[7] *Id.* at 105; DI 77-28, PX6. *See also* DI 76-1 at 30 (reflecting designated deposition testimony of Ms. Christina Bacon, LLP, about Adderall. Her testimony is discussed more fully below).

[8] *See* testimony by Dr. Kitchens, DI 79 at 112-16, 126-27, 146, and medical records, DI 77-29, PX09; DI 77-10, PX11 at 1; DI 77-31, PX16; DI 77-32, PX 19; DI 77-36, PX 37 at 1-6

m. In medical school, Dr. Kitchens took over-the-counter supplements instead of prescription medication.  DI 79 at 115-16; DI 77-53, DX35 at 77.  But he still struggled to focus; he was "horrible at test taking [and] horrible at paying attention during . . . examinations."  DI 79 at 116, 118.  Notwithstanding these challenges, Dr. Kitchens did not request accommodations from his medical school because it was already the school's policy to allow students three attempts to pass examinations.  *Id.* at 119.  And because his medical school professors "want[ed] to see their students succeed," they stood by during examinations to answer questions.  *Id.* at 119-20.  Further, because Dr. Kitchens was one of the only students in his class to take examinations for a third time, he took them in a one-on-one setting with extra time.  *Id.* at 119; DI 77-49, DX3 ¶ 29.

n. But despite this history of accommodations, significant help from teachers, prescription medication, and exhaustive efforts to self-mitigate, Dr. Kitchens has performed poorly during each phase of his academic career.  DI 79 at 92-93.

o. For instance — Dr. Kitchens's elementary school grades were low, with some final grades in the 40s, and 50s.  DI 77-1, JX1.  Even when he understood the material at issue, he performed poorly on timed academic exercises like multiplication tables.  DI 77-49, DX3.  As such, his elementary school recommended that he be failed for third grade, though Ms. King insisted he advance with his class.  DI 78 at 154-55.

p. While Dr. Kitchens's middle school grades were marginally higher, DI 77-2, JX2, he continued to experience difficulties with reading comprehension, writing, attention, and focus.  DI 77-49, DX3 ¶ 15.  He was often lost in thought during school, *id.*, and struggled to focus on timed reading tests.  DI 79 at 90.  He finished among the last in his class on the "Tennessee Comprehensive Assessment."  *Id.*

q. During high school, Dr. Kitchens continued to struggle with timed examinations.  DI 77-49, DX3 ¶ 17.  He was always the last one in his class to complete tests and had to guess on answers at the end of them.  *Id.*  Even during state-wide assessments with unlimited time, Dr. Kitchens finished last.  *Id.* at ¶ 18.  He earned many Bs and Cs during high school, with a cumulative GPA of 2.8.  DI 77-3, JX3.

r. Despite extensive self-study and participation in a remedial preparation course offered by his high school, Dr. Kitchens ultimately scored in the

---

(ECF); DI 77-37, PX46 at 1 (ECF); DI 77-51, DX7 at 24 (ECF); DI 77-52, DX 28 at 2 (ECF); DI 77-53, DX35 at 77, 81-82.

50th percentile on the ACT college entrance examination.  *See* DI 79 at 94-95; DI 77-49, DX3 ¶ 20.[9]  He did not request accommodations on the ACT because he was not aware they existed.  DI 79 at 95.

s.  Dr. Kitchens's college transcripts reflect a range of grades as low as F and as high as A; though he earned many Bs and Cs and a cumulative GPA of 2.6.  DI 77-4, JX4.

t.  Dr. Kitchens studied extensively for and used test-taking strategies on the Medical College Admission Test ("MCAT"), but still performed poorly on multiple attempts at the examination because he could not finish many of the questions.  DI 77-49, DX3 ¶¶ 24, 26.  The MCAT is a standardized examination required for admission into many medical schools, DI 77-49, DX3 ¶ 24, though Dr. Kitchens's Polish medical school did not require it.  DI 79 at 184.  Dr. Kitchens did not request accommodations on the MCAT because he was not aware they existed.  *Id.* at 132.

u.  Dr. Kitchens's medical school transcript reflects one failed class and many Cs.  DI 77-5, JX5.

v.  On December 10, 2020, Dr. Kitchens took and failed the NBME-administered Comprehensive Basic Science Examination ("CBSE").  DI 77-40, PX52; DI 79 at 122-23.  His medical school granted him accommodations on the CBSE in the form of double time.  DI 79 at 125; DI 77-24, PX2 at 7-15.  But even with extra time, he earned a score of 155, which falls just above the lowest CBSE score-range.  DI 77-40, PX52.  Due to personal "stressors" in his life, the CBSE was not a priority for Dr. Kitchens at that time.  DI 79 at 123.

w.  Dr. Kitchens has failed each attempt to pass Steps 1 and 2 of the USMLE despite three years of extraordinary effort to prepare for the tests, including studying full-time, working with tutors, participating in preparation courses, and implementing test taking strategies.  DI 77-49, DX3 ¶¶ 30, 32, 35, 41-42, 46-51, 56; DI 79 at 187-89.  Despite these efforts, he ran out of time on the Step examinations because he could not read through all of the questions in a timely manner.  DI 77-49, DX3 ¶¶ 30, 35-37, 41-43, 46-51.

x.  Across five attempts on Steps 1 and 2 of the USMLE, Dr. Kitchens took thirty-seven question blocks with one hour of allotted testing time per block.  He used the entire allotted time on twelve blocks and finished

---

[9] DX 3 is a declaration by Dr. Kitchens in support of his motion for preliminary injunction.  NBME moved to admit DX 3 to the record and cross examined him about it at trial.  *See, e.g.*, DI 79 at 187-89, 246.

seven blocks with mere seconds left.  On other blocks, he finished with several minutes left.  Across thirty-seven hours of allotted testing time, he used all but approximately one hour and fifteen minutes.  *See* JX14, JX15, JX16, JX17, JX18 (timing data for each of Dr. Kitchens's USMLE attempts).

y.  Dr. Kitchens used test-taking strategies on each Step examination including: reading the last sentence of each question vignette first, then skimming through passages while attempting to pick out key words, then spending a limited amount of time to answer questions before randomly guessing to avoid running out of time.  DI 77-49, DX3 ¶¶ 35, 36, 41-43, 46-51.  During his third attempt to pass Step 1, Dr. Kitchens preemptively answered each question with the same letter at the beginning of the exam so that no answer would be left blank; this allowed him to consolidate focus on reading the questions without "watching the clock."  *Id.* ¶¶ 47-51.

z.  But these time management strategies did not allow Dr. Kitchens full comprehension of exam questions because they required him to either select answers based on a few key words from long paragraphs or otherwise make arbitrary guesses.  *Id.* at ¶¶ 36, 41, 47-51.

aa.  Time pressure on standardized examinations encumbers Dr. Kitchens's ability to focus.  DI 80 at 43-44, 46-47.

bb.  Dr. Kitchens's academic history illustrates substantially limited concentration.

3. **Dr. Kitchens's recent medical records and ADHD evaluations, including Ms. Christina Bacon's evaluation**

a.  On September 22, 2022, Dr. Kitchens reported ongoing symptoms of ADHD to his primary care clinician, Tina Holbrook, APRN, during a medication management appointment.  DI 77-36, PX37 at 1 (ECF).  He discussed the mitigation measures he used to study for the USMLE, including noise-blocking headphones, modifications to lighting, and "sound machines."  *Id.*

b.  On February 3, 2023, Dr. Kitchens took the "Conners Continuance Performance Test 3rd Edition" ("Conners CPT").  DI 77-33, PX26; DI 77-53, DX 35 at 64-65.  The Conners CPT is a tool used by clinicians to diagnose ADHD in combination with information gathered from other psychometric measures, interviews, observations, and records.  DI 77-33, PX26 at 1-2; DI 78 at 60.  It assesses attention-related problems in individuals aged eight and older.  DI 77-33, PX26 at 2.  It performs a validity check and an accuracy check, issuing a flag of invalidity if

appropriate. *Id.* Therefore, the Connors CPT is a validated diagnostic tool, DI 78 at 60, and has demonstrated credibility and integrity in the field of psychiatric testing. DI 79 at 24.

c. Dr. Kitchens earned nine atypical scores on the Conners CPT, indicating a very high likelihood that he has ADHD. DI 77-33, PX26 at 3. Further, his results strongly suggest impaired concentration. *Id.* at 4; DI 77-53, DX 35 at 64-65.

d. On February 6, 2022, Ms. Holbrook issued a letter that stated "[Dr.] Kitchens . . . has been a patient of this clinic since [August 25, 2022]. He has a current diagnosis of ADHD, predominantly inattentive type. Any reasonable accommodations should be implemented." DI 77-53, DX35 at 69-71.

e. The results of Dr. Kitchens's Connors CPT are valid, reliable, and reflect Dr. Kitchens's symptoms and impaired functioning to a clinically sufficient degree.

f. Over the course of two days, on February 7 and 8, 2023, Ms. Christina Bacon, LLP[10] assessed Dr. Kitchens for ADHD. DI 77-35, PX30; DI 76-1 at 31. Ms. Bacon is a master's clinician trained in the diagnosis of ADHD. DI 76-1 at 12. She keeps abreast of research relating to ADHD. *Id.* at 18. She follows the DSM-5 to diagnose ADHD. *Id.* at 19. She assesses patients for ADHD in the course of her professional duties. *Id.* at 12-13. And to assess a patient for ADHD, she follows a protocol set forth by the American Phycological Association requiring a semi-structured interview and a computerized assessment. *Id.* at 14.

g. Following this protocol, Ms. Bacon deployed several diagnostic tools to evaluate Dr. Kitchens: a clinical interview, a record interview, behavioral observations, the Diagnostic Interview for ADHD in Adults-2) ("DIVA-2"), the Achenbach System of Empirically Based Assessment ("ASEBA"), and the MOXO-Distracted Continuous Performance Test (d-CPT) ("MOXO"). DI 77-35, PX30.

h. The DIVA-2 is a thorough evaluation of the diagnostic criteria for ADHD in adulthood and assesses how ADHD symptoms affect specific areas of a patient's life. DI 77-35, PX30 at 3. During her administration of the

---

[10] Ms. Bacon testified as a live witness during the preliminary injunction months earlier as an expert in psychology and cognitive behavioral therapy. *See* DI 37 at 51; Fed. R. Civ. P. 65(a)(2). Deposition testimony by Ms. Bacon was admitted to the trial record via designation by the parties. *See* DI 76. NBME had the opportunity to cross-examine Ms. Bacon both at the preliminary injunction hearing and in deposition.

DIVA-2, Ms. Bacon interviewed Dr. Kitchens about his experience with ADHD and reviewed his symptoms, history, and impaired daily functioning. DI 76-1 at 15; DI 77-35, PX30 at 3. He actively participated in the interview, answered all questions with relevant examples, endorsed all nine criteria for inattention related to ADHD and hyperactivity in ADHD, and reported that these symptoms affect multiple facets of his life including work and social relationships. DI 77-35, PX30 at 3.

i.  On the DIVA-2, Dr. Kitchens reported the following criteria for ADHD as problematic since childhood: "failing to give close attention to details, difficulty sustaining attention in tasks, does not seem to listen when spoken to directly, failing to follow through on instructions, difficulty organizing tasks and activities, avoiding, disliking or is reluctant to engage in tasks that require sustained mental effort, loses things necessary for tasks or activities, easily distracted by extraneous stimuli, and forgetful in daily activities." DI 77-35, PX30 at 3. Dr. Kitchens reported the following symptoms of hyperactivity as regularly problematic: "fidgeting with hands or feet or squirming in his seat, often standing when sitting is expected, feeling restless, finding it difficult to relax in leisure activities, often on the go, talking excessively, giving the answer before questions have been completed, difficulty waiting his turn, and interrupting the activities of others due to impatience." *Id.*

j.  The DIVA-2 revealed that Dr. Kitchens's ADHD symptoms are directly linked to his inability to complete the USMLE. *Id.* at 4; DI 76-1 at 48-49.

k.  The ASEBA is an empirically based assessment that is effective for differential diagnosis and recognizing behavioral trends and critical items. DI 76-1 at 34; DI 77-35, PX30 at 4. It is highly reliable and valid. DI 77-35, PX30 at 4.

l.  The ASEBA consists of approximately 115 questions about a patient's behaviors and mental health symptoms answered by both the patient and at least one other person close to them. DI 76-1 at 34. It measures and scales ADHD symptoms as described by the DSM-5 in a computerized report. *Id.* As part of Ms. Bacon's evaluation, Dr. Kitchens, his wife, and Ms. King took the ASEBA. *Id.* at 35-36. Ms. Bacon mistakenly administered the ASEBA to Ms. King because she initially thought that Ms. King lived with Dr. Kitchens. *Id.* at 37. Because the ASEBA requires close interactions with the patient during a period of six months prior to its administration, Ms. King's results were not valid, and Ms. Bacon did not include them in her report. *Id.* at 37-38.

m.  On the ASEBA, Dr. Kitchens's scores on all scales related to attention deficit and hyperactivity were in the clinical range above the 97th percentile. DI 77-35, PX30 at 4.

n. The MOXO is a highly effective computerized performance test that measures attentiveness, timeliness, impulsivity, and hyper-reactivity. DI 77-35, PX30 at 6. While MOXO results alone are not diagnostic of ADHD,[11] the test has shown a 90% sensitivity in the recognition of symptoms of ADHD, with reliable test-retest results,[12] and includes a built-in symptom validity assessment that flags malingering.[13]

o. The MOXO's attentiveness scale measures the participant's ability to respond correctly and remain focused. DI 77-35, PX30 at 6. In other words, it measures concentration. DI 76-1 at 67-68.

p. The MOXO's timeliness scale measures the ability to respond quickly and accurately. DI 77-35, PX30 at 6.

q. The MOXO's impulsivity scale measures the tendency to respond hastily without evaluating the situation. *Id.*

r. The MOXO's hyperactivity scale measures difficulty in regulating motor skills. *Id.*

s. Dr. Kitchens exhibited a deficit on all four MOXO scales so extreme that it noticeably affects his ability to attend to important information, answer questions in a timely manner, evaluate and respond quickly and accurately, and regulate motor responses. *Id.* at 6-7. His MOXO performance constituted a deviation from the norm. *Id.* at 7.

t. As she assessed Dr. Kitchens, Ms. Bacon observed the strategies he uses to mitigate ADHD in his home office space. DI 76-1 at 62. He places dark curtains over his windows to avoid visual distractions outside. *Id.* He uses whiteboards to keep track of schedules and reminders. *Id.* He keeps his cell phone on "do not disturb" while working. *Id.* He walks on a treadmill while studying to improve his concentration. *Id.* He wears noise cancelling headphones. *Id.* at 63. These mitigation measures are outside the norm of people without ADHD. *Id.*

u. Ms. Bacon's evaluation shows that Dr. Kitchens experiences clinically significant impairment in his ability to focus due to ADHD, though his

---

[11] DI 76-1 at 42.

[12] DI 77-35, PX30 at 6.

[13] DI 76-1 at 23, 44-45.

sense of motivation has prevented worse outcomes in his life.  DI 77-35,
PX30 at 7; DI 76-1 at 21.  Further, though Dr. Kitchens has implemented
coping skills such as organization, routine, structure, reminders, and
distraction removal, he nevertheless experiences significant difficulties
with restlessness, impaired concentration, forgetfulness, losing items, and
time management.  DI 77-35, PX30 at 8.

v.   Stressful situations such as examinations exacerbate ADHD symptoms,
causing distracted reading.  DI 76-1 at 69, 74.  Thus, Ms. Bacon
recommended that Dr. Kitchens receive accommodations on examinations
including double time, extra breaks, noise cancelling headphones, and the
option to break examinations into smaller time periods over multiple days.
DI 77-35, PX30 at 8.

w.   Dr. Kitchens demonstrated excellent effort during Ms. Bacon's
assessments, and his test results are an accurate reflection of his current
functioning.  DI 77-35, PX30 at 7.  Further, the MOXO symptom validity
system indicated that his responses were valid.  DI 76-1 at 64.  And
finally, his behavior during her assessment was consistent with his self-
reported symptoms, his wife's perception of his symptoms, and the
MOXO's measurement of his symptoms.  DI 77-35, PX30 at 7; DI 76-1 at
49-50, 73-74.

x.   Ms. Bacon's evaluation of Dr. Kitchens therefore appropriately
incorporated his self-report, was valid and reliable, and reflects Dr.
Kitchens's symptoms and impaired functioning to a clinically sufficient
degree.

E.  Additional expert opinions

1.  **Dr. Christopher Pullins**

a.   Dr. Christopher Pullins testified as an expert in family medicine.  DI 78 at
42-44.  Dr. Pullins has been licensed to practice medicine for 20 years.  *Id.*
at 38.  He has authored scholarly articles.  *Id.* at 38-39.  He is a member
of, and board certified through, the American Academy of Family
Medicine.  *Id.* at 39.  He chairs the family medicine department at Mayo
Clinic.  *Id.*  His duties in that capacity include direct patient care as well as
the oversight of thirty-five clinicians and daily operations pertaining to
research, education, and patient care.  *Id.*  Dr. Pullins evaluates patients for
ADHD in the course of his professional duties.  *Id.* at 43.  He is trained to
determine whether a patient is "faking" the symptoms of ADHD.  *Id.* at
46-47.

14

b. A patient's subjective symptom report is an important part of an ADHD diagnosis, as is the use of a validated diagnostic tool. *Id.* at 45, 60. One acceptable tool is the "Conners Rating System." DI 78 at 60.

c. Clinicians consider a patient's academic history and self-narrative when recommending testing accommodations based on mental impairments. DI 78 at 95-96.

**2. Dr. Jonathan Shepherd**

a. Dr. Jonathan Shepherd testified as an expert in clinical psychiatry. DI 79 at 14, 15. He has been licensed to practice medicine for thirteen years. *Id.* at 10. He is the author of scholarly articles and a book chapter about psychiatry. *Id.* at 10-11. He is a member of the American Psychiatric Association, the American Academy of Child and Adolescent Psychiatry, the Black Psychiatrists of America, the American Medical Association, and the American Psychiatric Society. *Id.* at 11-12. He is the Chief Medical Director at Hope Health Systems — the third largest provider of mental health services in Maryland. *Id.* at 8-9, 12. In this role, he oversees all clinical responsibilities and supervises the training and work of all physicians and nurses employed by Hope Health Systems. *Id.* at 12. He dedicates 70% of his time to direct patient care. *Id.* at 12-13. He has conducted approximately 1,000 ADHD evaluations during the past two years — it is the "bread and butter" of his specialty. *Id.* at 13, 14. He is trained to recognize a "malingering" patient. *Id.* at 27-28.

b. When conducting an ADHD assessment, it is very important for clinicians to consider a patient's personal statement and necessary to consider their medical, social, and developmental history. *Id.* at 18, 37. An adult's spouse may be a source of such information. *Id.* at 37-38.

c. Symptoms of hyperactivity, inattention, and impulsivity indicate that a patient has ADHD when they cause functional impairments that prevent the patient from operating at their maximum potential. *Id.* at 19.

d. There are several diagnostic tools psychiatrists use to diagnose ADHD based on their credibility and integrity, including the Conners Rating Scale. *Id.* at 24.

e. Ms. Bacon's assessment of Dr. Kitchens was valid and indicated a diagnosis of ADHD based on, among other things, a major attention deficit. *Id.* at 48, 26.

f. A patient's treating physician has a greater understanding of a patient's condition than a third party. *Id.* at 50.

g. Appropriate ADHD accommodations on examinations include testing spaces free from interruptions, extra break time, and testing sessions broken up over multiple days. *Id.*

In view of the above facts gleaned from documentary exhibits and the credible testimony of Dr. Kitchens, Ms. King, Ms. Bacon, Dr. Pullins, and Dr. Shepherd, we find that Dr. Kitchens is and was at all relevant times substantially limited in the major life activity of concentration.

## IV.   **Analysis / Legal Conclusions**

The ADA is a remedial statute meant to eliminate discrimination against people with disabilities. *Disabled in Action v. SEPTA*, 539 F.3d 199, 208 (3d Cir. 2008). As such, Title III of the ADA requires covered entities to offer professional licensing examinations[14] in a manner accessible to individuals with disabilities, or to offer "alternative accessible arrangements" to such individuals. 42 U.S.C. § 12189. To state a violation of the ADA based on a failure to accommodate a disability on an examination, plaintiffs must show (1) that they are disabled as defined by the ADA; (2) that they requested accommodations on an examination; and (3) that the defendant denied that request. *Ramsay v. Nat'l Bd. of Med. Exam'rs* (*Ramsay I*), 2019 WL 7372508, at *8 (E.D. Pa. Dec. 30, 2019), *aff'd*, 968 F.3d 251, 257 (3d Cir. 2020) (first citing *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 647 (E.D. Pa. 2013); then citing *Mahmood v. Nat'l Bd. of Med. Exam'rs*, 2012 WL 2368462, at *4 (E.D. Pa. June 21, 2012)).

In reaching our factual finding that Dr. Kitchens is and was at all relevant times substantially limited in the major life activity of concentration, we considered NBME's evidence, proposed findings, and various legal arguments. Generally, NBME argues that Dr. Kitchens has not shown that he is disabled under ADA or that he needs double testing time on the USMLE.

---

[14] There is no dispute that Title III of the ADA covers the NBME insofar as it offers USMLE Step examinations.

We disagree on both points and will order the extra time he seeks on future administrations of the USMLE.  But we will not order expungement of his past USMLE scores.

      A.  <u>Dr. Kitchens is disabled as defined by the ADA.</u>

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or major life activities of [an] individual" as compared to "most people in the general population."  42 U.S.C. § 12102(1)(A); 28 C.F.R. § 36.105(d)(1)(v).[15]  An "impairment" may be physical or mental in nature, like ADHD.  *Ramsay v. Nat'l Bd. of Med. Exam'rs* (*Ramsay II*), 968 F.3d 251, 257 (3d Cir. 2020) (citing 28 C.F.R. § 36.105(b)(2)).  "Major life activities" include, among other things, "learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).

Because we must construe the term "disability" broadly and in favor of "expansive coverage," whether an individual's impairment qualifies does "not demand extensive analysis."[16] Though not every impairment constitutes a disability under the ADA, the "substantially limits" standard is not a demanding one, and the comparison of an individual's performance of a major life activity to that of the general population "usually will not require scientific, medical, or statistical analysis."  29 C.F.R. §§ 1630.2(j)(1)(i-v).  Our analysis must focus on "how a major life activity is substantially limited, and not on what outcomes an individual can achieve."  29 C.F.R. § 1630.2(j)(4)(iii).  And we must determine "whether an impairment substantially limits a major life activity . . . without regard to the ameliorative effects of mitigating measures" such as

---

[15] The ADA's implementing regulations are equivalent to a legislative rule and have the force and effect of law.  *Ramsay II*, 968 F.3d at 257 n.6 (citing *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2055 (2019)).

[16] *Ramsay II*, 968 F.3d at 257 (citing 42 U.S.C. § 12102(4)(A); 28 C.F.R. § 36.105(d)(1)(ii)).

"medication," "accommodations," "auxiliary aids or services," or "learned behavioral or adaptive neurological modifications." 42 U.S.C. §§ 12102(4)(E)(i-iii). We may, however, consider the condition, manner, or duration it takes an individual to perform a major life activity, including the difficulty, effort, or time required to perform it. 29 C.F.R. §§ 1630.2(j)(4)(i-ii). For instance — "someone with a learning disability may achieve a high level of academic success but may nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read, write, or learn compared to most people in the general population." 29 C.F.R. § 1630.2(j)(4)(iii).

Here, both parties agree that the USMLE involves the major life activities of "reading, concentrating, [and] thinking." DI 85 ¶ 153; DI 88 at 8. But NBME contends that Dr. Kitchens has not shown a substantial limitation in any of those activities. DI 85 ¶¶ 142, 151. In support of its position, NBME argues that while Dr. Kitchens's medical records reflect a historical ADHD diagnosis, we should discredit it because it is not based on any diagnostic evaluation. *Id.* ¶¶ 143-46, 154-55. NBME next argues that while Ms. Bacon *did* perform a diagnostic evaluation, it does not support a diagnosis of ADHD or a finding of substantial limitation because it is not reliable or valid. *Id.* ¶¶ 147, 154-55. NBME further argues that even if Dr. Kitchens does have ADHD, the fact that he progressed through medical school without formal accommodations, together with the fact that he takes Adderall only as needed, indicates that he is not substantially impaired. *Id.* ¶¶ 155-56. Finally, NBME argues that Dr. Kitchens has not shown a disability because no witness explicitly testified that he is substantially limited and because he competently represented himself at a four-day bench trial. *Id.* ¶¶ 148, 155, 157.

Mindful that we must construe the ADA broadly to achieve its remedial aims, we are not persuaded by NBME's arguments.

First, and despite NBME's suggestion to the contrary, we need not determine whether Dr. Kitchens's historical ADHD diagnosis was clinically sufficient.  We must decide, based on the evidentiary record submitted at trial, whether he has a present impairment that substantially limits a major life activity as compared to most people in the general population.[17]  And for the reasons discussed below, we conclude that he does.

To determine whether an individual has a disability under the ADA, courts may consider, among other things, "(1) an individual's objective test results . . . ; (2) the individual's other life activities, including extra-curricular activities; (3) any pattern of substantial academic difficulties; and (4) whether the individual has been afforded testing accommodations in the past." *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'r, Inc.*, 2016 WL 1404157, at *7 (E.D. Pa. Apr. 11, 2016) (citations omitted).

Here, Ms. Bacon's evaluation shows that Dr. Kitchens has ADHD and that it substantially limits the major life activity of concentration.[18]  Over multiple days and using multiple clinical indices, Ms. Bacon tested Dr. Kitchens's concentration and other ADHD symptoms.  FF[19] ¶¶ (D)(3)(d-x).  The results of each assessment reflected, among other things, seriously impaired concentration.  *Id.*  Dr. Kitchens's attention deficit is quantified not only by

---

[17] The parties agree that for purposes of determining whether Dr. Kitchens should receive double time on future USMLE attempts, we may consider the full trial record, including medical records and other documents beyond those Dr. Kitchens submitted to NBME with his original requests for accommodations.  *See* DI 85 at 51 n.21; DI 88 at 39.

[18] We do not decide whether Dr. Kitchens is substantially limited in the major life activities of reading or thinking.  Similarly, though Dr. Kitchens originally requested accommodations for test anxiety as well as for ADHD, we reach no conclusion as to whether he is disabled under the ADA because of anxiety.

[19] We refer to our above findings of fact as "FF."

Ms. Bacon's evaluation, but also by Dr. Kitchens's Connors CPT[20] scores — they "strongly suggest" impaired concentration.  FF ¶¶ (D)(3)(b-c).  Moreover, both evaluations find support in the record.  Dr. Kitchens has a history of academic challenges caused by an attention deficit that dates to his early childhood and remains consistent through the present.  FF ¶¶ (D)(2)(a-bb).  As required by the DSM-5, his attention deficit limits his ability to concentrate in more than one environment.  FF ¶¶ (D)(1)(b); (D)(2)(b-h); (D)(3)(i),(t).  Because of these symptoms, he has sought and received formal and informal accommodations throughout his academic career.  FF ¶¶ (D)(2)(b-v).  And when studying and taking tests, he relies on elaborate strategies beyond the norm.  FF ¶¶ (D)(2)(d-n); (D)(2)(w-z).

*Ramsay I* is instructive here.  2019 WL 7372508.  In that case, the plaintiff medical student sought ADA accommodations on the USMLE Steps for ADHD and other mental impairments.  *Id.* at *4-5.  In finding the plaintiff disabled under the ADA, the district court relied on several clinical evaluations showing severe deficits in reading, processing speed, and attention.  *Id.* at *43-47.  The court also relied on plaintiff's long history of formal and informal academic accommodations, testimony about her symptoms and experiences, and historical medical records.  *Id.* at *36-48.  And on appeal, the Third Circuit held that the district court's "reliance on evidence that [the plaintiff's] . . . skills were abnormally low by multiple measures provided a sufficient comparison of her abilities to those of the general population to support the finding of disability."  *Ramsay II*, 968 F.3d at 259.  Similarly, the record in this case features multiple measures of Dr. Kitchens's abnormally low capacity for concentration, *see supra*.

---

[20] Both Dr. Shepherd and Dr. Pullins endorsed the Connors CPT, which features a built-in validity check, as a clinically accepted diagnostic tool for ADHD.  FF ¶¶ (E)(1)(b); (E)(2)(d).

NBME does not agree.  It downplays the results of Ms. Bacon's evaluation because: (i) Ms. Bacon took Dr. Kitchens's "self-report" into account; (ii) computerized "tests of attention are not sufficiently sensitive or specific to serve as diagnostic indices"; (iii) "there is some question whether Dr. Kitchens's performance [on the evaluation] was valid"; and (iv) the evaluation, in "isolation," does not reliably reflect the extent of Dr. Kitchens's functional limitations.  DI 85 ¶¶ 147, 155.  NBME'S expert, Dr. Michael Gordon, testified that only a "substantially brain damaged" individual could achieve the same scores as Dr. Kitchens on the MOXO.  DI 80 at 156.  He testified that Ms. Bacon did not perform a validity check, and that in his practice, he prefers to administer the "Test of Memory and Malingering" validity check during ADHD evaluations.  *Id.* at 160, 194.  He also stated that the MOXO should only be used as a decision support tool and should not serve as the sole basis for an ADHD diagnosis.  *Id.* at 157.  Further, he testified that the portions of Ms. Bacon's evaluation that incorporated Dr. Kitchens's self-report, or his wife's report, were not "particularly convincing" on their own.  *Id.* at 157-59.  We are unpersuaded.

First, the results of Ms. Bacon's assessment are valid.  FF ¶ (D)(3)(x).  She observed Dr. Kitchens as he participated in a clinical interview and while he sat for the MOXO.  FF ¶ (D)(3)(g).  He displayed such excellent effort that his scores accurately reflected his current functioning.  FF ¶ (D)(3)(w).  Further, despite Dr. Gordon's inaccurate testimony to the contrary, the MOXO test *does* feature a validity check, and it indicated valid performance by Dr. Kitchens. *Id.*  Finally, expert Dr. Shepherd reviewed Ms. Bacon's evaluation and concluded it was valid. FF ¶ (E)(2)(e).  Ms. Bacon's evaluation is not invalid simply because it did not include Dr. Gordon's validity check of choice or because it recorded a severe attention deficit; to the contrary, that result supports our finding of a substantial limitation.  *See, e.g.*, *Ramsay II*, 968

F.3d at 258 ("Indeed, some of the reading tests Dr. Smith administered placed Ramsay in *less than the fifth percentile* as compared to individuals her age. This is *exactly* the type of data DOJ contemplates as showing a learning disability that substantially limits an individual as compared to others in the general population." (emphasis added)).

Second, Ms. Bacon's assessment is reliable. FF ¶ (D)(3)(x). In evaluating Dr. Kitchens, she followed the protocol set forth by the American Psychological Association. FF ¶ (D)(3)(f). She measured Dr. Kitchens's symptoms through several different assessments, including an objective computerized test, a clinical interview about his history and symptoms, and two questionnaires about his history and symptoms, one of which his spouse completed. FF ¶ (D)(3)(g). Experts Dr. Shepherd and Dr. Pullins endorsed these methods as sufficiently reliable.[21] We thus disagree with NBME that "Ms. Bacon relied almost entirely on Dr. Kitchens's self-report" and that her evaluation "is not a sufficient reflection" of Dr. Kitchens's "real world" functioning. DI 85 ¶ 147; FF ¶ (D)(3)(x). As a clinician who is familiar with and who has personally observed Dr. Kitchens, we are permitted to credit Ms. Bacon's evaluation and do so here for the reasons above.[22] Further, though NBME attacks the MOXO as "no[t]

---

[21] FF ¶¶ (E)(1)(b-c); (E)(2)(b). Though Dr. Gordon criticized Ms. Bacon's partial reliance on Dr. Kitchens's self-reported history and symptoms, both Dr. Shepherd and Dr. Pullins testified that such a self-report is an essential feature of the ADHD diagnostic process. *Id.* And Dr. Shepherd testified that a patient's spouse is an acceptable source of this information as well. FF ¶ (E)(2)(b).

[22] *Ramsay II*, 968 F.3d at 259 (noting that "it is within the trial judge's discretion to credit a physician with firsthand observations of a patient over one who only reviewed the patient's records"). *See also Nondiscrimination on the Basis of Disability*, 75 F.R. 56236, 56297 (stating that "[r]eports from experts who have personal familiarity with the candidate should take precedence over those from . . . reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment"); 28 C.F.R. § 36.105(d)(1)(vi) (stating that "[t]he determination of whether an impairment substantially limits a major life activity requires an individualized assessment").

reliable" in "isolation" and not capable of supporting an ADHD diagnosis by itself,[23] we do not

consider it alone.  We consider it against the rest of Ms. Bacon's evaluation and the record in this

case, which, as described above, is replete with evidence supporting our finding that Dr.

Kitchens has ADHD and a substantial limitation with respect to concentration.

Next, Dr. Kitchens's graduation from medical school does not preclude our decision that

he is disabled under the ADA.  As a threshold matter, he need only have an impairment that

substantially *limits* a major life activity, not an impairment that makes a major life activity

*impossible* or even *significantly* or *severely restricted*; that is too high a bar.  *See* 29 C.F.R.

§ 1630.2(j)(ii).  And in analyzing whether Dr. Kitchens has a substantial limitation, we may not

focus on the academic "outcomes" he can achieve when he spends "additional time or effort . . .

compared to most people."  *See* 29 C.F.R. § 1630.2(j)(4)(iii); *Ramsay I*, 2019 WL 7372508, at

*18.  Indeed, testimony in this case[24] reflects what the law recognizes;[25] individuals with

---

NBME argues that the foregoing authorities do not apply to Ms. Bacon because she only
evaluated Dr. Kitchens once, virtually, and did not maintain an ongoing treatment relationship
him.  DI 85 ¶ 148.  But the regulations refer to a provider who has had the chance to *observe* and
*assess* an individual; they do not require an ongoing treatment relationship.  Ms. Bacon did both.
She conducted a multi-day assessment of Dr. Kitchens, observed him execute various
assessments, and spoke with him at length about his history.  FF ¶¶ (D)(3)(g-t).  That is enough
for our decision to weight her report and testimony.  *Ramsay II*, 968 F.3d at 259.

[23] *See* DI 85 ¶¶ 147, 155.

[24] FF ¶¶ (D)(1)(e); (D)(3)(u).

[25] Many courts have found that highly educated, academically successful plaintiffs are
disabled under the ADA where they achieved that success through compensation for a mental
impairment.  *See, e.g.*, *Ramsay I*, 2019 WL 7372508, at *13, 18 (finding medical student with
ADHD disabled under the ADA even where "despite [her impairments], [plaintiff] has been able
through her high intelligence and remarkably hard work habits to achieve great academic
success" and "performed exceedingly well overall academically during this time with little help.
Likewise, [she] scored quite well on several standardized tests without accommodations,
including the ACT and the MCAT examinations.  Certainly, in comparison to the average
individual in the general population, [she] appears to have been and continues to be quite

substantially limiting mental impairments can nevertheless achieve academic success if they compensate for their symptoms.

To that end, despite NBME's and its experts' characterizations to the contrary,[26] Dr. Kitchens's academic history illustrates substantially limited concentration.  FF ¶¶ (D)(2)(bb). During each phase of his education, he required and received extra time on tests and assignments, relaxations in normal academic rigor, and special attention from teachers that he and/or his mother were fortunate to have close relationships with.[27]  Similarly, he devised methods to minimize distractions, frequented tutors, and obtained over-the-counter stimulants while abroad in lieu of his Adderall prescription.  FF ¶¶ (D)(2)(e-y); (D)(3)(t).  He modified physical elements of his workspace, going as far as covering windows in his house.  FF ¶¶ (D)(3)(a); (D)(3)(t).  But still, Dr. Kitchens struggles to focus on examinations.  FF

---

successful in her endeavors" ); *Bartlett v. N.Y. State Bd. of L. Exam'rs*, 2001 WL 930792, at *38 (S.D.N.Y. Aug. 15, 2001) (Sotomayor, C.J., sitting by designation) (finding plaintiff law school graduate disabled under the ADA despite academic success because "how the plaintiff achieved that academic success was more relevant to the determination of disability than the fact of his success"); *Sampson v. Nat'l Bd. of Med. Exam'rs*, 2022 WL 17403785 (E.D.N.Y. Dec. 2, 2022) (finding plaintiff medical school student disabled under the ADA despite academic success), *vacated on other grounds*, 2023 WL 3162129 (2d Cir. May 1, 2023)); *Berger v. Nat'l Bd. of Med. Exam'rs*, 2019 WL 4040576, at *23 (S.D. Ohio Aug. 27, 2019) (similar); *Rush v. Nat'l Bd. of Med. Exam'rs*, 268 F. Supp. 2d 673, 675 (N.D. Tex. 2003) (similar).

[26] When asked about Dr. Kitchens's education, Dr. Gordon testified that it is "rare" for students with ADHD to "make it to medical school," and that Dr. Kitchens's having done so is an indication of "good functioning."  DI 80 at 170.  He also testified that people with ADHD lack the "executive functions" to implement mitigation measures, and that Dr. Kitchens's ability to do so calls into question his ADHD diagnosis.  *Id.* at 172.  Dr. Gordon's testimony is at odds with other expert testimony in this case, FF ¶¶ (D)(1)(e); (D)(3)(u), lacks credibility, and advances a position rejected by a slew of other courts.  *See supra* n. 24.

[27] FF ¶¶ (D)(2)(d-v).  Though NBME highlights the informal nature of many of Dr. Kitchens's previous academic accommodations, DI 85 ¶¶ 43, 46, 49, 96, 110, 156, we may rely on them in our decision, *Ramsey I*, 2019 WL 7372508, at *13; *Ramsay II*, 968 F.3d at 262.

¶¶ (D)(2)(z-bb).  His modest grades support this account.  FF ¶¶ (D)(2)(n-u).  His six failed attempts on USMLE Steps 1 and 2, despite numerous tutoring courses, full-time study, and individualized test-taking strategies, support this account.  FF ¶ (D)(2)(w).  And witness testimony supports this account.  FF ¶ (D)(2)(aa).  Dr. Kitchens expends greater effort and sustains greater difficulties concentrating than do most people in the general population.  *Bartlett*, 2001 WL 930792, at *13, 38 (law school graduate disabled under the ADA because she "struggle[d]" to read and write more than most people do).  For that reason, his educational history supports, rather than undermines, that he is disabled under the ADA.

Similarly, that Dr. Kitchens does not take Adderall when not engaged in cognitively challenging tasks does not change our conclusion.  In support of its argument, NBME cites testimony by its expert, Dr. Timothy Allen, that people with ADHD cannot timely pay their bills or keep their home clean without medication.  DI 81 at 33-34.  NBME further compares Dr. Kitchens to the plaintiff in *Jayatilaka v. National Board of Medical Examiners*, who was not disabled under the ADA because, among other things, he reported to his provider that he did not have any cognitive problems that interfered with his day-to-day functioning.  2011 WL 223349, at *14 (C.D. Cal. Jan. 20, 2011).  We disagree.  First, Dr. Allen's testimony implies that an individual must be severely globally impaired in every aspect of their life without medication to have ADHD.  DI 81 at 33-34.  That is too demanding a standard under the ADA, 29 C.F.R. § 1630.2(j)(ii), conflicts with the record, FF ¶¶ (D)(1)(e); (D)(2)(u); (E)(2)(c), concerns life activities not at issue here, and ignores the fact that Dr. Kitchens employs many strategies to manage his symptoms beyond medication.  FF ¶¶ (D)(3)(t-u).  Second, Dr. Kitchens is not like the plaintiff in *Jayatilaka*; to the contrary, the record indicates that he *does* experience symptoms

that interfere with his day-to-day functioning, particularly as they relate to concentration — the relevant life activity here.  FF ¶¶ (D)(2)(aa-bb); (D)(3)(i-x).

Further, the fact that Dr. Kitchens competently represented himself during a bench trial has no bearing on our decision.[28]  And finally, while Dr. Kitchens's witnesses did not explicitly testify that he is substantially limited in a major life activity, the record in this case adequately supports our finding that he is, *see supra*.

For all these reasons, Dr. Kitchens has shown that he is disabled under the ADA because he has an impairment that substantially limits the major life activity of concentration.

B.  <u>Dr. Kitchens is entitled to the accommodations he seeks on future USMLE Steps.</u>

Because he is disabled under the ADA, Dr. Kitchens is entitled to future accommodations on the USMLE that are reasonable, necessary, and do not fundamentally alter the nature of the examination.  42 U.S.C. §§ 12182(b)(2)(A)(i-iii); 42 U.S.C. § 12189; *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683 n.38 (2001)).  NBME does not argue that double testing time is unreasonable or fundamentally alters the nature of the USMLE; only that it is not necessary.[29]  Though the

---

[28] NBME's argument that Dr. Kitchens is not disabled because he displayed no symptoms of ADHD during the trial, and its assertion that he remained "focused and sustained his attention over multiple hours for multiple days," are curious.  DI 85, n. 10.  First, we do not base our decision here on any findings about Dr. Kitchens's conduct during the bench trial; it is not the court's function to infer a person's medical condition based on their behavior in the (virtual) courtroom.  Second, we are not permitted to consider the "outcome" a person can achieve, despite their impairment(s), when they spend extra time and effort to achieve it as compared to the general population.  C.F.R. § 1630.2(j)(4)(iii).  And third, we do not particularly agree with NBME's characterization of Dr. Kitchens's conduct during trial.  Especially as the days wore on, he often appeared to be struggling to maintain concentration on trial activities while combatting restlessness, fatigue, and inattention.  *See, e.g.*, DI 79 at 241, 244; DI 80 at 42, 266; DI 81 at 162.

[29] *See* DI 85 at 48-49 n.18 (stating "although NBME does not believe that Dr. Kitchens has come close to establishing that he is disabled and requires double-time testing accommodations to take the USMLE in an accessible manner, if the [c]ourt concludes otherwise, NBME is not aware of any reasons why the [c]ourt could not issue an injunction ordering NBME to accommodate Dr. Kitchens with double time on future tests").  Similarly, NBME does not

Third Circuit has not defined "necessary testing accommodations" under the ADA, we are persuaded that a testing accommodation is necessary if it provides a person with disabilities "an equal opportunity to take the [e]xam successfully" by placing them "on equal footing with [] non-disabled exam takers." *Albert v. Ass'n of Certified Anti-Money Laundering Specialists, LLC*, 2023 WL 2401451, at *5 (N.D. Ga. Jan. 23, 2023) (first citing *A.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1296 (11th Cir. 2018); then citing *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1289 (11th Cir. 2014); and then citing *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 343 (11th Cir. 2012)). Put differently, testing accommodations are necessary if they ensure that that a particular examination reflects an individual's abilities rather than the detriments of their impairment. *See Elder v. Nat'l Conf. of Bar Exam'rs*, 2011 WL 672662, at *8 (N.D. Cal. Feb. 16, 2011).

NBME argues that Dr. Kitchens does not need double time on the USMLE because Ms. Bacon's recommended accommodations were based on an ADHD evaluation that was dissimilar to the USMLE, because he previously indicated satisfaction with his ADHD medication to his providers, because he failed the CBSE despite having double time to take it, and because data from his past USMLE attempts indicates that he had ample time to finish them. DI 85 ¶ 158.

We disagree. Ms. Bacon testified that timed standardized examinations can exacerbate ADHD symptoms and reported that Dr. Kitchens's ADHD symptoms are directly linked to his inability to complete the USMLE. FF ¶ (D)(3)(j). To that end, she recommended that Dr.

---

contest Dr. Kitchens's original requests for additional break time. *See* DI 77-24, PX2 at 3; DI 77-25, PX3 at 3. Further, per NBME's accommodations request form, NBME automatically breaks each Step of the USMLE into extra testing days when an examinee has extra time accommodations. *See* DI 77-22, PX2 at 3. NBME has not contested that schedule with respect to Dr. Kitchens.

Kitchens receive double time.  FF ¶ (D)(3)(v).  Even if the assessments she performed are

dissimilar to the USMLE, we may give "great weight" to her recommendation because there is

no "medical evidence to the contrary" and her opinion is not "outrageous."  *D'Amico v. N. Y.*

*State Bd. Of L. Exam'rs*, 813 F. Supp. 217, 223 (W.D.N.Y. 1993).  Indeed, the record supports

her recommendation.  Dr. Shepherd testified that additional time on examinations is an

appropriate testing accommodation for an individual with ADHD.  FF ¶ (E)(2)(g).  Dr. Kitchens

testified to a history of running out of time on standardized examinations, including the USMLE,

due to his inability to focus while reading.  FF ¶¶ (D)(2)(o-aa).  He explained that the time

pressure of the USMLE aggravates his impairment and that extra time would help to neutralize

it.  FF ¶ (D)(2)(aa).  Further, we do not understand Dr. Kitchens's previous statements to

providers indicating satisfaction with his ADHD medication to mean that he does not suffer

symptoms when taking examinations.[30]  To the contrary, Dr. Kitchens feels that even with his

medication, he cannot access the USMLE without double time — that is the genesis of this

litigation.  Nor do we believe his poor performance on a prior standardized test, even where he

had double time, to indicate that he does not need it now.[31]  And finally, the timing data from Dr.

---

[30] NBME cites statements made by Dr. Kitchens to his providers such as: "overall [his] ADHD symptoms are controlled with [his] current [medication] regimen," DI 77-52, DX28 at 1 (ECF), "[his] ADHD symptoms are adequately controlled with [his] current medication regimen," DI 77-53, DX35 at 61, and "[patient] believes that his ADHD symptoms are adequately managed with current dose of Adderall.  He is able to focus well when taking it twice a day." DI 77-37, PX46 at 1 (ECF).  These statements do not concern standardized testing — they refer to Dr. Kitchens's "overall" satisfaction with his medication, and in fact, follow discussion with his providers about the instant litigation and Dr. Kitchens's challenges on standardized tests.

[31] Dr. Kitchens explained that he performed poorly on the December 2020 CBSE, even though he had extra time to take it, because he did not prioritize the examination due to personal circumstances at the time.  FF ¶ (D)(2)(v).  Therefore, his score does not indicate that "testing time is not the issue," as NBME suggests.  DI 85 ¶ 158.

Kitchens's past UMSLE attempts does not show that he has no need for double time on future attempts.[32]

For these reasons, Dr. Kitchens has shown that double testing time is necessary to "level[] the playing field."  *See Bartlett,* 2001 WL 930792, at *42 ("the extra time provided to learning disabled applicants merely levels the playing field and allows these individuals to be tested on their knowledge").  Therefore, he is entitled to accommodations on the USMLE in the form of double time on all future attempts, to be executed across multiple days per the accommodated testing schedule reflected in NBME's accommodations requests form.  Though there has been no dispute as to Dr. Kitchens's original requests for additional break time, we clarify that the instant injunction includes extra break time on each USMLE testing day.

### C.  Dr. Kitchens is not entitled to expungement of his past USMLE scores.

In addition to accommodations on future USMLE attempts, Dr. Kitchens seeks expungement of his past USMLE scores.  Both parties agree that Title III of the ADA provides only preventive injunctive relief.  DI 85 ¶ 161; DI 88 at 45.  But the parties disagree as to whether expungement of Dr. Kitchens's past scores constitutes preventive relief.  DI 85 ¶¶ 161-65; DI 88 at 45.

---

[32] Across thirty-seven hours of allotted testing time on his USMLE Step attempts, Dr. Kitchens used all but approximately one hour and fifteen minutes.  *See* FF ¶ (D)(2)(x).  That is not enough to alter our conclusion.  Further, Dr. Kitchens testified that he spent portions of the allotted time guessing at or choosing answers without full question comprehension because he knew he could not finish reading the entire examination.  FF ¶ (D)(2)(y).  Therefore, even if Dr. Kitchens recorded answers for each question in a particular block before the allotted time expired, those answers were selected under conditions that did not allow him equal access to the examination material.  We credit Dr. Kitchens's testimony over "the inferences that [NBME] argue[s] should be drawn from its measurements."  *Ramsay II*, 968 F.3d at 261-62; *see also Sampson*, 2022 WL 17403785, at *18 (crediting plaintiff's testimony that he used certain test-taking strategies despite NBME's argument that they would not be feasible on the examination at issue).

Dr. Kitchens argues that expungement is preventive relief because even though the examinations at issue took place in the past, "the discriminatory effects of [] NBME's refusal [to grant accommodations] will follow Dr. Kitchens in perpetuity." DI 88 at 45. According to Dr. Kitchens, expungement will prevent "future violations" of the ADA and "continued discriminatory practices" in the form of foreclosed career opportunities. *Id.* at 46, 49. We disagree.

Consider the relevant statutory provisions. The parties agree that Title III of the ADA adopts the remedies provided by § 2000a-3(a) of the Civil Rights Act of 1964. 42 U.S.C. § 12188(a)(1). In turn, § 2000a-3(a) affords "preventive relief" "[w]henever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited." 42 U.S.C. § 2000a-3(a). Title III of the ADA provides this preventive relief to "any person who is being subjected to discrimination on the basis of disability in violation of this subchapter or who has reasonable grounds for believing that such person is about to be subjected to discrimination." 42 U.S.C. § 12188(a)(1).

Here, the relevant conduct prohibited by Title III is when covered entities offer inaccessible examinations to persons with disabilities without alternative arrangements. *See* 42 U.S.C. § 12189. Thus, as applied to Dr. Kitchens's claim, Title III allows only for injunctive relief that will prevent NBME from offering Dr. Kitchens an inaccessible examination without accommodations. Expungement of Dr. Kitchens's USMLE scores does not fit the bill; it would not ensure the accessibility of the underlying examinations because Dr. Kitchens already took them and already experienced any alleged inaccessibility.[33] *See Doe v. Nat'l Bd. of Med.*

---

[33] Because expungement is not an available remedy under Title III of the ADA, we need not address the parties' dispute as to whether NBME violated the ADA when it originally denied Dr. Kitchens's requests for accommodations or their dispute about the expungement of

*Exam'rs*, 199 F.3d 146, 156 (3d Cir. 1999) ("The notion of accessibility [in 42 U.S.C.

§ 12189] . . . mandates changes *to examinations* . . . so that disabled people who are

disadvantaged by certain features of standardized examinations *may take the examinations*

without those features that disadvantage them." (emphasis added)).

It is probably true that if we ordered expungement of Dr. Kitchens's USMLE transcript, it

would ameliorate some of the harm from NBME's decision to deny him accommodations.  But

potential harm to Dr. Kitchens's career caused by his USMLE transcript is not itself a violation

of the ADA — continuing, new, or otherwise.  Rather, such potential harm would be the

lingering effect of prior alleged ADA violations.[34]  And under Title III, we may not order redress

to past injuries.[35]  The expungement Dr. Kitchens seeks is not preventive relief under the

relevant statute, and thus is not available to Dr. Kitchens here.

---

examination scores for which Dr. Kitchens did not request accommodations.  DI 85 at 51-53; DI
88 at 49-57.

[34] *See, e.g., Katz v. Nat'l Bd. of Med. Exam'rs*, 2016 U.S. Dist. LEXIS 166729, at *17
(M.D. Pa. Nov. 30, 2016) ("a "continuing violation [of the ADA] is occasioned by continual
unlawful acts, *not continual ill effects from an original violation*") (emphasis added) (quoting
*Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001).  In *Katz*, NBME's refusal to waive an
examination attempt limit after previously denying an examinee testing accommodations did
"not constitute a new, separate discriminatory act actionable under the ADA . . . .  [I]t [was] part
of the harm that continued to flow to [plaintiff] as a result [of an earlier alleged violation]."  2016
U.S. Dist. LEXIS 166729, at *18.

[35] *See, e.g., Borenstein v. Lead Animal Shelter Animal Found.*, 2019 WL 11339873, at *2
(D. Nev. Oct. 15, 2019) (injunction mandating the return of plaintiff's dog was intended to
redress a past injury, rather than to prevent a future discrimination, and therefore was not
preventive relief under Title III of the ADA); *Fiorica v. Univ. of Rochester*, 2008 WL 907371, at
*3 (W.D.N.Y. Mar. 31, 2008) ("[T]he injunctive relief sought by the plaintiff (reinstatement to
the nursing program) is not prevent[]ive relief, and therefore, is not available under Title III of
the ADA.").  *See also Bernas v. Cablevision Sys. Corp.*, 215 F. App'x 64, 67 (2d Cir. 2007)
("Title III provides private parties with the right to injunctive relief to stop or prevent disability
discrimination in a place of public accommodation, but it provides no right to [] damages for past
discrimination.").

We understand why Dr. Kitchens is concerned about his USMLE transcript. But we are confined to preventive relief, and we have awarded that relief by ordering the accommodations he seeks on future USMLEs. *Garcia v. Beck*, 2022 WL 1215788, at *3 (N.D. Cal. Mar. 24, 2022) ("[a]bsent the need for prevent[]ive relief—*i.e.*, where [an ADA] violation *has already been corrected, such that the plaintiff will not encounter it again*—there is no remedy." (first alteration in original) (emphasis added) (quoting *Garcia v. Ductoc*, 2021 WL 4776005, at *2 (C.D. Cal. May 18, 2021)). We note that Dr. Kitchens is free to include this publicly available opinion in residency or job applications if the recipients allow. He is free to educate future employers about the history of this case in written personal statements and in interviews. And if he were denied an employment opportunity in the future because of his disability in violation of the ADA, he would be free to seek redress like any other person.

## V.   **Conclusion**

For the above reasons, Dr. Kitchens is disabled under the ADA and seeks necessary accommodations. Therefore, NBME must provide him double time on each future USMLE attempt, including extra break time. Dr. Kitchens is not, however, entitled to expungement of his USMLE transcript. Final judgment is entered in a separate order.